**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | Chapter 11 |
| **LTL MANAGEMENT LLC,**[1] | ) | |
| | ) | Case No. 21-30589 (JCW) |
| **Debtor.** | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW OF CERTAIN MESOTHELIOMA CLAIMANTS
AS CREDITORS OPPOSITION TO DEBTOR'S MOTION FOR
AN ORDER(I) DECLARING THAT THE AUTOMATIC STAY
APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR
(II) PRELIMINARILY ENJOINING SUCH ACTIONS AND (III) GRANTING
<u>A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING</u>**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

**INTRODUCTION** ……………………………………………………………………………... 1

**FACTUAL BACKGROUND** ……………………………………………………………….. 3

**ARGUMENT** …………………………………………………………………………………... 13

I. **The Court Does Not Have Subject Matter Jurisdiction to Enter Orders Affecting Litigation Against the Non-debtor Alleged Protected Parties** 15

II. **Evidence Does Not Demonstrate that Non-derivative Claims Against Non-debtor Affiliates Implicate Assets of, or Otherwise Bind, the Debtor and Its Estate, so Extension of the Automatic Stay Is Improper** 27

    A. **Unlike Prior Cases Before this Court, There Is No Arguable Identity of Interest Between the Debtor and any Alleged Protected Parties** 28

    B. **The Debtor's Remaining Arguments Concerning Derivative Claims and Successor Liability Are Irrelevant** 30

III. **The Debtor Has Failed to Demonstrate Clear Evidence that It Is Entitled to a Preliminary Injunction for the Benefit of the Alleged Protected Parties** 30

    A. **The Debtor Has Adopted Positions Entirely Incongruous with an Efficient and Consensual Reorganization** 31

    B. **Litigation Against Alleged Protected Parties Cannot Cause the Debtor Irreparable Harm—As it Cannot Affect the Debtor at All** 32

    C. **The Balance of Equities Does Not Favor Issuing an Injunction for the Benefit of Third Parties Whose Liabilities Cannot Affect the Debtor** 33

    D. **The Public Interest Is Not Served by Extending the Protections of a Bankruptcy Case to Third Parties Whose Liabilities Cannot Affect the Debtor** 33

**CONCLUSION** …………………………………………………………………………… 35

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pg.**

A.H. Robins Co. v. Piccinin, 788 F.2d 994 (4th Cir. 1986)                    passim

Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to          6, 28, 29, 35
Complaint (In re Aldrich Pump LLC), Case No. 20-30608, Adv. Proc. No. 20-
03041, 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)

Brown v. E.W. Bliss Co., 818 F.2d 1405 (8th Cir. 1987), adhered to, 831 F.2d   22
810 (8th Cir. 1987)

Credit Alliance Corp. v. Williams, 851 F.2d 119 (4th Cir. 1998)              28, 29

DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re           4, 6, 29
DBMP LLC), Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL
3552350 (Bankr. W.D.N.C. Aug. 11, 2021))

Gee v. Tenneco, Inc., 615 F.2d 857 (9th Cir. 1980)                            22

Howerton v. Grace Hosp., Inc., 1991 WL 104193 (W.D.N.C. Mar. 14, 1991)        31

Husak v. Berkel, Inc., 341 A.2d 174 (Pa. Super. 1975)                         22

In re 15375 Mem'l Corp., 589 F.3d 605 (3d Cir. 2009)                           4

In re Bestwall LLC, 606 B.R. 243 (Bankr. W.D.N.C. 2019)                       16, 34

In re Brier Creek Corp. Ctr. Assocs. Ltd., 486 B.R. 681 (Bankr. E.D.N.C.      16
2013)

In re Colonial Realty Co., 980 F.2d 125 (2d Cir. 1992)                        28

In re Combustion Engineering, Inc., 4391 F.3d 190 (3d Cir. 2004)              17

In re FPSDA I, LLC, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012)           31

In re Federal-Mogul Glob. Inc., 411 B.R. 148 (D. Del. Bankr. 2008)          22, 34–35

In re LOG, L.L.C., 2010 WL 4774347 (Bankr. M.D.N.C. Nov. 9, 2010)             29

In re MCSi, Inc., 371 B.R. 270 (S.D. Ohio 2004)                               30

In re Metal Ctr., 31 B.R. 458 (D. Conn. 1983)                                17, 30

<u>In re Purdue Pharma. L.P.</u>, 619 B.R. 38 (S.D.N.Y. 2020)                                      34–35

<u>In re W.R. Grace & Co.</u>, 386 B.R. 17 (Bankr. D. Del. 2008)                                34

<u>Ingham v. Johnson & Johnson</u>, 608 S.W.3d 663, 701–02 (Mo. App. 2020),      10, 32
<u>cert. denied</u>, 2021 WL 2194948 (June 1, 2021)

<u>Jaycox v. Terex Corp.</u>, No. 4:19-CV-02650 SRC, 2021 WL 2187907 (E.D.        22
Mo. May 28, 2021)

<u>Johns-Manville Sales Corp.</u>, 26 B.R. 405 (S.D.N.Y. 1983)                                   17

<u>Leavitt v. Johnson & Johnson</u>, A157572/A159021, 2021 WL 3418410 (Cal.       10
Ct. App. Aug. 5, 2021)

<u>Stern v. Marshall (In re Marshall)</u>, 564 U.S. ___, 131 S. Ct. 2594 (2011)          14

<u>Picard v Fairfield Greenwich Ltd.</u>, 762 F.3d 199 (2d Cir. 2014)                        28

<u>Winter v. Nat'l Res. Def. Council, Inc.</u>, 555 U.S. 7 (2008)                            30–31

<u>Winters v. George Mason Bank</u>, 94 F.3d 130 (4th Cir. 1996)                          28

**Statutes**

11 U.S.C. § 105(a)                                                                                      <u>passim</u>

11 U.S.C. § 362(a)                                                                                      <u>passim</u>

11 U.S.C. § 524(g)                                                                                      4, 35

28 U.S.C. § 1334(b)                                                                                14, 16, 24

**Other Authorities**

63 Am. Jur. 2d <u>Products Liability</u> § 91(Aug. 2021 update)                            27

15 Fletcher's Cyclopedia of the Law of Corporations § 7123 (2020)                  22

Fletcher's Cyclopedia of the Law of Corporations § 7114 (Sept. 2021 update)    22

Jef Feeley, <u>J&J Offered Talc Victims $4 Billion to Settle Claims Months</u>         32
<u>Before Unit's Bankruptcy</u>, BLOOMBERG (October 21, 2021, 12:33 PM),
https://www.bloomberg.com/news/articles/2021-10-21/j-j-offered-4-billion-to-
settle-talc-months-before-bankruptcy

## **INTRODUCTION**

LTL Management LLC (the "Debtor") was only days old when it filed this case. It was organized in Texas, was domesticated in North Carolina, and then filed for bankruptcy in North Carolina – all in the span of some forty-eight hours. Johnson & Johnson ("J&J"), one of the most solvent, creditworthy, and well-capitalized entities in the United States, created the Debtor as a scapegoat, laying J&J's sins upon it and sending it into the wilderness, and hoping its existence would allow J&J to obtain the benefits of a bankruptcy petition without the burdens of the bankruptcy system. Utilizing the Texas Two Step—a legal strategy that has become something of a signature of Debtor's counsel—J&J believed that dividing the subsidiary Johnson & Johnson Consumer Inc. ("Old JJCI") into two entities, Johnson & Johnson Consumer Inc. ("New JJCI") and the Debtor, would suffice. A product of this divisional merger, the Debtor filed its petition before this Court under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

In the underlying bankruptcy case, Case No. 21-30589 (the "Main Case"), the *Declaration of John K. Kim in Support of First Day Pleadings* (the "Kim Declaration") [Main Case, ECF No. 5] sets out the impetus for the Debtor's petition: Old JJCI and/or J&J are defendants in nearly 40,000 pending talc-related tort actions. Kim Declaration, at 15. Over 38,000 individuals (or their survivors) allege that Old JJCI and/or J&J talc products caused their ovarian cancer, and over 430 individuals (or their survivors) allege those same products caused mesothelioma.

The Debtor asserts that litigation against J&J, even cases asserting that J&J alone should be liable for its independent tortious acts, constitute acts to recover or control property of the Debtor's estate. On October 21, 2021, one week after the Debtor filed its petition, the Debtor filed the complaint to commence this adversary proceeding [ECF No. 1] and also filed the *Debtor's Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against*

*Non-debtors or (II) Preliminarily Enjoining such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing* (the "Motion") [ECF No. 2]. The Motion seeks alternative but substantively identical relief: entry of an order (i) holding that Section 362(a) of the Bankruptcy Code prevents all talc-related tort litigation against some 490 non-debtor affiliates, some 140 retailers, and some 100 insurance companies (the "Alleged Protected Parties"), or (ii) issuing a sweeping injunction protecting the Alleged Protected Parties pursuant to Section 105(a) of the Bankruptcy Code.

Such overreach is unprecedented in a mass tort bankruptcy. At the initial hearing before the Court upon the Motion on October 25, 2021 (the "TRO Hearing"), this Court determined that the Debtor failed to proffer competent evidence to support the issuance of a temporary restraining order ("TRO") for all Alleged Protected Parties, and the Court entered an order on October 26, 2021, denying the TRO except as to the Debtor and Old JJCI (the "Order Denying TRO") [ECF No. 28].

This memorandum of law submitted by the law firms of Maune Raichle Hartley French & Mudd, LLC; Levy Konigsberg LLP; Kazan, McLain, Satterly &Greenwood; and Wietz & Luxenberg P.C.[2] (the "Memorandum") explains why the Court's initial determination was correct. The Debtor bears a substantial burden of both proof and persuasion in seeking the extraordinary relief that it requests, and it has failed to meet that burden. The conclusory and contradictory allegations it proffers are not enough. Moreover, this case is far different from DBMP and Aldrich Pump/Murray. J&J faces independent tort liability for its own wrongdoing, which is not derivative of the Debtor's. There is no "identity of interest" between J&J and Old JJCI. And none of the Alleged Protected Parties holds the kind of right to "absolute indemnity" that the Debtor is required

---

[2] The law firms submit this memorandum for practical and procedural purposes only, and this submission does not constitute any acceptance of service or waiver of rights regarding notice and service.

to show. These and other deficiencies lead to the inescapable conclusion that the Debtor's Motion must be denied.[3]

## FACTUAL BACKGROUND

I.    **Relevant Pre-petition History of the Debtor and Related Entities**

   A.  **Pre-Bankruptcy Positions Asserted by J&J in Other Bankruptcy Cases**

1.    This case is not J&J's first involvement in the bankruptcy system for its talc related liability.  However, this case illustrates that J&J, through the Debtor, is willing to take positions in this case that contradict positions that it has taken previously in other jurisdictions.

2.    In the Chapter 11 bankruptcy case of Imerys Talc America, Inc., *et al*. ("Imerys"), Case No. 19-10289 (LSS), pending before the United States Bankruptcy Court for the District of Delaware (the "Imerys Case"), J&J filed a motion for relief from the automatic stay to permit its defense of certain talc claims and to permit litigation involving J&J to be resolved in the American tort system outside of bankruptcy.  [Imerys Case, ECF No. 1567].

3.    In an omnibus reply in support of that motion (the "Imerys Reply") [Imerys Case, ECF No. 1769] filed on May 28, 2020, J&J explained it was a highly credit-worthy company "standing ready to take over the claims and pay proven claims in full."  Id. at 10. J&J said it was "absurd" to suggest any need for bankruptcy: J&J "is one of the top 10 companies in the United States by market value" and "can provide the claimants far greater protection than the Debtors or the bankruptcy claims trust ever could."  Id. at 22. J&J warned that "bankruptcy cannot be used for improper purposes," id. at 10, and criticized the attempt by the holding company of Imerys, non-debtor Imerys S.A. Group, to seek the benefits of the channeling injunction and third-party releases through the Imerys Case:

---

[3] We reserve the right to argue later that the filing of the Case by the Debtor was improper and should be dismissed based on the pre-petition transactions described herein, or for any other reason that justifies dismissal.

This raises issues as to the Debtors' good faith in prioritizing mitigation of potential claims against their Parent over management of liabilities and maximizing recoveries to other creditors and stakeholders of the estates themselves. See In re 15375 Mem'l Corp., 589 F.3d 605, 624–25 (3d Cir. 2009) (finding a lack of good faith where a debtor's bankruptcy was primarily concerned with protecting the debtor's parent from litigation).

Id. at 23, n.27.  J&J's resort to the Texas divisional merger, creating the Debtor for the purpose of avoiding tort litigation, is exactly the same tactic J&J excoriated in the Imerys Case.

### B. The Creation of the Debtor

4.      Pages 6 through 9 of the Kim Declaration recount the series of transactions over two days in October (October 11, 2021 to October 12, 2021) that created the Debtor from the worst parts of J&J.  Old JJCI, a New Jersey entity, re-domesticated itself in Texas through a merger with a newly-organized Texas entity.  That entity divided into two separate Texas limited liability companies that became New JJCI and the Debtor.  The Debtor obtained (i) all the talc-related liabilities held by Old JJCI, (ii) around $6 million in cash, (iii) all equity interests in a recently organized royalty-generating entity, and (iv) Old JJCI's rights under a certain funding agreement with J&J and New JJCI (the "Funding Agreement").  New JJCI obtained all other assets and liabilities of Old JJCI.  Such divisional mergers are known colloquially, and appropriately derisively, as the "Texas Two Step."[4]  The Debtor's grossly undercapitalized birthright was thus the paltry bequest of J&J's scraps to offset the billions of dollars of talc liability that it took on.

---

[4] "At the center of the disputes in this case is the propriety of what the [Asbestos Claimants' Committee] terms the 'Texas Two Step,' a Divisional Merger followed by a bankruptcy of the new company bearing the old company's asbestos liabilities in which the debtor seeks Section 524(g) relief for the entire enterprise." DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC, Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350, at *22 (Bankr. W.D.N.C. Aug. 11, 2021).

II.    **Post-petition Events and Litigation**

A. **The Debtor's Bankruptcy Case So Far**

5.    On October 14, 2021 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") [Main Case, ECF No. 1] under Chapter 11 of the Bankruptcy Code before this Court. The same day, the Debtor filed the Kim Declaration and a 120-page *Informational Brief of LTL Management LLC* (the "Informational Brief") [Main Case, ECF No. 3]. Despite the evident time and energy devoted to such extensive filings, the Debtor did not submit a timely motion seeking injunctive relief with its Petition.

6.    Shortly after the filing of the Petition, a *Notice of Bankruptcy Filing and Stay of Proceedings* (the "Bankruptcy Notice") was filed in thousands of pending tort cases across the country, including federal multi-district litigation, stating that pursuit of actions against Old JJCI, New JJCI, J&J, and a two-and-a-half-page single-spaced list of retailers, distributors, others were automatically stayed due to the Debtor's petition. The Bankruptcy Notice was later filed as the Exhibit B to the *Debtor's Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Their Claims Against the Debtor and Its Non-debtor Affiliates* (the "Emergency Stay Motion") [Main Case, ECF No. 44]. The Bankruptcy Notice was filed before the Debtor requested such relief from this Court by motion, adversary proceeding, or otherwise.

7.    On October 18, 2021, several days after filing the Bankruptcy Notice in other courts, the Debtor filed its procedurally infirm Emergency Stay Motion in the Main Case. The Debtor requested entry of interim and final orders applying the automatic stay of Section 362 of the Bankruptcy Code to all talc-related claims asserted against J&J, New JJCI, and "any other affiliate of the Debtor . . . ." In support of the relief requested, the Debtor cited orders entered by this Court in adversary proceedings of other bankrupt asbestos companies, representing that those

orders stand for the automatic extension of the automatic stay to non-debtor affiliates due to presumed identity of interest.  Emergency Stay Motion, at 2 (citing <u>Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)</u>, Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335, at *30–32 (Bankr. W.D.N.C. Aug. 23, 2021); <u>DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)</u>, Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350, at *27–28 (Bankr. W.D.N.C. Aug. 11, 2021)).

8.      The Emergency Stay Motion elicited several well-grounded objections.  At a hearing before the Court on October 20, 2021, the Court declined to hear the Emergency Stay Motion on an expedited basis and scheduled further hearing thereupon for October 22, 2021 and November 4 and 5, 2021.

### B.  The Debtor Commenced this Adversary Proceeding

9.      On October 21, 2021, the Debtor commenced this adversary proceeding by filing *Debtor's Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing* (the "<u>Complaint</u>") [ECF No. 1].  The filing of the Complaint was followed immediately by the Motion and the *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions* (the "<u>Supplemental Kim Declaration</u>") [ECF No. 3].

10.     The Supplemental Kim Declaration focused on only one non-debtor affiliate: J&J. Echoing his prior statements in the Kim Declaration, Mr. Kim testified that the 1979 transaction creating Old JJCI's predecessor entity (J&J Baby Products Company) included a blanket assumption of "<u>all</u> liabilities associated with the Baby Products division." Supplemental Kim

Declaration ¶ 5 (emphasis added); *see also* Kim Declaration ¶ 10 (same). Specifically, due to this 1979 transaction, the Debtor maintains that "Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases." Kim Declaration, at 4.

11.     The Debtor proffers three arguments in support of the Motion: (i) the Court has subject matter jurisdiction to issue an order extending the stay to or enjoining the prosecution of actions against the Alleged Protected Parties, (ii) the automatic stay of Section 362(a) of the Bankruptcy Code prevents litigation against the Alleged Protected Parties, and (iii) the Court should enjoin litigation against the Alleged Protected Parties pursuant to Section 105(a) of the Bankruptcy Code to protect the Debtor's estate. The Debtor also moved for a temporary restraining order, citing irreparable harm in the absence of an immediate injunction.

### C.  The Evidence Presented at the TRO Hearing

12.     On October 22, 2021, the Court held the TRO Hearing to determine whether the Debtor carried its burden of demonstrating clear evidence to support the requested relief. During the TRO Hearing, attorney Jerome Block cross-examined John K. Kim, the Chief Legal Officer of the Debtor and the declarant for the Kim Declaration and the Supplemental Kim Declaration.

13.     The evidence at the TRO Hearing demonstrated J&J's direct liability for talc-related cancer claims—liability that is independent of, and not derivative of, the Debtor's liability. For example, the evidence showed that J&J made all health and safety decisions regarding talc and asbestos. The corporate representative of both J&J and Old JJCI, Dr. John Hopkins, repeatedly confirmed this point in sworn testimony. Ex. 1, at 20:11-17[5] (Dr. Hopkins: "the parent company [J&J] for all the global companies made those decisions, yes."); Ex. 2, at 1993:6-12 (Dr. Hopkins:

---

[5] For brevity, all exhibits attached hereto shall be cited as "Ex."

"Q. [A]ll talc in asbestos decision went through [New] Brunswick? A. Correct.   Q. The headquarters for Johnson & Johnson, correct? A. Correct."); Ex. 3, at 17:24–18:3 (Dr. Hopkins: "Q.  Johnson & Johnson Corporate in New Brunswick, New Jersey made all health and safety policy decisions with regard to asbestos and talc issues, correct? A. Yes."); Ex. 4, at 25:10-15 (same).  There is no dispute that Dr. Hopkins repeatedly gave this sworn testimony on behalf of both J&J and JJCI as corporate representative of both companies and that his testimony is binding on both companies.   See Ex. 5, at 47:14-18, 51:24-52:2; Ex. 4, at 19:18-20:10 (Dr. Hopkins acknowledging his testimony is "binding" on the companies).

14.     Dr. Hopkins conceded that J&J had the authority to require warnings on Johnson's Baby Powder ("JBP").   Ex. 6, at 7752:11-15.   J&J never required warnings about asbestos or cancer on JBP, despite knowing that JBP contained asbestos.  See, e.g., Ex. 7; Ex. 8.

15.     In contrast to J&J's failure to require any warnings on JBP containers, J&J required its branding on the front of each JBP container with the cursive "Johnson & Johnson" logo.  Ex. 4, at 22:10-13.  The prestigious J&J logo, of course, is owned by J&J—and not by any subsidiary. Id.; see Ex. 5, at 90:13-17.  As Mr. Kim admitted, J&J owned the intellectual property relating to JBP including advertisements, which also lacked any warning about asbestos and cancer. Ex. 5, at 77:10-78:19 (testimony about 1980 advertisement for JBP copyrighted by "J&J"); Ex. 9 (1980 JBP advertisement).

16.     Compounding its failure to warn, J&J affirmatively misrepresented to the public that its talc was safe and never contained asbestos.  For example, John McKeegan told the public on behalf of J&J (in an Associated Press news article) that JBP never contained asbestos.  See, e.g., Ex. 10 (email attaching news article).  While Mr. Kim denied knowing that Mr. McKeegan was employed by J&J (Ex. 5, at 93:3-9, 94:22-95:1), Mr. McKeegan gave sworn testimony

confirming that he was "manager of corporate communications for Johnson & Johnson." Ex. 11,

at 9:24-10:3.  Mr. McKeegan confirmed that when he told the public "Johnson's Baby Powder

never contained any asbestos," he was "speaking on behalf of Johnson & Johnson." Id., at 61:11-

15.

17.    Similarly, when Reuters published an article in December 2018 about asbestos in

Johnson's Baby Powder, it was J&J that responded with statements denying that Johnson's Baby

Powder ever contained asbestos.  Ex. 12 (email attaching advertisement).  There was no mention

of Old JJCI or any other subsidiary.  In March 2019, it was J&J, without any reference to any

subsidiary, that wrote the U.S. House Subcommittee on Economic and Consumer Policy to advise

Congress about the purported safety of its talc products, including JBP, and J&J's efforts to

maintain consumer trust.  Ex. 13.

18.    Similarly, it was the CEO of J&J, Alex Gorsky, whose video was circulated to

millions of people around the world on Twitter in December of 2018, making statements including:

"J&J's Baby Powder Has Never Contained Asbestos"; "J&J's Baby Powder is Safe and Does Not

Cause Cancer"; and "We Know Our Talc Is Safe."  See Ex. 5, at 98:8-100:23; Ex. 14 (Gorsky

Twitter Video).  Gorsky also went on CNBC's Mad Money to further assure investors and the

public that JBP never contained asbestos.  See Ex. 5, at 100:24–102:10; Ex. 15 (screenshot of

Gorsky and Jim Kramer on Mad Money).

19.    Given that J&J engaged in its own tortious conduct, courts have determined that

juries must separately consider J&J and JJCI in determining if either is liable for its own tortious

conduct.  See, e.g., Ex. 16, at 9517:23-9518:7; Ex. 17, at 1.  Juries also separately consider J&J

and JJCI in apportioning fault to these separate corporations based on case-specific facts.  See,

e.g., Ex. 18, at 5, Ex. 19, at 19.  The same is true for punitive damages.  See, e.g., Ex. 20, at

10139:13–20 (jury imposed $200MM punitives against J&J and $100MM against JJCI), Ex. 21 ($70MM punitives against J&J and $35MM against JJCI).  When J&J and JJCI are found liable for punitive damages, each company secures its separate payments with separate bonds.  Ex. 21.

20.     Appellate courts have affirmed the separate liability findings against J&J and JJCI. See Leavitt v. Johnson & Johnson, A157572/A159021, 2021 WL 3418410, at *7 (Cal. Ct. App. Aug. 5, 2021) (affirming separate jury verdicts against J&J and JJCI); Ingham v. Johnson & Johnson, 608 S.W.3d 663, 701–02 (Mo. App. 2020), cert. denied, 2021 WL 2194948 (June 1, 2021) (affirming approximately 20 ovarian cancer jury verdicts answered separately as to J&J and JJCI, with greater amount of punitive damages imposed on J&J).

21.     The evidence at the TRO Hearing also showed that J&J bore independent liability for its Shower to Shower line of talc products.  Prior to approximately 1978, J&J itself (and not any J&J subsidiary or division) manufactured Shower to Shower through the use of an outside manufacturer, Kolmar Laboratories.  Ex. 22 (10/4/76 internal J&J memo referring to Shower to Shower as "our commercial product"); Ex. 23 (6/3/76 internal J&J memo discussing "level of exposure to respirable particles" after use of Shower to Shower).  J&J itself directed large quantities of the raw talc ingredient to Kolmar so that this outside manufacturer could make the product according to J&J's specifications.  Ex. 24; Ex. 25.

22.     Finally, the evidence at the TRO Hearing showed that J&J has never asserted in litigation that Old JJCI assumed any of J&J's talc-related liabilities.  In answers to interrogatories, J&J and JJCI have stated there are no indemnification claims between the two companies.  Ex. 26, at 21–23.  If JJCI were indemnifying J&J for liabilities, these answers would have been incorrect.

23.     In fact, J&J and Old JJCI have repeatedly taken the opposite position, representing to courts and litigants that Old JJCI is not liable for any pre-1979 exposures to JBP.  For example,

in the <u>Etheridge</u> case in New Jersey, defendants took the position that JJCI could not be liable and "was not a proper party" because plaintiffs alleged JBP exposure only in the years 1960–1963. <u>Ex. 27</u>, at 2.  Defendants argued "<u>it was Johnson & Johnson – the only defendant named in Plaintiffs' complaint – that was responsible</u> for manufacturing and selling Johnson's Baby Powder during the relevant time period, 1960-1963." <u>Ex. 27</u>, at 3 (emphasis added).  Defendants argued that Old JJCI could not be a defendant because Old JJCI didn't "come into the picture until 1979." <u>Ex. 28</u>, at 260:22–261:2.  Defendants insisted that JJCI could not go on the verdict sheet because the answers to interrogatories alleged only pre-1979 exposures; they proposed the trial court charge the jury that "Johnson was responsible for the product up until 1979, after that it's JJCI." <u>Ex. 29</u>, at 322:24–323:2.

24.     Similarly, J&J has repeatedly filed sworn affidavits in litigation stating that "J&J and Johnson & Johnson Consumer, Inc. are financially independent of each other." <u>Ex. 30</u>, ¶ 9; <u>Ex. 31</u>, ¶ 11; <u>Ex. 32</u>, ¶ 10; <u>Ex. 33</u>, ¶ 10.  "J&J and [JJCI] do not treat assets of one entity as the assets of the other.  There has been no effort on the part of J&J to divest assets away from [JJCI] for the benefit of J&J.  Likewise, there has been no effort on the part of [JJCI] to divest assets away from J&J for the benefit of [JJCI]." <u>Ex. 30</u>, ¶ 12; <u>Ex. 31</u>, ¶ 14; <u>Ex. 32</u>, ¶ 13; <u>Ex. 33</u>, ¶ 13.

### D.  The Outcome of the TRO Hearing

25.     The Court determined the Debtor failed to carry its burden to show that it was entitled to a TRO as to any of the Alleged Protected Parties.  The Court issued a TRO only as to the Debtor itself and Old JJCI.

26.     On October 26, 2021, notwithstanding the Court's order, the Debtor filed copies of a new *Notice of Bankruptcy Filing and Reservation of Rights* (the "<u>Post-TRO Notice</u>") in tort litigation all over the country, as it had with the Bankruptcy Notice.  Despite the absence of a TRO

protecting any party beyond the Debtor or Old JJCI, the Post-TRO Notice asserted that litigation against any other party, including J&J, could not commence or continue without an order from this Court lifting or modifying the automatic stay. Further, the Post-TRO Notice restated the objection of J&J to further proceedings—acknowledging that trial courts might nonetheless permit proceedings to continue, but, asserting that any actions taken before further order of this Court could be deemed violations of the automatic stay and "null and void as a matter of law."

27.     At the TRO Hearing, Mr. Kim had testified that, although J&J had searched high and low for years, including an intense search for the previous six months, neither the Debtor nor J&J was able to produce any agreement establishing that the Debtor's predecessor-in-interest affirmatively assumed talc-related liabilities of J&J in the 1979 transaction.

28.     Yet after the Court's ruling at the TRO hearing, the Debtor miraculously located and produced an *Agreement for Transfer of Assets and Bill of Sale* (the "1979 Agreement") by and between J&J and Old JJCI's predecessor-in-interest, Johnson & Johnson Baby Products Company. The relevant provision, which the Debtor has maintained constituted an assumption of talc-related liabilities, is as follows:

> In consideration of the assignment, transfer and conveyance to it of all the [business assets] above described, the Subsidiary agrees to assume and hereby does assume and agrees to pay, perform or discharge, as the case may be, all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division and the Subsidiary hereby covenants and agrees with J&J that the Subsidiary will forever indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid, performed or discharged, as the case may be, by the Subsidiary and to assume and complete all pending contracts of J&J which are allocated on its books or records to the BABY Division and to indemnify J&J and its officers, directors and stockholders from any liability under any such indebtedness, liabilities and obligations.

Ex. 34 (LTL 561) (emphasis added).

29.     The Debtor has not demonstrated that the relevant liabilities were "on the books or records of J&J" at the time of the 1979 Transaction.  In fact, on page 45 of the Informational Brief, the Debtor discloses that the first lawsuit against J&J alleging talc-related injuries was filed in federal court in Louisiana in 1982.  In its answer to Interrogatory No. 8, the Debtor states that it has not identified any lawsuits claiming personal injury arising from the alleged use of Johnson's Baby Powder prior to January 1, 1979.  Ex. 35.

30.     Neither the Kim Declaration, the Supplemental Declaration, the Complaint, nor the Motion mention, let alone attempt to address, the qualifier "on the books or records of J&J."  The Debtor has not explained the inconsistency between the key "books or records" caveat, and Mr. Kim's prior sworn statement that "all liabilities" associated with the Baby Products Division were assumed by Old JJCI's predecessor in the 1979 Transaction.

31.     The Debtor has since produced several gigabytes of documentation in electronic form to counsel for tort claimants.[6]  When such documents are cited to herein, they shall be referenced utilizing the names ascribed to each file by the Debtor, e.g. "LTL No."

## ARGUMENT

32.     Typically, the prior statements of one entity in separate litigation are not binding or preclusive on another, separate entity.  Here, though, the entire basis for the Motion is that the Debtor and the Alleged Protected Parties share such a common identity that the Court should extend the automatic stay to cover them.  The Debtor thus must live with the prior inconsistent statements of those whom it is trying to protect.  J&J has long vehemently objected to using the bankruptcy of a subsidiary in a blatant attempt to shield a non-debtor parent company from litigation.  Now it wants to benefit from those same strategies employed in this case.

---

[6] Production of documents has been frustrated by Debtor's counsel redacting or withholding documents through an assertion of privilege without providing a privilege log, citing time constraints.

33.     The Court should deny Debtor's Motion.  The evidence and the law clearly do not support the Debtor's unprecedented attempt to extend the automatic stay or for injunctive relief. To obtain the sweeping relief sought, the Debtor must demonstrate that:

    a.  the commencement or continuation of litigation against non-debtor affiliates, principally J&J, necessarily implicates the assets of the Debtor's estate through some form of assumption or indemnification;

    b.  the same litigation necessarily implicates the coverage of insurance policies in which the Debtor's estate has a beneficial interest; and

    c.  the same litigation necessarily implicates Old JJCI's agreements with retailers.

The Debtor has not proffered and cannot proffer competent evidence to support these positions, nor can it point to law allowing the extraordinary relief that it seeks.

34.     The Debtor has not demonstrated, and cannot demonstrate, that this Court has subject matter jurisdiction to issue orders affecting proceedings against the Alleged Protected Parties.  As non-derivative actions against non-debtors for their individual liabilities, where there is no evidence demonstrating a statutory or contractual right of indemnification, such actions are not "related to" the Debtor's case, as required by 28 U.S.C. § 1334(b).  More importantly, the Court has no constitutional ability to decide such matters.  Stern v. Marshall (In re Marshall), 564 U.S. ___, 131 S. Ct. 2594 (2011) (the bankruptcy court's exercise of core jurisdiction to determine a tortious interference counterclaim went beyond what was necessary to determine the bankruptcy issues (claim allowance and dischargeability) and the adjustment of the debtor-creditor relationship and was therefore unconstitutional).

35.     Similarly, the Debtor cannot demonstrate that litigation against suppliers, insurance companies, and affiliated companies is litigation to "recover a claim against" the Debtor or an act to possess or exercise control over property of the Debtor, as required to extend the automatic stay pursuant to Section 362(a) of the Bankruptcy Code.

36.    Finally, the Debtor has not demonstrated entitlement to the extraordinary relief of a preliminary injunction under Section 105(a) of the Bankruptcy Code.  The evidence does not support, and in fact contradicts, the Debtor's assertions regarding the likelihood of reorganization, irreparable harm, the equitable balance of the relief requested, and the public interest.

37.    The Debtor has utterly failed to address the applicable standard for determining whether subject matter jurisdiction exists for the Court to enter orders affecting the commencement or continuation of litigation against non-debtors.  Without competent evidence that demonstrates litigation against non-debtors necessarily implicates the assets of the Debtor's estate, the Court lacks subject matter jurisdiction to extend the stay to, or enjoin litigation against, non-debtors.

38.    The same lack of evidence undercuts the Debtor's requested extension of the automatic stay.  The linchpin of the Debtor's position turns on the 1979 Transaction.  As will be set out below, the evidence regarding the 1979 Transaction fails to demonstrate that J&J's direct talc-related liabilities were assigned to and assumed by the Debtor's predecessor-in-interest.

39.    Finally, the same lack of evidence prevents the Debtor from demonstrating the prospective harm necessary to warrant a preliminary injunction.

**I.    The Court Does Not Have Subject Matter Jurisdiction to Enter Orders Affecting Litigation Against the Non-debtor Alleged Protected Parties**

40.    The Debtor asserts that the Court has subject matter jurisdiction to enter an order affecting non-debtor litigation because (i) a motion invoking of the automatic stay is "arising under" the Bankruptcy Code and (ii) a motion for a Section 105(a) injunction "arises in" the Chapter 11 case.  Motion, at 21 (citing A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1002 (4th Cir. 1986).

41.    The Debtor critically misreads the discussion in <u>A.H. Robins</u> regarding "related to" jurisdiction.[7]  The issue in <u>A.H. Robins</u> was whether the district court administering the underlying bankruptcy case could properly stay "all actions based upon personal injury tort or wrongful death claims arising from the use of the Dalkon Shield" as "proceedings <u>related to</u> [the] Chapter 11 case." <u>Id.</u> at 998 (emphasis added).  A bankruptcy court has subject matter jurisdiction to enter orders affecting proceedings "related to" a debtor's case if the outcome of other proceedings can conceivably alter or create a debtor's rights or liabilities.  <u>Id.</u> at 1002–03, n.11; <u>In re Brier Creek Corp. Ctr. Assocs. Ltd.</u>, 486 B.R. 681, 686 (Bankr. E.D.N.C. 2013).  If proceedings cannot affect a debtor's estate, the bankruptcy court lacks subject matter jurisdiction to enter an order regarding those proceedings pursuant to 28 U.S.C. § 1334(b).  <u>Cf.</u>, <u>Brier Creek</u>, 486 B.R. at 686–687 (holding the bankruptcy court had, "at a minimum," "related to" jurisdiction over a guarantor arbitration action when that action jeopardized the debtor's ability to obtain funding necessary to reorganize); <u>In re Bestwall LLC</u>, 606 B.R. 243, 249 (Bankr. W.D.N.C. 2019) (holding that, where a Texas divisional merger debtor sought an injunction of litigation against its sister successor entity, "[t]he Fourth Circuit's test for 'related to' jurisdiction under 28 U.S.C. § 1334(b) confirms that the Court has the authority to issue the requested injunction").

42.    This is no basis in law for prohibiting or enjoining non-derivative litigation against non-debtors for the non-debtor's independent tort liability.  With respect to stay relief, the Fourth Circuit observed in <u>Robins</u> that:

> [T]here must be "unusual circumstances" and certainly "[s]omething more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties." This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real

---

[7] The Debtor also apparently skipped the part of the opinion observing that the debtor in <u>A.H. Robins</u> properly served the motion for preliminary injunction and related notice of hearing "by first-class mail and by Federal Express to <u>all the defendants</u> and their attorneys."  <u>A.H. Robins</u>, 788 F.3d at 997.

> party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation <u>would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them</u> in the case.

<u>A.H. Robins</u>, 788 F.2d at 999 (quoting, in part, <u>Johns-Manville Sales Corp.</u>, 26 B.R. 405, 410 (S.D.N.Y. 1983) and citing <u>In re Metal Ctr.</u>, 31 B.R. 458 (D. Conn. 1983)).   In cases where a separate party, even a co-defendant with a debtor in pending litigation, is "independently liable as, for example, where the debtor and another are joint tort feasors or where the nondebtor's liability rests upon his own breach of duty . . . the automatic stay would clearly not extend to such non debtor" absent a relevant statutory provision or governing contract.  <u>A.H. Robins</u>, 288 F.2d at 999 (quoting <u>Metal Center</u>, 31 B.R. at 462, and discussing how the bankruptcy court in <u>Metal Center</u> extended the automatic stay to a co-defendant guarantor due to the binding nature a finding of guarantor liability would have on the debtor's estate).

43.     The United States Court of Appeals for the Third Circuit applied the same principle in an asbestos bankruptcy context to reverse a Section 105(a) order enjoining non-derivative claims against a non-debtor.  In <u>In re Combustion Engineering, Inc.</u>, 4391 F.3d 190 (3d Cir. 2004), the Third Circuit held that a Section 105(a) injunction could not be applied to "independent non-derivative claims against non-debtor third parties," because it "would improperly extend bankruptcy relief to non-debtors" and "would jeopardize the interests of future . . . claimants" against the non-debtors.  <u>Id.</u> at 234.  The court stressed that the claims involved "third-party actions against non-debtors where the liability alleged is not derivative of the debtor."  <u>Id.</u> at 236.[8]  That is precisely the situation here.

---

[8] The Third Circuit in <u>Combustion Engineering</u> cited an important concern about the subversion of bankruptcy principles equally applicable here.  The court opined that "the practical effect of the § 105(a) injunction here is to extend bankruptcy relief to two non-debtor companies outside of bankruptcy," allowing those entities "to cleanse themselves of non-derivative asbestos liability without enduring the rigors of bankruptcy." <u>Id.</u> at 237.

44.    The Debtor has not produced any evidence that indicates that non-debtor affiliates, especially J&J, hold an "absolute" or automatic right of indemnification from the Debtor for defense of their own independent tort liability.  J&J has never asserted in litigation that Old JJCI assumed any of J&J's talc-related liabilities.  In fact, it has represented the opposite.  See paras. 22–24, supra. Nor has the Debtor produced any evidence demonstrating that prosecution of claims against non-debtor affiliates implicates (i) insurance coverage in which the Debtor holds a beneficial interest or (ii) agreements with retailers to which the Debtor is a party.

45.    **1979 Transaction:** The evidence regarding the 1979 Transaction simply does not support any transfer or assumption of liability, or any other agreement to indemnify J&J or any other non-debtor entity.  The Debtor has adduced no evidence that talc-related liabilities were included in J&J's "books or records" in 1978 or 1979—the Informational Brief itself notes that the first talc-related tort case of any kind was filed against J&J in 1982.  J&J has conceded that it has not identified any personal injury case involving talc prior to 1979. Ex. 35, Ans. 8. And J&J has admitted that not until the fourth quarter of 2018 did J&J's consolidated financial statements reflect a reserve for defense and indemnity costs outside of insurance coverage for Old JJCI associated with personal injury talc-related claims.  Ex. 35, Ans 7.  In fact, the senior legal documents coordinator for J&J, identified by the Debtor as the person responsible for document searches, Depo. Ex. 1,[9] was not even asked to look for the books or records as to these liabilities. Depo. Ex. 2, at 57:22–64:16.

46.    J&J's 1979 10-K (the "1979 10-K") filed with the Securities and Exchange Commission, a true and correct copy of which is attached hereto as Exhibit JJ, discloses the then-current corporate structure of the enterprise, including the ownership and scope of operations of

---

[9] Certain exhibits, related to depositions taken in preparation for the November 4–5, 2021 hearings, are cited herein as "Deposition Exhibits."

Johnson & Johnson Baby Products Company.  Ex. 36, at 6, 17.  On page 18, in the "Legal Proceedings" paragraph, J&J makes vague reference to product liability litigation, "a large majority of which concern contraceptive products," subpoenas received in 1978 concerning patent licensing and marketing practices, and intellectual property litigation.  If J&J was aware of any talc-related liabilities or litigation, such litigation was not disclosed—however, J&J would have required a crystal ball with foresight into the next decade to do so.  Therefore, there is no evidence that the "books or records" of J&J referenced in the 1979 Transaction included talc-related liabilities.

47.     Nor does J&J's 1978 10-K contain any indication that the "books or records" of J&J referenced in the 1979 Transaction included talc-related liabilities.  Ex. 37 (LTL 19223, LTL 19223–25). The same was true of the 1977 10-K.  Id. LTL 19210.

48.     Documents produced by the Debtor demonstrate that J&J is more than capable of disclosing specifically assumed liabilities in the realm of mergers and acquisitions.  See, e.g., Ex. 38 (LTL 617) (listing specific assumed liabilities, such as contract obligations, obligations to employees, product liabilities claims, and environmental liabilities in a 2005 asset purchase agreement selling certain assets of Johnson & Johnson Consumer Companies, Inc. to Pharma Tech Industries, Inc.); Ex. 39 (LTL 972–73) (listing specific assumed liabilities for legal proceedings arising from the "manufacture, advertising, marketing, distribution, sale or use" of products in a 2012 asset purchase agreement selling certain assets of Johnson & Johnson Consumer Companies, Inc. to Valeant Pharmaceuticals International, Inc.).

49.     Thus, there is no evidence demonstrating that the 1979 Transaction resulted in the Debtor's predecessor-in-interest assuming talc-related liabilities.  Moreover, the limitation of the assumption to liability "on the books or records" recurred in subsequent transfer agreements.  In

1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products. Whereas Mr. Kim testified that "Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program," First Day Declaration ¶ 11 (emphasis added), in fact that agreement provided for a much more limited assumption only of liabilities "on the books or records":

> Omni agrees to assume and hereby does assume and agrees to pay, perform or discharge, as the case may be, all the indebtedness, liabilities and obligations of every kind and description on the books or records of Baby Products to except those which are now allocated to Baby Products' diaper programs on the books and records of Baby Products .
> . . .

Ex. 40, at 5 (emphasis added). This document was produced in litigation prior to this bankruptcy and was reasonably available to Mr. Kim at the time of his Declaration.

50.    Similarly, in 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company. Contrary to Mr. Kim's sworn testimony that Dental Products Company ("DPC") "assumed all of [Baby Products Company's] liabilities," Kim Declaration ¶ 12, in fact the relevant agreement again provided for a much more limited assumption only of liabilities "on the books or records": "DPC agrees to assume and hereby does assume and agrees to pay, perform or discharge, as the case may be, all the indebtedness, liabilities and obligations of every kind and description on the books or records of JJBP as pertaining to the DIVISION." Ex. 41, at 4 (emphasis added).

51.    Hence, the only liabilities that flowed to Old JJCI were those "on the books or records" of the relevant companies at each stage of the transaction. The Debtor has utterly failed to meet its burden of proof establishing that any talc-liabilities for personal injury (e.g.,

mesothelioma or ovarian cancer) were ever listed on any "books or records" referenced in the 1979 Transaction or any of the subsequent agreements relevant to Old JJCI.

52.    There is a further reason that the Debtor's argument fails: J&J's "Shower to Shower" talc products were not part of J&J Baby Products Division as of December 1978 and therefore J&J's liabilities arising from Shower to Shower could not have been included in the 1979 Transaction. Shower to Shower was a product line manufactured and sold by a separate J&J subsidiary company known as Personal Products Company ("PPC").  Ex. 42, at 45–46; Ex. 43; Ex. 37 (LTL 19198) (1978 10-K).  Shower to Shower continued to be a PPC (and not a Baby Products Company) product into at least the early 1980s. Ex. 44, at 53–54 (identifying "SHOWER-TO-SHOWER Body Powder" as a product of PPC, based in Milltown, New Jersey); Ex. 45, at 55–56 (same); Ex. 46, at 6 (describing "SHOWER-TO-SHOWER" as one of the primary products of PPC); Ex. 47 (4/11/80 PPC product specification); Ex. 48 (7/29/81 PPC document); Ex. 49 (LTL 19687) (Shower to Shower was a PPC product and not with Baby Products in 1986).

53.    Similarly, the talc liabilities arising from J&J's Vermont talc mining subsidiary (Windsor Minerals) were never a part of J&J's Baby Products Division and thus could not have been passed to the Old JJCI's predecessor as part of the 1979 Transaction.  Windsor Minerals supplied the talc for JBP and Shower to Shower from approximately 1967 through 1989. Ex. 1, at 17:21–18:20.  It was J&J—and not Old JJCI—that owned Windsor until 1989, when J&J sold the company to Cyprus Mines Corporation ("Cyprus").  Id., at 19–22; Ex. 50, § 11.2.  Because Windsor was not a part of J&J's Baby Products Division, the 1979 Transaction could not have transferred any liabilities relating to Windsor.

54.    Moreover, even if the Debtor were able to produce some sort of evidence that the 1979 Transaction "books or records" included an explicit assumption of talc-related liabilities by

the Debtor's predecessor-in-interest (and it has failed to do so), such transaction would still fail to

provide the Court with "related to" subject matter jurisdiction over non-derivative actions against

non-debtors—such as J&J—for their independent tortious acts.

55.     "Corporations cannot discharge liabilities for their torts against third parties

through contract." Jaycox v. Terex Corp., No. 4:19-CV-02650 SRC, 2021 WL 2187907, *12 (E.D.

Mo. May 28, 2021).  "Even if a successor assumes the tort liability of the predecessor through an

asset purchase agreement, a plaintiff may still bring a claim against the predecessor." Id. (citing

15 Fletcher's Cyclopedia of the Law of Corporations § 7123 (2020)).  A party "cannot absolve

itself of liability simply by transferring it to a different entity by contract." Id. at *13; see also In

re Federal-Mogul Glob. Inc., 411 B.R. 148, 161 (D. Del. Bankr. 2008) ("The indemnity provisions

allocated liabilities between Wagner and Pneumo Abex.  They did not impact the claims against

either party that may be brought directly by an asbestos claimant.").[10]

56.     It is hornbook law that the effectiveness of a corporate assumption of liabilities

requires the acceptance of that assumption by creditors—tort claimants—which has certainly not

occurred in this matter.  See Fletcher's Cyclopedia of the Law of Corporations § 7114 (Sept. 2021

update) ("[W]here an assumption agreement is based on a valuable consideration and the receipt

of the property of the other company is a sufficient consideration, the company assuming such

debts or liabilities may become liable, provided, it seems, there has been an acceptance of, or

acquiescence in, the agreement by the creditors of the corporation that was originally indebted.")

---

[10] "We are aware of no rule of law which allows a corporate entity to evade liability for its tortious conduct merely by selling the instrumentality which is alleged to have caused the injury." Gee v. Tenneco, Inc., 615 F.2d 857, 862 (9th Cir. 1980).  "A party with an original obligation to another cannot divest himself of liability to that party merely by contracting with a third party to assume that liability . . . . The plaintiff's action is considered apart from the agreement between the transferor and transferee of liability." Husak v. Berkel, Inc., 341 A.2d 174, 179 (Pa. Super. 1975); see also Brown v. E.W. Bliss Co., 818 F.2d 1405, 1410 (8th Cir. 1987), adhered to, 831 F.2d 810 (8th Cir. 1987) ("The fact that Bliss II later transferred the assets of the original Bliss did not relieve it of the original Bliss's liabilities.").

(emphasis added). Moreover, the assumption must be clear and unambiguous as to the liabilities

assumed. Id. The opaque reference in the 1979 Transaction to the "books or records" not before

this Court, does not qualify as clear and unambiguous assumption of all tort liabilities for talc.

57.     The Debtor's motion now suggests that J&J engages in a practice of assigning talc-

related legal expenses to Old JCCI through inter-company charges. But until now J&J's consistent

position in sworn testimony has been that that "J&J and Johnson & Johnson Consumer, Inc. are

financially independent of each other," and that "J&J and [JJCI] do not treat assets of one entity

as the assets of the other. There has been no effort on the part of J&J to divest assets away from

[JJCI] for the benefit of J&J." See supra pp. 10–11.

58.     In addition, on August 6, 2021, Old JJCI's vice president of finance denied that Old

JCCI paid for legal expenses, in sworn testimony in the Prudencio case:

> Q: Does Johnson & Johnson Consumer have a separate litigation expense that they list on
> their information that they give to Johnson & Johnson Enterprise?
>
> Mr. Cox: Object to form.
>
> The Witness: They do not.
>
> Q: All the litigation expenses as set forth on the 10 – 10-K here are paid for by Johnson &
> Johnson Enterprise, right?
>
> Mr. Cox: Object to the form.
>
> The Witness: They are – they are managed centrally through Johnson & Johnson, the
> enterprise.
>
> Q: And Johnson & Johnson Consumer does not have a separate litigation expense in any
> documents that you've ever seen; correct?
>
> Mr. Cox: Object to the form.
>
> The Witness: Not that I'm aware of.

Ex. 51, at 38–39.

59.     In any event, the practice of inter-company charges asserted by J&J fails to

establish that such charges are a legal liability of JJCI. The practice does not reflect

indemnification agreements signed by J&J subsidiaries and affiliates or court rulings apportioning

liabilities. Rather, the practice reflects a "subjective" internal accounting "policy" issued by the J&J "corporate controller's office." Depo. Ex. 3.

60. Thus, the 1979 Transaction failed to cause the Debtor's predecessor-in-interest to assume any talc-related liabilities of any of the non-debtor affiliates (including, and especially, those of J&J). This Court lacks subject matter jurisdiction under 28 U.S.C. § 1334(b) to enjoin any actions asserting non-derivative claims against non-debtors for the individual tortious liability of those non-debtors, as those actions are not "related to" the administration of the Debtor's estate.

61. **Insurance Agreements:** With respect to insurance agreements, by the Debtor's own admission, insurance carriers for Old JJCI and/or J&J have never tendered coverage for talc-related liabilities—in decades of litigation—and have always asserted defenses to such coverage. Nothing on the record demonstrates that this will change. At best, any potential coverage is speculative and demonstrably uncertain. In litigation, J&J has taken the position that it is "self-insured," Ex. 52, at 6, and tort claims are unlikely to implicate its insurance policies. See Ex. 53, at 84; Ex. 54, at 8; Ex. 55, at 10.

62. This case is completely different from prior cases. There was no insurance issue in DBMP because insurance coverage had long been exhausted. Debtor's Proposed Findings and Conclusions in DBMP Proposed Findings and Conclusions ¶ 32 (filed 4/9/21). In Aldrich Pump/Murray, this Court's Order (Order at ¶ 191) addressed suits by tort claimants against the debtor's insurers, which has not happened here.

63. In Robins, there were no factual disputes about insurance coverage and whether the policies were property of the estate. The Fourth Circuit noted the insureds' status was "undisputed on the record," and "the record and the limited fund available under Robins' insurance policy is recognized in the record." 788 F.2d at 1008. This case is different.

64.     Consistent with the Debtor's concessions, the Debtor has produced letters from insurers asserting denials of coverage.[11]

65.     Certain insurers, such as Lloyd's of London and North River Insurance, have cataloged reasons why their policies do not cover talc-related liabilities. Ex. 56 (LTL 12205–09). Other policies issued to J&J contain assignment restrictions requiring the insurers' consent for J&J to assign the benefits of those policies to other entities. See, e.g., Ex. 57 (LTL 3141); Ex. 58 (LTL 3198, LTL 3215); Ex. 59 (LTL 3314, LTL 3357); Ex. 60 (LTL 3767), Ex. 61 (LTL 3920).

66.     Other policies produced by the Debtor contain explicit limitations on personal injury coverage, such as policies covering only accidental injuries—Ex. 57 (LTL 3138); Ex. 62 (LTL 3221); Ex. 59 (LTL 3311); Ex. 63 (LTL 3554); and Ex. 61 (LTL 3917)—or specific torts like false arrest, malicious prosecution, defamatory torts, or privacy torts—Ex. 57 (LTL 3149–50); Ex. 59 (LTL 3359–60); Ex. 63 (LTL 3565–66); Ex. 61 (LTL 3965–66).

67.     Numerous insurers have commenced an action in Middlesex County, New Jersey, Case No. MID-L-003565-19, seeking a declaratory judgment that they owe no coverage due to, among other issues, J&J's failure to comply with specific Assistance and Cooperation and Claims Control Provisions in their respective policies. See Ex. 57 (LTL 3141, LTL 3148); Ex. 58 (LTL 3197, LTL 3214); Ex. 62 (LTL 3224); Ex. 59 (LTL 3314); Ex. 63 (LTL 3557); Ex. 103 (LTL 3667); and Ex. 61 (LTL 3920) (listing such provisions in insurance policies).

---

[11] Ex. 64 (LTL 12483–87, letter from Westport Insurance f/k/a Puritan Insurance); Ex. 65 (LTL 12477–82); Ex. 66 (LTL 12475–76); Ex. 67 (LTL 0012471–74); Ex. 68 (LTL 12469–70); Ex. 69 (LTL 12462–68); Ex. 70 (LTL 12453–55); Ex. 71 (LTL 12450–52); Ex. 72 (LTL 12447–49); Ex. 73 (LTL 12444–46); Ex. 74 (LTL 12439–43); Ex. 75 (LTL 12432–38); Ex. 76 (LTL 12424–27); Ex. 77 (LTL 12420–23); Ex. 78 (LTL 0012416–19); Ex. 79 (LTL 12411–15); Ex. 80 (LTL 12409–10); Ex. 81 (LTL 12404–08); Ex. 82 (LTL 12327–33) (letters from Travelers, which purchased Aetna in 1995); Ex. 83 (LTL 12313–15) (letter from Safety Insurance); as well as letters from numerous other insurers; Ex. 84 (LTL 12310–12); Ex. 85 (LTL 12307–09); Ex. 86 (LTL 12304–06); Ex. 87 (LTL 12301–03); Ex. 88 (LTL 12298–300); Ex. 89 (LTL 12293–95); Ex. 90 (LTL 12290–92); Ex. 91 (LTL 12285–87); Ex. 92 (LTL 12270–72); Ex. 93 (LTL 12267–69); Ex. 94 (LTL 12264–66); Ex. 95 (LTL 12261–63); Ex. 96 (LTL 12258–60); Ex. 97 (LTL 12240–42); Ex. 98 (LTL 12225–27); Ex. 99 (LTL 12222–24); Ex. 100 (LTL 12219–21); Ex. 101 (LTL 12214–18); and Ex. 102 (LTL 12211–13).

68.     No evidence on the record supports the Kim Declaration's assertions of coverage. The Court lacks subject matter jurisdiction to extend the stay or enjoin proceedings against non-debtor insurance companies, as they are not "related to" the Debtor's case.

69.     **Agreements with retailers:** The Debtor has produced  "Tender Letters" sent to retailers by Old JJCI (e.g., Ex. 104 (LTL 57–61) (to Albertsons); Ex. 105 (LTL 62–64) (to Walgreens); Ex. 106 (LTL 65–69) (to Meijers); Ex. 107 (LTL 85–90) (to Ralph's Grocery); Ex. 108 (LTL 91) (to Giant Eagle); and Ex. 109 (LTL 97–101) (to CVS Pharmacy)) and in certain cases by both J&J and JJCI (e.g., Ex. 110 (LTL 17042–43); Ex. 111 (LTL 17057–58); Ex. 112 (LTL 17069–70); Ex. 113 (LTL 17108–9); Ex. 114 (LTL 17160–61); Ex. 115 (LTL 17170–71); Ex. 116 (LTL 17172–73); Ex. 117 (LTL 17220–21); Ex. 118 (LTL 20722–23); Ex. 119 (LTL 20939–40); Ex. 120 (LTL 21059–60); Ex. 121 (LTL 21156–57). See also Ex. 122 (LTL 19834–39) (J&J and JJCI indemnification agreement with Publix).  But the Debtor has failed to justify the requested relief.

70.     First, the Debtor's own evidence contradicts its prior assertion that Old JJCI assumed all J&J's talc-related liabilities in the 1979 Transaction.  The evidence shows extensive efforts by J&J regarding liabilities that supposedly were JJCI's alone.

71.     To the extent that the Debtor relies on agreements and Tender Letters to which Old JCCI alone is party, those do not support the extension of the stay to non-debtor J&J.

72.     Next, the Debtor has not shown that claims against retailers would be derivative claims.  In many states, "[a] retailer who sells a product in a defective condition may be held liable in a products liability action. Furthermore, a retailer, along with others engaged in distributing a defective product, may be held strictly liable for personal injuries caused by the product's defects,

even though the retailer has no control as to hidden or latent defects, as where the product is prepackaged." 63 Am. Jur. 2d Products Liability § 91(Aug. 2021 update) (citing cases).

73.    Fatal to the Debtor's requested relief, the Debtor has produced no evidence that any of the agreements or letters create absolute entitlement to indemnity by the Debtor, necessary to hold that a transaction is "related to" a Debtor's case. A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986). At best, agreements with retailers contain various conditions, exclusions, and qualifications, and represent only voluntary indemnification of retailers. For example, the Debtor produced a retailer agreement with Winn-Dixie Stores covering only liability from an "alleged defect" in the product sold, see Ex. 123 (LTL 12776), which does not appear to cover non-defect claims like negligence, breach of express or implied warranties, fraud, negligent misrepresentation, or fraudulent concealment. The Debtor produced a separate vendor agreement between Johnson & Johnson Sales & Logistics Co. and Wal-Mart Stores, Inc., providing similarly qualified indemnification terms—applying only to intellectual property actions and "actual or alleged defect" actions. See Ex. 124 (LTL 38, 41). And many of the agreements to indemnify and defend are not absolute and can be revoked.

74.    In sum, the Debtor has failed to establish that this Court has subject matter jurisdiction to extend the stay to the Alleged Protected Parties.

**II.    The Evidence Does Not Demonstrate that Non-derivative Claims Against Non-debtor Affiliates Implicate Assets of, or Otherwise Bind, the Debtor and Its Estate, so Extension of the Automatic Stay Is Improper**

75.    The automatic stay of the Bankruptcy Code prevents the commencement or continuation of actions against a debtor or acts to obtain possession or control of property of a debtor's estate. 11 U.S.C. § 362(a). For the reasons stated supra in paras. 34 through 71, there is

no basis in fact or law for the extension of the automatic stay to non-derivative claims against the Alleged Protected Parties.

76.     The Debtor's reliance on In re Colonial Realty Co., 980 F.2d 125 (2d Cir. 1992), is unavailing.  Its argument is premised on the assumption that in 1979 Old JJCI assumed all J&J's talc-relating liabilities, so that a claim against J&J is a claim "to recover a claim against the debtor." But, as already shown, that premise is wrong.  J&J also ignores the point that the claims against J&J are independent of any claims against the estate; they are not claims "against the debtor," and the automatic stay is inapplicable.  See Credit Alliance Corp. v. Williams, 851 F.2d 119, 121–22 (4th Cir. 1998); Winters v. George Mason Bank, 94 F.3d 130, 133–34 (4th Cir. 1996).  Colonial Realty has no application in such a situation.  See Picard v Fairfield Greenwich Ltd., 762 F.3d 199, 208 (2d Cir. 2014) (automatic stay does not bar actions based on independent misconduct of funds and related parties harming investors directly; automatic stay does not apply to "actions taken against third parties that are only factually likely, as opposed to legally certain, to impact estate property").

**A.     Unlike Prior Cases Before this Court, There Is No Arguable Identity of Interest Between the Debtor and any Alleged Protected Parties**

77.     The Debtor compares its request for extension of the stay in this case to the proceedings in Aldrich Pump and DBMP, other cases pending before this Court.  Such comparison is woefully inapt.  As this Court noted, the Aldrich and Murray entities in Aldrich Pump were themselves parties to a Texas divisional merger with Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company, and Trane U.S. Inc.  Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335, at *1 (Bankr. W.D.N.C. Aug. 23, 2021). Similarly, the DBMP entity was itself a party to a Texas divisional merger with CertainTeed

Corporation.  <u>DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP</u>

<u>LLC)</u>, Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350, at *1 (Bankr. W.D.N.C.

Aug. 11, 2021)).  In both cases, the debtors assumed the liabilities of their predecessor through the

divisional merger process.  <u>Aldrich Pump</u>, 2021 WL 3729335, at *1; <u>DMBP</u>, 2021 WL 3552350,

at *1.

78.     Neither <u>Aldrich Pump</u> nor <u>DBMP</u> involved a <u>separate</u> parent entity seeking the

benefit of a divisional merger to which it was <u>not</u> a party, as the Debtor proposes here.  The <u>only</u>

postural similarity to those prior cases is the relationship between Old JJCI and the Debtor.  Those

prior orders absolutely do not stand for any "identity of interest" between the Debtor and any other

non-debtor affiliates, especially J&J.

79.     There is no unusual commonality of interest or claims between the Debtor and J&J.

The Fourth Circuit has previously held, in <u>Credit Alliance Corporation v. Williams</u>, that not even

an ordinary guarantor of a debtor's obligation to a third party can claim the protections of the

debtor's automatic stay.  851 F.2d 119, 121–21 (4th Cir. 1988) ("[n]othing in § 362 suggests that

Congress intended that provision to strip from the creditors of a bankrupt debtor the protection

they sought and received when they required a third party to guaranty the debt. Congress knew

how to extend the automatic stay to non-bankrupt parties when it intended to do so."); <u>see</u> <u>In re</u>

<u>LOG, L.L.C.</u>, 2010 WL 4774347, at *2 (Bankr. M.D.N.C. Nov. 9, 2010) (citing <u>Credit Alliance</u>).

Here, just as there is no evidence of the Debtor's assumption of liabilities or indemnification of

any non-debtor affiliates, there is no evidence that J&J or any other non-debtor affiliate is <u>even a</u>

<u>guarantor</u> of the Debtor's liabilities.

80.     The Debtor's arguments regarding collateral estoppel and res judicata issues are

likewise off-base.  Motion, at 25 (citing <u>Aldrich Pump</u>, 2021 WL 3729335, at *31).  Factual

findings and legal holdings reached in the litigation of non-derivative claims against unrelated Alleged Protected Parties <u>cannot</u> bind a separate legal entity with no interest in the proceedings. See, e.g., <u>In re Metal Center, Inc.</u>, 31 B.R. 458, 463 (Bankr.D.Conn.1983) ("[T]he debtor would not be bound by any judgment [the creditor] might obtain against [the co-debtor] in state court, and consequently, [the co-debtor] is not protected by the automatic stay."); <u>In re MCSi, Inc.</u>, 371 B.R. 270, 275 (S.D. Ohio 2004) ("[T]his concern [about collateral estoppel] has never been the sole justification for extending the stay as to such co-defendants. This should scarcely be surprising, given the general inevitability of common issues arising as to co-defendants in a lawsuit with common causes of action as to the various co-defendants.").

**B.     The Debtor's Remaining Arguments Concerning Derivative Claims and Successor Liability Are Irrelevant**

81.     The Debtor spends extensive time and ink arguing that the Debtor's estate is the rightful owner of derivative claims, alter ego claims, and successor liability claims against its predecessors-in-interest or its parent company, J&J.  Because such claims are not relevant to the assertion of non-derivative claims against non-debtor affiliates for their individual liability in tort, such arguments are beside the point.  The Debtor is not a "successor," for liability purposes, to any entity other than Old JJCI by virtue of the Texas divisional merger.  Whether a non-debtor such as J&J faces non-derivative claims are of no import to the Debtor's case.[12]

**III.     <u>The Debtor Has Failed to Demonstrate Clear Evidence that It Is Entitled to a Preliminary Injunction for the Benefit of the Alleged Protected Parties</u>**

82.     A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  <u>Winter v. Nat'l Res. Def. Council,</u>

---

[12] For example, J&J's liability for its control over enterprise-wide health and safety decisions, its public statements, its failures to publish warnings on products bearing its trademark, its pre-1979 production of baby powder products, its historical production of Shower to Shower products, or its ownership and operation of a talc mine are of no moment to the Debtor in this case.

Inc., 555 U.S. 7, 22 (2008) (citation omitted).  The movant must prove four elements: likelihood of success on the merits, irreparable harm in the absence of an injunction, the balance of equities favors the injunction, and public interest favors the injunction.  Id. at 20; see also Howerton v. Grace Hosp., Inc., 1991 WL 104193, *1 (W.D.N.C. Mar. 14, 1991) (entitlement must be "clearly established"); In re FPSDA I, LLC, 2012 WL 6681794, *8 (Bankr. E.D.N.Y. Dec. 21, 2012) ("real evidence" required to extend stay; "theoretical threat to the reorganization" is not enough).

83.     At the outset, the evidence on the record does not demonstrate that any of the actions that the Debtor seeks to enjoin are "related to" the Debtor's case, so the Court lacks subject matter jurisdiction to enjoin those actions.  Regardless, the Debtor has still failed to satisfy the four-part test set out in Winter.

**A.     The Debtor Has Adopted Positions Entirely Incongruous with an Efficient and Consensual Reorganization**

84.     The determination of likelihood of success on the merits, in the context of a bankruptcy case, turns on the likelihood of a successful reorganization.  Here, the Debtor's proclivity for speaking out of both sides of its mouth weighs against any argument that the Debtor's case is moving towards resolution.

85.     In the Motion, the Debtor states that the case was filed "in good faith to pursue an equitable resolution of tens of thousands of talc claims."  The Debtor also states that it is "committed to engaging with claimant representatives and key stakeholders to consensually resolve the Chapter 11 Case."  The Informational Brief, on the other hand, commits over 100 pages to explaining how the J&J enterprise is the victim of a baseless, scientifically-unfounded smear campaign spearheaded by a profit-motivated plaintiff's bar.  See also Kim Declaration, at 12 ("The Debtor believes, for the reasons set forth in the Information Brief, that these [talc-related] claims have no valid scientific basis, as Old JJCI's talc products never contained asbestos . . . .").

Vigorous denials, asserting that each and every claim is baseless, are not a strong indicator of the pursuit of an equitable resolution.

86.    The Kim Declaration also notes that the Debtor (with support of J&J and New JCI) have agreed to fund a "qualified settlement fund" in the amount of $2 billion to resolve all current and future talc-related claims.  This figure is <u>half</u> the amount that, as a matter of public record, J&J offered to resolve all talc-related claims back in March of 2021—only three months prior to the denial of certiorari by the Supreme Court of J&J's appeal of a several-billion-dollar Missouri judgment entered against J&J and Old JJCI for talc-related personal injuries.  <u>See</u> Jef Feeley, <u>J&J Offered Talc Victims $4 Billion to Settle Claims Months Before Unit's Bankruptcy</u>, BLOOMBERG (October 21, 2021, 12:33 PM), https://www.bloomberg.com/news/articles/2021-10-21/j-j-offered-4-billion-to-settle-talc-months-before-bankruptcy; Ingham v. Johnson & Johnson, 608 S.W.3d 663 (Mo. Ct. App. 2020), <u>cert. denied</u> 141 S,Ct, 2716 (2021).   The Debtor has adopted positions incongruous with an expeditious reorganization.

87.    As stated previously, the Debtor's concerns about issues of "collateral estoppel" or "res judicata" affecting its estate or otherwise inhibiting its reorganization are meritless.

**B.    Litigation Against Alleged Protected Parties Cannot Cause the Debtor Irreparable Harm—As it Cannot Affect the Debtor at All**

88.    Fatal to the requested injunction in its own right, the Debtor has not established, and cannot establish, clear evidence that the post-petition assertion of non-derivative claims against the Alleged Protected Parties can cause the Debtor irreparable harm.  The Debtor's claims of non-debtor affiliate assumption of liabilities and indemnification rights, the implication of insurance policies, and retailer indemnification are not supported by the evidence on the record or the documents produced after the TRO Hearing.

89.     The Debtor asserts that it, of its own accord, "would be compelled to actively participate" in the litigation of talc-related claims involving the Alleged Protected Parties in the tort system, thereby "diverting the attention of key personnel who would otherwise be assisting the Debtor" in its bankruptcy case.  Motion, at 7.  This illogical position cannot support an injunction.  Any effort by the Debtor to voluntarily commit professionals to participate in litigation that has no bearing on its estate would raise serious bankruptcy issues.  The Debtor cannot distract itself into meriting injunctive relief.

**C.     The Balance of Equities Does Not Favor Issuing an Injunction for the Benefit of Third Parties Whose Liabilities Cannot Affect the Debtor**

90.     The Debtor fails to establish the third element, clear evidence that the balance of equities weighs in favor of a preliminary injunction.  The Debtor argues that purported risks of unequal results in the tort system merit an injunction, but the Debtor must first establish that it is a party with authority to settle non-derivative claims assertable against the Alleged Protected Parties.  The evidence demonstrates that the Debtor is not.  Non-debtors like J&J (which might seek to claim an interest in an injunction) are owed no obligation by the Debtor.

91.     Moreover, any complaints about the tort system are completely inconsistent with J&J's position in the Imerys case, where it argued in favor of allowing victims to proceed in the civil justice system: "The individual tort claimants who hold J&J Talc Claims would particularly benefit by taking their claims out of the bankruptcy and restoring to each full due process rights to 'have h[er or his] own day in court.'" Imerys Reply at 16 (citation omitted).

**D.     The Public Interest Is Not Served by Extending the Protections of a Bankruptcy Case to Third Parties Whose Liabilities Cannot Affect the Debtor**

92.     The Debtor has failed to demonstrate why the public interest is served by a sweeping and improper injunction.  Litigation against the Alleged Protected Parties cannot have

any financial or legally preclusive impacts on the Debtor's case.  Therefore, the Debtor's reliance

on cases such as In re W.R. Grace & Co.—in which the Bankruptcy Court for the District of

Delaware held that a railroad with (i) assertable indemnification rights against the debtors and (ii)

whose own liability to tort plaintiffs necessarily implicated the debtors' insurance policies was

entitled to the benefit of an injunction—is misplaced.  386 B.R. 17, 30–31 (Bankr. D. Del. 2008)

(citing A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986), for the "identity of

interest" test).

93.    Similarly misplaced is the Debtor's citation of and comparison to another asbestos

bankruptcy case pending before this Court, the Bestwall case.  Motion, at 60 (citing In re Bestwall

LLC, 606 B.R. 243 (Bankr. W.D.N.C. 2019)).  Like Aldrich Pump and DBMP, the Debtor shares

the same primary bankruptcy counsel as the debtor in Bestwall.  However, that counsel ignores

that the requested injunction seeks an unprecedented extension of the "Texas Two Step" benefits

to a parent company and other non-debtor affiliates not involved in the divisional merger.  This

Court has never (nor could it) issued such sweeping and inappropriate relief.

94.    The public interest does not favor condoning the creative and unprecedented legal

maneuvering on display in this case.  The Debtor, acting on behalf of (and at the apparent behest

of) J&J seeks to bootstrap the statutory benefits of its Petition to the independent tort liabilities

faced by J&J.  Meanwhile, J&J bears no bankruptcy-related financial reporting requirements, no

bankruptcy-related administration of its operations, and no disruption of its ordinary relationships

with creditors.

95.    The Debtor cites the cases of In re Federal-Mogul Global Inc., 684 F.3d 355 (3d

Cir. 2012), and In re Purdue Pharmaceuticals L.P., 619 B.R. 38 (S.D.N.Y. 2020), in support of its

requested injunction benefitting J&J, but it ignores that in those cases the actual tortfeasor entities

put themselves into bankruptcy. <u>Federal-Mogul Glob.</u>, 684 F.3d at 357 ("Federal-Mogul Global
and its affiliates filed for Chapter 11 bankruptcy and sought to resolve asbestos-related liability
through the creation of a personal-injury trust under 11 U.S.C.§ 524(g)."); <u>Purdue Pharma.</u>, 619
B.R. at 41 ("Purdue Pharmaceutical, L.P. and certain of its affiliated entities and debtors (together,
the "Debtors") filed for bankruptcy in this district on September 15, 2019.").

96.     This Court has expressed well founded concerns about the questionable propriety
of Texas divisional mergers to consolidate a tortfeasor's liabilities in a bankruptcy-purpose entity,
shielding a business's operations from both litigation and the negative impacts of a bankruptcy
petition. <u>Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In
re Aldrich Pump LLC)</u>, Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335, at *19,
n.156 (Bankr. W.D.N.C. Aug. 23, 2021) ("Be it an appropriate use of the bankruptcy laws, or not,
the "Texas Two Step" is an attorney designed strategy for use in a bankruptcy case."). However,
the relief requested in the Motion is far beyond that granted in <u>Aldrich Pump</u>, <u>DBMP</u>, or <u>Bestwall</u>.
The only Alleged Protected Parties with any meaningful identity of interest with the Debtor is Old
JJCI, and the Debtor and Old JJCI are the only parties in whose favor the Court has issued the
TRO. [ECF No. 28, at 4].

## CONCLUSION

97.     The Motion should be denied, as the Court lacks subject matter jurisdiction to enter
orders extending the automatic stay to, or enjoining litigation of, claims that are not "related to"
the Debtor's case. Notwithstanding jurisdiction, the absence of evidence regarding assumption of
liability by the Debtor, indemnification by the Debtor, or insurance coverage in which the Debtor
has a beneficial interest means the automatic stay cannot be extended to the Alleged Protected
Parties. Finally, the Debtor cannot demonstrate any clear evidence that it is entitled to injunctive

relief: (i) the Debtor's own statements indicate hostility towards talc claimants, not a consensual

reorganization; (ii) litigation against the Alleged Protected Parties cannot harm the Debtor; (iii)

the equities do not favor enjoining litigation in which the Debtor has no interest; and (iv) the public

interest in not served by rewarding creative lawyering in the absence of necessary facts.

Respectfully submitted, this the 1st day of November, 2021.

**WALDREP WALL BABCOCK
& BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Kevin L. Sink (NC State Bar No. 21041)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
John R. Van Swearingen (NC State Bar No. 53646)
Natalia L. Talbot (NC State Bar No. 55328)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

**MASSEY & GAIL LLP**

*/s/ Jonathan S. Massey*
Jonathan S. Massey (DC Bar 457593)
The Wharf
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: 202-650-5452
Facsimile: 312-379-0467
Email: www.masseygail.com

*Attorneys for Certain Mesothelioma Claimants*

# **<u>EXHIBITS FORTHCOMING</u>**

Exhibits will be filed separately due to CM/ECF file-size limitations.