**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LTL MANAGEMENT LLC,[1] | ) Case No. 21-30589 (JCW) |
| | ) |
| Debtor. | ) |
| | ) |
| LTL MANAGEMENT LLC, | ) |
| | ) |
| Plaintiff. | ) Adv. Proc. No. 21-03032 (JCW) |
| | ) |
| v. | ) |
| | ) |
| THOSE PARTIES LISTED ON | ) |
| APPENDIX A TO COMPLAINT and | ) |
| JOHN AND JANE DOES 1-1000, | ) |
| | ) |
| Defendants. | ) **Re: Bankr. Docket No. 44; Adv. Docket No. 2** |
| | ) |

**OPPOSITION OF AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC**
**TO DEBTOR'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"), on behalf of thousands of

holders of talc personal injury claims (the "AWKO Claimants"), hereby opposes (i) the *Debtor's*

*Motion for an Order (I) Declaring That the Automatic Stay Applies to Certain Actions Against*

*Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary*

*Restraining Order Pending a Final Hearing* [Adv. Docket No. 2] (the "A/P Motion"); and

(ii) the *Debtor's Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who*

*Seek to Pursue Their Claims Against the Debtor and Its Non-Debtor Affiliates* [Bankr. Docket

No. 44] (the "Main Case Motion" and, together with the A/P Motion, the "Motions").[2]

---

[1]  The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George
Street, New Brunswick, New Jersey 08933.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motions.

## PRELIMINARY STATEMENT

1.      The Debtor appears to presume that the injunctive relief sought in the Motions will be granted as a matter of course given the rulings in *In re DBMP LLC*, 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ("*DBMP*"), and *In re Aldrich Pump LLC*, 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) ("*Aldrich*").  The Debtor's presumptuousness is unwarranted. There are three key differences between this case and *DBMP* and *Aldrich*:

- *First*, unlike the parent companies in *DBMP* and *Aldrich*, the Debtor's parent – J&J – has its own direct liability to talc plaintiffs.  No amount of intercompany accounting or corporate paper-shuffling can transform talc claimants' lawsuits against J&J for J&J's own direct conduct into actions "against the debtor" or "to recover a claim against the debtor," 11 U.S.C. § 362(a)(1), such that those actions are automatically stayed.

- *Second,* neither *DBMP* nor *Aldrich* addressed the insurance circumstances here, in which "none of [the Debtor's] insurers has acknowledged its coverage obligations, defended [any entity in the Debtor's corporate family], paid [any] costs of defense, or indemnified [any entity in the Debtor's corporate family] for settlements or judgments."  First Day Decl. ¶ 53.  On these facts, the Debtor's argument that shared insurance coverage between J&J and the Debtor implicates the automatic stay under section 362(a)(3) is wholly speculative.

- *Third*, the decisions in both *DBMP* and *Aldrich* were the culmination of between 15 to 20 months of intense litigation between the petition dates and the decision dates.  During that time, all parties in interest, including

statutory committees, had a full and fair opportunity to develop the facts
and argue the law.  Here, the Debtor's case has been pending barely 15 to
20 *days*.  No official committee exists, and discovery, briefing, and
argument have all been highly truncated – not because of any external
circumstance that necessitated an emergency bankruptcy filing (such as an
imminent foreclosure or particular jury verdict), but rather because this is
the timeframe that J&J voluntarily and unilaterally selected to effect its
Texas Two-Step.

2.      With these three key differences, and especially with venue (and hence the
ultimate applicability of *DBMP* and *Aldrich*) still an open question, the Court should decline the
Debtor's request to make any findings – even on a preliminary basis – that the talc litigation is
automatically stayed under section 362.  The automatic stay is an appropriately blunt tool when
wielded against litigation that clearly falls within its purview, such as actions that name a debtor
itself as a defendant.  In such circumstances, there is generally no occasion for weighing the
equities: the lawsuit is stayed automatically, by clear statutory command.  But where, as here, the
claimed application of the automatic stay rests on highly contested assertions about the factual
particulars and legal implications of corporate transactions that span four decades (from 1970s-
era internal J&J dealings through the 2021 Texas Two-Step), the applicability of the automatic
stay is far more complex, nuanced, and fact-dependent.  Such determinations should not be made
on a truncated schedule or on the Debtor's essentially talismanic invocations of *DBMP* and
*Aldrich*, which presume that those two recent decisions (untested on appeal) settled all section
362 issues for all divisive merger cases for all time.

3

3. The Court should instead evaluate the Debtor's request for preliminary injunctive relief under Bankruptcy Code section 105. That requires a balancing of the likelihood of the Debtor's successful reorganization (highly speculative at best) against the immediate, concrete, and indisputable harm that will be visited on talc claimants if their cases are stayed. The inquiry takes into account the public interest, and is conducted against the background principle that preliminary injunctive relief is "extraordinary" and should be granted "only sparingly and in limited circumstances." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

4. No preliminary injunctive relief is warranted here. This Debtor was created as the product of an actual intent fraudulent transfer. Its very purpose is, at a minimum, to "hinder" or "delay" creditors, if not to "defraud" them. *See* 11 U.S.C. § 548(a)(1)(A) ("actual intent to hinder, delay, *or* defraud" creditors – in the disjunctive (emphasis added)). It is true that no court has (yet) declared that obvious fact to be a fact, but for what other purpose did J&J orchestrate this Texas Two-Step? It certainly was not to *help* J&J's creditors. Its purpose was to benefit J&J. With J&J's unquestionable solvency and liquidity, the benefit that J&J anticipates will only come at the expense of J&J's creditors. Its effect will be, at a minimum, to "hinder" and "delay" talc claimants (hence the pending Motions for preliminary injunctive relief).

5. In undertaking the balancing required by section 105, the Court must assess the likelihood that a scheme orchestrated by one of the most solvent enterprises in the world to hinder and delay its creditors will ultimately result in a successful reorganization. That assessment should take into account the low odds of peace breaking out to deliver the super-majority of creditor support required under Bankruptcy Code section 524(g) (which is admittedly the Debtor's only game plan), as well as the ample tools that will be available to creditors to challenge J&J's machinations, including:

- Dismissal for cause, which may or may not be decided under Fourth Circuit precedent, depending on this case's ultimate venue;

- Derivative standing to pursue fraudulent transfer claims against J&J and JJCI, which appears highly likely given the trajectory of this case and developments in other cases pending before this Court; and

- Substantive consolidation of non-debtors JJCI and/or J&J into the bankruptcy estate, for which this case may serve as a textbook example.

6.      When these circumstances are accounted for, the likelihood of a successful reorganization here is a far cry from even *DBMP* and *Aldrich*. Nor is there any irreparable harm: J&J is one of the most solvent enterprises in the world, and is fully capable of defending litigation brought against it for its own misconduct. The equities tip decidedly in favor of allowing talc claimants to continue their cases against J&J for J&J's own independent misconduct. Adding the public interest into the mix solidifies the conclusion that no preliminary injunctive relief is warranted here, as there is "no public policy interest in aiding a fraud on creditors." *DBMP*, 2021 WL 3552350, at *42; *Aldrich*, 2021 WL 3729335, at *38.

7.      Finally, to the extent the Court is inclined to grant any of the relief sought in the Motions, the Court should ensure that non-debtor beneficiaries have some skin in the game. Appropriate equitable relief does not visit all the burdens on one side; it strikes a balance such that both sides have appropriate incentives. Thus, any preliminary injunctive relief in favor of a non-debtor should be conditioned on that non-debtor's express agreement to provide due notice to the Court and parties in interest of any transactions outside the ordinary course of business and to declare no dividends and make no changes in executive compensation during the pendency of the relief.

## FACTUAL BACKRGOUND

8.      AWKO incorporates by reference the background set out in *Aylstock, Witkin,*

*Kreis & Overholtz PLLC's (I) Objection to Debtor's Ex Parte Motion for an Emergency*

*Hearing; (II) Preliminary Response to Debtor's Emergency Motion to Enforce the Automatic*

*Stay; and (III) Joinder in Related Filings* [Bankr. Docket No. 103]. AWKO also joins the

objections to the Motions filed or expected to be filed by other plaintiffs opposing the relief

sought in the Motions, including the declarations and other evidence tendered therewith.

9.      In addition, AWKO respectfully refers the Court to the documentary and

testimonial evidence already adduced at the TRO hearing on October 22, 2021, and the evidence

that will be presented at the hearing on the Motions scheduled for November 4 and 5, 2021,

including the evidence offered or to be offered by the Debtor itself (such as the declarations and

testimony of Mr. Kim). This evidence reflects that:

- J&J has its own direct liability to talc plaintiffs such as the AWKO

  Claimants, separate from and independent of the Debtor's liability;

- The Debtor's position that all of J&J's talc-related liabilities were

  transferred to or are siloed in the Debtor or its predecessors rests on hotly

  contested facts about decades-old corporate transactions for which there is

  incomplete or missing documentation; and

- Any assertions of "shared insurance" between and among members of the

  J&J corporate family are highly speculative insofar as no insurer has

  acknowledged any coverage obligations or defended or indemnified any

  entity in the Debtor's corporate family for settlements or judgments

  related to talc.

# ARGUMENT

## A.    Talc-Related Litigation Against Non-Debtors is Not Automatically Stayed

10.    Section 362(a)(1) prohibits the "commencement or continuation … of a judicial … proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."  Section 362(a)(1) "provides only for the automatic stay of judicial proceedings and enforcement of judgments 'against the debtor or the property of the estate.'"  *Credit Alliance Corp. v. Williams*, 851 F.2d 119, 121 (4th Cir. 1988). Section 362(a)(3) stays suits involving the "possession" or "control" of property of the debtor. Neither section 362(a)(1) nor 362(a)(3) applies here.

11.    The seminal case in the Fourth Circuit on the application or extension of the automatic stay to non-debtors is *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ("*Robins*").  There, the debtor itself was the primary alleged tortfeasor, the primary named defendant in the personal injury litigation at issue, and the primary owner of the insurance coverage applicable to the personal injury claims.  The Fourth Circuit was confronted with a situation where certain plaintiffs sought to evade the automatic stay that indisputably applied to the debtor by instead electing to proceed with claims against secondary or tertiary parties.  It was in that specific factual context that the Fourth Circuit concluded the plaintiffs were barred from pursuing their claims against non-debtors on an "identity of interests" analysis.  *Id*. at 999.

12.    This case is not *Robins*.  Here, the Debtor is a newly-confected creation "designed to ferry" another solvent enterprise's "liabilities into bankruptcy."  *DBMP*, 2021 WL 3552350, at *13.  The machinations that created the Debtor – including rapid-fire corporate actions across multiple jurisdictions and a web of funding and services agreements – are specifically and admittedly tailored to exploit the Debtor's alleged separateness to the extent such separateness

benefits J&J, while at the same time keeping the Debtor just close enough so that J&J (and hundreds of other putative "Protected Parties") can avail themselves of the *Robins* "identity of interests" language.

13.     The *Robins* decision and its "identity of interests" language is not a section of the Bankruptcy Code that can be mechanically and a-textually applied; rather, "it is just an explanation for the Court's disposition."  *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).  "Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration."  *Id.*  Explanatory expositions such as the "identity of interests" reasoning of *Robins* thus cannot be applied in the abstract, without consideration of the specific facts and circumstances before a court.

14.     Here, the Court can and should take into account all the relevant circumstances and assess whether the Fourth Circuit would have reached the result it reached in *Robins* had the facts of *Robins* been the facts here – *i.e.*, a solvent enterprise confecting a new debtor entity to take advantage of that entity's automatic stay without subjecting the enterprise itself to the bankruptcy process of which the stay is merely one integral part.  To ask the question is to answer the question.  *Cf. Pepper v. Litton*, 308 U.S. 295, 305 (1939) ("The bankruptcy courts have exercised the[ir] equitable powers … to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." (footnote omitted)).

**B.      The Court Should Not Grant Preliminary Injunctive Relief**

15.     Preliminary injunctions are "extraordinary remedies" that should be granted "only sparingly and in limited circumstances."  *Winter*, 555 U.S. at 22.  To obtain such relief, the Debtor must make "a clear showing" that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in the

Debtor's favor, and that an injunction is in the public interest.  *Id.* at 20.  In bankruptcy, "success

on the merits is to be evaluated in terms of the likelihood of a successful reorganization."  *In re*

*Bestwall LLC*, 606 B.R. 243, 254 (Bankr. W.D.N.C. 2019).

16.     J&J is among the most solvent, liquid, and profitable corporations in the world.  It

is capable of answering for its own direct liability to talc plaintiffs, as it has been doing for years.

There is no reason to upset that status quo now – especially not to facilitate the "reorganization"

of a newly-created entity with no employees, no operations, and no realistic prospect that a

super-majority of creditors will vote in favor of a channeling injunction under Bankruptcy Code

section 524(g).

17.     The far more likely trajectory of this case is dismissal for cause.[3]  Barring that, the

active and engaged creditor body in this case is likely to secure derivative standing to pursue

fraudulent transfer claims against J&J and JJCI, to seek substantive consolidation of non-debtors

JJCI and/or J&J into the bankruptcy estate, *see Sampsell v. Imperial Paper & Color Corp.*, 313

U.S. 215, 217-19 (1941) (ordering consolidation upon finding that corporate debtor "was formed

for the purpose of hindering, delaying and defrauding … [the non-debtor's] creditors"),[4] and to

exercise other tools provided by the Bankruptcy Code to frustrate what they correctly perceive to

---

[3]  Although the Court observed in *DBMP* and *Aldrich* that the Fourth Circuit utilizes a relatively stringent test for dismissal for cause, *see DBMP*, 2021 WL 3552350, at *23 (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700-01 (1989) and *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019)); *Aldrich*, 2021 WL 3729335, at *26 (same), the *Carolin* court *affirmed* dismissal for cause where the debtor: (i) "failed to show significant potential to ultimately emerge from Chapter 11 proceedings in a rehabilitated condition – that is ready to carry on with viable business operations," thereby satisfying the objective futility prong, and (ii) satisfied the subjective bad faith prong of the test because the debtor's shareholder was formed just days before the debtor filed its petition solely for the purpose of staying a foreclosure sale, which would have taken place mere minutes after the petition. 886 F.2d at 702-04.  The facts here are not far afield from the facts that justified dismissal for cause in *Carolin*.

[4]  *See also, e.g.*, *In re Clark*, 548 B.R. 246, 249 (B.A.P. 9th Cir. 2016), *aff'd*, 692 F. App'x 946 (9th Cir. 2017); *In re Bonham*, 229 F.3d 750, 765 (9th Cir. 2000); *In re Auto-Train Corp.*, 810 F.2d 270, 275 (D.C. Cir. 1987); *In re Munford, Inc.*, 115 B.R 390, 395-96 (Bankr. N.D. Ga. 1990); *In re Tureaud*, 59 B.R. 973, 974, 978 (N.D. Okla. 1986); *In re Giller*, 962 F.2d 796, 798-99 (8th Cir. 1992); *Kapila v. S&G Fin. Servs, LLC (In re S&G Fin. Servs. of S. Fla., Inc.)*, 451 B.R. 573, 585 n.14 (Bankr. S.D. Fla. 2011); *In re Logistics Info. Sys., Inc.*, 432 B.R. 1, 12 (D. Mass. 2010).

be an affront to the bankruptcy process.  *Cf*. Garrard Glenn, The Law of Fraudulent

Conveyances, § 43 (Rev. ed. 1940) ("The fraudulent conveyance is nothing but an offense

against the creditor's right to realize his debt [and] the collective right of creditors to a fair

distribution of their debtor's estate").

18.    It is true, of course, that at this early stage of the case, there are no currently

pending requests for dismissal, derivative standing, substantive consolidation, or other remedies.

But the fact that such relief is not before the Court right now does not mean that the Court should

presume that this chapter 11 case is likely to succeed.  Filed and fully briefed and argued motions

are not the *sine qua non* of likely entitlement to relief.  (Or, more colloquially, there is not

always a need for a weatherman to know which way the wind is blowing.)

19.    Nor has the Debtor shown any likelihood of irreparable harm.  Given J&J's

unquestioned solvency and unlimited funding commitment, there is no concrete or particularized

harm to the Debtor in permitting litigation to proceed against J&J in the ordinary course.  Any

indemnification obligations on the part of the Debtor are speculative at best (given the

independent liability of J&J) and may well be subject to recharacterization, subordination, or

other appropriate treatment.  By contrast, the harm to plaintiffs of a preliminary injunction is real

and immediate.  A plaintiff's sole and exclusive leverage is his or her ability to use the legal

process to seek compensation for harm.  Halting all such litigation is not a mere temporary

pause; it is the equivalent of cutting the plaintiff off at the knees.

20.    Finally, considerations of the public interest weigh heavily against preliminary

injunctive relief.  There is "no public policy interest in aiding a fraud on creditors."  *DBMP*,

2021 WL 3552350, at *42; *Aldrich*, 2021 WL 3729335, at *38.  Shielding J&J from lawsuits

seeking recompense for J&J's own independent conduct would, among other things, greatly

undermine public confidence in the bankruptcy system by appearing to reward gamesmanship.[5]

## C.     Any Relief Should be Limited in Scope and Duration, and Fairly Balanced

21.     To the extent the Court is inclined to grant any relief whatsoever in connection

with the Motions, such relief should be appropriately tailored and circumscribed, with a definite

expiration date that can be extended for cause shown (rather than an indefinite duration that can

only be ended for cause shown).

22.     In view of the fact that any injunctive relief will provide a significant benefit to

J&J and other non-debtors at the expense of litigation plaintiffs, the Court should balance the

equities by conditioning relief on commonsense provisions that will ensure that the beneficiaries

of the relief have an incentive to bring matters to an expeditious conclusion.  Such provisions

should include a non-debtor beneficiary's express agreement to provide due notice to the Court

and parties in interest of any transactions outside the ordinary course of business and to declare

no dividends and make no changes in executive compensation during the pendency of the relief.

The Supreme Court's description of equity jurisdiction in *Swann v. Charlotte-Mecklenburg*

*Board of Education* is instructive as to this Court's power and responsibility in this regard:

> The essence of equity jurisdiction has been the power of the Chancellor to
> do equity and to mould each decree to the necessities of the particular
> case.  Flexibility rather than rigidity has distinguished it.  The qualities of
> mercy and practicality have made equity the instrument for nice

---

[5]   *See* Jamie Smyth, "Johnson & Johnson's 'Texas-two-step' sparks outcry over US bankruptcy regime", *The Financial Times* (October 27, 2021), *available at* https://www.ft.com/content/de13b1ec-9b4a-4a27-ae63-c8ea38ffc683; Adam Levitin, "The Texas Two-Step: The New Fad in Fraudulent Transfers", *Credit Slips* (July 19, 2021), *available at* https://www.creditslips.org/creditslips/2021/07/the-texas-two-step.html; *see also* Written Testimony of Adam J. Levitin, "Oversight of the Bankruptcy Code, Part I: Confronting Abuses of the Chapter 11 System" (July 28, 2021), *available at* https://docs.house.gov/meetings/JU/JU05/20210728/113996/HHRG-117-JU05-Wstate-LevitinA-20210728.pdf.

adjustment and reconciliation between the public interest and private
needs as well as between competing private claims.

402 U.S. 1, 15 (1971) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944)).

## CONCLUSION

23.    For all the reasons set forth above and in the erudite submissions of other

plaintiffs opposing the relief sought, the Motions should be denied.

Dated: November 1, 2021                    Respectfully submitted,

**OFFIT KURMAN, P.A.**

/s/ Paul R. Baynard
Paul R. Baynard (NC Bar No. 15769)
301 South College Street, Suite 2600
Charlotte, North Carolina 28202
Telephone:    (704) 377-2500
Email:          Paul.Baynard@offitkurman.com

- and -

**KTBS LAW LLP**
Michael L. Tuchin (*pro hac vice*)
Robert J. Pfister  (*pro hac vice*)
Samuel M. Kidder (*pro hac vice*)
Nir Maoz (*pro hac vice*)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090
Email:          mtuchin@ktbslaw.com
                  rpfister@ktbslaw.com
                  skidder@ktbslaw.com
                  nmaoz@ktbslaw.com

*Attorneys for Aylstock, Witkin, Kreis & Overholtz,*
*PLLC*