**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
PROPOSED ATTORNEYS FOR DEBTOR

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.:  21-30589 (MBK) |
| Debtor. | Judge:  Michael B. Kaplan |
| | **Hearing Date and Time:** January 11, 2021 at 10:00 a.m. |
| In re: | |
| LTL MANAGEMENT LLC, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 21-03032 (MBK) |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | |
| Defendants. | |

## DEBTOR'S SUPPLEMENTAL MEMORANDUM OF
## LAW IN SUPPORT OF PRELIMINARY INUNCTION MOTION

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF FACTS ................................................................................. 5

    A.    General Background ............................................................................. 5

    B.    Corporate History................................................................................. 7

        1.    J&J Adopts Decentralization Policy ........................................ 8

        2.    Old JJCI's Responsibility For All Liabilities Associated With JOHNSON'S® Baby Powder.......................................... 8

        3.    Old JJCI's Responsibility For All  Liabilities Associated with Shower to Shower ............................................... 12

        4.    The 2021 Corporate Restructuring......................................... 14

    C.    Financial Course of Performance....................................................... 17

    D.    The Debtor Talc Claims...................................................................... 18

        1.    Talc-Related Claims against the Debtor and J&J Are the Same ............ 19

        2.    Health and Medical Safety Decisions Were Made By Old JJCI ............ 22

        3.    Windsor Minerals Inc. Was at All-Times a Subsidiary of J&J............... 24

    E.    The Debtor's Insurance Coverage ...................................................... 25

    F.    The Debtor's Retailers and Other Indemnified Parties ...................... 28

    G.    The Debtor's Decision to File for Chapter 11 Reorganization............ 30

    H.    The NC Bankruptcy Court's Ruling on the PI Motion........................ 33

II.    THE COURT HAS SUBJECT MATTER JURISDICTION............................. 34

    A.    The Court Has Both "Arising Under" and "Arising in" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and Would Have No Existence Outside of Bankruptcy ............................... 35

    B.    The Court Has "Related to" Jurisdiction Over Third-Party Claims, Including Direct Claims, Against the Protected Parties........................ 37

III.    THE AUTOMATIC STAY PROHIBITS PROSECUTION OF DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES ....................................... 39

    A.    Actions Seeking to Hold Protected Parties Liable for Debtor Talc Claims Are Stayed Pursuant to Section 362(a)(1) ......................................... 41

    B.    Insurance Policies Are Estate Assets and Therefore Suits That Would Deplete Those Policies Are Automatically Stayed............................... 44

    C.    Actions Seeking to Hold Protected Parties Liable for the Debtor Talc Claims Based on "Derivative Liability" Are Property of the Debtor's Estate and Automatically Stayed ........................................................ 46

# TABLE OF CONTENTS
### (continued)

| | | | Page |
|---|---|---|---|

1.     The Debtor Had Standing Under State Law To Assert Alter Ego and Successor Liability Claims at the Time It Commenced the Chapter 11 Case ...................................................................................... 48

2.     Any Alleged Alter Ego and Successor Liability Claims Are Based on Facts and Legal Theories that Are Generally Available to Other Creditors of the Debtor ............................................................................ 56

D.     The Debtor Has Exclusive Standing to Assert the Defendants' Fraudulent Transfer Claims .................................................................................... 60

IV.     THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(A) TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF THE DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES ........................ 62

A.     The Court Has Authority to Enjoin the Pursuit of Debtor Talc Claims Against the Protected Parties .............................................................. 62

1.     The Court Has Authority to Enjoin "Direct" Claims Against the Protected Parties ...................................................................... 65

B.     The Preliminary Injunction Factors All Support Enjoining the Pursuit of Debtor Talc Claims Against the Protected Parties ................................. 75

1.     The Debtor's Successful Reorganization Is Likely ................................. 77

2.     Failure to Enjoin Litigation of Debtor Talc Claims Would Irreparably Harm the Debtor .................................................... 79

3.     The Irreparable Harm that the Debtor Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to the Defendants .......................................................................... 86

4.     Injunctive Relief Will Further the Public Interest by Ensuring the Debtor's Successful Reorganization and Equitable Treatment of Defendants ........................................................................... 90

CONCLUSION .................................................................................................... 93

# TABLE OF AUTHORITIES

**Page**

CASES

TK Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.),
    No. 17-11375, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017)..............................66

A.H. Robins Co., Inc. v. Piccinin,
    788 F.2d 994 (4th Cir. 1986) .............................4, 36, 39, 43, 44, 45, 62, 63, 64, 67, 81, 82, 92

ACandS, Inc. v. Travelers Cas. & Sur. Co.,
    435 F.3d 252 (3d Cir. 2006)...........................................................................................26, 45

Alvarez v. Ward,
    No. 1:11CV03, 2011 WL 7025906 (W.D.N.C. Oct. 17, 2011) .........................................50, 52

Alvarez v. Ward,
    No. 1:11CV03, 2012 WL 113567 (W.D.N.C. Jan. 13, 2012) .....................................50, 52, 60

Anderson et al. v. Borg Warner Corp. et al.,
    No. BC666513 ...............................................................................................................21

Artesanias Hacienda Real S.A. DE C.V. v. N. Mill Cap., LLC (In re Wilton
    Armetale, Inc.),
    968 F.3d 273 (3d Cir. 2020)...................................................................................46, 47, 56, 61

Baillie Lumber Co., LP v. Thompson (In re Icarus Holding, LLC),
    391 F.3d 1315 (11th Cir. 2004) ......................................................................................47, 56

Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,
    296 F.3d 164 (3d Cir. 2002)...........................................................................................47, 56

Belcufine v. Aloe,
    112 F.3d 633 (3d Cir. 1997)...........................................................................................43, 67

Berg v. Johnson & Johnson,
    940 F.Supp.2d 983 (D. S. Dakota 2013)..................................................................................30

Borman v. Raymark Indus., Inc.,
    946 F.2d 1031 (3rd Cir. 1991) ...............................................................................................42

Butler v. Enhanced Equity Fund II, LP
    (In re Am. Ambulette & Ambulance Serv. Inc.),
    560 B.R. 256 (Bankr. E.D.N.C. 2016) ...................................................................49

Butner v. United States,
    440 U.S. 48 (1979) ...........................................................................................46

Celotex Corp. v. Edwards,
    514 U.S. 300 (1995) ..........................................................................................37

Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs.,
    138 B.R. 144 (S.D.N.Y. 1992) .....................................................................36, 70

Cho v. Park (In re Park),
    682 F. App'x 104 (3d Cir. 2017) .......................................................................60

City of Richmond v. Madison Mgmt. Grp., Inc.,
    918 F.2d 438 (4th Cir. 1990) ............................................................................53

Covertech Fabricating, Inc. v. TVMP Building Prods., Inc.,
    No. 3:17-cv-196, 2017 WL 5466709 (W.D. Pa. Nov. 13, 2017) ...........................42

DBMP LLC v. Those Parties Listed on Appendix A to Complaint
    (In re DBMP LLC),
    2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ...........................3, 5, 35

Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.,
    54 B.R. 353 (Bankr. W.D. Wis. 1985) ................................................................78

Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.),
    619 B.R. 38 (S.D.N.Y. 2020) .......................................................................65, 68

Edwards v. McElliotts Trucking, LLC,
    No. 3:16-1879, 2017 WL 5559921 (S.D. W. Va. Nov. 17, 2017) ..........................43

Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.,
    479 N.E.2d 1386 (Mass. 1985) ..........................................................................29

FPSDA II, LLC v. Larin (In re FPSDA I, LLC),
    No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794
    (Bankr. E.D.N.Y. Dec. 21, 2012) .................................................................35, 37

FPSDA II, LLC v. Larin,
    Nos. 10-75439, 12-08032, 2012 Bankr. LEXIS 5906
    (Bankr. E.D.N.Y. Dec. 21, 2012).................................................................................36

Harrison v. Soroof Int'l, Inc.,
    320 F. Supp. 3d 602 (D. Del. 2018).....................................................................42, 57

Holcomb v. Pilot Freight Carriers, Inc.,
    120 B.R. 35 (M.D.N.C. 1990) ................................................................50, 51, 52, 60

Hollis v. Hill,
    232 F.3d 460 (5th Cir. 2000) ...............................................................................49

Hood, et al. v. Acme et al.,
    No. 2020-CP10-03946 ..........................................................................................22

In re ACandS, Inc.,
    No. 02-12687 (PJW), Adv. No. 02-5581 (PJW)
    (Bankr. D. Del. Sept. 27, 2002) ..........................................................................65

In re Alcon Demolition, Inc.,
    204 B.R. 440 (Bankr. D.N.J. 1997) .....................................................................49

In re Aldrich Pump LLC,
    No. 20-30608 (JCW), Adv. No. 20-03041 (JCW)
    (Bankr. W.D.N.C. Aug. 23, 2021) ...........................................................43, 65, 80

In re Am. Film Techs., Inc.,
    175 B.R. 847 (Bankr. D. Del. 1994) ..................................64, 66, 67, 71, 84, 89

In re Arrow Mill Dev. Corp.,
    185 B.R. 190 (Bankr. D.N.J. 1995) .....................................................................48

In re The Babcock & Wilcox Co.,
    No. 00-10992 (JAB), Adv. No. 00-1029 (JAB)
    (Bankr. E.D. La. Apr. 17, 2000) ..........................................................................65

In re Bestwall LLC,
    606 B.R. 243 (Bankr. W.D.N.C. 2019)........5, 35, 39, 64, 75, 77, 78, 81, 84, 85, 87, 88, 89, 92

In re Bridgepoint Nurseries, Inc.,
    190 B.R. 215 (Bankr. D.N.J. 1996) .....................................................................48

In re Brier Creek Corp. Ctr. Assocs. Ltd.,
  486 B.R. 681 (Bankr. E.D.N.C. 2013)...............................................................4, 36, 37, 76, 77

In re Calpine Corp.,
  365 B.R. 401 (S.D.N.Y. 2007)...............................................................................................63

In re Colonial Realty Co.,
  980 F.2d 125 (2d Cir. 1992)....................................................................................................41

In re Combustion Eng'g, Inc.,
  391 F.3d 190 (3d Cir. 2004)...........................................................................................88, 92

In re Combustion Eng'g, Inc.,
  No. 03-10495 (JKF), Adv. No. 03-50839 (JKF) (Bankr. D. Del. Mar. 7, 2003)....................65

In re Congoleum Corp.,
  362 B.R. 198 (Bankr. D.N.J. 2007) ......................................................................................91

In re Cybergenics Corp.,
  226 F.3d 237 (3d. Cir. 2000)...........................................................................................61, 62

In re DBMP LLC,
  No. 20-30080 (JCW), Adv. No. 20-03004 (JCW)
  (Bankr. W.D.N.C. Aug. 10, 2021) .........................................................................................65

In re Dow Corning Corp.,
  211 B.R. 545 (Bankr. E.D. Mich. 1997) ...............................................................................91

In re Eagle-Picher Indus., Inc.,
  963 F.2d 855 (6th Cir. 1992) .................................................................................................77

In re Elsinore Shore Assocs.,
  91 B.R. 238 (Bankr. D.N.J. 1988) .........................................................................................37

In re Emoral, Inc.,
  740 F.3d 875 (3d Cir. 2014)..........................................46, 47, 49, 53, 54, 55, 56, 57, 58, 60, 74

In re Family Health Servs., Inc.,
  105 B.R. 937 (Bankr. C.D. Cal. 1989)..............................................................................64, 82

In re Federal-Mogul Glob., Inc.,
  684 F.3d 355 (3d Cir. 2012).............................................................................................78, 87

In re First Interregional Advisors Corp.,
   271 B.R. 463 (Bankr. D.N.J. 2001) ...................................................................48, 69

In re G-1 Holdings, Inc.,
   420 B.R. 216 (D.N.J. 2009) ......................................................................75, 76, 77

In re G-I Holdings, Inc.,
   327 B.R. 730 (Bankr. D.N.J. 2005) ...................................................................37

In re G-I Holdings, Inc.,
   580 B.R. 388 (Bankr. D.N.J. 2018) ...................................................................37

In re Gander Partners LLC,
   432 B.R 781 (Bankr. N.D. Ill. 2010) ............................................................90, 92

In re Garlock Sealing Techs. LLC,
   No. 10-31607, Adv. No. 10-03145 (Bankr. W.D.N.C. June 21, 2010) ...........35, 65

In re Gathering Rest., Inc.,
   79 B.R. 992 (Bankr. N.D. Ind. 1986).................................................................78

In re Gronczewski,
   444 B.R. 526 (Bankr. E.D. Pa. 2011) ...............................................................62

In re Harbison-Walker Refractories Co.,
   No. 02-21627 (JKF), Adv. No. 02-02080 (Bankr. W.D. Pa. Feb. 14, 2002).........65

In re Heating Oil Partners,
   No. 3:08-CV-1976 CSH, 2009 WL 5110838 (D. Conn. Dec. 17, 2009)...............41

In re Heron, Burchette, Ruckert & Rothwell,
   148 B.R. 660 (Bankr. D.D.C. 1992) ..................................................................64

In re Hillsborough Holdings Corp.,
   123 B.R. 1004 (Bankr. M.D. Fla. 1990) .............................................................78

In re Integrated Health Servs., Inc.,
   281 B.R. 231 (Bankr. D. Del. 2002) ..................................................................92

In re Irish Bank Resolution Corp. Ltd.,
   2019 WL 4740249 (D. Del. Sept. 27, 2019).......................................................76

In re Johns-Manville Corp.,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983) ........................................................................62, 81, 84, 90

In re Johns-Manville Corp.,
    40 B.R. 219 (S.D.N.Y. 1984) ...................................................................................44, 62, 86

In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., & Prod.
    Liab. Litig.,
    No. 3:16-MD-02738-FLW-LHG (D. N.J. Dec. 12, 2020) .......................................................20

In re Kaiser Gypsum Co., Inc.,
    No. 16-31602 (JCW), Adv. No. 16-03313 (JCW)
    (Bankr. W.D.N.C. Nov. 4, 2016) ..........................................................................................65

In re Kaplan,
    186 B.R. 871 (Bankr. D.N.J. 1995) .....................................................................................49

In re Keene,
    164 B.R. 844 (Bankr. S.D.N.Y 1994) ............................................................49, 54, 55, 60

In re Lazarus Burman Assocs.,
    161 B.R. 891 (Bankr. E.D.N.Y. 1993) ...........................................................................63, 89

In re Leslie Controls, Inc.,
    No. 10-12199 (CSS), Adv. No. 10-51394 (CSS)
    (Bankr. D. Del. July 14, 2010) ...........................................................................................64

In re Lomas Fin. Corp.,
    117 B.R. 64 (S.D.N.Y. 1990) ..............................................................................................82

In re Manley Toys Ltd.,
    No. 16-15374 (JNP), 2020 WL 1580244 (Bankr. D.N.J. Mar. 31, 2020) .............................40

In re Melly,
    No. 18-26036-RG, 2019 WL 1953661 (Bankr. D.N.J. Apr. 29, 2019) ...........................60, 61

In re Metro Mortg. & Secs. Co.,
    325 B.R. 851 (Bankr. E.D. Wash. 2005) .............................................................................45

In re Mid Valley, Inc.,
    No. 03-35592 (JKF), Adv. No. 03-3296 (JKF)
    (Bankr. W.D. Pa. Dec. 17, 2003) ........................................................................................65

In re Midstate Mills,
    No. 13-50033, 2015 WL 5475295 (Bankr. W.D.N.C. Sept. 15, 2015) .............................50, 52

In re Monroe Well Serv., Inc.,
    67 B.R. 746 (Bankr. E.D. Pa. 1986) ......................................................................................37

In re Montreal Me. & Atl. Ry., Ltd.,
    No. 1:13-MC-00184-NT, 2014 WL 1155419 (D. Me. Mar. 21, 2014) ..................................45

In re Ms. Kipps, Inc.,
    34 B.R. 91 (Bankr. S.D.N.Y. 1983) .......................................................................................67

In re Myerson & Kuhn,
    121 B.R. 145 (Bankr. S.D.N.Y. 1990) ...................................................................................64

In re N. Am. Refractories Co.,
    No. 02-20198 (JKF), Adv. No. 02-2004 (JKF) ......................................................................65

In re Phila. Newspapers, LLC,
    407 B.R. 606 (E.D. Pa. 2009) .......................................................................38, 63, 72, 75, 77

In re Pittsburgh Corning Corp.,
    No. 00-22876 (JKF), Adv. No. 00-2161 (JKF)
    (Bankr. W.D. Pa. Apr. 16, 2000) ...........................................................................................65

In re PTI Holding Corp.,
    346 B.R. 820 (Bankr. D. Nev. 2006) .....................................................................................89

In re Purdue Pharma L.P.,
    No. 19-23649, Adv. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) ..............................64, 69

In re PWS Holding Corp.,
    303 F.3d 308 (3d Cir. 2002) ..................................................................................................61

In re Quigley Co., Inc.,
    No. 04-15739 (PCB), Adv. No. 04-04262 (PCB)
    (Bankr. S.D.N.Y. Dec. 17, 2004) .....................................................................................65, 66

In re RNI Wind Down Corp.,
    348 B.R. 286 (Bankr. D. Del. 2006) ......................................................................................62

In re Seven Fields Dev. Corp.,
    505 F.3d 237 (3d Cir. 2007) ..................................................................................................37

In re Specialty Prods. Holding Corp.,
   No. 10-11780, Adv. No. 10-51085 (Bankr. D. Del. Oct. 13, 2010) ..................................35, 64

In re SunEdison, Inc.,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017)......................................................................................39

In re TK Holdings Inc.,
   Case No. 17-50880, Adv. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) ........................64, 67

In re United Health Care Org.,
   210 B.R. 228 (S.D.N.Y. 1997)..................................................................................................88

In re USA Gymnastics,
   No. 18-09108, Adv. No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019) .......................................64

In re VistaCare Grp., LLC,
   678 F.3d 218 (3d Cir. 2012).....................................................................................................62

In re W.R. Grace & Co.,
   115 F. App'x 565 (3d Cir. 2004) .........................................................................................38, 63

In re W.R. Grace & Co.,
   475 B.R. 34 (D. Del. 2012)..........................................................................................44, 63, 82

In re W.R. Grace & Co.,
   900 F.3d 126 (3d Cir. 2018).....................................................................................................38

In re W.R. Grace & Co.,
   Case No. 01-01139 (JKF), 2004 WL 954772
   (Bankr. D. Del. Apr. 29, 2004) .......................................................................43, 66, 69, 70, 81

In re W.R. Grace & Co.,
   No. 01-01139 (KJC), Adv. No. 01-00771 (KJC) (Bankr. D. Del. May 3, 2001) ...................65

Ingham v. Johnson & Johnson,
   608 S.W.3d 663 (Mo. App. 2020) ...........................................................................................31

Ingham v. Johnson & Johnson,
   No. 1522-CC10417 .............................................................................................................23, 31

Kaiser Group Int'l, Inc. v. Kaiser Aluminium and Chem. Corp. (In re Kaiser
   Aluminum Corp., Inc.),
   315 B.R. 655 (D. Del. 2004).....................................................................................................40

Koch Refining v. Farmers Union Cent. Exch., Inc.,
   831 F.2d 1339 (7th Cir. 1987) ........................................................................47, 48

Kocher v. Dow Chem. Co.,
   132 F.3d 1225 (8th Cir. 1997) ................................................................................39

Kreisler v. Goldberg (In re Kreisler),
   478 F.3d 209 (4th Cir. 2007) ..................................................................................76

Krys v. Aaron,
   106 F. Supp. 3d 472 (D.N.J. 2015) .........................................................................49

Labarbera v. United Crane & Rigging Servs, Inc.,
   No 08-CV-3274, 2011 WL 1303146 (E.D.N.Y. March 2, 2011) ...........................57

Leonard v. Bed, Bath & Beyond, Inc.,
   No. 5:15-CV-00284, 2016 WL 158587 (E.D.N.C. Jan. 8, 2016) .....................53, 54

Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn.
   (In re Dow Corning Corp.),
   86 F.3d 482 (6th Cir. 1996) ....................................................................................39

Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C.
   Ltd. P'ship),
   135 B.R. 797 (W.D.N.C. 1992) ...............................................................59, 60, 61

Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell
   Chem. Co.),
   402 B.R. 571 (Bankr. S.D.N.Y. 2009)...............................................................37, 64

Maaco Enters., Inc. v. Corrao,
   No. CIV. A. 91-3325, 1991 WL 255132 (E.D. Pa. Nov. 25, 1991) ........................40

Maertin v. Armstrong World Indus., Inc.,
   241 F. Supp. 2d 434 (D.N.J. 2002) .........................................................................45

Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC),
   No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021)............................39, 65, 68, 70, 71, 82

Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),
   740 F.3d 81 (2d Cir. 2014)......................................................................................57

McBride et al. v American International Industries, Inc., et al.,
   No. 49D13-2110-MI-034781 ...........................................................................21, 22

McCartney v. Integra Nat'l. Bank N.,
   106 F.3d 506 (3d Cir. 1997)..............................................4, 36, 40, 42, 44, 67

Mine Mgmt, Inc. v. Wolfe (In re Mountain Laurel Res. Co.),
   210 F.3d 361 (4th Cir. 2000) ......................................................................39

Mitchell v. Greenberg (In re Creative Entm't, Inc.),
   No. 99-30485, 2003 Bankr. LEXIS 2468
   (Bankr. W.D.N.C. May 28, 2003)....................................50, 52, 53, 54, 55

Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.,
   187 F.3d 439 (4th Cir. 1999) ......................................................................59

Pacor, Inc. v. Higgins,
   743 F.2d 984 (3d Cir. 1984).................................................................38, 39

Parklane Hosiery Co. v. Shore,
   439 U.S. 322 (1979)....................................................................................83

Pfizer Inc. v. Angelos (In re Quigley Co., Inc.),
   676 F.3d 45 (2d Cir. 2012).........................................................................45

Promaulayko v. Johns Manville Sales Corp.,
   562 A.2d 202 (N.J. 1989)..........................................29, 81, 84, 85, 86, 90

Queenie, Ltd. v. Nygard Int'l,
   321 F.3d 282 (2d Cir. 2003)........................................................................42

Raudonis, as Tr. for the Raudonis 2016 Revocable Tr. v. RealtyShares, Inc.,
   507 F.Supp.3d 378 (D. Mass. 2020) ...........................................................45

Reilly v. City of Harrisburg,
   858 F.3d 173 (3d Cir. 2017).................................................................75, 76

Richards, et al. v. Johnson & Johnson, et al.,
   No. 21-2-10988-4.........................................................................................21

Roggio v. Roggio (In re Roggio),
   612 B.R. 655 (Bankr. M.D. Pa. 2020) ........................................................35

Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC),
    321 B.R. 128 (Bankr. D. Del. 2005) ........................................................................74

S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.),
    817 F.2d 1142 (5th Cir. 1987) ..............................................................51, 52, 60

Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.),
    2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ............................................67

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),
    502 F.3d 1086 (9th Cir. 2007) ........................................................................75, 77

St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,
    884 F.2d 688 (2d Cir. 1989).............................................................................47, 48

Sterne Agee Grp., Inc. v. Robinson (In re Anderson & Strudwick, Inc.),
    No. 14-03175, 2015 WL 1651146 (Bankr. E.D. Va. April 8, 2015) ................50, 55

Steyr-Daimler-Puch of Am. Corp. v. Pappas,
    852 F.2d 132 (4th Cir. 1988) ...................................................................46, 47, 50

Stoe v. Flaherty,
    436 F.3d 209 (3d Cir. 2006).....................................................................................35

Sudbury, Inc. v. Escott,
    140 B.R. 461 (Bankr. N.D. Ohio 1992) .......................................................84, 88, 90

T&E Indus., Inc. v. Safety Light Corp.,
    680 F. Supp. 696 (D. N.J. 1988) .............................................................................64

Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc),
    855 F.3d 84 (2d Cir. 2017)............................................47, 49, 55, 58, 59, 60, 74

True Health Diagnostics LLC v. Azar (In re THG Holdings LLC),
    604 B.R. 154 (Bankr. D. Del. 2019) .......................................................................76

Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs.by Jamie, Inc.),
    230 B.R. 36 (Bankr. D.N.J. 1998) ....................................................................47, 52

U.S. v. 5 Unlabeled Boxes,
    572 F.3d 169 ............................................................................................................83

Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC),
    460 B.R. 644 (E.D. Pa. 2011) ................................................................86

United States v. Bestfoods,
    524 U.S. 51 (1998) ................................................................74

United States v. Whiting Pools, Inc.,
    462 U.S. 198 (1983) ................................................................90

Vanklive v. Johnson & Johnson,
    No. RC20062734, Superior Court of California, ................................................22

W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),
    386 B.R. 17 (Bankr. D. Del. 2008) .................35, 37, 63, 65, 66, 67, 68, 70, 71, 77, 86, 89, 91

W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),
    No. 01-01139(JKF), 2004 Bankr. LEXIS 579 (Bankr. D. Del. Apr. 29, 2004).......................87

**STATUTES**

11 U.S.C. § 362 ................................................................3, 4, 40, 63

11 U.S.C. § 362(a)(3) ................................................42, 44, 45, 46, 47, 48, 56, 60

11 U.S.C. § 541(a) ................................................................46, 47, 50, 54

11 U.S.C. § 541(a)(1) ................................................................45

11 U.S.C. § 548(a) ................................................................62

28 U.S.C. § 1334(b) ................................................................34

Ariz. Rev. Stat. Ann. § 12-684 ................................................................29

Ark. Code Ann. § 16-116-207 ................................................................29

Bankruptcy Code § 105(a) ................................5, 36, 37, 39, 62, 63, 64, 65, 75

Bankruptcy Code § 362(a) ................................................................39, 40, 44, 47

Bankruptcy Code § 362(a)(1) ................................36, 41, 42, 43, 44, 60, 88

Bankruptcy Code § 362(a)(3) ................................................................88

Bankruptcy Code § 541 ................................................................................................46

Bankruptcy Code § 541(a)(1) .........................................................................42, 46, 47, 55

Bankruptcy Code § 541(a)(7) ........................................................................................60

Bankruptcy Code § 544(b)..............................................................................................61

Iowa Code Ann. § 613.18 ..............................................................................................29

Tex. Civ. Prac. & Rem. Code Ann. § 82.002 .................................................................29

**OTHER AUTHORITIES**

*Mass Tort Bankruptcy Cases*, Federal Judicial Center, at 1 (2005),
    https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf ......................................78

Restatement (Second) of Torts § 886B ...........................................................................29

Restatement (Third) of Torts § 22 ..................................................................................29

Plaintiff LTL Management LLC, the debtor in the above-captioned chapter 11 case (the "Debtor"), files this Supplemental Memorandum of Law in further support of (a) *Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. Pro. Dkt. 2] (the "PI Motion") and (b) its omnibus reply in support of the PI Motion [Adv. Pro. Dkt. 58] (the "Reply").  The United States Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court") granted the PI Motion on a preliminary basis and, on November 15, 2021, entered an order that, for the ensuing 60 days, stayed and enjoined all Debtor Talc Claims against the Protected Parties. After the NC Bankruptcy Court transferred the Debtor's chapter 11 case, including this Adversary Proceeding, to this District, the Court scheduled a further hearing to consider the PI Motion on January 11, 2022.

This Supplemental Memorandum of Law (a) summarizes the factual record in this Adversary Proceeding, including evidence that was submitted during a two-day evidentiary hearing before the NC Bankruptcy Court and additional facts that will be presented at the January 11, 2022 hearing, and (b) amends and restates the arguments in support of the relief requested by the PI Motion to address applicable Third Circuit precedent and apply that precedent to the facts adduced in support of the PI Motion.[1]

## PRELIMINARY STATEMENT

Judge Whitley of the NC Bankruptcy Court, on a full evidentiary record, ruled that all litigation in respect of the Debtor Talc Claims against the Protected Parties is

---

[1]          Capitalized terms not defined herein have the meanings given to them in the PI Motion or the Reply.

automatically stayed and should be preliminary enjoined.  In so ruling, he adopted "most of the

arguments that the debtor made in [its] reply brief."  Transcript of NC Bankruptcy Court Ruling

on PI Motion (the "<u>PI Tr.</u>"), 136:19-21, Nov. 10, 2021.  Key to his ruling was his finding that, "at

the core," claims against the Protected Parties are all based on Old JJCI's products and conduct,

or relate to liabilities that Old JJCI assumed.  <u>Id.</u> at 139:9-17.  Judge Whitley noted that, had he

kept the case, he may have entered a "permanent" injunction.  <u>Id.</u> 135:22-23.  But having decided

to transfer venue, he then limited the duration of his interim stay ruling and the preliminary

injunction to a 60 day period to permit this Court to "get up to speed, and have a chance to weigh

in on this."  <u>Id.</u> 134:25-135:7.  For the same reasons that Judge Whitely granted the PI Motion on

a preliminary basis, this Court should grant the relief requested by the PI Motion on a final basis.

At the time of the bankruptcy filing, the Debtor was besieged by talc claims

premised largely on the false allegation that Johnson's Baby Powder, a staple for hundreds of

millions of people for over 125 years, contained asbestos and caused cancer.  As described in

detail in the *Informational Brief* [Dkt. 3], these claims have no valid scientific basis.  In fact, the

safety of cosmetic-grade talc has been confirmed by independent experts, as well as

governmental and regulatory bodies.  Nonetheless, a few blockbuster plaintiff verdicts in

plaintiff-friendly jurisdictions have fueled a boom in talc claims, causing Old JJCI to incur

astronomical costs:  nearly $1 billion in defense costs on account of cosmetic talc litigation, most

of which has been spent in only the last five years, and over $3.5 billion in indemnity payments.

*Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 5] (the "<u>First Day</u>

<u>Declaration</u>") ¶ 40.  Although Old JJCI prevailed in most claims brought, including securing

unanimous defense verdicts in six of the eight claims tried to verdict this year, the costs of this

litigation and the intermittent extreme awards granted demonstrate that the litigation of these

cases in the tort system for the next 50 years or more (as claimants seek to do) is untenable, unsustainable and inequitable.  Only plaintiff law firms benefit from continued litigation.  The large majority of claimants, who receive nothing on account of their claims, do not.  The lottery-like results of the litigation demonstrate the tort system's ineffectiveness and unfairness.

A declaration that the automatic stay applies and/or the issuance of a preliminary injunction is critical to the Debtor's reorganization:  Without it, talc claimants will seek (and, in fact, have sought) to prosecute the exact same talc-related personal injury claims that are pending against the Debtor against J&J, other Non-Debtor Affiliates, the Retailers and the Indemnified Parties, and the Debtor's insurers.  And, that litigation will proceed in literally tens of thousands of individual actions across the country.  Such efforts "would undoubtedly interfere with, and almost surely end, the Debtor's reorganization. With thousands of claims and proceedings spread out across the country, it would be all but impossible to negotiate or confirm a Section 524(g), or any other, plan." DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC), 2021 WL 3552350,, at *43 (Bankr. W.D.N.C. Aug. 11, 2021).  That, of course, is why every court asked to enjoin such piecemeal litigation to permit a debtor to pursue a full resolution of its mass tort claims has done so.  See PI Mot. at 45-46.

To allow these tens of thousands of pending tort claims to proceed outside of chapter 11 would—given the Debtor's indemnification obligations to J&J, other Non-Debtor Affiliates, and other Protected Parties—effectively lift the section 362 automatic stay of litigation against the Debtor, the real party in interest.  At the same time, it would usurp this Court's ability to preside over this case and consider and approve any resolution of the claims

proposed herein.[2]  This unprecedented result would, contrary to Third Circuit precedent, defeat

the purpose of this case.  See McCartney v. Integra Nat'l. Bank N., 106 F.3d 506, 511 (3d Cir.

1997) (one purpose of section 362 is "to centralize all prebankruptcy civil claims against a debtor

in the bankruptcy court"); see also A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir.

1986) ("To refuse application of the statutory stay in that case would defeat the very purpose and

intent of the statute.").

    The prosecution of the Debtor Talc Claims against the Protected Parties, including

J&J, is automatically stayed because it would liquidate contractual indemnification claims

against the Debtor outside of chapter 11, effectively seek to collect on claims against the Debtor,

deplete available insurance coverage and eliminate the protections of the automatic stay.

Because the Debtor is the real party in interest with respect to the Debtor Talc Claims, the

automatic stay is applicable here.

    Further, the PI Motion satisfies each of four factors that bankruptcy courts

typically consider in reviewing a request to enjoin litigation against non-debtors.  The first—

likelihood of success—is satisfied because the Debtor unquestionably has the financial capacity

to implement a plan of reorganization and is prepared promptly to commence negotiations to

resolve this case.  The second—irreparable harm—is met because the very purpose of the case

would be defeated in the absence of the requested injunction.  It is beyond dispute that a

preliminary injunction is critical to the fundamental purpose of the case—to achieve an

equitable, final, and full resolution of the Debtor's talc liabilities.  The third—the balance of

harms—weighs decidedly in favor of a preliminary injunction because it will preserve the

---

[2]    See In re Brier Creek Corp. Ctr. Assocs. Ltd., 486 B.R. 681, 697 (Bankr. E.D.N.C. 2013) ("Many courts
have also stayed non-debtor litigation when such litigation would impair the court's jurisdiction over the
bankruptcy case or an adversary proceeding pending before the court.") (citing cases).

Debtor's opportunity to pursue a successful reorganization.  At the same time, halting the pursuit

of the Debtor Talc Claims outside this Court will not materially harm the Defendants.  Based on

the historical pace of resolution of these claims, it would take decades to resolve them in the tort

system.  And, in the majority of cases, the Defendants would receive no recovery.  In contrast, a

bankruptcy trust will provide those claimants "with an efficient means through which to

equitably resolve their claims."  In re Bestwall LLC, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019)

(citing In re Federal-Mogul Glob., Inc., 684 F.3d 355, 357-62 (3d Cir. 2012)).

   The fourth—public interest—also supports granting the PI Motion.  A trust would

establish a far more equitable and efficient process—both for current and future talc claimants—

than the tort system.  Not only will the requested injunction help foster a successful chapter 11

reorganization here, which is always in the public interest, it will, in stark contrast to the

lottery-like results in the tort system, do so by fostering a rational, equitable resolution of the

Debtor Talc Claims.

## I. STATEMENT OF FACTS

### A. General Background

   On October 14, 2021 (the "Petition Date"), the Debtor commenced this

reorganization case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter

11 of the Bankruptcy Code in the NC Bankruptcy Court.

   On October 21, 2021, the Debtor filed an adversary complaint [Adv. Pro. Dkt. 1]

(the "Complaint") commencing this Adversary Proceeding and seeking (i) a declaration that the

automatic stay applies to prohibit the commencement or continuation of certain actions against

the Protected Parties while this Chapter 11 Case remains pending; and (ii) a preliminary

injunction under section 105(a) of the Bankruptcy Code to enjoin the commencement or

prosecution of actions outside of the Chapter 11 Case on account of the same talc claims that

exist against the Debtor in the Chapter 11 Case.  On that same day, the Debtor filed the PI

Motion seeking such declaration and preliminary injunction.  Various parties filed objections,[3]

and the Debtor filed the Reply.

On October 26, 2021, the NC Bankruptcy Court entered a temporary restraining

order [Adv. Pro. Dkt. 28] prohibiting and enjoining talc claims against the Debtor and Old JJCI

and scheduling a further hearing on the PI Motion and the Complaint for November 4 and 5,

2021.  Thereafter, counsel to certain objectors conducted discovery and deposed five witnesses

between October 27, 2021 and November 3, 2021.  The parties then presented evidence at the

two-day hearing before the NC Bankruptcy Court (the "PI Hearing").

On November 10, 2021, the NC Bankruptcy Court issued oral findings of fact and

conclusions of law in respect of the PI Motion.  On November 15, 2021, the NC Bankruptcy

Court entered a preliminary injunction order [Adv. Pro. Dkt. 102] (the "PI Order") granting the

PI Motion on a preliminary basis.  Pursuant to the PI Order, the NC Bankruptcy Court

determined that the automatic stay applies to prohibit, and also preliminarily enjoined, the

commencement or continuation of Debtor Talc Claims against the Protected Parties for 60 days

(i.e. until January 14, 2022), subject to modification or extension by this Court.

On November 16, 2021, the NC Bankruptcy Court entered an order [Dkt. 416]

transferring the Chapter 11 Case and this Adversary Proceeding to the District of New Jersey,

which referred the Chapter 11 Case and this Adversary Proceeding to this Court.

---

[3]     See Adv. Pro. Dkts. 44, 45, 49, 50 and 52.

On November 22, 2021, this Court held a status conference in the Chapter 11

Case.  At the status conference, the Court scheduled a hearing for January 11, 2022 to further

consider the PI Motion.

On November 24, 2021, the official committee of talc claimants

(the "Committee") filed a motion for withdrawal of the reference of this Adversary Proceeding

[Adv. Pro. Dkt. 110].  The United States District Court for the District of New Jersey has

scheduled the motion for withdrawal of the reference for hearing on January 3, 2022.  The

deadline for responses to the motion for withdrawal is December 20, 2021.

### B.      Corporate History

On October 12, 2021, Old JJCI implemented the 2021 Corporate Restructuring as

described below.  First Day Decl. ¶ 16.  As a result of that restructuring, Old JJCI ceased to exist

and two new entities were created:  (a) the Debtor, which was initially formed as a Texas limited

liability company and then converted into a North Carolina limited liability company; and (b) a

second entity, which was initially formed as a Texas limited liability company and then merged

into a New Jersey corporation that was its direct parent (as well as the direct parent of the

Debtor), whereupon this entity changed its name to "Johnson & Johnson Consumer Inc." ("New

JJCI").  Id.

New JJCI manufactures and sells a broad range of products used in the baby care,

beauty, oral care, wound care and women's health-care fields, as well as over-the-counter

pharmaceutical products.  Id. ¶ 19.  The Debtor's ultimate parent company, J&J, is a New Jersey

company incorporated in 1887 that, through its operating subsidiaries, conducts business in

virtually all countries in the world, focused primarily on products related to human health and

well-being.  Id. ¶¶ 10, 19.

1.    **J&J Adopts Decentralization Policy**

In the 1970s, J&J adopted a policy to decentralize its operations as a part of a

growth and innovation strategy.  Transcript PI Hearing ("Hr'g Tr."), 97:14-21, Nov. 4, 2021, Kim

Direct.  As a part of this decentralization policy, J&J converted into a holding company, and

certain J&J subsidiaries accepted all assets and operational responsibilities, and assumed all

liabilities associated with, designated operating divisions of J&J.  Id. at 98:3-13.  The purpose of

the decentralization policy was to drive creativity and productivity by giving each company

autonomy to make decisions without unnecessary constraints.  *Second Supplemental Declaration*

*of John K. Kim in Support of Motion to Extend Preliminary Injunction*, filed contemporaneously

herewith (the "Second Supp. Kim Decl.") at Ex. A (1981 Annual Report at

JNJTALC000648400, 401, and 404).  J&J's public SEC disclosures,[4] and Board meeting

minutes, emphasize the importance of J&J's decentralization strategy and philosophy to its

businesses.  (Debtor's PI Hr'g Ex. 6, Board of Directors Meeting Minutes, dated Dec. 12, 1978).

2.    **Old JJCI's Responsibility For All Liabilities Associated With**
       **JOHNSON'S® Baby Powder**

J&J launched its baby care line of products shortly after its incorporation in 1894

by selling JOHNSON'S® Baby Powder (hereinafter, "Johnson's Baby Powder").  First Day Decl.

¶ 10.  In 1972, J&J established a formal operating division for its baby products business, which

included Johnson's Baby Powder.  Id.  Consistent with J&J's policy of decentralizing its

businesses, on December 12, 1978, J&J's Board of Directors approved the transfer of all assets

---

[4]    E.g., Debtor's PI Hr'g Ex. 66, J&J 10-K, dated Dec. 30, 1979, at 3 ("Johnson & Johnson is organized on the
principles of decentralized management and conducts its business through operating subsidiaries which are
themselves, for the most part, integral, autonomous operations."); Debtor's PI Hr'g Ex. 65, J&J 10-K, dated
Jan. 2, 1977, at 3; Debtor's PI Hr'g Ex. 67, 1986 Johnson & Johnson Annual Report, at 5 "… this growth
will continue into the future if we adhere to our basic philosophies:  continue our unique form of
decentralization") (emphasis added); Debtor's PI Hr'g Ex. 68, Johnson & Johnson 10-K, dated Jan. 1, 1978,
at 3; Debtor's PI Hr'g Ex. 69, Johnson & Johnson 10-K, dated Dec. 31, 1978, at 3.

and liabilities of the Baby Products division, including those associated with Johnson's Baby

Powder, to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a

wholly-owned subsidiary of J&J.  Hr'g Tr., 99:21-100:25, Nov. 4, 2021, Kim Direct.[5]  This was

part of a larger restructuring of J&J that included the transfer of assets and liabilities of seven

principal operating divisions to wholly-owned subsidiaries:

> **The incorporation of seven principal operating divisions of Johnson & Johnson effective January 1, 1979 as wholly-owned subsidiaries** . . . will be accomplished by a transfer of assets from the divisions to the corporations respectively which **will also assume the liabilities of the divisions** respectively … In keeping with Johnson & Johnson's long standing policy of decentralization of corporate business, and in light of substantial potential state tax savings, as well as additional legal considerations, the matter has been approved by the Executive Committee in June 1978 and reported to the Board on July 1978.

Debtor's PI Hr'g Ex. 6, Dec. 12, 1978 Board of Directors Meeting Minutes, at 6-7 (emphasis

added).

Subsequently, to effectuate the transaction, J&J and J&J Baby Products entered

into an Agreement for Transfer of Assets and Bill of Sale, effective January 1, 1979 (the "1979

Agreement"), pursuant to which J&J transferred all assets and liabilities associated with the Baby

Products division to J&J Baby Products:

> WHEREAS, J&J has a number of operating divisions conducting various lines of business; and
>
> WHEREAS, one of these operating divisions is named the JOHNSON & JOHNSON BABY PRODUCTS COMPANY Division (sometimes hereinafter called the "BABY Division"); and

---

[5]     "This was part of an overall strategy that Johnson & Johnson had at that time to, to decentralize and what this  does, it sets up seven subsidiaries that would, all of them would, basically, be given assets related to, to the businesses that, that pertained to those divisions that were turning into subsidiaries. They would assume liability with respect to those."  Hr'g Tr., 100:19-25, Nov. 4, 2021, Kim Direct.

> WHEREAS, the Subsidiary corporation, is wholly-owned by J&J and J&J is desirous of **transferring to this Subsidiary all assets and liabilities** which are now allocated to the BABY Division on the books or records of Johnson & Johnson; …

Debtor's PI Hr'g Ex. 2, 1979 Agreement (emphasis added).   Accord id. §1 ("J&J . . . does grant, bargain, sell, assign, alien, remise, release, convey, transfer, set over and confirm, **unto the Subsidiary**, **its successors and assigns**, forever, all the **businesses**, franchises, properties and assets . . . which are now allocated on its books or records of J&J to its Baby Division . . .") (emphasis added).

The 1979 Agreement provides that J&J Baby Products assumed all liabilities of every kind and description associated with the Baby Products division and indemnified J&J for such liabilities:

> …Subsidiary agrees to **assume… all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division** and the Subsidiary hereby covenants and agrees with J&J that the **Subsidiary will forever** … **indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed**….

> …the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and assigns.

Id.  The assumed liabilities included contingent and future product liability claims.  PI Tr. at 138:15-19.  The 1979 Agreement also provided J&J Baby Products with an irrevocable power of attorney to substitute itself "**for J&J and in its [J&J's] name and stead** . . . **on behalf of and for the benefit of the Subsidiary**" to, among other things, "**defend and compromise any and all actions**, suits or proceedings in respect of any said Properties" – defined as the Baby Products division's "businesses, franchises, properties and asset".  Debtor's Hr'g Ex. 2 at ?? 1-2 (emphasis added).  Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits

or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc

business that was being transferred

   In 1981, J&J Baby Products transferred all its assets, except those assets allocated

to its diaper programs, to Omni Education Corporation ("Omni"), a wholly-owned subsidiary of

J&J Baby Products.  First Day Decl. ¶ 11; Debtor's PI Hr'g Ex. 52, Johnson & Johnson Baby

Products Company Action Authorized by Unanimous Consent, dated July 21, 1981.  In turn,

Omni assumed all liabilities of J&J Baby Products, except those liabilities related to its diaper

program, and agreed to indemnify J&J Baby Products against all assumed liabilities.  Id.

Immediately following the transaction, J&J Baby Products merged into Personal Products

Company, with J&J Baby Products as the surviving corporation but renamed Personal Products

Company, and Omni changed its name to Johnson & Johnson Baby Products Company.  Id.

   In 1988, Johnson & Johnson Baby Products Company transferred all its assets in

respect of its baby products business to Johnson & Johnson Dental Products Company, which

assumed all of the liabilities of, and agreed to indemnify, Johnson & Johnson Baby Products

Company and was renamed Johnson & Johnson Consumer Products, Inc.  First Day Decl. ¶ 12;

Debtor's PI Hr'g Ex. 54, Agreement for Transfer of Assets and Bill of Sale, dated Jan. 3, 1988.

   In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to

Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").  First Day Decl.

¶ 13; Debtor's PI Hr'g Ex. 55, Certificate of Incorporation, dated July 1, 1997.  In 2015, J&J

Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC,

Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former

names and historical forms, ("Old JJCI").  First Day Decl. ¶ 14; Debtor's PI Hr'g Exs. 57-59,

Certificates of Merger, dated Nov. 2, 1998, June 15, 2015, June 25, 2015.

The timeline below reflects these intercompany transactions that resulted in Old JJCI becoming responsible for all claims alleging that Johnson's Baby Powder causes cancer or other diseases:



### 3.    Old JJCI's Responsibility For All  Liabilities Associated with Shower to Shower

Similar to Johnson's Baby Powder, Old JJCI became responsible for all claims alleging that Shower to Shower products, which contained talc, causes cancer or other diseases. Prior to the institution of the 1970s decentralization policy Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division. Hr'g Tr., 117:2-7, Nov. 4, 2021, Kim Direct.  Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly-owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products.  Id.; see id. at 98:3-13; Debtor's PI Hr'g Ex. 51.  This

transaction was discussed in an internal Personal Products Company letter dated October

31, 1977:

> As we discussed, **Personal Products Company will take full responsibility for SHOWER TO SHOWER*** on January 1, 1978. During January, I will take the necessary steps to register with FDA and our Consumer Affairs Department will be taking over the complaint handling…

Debtor's PI Hr'g Ex. 51 (emphasis added).  Contemporaneous public filings by J&J confirm that

Personal Products Company in fact took responsibility for the Shower to Shower product line.

Compare Debtor's PI Hr'g Ex. 65 (J&J 10-K, for the FYE Jan. 2, 1977, wherein Shower to

Shower is not listed as a product of Personal Products Company) with Debtor's PI Hr'g Ex. 68

(J&J 10-K, for the FYE Jan. 1, 1978, listing Shower to Shower as a product of Personal Products

Company) and Debtor's PI Hr'g Ex. 66 (J&J 10-K, for the FYE Dec. 30, 1979, listing Shower to

Shower as a product of Personal Products Company); Hr'g Tr., 130:6-131:6, Nov. 4, 2021, Kim

Direct.  Likewise, internal accounting records for year-end December 31, 1978 show that

expenses associated with the Shower to Shower product line were recorded on the books of the

Personal Products Company.  Second Supp. Kim Decl. at Ex. P.

      The operational responsibilities, liabilities, and assets related to Shower to Shower

products were transferred from Personal Products Company to Johnson & Johnson Baby

Products Company by early 1987.  Compare Debtor's PI Hr'g Ex. 70 (excerpt from J&J 1985

Annual Report, listing Shower to Shower as a product of Personal Products Company) with

Debtor's PI Hr'g Ex. 71 (excerpt from J&J 1986 Annual Report, listing Shower to Shower as a

product of Johnson & Johnson Baby Product Company); Hr'g Tr., 130:6-131:6, Nov. 4, 2021,

Kim Direct.

In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant").  *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions* [Adv. Pro. Dkt. 3] (the "Supplemental Kim Declaration") ¶ 12.  Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc.) entered into an indemnification agreement.  Id.  Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the agreement. Id.

At all times after 1978, all Shower to Shower liabilities—including costs for talc-related litigation claims—were ultimately charged to Personal Products Company, Johnson & Johnson Baby Products Company, or Old JJCI.  Hr'g Tr., 341:1-10, Nov. 5, 2021, Kim Redirect.

### 4.    The 2021 Corporate Restructuring

Throughout the company history, Old JJCI and its affiliates have engaged in multiple restructurings to achieve business and operational objectives.  First Day Decl. ¶ 16, 20. On October 12, 2021, Old JJCI implemented the 2021 Corporate Restructuring.  Id. The 2021 Corporate Restructuring was implemented to enable the Debtor to fully resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding.  Id. ¶ 21.

As a result of the 2021 Corporate Restructuring, which is described in greater detail in the First Day Declaration:

    a.  Old JJCI ceased to exist;

    b.  The Debtor, was formed;

    c.  A second entity was formed, which was initially formed as a Texas limited liability company and then merged into a New Jersey corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to "Johnson & Johnson Consumer Inc."

    d.  The Debtor received certain of Old JJCI's assets, as set forth below, and became solely responsible for certain of its liabilities, including Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws);

    e.  New JJCI was allocated all other assets of Old JJCI and became solely responsible for all other liabilities of Old JJCI;

    f.  A funding agreement (the "Funding Agreement") was established between New JJCI, J&J and the Debtor for the purpose of ensuring that the Debtor has at least the same, if not greater, ability to pay the Debtor Talc Claims against it as Old JJCI had before the 2021 Corporate Restructuring;[6] and

---

[6] Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. First Day Decl. ¶ 27. In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a

g.  The Debtor agreed to indemnify New JJCI and its affiliates for any losses
it might suffer related to the Debtor Talc Claims.

Id. ¶¶ 22-23.

At the time of the 2021 Corporate Restructuring, the Debtor received the
following assets:

a.  Old JJCI's rights and interests as payee under the Funding Agreement
(as discussed below, J&J and New JJCI have agreed to advance
$2 billion under the Funding Agreement into a qualified settlement
trust);

b.  A bank account and approximately $6 million in cash;

c.  All contracts of Old JJCI related to its talc-related litigation, including
settlement agreements, interests in qualified settlement trusts,
indemnity rights, insurance coverage rights, service contracts and
engagement and retention contracts, if any;

d.  All equity interests in Royalty A&M, which owns a portfolio of
royalty revenue streams, including royalty revenue streams based on
third-party sales of certain products, a business that is projected to
generate approximately $50 million in revenue per year over the next
five years and has the ability to borrow up to $50 million from J&J on
terms consistent with those provided to other J&J affiliates;

---

chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash
distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses
and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that
funding.  Id.

e.   Causes of action that relate to the assets and liabilities allocated to the

Debtor;

f.   Privileges that relate to the assets and liabilities allocated to the

Debtor; and

g.   Records that relate to the assets and liabilities allocated to the Debtor.

Id. ¶¶ 24, 26, 30.

In total, the Debtor's value is approximately $373.1 million, without taking into account the Funding Agreement with New JJCI and J&J.  Id. ¶ 26.  In addition, J&J and New JJCI have committed to fund as early as January 31, 2022 a trust that will constitute a "qualified settlement fund" with an aggregate amount of $2 billion for the payment of current and future talc-related claims asserted against or related to the Debtor.  Id. ¶ 28.  These funds will be dedicated exclusively for use in paying such claims.  Id.  Although J&J and New JJCI have no obligation to make this contribution, they have agreed to do so as a pre-funding of Permitted Funding Uses (as such term is defined in the Funding Agreement) under the Funding Agreement. Id.  The funds in the qualified settlement fund trust will be available for eventual use when and as needed to resolve the Debtor's talc-related claims.  Id.

### C.    Financial Course of Performance

Prior to the Petition Date, except where insurance coverage was available to pay talc-related costs, all costs associated with litigation concerning any talc products—including defense costs, settlements and any verdict amounts—were borne by Old JJCI.  Debtor's PI Hr'g Ex. 50, Lisman Decl. ¶¶ 8-12.  J&J and Old JJCI used an integrated, centralized cash management system to collect, manage, and disburse funds.  Id.  Pursuant to company policy, cash collected by Old JJCI was generally swept to J&J's concentration account on a daily basis.

Id.  For administrative convenience and pursuant to company policy, J&J initially paid costs associated with litigation concerning talc products from its concentration account and then charged 100% of those costs to Old JJCI through intercompany charges.  Id.

These intercompany charges are reflected on Old JJCI's general ledger.  Id.  Since 2007, Old JJCI has used SAP accounting software to maintain its general ledger electronically. Id.  Old JJCI's debit entries in its general ledger from 2007 to the present confirm that Old JJCI has been charged through intercompany payables all defense costs and any settlement or verdict amounts related to litigation concerning talc products.  Id.  J&J reports its financial statements on a consolidated basis with all of its subsidiaries.  Id.  J&J's consolidated financial statements reflect a reserve for defense and indemnity costs for Old JJCI associated with personal injury claims related to talc.  Id.  Although the reserve is reported on a consolidated basis, it is allocated by segment, as required by Generally Accepted Accounting Principles and SEC reporting requirements.  Id.  The talc-related reserve in J&J's consolidated financial statements is allocated to the consumer segment, which includes Old JJCI.  Id.

**D.    The Debtor Talc Claims**

Cosmetic talc litigation against the Debtor has focused primarily on Johnson's Baby Powder and/or Shower to Shower as a purported cause of ovarian cancer and mesothelioma.  First Day Decl. ¶ 32.  For over 125 years Johnson's Baby Powder has been used by hundreds of millions of consumers worldwide.  Id.

In 1979, after J&J transferred all its assets and liabilities associated with the baby products division to Old JJCI, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder and, instead, Old JJCI (or its predecessors) manufactured and sold Johnson's Baby Powder.  Id. ¶¶ 10, 33.

On May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada.  Id.  The decision was based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder.  First Day Decl. ¶ 33.  As set forth in the *Informational Brief*, the Debtor stands behind the safety of Johnson's Baby Powder and asserts, based on decades of internal and third party studies and testing, that it is not a cause of either ovarian cancer or mesothelioma.

As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in the federal multi-district litigation in New Jersey (the "MDL"), and approximately 3,300 cases in multiple state court jurisdictions across the country.  Id. ¶ 42.  In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York and Ohio.

### 1. Talc-Related Claims against the Debtor and J&J Are the Same

Even though J&J has not manufactured or sold talc-containing products for over 40 years, the Debtor Talc Claims are asserted in virtually every case against both the Debtor and J&J.  Hr'g Tr., 134:21-139:11, Nov. 4, 2021, Kim Direct.  In many jurisdictions, the plaintiffs seek to hold the Debtor and J&J jointly and severally liable for the Debtor Talc Claims.

For example, in the MDL pending in the District Court of New Jersey, the alleged claims against J&J and Old JJCI are all identical—based on same products, same defect, and same alleged harm.  Id.  The MDL plaintiffs allege that they were diagnosed with various forms

of cancer caused by Johnson's Baby Powder and Shower to Shower, which are defined in the

operative complaint (the "MDL Complaint") as the "PRODUCTS":

> 2.      Plaintiffs were diagnosed with various forms of cancer of the
> female reproductive system, including epithelial ovarian cancer,
> fallopian tube cancer, and primary peritoneal cancer, which were
> directly and proximately caused by their regular and prolonged
> exposure to talcum powder contained in the PRODUCTS. …

Debtor's PI Hr'g Ex. 20, In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., &

Prod. Liab. Litig., No. 3:16-MD-02738-FLW-LHG (D. N.J. Dec. 12, 2020); Hr'g Tr.,

134:21-137:3, Nov. 4, 2021, Kim Direct ("they've now clumped together Johnson's Baby Power

and Shower to Shower and treat them for the purposes of the complaint as, as the same

product….").

In addition, the MDL plaintiffs make no effort to differentiate between J&J and

Old JJCI and instead refer throughout the MDL Complaint to two separate entities collectively as

"Johnson & Johnson Defendants":

> 3.      Defendant, Johnson & Johnson, is a New Jersey corporation
> with its principal place of business at One Johnson & Johnson Plaza,
> New Brunswick, New Jersey 08933. Johnson & Johnson may be
> served with process by serving its registered agent at One Johnson
> & Johnson Plaza, New Brunswick, New Jersey 08933. …

> 8.      Defendant Johnson & Johnson Consumer Inc. is and has
> been at all relevant times a wholly-owned subsidiary of Defendant
> Johnson & Johnson, under the complete dominion of and control of
> Defendant Johnson & Johnson. Hereinafter, unless otherwise
> delineated, these two entities together shall be referred to as the
> "Johnson & Johnson Defendants." …

Id.; Hr'g Tr., 138:10-139:11, Nov. 4, 2021, Kim Direct.

The mesothelioma cases are plead and prosecuted in a similar manner.  By way of

one example, in a case tried to verdict in the Superior Court for the State of California, County of

Los Angeles, the plaintiffs lumped J&J and Old JJCI together, asserting collectively against them

the same claim based on the same product, the same defect, and the same alleged harm:

| 5 | DEFENDANT | ALTERNATE ENTITY |
|---|-----------|------------------|
| 22 23 | JOHNSON & JOHNSON CONSUMER, INC. | JOHNSON & JOHNSON |

> 18(a)."**Defendants, their 'alternate entities', and each of them**, suppressed from all consumers, including Plaintiffs …, medical and scientific information concerning the health hazards associated with inhalation of asbestos, including the substantial risk of injury or death therefrom …"
>
> 18(d)."**Defendants, their 'alternate entities', and each of them**, failed to warn Plaintiffs … and others of the nature of Defendants' Products which were dangerous when breathed …"

Debtor's PI Hr'g Ex. 22, Anderson et al. v. Borg Warner Corp. et al., No. BC666513, in (Jun.

27, 2017) (emphasis added).

This pattern of filing identical claims against J&J and Old JJCI is seen starkly by

comparing two complaints—one filed before the Chapter 11 Case and one filed after.  Debtor's

PI Hr'g Ex. 86, Richards, et al. v. Johnson & Johnson, et al., No. 21-2-10988-4, Superior Court

of the State of Washington in and for the County of King (Aug. 18, 2021); Debtor's PI Hr'g

Ex. 26, McBride et al. v American International Industries, Inc., et al., No. 49D13-2110-MI-

034781, Marion County Superior Court for the State of Indiana (Oct. 15, 2021)).  In both the

Richards and McBride complaints, the plaintiffs allege, among other things, that false representations

were made regarding the asbestos content of their cosmetic talc products, including Johnson's Baby

Powder.  Compare Debtor's PI Hr'g Ex. 86 ¶¶ 9, 35, 42 to Debtor's PI Hr'g Ex. 26 ¶¶ 15, 41, 48.

The only difference is that in Richards the defendants are both J&J and Old JJCI, whereas in

<u>McBride</u> the only named defendant is J&J.  <u>Id.</u>; Hr'g Tr., 324:13-328:21, Nov. 5, 2021, Kim

Redirect.

Courts presiding over Debtor Talc Claims have likewise treated both J&J and Old

JJCI as the same for evidentiary purposes.  For example, after the commencement of the Chapter

11 Case but before the NC Bankruptcy Court preliminary injunction ruling, a court in South

Carolina ruled that the filing of the Chapter 11 Case did not impact in any way the evidence that

could be presented at trial, holding that all evidence would be received regardless of whether it

was against J&J or Old JJCI:

> I tell you one thing, …, if you think anybody in any of these cases
> is going to allow the stay against liability on behalf of Old Johnson
> & Johnson Consumer Inc. to somehow affect the evidence that is
> going to be received, whether that evidence was from Johnson &
> Johnson, Old Johnson or New Johnson, that is a very different kettle
> of fish, and I can tell you right now, that is not going to happen in
> this case as far as I'm concerned.

Debtor's PI Hr'g Ex. 27, <u>Hood, et al. v. Acme et al.</u>, No. 2020-CP10-03946, County of

Charleston for the State of South Carolina (Oct. 28, 2021); Hr'g Tr., 142:17-144:9, Nov. 4, 2021,

Kim Direct.  A similar ruling was reached in a case pending in California state court.  Hr'g Tr.,

144:10-145:1, Nov. 4, 2021, Kim Direct (testifying that court in <u>Vanklive v. Johnson & Johnson</u>,

No. RC20062734, Superior Court of California, Alameda County, denied request to limit

evidence to focus only on J&J); <u>see also</u> Debtor's PI Hr'g Ex. 25, <u>Vanklive v. Johnson &</u>

<u>Johnson</u>, No. RC20062734, Superior Court of California, Alameda County, Hearing Transcripts.

## 2.    Health and Medical Safety Decisions Were Made By Old JJCI

Old JJCI was responsible for making all health and safety *decisions* relating to its

operations, while J&J was responsible for establishing health and safety *policy*.  Hr'g Tr.,

374:13-376:8, Nov. 5, 2021, Kuffner Direct ("I have ultimate responsibility for the safety of the

products within [Old JJCI]. That lies with me."); Debtor's PI Hr'g Ex. 81, J&J Medical Safety Standard, dated Jan. 1, 2014 ("Each sector within Johnson & Johnson … shall establish policies and process that adhere to the … Safety Standard").

This has been confirmed by the Chief Medical Officer of J&J, Dr. Joanne Waldstreicher, who has testified in the talc products liability litigation that decisions about the safety of talc products were made by the safety and medical officers at Old JJCI, not those at J&J. Second Supp. Kim Decl. at Ex. B (excerpts of Waldstreicher testimony from Ingham v. Johnson & Johnson, No. 1522-CC10417, Circuit Court of the City of St. Louis, State of Missouri, Dep. Tr., 14:15-15:9; 60:15-62:1; 92:5-94:7; 102:5-103:6; 168:2-168:17; 171:7-172:17; 182:6-182:18; 192:3-192:11; 212:21-213:11, April 19, 2017 and Leavitt v. Johnson & Johnson, RGI 7882401, Superior Court of California, County of Alameda, Dep. Tr., 131:8-133:9, Sept. 14, 2018). She further testified that Old JJCI's safety officers were responsible for reviewing and approving J&J's public statements about the safety of talc products before the statements were released to the public. Id. Likewise, the Chief Safety Officer of Old JJCI, Dr. Susan Nicholson, has testified that she was responsible for the medical oversight of the consumer products, including Johnson's Baby Powder, and that her team evaluated the safety of any product Old JJCI made. Second Supp. Kim Decl. at Ex. C (excerpts of Nicholson testimony from Prudencio v. Johnson & Johnson, RG20061303, Superior Court of the State of California, County of Alameda, Dep. Tr., 706:14-707:23, Jun. 4, 2021).[7]

---

[7]      The Debtor's corporate representative, John Kim, also testified that JJCI was responsible for the safety of Johnson's Baby Powder. Hr'g Tr., 322:9-324:9, Nov. 5, 2021, Kim Redirect.

### 3.    Windsor Minerals Inc. Was at All-Times a Subsidiary of J&J

In 1965, J&J formed Docrom, Inc., a wholly-owned subsidiary, to purchase the

assets and to assume the liabilities of Eastern Magnesia Talc Company, Inc.  Second Supp. Kim

Decl. at Ex. D (September 17, 1965 Amendment of Articles of Association of Docrom, Inc.); see

also id. at Ex. E (July 30, 1965 Plan and Agreement of Reorganization between J&J and Eastern

Magnesia Talc Co., Inc., which states that the reorganization would include, "the transfer to J&J,

or to a designated subsidiary of J&J…, of substantially all the assets, properties, business and

goodwill…" of Eastern Magnesia Talc Co., Inc.).  In connection with the transaction, Docrom,

Inc. changed its name to Eastern Magnesia Talc Co., Inc.  Id. at Ex. D (September 17, 1965

Amendment of Articles of Association of Docrom, Inc.).  A few years later, Eastern Magnesia

Talc Co. changed its name to Windsor Minerals Inc. ("Windsor").  Id. at Ex. F (October 2, 1967

Amendment of Articles of Association of the Eastern Magnesia Talc Co., Inc.).

At all times, Windsor was a subsidiary of J&J, which had its own business.  See

e.g., Second Supp. Kim Decl. at Ex. G (October 29, 1983 deposition transcript of Roger Miller in

Westfall v. Whittaker, Clark & Daniels, et al., CA 79-0269, at 76:22-77:6  (Q:  "How many

subsidiaries does Johnson and Johnson have dealing with talc?"  A:  "Two"  Q:  "What is the

other one?"  A:  "One is Johnson & Johnson Baby Products Company and one is Windsor

Minerals, Incorporated.").  Windsor maintained separate management and offices; in fact, the

pre-acquisition president and home office remained in place for several years after the

acquisition.  See id. at Ex. H (April 9, 1965 (pre-acquisition) letter to the shareholders, listing

Emil Esckilsen as President, JNJ 000338807) and Ex. I (April 5, 1967 (post-acquisition) State of

Vermont Annual Report of Eastern Magnesia Talc Co., Inc., listing Emil Esckilsen as President,

JNJTALC000299392); and Ex. J (November 28, 1967 Windsor Minerals Inc. Board Minutes,

stating the principal office was relocated from Burlington to Reading following sale of the

northern properties).  Windsor also independently conducted talc testing and interfaced with

testers/agencies.  See e.g., id. at Ex. K (January 14, 1975 Letter regarding Windsor Minerals ore

study to assess asbestos content of its products); Ex. L (December 8, 1978, memo re Asbestiform

Mineral Analysis – Sampling Procedure for Hammondsville Cosmetic Ore.).  And Windsor

received orders and talc specification requirements directly from J&J's subsidiaries.  See e.g., id.

at Ex. M (June 26, 1979 J&J Baby Products' Windsor 66 Talc Raw Materials Specification).

On January 6, 1989, J&J sold its equity interests in Windsor to Cyprus Mines

Corporation ("Cyprus"), conditioned upon an exclusive supply agreement.  Second Supp. Kim

Decl. at Ex. N (1989 Stock Purchase Agreement between Windsor and Cyprus).  On the same

day as the sale, Windsor and J&J Baby Products entered into a talc supply agreement (the "1989

Supply Agreement").  Id. at Ex. O (1989 Supply Agreement).  Windsor eventually became

Imerys Talc America, who is a Debtor in the Imerys chapter 11 cases in Delaware.  Hr'g Tr.,

329:6-9, Nov. 5, 2021, Kim Redirect.

### E.    The Debtor's Insurance Coverage

The Debtor believes that it has rights to insurance coverage for its Debtor Talc

Claims.  First Day Decl. ¶ 46.  In particular, the Debtor has access to primary and excess liability

insurance policies that cover, among other things, defense and/or indemnity costs related to talc

bodily injury claims, subject to the terms of the policies.[8]  Id.; see Debtor's PI Hr'g Ex. 8,

FRE 1006 Insurance Coverage Evidence Summary.  All of these insurance policies provide that J&J

---

[8]    The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the
period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI
was a subsidiary of J&J.  Hr'g Tr., 148:1-17, Nov. 4, 2021, Kim Direct; see e.g. Debtor's PI Hr'g Ex. 11,
Aetna Insurance Agreement 38 XN 07 SCA, at 9.

and all its subsidiaries and affiliates are named insureds, and many also include Retailers (as defined below) as insureds.  Hr'g Tr., 146:22-153:14, Nov. 4, 2021, Kim Direct; Debtor's PI Hr'g Exs. 8, 11, 12, 14.  In addition, the policies contain annual aggregate limits shared by all of the named insureds. Id.

Aetna Casualty and Surety Company ("Travelers")[9] issued primary general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980 (the "Travelers Policies").  Id. ¶ 47; see e.g., Debtor's PI Hr'g Ex. 10, Aetna Insurance Agreement, #38 AL 12880 SR(Y)_1-1-1967 to 1-1-1970.  The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $263 million in the aggregate.  First Day Decl. ¶ 47; Debtor's PI Hr'g Ex. 8.  The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977.  First Day Decl. ¶ 47; see e.g., Debtor's PI Hr'g Ex. 14, Aetna Insurance Agreement, Aetna Primary 38 PK 15 SCA.

The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits.  First Day Decl. ¶ 47; see e.g., Debtor's PI Hr'g Ex. 10.  From 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor.  See e.g., Debtor's PI Hr'g Ex. 11, Aetna Insurance Agreement, 38 XN 07 SCA.  The combined aggregate limits of those policies total approximately $563 million.  First Day Decl. ¶ 48; see Debtor's PI Hr'g Ex. 8.

From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor.  Debtor's PI Hr'g Ex. 8.  Those insurers include subsidiaries or affiliates of the following companies:  American International Group, Allstate Insurance Company, The

---

[9]      Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

Hartford, Home Insurance Company, Nationwide Indemnity Company and North River Insurance Company.  Id.  The combined limits of those excess policies total more than $1.09 billion in the aggregate.  Id.  Certain of the insurers that issued the above-described excess policies are insolvent (including, in particular, Home Insurance Company).  First Day Decl. ¶ 49.

From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued primary and excess coverage that covers the Debtor (the "AMICO Policies").  Id. ¶ 50; see Debtor's PI Hr'g Ex. 8.  AMICO is insolvent, having been placed into liquidation in 2013. First Day Decl. ¶ 50.  The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.  Id.

From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a captive insurance company that is a wholly-owned subsidiary of J&J, issued policies that cover J&J and the Debtor.  Id. ¶ 51.  Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies.  Id.  From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI.  Id.  As described in the First Day Declaration, there is a dispute between J&J, the Debtor, and Middlesex, on the one hand, and the third-party insurers (i.e., insurers other than the Middlesex captive), on the other hand, regarding the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex policies.  Id.

In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion. Id. ¶ 52.  The annual limits for these policies are aggregated.  Hr'g Tr., 148:18-150:1, Nov. 4, 2021, Kim Direct.

J&J and Old JJCI have tendered talc-related claims to the third-party insurers.  To

date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or

J&J, paid the costs of defense, or indemnified J&J or Old JJCI for settlements or judgments.

Instead, the third-party insurers have asserted various coverage defenses.  First Day Decl. ¶ 53.

In May 2019, certain of the Debtor's third-party insurers filed a lawsuit against

Old JJCI, J&J and Middlesex in the Superior Court of Middlesex County (Docket No. MID-L-

003563-19) (the "New Jersey Coverage Action"), seeking a declaratory judgment regarding the

parties' respective obligations under the plaintiff insurers' policies.  The insurer plaintiffs filed a

Second Amended Complaint on June 22, 2020.  On July 31, 2020, J&J, Old JJCI, and Middlesex

filed answers to the Second Amended Complaint, and asserted counterclaims and cross-claims

against certain defendants.  Travelers and certain other insurers filed cross-claims against J&J,

Old JJCI, and Middlesex to which J&J, Old JJCI, and Middlesex responded later in 2020.  The

New Jersey Coverage Action remains pending.  Id. at ¶ 54

F.      **The Debtor's Retailers and Other Indemnified Parties**

Old JJCI had relationships with various retailers that sold Old JJCI's

talc-containing products (collectively, the "Retailers").  Hr'g Tr., 154:3-155:12, Nov. 4, 2021,

Kim Direct.  Some of the Retailers have contractual indemnities with the Debtor related to the

sale of Old JJCI's talc-containing products.  Supp. Kim Decl. ¶ 8; see e.g., Debtor's PI Hr'g

Ex. 15, 1989 Agreement with Safeway for indemnification, Debtor's PI Hr'g Ex. 16, 2020

Agreement with HEB for indemnification.  In addition, to the extent a Retailer is held liable for a

claim arising out of the products manufactured and/or sold by Old JJCI (i.e., such that those

claims are Debtor Talc Claims), and not by independent actions of the Retailers, the Debtor

likely has an obligation to indemnify the Retailers under applicable state law.[10]  Supp. Kim Decl.

¶ 8; Hr'g Tr., 156:1-5; 160:4-10, Nov. 4, 2021, Kim Direct.

Old JJCI would periodically accept from the Retailers tenders of talc-related

claims related to the sale of its products.  Supp. Kim Decl. ¶ 10; Debtor's PI Hr'g Ex. 17,

FRE 1006 Tender Agreement Evidence Summary; see e.g., Debtor's PI Hr'g Ex. 18, Tender

Agreement wherein Johnson & Johnson Consumer Inc. agrees to tender defense and indemnify

Safeway for claims by Abbott, Richard, dated May 13, 2019; Debtor's PI Hr'g Ex. 19, Tender

Agreement wherein Johnson & Johnson Consumer Inc. agrees to tender defense and indemnify

Albertson for claims by Lane, Ardys, dated October 8, 2018.

When a Retailer was sued on a Debtor Talc Claim, the Retailer would notify Old

JJCI by submitting a tender request.  Supp. Kim Decl. ¶ 10; Hr'g Tr., 156:7-157:20, Nov.

4, 2021, Kim Direct.  Old JJCI would then determine whether to accept the Retailer's tender of

its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender

Agreement").  Id.  Since 2018, Old JJCI has indemnified and agreed to assume the defense of

nearly 600 talc-related claims against the Retailers pursuant to Tender Agreements.  Supp. Kim

Decl. ¶ 10; see Debtor's PI Hr'g Ex. 17.  Of those tendered claims, about 450 were pending as of

the Petition Date.  Supp. Kim Decl. ¶ 10.

---

[10]      See, e.g., Restatement (Second) of Torts § 886B (Am. Law Inst., 1979) (establishing obligation to
indemnify party that is held vicariously liable for the conduct of the indemnitor); Restatement (Third) of
Torts § 22 (Am. Law Inst., 2000) (same, and also expressly establishing a right to recover indemnity where
indemnitee was held liable only as the seller of a product supplied to the indemnitee by the indemnitor); see
also Promaulayko v. Johns Manville Sales Corp., 562 A.2d 202, 206 (N.J. 1989) (recognizing "claims for
common-law indemnification [for asbestos-related tort claims] by one party in the chain of distribution
against a party higher up the chain" in New Jersey and other states); Fireside Motors, Inc. v. Nissan Motor
Corp. in U.S.A., 479 N.E.2d 1386, 1389 (Mass. 1985) ("[T]he retailer may recover in indemnity against the
manufacturer."); Tex. Civ. Prac. & Rem. Code Ann. § 82.002 ("A manufacturer shall indemnify and hold
harmless a seller against loss arising out of a products liability action, except for any loss caused by the
seller's negligence, intentional misconduct, or other act or omission…"); Ariz. Rev. Stat. Ann. § 12-684;
Ark. Code Ann. § 16-116-207; Iowa Code Ann. § 613.18.

In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from Debtor Talc Claims, including Pharma Tech Industries, Inc. and Valeant Pharmaceuticals International, Inc. (now known as Bausch Health Companies Inc.). Id. ¶ 11; Debtor's PI Hr'g Ex. 41, Indemnification Agreement; Debtor's PI Hr'g Ex. 36, Asset Purchase Agreement.

G.    **The Debtor's Decision to File for Chapter 11 Reorganization**

Before 2010, there were few lawsuits alleging claims related to Johnson's Baby Powder or Shower to Shower. See First Day Decl. ¶¶ 42-45. Claims started to increase after the jury in a 2013 talc-related ovarian cancer case, Berg,[11] found for the plaintiff but awarded no damages. Id. ¶ 35; Info. Brief at 47; First Day Decl. ¶ 35; Hr'g Tr., 120:12-121:1, Nov. 4, 2021, Kim Direct. In 2014, Old JJCI was served with 46 ovarian cancer complaints. First Day Decl. ¶ 43. In 2017, that number was nearly 5,000. Id.

This acceleration showed no signs of abating. As of the Petition Date, Old JJCI had been served with over 12,300 ovarian cancer complaints in just the first ten and a half months of 2021. Id. As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including 35,000 cases pending in the MDL in New Jersey and approximately 3,300 cases in multiple state court jurisdictions across the country. Id. ¶ 42.

Additionally, as of the Petition Date, more than 430 mesothelioma cases against the Debtor were pending. Id. at 44. These claims, like the ovarian cancer claims, spanned the United States, with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio. Id.

---

[11]    Berg v. Johnson & Johnson, 940 F.Supp.2d 983, 993 (D. S. Dakota 2013).

Prior to the Petition Date, Old JJCI and J&J defended the talc-related claims on the basis, among other things, that there is no scientific or other proof that Johnson's Baby Powder either contained asbestos or was a cause of ovarian cancer or mesothelioma. Old JJCI and J&J had multiple successes in the cosmetic talc litigation, including, among others things, securing dismissals of roughly 1,300 ovarian cancer and over 250 mesothelioma cases without payment, and trying 16 cases to defense verdicts. Id. ¶ 38. Old JJCI was also successful on appeal, obtaining reversal of numerous plaintiff verdicts. Id. Despite these results, and the lack of credible proof that its product was unsafe, Old JJCI nonetheless suffered a number of plaintiff verdicts involving unpredictable and wildly divergent compensatory and punitive damages awards. Id.

The most egregious example is the Ingham[12] verdict, which was the fifth largest personal injury verdict in the history of the United States. Although the verdict in that case was reversed in part and reduced, the total damages award was still $2.243 billion for 22 plaintiffs (which were improperly consolidated). First Day Decl. ¶ 39. Notably, each plaintiff received the exact same compensatory damage award, $25 million, regardless of the alleged product used (Shower to Shower or Johnson's Baby Powder) and the duration of use (e.g., 60 years or five years). Hr'g Tr., 336:17-339:17, Nov. 5, 2021, Kim Redirect.

In addition, prior to the commencement of the Chapter 11 Case, Old JJCI had incurred nearly $1 billion in defending a tidal wave of personal-injury lawsuits relating to alleged talc exposure, nearly all of which was spent in the last five years. First Day Decl. ¶ 40. In the months prior to the Petition Date, Old JJCI was paying anywhere from $10 million to

---

[12]     Ingham v. Johnson & Johnson, 608 S.W.3d 663, 680 (Mo. App. 2020).

$20 million monthly in defense costs.  Id.  On top of these costs, Old JJCI paid approximately

$3.5 billion in indemnity in connection with settlements and verdicts.  Id.  And, cosmetic talc

litigation against the Debtor was anticipated to continue and grow for decades more, as were the

extraordinary costs of resolving tens of thousands of expected claims.  Id. ¶ 41.

The status quo was untenable given the cost, burden, uncertainty and anticipated

duration of the cosmetic talc litigation.  Id. ¶ 58.  The only available option to appropriately

assess, resolve and administer the current and future talc-related claims in an efficient and

equitable manner is this Chapter 11 Case.  Id.

The purpose of the restructuring was to enable the Debtor to equitably and

efficiently resolve all current and future talc-related claims:

> [T]he fundamental purpose [for the corporate restructuring] was to
> enter into a transaction that would enable the debtor, LTL, to fairly
> and, … equitably, efficiently resolve the litigation without having to
> put the unrelated assets of…[J&J,] … Old JJCI … into bankruptcy.
> And … the key steps there was to make sure that we followed
> precedent in order to make sure that the claimants were in a better
> position post-petition than they were pre-petition.

Hr'g Tr., 163:13-25, Nov. 4, 2021, Kim Direct.

To promote a prompt resolution of the Chapter 11 Case and attempt to avoid

unnecessary litigation regarding alleged harm suffered by claimants as a result of the divisional

merger, the Debtor's ability to pay claims is supported by the Funding Agreement (Debtor's PI

Hr'g Ex. 4) with both New JJCI and J&J, as joint obligors, for the full amount of the value of New

JJCI.  Id.  J&J and New JJCI have also agreed to advance an aggregate amount of $2 billion

under the Funding Agreement into the qualified settlement fund for the exclusive payment of

cosmetic talc claims.  First Day Decl. ¶ 28.

**H.**      **The NC Bankruptcy Court's Ruling on the PI Motion**

Based on the factual record developed during the two-day evidentiary hearing on

November 4 and 5, 2021 (including the evidence cited above), on November 10, 2021 Judge

Whitley of the NC Bankruptcy Court issued oral findings of fact and conclusions of law in

respect of the PI Motion.  Judge Whitley ruled that litigation against the Protected Parties was

automatically stayed and should be enjoined for 60 days.  In reaching his ruling, Judge Whitley

adopted "most of the arguments that the debtor made in [its] reply brief."  PI Tr. at 136:19-21.

As an initial matter, Judge Whitely rejected the argument of some objectors that

he lacked subject matter jurisdiction, ruling that he had "arising in, arising under, and related to

jurisdiction at a bare minimum" because the Debtor Talc Claims against the Protected Parties

"are, essentially, claims against the debtor that impair the automatic stay and they certainly

would have a conceivable effect on the estate . . . ." PI Tr. at 137:14-18.  He then found that the

prosecution of the Debtor Talc Claims against the Protected Parties is automatically stayed:

> So what I'm effectively doing is making a preliminary ruling that
> says that the stay is in effect on the talc-based claims as against not
> just the debtor and as against Old JJCI, but also as against J&J, the
> other protected parties, including retailers.

Id. at 136:4-8.

In so ruling, he found that talc-related claims against J&J were essentially claims

against the Debtor:

> Because I believe that the liabilities were assumed by JJCI in '79 and
> indemnities were given to Old J&J, I think that any claim against
> J&J for its, its manufacture and product liability for the operational
> periods prior to that become Old JJCI's liabilities and thus the
> debtor's.  To the extent we're talking about post-'79, then, as to the
> baby products, we're also taking about matters that are based on the
> conduct of JJCI.

Id. at 139:1-8.  Although he noted the objectors' allegations that J&J is purportedly independently liable for the Debtor Talc Claims based on post-1979 actions, Judge Whitley concluded that those allegations did not impact his ruling because "at the core" the claims "are based upon products that either Old JJCI had assumed and agreed to indemnify its parent for or based on its products and conduct." Id. at 139:9-17.  Likewise, he found that claims against the Retailers, even direct claims for negligence and strict liability, are essentially claims against the Debtor because of the Debtor's indemnification obligations to the Retailers.  Id. at 140:18-25; 141:1-2.

In addition, Judge Whitely ruled that, while actions against the Protected Parties are automatically stayed, a preliminary injunction under section 105 should be issued as requested by the Debtor "to remove all doubt." PI Tr. at 141:3-8.  He found that the preliminary injunction standards "are met for the reasons that the debtor argued." Id. at 142:7-8.

The basis for the 60-day limitation on the ruling, Judge Whitley said, was to permit this Court to "get up to speed, and have a chance to weigh in on this." Id. 134:25-135:7.  If he had decided to retain the case and not transfer it, Judge Whitley said he "might make this [ruling] more permanent than I am.  But I do not wish to bind the hands of those who come behind me on this." Id. 135:22-25.

On November 15, 2021, consistent with his oral ruling, Judge Whitley entered the PI Order, which contains certain additional findings of fact and conclusions of law.

## II.    THE COURT HAS SUBJECT MATTER JURISDICTION.

This Court has "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).  A bankruptcy court has jurisdiction to enjoin third-party litigation such as that at issue here under *at least* one of those

three bases. Indeed, *every* other court that has considered the grant of a preliminary injunction

relating to a debtor's mass tort liabilities has granted it.[13]  This includes cases in which the court

expressly found it had jurisdiction over such third-party claims.[14]  And in the instant case, the

North Carolina Bankruptcy Court already has found "arising in, arising under, and related to

jurisdiction *at a bare minimum*."  PI Tr. at 137:14-15 (emphasis added).

> **A.    The Court Has Both "Arising Under" and "Arising in" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and Would Have No Existence Outside of Bankruptcy.**

First, a proceeding "aris[es] under" the Bankruptcy Code if it "invokes a

substantive right created by the Bankruptcy Code."[15]  The Debtor's request for declaratory relief

aims to confirm the scope of the automatic stay, "a substantive right provided by the Bankruptcy

Code."  Roggio v. Roggio (In re Roggio), 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020) (the

automatic stay is "a substantive right provided by the Bankruptcy Code" and "one of the

---

[13]    See, e.g., Bestwall, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases") (enjoining asbestos-related actions against non-debtor affiliates, and collecting cases).

[14]    See, e.g., DBMP, 2021 WL 3552350, at *18-21 (rejecting challenges to the court's subject-matter jurisdiction and enjoining asbestos-related claims against non-debtor affiliates); Bestwall, 606 B.R. at 249 (same); In re Specialty Prods. Holding Corp., No. 10-11780, Adv. No. 10-51085, at 2 [Adv. Pro. Dkt. 72] (Bankr. D. Del. Oct. 13, 2010) (the bankruptcy court had jurisdiction to rule on the debtors' motion to clarify the scope of the injunction); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 386 B.R. 17, 28-30 (Bankr. D. Del. 2008) (rejecting challenges to the court's subject-matter jurisdiction and extending the automatic stay to enjoin third party actions); see also In re Garlock Sealing Techs. LLC, No. 10-31607, Adv. No. 10-03145, at 6 [Adv. Pro. Dkt. 14] (Bankr. W.D.N.C. June 21, 2010) (after debtor addressed jurisdiction, finding jurisdiction and granting a preliminary injunction).

[15]    Stoe v. Flaherty, 436 F.3d 209, 216 (3d Cir. 2006) ("A case 'arises under' title 11 'if it invokes a substantive right provided by title 11.'") (quoting  Torkelsen v. Maggio (In re Guild & Gallery Plus), 72 F.3d 1171, 1178 (3d Cir. 1996)); FPSDA II, LLC v. Larin (In re FPSDA I, LLC), No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794, at *4 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("A case 'arising under' the Bankruptcy Code is one that 'invokes a substantive right' created by the Bankruptcy Code.") (citing Atamian v. U.S. Dept. of Educ. (In re Atamian), 368 B.R. 375, 379 (Bankr. D. Del. 2007)), aff'd, No. ADV A-06-50435, 2008 WL 853462 (D. Del. Mar. 31, 2008), aff'd, 300 F. App'x 175 (3d Cir. 2008)).

fundamental protections provided to debtors when they file for bankruptcy").[16]  That should be
conclusive for the proceeding.  See, e.g., FPSDA II, LLC v. Larin, Nos. 10-75439, 12-08032,
2012 Bankr. LEXIS 5906, at *17 (Bankr. E.D.N.Y. Dec. 21, 2012) ("[S]ince the Bankruptcy
Code both imposes the automatic stay and provides the Debtors and the Court with the means to
invoke it and to implement its protections, it is manifest that any proceeding to determine the
scope and applicability of the automatic stay 'arises under' the Bankruptcy Code"); Brier Creek,
486 B.R. at 685 ("arising under" jurisdiction existed over motion in which debtor sought
declaratory relief or, in the alternative, a section 105(a) injunction, "in that it specifically
requested an order confirming that the stay under § 362(a)(1) applies to" the third-party action
against non-debtor guarantor).

       The Court also has "arising under" jurisdiction because the Debtor's request for
the section 105(a) injunction is necessary to guarantee the integrity of the automatic stay (if it
does not apply by its own force).  The Debtor Talc Claims against the Protected Parties "are
really claims against the debtor and therefore impair the automatic stay." Chase Manhattan Bank
(N.A.) v. Third Eighty-Ninth Assocs., 138 B.R. 144, 147 (S.D.N.Y. 1992); see McCartney,
106 F.3d at 510–11 (concluding that the automatic stay enjoined an action against nondebtor
third party where the debtor "was, in essence, the real party in interest" in the pursuit of a
deficiency judgment against the third party).  Given this close link between the injunction sought
and the substantive right in the automatic stay, "common sense indicates that, if the Court has
subject matter jurisdiction over a proceeding to determine the applicability of the automatic

---

[16]     See also A.H. Robins, 788 F.2d at 999-1000; Brier Creek, 486 B.R. at 685.

stay," as it plainly does, "then it has jurisdiction over a related motion for preliminary injunctive

relief," in the same proceeding.[17]

Second, and independently, the Court also has "arising in" jurisdiction because the

Debtor's request for injunctive relief under section 105(a) is unique to bankruptcy.  A proceeding

"arises in" a bankruptcy case when it would "have no existence outside of the bankruptcy."[18]

And a claim for such an injunction, tied to and lasting only during a bankruptcy case, arises only

in bankruptcy cases because such an injunction necessarily "encompass[es] matters concerning

the administration of the estate."[19]  At least three courts, in three circuits, across several decades,

have recognized this logic.[20]

### B.    The Court Has "Related to" Jurisdiction Over Third-Party Claims, Including Direct Claims, Against the Protected Parties.

The Court "at a minimum, [has] 'related to' jurisdiction."[21]  The bar for "related to"

jurisdiction is intentionally low.  The Court has "related to" jurisdiction over third-party claims

against non-debtors when "the outcome of that proceeding could *conceivably* have *any effect* on

---

[17]     FPSDA I, LLC, 2012 WL 6681794, at *5 (finding "related to" and "arising under" jurisdiction).

[18]     In re G-I Holdings, Inc., 580 B.R. 388, 415 (Bankr. D.N.J. 2018) (citing Stoe v. Flaherty, 436 F.3d 209, 261 (3d Cir. 2006)); accord In re Seven Fields Dev. Corp., 505 F.3d 237, 260 (3d Cir. 2007).

[19]     See In re Elsinore Shore Assocs., 91 B.R. 238, 255 (Bankr. D.N.J. 1988) (citing In re Johns-Manville Corp., 801 F.2d 60, 63 (2d Cir. 1986); see also In re Monroe Well Serv., Inc., 67 B.R. 746, 754 (Bankr. E.D. Pa. 1986); In re G-I Holdings, Inc., 327 B.R. 730, 734 (Bankr. D.N.J. 2005) (exercising core jurisdiction over a motion for a preliminary injunction).

[20]     See Monroe Well Serv., 67 B.R. at 753 n.9 (Bankr. E.D. Pa. 1986) (finding "arising in" jurisdiction over a request for a section 105(a) injunction of third party action against non-debtor; favorably cited in Celotex Corp. v. Edwards, 514 U.S. 300, 311 n.8 (1995)); Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.), 402 B.R. 571, 586 (Bankr. S.D.N.Y. 2009) (same; also finding "arising under" jurisdiction); Brier Creek, 486 B.R. at 684 (finding "arising in" jurisdiction over a request for a section 105(a) injunction of third party action against non-debtor).

[21]     In re W.R. Grace & Co., 386 B.R. 17, 25-30 (Bankr. D. Del. 2008); accord Celotex, 514 U.S. at 309-311, 311 n.8 (§ 105(a) injunction issued to augment automatic stay was "at least a question 'related to' Celotex's bankruptcy").

the estate being administered in bankruptcy."[22]  Under this standard, jurisdiction is

straightforward.

Litigation of the Debtor Talc Claims against the Protected Parties outside of this Court

would *at least* "conceivably have [an] effect" on the Debtor's estate and reorganization.  As the

evidence demonstrated, those claims are the *exact same claims* the Debtor seeks to resolve

through reorganization in bankruptcy.  As explained below, in accordance with Texas law, any

liability associated with those claims is the responsibility of the Debtor.  Moreover, the Debtor

has indemnification obligations to J&J, the Retailers and the Indemnified Parties.  And, the

Debtor shares insurance coverage with J&J and the Retailers, who are named as insureds under

many of the policies.[23]  Any party pursuing the Debtor Talc Claims against another entity is

seeking to establish through third-party litigation a claim against the Debtor.  Third-party

litigation involving these claims could at least "conceivably" affect the Debtor's estate (and, in

fact, would materially and adversely impact this case).  See PI Tr. at 142:15-17 ("We're not

going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same

claims that they would be asserting there."); id. 137:21-24 ("[J]urisdiction still exists [as to direct

claims], to the extent that [such claims] would have an effect on the estate or impair the debtor's

---

[22]    Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984); see In re W.R. Grace & Co., 900 F.3d 126, 139
(3d Cir. 2018) (citing Pacor); In re W.R. Grace & Co., 115 F. App'x 565, 567–68 (3d Cir. 2004) (finding
that an adversary proceeding to modify an injunction already entered by the bankruptcy court pursuant to
section 105 "was assuredly 'related to' the case, and, further, it definitely 'arose under' the bankruptcy
proceeding (and was perhaps even a 'core' proceeding)"); In re Phila. Newspapers, LLC, 407 B.R. 606, 615
(E.D. Pa. 2009) (upholding the bankruptcy court's exercise of related to jurisdiction to enjoin state court
actions against non-debtors, even absent contractual indemnification obligations).

[23]    All of the pre-1986 occurrence-based insurance policies provide insurance shared by the Debtor and J&J.
Kim Decl. ¶¶ 46-54.  In addition, as the evidence demonstrated, the Retailers are identified as insureds in
many of the pre-1986 insurance policies.  The relevant provisions generally provide coverage to vendors
with respect to bodily injury arising out of the distribution or sale in the regular course of the vendor's
business of the named insured's products, subject to certain exclusions.  The only relevant exclusion is
where the vendor is alleged to repackage J&J or Old JJCI's products, or where the vendor made a physical
or chemical change to the product.

rights."); <u>see</u>, <u>e.g.</u>, <u>Bestwall</u>, 606 B.R. at 249-51 (confirming court's jurisdiction over third party claims that assert the same liabilities as the debtor sought to reorganize in bankruptcy).

"[C]ourts have made clear that this standard [for "related to" jurisdiction] applies whether any claims against a third party are alleged to be 'direct' or 'derivative.'" <u>Bestwall</u>, 606 B.R. at 249 (citing <u>Pfizer Inc. v. Angelos (In re Quigley Co., Inc.)</u>, 676 F.3d 45, 56-57 (2d Cir. 2012)).[24] A proceeding "need not necessarily be against the debtor or against the debtor's property" to confer jurisdiction. <u>Pacor</u>, 743 F.2d at 994. Rather, "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which *in any way impacts upon the handling and administration of the bankrupt estate.*" <u>Id.</u>[25]

## III. THE AUTOMATIC STAY PROHIBITS PROSECUTION OF DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES.

The automatic stay provided by section 362(a) of the Bankruptcy Code "is intended to 'allow the bankruptcy court to centralize all disputes concerning property of the

---

[24]  <u>See</u> <u>Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC)</u>, No. 20-408, 2021 WL 523625, at *2-3 (D. Del. Feb. 11, 2021) (holding that even if non-debtors had independent liability the court had "related to" jurisdiction to issue preliminary injunction enjoining claims against them); <u>In re SunEdison, Inc.</u>, 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017) ("Where a third party claim may give rise to a potential indemnification or contribution claim against the estate, the third party claim will have a conceivable effect on the estate, and accordingly, the [c]ourt has the jurisdiction to enjoin it.").

[25]  <u>Robins</u>, 788 F.2d at 1002 n.11 ("The accepted definition of the "related to" [jurisdiction] . . . is that declared in <u>Pacor</u>"); <u>see also</u> <u>Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn. (In re Dow Corning Corp.)</u>, 86 F.3d 482, 491 (6th Cir. 1996), <u>as amended on denial of reh'g and reh'g en banc</u> (June 3, 1996) ("Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on 'the debtor's rights, liabilities, options, or freedom of action' or the 'handling and administration of the bankrupt estate.'"); <u>Kocher v. Dow Chem. Co.</u>, 132 F.3d 1225, 1231 (8th Cir. 1997) (holding that the district court had "related to" jurisdiction over plaintiff's product liability claims against debtor's non-debtor co-defendants because the co-defendants had potential indemnification claims against the debtor and therefore "it is at least arguable that [the plaintiff's] claims against [the co-defendants] conceivably could affect [the debtor's] bankruptcy estate"); <u>see also</u> <u>Mine Mgmt, Inc. v. Wolfe (In re Mountain Laurel Res. Co.)</u>, 210 F.3d 361 (4th Cir. 2000) ("A.H. Robins makes clear that a bankruptcy court has the authority under § 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate or where a judgment against the third-party may raise issues of collateral estoppel with respect to suits against the estate.").

debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated

proceedings in other arenas.'" In re Manley Toys Ltd., No. 16-15374 (JNP), 2020 WL 1580244,

at *7 (Bankr. D.N.J. Mar. 31, 2020) (quoting S.E.C. v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000));

McCartney, 106 F.3d at 511 (one purpose of section 362 is "to centralize all prebankruptcy civil

claims against a debtor in the bankruptcy court"); see also 11 U.S.C. § 362(a).

Courts in this circuit recognize that the automatic stay of section 362(a) may

apply of its own force to prohibit the prosecution of claims against third parties where the debtor

is the real party in interest, such as the prosecution of Debtor Talc Claims against the Protected

Parties. See McCartney, 106 F.3d at 511 (holding that deficiency action against non-debtor

principal was automatically stayed because, among other things, the debtor guarantor would have

been required to satisfy any judgment entered against the principal); Kaiser Group Int'l, Inc. v.

Kaiser Aluminium and Chem. Corp. (In re Kaiser Aluminum Corp., Inc.), 315 B.R. 655, 658 (D.

Del. 2004) ("The protection of the automatic stay extends to any action or proceeding against an

interest of the debtor. The scope of this protection is not determined solely by whom a party

chose to name in the proceeding, but rather, by who is the party with a real interest in the

litigation."); Maaco Enters., Inc. v. Corrao, No. CIV. A. 91-3325, 1991 WL 255132, at *2 (E.D.

Pa. Nov. 25, 1991) ("The automatic stay provision applies to suits against non-debtor defendants

who are related to the debtor and to suits the resolution of which may have a significant impact

on the debtor."). Thus, the Debtor requests a declaration that section 362(a) of the Bankruptcy

Code prohibits the commencement or continuation of Debtor Talc Claims against the Protected

Parties while the Chapter 11 Case remains pending.

A.     **Actions Seeking to Hold Protected Parties Liable for Debtor Talc Claims Are Stayed Pursuant to Section 362(a)(1).**

Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

As explained above, Old JJCI no longer exists, and the Debtor is responsible for the Debtor Talc Claims.  Thus, the commencement or continuation of the Debtor Talc Claims against Old JJCI can have only one purpose:  the ultimate liquidation and recovery of claims against the Debtor.  And, because the Debtor Talc Claims allege liabilities arising out of Old JJCI's actions years before the Petition Date, any action against Old JJCI to recover such claims is expressly enjoined by section 362(a)(1) because it constitutes an "action or proceeding against the debtor" to recover a prepetition claim.  See In re Heating Oil Partners, No. 3:08-CV-1976 CSH, 2009 WL 5110838, at *6–7 (D. Conn. Dec. 17, 2009) (holding that a default judgment entered as to a predecessor entity of the debtor was automatically stayed upon the successor entity's chapter 11 filing and void ab initio), aff'd sub nom. In re Heating Oil Partners, LP, 422 F. App'x 15 (2d Cir. 2011);  PI Tr. at 136:25-137:1-5 (ruling that claims against Old JJCI are "claims against the debtor" that are automatically stayed).

Likewise, as explained above, all of J&J's liabilities associated with Johnson's Baby Powder or Shower to Shower were transferred to Old JJCI which assumed those liabilities in the 1970s.  Thus, the pursuit of the Debtor Talc Claims against J&J is an effort to liquidate and recover claims for liabilities that were transferred to the Debtor's predecessor in the 1970s and are now liabilities of the Debtor.  See In re Colonial Realty Co., 980 F.2d 125, 131-32 (2d

Cir. 1992) (actions "to recover a claim against the debtor" as provided in section 362(a)(1) "must

encompass cases in which the debtor is not a defendant; it would otherwise be totally duplicative

of the former category and pure surplusage"); Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287

(2d Cir. 2003) (automatic stay may apply to non-debtors, specifically where there is a claim to

establish an obligation of which the debtor is a guarantor) (citing McCartney, 106 F.3d at

510-11; see also Borman v. Raymark Indus., Inc., 946 F.2d 1031, 1036 (3rd Cir. 1991) ("It is an

'elementary canon of construction that a statute should be interpreted so as not to render one part

inoperative'") (quoting Colautti v. Franklin, 439 U.S. 379, 392 (1979)).

In addition, Third Circuit precedent recognizes that the automatic stay imposed by

section 362(a)(1) extends of its own force to enjoin actions against parties who share such an

identity of interests with the debtor in respect to those actions that the debtor is, in effect, the

real-party defendant.  See McCartney, 106 F.3d at 510–11 (concluding that the automatic stay

enjoined an action against non-debtor third party where the debtor "was, in essence, the real

party in interest" in the pursuit of a deficiency judgment against the third party); Harrison v.

Soroof Int'l, Inc., 320 F. Supp. 3d 602, 628 (D. Del. 2018) ("Having found that [plaintiff's] alter

ego claim is property of the bankruptcy estate under Section 541(a)(1), the automatic stay of

Section 362(a)(3) is clearly implicated."); Covertech Fabricating, Inc. v. TVMP Building Prods.,

Inc., No. 3:17-cv-196, 2017 WL 5466709, at *2, *6 (W.D. Pa. Nov. 13, 2017) (concluding that

the automatic stay enjoined actions against non-debtor affiliates based on theories of successor

liability, alter ego, and fraudulent transfer, which were deemed property of the bankruptcy estate,

despite assertion that such claims were "completely independent of" the debtor's bankruptcy).

Actions against the Retailers and Indemnified Parties, including New JJCI and J&J, are stayed

because, given the Debtor's responsibility for claims asserted against the Retailers and the

Indemnified Parties, including New JJCI or J&J, "there is such identity" with the Debtor that it "may be said to be the real party defendant." See A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.), 788 F.2d 994, 999–1001 (4th Cir. 1986), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

The Third Circuit has adopted the Fourth Circuit's reasoning from Robins on this point.  See Belcufine v. Aloe, 112 F.3d 633, 637 n.6 (3d Cir. 1997) (stating that the rationale "first articulated in [Robins] . . . has since been adopted by this Circuit").  In Robins, the Fourth Circuit described a type of situation that would cause such an identity of interests:

> An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case.

Robins, 788 F.2d at 999.  Indeed, the court continued, "[t]o refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute." Id.; see id. (quoting In re Metal Ctr., 31 B.R. 458, 462 (D. Conn. 1983) ("Clearly the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate.")); Edwards v. McElliotts Trucking, LLC, No. 3:16-1879, 2017 WL 5559921, at *3 (S.D. W. Va. Nov. 17, 2017) (finding that indemnification arrangement between the debtor and non-debtor defendants made action against non-debtor defendants subject to the automatic stay imposed by section 362(a)(1)); In re W.R. Grace & Co., Case No. 01-01139 (JKF), 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (applying automatic stay to litigation between two non-debtor parties where one of the parties was entitled to contractual indemnity from the debtor on account of such claims and amending preliminary injunction order to include such action).  "Identity of interests" also occurs where adjudication of the claims against non-debtors "raises collateral estoppel and res judicata issues for the debtor." Aldrich Pump,

2021 WL 3729335, at *31; accord McCartney, 106 F.3d at 510 (citing In re Am. Film Techs.,

Inc., 175 B.R. 847, 855 (Bankr. D. Del. 1994)).

　　　　　Here, as in Robins, the Protected Parties share an identity of interest with the

Debtor in respect of the Debtor Talc Claims such that the Debtor is the real-party defendant in

the Debtor Talc Claims brought against the Protected Parties.  As discussed above, litigating,

settling or attempting to establish the value the Debtor Talc Claims against the non-debtor

affiliate would liquidate claims against the Debtor, including by triggering existing

indemnification and similar obligations of the Debtor to such entities.  Such litigation also

creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an

evidentiary record that prejudices the Debtor.  Because the Debtor is the real-party defendant in

any suit seeking to liquidate and recover on account of a Debtor Talc Claim, section 362(a)(1)

stays such actions

　　　**B.**　　　**Insurance Policies Are Estate Assets and Therefore Suits That Would
　　　　　　Deplete Those Policies Are Automatically Stayed.**

　　　　　Section 362(a)(3) bars plaintiffs from bringing suits, against the Debtor's Insurers,

the Retailers and J&J, that would deplete the Debtor's insurance on account of Debtor Talc

Claims because the right to insurance coverage is property of the estate.  See Robins, 788 F.2d

at 1001 (agreeing with "the weight of authority" that insurance contracts are property of the

estate and that "[a]ccordingly actions 'related to' the bankruptcy proceedings against the insurer

. . . are to be stayed under section 362(a)(3)"); In re W.R. Grace & Co., 475 B.R. 34, 149 (D.

Del. 2012), aff'd sub nom. In re WR Grace & Co., 729 F.3d 332 (3d Cir. 2013) (insurance

policies constitute "'valuable property of a debtor, . . . therefore '[a]ny action in which the

judgment may diminish this 'important asset' is unquestionably subject to [the § 362(a)] stay[.]'")

(quoting Robins, 788 F.2d at 1001); In re Johns-Manville Corp., 40 B.R. 219, 231 (S.D.N.Y.

1984) ("determin[ing] that Manville's insurance is property of the estate under the Code and that

actions by third parties against the bankrupt's insurers are automatically stayed upon the filing of

the petition"); see also ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir.

2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the

property of a bankruptcy estate."); Maertin v. Armstrong World Indus., Inc., 241 F. Supp. 2d

434, 446 (D.N.J. 2002) (insurance policies and proceeds of policies are property of the estate).

      J&J and the Debtor are both covered for talc-related claims under various shared

insurance policies.  The Retailers are named as insureds in many such policies.  The right to

coverage under these insurance policies is property of the Debtor's estate, and prosecution of a

claim against J&J or the Retailers, each of which is a co-insured party, would deplete proceeds

available to the Debtor, thereby reducing assets available to the bankruptcy estate.  See, e.g., In

re Quigley Co., Inc., 676 F.3d 45, 53-54, 58 (2d Cir. 2012) ("[W]here litigation of the [lawsuits

against non-debtor] would almost certainly result in the drawing down of insurance policies that

are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction to enjoin

these suits was appropriate."); Robins, 788 F.2d at 1008 (sustaining injunction and transfer of

claims against non-debtors in part because such claims, if successful, would reduce insurance

funds available to debtor's estate); In re Montreal Me. & Atl. Ry., Ltd., No. 1:13-MC-00184-NT,

2014 WL 1155419, at *10 (D. Me. Mar. 21, 2014) (finding jurisdiction and transferring non-

debtors' cases based on shared insurance); Raudonis, as Tr. for the Raudonis 2016 Revocable Tr.

v. RealtyShares, Inc., 507 F.Supp.3d 378, 384 (D. Mass. 2020) ("Because courts generally

recognize insurance policy as 'property' under 11 U.S.C. § 541(a)(1) – and thus find such policies

subject to an automatic stay pursuant to 11 U.S.C. § 362(a)(3) – the defendants' shared insurance

contract arguably sweeps [co-insureds] into the reach of the automatic stay."); In re Metro

Mortg. & Secs. Co., 325 B.R. 851 (Bankr. E.D. Wash. 2005) (holding that shared insurance policies and their proceeds were property of the debtors' estates and were protected by automatic stay).

Here, insurance is potentially available to the Debtor, J&J and the Retailers under various insurance policies for talc-related claims.  If a Debtor Talc Claim is prosecuted against J&J or the Retailers, J&J or the Retailers may seek coverage under these shared insurance policies to satisfy any judgment, thereby reducing the coverage available to the Debtor's estate. Such a depletion of an estate asset violates the automatic stay and, therefore, Debtor Talc Claims against the Insurers, J&J and the Retailers are stayed pursuant to section 362(a)(3).

C.     **Actions Seeking to Hold Protected Parties Liable for the Debtor Talc Claims Based on "Derivative Liability" Are Property of the Debtor's Estate and Automatically Stayed.**

Section 541 of the Bankruptcy Code establishes that the filing of a bankruptcy case creates an "estate."  11 U.S.C. § 541(a).  That estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," wherever located and by whomever held.  Id. § 541(a)(1).  Thus, "'[a] cause of action [becomes] property of the estate if the claim existed at the commencement of the [bankruptcy] filing and the debtor could have asserted the claim on his own behalf under state law.'"  Artesanias Hacienda Real S.A. DE C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.), 968 F.3d 273, 280 (3d Cir. 2020) (quoting Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002)); see also Butner v. United States, 440 U.S. 48, 54 (1979).  Such causes of action include alter ego or successor liability claims.  See, e.g., In re Emoral, Inc., 740 F.3d 875, 880-82 (3d Cir. 2014) (holding that personal injury claimants' successor liability claims against transferee were property of the debtor's estate); Steyr-Daimler-Puch of Am. Corp. v. Pappas,

852 F.2d 132, 135 (4th Cir. 1988) (creditor's alter ego claim against debtor's principal and

affiliate was cause of action that debtor could assert under state law and thus was "'property of

the estate' within the meaning of § 541(a)(1)"); Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs.by

Jamie, Inc.), 230 B.R. 36, 43 (Bankr. D.N.J. 1998) (holding that trustee succeeded to debtor's

right to assert alter ego claim because corporate debtor's interest in its alter ego's assets is

property of the estate).

Section 362(a) of the Bankruptcy Code states that the filing of a bankruptcy

petition "operates as a stay, applicable to all entities, of . . . (3) any act . . . to exercise control

over property of the estate; . . ." 11 U.S.C. § 362(a). Accordingly, when claims against a

non-debtor "are property of the estate under section 541(a), any similar extraneous lawsuits

brought by individual creditors will be subject to the automatic stay provision of 11 U.S.C.

§ 362(a)(3)." Baillie Lumber Co., LP v. Thompson (In re Icarus Holding, LLC), 391 F.3d 1315,

1319 (11th Cir. 2004); see also Steyr, 852 F.2d at 136 ("Since the alter ego claim . . . is 'property

of the estate' within the meaning of § 541(a)(1) . . . the automatic stay applies" and "the trustee is

given full authority over it.") (citations omitted).

To determine whether a creditor's claim against a non-debtor constitutes an act to

exercise control over property of the estate, a court must answer two inquiries:  (a) whether "the

debtor could have asserted the claim on his own behalf under state law" and (b) whether the

individual creditor's claim against the non-debtor is a "general claim" available to the debtor's

other creditors. E.g., Emoral, 740 F.3d at 879; Wilton, 968 F.3d  at 282; Foodtown, 296 F.3d at

169 n.5, 170; Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc), 855 F.3d 84, 107 (2d Cir.

2017); St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 701 (2d Cir. 1989); Koch

Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1348-49 (7th Cir. 1987).

Here, any fraudulent transfer, alter ego and, successor liability or similar "derivative" claims that might be alleged by the Defendants against the Debtor's non-debtor affiliates seek to exercise control over property of the Debtor's estate and are thus stayed by section 362(a)(3).  Although it is not entirely clear whether the Defendants are asserting or will assert such derivative claims against the Debtor's non-debtor affiliates, given the Defendants' broad statements to date that they intend to continue to pursue these entities for talc-related claims notwithstanding the Debtor's chapter 11 filing, it is appropriate for this Court to confirm for the benefit of the Debtor, and as a clear direction to the Defendants, that any such actions would be barred by the automatic stay.

     1.      **The Debtor Had Standing Under State Law To Assert Alter Ego and Successor Liability Claims at the Time It Commenced the Chapter 11 Case**

          a.      **The Debtor's Standing To Bring Alter Ego and Successor Liability Claims Under State Law**

Whether a debtor had standing to assert a cause of action against another at the time it filed its bankruptcy case is a question of state law.  See St. Paul Fire & Marine, 884 F.2d at 700 ("Whether the rights belong to the debtor or the individual creditors is a question of state law."); see also Koch Refining, 831 F.2d at 1344 (whether alter ego claim belongs to estate or creditors is a question of state law); In re Bridgepoint Nurseries, Inc., 190 B.R. 215, 219 (Bankr. D.N.J. 1996) ("[I]n determining property rights courts must look to state law."); In re Arrow Mill Dev. Corp., 185 B.R. 190, 194 (Bankr. D.N.J. 1995) ("Because property interests of the debtor are not defined by the Bankruptcy Code, the court must look to state law.").

To determine which state law is the "relevant state law" for this inquiry, courts use the choice-of-law rules of the forum state in which the bankruptcy case sits.  See In re First Interregional Advisors Corp., 271 B.R. 463, 469 (Bankr. D.N.J. 2001) ("Where state law governs

in a federal case, the federal court must apply the choice of law doctrine from the forum state.");

In re Alcon Demolition, Inc., 204 B.R. 440, 446 (Bankr. D.N.J. 1997) ("A federal court applies

the choice-of-law doctrine in the forum state in which it sits."); In re Kaplan, 186 B.R. 871, 874

(Bankr. D.N.J. 1995) ("In an action where state law governs, federal courts generally look to the

law of the forum state to resolve choice of law issues.").

      With respect to alter ego claims, New Jersey (like most jurisdictions) applies the

"internal affairs doctrine," which applies the law of the state in which the debtor is incorporated.

See Krys v. Aaron, 106 F. Supp. 3d 472, 484 (D.N.J. 2015) ("New Jersey courts adhere to the

[internal affairs] doctrine, and direct that the law of the state of incorporation [governs] internal

corporate affairs.") (internal quotations omitted).[26]  Here, the Debtor was a North Carolina

limited liability company when it commenced its chapter 11 case.  Thus, North Carolina law

governs whether it had standing at that time to pierce its own corporate veil to assert alter ego

claims.[27]

---

[26]    The internal affairs doctrine serves as "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs . . . because otherwise a corporation could be faced with conflicting demands." Id., 106 F. Supp. 3d at 484.  The choice of law rules of Texas and North Carolina also use the internal affairs doctrine. See Hollis v. Hill, 232 F.3d 460, 464-65 (5th Cir. 2000) ("Texas, like most other states, follows the 'internal affairs doctrine.'"); Butler v. Enhanced Equity Fund II, LP (In re Am. Ambulette & Ambulance Serv. Inc.), 560 B.R. 256, 269-70 (Bankr. E.D.N.C. 2016) (applying Delaware law to veil-piercing claim pursuant to internal affairs doctrine).

[27]    At the time of the 2021 Corporate Restructuring when it was formed, the Debtor was a Texas limited liability company.  In addition, during the 2021 Corporate Restructuring, Old JJCI (which was formerly a New Jersey corporation) became an entity formed under Texas law. See First Day Decl. ¶ 16.  Thus, it is conceivable that a claimant might contend that, under the "internal affairs doctrine," Texas (or even New Jersey) law instead governs whether the Debtor had the right to assert the alleged alter ego claim when this bankruptcy case was commenced, depending on what facts are alleged to support the claim and when the claim allegedly arose. See In re Keene, 164 B.R. 844, 847 n.3 (Bankr. S.D.N.Y 1994).

    As detailed below, the laws of Texas and New Jersey are identical to North Carolina law as to whether a corporation has a right to pierce its own veil to sue an alleged alter ego in order to hold it responsible for the corporation's debts.  Accordingly, this Court does not need to resolve that particular choice-of-law question to determine whether a Defendant's assertion of such an alter ego claim is barred by the automatic stay. See Tronox, 855 F.3d at 104 & n.25 ("we need not resolve the parties' dispute concerning which state's law governs" because, under either Pennsylvania or Delaware law, alter ego claims were estate property "to the extent the claims qualify as 'general'"). In re Emoral Inc., 740 F.3d 875, 879 n.2 (3d Cir.

### b. The Debtor Had Standing Under North Carolina Law To Pierce its Corporate Veil and Seek Recovery from an Alter Ego

Courts that have examined the issue have held that North Carolina law empowers a corporation to seek to pierce its corporate veil to sue an alleged alter ego for the purpose of holding it responsible for the corporation's debts.  See Alvarez v. Ward, No. 1:11CV03, 2012 WL 113567, at *4 n.5 (W.D.N.C. Jan. 13, 2012); Alvarez v. Ward, No. 1:11CV03, 2011 WL 7025906 at *3 (W.D.N.C. Oct. 17, 2011); Holcomb v. Pilot Freight Carriers, Inc., 120 B.R. 35, 41-42 (M.D.N.C. 1990); In re Midstate Mills, No. 13-50033, 2015 WL 5475295 at *7 (Bankr. W.D.N.C. Sept. 15, 2015); Mitchell v. Greenberg (In re Creative Entm't, Inc.), No. 99-30485, 2003 Bankr. LEXIS 2468 at *26-28 (Bankr. W.D.N.C. May 28, 2003).  Those decisions all followed the Fourth Circuit's decision in Steyr.

In Steyr, the Fourth Circuit held that a debtor corporation had the right under Virginia law to bring an alter ego claim against its principal and an affiliate, and that the claim became property of the estate when the corporation filed its chapter 7 case.  852 F.2d at 136. The court reasoned that "[u]nder Virginia law, a corporation has an equitable interest in the assets of an alter ego because the corporation and the alter ego are 'one and the same.'" Id. (quoting Pepper v. Dixie Splint Coal Co., 165 Va. 179, 181 S.E. 406 (1935)).  The Fourth Circuit in Steyr held that section 541(a) "brings the right of [the debtor corporation] to proceed against its alter ego and claim its equitable interest in assets of the alter ego into the bankruptcy estate," id., endorsing the Fifth Circuit's analysis of the same question under Texas law in

---

2014) (whether debtor had right to bring successor liability claim was governed by either New Jersey or New York law, and "the two states' relevant applicable legal standards are identical, rendering a choice-of-law analysis unnecessary"); Sterne Agee Grp., Inc. v. Robinson (In re Anderson & Strudwick, Inc.), No. 14-03175, 2015 WL 1651146, at *6 n.4 (Bankr. E.D. Va. April 8, 2015) (same for New York and Virginia successor liability law, which are "'essentially the same'").

S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142,

1152-53 (5th Cir. 1987).

In analyzing Texas law on this issue, the Fifth Circuit in S.I. Acquisition

concluded:

> Not surprisingly, we have found no Texas law suggesting that a
> corporation could or could not itself bring an alter ego claim.  Even
> so, we note that the predominate policy of Texas alter ego law is that
> the control entity that has misused the corporate form will be held
> accountable for the corporation's obligations.  [Citation omitted];
> see also Valdes [v. Leisure Resource Group, Inc., 810 F.2d 1345,
> 1353 (5th Cir. 1987)] (alter ego doctrine applies to hold dominant
> entity responsible for subservient company's debt since dominant
> entity was responsible for creating the debts).  Since the corporation
> has an independent existence at law, we do not believe it is
> inconsistent in light of the above policy to say that a corporation
> may pierce its own corporate veil and hold accountable those who
> have misused the corporation in order to meet its corporate
> obligations.

817 F.2d at 1152.  In reaching that conclusion, the Fifth Circuit found persuasive Judge Jones'

explanation in In re Western World Funding, Inc., that "[t]he corporation may be thought of as a

separate legal entity which has an interest of its own in assuring that it can meet its responsibility

to its creditors . . . while at the same time allowing it to argue that it should be deemed to be

identical to its alleged alter ego for purposes of paying those creditors."  52 B.R. 743, 784

(Bankr. D. Nev. 1985) (internal quotations and citations omitted).

In Holcomb, the Middle District of North Carolina adopted the magistrate's

extensive review of North Carolina law governing alter ego claims.  120 B.R. at 38-42.  Based

on that review, the magistrate rejected the argument that North Carolina law was "radically

different" from the Nevada law applied in Western World Funding and the Virginia law applied

by the Fourth Circuit in Steyr.  120 B.R. at 39-40.  Instead, he found:

> Having completed this examination of North Carolina law, the Court finds it to be entirely consistent with the Fourth Circuit's requirement in Steyr that a corporation may be said to have an equitable interest in the assets of an alter ego when they are one and the same. Steyr, 852 F.2d at 136. Thus, in North Carolina, alter ego claims, which are based on factors which establish that the controlled corporation and the alter ego have the same identity, belong to the bankruptcy estate and must be prosecuted by the trustee.

Id. at 41-42.  The same conclusion was reached in Alvarez:

> North Carolina law, like Virginia law, treats a corporation and its alter-ego as "one and the same . . . ." Fischer Inv. Capital, Inc. v. Catawba Dev., Corp., 689 S.E.2d 143, 147 (N.C. Ct. App. 2009) (quoting Strategic Outsourcing, Inc. v. Stacks, 625 S.E.2d 800, 804 (N.C. Ct. App. 2006)).  Consistent with the Fourth Circuit's holding in [Steyr], a corporation has an interest in the assets of its alter ego, and, thus, an alter ego claim is the property of the estate for purposes of Section 541(a)(1).

2011 WL 7025906 at *3 (citing Steyr, 852 F.2d at 136, and Holcomb, 120 B.R. at 41-42).

Relying on Holcomb and Alvarez, North Carolina bankruptcy courts have repeatedly held that a corporation has the right to sue an alleged alter ego under North Carolina law and that such claim becomes property of the estate when the corporation files a bankruptcy case.  Midstate Mills, 2015 WL 5475295 at *7; Mitchell, 2003 Bankr. LEXIS 2468 at *26-28.

To the extent that a party might assert instead that Texas or New Jersey law governs whether the Debtor has standing to bring an alter ego claim against a Protected Party, courts applying the law from both states have reached the same conclusion.  See S.I. Acquisition, 817 F.2d at 1153 (corporation had right under Texas law to bring alter ego claim, which became property of estate when corporation filed bankruptcy case); Bldgs. by Jamie, 230 B.R. at 43 (corporation can sue alter ego under New Jersey law, noting "majority of courts in other jurisdictions that have addressed the issue of authority to pursue an alter ego action on behalf of a corporate debtor have also held that the trustee has standing" to assert such claim).

c.  **The Debtor Also Had Standing To Bring Successor Liability Claims**

As is the case in most states, the general rule under North Carolina law is, "'where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor.'"  City of Richmond v. Madison Mgmt. Grp., Inc., 918 F.2d 438, 450 (4th Cir. 1990) (quoting 15 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 7122, at 188 (rev. perm. ed. 1983));[28] accord Leonard v. Bed, Bath & Beyond, Inc., No. 5:15-CV-00284, 2016 WL 158587, at *2 (E.D.N.C. Jan. 8, 2016).  Most states recognize four exceptions to the general rule:

> (1) where there is an express or implied agreement by the purchasing corporation to assume the debt or liability; (2) where the transfer amounts to a de facto merger of the two corporations; (3) where the transfer of assets was done for the purpose of defrauding the corporation's creditors; or (4) where the purchasing corporation is a "mere continuation" of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers.

Leonard, 2016 WL 158587 at *3 (citing G.P. Publ'ns, Inc. v. Quebecor Printing-St. Paul, Inc., 481 S.E.2d 674, 679 (N.C. Ct. App. 1997) (citing Budd Tire Corp. v. Pierce Tire Co., 370 S.E.2d 267, 269 (N.C. Ct. App. 1988))).

In Mitchell, the court noted that whether state law allows a corporation (or its receiver) to recover on a claim against an alleged successor under one of these exceptions "is apparently a question of first impression under North Carolina law."  2003 Bankr. LEXIS 2468 at *28-29.  Finding that "[s]uch a claim is substantially similar to an alter ego claim because it

---

[28]    See also Emoral, 740 F.3d at 879-80 ("[U]nder both New Jersey and New York state law, an acquiring company is generally 'not liable for the debts and liabilities of the selling company simply because it has succeeded to ownership of the assets of the seller,' except in limited circumstances.") (quoting Lefever v. K.P. Hovnanian Enters., Inc., 160 N.J. 307, 310 (1999)).

seeks to recover assets of a corporation and to make these available to satisfy creditor claims,"
the court held that the debtor could assert a successor liability claim under North Carolina law
and that the claim became property of the estate under section 541(a) when the corporation's
chapter 7 case was commenced.  Id. (citing Keene, 164 B.R. at 853).

Similar to Mitchell, Judge Bernstein's reasoning in Keene was based on the
finding that "[t]he principles relating to successor tort liability, and the results which they are
designed to achieve, are similar to piercing the corporate veil."  164 B.R. at 852.  Applying New
York law on successor liability that was the same as the North Carolina law detailed in Leonard,
id., Judge Bernstein declared that the automatic stay barred the asbestos claimants from pursuing
their actions against the debtor's affiliates on successor liability claims, explaining that "the
remedy against a successor corporation for the tort liability of the predecessor is, like the
piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims"
and that, for "the same reasons stated with respect to the piercing claims, claims based upon
successor liability should be asserted by the trustee on behalf of all creditors."  Id. at 853.

The Third Circuit reached the same conclusion in Emoral.  In that case, the debtor
manufactured a chemical used in food flavoring that gave rise to personal injury claims.
740 F.3d at 877.  After it sold operating assets to a transferee, the debtor filed its bankruptcy
case, and the trustee for the debtor's estate entered into a settlement with the transferee in which
the trustee released it from claims that "are property of the" debtor's estate.  Id.  The personal
injury claimants then sued the transferee in state court, alleging that the transferee was a "mere
continuation" of the debtor and thus subject to their successor liability claims.  Id.

When the bankruptcy court denied the transferee's motion to enforce the order
approving its settlement with the trustee, the district court reversed, and the Third Circuit

affirmed the district court's reversal.  Id. at 882.  The Third Circuit, relying on Keene and cases

finding that a corporation had standing under state law to assert alter ego claims, held that the

personal injury claimants' successor liability claims against the transferee were property of the

estate under the state law of both New York and New Jersey and were thus settled and released

by the trustee.  Id. at 880-82 and n.3.  The court noted that, although that result might seem odd

at first, it nonetheless makes perfect sense:

> As we observed in Phar–Mor, so, too, here it "may seem strange" to
> hold that a cause of action for successor liability against Aaroma is
> property of Emoral's bankruptcy estate. As a practical matter, it is
> difficult to imagine a factual scenario in which a solvent Emoral,
> outside of the bankruptcy context, would or could bring a claim for
> successor liability against Aaroma.  Just as the purpose behind
> piercing the corporate veil, however, the purpose of successor
> liability is to promote equity and avoid unfairness, and it is not
> incompatible with that purpose for a trustee, on behalf of a debtor
> corporation, to pursue that claim.

Id. at 881 (internal citations omitted).

The Second Circuit, in Tronox, reached the same conclusion as the courts in

Mitchell, Keene and Emoral, holding that the alter ego and successor liability claims of

4,300 toxic tort claimants against a non-debtor transferee were property of the debtor's estate

under both Pennsylvania and Delaware law.  855 F.3d at 104 (citing Rosener v. Majestic Mgmt.,

Inc. (In re OODC, LLC), 321 B.R. 128, 136-37 (Bankr. D. Del. 2005) (allowing trustee to bring

successor liability and alter ego claims under Delaware law)); see also Sterne Agee Group,

2015 WL 1651146, at *5 (holding Virginia law allows corporation to recover against its alleged

successor based on both Steyr and the "weight of authority outside this Circuit" that "supports

the conclusion that a successor liability claim constitutes property of the bankruptcy estate under

Bankruptcy Code § 541(a)(1)").

**2.      Any Alleged Alter Ego and Successor Liability Claims Are Based on Facts and Legal Theories that Are Generally Available to Other Creditors of the Debtor**

State law affords an individual creditor the right in some circumstances to recover a claim against an entity from a third party based on alter ego and successor liability theories. But once that entity files for bankruptcy, the creditor's pursuit of the claim against the third party is automatically stayed by section 362(a)(3) if it constitutes an act "to exercise control over" the same or similar claim that state law affords to the debtor to assert generally on behalf of its creditors.  When the individual creditor's claim against the third party is based on facts and legal theories "generally available" to the debtor's other creditors, the stay applies because the individual creditor's pursuit of the claim interferes with, and thus constitutes an act "to exercise control over," the same or similar claim that is property of the estate.  Accordingly, to avoid the automatic stay, the individual creditor's claim against the third party must be based on facts and legal theories of liability that are "personal" and "unique" to that creditor.  Emoral, 740 F.3d at 880; Baillie Lumber, 391 F.3d at 1321.

"To distinguish general from personal claims," the Third Circuit focuses "not on the nature of the injury, but on the 'theory of liability.'"  Wilton, 968 F.3d at 283 (quoting Emoral, 740 F.3d at 879).  "A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim."  Foodtown, 296 F.3d at 170 (citing Koch Refining, 831 F.2d at 1348-49.  Conversely, were a theory of recovery "would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors," the claim is general, not personal.  Emoral, 740 F.3d at 881.  "Only when a particular creditor suffers a direct, particularized injury that can be 'directly traced' to the defendant's conduct is the claim personal to that creditor and not property of the estate."  Wilton, 968 F.3d at

283 (quoting <u>Tronox</u>, 855 F.3d at 100); <u>see also</u> <u>Marshall v. Picard (In re Bernard L. Madoff Inv.</u>

<u>Sec. LLC</u>), 740 F.3d 81, 89 (2d Cir. 2014).  In undertaking this inquiry, the Court "should be

focused on [the creditor]'s alter ego claim itself—not [the creditor]'s underlying claim" against

the debtor.  <u>Harrison</u>, 320 F. Supp. 3d at 619.  "The case law demonstrates that an alter ego or

successorship claim is personal, and thus can be asserted by an individual creditor, only if the

conduct that supports the claim is the same conduct that directly harmed the creditor in the

underlying cause of action."  <u>Labarbera v. United Crane & Rigging Servs, Inc.</u>, No 08-CV-3274,

2011 WL 1303146 at *7 (E.D.N.Y. March 2, 2011).

Any alter ego or successor liability claims that the Defendants attempt to assert

against the Non-Debtor Affiliates are "general," not "personal," because the facts and legal

theories on which the alleged liability of the affiliate is based have nothing to do with the

conduct that gave rise to the claimants' talc-related claim against the Debtor.  Here, as in <u>Emoral</u>,

if claimants were in fact harmed by the restructuring (they were not), all creditors would benefit

if the successor liability claims were successful:

> To determine whether the Diacetyl Plaintiffs' cause of action against
> Aaroma constitutes property of Emoral's bankruptcy estate, we must
> examine the nature of the cause of action itself.  While the Diacetyl
> Plaintiffs focus on the individualized nature of their personal injury
> claims against *Emoral*, we cannot ignore the fact, and fact it be, that
> their only theory of liability as against *Aaroma*, a third party that is
> not alleged to have caused any direct injury to the Diacetyl Plaintiffs,
> is that, as a matter of state law, Aaroma constitutes a "mere
> continuation" of Emoral such that it has also succeeded to all of
> Emoral's liabilities. . . .
>
> The Diacetyl Plaintiffs fail to demonstrate how any of the factual
> allegations that would establish their cause of action based on
> successor liability are unique to them as compared to other creditors
> of Emoral.  Likewise, they fail to demonstrate how recovery on their
> successor liability cause of action would not benefit all creditors of
> Emoral given that Aaroma, as a mere continuation of Emoral, would
> succeed to all of Emoral's liabilities. . . .

> . . . Therefore, the District Court appropriately classified the cause
> of action as a generalized claim constituting property of the estate.

740 F.3d at 879-81.  Accord Tronox, 855 F.3d at 103 (agreeing with Emoral holding that

personal injury claimants' successor liability claim was "general" rather than "individualized,"

observing: "That the plaintiffs in Emoral had an underlying harm specific to them did not put the

claims automatically outside the estate.  Indeed, every creditor in bankruptcy has an individual

claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or

otherwise.").

The Second Circuit's analysis of the issue in Tronox is instructive here.  In that

case, the court emphasized the "critical distinction between the underlying tort claim against" the

debtors and the alter ego and successor liability claims against the newly-created transferee that

received assets from the debtors' predecessors.  855 F.3d at 107.  In holding that the court below

had "correctly classified the [tort claimants'] claims as generalized, derivative claims comprising

estate property," the Second Circuit explained that

> establishing the former [the underlying tort claim] would benefit
> only [the tort claimants] as individual creditors, whereas the latter—
> that New Kerr-McGee is the alter ego of the relevant Tronox debtors
> and should therefore be charged with all its liabilities—would
> benefit all creditors of the Tronox debtors generally.  See Emoral,
> 740 F.3d at 880.  The facts necessary to prove that the Tronox
> debtors committed the underlying torts may be particular to the [tort
> claimants], but the facts necessary to impute that liability to New
> Kerr-McGee 'would be . . . generally available to any creditor, and
> recovery would serve to increase the pool of assets available to all
> creditors.'

Tronox, 855 F.3d at 107 (quoting Emoral, 740 F.3d at 881).  The court in Tronox emphasized

that, "[i]n distinguishing derivative claims from particularized claims exclusive to individual

creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead

around a bankruptcy."  855 F.3d at 100.  "In other words," the court explained, "we are wary of

putting form over substance.  Thus, we 'inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted.'"  Id. (citations omitted); see also Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc., 187 F.3d 439 (4th Cir. 1999) (holding that sureties' successor liability and conspiracy claims against transferee of certain of debtor's assets were "so similar in object and purpose to claims the trustee could bring in bankruptcy court that the Sureties lack standing to pursue these claims"); Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship), 135 B.R. 797 (W.D.N.C. 1992) (holding that bank's state court action against partners of debtor violated the automatic stay where the action— although not identical to the right of the debtor to compel its general partners to pay its debts— "would necessarily impair the debtor's exercise of its right to compel its general partners to pay its debts, thus interfering with property of the estate.").

Enforcing the automatic stay to prevent individual creditors from pursuing liability claims against non-debtors based on alter ego or successor liability theories is essential to provide the estate with control over the res available for distribution to all claimants.  As the Second Circuit pointed out in Tronox, preserving the estate's control over such claims not only ensures a fair distribution of the res, but also promotes the efficient resolution of those causes of action, which are part of the res:

> The whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets.  That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property.  Instead, the trustee is conferred the right to recover for derivative, generalized claims; only the estate is charged with ensuring equitable distribution of estate assets and preventing individual creditors from pursuing their own interests and thus diminishing the res available to the rest of the creditors.  Even more, it encourages, as it did here, orderly settlement—an interest not taken lightly.

855 F.3d at 106 (internal citations omitted).

The bottom line is that the Defendants here are in the same position as were the diacetyl claimants in <u>Emoral</u>, the individual creditors in <u>S.I. Acquisition</u> and <u>Steyr</u>, the bank in <u>Litchfield</u>, the former employees in <u>Holcomb</u>, the purchasers of empty lots in <u>Alvarez</u>, the asbestos claimants in <u>Keene</u> and the toxic tort claimants in <u>Tronox</u>.  Their successor liability and alter ego claims against the Non-Debtor Affiliates are based on facts and theories generally available to the Debtor's other creditors and are therefore automatically stayed by section 362(a)(3) because they are acts to exercise control over property of the Debtor's estate.

### D.     The Debtor Has Exclusive Standing to Assert the Defendants' Fraudulent Transfer Claims

Any fraudulent conveyance claims asserted by the Defendants in their lawsuits are property of the Debtor's estate.  Section 541(a)(7) of the Bankruptcy Code states that the debtor's estate is also comprised of "[a]ny interest in property that the estate acquires after the commencement of case." 11 U.S.C. § 541(a)(7) (emphasis added).  The "broad definition of a bankruptcy estate includes causes of action that arise out of preferential or fraudulent transfers." <u>Cho v. Park (In re Park)</u>, 682 F. App'x 104, 107 (3d Cir. 2017); <u>see also</u> <u>In re Melly</u>, No. 18-26036-RG, 2019 WL 1953661, at *3 (Bankr. D.N.J. Apr. 29, 2019) ("A fraudulent conveyance claim is property of the estate and is protected by the automatic stay.").  The Third Circuit has observed that, "[a] third party action to recover fraudulently transferred property is properly regarded as undertaken to recover a claim against the debtor and subject to the automatic stay pursuant to § 362(a)(1)." <u>Park</u>, 682 F. App'x at 107–08 (quoting <u>In re Keene Corp.</u>, 164 B.R. 844, 850 (Bankr. S.D.N.Y. 1994)).

This view is consistent with courts' analyses of alter ego and derivative liability causes of action discussed above because any fraudulent conveyance claim must be a general,

not a personal, claim.  "Claims alleging that 'third parties . . . wrongfully deplete[d] the debtor's

assets' are general or derivative because '[e]very creditor has a similar claim for the diversion of

assets of the debtor's estate.'"  Wilton, 968 F.3d at 282 (quoting Tronox, 855 F.3d at 103).  As the

Third Circuit has explained:

> The theory of recovery for those claims is not tied to the harm done
> to the creditor by the debtor.  Rather, it is based on an injury to the
> debtor's estate that creates a secondary harm to all creditors
> regardless of the nature of their underlying claims against the debtor.

Wilton, 968 F.3d at 282-83.  Therefore, section "362(a)(3) stays automatically—without a

restraining order—a creditor's claim against a third-party that the debtor can assert for the benefit

of the estate . . . including actions to . . . recover fraudulent transfers." Litchfield, 135 B.R. at 803

n.4; see also Melly, 2019 WL 1953661, at *3 ("Under § 544(b), state law fraudulent conveyance

claims can be brought on behalf of the bankruptcy estate for the benefit of all creditors.  Thus, it

is well established that these claims are property of the estate which (with rare exceptions) can

only be prosecuted by a trustee.").[29]

In any event, after a bankruptcy case is filed, section 544(b) of the Bankruptcy

Code reserves for the trustee (or debtor in possession) exclusive authority to bring on behalf of

the estate the same fraudulent conveyance actions that individual creditors could have brought

under state law prior to the filing of the bankruptcy case.  See In re PWS Holding Corp.,

---

[29]     The Third Circuit's 2000 decision in In re Cybergenics Corp., 226 F.3d 237 (3d. Cir. 2000), does not
compel a different conclusion.  In Cybergenics, the court held that a fraudulent transfer claim was not
property of the debtor-in-possession and thus was not sold in an auction of the debtor's assets.  Id. at 246.
In so concluding, the court took pains to distinguish between property of the debtor and property of the
estate.  See id. ("'Cybergenics' assets' and 'property of the estate' have different meanings . . . .  Issues
relating to property of the estate are simply not relevant to the inquiry into whether the fraudulent transfer
claims in the Committee's complaints were assets of Cybergenics as debtor or debtor-in-possession.").
Although the court suggested in dicta that it may not agree that fraudulent transfer claims are property of
the estate (see id. at n.16), the court's clear focus is on the accepted point that the trustee steps into the
shoes of creditors under section 544(b) and may pursue fraudulent transfer actions solely for the benefit of
the estate and not for the debtor.  See id. at 244.

303 F.3d 308, 315 (3d Cir. 2002) (noting the "well-established rule under [section] 544(b) that we reaffirmed in <u>Cybergenics</u>, namely, that 'a debtor in possession is empowered to pursue . . . fraudulent transfer claims for the benefit of all creditors.'") (quoting <u>Cybergenics</u>, 226 F.3d at 245); <u>In re Gronczewski</u>, 444 B.R. 526, 533 (Bankr. E.D. Pa. 2011) ("The commencement of bankruptcy gives the trustee the right to pursue fraudulently conveyed assets to the exclusion of all creditors."); <u>In re RNI Wind Down Corp.</u>, 348 B.R. 286, 294 (Bankr. D. Del. 2006) ("[T]he trustee has the exclusive right to prosecute a fraudulent transfer claim. . . ."); <u>see also</u> 11 U.S.C. § 548(a) (providing a separate federal right of action to avoid fraudulent transfers and granting exclusive authority to bring any such action in the trustee).

## IV.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(A) TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF THE DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES.

### A.    The Court Has Authority to Enjoin the Pursuit of Debtor Talc Claims Against the Protected Parties.

Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This includes "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process" of a bankruptcy case. <u>In re Johns-Manville Corp.</u>, 26 B.R. 420, 425, 436 (Bankr. S.D.N.Y. 1983) (citing 2 COLLIER ON BANKRUPTCY § 362.05 (15th Ed.)), <u>aff'd</u> 40 B.R. 219 (S.D.N.Y. 1984), and appeal allowed, decision vacated in part on other grounds, 41 B.R. 926 (S.D.N.Y. 1984).

Under section 105(a), courts have broad authority "to enjoin parties other than the bankrupt from commencing or continuing litigation." <u>Robins</u>, 788 F.2d at 1002 (quoting <u>In re Otero Mills, Inc.</u>, 25 B.R. 1018, 1020 (D.N.M. 1982); <u>see In re VistaCare Grp., LLC</u>,

678 F.3d 218, 231 n.11 (3d Cir. 2012) ("Bankruptcy courts have broad powers (in addition

to 11 U.S.C. § 362) to protect the property of the estate.  For example, under 11 U.S.C.

§ 105(a), a bankruptcy court may issue injunctive relief.").  An injunction as to third-party

litigation is appropriate where, among other things, "the third-party action will have an adverse

impact on the debtor's ability to accomplish reorganization."  See In re W.R. Grace & Co.,

386 B.R. 17, 30 (Bankr. D. Del. 2008);[30] Phila. Newspapers, 407 B.R. at 616-17; Robins,

788 F.2d at 1003 (enjoining litigation against a third party where "failure to enjoin would [a]ffect

the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor

through the third party" (citation omitted)).[31]  In such cases, an injunction allows the debtor to

receive the benefits of the automatic stay imposed by section 362 of the Bankruptcy Code, which

aims to:

> protect the debtor from an uncontrollable scramble for its assets in a
> number of uncoordinated proceedings in different courts, to
> preclude one creditor from pursuing a remedy to the disadvantage
> of other creditors, and to provide the debtor and its executives with
> a reasonable respite from protracted litigation, during which they
> may have an opportunity to formulate a plan of reorganization for
> the debtor.

Robins, 788 F.2d at 998; see also In re W.R. Grace & Co., 475 B.R. 34, 147 (D. Del. 2012)

(quoting Robins).[32]

---

[30]     See also Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.), 115 F. App'x 565, 570 (3d Cir. 2004)
("The standard for the grant of a stay is generally whether the litigation 'could interfere with the
reorganization of the debtor,' or 'would interfere with, deplete or adversely affect property of [the] estates or
which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a
plan of reorganization.'") (internal citations omitted).

[31]     See also In re Calpine Corp., 365 B.R. 401, 409 (S.D.N.Y. 2007) (holding that court may issue a
"preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens
the reorganization process") (internal quotation omitted); In re Lazarus Burman Assocs., 161 B.R. 891, 897
(Bankr. E.D.N.Y. 1993) ("When an action by a creditor of a debtor against a non-debtor third party
threatens a debtor's reorganization, the creditor's action may be enjoined pursuant to section 105(a).").

[32]     This authority is bolstered by the inherent power of all courts "under their general equity powers and in
the efficient management of [their] dockets to grant" appropriate injunctive relief.  Robins, 788 F.2d

Acting under the broad authority granted by section 105(a), courts have consistently stayed claims against non-debtor entities, including a debtor's affiliates, both in mass tort and non-mass tort bankruptcies, to maintain the integrity of the debtor's estate and fully effectuate the protections of the automatic stay.[33]  In fact, to the Debtor's knowledge every court that has addressed the issue in the context of mass tort claims of a debtor asserted against non-debtor affiliates or insurers has recognized that such claims threaten the debtor's prospects for reorganization and has implemented a section 105(a) injunction.  See, e.g., Bestwall, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases" (enjoining asbestos-related actions against non-debtor affiliates)); In re G-1 Holdings, Inc., No. 01-30135 (RG), Adv. No. 01-3013 (RG) (Bankr. D.N.J. Feb. 22, 2002) (issuing preliminary injunction in favor of a non-debtor subsidiary of the debtor, and enjoining the filing or prosecution of asbestos claims against non-debtor subsidiary); In re Leslie Controls, Inc., No. 10-12199 (CSS), Adv. No. 10-51394, at 4–5 (CSS) (Bankr. D. Del. July 14, 2010) (staying asbestos-related actions against current and former affiliates); In re Specialty Prods. Holding Corp., No. 10-11780 (KJC), Adv. No. 10-51085, at 3–5

---

at 1003 (internal quotation omitted); see also T&E Indus., Inc. v. Safety Light Corp., 680 F. Supp. 696, 705 (D. N.J. 1988) (reasoning that federal courts do not need statutory authorization to grant injunctive relief, and "absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction") (quoting Califano v. Yamasaki, 442 U.S. 682, 705 (1985)).

[33]    As to non-asbestos mass tort bankruptcies, see In re Purdue Pharma L.P., No. 19-23649, Adv. No. 19-08289 [Adv. Pro. Dkt. 82] (Bankr. S.D.N.Y. Oct. 11, 2019) aff'd 619 B.R. 38 (S.D.N.Y. 2020); In re USA Gymnastics, No. 18-09108, Adv. No. 19-50075 [Adv. Pro. Dkt. 71] (Bankr. S.D. Ind. Apr. 22, 2019); In re TK Holdings Inc., Case No. 17-50880, Adv. No. 17-50880 [Adv. Pro. Dkt. 63] (Bankr. D. Del. Aug. 22, 2017); In re Lyondell Chem. Co., 402 B.R. 571 (Bankr. S.D.N.Y. 2009); Robins, 788 F.2d at 999-1000. As to non-mass tort bankruptcies, see In re Am. Film Techs., Inc., 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying claims against a debtor's directors); In re Family Health Servs., Inc., 105 B.R. 937, 942–43 (Bankr. C.D. Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor HMO); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that injunction of suits against non-debtor partners should issue); In re Myerson & Kuhn, 121 B.R. 145, 160 (Bankr. S.D.N.Y. 1990) (enjoining suits against non-debtor partners).

(KJC) (Bankr. D. Del. June 4, 2010) (staying asbestos-related actions against non-debtor parent

company and other affiliates); In re W.R. Grace & Co., 386 B.R. 17, 34 (Bankr D. Del. 2008)

(enjoining actions against a third party railroad that transported the debtor's asbestos-containing

products).[34]  Such relief is critical for a debtor to equitably resolve all current and future talc

claims against it under the Bankruptcy Code.

> ### 1.    The Court Has Authority to Enjoin "Direct" Claims Against the Protected Parties.

Courts within and outside of the Third Circuit have routinely found that

section 105(a) of the Bankruptcy Code may be used to enjoin claims against non-debtor third

parties, even if they are based on the non-debtor parties' own conduct, if pursuit of such claims

would adversely impact the debtor's estate or impair the debtor's reorganization.  Mallinckrodt,

2021 WL 523625, at *2-5 (D. Del. Feb. 11, 2021) (denying motion for leave to appeal

preliminary injunction enjoining actions asserting liability based on non-debtors' own conduct

because non-debtors were entitled to contractual indemnity from debtor); Dunaway v. Purdue

---

[34]    See also In re Aldrich Pump LLC, No. 20-30608 (JCW), Adv. No. 20-03041 (JCW) (Bankr. W.D.N.C. Aug. 23, 2021) (staying asbestos-related actions against non-debtor affiliates, insurers, and indemnified parties); In re DBMP LLC, No. 20-30080 (JCW), Adv. No. 20-03004 (JCW) (Bankr. W.D.N.C. Aug. 10, 2021) (staying asbestos-related actions against non-debtor affiliates and distributors); In re Kaiser Gypsum Co., Inc., No. 16-31602 (JCW), Adv. No. 16-03313, at 3–4 (JCW) (Bankr. W.D.N.C. Nov. 4, 2016) (staying asbestos-related actions against debtors' third party insurer and non-debtor affiliates); In re Garlock Sealing Techs. LLC, No. 10-31607 (JCW), Adv. No. 10-03145, at 2–3 (JCW) (Bankr. W.D.N.C. June 7, 2010) (staying asbestos-related actions against non-debtor affiliates); In re Quigley Co., Inc., No. 04-15739 (PCB), Adv. No. 04-04262, at 4–5 (PCB) (Bankr. S.D.N.Y. Dec. 17, 2004) (enjoining the continuation of asbestos lawsuits against the parent corporation of the debtor); In re Mid Valley, Inc., No. 03-35592 (JKF), Adv. No. 03-3296 (JKF) (Bankr. W.D. Pa. Dec. 17, 2003); In re Combustion Eng'g, Inc., No. 03-10495 (JKF), Adv. No. 03-50839 (JKF) (Bankr. D. Del. Mar. 7, 2003) (order enjoining asbestos litigation against certain non-debtor affiliates); In re ACandS, Inc., No. 02-12687 (PJW), Adv. No. 02-5581 (PJW) (Bankr. D. Del. Sept. 27, 2002); In re Harbison-Walker Refractories Co., No. 02-21627 (JKF), Adv. No. 02-02080 (Bankr. W.D. Pa. Feb. 14, 2002) (enjoining asbestos lawsuits against the former owner of the debtor); In re N. Am. Refractories Co., No. 02-20198 (JKF), Adv. No. 02-2004 (JKF) Bankr. W.D. Pa. Jan. 4, 2002) (TRO); In re W.R. Grace & Co., No. 01-01139 (KJC), Adv. No. 01-00771, at 36 (KJC) (Bankr. D. Del. May 3, 2001) (order expanding preliminary injunction to enjoin asbestos suits against non-debtor subsidiaries);In re The Babcock & Wilcox Co., No. 00-10992 (JAB), Adv. No. 00-1029 (JAB) (Bankr. E.D. La. Apr. 17, 2000); and In re Pittsburgh Corning Corp., No. 00-22876 (JKF), Adv. No. 00-2161 (JKF) (Bankr. W.D. Pa. Apr. 16, 2000).

Pharm. L.P. (In re Purdue Pharm. L.P.), 619 B.R. 38 (S.D.N.Y. 2020) (affirming bankruptcy

court's issuance of preliminary injunction to halt pending state and private actions against debtors

and certain non-debtors, including former or current owners, directors, officers and other

associated entities and including claims that were allegedly independent or not derivative of the

debtors); *Order Pursuant to 11 U.S.C. § 105 Granting in Part and Denying in Part Debtor's*

*Mot. for a Prelim. Inj.*, TK Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.), No.

17-11375, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) [Dkt. 63] (enjoining state and

private actions against non-debtors for 90-days, subject to further extensions, notwithstanding

arguments that claims against non-debtors were direct claims); W.R. Grace & Co. v. Chakarian

(In re W.R. Grace & Co.) ("Chakarian"), 386 B.R. 17, 34 (Bankr. D. Del. 2008) (staying actions

against non-debtor railroad asserting liability based on railroad's transportation of asbestos-

containing material from debtors' mining operations because, among other things, the possibility

of collateral estoppel and "record taint" in such actions would compel the debtors' participation

and impair the reorganization effort).[35]

       As found by the NC Bankruptcy Court, the Protected Parties, including J&J, the

Retailers and the Indemnified Parties, share such an identity of interest with the Debtor that

continued prosecution of the Debtor Talc Claims against the Protected Parties, even if such

---

[35]    See also *Inj. Pursuant to §§ 105(a) and 362(a) and Fed. Rule of Bankruptcy Procedure 7065*, In re Quigley Co., Inc., No. 04-15739, Adv. No. 04-04262 (Bankr. S.D.N.Y. Dec. 17, 2004) [Dkt. 122] (the "Quigley PI Order") (enjoining the continuation of any and all asbestos lawsuits against the parent corporation of the debtor); In re W.R. Grace & Co., No. 01-01139 (JKF), 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (applying automatic stay to litigation between two non-debtor parties where one of the parties was the current owner of property previously owned by the debtor but was entitled to contractual indemnity from the debtor on account of claims with respect to that property); In re Am. Film Techs., Inc., 175 B.R. 847, 853 (Bankr. D. Del. 1994) (rejecting the argument that third-party suits should be permitted to proceed where the non-debtor's alleged liability "rests upon his own breach of duty" because the existence of a contract imputing the liability of the non-debtor parties to the debtors created an important distinction, rendering inapplicable cases that declined to enjoin suits against the non-debtor).

claims are allegedly for the Protected Parties' independent conduct (which they are not), would

involve litigation of the same key facts—the same products, the same time periods and the same

alleged injuries—related to the talc liabilities of Old JJCI, and would effectively seek to resolve

the very same claims at issue in this Chapter 11 Case.  See PI Tr. at 141:8-12 ("I believe there is,

in effect, an identity of interest within the meaning of the Robins case and that, notwithstanding

the potential that some of the claims may be direct, almost all of them, if not all of them, relate to

the debtor's operations."); see also Belcufine v. Aloe, 112 F.3d 633, 637 n. 5 (3d Cir. 1997)

(adopting the reasoning in Robins that "an identity between the debtor and the individual officers

[existed and] that allowing the suit to proceed against the officers would, in effect, be allowing

the suit to proceed against the bankrupt debtor"); McCartney, 106 F.3d at 510–11 (describing

and applying the Robins principle).

### a.    The Debtor Shares an Identity of Interest With the Protected Parties.

In the Third Circuit, courts have found that there is an identity of interest between

a debtor and a non-debtor when the debtor's conduct or product is "at the core of the issues

raised" in actions against the non-debtor.  See Chakarian, 386 B.R. at 30-31.[36]  The Debtor Talc

---

[36]    See also PI Tr. at 139:16-24, 14:7-15:4, TK Holdings Inc., Adv. Pro. No. 17-50880 (Bankr. D. Del. July 13, 2017) [Dkt. 64] (the "Takata PI Ruling") (finding an identity of interest between the debtors and the non-debtors, even though plaintiffs alleged they asserted direct claims against the non-debtors, because the basis for all the claims was the "delivery and installation of a defective part manufactured by the debtors" and the debtors owed indemnification obligations to the non-debtors); Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.), 2000 WL 33716976, at *3 (Bankr. S.D.N.Y. Nov. 3, 2000) (finding that action against non-debtor defendant was inextricably intertwined with the debtors given that non-debtor was merely a distributor of the debtors and the core of the action was for patent infringement based on the debtors' product); Am. Film Techs., 175 B.R. at 849-50 (finding identity of interest in part because counts against non-debtors and debtors necessarily involved the same subject matter and would involve facts identical to each other); In re Ms. Kipps, Inc., 34 B.R. 91, 93 (Bankr. S.D.N.Y. 1983) (finding that automatic stay extended to non-debtor principal of the debtor given that action against non-debtor was inextricably intertwined with claim against and liability of the debtor and was premised on "one wrong, one injury and one recovery").

Claims seek to recover on alleged liabilities for which the Debtor is responsible as a result of the

2021 Corporate Restructuring.  See PI Tr. at 139:1-8 (finding that Old JJCI assumed claims

against J&J for "its manufacture and product liability and that these liabilities were allocated to

the Debtor.  And they are all based on the same talc-containing products, including primarily

Johnson's Baby Powder.  Id. at 139:14-19 (finding that "the core of [the Debtor Talc Claims] or

almost all of them are based upon products that either Old JJCI had assumed and agreed to

indemnify its parent for or based on its products and conduct" and that the Debtor Talc Claims

involve "the same products, the same periods, etc."); id. at 140:21-24 (finding that claims against

Retailers, even if "direct claims for negligence and strict liability" are, "at their core" based on

"the products and operations of Old JJCI," including Johnson's Baby Powder).

        This case is (a) comparable to Chakarian, where the debtor's alleged conduct

predominated the claims against the non-debtors and the court found it appropriate to enjoin such

claims based on an identity of interest, and (b) in line with other cases where courts have

likewise found that even allegedly direct claims against non-debtors do not cut off an identity of

interest between the debtor and the non-debtors.  See e.g., Chakarian 386 B.R. at 30-36 (rejecting

argument that the test for identity of interest could not be satisfied where the non-debtor was

allegedly independently liable and preliminarily enjoining actions against non-debtor railroad

company because the debtors' actions were alleged to be the proximate cause of the plaintiffs'

injuries, i.e., the debtors' operations and conduct were at the "core of the issues" raised in the

actions against the non-debtor, and the debtors were obligated to indemnify the non-debtor);

Mallinckrodt, 2021 WL 523625 at **3, 6 (stating that a holding that the non-debtors could have

independent liability would not preclude or estop the bankruptcy court's conclusions that the

claims are "inextricably intertwined" for purposes of issuing a preliminary injunction); Purdue

Pharm., 619 B.R. at 45, 53 (recognizing identity of factual interest in allegations against

non-debtor and debtors and the fact that objectors would rely on the same facts to prove the

claims against the non-debtor as against the debtors); Purdue Pharm. L.P. v. Mass. (In re Purdue

Pharm. L.P.), No. 19-23649 [Dkt. 87] (Bankr. S.D.N.Y. Oct. 11, 2019) (stating that even if "a

claim against a third party is independent or not derivative of the debtors, it still may be enjoined

under proper circumstances."); Takata PI Ruling 15:5-16 (rejecting contention that non-debtors

"inability to be indemnified for their own negligent or wrongful acts" vitiated the identity of

interest created by contractual indemnity obligations of the debtors and finding that all the claims

against the non-debtors revolved around the acts and omissions of the debtors); see also W.R.

Grace & Co., 2004 WL 954772 at **2-3 (finding that there was an identity of interest between

the debtor and the non-debtor owner of property that was previously owned by the debtor in

litigation between two non-debtors given entitlement to contractual indemnity).

      The identity of interest between the Debtor and the Protected Parties is based on

the same grounds that courts in the Third Circuit have previously found sufficient to support a

preliminary injunction, regardless of any alleged direct claims.  First, at their core, all the claims

against the Debtor and the Protected Parties arise out of alleged harm caused by Johnson's Baby

Powder and other talc-containing products for which the Debtor is responsible as a result of the

2021 Corporate Restructuring.  See PI Tr. at 139:14-19 (finding that "the core of [the Debtor

Talc Claims] or almost all of them are based upon products that either Old JJCI had assumed and

agreed to indemnify its parent for or based on its products and conduct" and that the Debtor Talc

Claims involve "the same products, the same periods, etc."); id. at 140:21-24 (finding that claims

against Retailers, even if "direct claims for negligence and strict liability" are, "at their core"

based on "the products and operations of Old JJCI," including Johnson's Baby Powder); see also

Chakarian, 386 B.R. at 36 (stating that non-debtor alleged that the debtors' actions were the cause of plaintiffs' injuries); Takata PI Ruling 14:7-15:4 (finding that basis for claims was the delivery and installation of defective part manufactured by debtors). This is true regardless of whether the Protected Parties have independent liability—the Debtor Talc Claims do not distinguish between the actions of the Debtor or the Protected Parties but instead seek recoveries for the same alleged conduct under the same or similar theories.

Second, the Debtor is contractually obligated to indemnify the Non-Debtor Affiliates, including J&J and New JJCI, and has or is alleged to have contractual indemnification obligations with, or other obligations to, the Retailers and Indemnified Parties. See PI Tr. at 139:1-8, 140:18-141:2, 141:8-12 (finding that there is an identity of interest between the Debtor and the Protected Parties, notwithstanding that some of the claims may be direct, in part because of indemnification obligations owed by the Debtor); see also Chakarian, 386 B.R. at 31 (finding identity of interest because debtors owed the non-debtor contractual indemnification obligations); Takata PI Ruling 15:5-16 (finding identity of interest created by contractual indemnification obligations and rejecting contention that inability to be indemnified for negligent or wrongful acts vitiated this identity); Mallinckrodt, 2021 WL 523625 at *3 (noting how the bankruptcy court found that there was an identity of interest between the non-debtors and the debtors based, in part, on the existence of contractual indemnity claims); W.R. Grace & Co., 2004 WL 954772 at **2-3 (finding that there was an identity of interest between the debtor and the non-debtor given entitlement to contractual indemnity).

Third, litigating, settling or attempting to establish the value of the Debtor Talc Claims against the Protected Parties would liquidate claims against the Debtor, which are the very same claims the Debtor seeks to address through this Chapter 11 Case. PI Tr. at 142:15-17

NAI-1523939622                                    -70-

("We're not going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same claims that they would be asserting there.").

Finally, continuance of such litigation also creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor.  See Chakarian, 386 B.R. at 35 (taking into account "the risks of collateral estoppel and record taint" in issuing injunction to stay claims against non-debtor); Mallinckrodt, 2021 WL 523625 at *3 (noting bankruptcy court's finding that risk of collateral estoppel and record taint would make it necessary for the debtors to participate in the actions to protect their interests). This risk is present regardless of any alleged independent liability on the part of the Protected Parties.  See Am. Film Techs., 175 B.R. at 853-55 (rejecting argument that, even if collateral estoppel applied, suits against non-debtors should not be enjoined because the non-debtors were allegedly independently liable).  In their totality, therefore, these circumstances satisfy the identity of interests factor.

> **b.** **Permitting Debtor Talc Claims to Continue Against the Protected Parties Would Adversely Affect the Debtor's Restructuring Efforts.**

In addition to the identity of interests between the Debtor and the Protected Parties, courts in the Third Circuit have found that actions against a non-debtor should be stayed where permitting them to proceed would adversely impact the debtor's reorganization, regardless of whether such claims are direct.  See Chakarian, 386 B.R. at 31-32 (finding that actions against non-debtor directly impacted the estate due to the overlap of issues, contractual indemnity and the implication of the debtors' insurance, which would all necessitate the debtors' involvement and divert resources to attend to the claims rather than the reorganization); Takata PI Ruling 19:5-23:5 (finding that continued prosecution of the state and individual actions against

non-debtors would adversely impact the debtors' efforts to reorganize given need of all

stakeholders to focus on reorganization process); Phila. Newspapers, 407 B.R. at 616 (finding

that the diversion of resources caused by action against non-debtors arising from a series of

allegedly false and misleading newspaper and internet articles and certain non-debtors "bad acts"

would impact the debtors' ability to engage in a timely and effective reorganization); see also

Quigley PI Order at 3-4 (finding that continued prosecution of any and all asbestos claims

against non-debtor parent, whether allegedly direct or derivative, would deplete shared insurance

policies and funds in an insurance trust to the detriment of the debtor's estate).

　　　　　Here, by allowing the actions to proceed against the Protected Parties, claimants

would be permitted an end-round to the Chapter 11 Case and would litigate, in other forums, the

exact same talc claims based on the exact same facts that are being asserted against the Debtor in

the Chapter 11 Case.  Doing so would adversely impact the Debtor's ability to equitably and

completely resolve such claims and the Debtor's rights to insurance coverage by depleting its

insurance policies.  This is especially true given the potential for indemnification claims, the risk

of collateral estoppel and evidentiary prejudice and potential diminution of insurance coverage,

all which all harm the Debtor and its prospects for reorganization.  Further, a continuation of this

litigation would require the Debtor to actively involve itself in and defend the litigation of the

Debtor Talc Claims against the Protected Parties at a time when the Debtor should be protected

from such litigation burdens.  The NC Bankruptcy Court agreed and found that permitting the

claimants to continue to assert the Debtor Talc Claims against the Protected Parties would

undermine the Debtor's restructuring efforts.  See PI Tr. at 142:15-17 ("We're not going to have a

bankruptcy case of any sort if everybody can go sue J&J and assert the same claims that they

would be asserting there.").  In order to avoid irreparable harm to the Debtor's prospects for

reorganization, this Court should continue to enjoin the prosecution of Debtor Talc Claims

against the Protected Parties.

> **c.      Allegations That J&J is Independently Liable For the Debtor
> Talc Claims Based on Post-1979 Actions Are Irrelevant and
> Baseless.**

At the preliminary injunction hearing in the NC Bankruptcy Court, claimants

alleged that J&J is directly liable for talc-related claims against the Debtor based on alleged

conduct by J&J after 1979, as well as its actions regarding its former subsidiary, Windsor.  These

allegations do not change the fact that these purported "direct" claims are the exact same talc

claims based on the exact same facts that are being asserted against the Debtor in this Chapter 11

Case.  See PI Tr. at 139:5-19 (finding that to the extent the claims at issue involve post-1979

conduct "as to the baby products, we're also talking about matters that are based on the conduct

of JJCI" and involve "the same products, the same periods, etc."); id. at 139:25-140:14 (stating

that "for the largest portion of the Shower to Shower time period" the claims where "primarily,

for most of those years Old JJCI acts and conduct, its products"); id. at 142:1-5 (stating that

claims against Windsor are likely "based on the products that Old JJCI sold or assumed liabilities

for and, therefore, they would still be subject to the stay").  They should therefore be enjoined.

Further, there is no support for the claimants' argument that J&J has direct

liability post-1979 because it allegedly controlled safety decisions.  As the record demonstrates,

Old JJCI was responsible for making all health and safety *decisions* relating to its operations,

while J&J was responsible for establishing health and safety *policy*.

Likewise, there is no support for the claimants' assertion that J&J dominated and

controlled Windsor.  As the record demonstrates, Windsor has always been a separate company

and subsidiary of J&J that maintained separate management and offices.  As a general

proposition, the corporate form must be respected, and J&J cannot be held liable for the acts of

its subsidiaries.  United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of

corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . .

is not liable for the acts of its subsidiaries.").

If the claimants are claiming that J&J so dominated Windsor that corporate

separateness should be ignored and J&J should be held responsible for some or all of the

talc-related claims against Windsor, such claims are in the nature of alter ego claims.  The facts

belie this assertion.  The record shows that Windsor  independently conducted talc testing and

interfaced with testers/agencies, and received orders and talc specification requirements directly

from J&J's subsidiaries, rather than J&J.  There was no domination by J&J.  In addition, Windsor

is now known as Imerys Talc Vermont, Inc. and is a debtor in the currently pending Imerys

bankruptcy case.  It is widely recognized that alter ego and similar claims are property of a

debtor's estate.  See, e.g., Emoral; Steyr; Tronox; OODC, LLC.  Accordingly, these claims

would be property of the Imerys Talc Vermont, Inc. bankruptcy case and cannot be brought by

the claimants.  See PI Tr. at 141:22-25 (agreeing that claims against Windsor based on alter ego

or successor liability would be property of the Imerys Talc Vermont, Inc. bankruptcy case).

Finally, any alleged liability J&J may have with respect to its interactions with

Windsor prior to 1979 were assumed by Old JJCI in the 1979 transaction and are now the

Debtor's responsibility.  Thus, these claims are in reality claims against the Debtor and none of

these "direct" claims provide a basis for this Court to except from the automatic stay or the

requested preliminary injunction the litigation of talc claims against J&J.

**B.      The Preliminary Injunction Factors All Support Enjoining the Pursuit of
Debtor Talc Claims Against the Protected Parties.**

Courts considering the propriety of an injunction under section 105(a) typically

apply the traditional four injunction factors, as modified for the bankruptcy context.  See In re

G-1 Holdings, Inc., 420 B.R. 216, 281 (D.N.J. 2009) (stating the standard for the issuance of an

injunction in the bankruptcy context); Phila. Newspapers, 407 B.R. at 616–17 (citing Tenafly

Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002)) (explaining the

elements of the Third Circuit test for a preliminary injunction in the bankruptcy context).[37]  The

four elements, as tailored to a bankruptcy case, are:

1.      The debtor's reasonable likelihood of a successful reorganization;

2.      The imminent risk of irreparable harm to the debtor's estate in the absence
of an injunction;

3.      The balance of harms between the debtor and its creditors; and

4.      Whether the public interest weighs in favor of an injunction.

G-1 Holdings, 420 B.R. at 281; see also Bestwall, 606 B.R. at 253.

Under the Third Circuit test, the proponent of an injunction "must meet the

threshold for the first two 'most critical' factors."  Reilly v. City of Harrisburg, 858 F.3d 173, 179

(3d Cir. 2017) (the movant "must demonstrate that it can win on the merits (which requires a

showing significantly better than negligible but not necessarily more likely than not) and that it is

more likely than not to suffer irreparable harm in the absence of preliminary relief"); Phila.

Newspapers, 407 B.R. at 616–17 (applying the Reilly test in the bankruptcy context).  Once the

---

[37]      See also Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086,
1094 (9th Cir. 2007) (holding that traditional preliminary injunction standard applies to section 105(a)
injunctions and stating that "[t]he majority of circuits that have reviewed injunctions staying actions against
non-debtors have applied the usual preliminary injunction standard") (internal citations omitted).

movant establishes the first two elements, the court will balance those with the second two

elements to determine whether an injunction is warranted.  See Reilly, 858 F.3d at 179 (stating

that "if these gateway factors are met" a court will consider them in conjunction with the

remaining two factors of the test).  The Debtor, therefore, must establish that its reorganization is

likely to be successful and that irreparable harm to the reorganization effort will result in the

absence of the injunction.[38]  This second element is particularly important, because courts

generally look to the impact a request for injunctive relief will have on a successful

reorganization when determining whether to grant the request.  See In re Irish Bank Resolution

Corp. Ltd., 2019 WL 4740249, at *5 (D. Del. Sept. 27, 2019) (quoting Gerard v. W.R. Grace &

Co. (In re W.R. Grace & Co.), 115 Fed. Appx. 565, 570 (3d Cir. 2004)) (explaining that "[t]he

standard for the grant of a stay is generally whether the litigation could interfere with the

reorganization of the debtor.").[39]

Here, as set forth below, the Debtor has satisfied the threshold showing because (i) its

prospects for a successful reorganization are strong and (ii) the requested injunction is necessary

to achieve the reorganizational goals of this Chapter 11 Case.  In addition, as set forth below, the

injunction is appropriate when considering all four prongs of the test.[40]

---

[38]   See Reilly, 858 F.3d at 179 ("How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.") (citation omitted).

[39]   See also Brier Creek, 486 B.R. at 694 ("[T]he Fourth Circuit has made very clear that the critical, if not decisive, issue over whether injunctive relief should be granted is whether and to what extent the non-debtor litigation interferes with the debtors' reorganization efforts) (citing Robins, 788 F.2d at 1003-09); Kreisler v. Goldberg (In re Kreisler), 478 F.2d 209, 215 (4th Cir. 2007)) (same).

[40]   In some instances, both prior and subsequent to Reilly, courts in the Third Circuit nonetheless considered all four factors together.  See, e.g., G-1 Holdings, Inc., 420 B.R. at 281 (decided prior to Reilly and seemingly requiring the proponent of the injunction to establish each prong of the test).  Post-Reilly, courts have not uniformly applied the preliminary injunction test.  Compare  In EHT US1, Inc., 2021 WL 3828556, at *1 (Bankr. D. Del. 2021) (decided post-Reilly and finding that the party seeking the injunction must establish the first two prongs of the preliminary injunction test, after which the court will go on to consider the second two prongs) with True Health Diagnostics LLC v. Azar (In re THG Holdings LLC),

### 1.   The Debtor's Successful Reorganization Is Likely.

In bankruptcy proceedings, success on the merits is to be evaluated in terms of the likelihood of a successful reorganization.  See In re G-1 Holdings Inc., 420 B.R. 216, 281 (Bankr. D.N.J. 2009) (evaluating the "reasonable likelihood of a successful plan of reorganization"); In re W.R. Grace & Co., 386 B.R. at 33 (Bankr. D. Del. 2008) (citing Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1096 (9th Cir. 2007) (in determining the likelihood of success on the merits, "a bankruptcy court must consider whether the debtor has a reasonable likelihood of a successful reorganization")); Bestwall, 606 B.R. at 254 ("success on the merits is to be evaluated in terms of the likelihood of a successful reorganization" (quoting Sudbury, Inc. v. Escott, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992)); PI Tr. at 142:10-11 ("I do believe that success is measured by . . . a successful reorganization in bankruptcy cases.").[41]  This is not intended to be a particularly high standard where, as here, the attempted reorganization has just begun.  See Bestwall, 606 B.R. at 254; Excel Innovations, 502 F.3d at 1097 ("[I]t is not a high burden to show a reasonable likelihood of success in reorganization"); see also Phila. Newspapers, 407 B.R. at 617 (noting the speculative nature of the inquiry into the likelihood of a successful reorganization in the early stages of a case); In re Eagle-Picher Indus., Inc., 963 F.2d 855, 860 (6th Cir. 1992) ("In view of the bankruptcy court's protection of [the debtor's] reorganization efforts, it is implicit in its decision that it believed [the debtor] had some realistic possibility of successfully reorganizing under

---

604 B.R. 154, 162 (Bankr. D. Del. 2019) (referencing, without elaboration, a "four-part test for issuing a preliminary injunction").

[41]   See also Phila. Newspapers, 407 B.R. at 617 (citing In re Monroe Well Service, Inc., 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986), for the proposition that a "reasonable likelihood of success in the bankruptcy context is equated to the ability to successfully reorganize the debtors"); Chicora Life Ctr., 553 B.R. at 66; Brier Creek, 486 B.R. at 696.

Chapter 11.").  Indeed, "at the early stages" of bankruptcy proceedings, the court "must make at

least a rebuttable presumption that the [debtors] have made a good faith filing and are making a

good faith effort to reorganize." In re Gathering Rest., Inc., 79 B.R. 992, 1001 (Bankr. N.D. Ind.

1986); accord Bestwall, 606 B.R. at 254 (quoting Gathering, 79 B.R. at 1001).[42]

       Here, the Debtor's prospects for a successful reorganization are strong.

The Debtor has entered bankruptcy in good faith and in an effort to permanently, fully and

equitably resolve current and future Debtor Talc Claims through the establishment of a trust.  As

courts have consistently recognized, the bankruptcy court is the most logical and best positioned

forum for the resolution of mass tort liability.  See In re Fed-Mogul Glob., Inc., 684 F.3d 355,

359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative to the tort system for

corporations [facing mass tort claims] because it permits a global resolution and discharge of

current and future liability, while claimants' interests are protected by the bankruptcy court's

power to use future earnings to compensate similarly situated tort claimants equitably.");

S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases, Federal Judicial

Center, at 1 (2005), https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that

"bankruptcy courts have become a forum for companies seeking the resolution of pending and

threatened mass tort litigation" and that, as of the publication date, "over seventy companies,

motivated primarily by their desire to reach a final resolution of their mass tort liabilities, have

sought bankruptcy protection").

---

[42]    See also In re Hillsborough Holdings Corp., 123 B.R. 1004, 1015 (Bankr. M.D. Fla. 1990) (finding that
until it can be determined that debtors "are not viable business entities incapable of achieving a successful
reorganization," it "would be premature to conclude . . . that this reorganization process is doomed and that
there is no legal justification for granting the injunctive relief sought"); Dore & Assocs. Contracting, Inc. v.
Am. Druggists' Ins. Co., 54 B.R. 353, 359 (Bankr. W.D. Wis. 1985) ("In the early stages of bankruptcy
when it is uncertain if reorganization is feasible or not the bankruptcy court must have broader latitude in
determining whether to grant injunctive relief.").

The Debtor's aggregate value (not including insurance assets) is approximately $373.1 million and, to the extent its assets, including insurance, are insufficient, it has access to additional funds through the Funding Agreement.  First Day Decl. ¶ 26.  In addition, J&J and New JJCI have agreed to deposit $2 billion into a "qualified settlement fund" for the payment of current and future talc-related claims asserted against or related to the Debtor.  Id. ¶ 28.  The Debtor submits it will have sufficient assets to fund the Chapter 11 Case and a trust in the amount required by a confirmed plan of reorganization and there can be no dispute that the Debtor has the wherewithal to reorganize.

The Debtor also has favorable prospects for resolving the Debtor Talc Claims through a plan of reorganization that conforms with the requirements of the Bankruptcy Code.  A number of similarly situated companies have successfully used bankruptcy to resolve mass tort claims, and the Debtor is committed to equitably resolving the Debtor Talc Claims.  The Debtor seeks to engage in good faith negotiations to reach a consensual resolution of the Chapter 11 Case with representatives for current and future claimants as soon as they are in a position to begin discussions.  Id. ¶ 60.

In short, the Debtor is likely to successfully reorganize through a plan of reorganization confirmed in accordance with the Bankruptcy Code.  Accordingly, the Debtor's prospects for successfully reorganizing strongly weigh in favor of the requested injunction.

> **2.      Failure to Enjoin Litigation of Debtor Talc Claims
>              Would Irreparably Harm the Debtor.**

The Debtor and its estate will be irreparably harmed in several ways if the requested injunction is not issued.  As described above, the Debtor filed this Chapter 11 Case to obtain a complete and equitable resolution of all current and future Debtor Talc Claims against it—an option that is not available in the tort system or anywhere else.  As Judge Whitley ruled, it

would defeat the purpose of the Chapter 11 Case if those claims continue to be prosecuted in the

tort system, notwithstanding the Debtor's bankruptcy case.  See PI Tr. at 142:15-16; Aldrich

Pump, 2021 WL 3729335, at *36 ("[P]rosecution of those same claims outside of this case would

almost certainly end the Debtors' reorganization efforts").

### a.      The Debtor's Indemnification Obligations.

As the record demonstrates, the Debtor has various indemnification or alleged

indemnification obligations to the Protected Parties.  First, the Debtor has a contractual

obligation to indemnity J&J pursuant to the 1979 Agreement and contractual obligations to

indemnify all the Non-Debtor Affiliates pursuant to a merger support agreement in the event

those companies are held liable for any Debtor Talc Claims.  Second, the Debtor has, or is

alleged to have, contractual indemnification obligations with, or other obligations to, the

Retailers and the Indemnified Parties relating to products sold by or otherwise associated with

the Debtor and/or prior corporate transactions in which, in connection with the sale by a Debtor's

predecessor of certain assets, the Debtor's predecessor undertook a contractual obligation to the

buyer to indemnify it (or otherwise assume legal responsibility).

As previously discussed, continued prosecution of Debtor Talc Claims against the

Protected Parties would irreparably harm the Debtor because the Debtor has indemnity

obligations that could make judgments against certain Protected Parties on those claims

tantamount to judgments against the Debtor.[43]  In particular, the Debtor has an express

---

[43]      Of course, because Old JJCI no longer exists and the Debtor is solely responsible for any Debtor Talc
Claims, a judgment against Old JJCI for Debtor Talc Claims would necessarily constitute a judgment
against the Debtor.

contractual obligation to indemnify New JJCI and J&J in the event that either entity is held liable

for any Debtor Talc Claims.[44]

These indemnification obligations render the Debtor the real-party defendant in

any suit against New JJCI, J&J or other Protected Parties.  See PI Tr. at 140:18-141:12.

Continued litigation of those suits, therefore, would effectively eliminate the protections of the

automatic stay.  See In re W.R. Grace & Co., No. 01-01139, 2004 WL 954772, at *5 (Bankr. D.

Del. Apr. 29, 2004) (citation omitted) (noting that the automatic stay has generally been

extended to the situation "where an action against one party is essentially an action against the

bankruptcy debtor, as in the case where a third-party is entitled to indemnification by the debtor

for any judgment taken against it"); **12-13 (granting section 105 injunction due to

indemnification obligations); Robins, 788 F.2d at 999 (noting obligation to indemnify between

the debtor and non-debtor is the typical situation that gives rise to "such identity between [them]"

as to make an injunction appropriate); id. at 1008 (finding "no difficulty in sustaining the grant of

a preliminary injunction" that enjoined tort system plaintiffs from proceeding against the debtor's

co-defendants, which included its insurer); Bestwall, 606 B.R. at 255 ("[A]n injunction is

warranted because contractual and common law indemnification obligations would make the

Debtor the real party in interest in any suit against New GP or other Protected Parties and

effectively eliminate the protections of the automatic stay.); Manville, 26 B.R. at 436 (enjoining

---

[44]    Although the Funding Agreement with New JJCI and J&J serves as a backstop to ensure that the Debtor's
ability to pay the Debtor Talc Claims has not been diminished as compared to that of Old JJCI, the New
JJCI and J&J indemnity claims nonetheless would affect the estate because the Debtor's assets must be used
first to fund a trust to pay these claims under a plan of reorganization.

"any proceeding against Manville's insurers based on the alleged liability of Manville [or] its affiliates.").[45]

The entire purpose of this Chapter 11 Case—an equitable, final, and complete resolution of tens to hundreds of thousands of current and future Debtor Talc Claims—would be thwarted without a preliminary injunction.  See PI Tr. at 142:15-17 ("We're not going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same claims that they would be asserting [in the bankruptcy case].").  There is no dispute that the objectors oppose the injunction so that talc claimants can pursue in the tort system the exact same claims pending against the Debtor—involving the same plaintiffs, the same products, the same time periods, and the same liability and damage allegations—through piecemeal litigation against the Non-Debtor Affiliates.  That is precisely what has continued to occur after the filing of this case and the entry of the temporary restraining order.  Both Old JJCI and J&J have been named together as defendants more than 265 times since the chapter 11 filing.  Irreparable harm here is not merely a possibility, it is a virtual certainty.

An injunction protects a debtor from "uncontrollable" and "uncoordinated proceedings in different courts," allowing that debtor an "opportunity to formulate a plan of reorganization."  Robins, 788 F.2d at 998.[46]  Moreover, permitting claimants to seek to indirectly establish claims against the Debtor through actions against third parties with indemnity rights

---

[45]    See also Family Health Servs., 105 B.R. at 942-43 (same); In re Lomas Fin. Corp., 117 B.R. 64, 68 (S.D.N.Y. 1990) (affirming grant of preliminary injunction due to indemnification obligations); cf. Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC), No. 20-408, 2021 WL 523625, at *2-5 (D. Del. Feb. 11, 2021) (denying motion for leave to appeal preliminary injunction which extended automatic stay and temporarily enjoined actions against non-debtors asserting liability based on non-debtors' distribution of debtor's product because the non-debtor was entitled to contractual indemnity from the debtor).

[46]    Cf. In re W.R. Grace & Co., 475 B.R. 34, 147-149 & n.16 (D. Del. 2012) (applying Robins in the context of a hypothetical liquidation under Chapter 7).

would prevent the Debtor from establishing a trust to consolidate and collectively resolve all talc

claims against the Debtor—current and future—through the Chapter 11 Case.  This

non-bankruptcy litigation, if not stayed, would undermine (or eliminate) the parties' and the

Court's ability to achieve confirmation of a plan that treats all talc claimants fairly and equitably.

> **b.    Findings and Judgments in Litigation of Debtor Talc Claims Against the Protected Parties Might Bind the Debtor.**

In addition to the risk of indirectly fixing Debtor Talc Claims against the Debtor

through indemnity liability, the Debtor faces the risk that state court findings and judgments on

the Debtor Talc Claims against the Protected Parties could bind the Debtor and effectively

establish Debtor Talc Claims against it, including through the doctrines of res judicata and

collateral estoppel.[47]  This risk is underscored by the fact that collateral estoppel has been applied

offensively by litigants who were not parties to the prior litigation.  See, e.g., Parklane Hosiery

Co. v. Shore, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent

a corporation from defending against the stockholder class action of plaintiffs who were not

parties to prior SEC litigation against the corporation).  Talc claimants who have never before

litigated their claims against the Debtor, or against the Protected Parties, might seek to establish

liability against the Debtor simply by pointing to a prior judgment on a Debtor Talc Claim

against a Protected Party.[48]

---

[47]    Res judicata bars claims where the following elements are met:  (1) the previous suit resulted in a final judgment on the merits; (2) the same cause of action is involved; and (3) both the party asserting res judicata and the party against whom res judicata is asserted were either parties or stand in privity with parties. U.S. v. 5 Unlabeled Boxes, 572 F.3d 169, 173 (quoting EEOC v. United States Steel Corp., 921 F.2d 489, 493 (3d Cir. 1990)).  Similarly, collateral estoppel bars the re-litigation of issues where (1) the earlier suit resulted in a final judgment on the merits; (2) the issue in question was identical to an issue actually litigated and necessary to the judgment; and (3) the party against whom collateral estoppel is asserted was adequately represented in the prior suit. Id. (quoting Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006)).

[48]    Plaintiffs have sued J&J and certain of its officers and directors in United States District Court in the District of New Jersey, alleging securities violations based on a failure to disclose the purported dangers

Under these circumstances, the Debtor could not stand idly by as liability is effectively established against it by Defendants in collateral proceedings.  Rather, the Debtor would be required to actively involve itself in, and defend the litigation, of Debtor Talc Claims against the Protected Parties, even as it attempts simultaneously to move forward with its goal of reorganizing to address these very same claims.

Courts consistently have concluded that the risks of collateral estoppel and res judicata warrant a stay of third-party litigation that would thwart the purposes of the automatic stay.  Bestwall, 606 B.R. at 256 (determining that the risks posed by the doctrines of res judicata and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates); Am. Film Techs., 175 B.R. at 850–55 (staying claims against debtor's directors and holding that a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions); Sudbury, 140 B.R. at 463 (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); Manville, 26 B.R. at 429 (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted).

The same concerns warrant a stay in this case.  PI Tr. at 134:25-135:1 ("What I believe today is that I need to stop litigation against the would-be protected parties.").  If allowed to pursue the Debtor Talc Claims against the Protected Parties, the Defendants would litigate the

---

associated with Johnson's Baby Powder and other talc-containing products.  Because the lawsuit raises issues about the safety of Old JJCI's products, which issues are central to this Chapter 11 Case, the Debtor may seek to enjoin the action pursuant to a separate complaint.

same key facts—involving the same products, the same time periods, and the same alleged

injuries—related to the talc liabilities of Old JJCI that are at issue with respect to the Debtor Talc

Claims asserted against the Debtor.  Supp. Kim Decl. ¶ 17; PI Tr. at 139:12-17 ("[I]t is my belief

that, at the core of [] these claims [(alleged direct claims against J&J)] or almost all of them are

based upon products that either Old JJCI had assumed and agreed to indemnify its parent for or

based on its products and conduct.  They're at the core of the disputes . . .  They're being sued on,

effectively, the same products, the same time periods, etc."); id. 140:18-141:2 ("[w]hile [claims

against retailers] may be direct claims for negligence and strict liability . . . , at their core they

have the products and operation of Old JJCI . . . .  So from that point, I agree with the debtor that

if we let someone else litigate those, we are determining claims that are essentially at their core

against the debtor.").  Accordingly, any rulings or findings regarding the Debtor Talc Claims

asserted against the Protected Parties may bind the Debtor with respect to those same claims.

This would frustrate the Debtor's efforts to resolve the Debtor Talc Claims in the Chapter 11

Case, and would undermine the effect of the automatic stay.  Id. 142:15-17.

> Beyond the potential consequences of collateral estoppel and res judicata,

litigation of the Debtor Talc Claims against the Protected Parties would allow parties to use

statements, testimony and other evidence generated in those proceedings to try to establish

Debtor Talc Claims against the Debtor.  Supp. Kim Decl. ¶ 17.

> The burden of protecting against evidentiary prejudice was part of the justification

for granting the injunctive relief both in Bestwall and Manville.  See Bestwall, 606 B.R. at 256

("Litigation of the Bestwall Asbestos Claims against the Protected Parties will create the

additional risk that statement, testimony, and other evidence generated in proceedings against the

Protected Parties will be used to try to establish Bestwall Asbestos Claims against the Debtor.").

The Manville court there explained the danger as follows:

> [O]nce a witness has testified to a fact, or what sounds like a fact, that witness may be confronted with his prior testimony under oath in a future proceeding directly involving Manville, whether or not Manville was a party to the record on which the initial testimony was taken.  Once an admission against interest is made, under oath or otherwise, by the agent of a party, that admission stands for all time.  No matter what [Manville's co-defendant] may stipulate, the thousands of other claimants and cross-claimants who are after Manville's assets, would be entitled to use the product of such discovery.

In re Johns-Manville Corp., 40 B.R. at 225; see also W.R. Grace & Co., 386 B.R. at 34 (granting injunction based, among other things, on the possibility that "record taint" in actions against non-debtors would compel the debtors' participation and impair the reorganization effort); Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC), 460 B.R. 644, 657 (E.D. Pa. 2011) (in subsequent suits, debtor could be bound by "critical factual and legal issues" determined in the proceedings against non-debtor).

The Debtor may be compelled to defend its interest in pending litigation against the Protected Parties to prevent such harm to its estate, thereby defeating the "breathing spell" intended by the automatic stay.  Supp. Kim Decl. ¶ 18.  These are consequences that the Debtor should not be required to suffer or be compelled to protect against.

> **3.**    **The Irreparable Harm that the Debtor Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to the Defendants.**

As described above, the Debtor would suffer substantial and irreversible harm if injunctive relief is not granted.  Prosecution of Debtor Talc Claims outside of this Court may liquidate claims against the Debtor and bind the Debtor with respect to rulings, judgments and evidentiary records established in those cases.  It would also compromise the protections of the

automatic stay.  In short, the entire purpose of the Chapter 11 Case would be thwarted.  See

Bestwall, 606 B.R. at 257 ("The very purpose of the Debtor's Chapter 11 case would be defeated

if litigation of the Bestwall Asbestos Claims against the Protected Parties is permitted."); PI Tr.

at 142:15-17 ("We're not going to have a bankruptcy case of any sort if everybody can go sue

J&J and assert the same claims that they would be asserting [in the bankruptcy case]."); W.R.

Grace & Co. v. Chakarian (In re W.R. Grace & Co.), No. 01-01139(JKF), 2004 Bankr. LEXIS

579, at *12-13 (Bankr. D. Del. Apr. 29, 2004) (extending 105(a) injunction to a non-debtor

where litigation against it had "a direct effect on the reorganization proceedings of the[]

Debtors").  One of the overriding goals of the bankruptcy process is to ensure that all similarly

situated claims are evaluated and treated in a uniform manner.  That goal would be compromised

if claimants could seek to liquidate and collect Debtor Talc Claims outside of the Chapter 11

Case.

Talc claimants also may be prejudiced if the Court does not issue an injunction.

Through litigation against the Protected Parties, holders of current Debtor Talc Claims could

receive recoveries on those claims that differ from the recoveries that would be realized by other

current or future claimants through a court-approved trust.  Further, litigation, particularly

personal injury litigation, generally requires extensive discovery, involves numerous parties and

presents complicated questions of causation.  Such litigation is rarely efficient and often goes on

for many years.  By contrast, a trust established by the Debtor in the Chapter 11 Case would

"provide all claimants—including future claimants who have yet to institute litigation—with an

efficient means through which to equitably resolve their claims."  Bestwall, 606 B.R. at 257.[49]

---

[49]     See In re Federal-Mogul Glob., Inc., 684 F.3d 355, 362 (3d Cir. 2012) ("Furthermore, the trusts appear to
         have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos
         claimants and corporations saddled with asbestos liability.  In particular, observers have noted the trusts'

Continued prosecution of claims against the Protected Parties would thwart the Debtor's ability

to resolve its talc liabilities through a bankruptcy trust, eliminating any possibility of a more

efficient means of recovery to current and future talc claimants.

        In contrast, the prejudice caused to the Defendants by an injunction would be

minimal, to the extent it would exist at all.[50]  The issuance of an injunction will not permanently

deprive the Defendants of an opportunity to pursue the Debtor Talc Claims.  Instead, it will

merely halt those alleged claims, giving the Debtor time to reach consensus on a plan of

reorganization.  Thus, the requested injunction will do nothing more than place claimants that

seek to litigate the Debtor Talc Claims outside of this Court in their appropriate position:

alongside all other claimants who, through court-appointed representatives, are working with the

Debtor to establish a trust that equitably treats and pays all current and future Debtor Talc

Claims.[51]

        Even if this Court assumes that an injunction might cause delay for some

Defendants, "it is well established that mere delay is insufficient to prevent the issuance of

an injunction."  Bestwall, 606 B.R. at 257; see also In re United Health Care Org., 210 B.R. 228,

234 (S.D.N.Y. 1997) (finding that delay to the enjoined party from pursuing remedies was

---

[50]    effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution.  Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.") (citing studies).

[50]    As explained above, litigation of the Debtor Talc Claims is already stayed pursuant to sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.  Because of this, the requested injunction does not affect, much less harm, the Defendants asserting such claims, except as contemplated by the Bankruptcy Code.

[51]    See Sudbury, 140 B.R. at 464–65; see also In re Combustion Eng'g, Inc., 391 F.3d 190, 234 (3d Cir. 2004) (The "unique funding mechanism [available under section 524(g)] makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process.").

heavily outweighed by potential harm to reorganization efforts).[52]  Otherwise, an injunction

could never be issued, as an injunction by definition involves delay, yet the relief has "uniformly

been issued" by many different courts notwithstanding claimants raising this theoretical

consequence.  Bestwall, 606 B.R. at 254 (citing cases).

       Further, the balance of harms weighs decidedly in favor of a preliminary

injunction and giving the Debtor's reorganization effort an opportunity to succeed.  As noted

above, halting the pursuit of the Debtor Talc Claims imposes no material harm.  As the record

demonstrates, based on the historical pace of resolution of these claims, it would take decades to

resolve them in the tort system.  Hr'g Tr., 455:6-456:15, Nov. 5, 2021, Mullin Direct; Debtor's PI

Hr'g Ex. 31, Expert Report of Charles h. Mullin PhD, at ¶ 17  Such resolutions are costly—Old

JJCI incurred nearly $1 billion in the past five years alone defending personal-injury talc

claims—and result in widely varying recoveries for claimants with comparable damages.  See

Kim Decl. ¶¶ 38-40, 58.  In contrast, a bankruptcy trust will provide claimants (and the Debtor)

"with an efficient means through which to equitably resolve [the] claims." Id. (citing In re

Federal-Mogul Glob., Inc., 684 F.3d 355, 357-62 (3d Cir. 2012)); see also, Hr'g Tr., 455:6-

456:15, Nov. 5, 2021, Mullin Direct; Debtor's PI Hr'g Ex. 31 at ¶ 25.

       Finally, the Defendants cannot establish harm based on speculation that an

injunction could affect the ultimate payment of their claims.  As set forth above, the Debtor's

---

[52]    See also W.R. Grace & Co., 386 B.R. at 35 (finding that delay of compensation for asbestos claimants and
potential loss of witness testimony did not outweigh potential harm to reorganization efforts); In re Lazarus
Burman Assocs., 161 B.R. at 901 (concluding that delay was not sufficient harm to justify denial of
injunction because "[t]he preliminary injunction will not invalidate the rights of [the creditor]" but rather
"will merely delay the enforcement of those rights"); Am. Film Techs., 175 B.R. at 849 (defendants are
"not being asked to forego [their] prosecution against the individual defendants, only to delay it"); In re PTI
Holding Corp., 346 B.R. 820, 831–32 (Bankr. D. Nev. 2006) (holding that delay of pursuit of guaranty did
not constitute sufficient harm to justify denial of injunction).

value is approximately $373.1 million in addition to insurance rights and the Funding Agreement

with New JJCI and J&J.  First Day Decl. ¶ 26.  Among other things, the Funding Agreement will

ensure funding for a trust in the amount required by a confirmed plan of reorganization, to the

extent the Debtor's other assets (including insurance) are insufficient to fund the trust.  In

addition, New JJCI and J&J have agreed to deposit an aggregate amount of $2 billion into a

"qualified settlement fund" for the payment of current and future talc-related claims asserted

against or related to the Debtor.  Thus, the balance of harms clearly weighs in the Debtor's favor.

For the reasons set forth herein, permitting litigation of the Debtor Talc Claims

against the Protected Parties (to many of whom the Debtor owes indemnity) to continue will

irreparably harm the Debtor's estate and thwart the entire purpose of this Chapter 11 Case.

Accordingly, the balance of harms clearly weighs in favor of issuing an injunction.

**4.      Injunctive Relief Will Further the Public Interest by Ensuring
the Debtor's Successful Reorganization and Equitable Treatment of
Defendants.**

Courts consistently have recognized the public interest in a successful reorganization.  See, e.g.,

United States v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983); Sudbury, 140 B.R. at 465.  As

one bankruptcy judge observed:  "[P]romoting a successful reorganization is one of the most

important public interests."  In re Gander Partners LLC, 432 B.R 781, 789 (Bankr. N.D. Ill.

2010) (quoting In re Integrated Health Servs., Inc., 281 B.R. 231, 239 (Bankr. D. Del. 2002));

see also Manville, 26 B.R. at 428 ("[T]he goal of removing all obstacles to plan formulation [is]

eminently praiseworthy and [this court] supports every lawful effort to foster this goal while

protecting the due process rights of all constituencies.").

A successful reorganization particularly serves the public interest in the mass tort

context, where "completing the reorganization process . . . [will] resolv[e] thousands of claims in

a uniform and equitable manner." W.R. Grace & Co., 386 B.R. at 36 (extending injunction to cover a non-debtor affiliate railroad that transported products of the debtor). It is in the public interest that "the bankruptcy process [is] utilized to the fullest extent" to resolve claims against the Debtor—a result made possible by a comprehensive injunction. Id. Such a resolution is also in the public interest because it would conserve judicial resources.

It also is in the public interest to promote justice in the court system through the equitable treatment of all holders of current and future Debtor Talc Claims. Inconsistent judgments are not a desirable means of resolving a dispute with nationwide implications. In re Dow Corning Corp., 211 B.R. 545, 588 (Bankr. E.D. Mich. 1997) ("[I]t is anything but just when presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a multimillion dollar verdict against a defendant while another takes nothing."). The Debtor respectfully submits that an equitable outcome can only be achieved in this Court by utilizing bankruptcy-specific tools geared towards encouraging efficient and fair resolution of liabilities. See In re Congoleum Corp., 362 B.R. 198, 201 (Bankr. D.N.J. 2007) ("Section 524 was created to provide a comprehensive resolution to asbestos liabilities both present and future."). Allowing the Debtor Talc Claims to proceed in the tort system, however, would undermine public interests by allowing for different recoveries for similarly situated claimants.

Further, permitting Debtor Talc Claims to continue against the Protected Parties would jeopardize the very purpose of the Chapter 11 Case. Undermining the Chapter 11 Case in this way also undermines the public interest. As set forth above, enjoining "direct" claims against the Protected Parties is entirely appropriate. Without the requested relief, the Debtor would not benefit from a reprieve of litigation to focus on its reorganization. Indeed, the Debtor, contrary to the assertion of certain objectors, is not "advancing the interests of corporate

third-parties." Rather, it is seeking to preserve its ability to pursue a reorganization. The Debtor

and the Protected Parties are not seeking to "escape" any talc liabilities through the injunctive

relief requested herein or through the Chapter 11 Case. They fully understand that all liability

arising out of the Debtor Talc Claims will be "resolved and channeled only if [the Debtor]

succeeds in confirming a plan of reorganization that contains a channeling injunction that

extends to the Protected Parties." Bestwall, 606 B.R. at 258; see also In re Combustion Eng'g,

Inc., 391 F.3d 190, 233-34 (3d Cir. 2004) (holding that a channeling injunction may be extended

to non-debtors where the requirements of section 524(g) are met). The Court and parties in

interest, however, will be unable to comprehensively and equitably resolve all Debtor Talc

Claims in this Chapter 11 Case without the requested injunctive relief.

Courts have consistently affirmed the public's interest in a successful

reorganization,[53] which may be at its greatest in mass-tort bankruptcies.[54] As detailed above, the

preliminary injunction is a critical ingredient to the Debtor's successful reorganization.

As described above, each of the four factors clearly weighs in favor of this Court

issuing a preliminary injunction prohibiting the Defendants from commencing or prosecuting

Debtor Talc Claims against the Protected Parties. The NC Bankruptcy Court agreed. PI Tr. at

141:5-6 (finding "that a 105 injunction should issue consistent with what the debtor has

proposed"); id. 135:22-25 (noting that, were the court keeping the case, it may have made the

preliminary injunction "more permanent" than 60 days).

---

[53]    Rehabworks, Inc. v. Lee (In re Integrated Health Servs.), 281 B.R. 231, 239 (Bankr. D. Del. 2002) ("In the
context of a bankruptcy case, promoting a successful reorganization is one of the most important public
interests."); In re Gander Partners LLC, 432 B.R 781, 789 (Bankr. N.D. Ill. 2010) (quoting Integrated
Health Servs.).

[54]    See, e.g., Robins, 788 F.2d at 1008 (noting "the unquestioned public interest in promoting a viable
reorganization").

## CONCLUSION

For the reasons discussed above, the Debtor requests that the Court enter an order

declaring that the filing or continued prosecution of the Debtor Talc Claims against any of the

Protected Parties while the Chapter 11 Case remains pending violates the automatic stay.  The

Debtor also respectfully requests that the Court enter an order preliminarily enjoining the filing

or continued prosecution of Debtor Talc Claims (on any theory of liability) against any of the

Protected Parties while the Debtor's Chapter 11 Case remains pending.

Dated: December 8, 2021

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
PROPOSED ATTORNEYS FOR DEBTOR