# EXHIBIT A

1          UNITED STATES BANKRUPTCY COURT

          WESTERN DISTRICT OF NORTH CAROLINA

2                CHARLOTTE DIVISION

3    -------------------------

     IN RE:                    :Case No. 21-030589

4                              :

     LTL MANAGEMENT LLC,       :

5                              :

              Debtor.          :

6    -------------------------

7

8                OCTOBER 31, 2021

9

10         C O N F I D E N T I A L

11

12          Remote deposition of JOHN KIM,

13     ESQUIRE, conducted via Zoom

14     videoconference, at the location of the

15     witness, commencing at 10:05 a.m., on the

16     above date, before Margaret M. Reihl, RPR,

17     CRR, CCR - NJ.

18

19

20

          GOLKOW LITIGATION SERVICES

21     877.370.3377 ph | 917.591.5672 fax

              Deps@golkow.com

22

23

24

```
 1   APPEARANCES: (via Zoom)
 2
     KAZAN McCLAIN SATTERLEY & GREENWOOD
 3   BY:  JOSEPH SATTERLEY, ESQUIRE
     55 Harrison St. Suite 400
 4   Oakland, California  94607
     (888) 887-1238
 5   jsatterley@kazanlaw.com
     Representing the Creditor Claimants
 6
 7   OTTERBOURG
     BY:  ADAM C. SILVERSTEIN, ESQUIRE
 8        JOHN BOUGIAMAS, ESQUIRE
     230 Park Avenue
 9   New York, New York  10169-0075
     (212) 905-3628
10   asilverstein@otterbourg.com
     Representing the MDL Plaintiffs
11   Steering Committee
12
     COHEN PLACITELLA & ROTH
13   BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
     127 Maple Avenue
14   Red Bank, New Jersey  07701
     (888) 219-3599
15   cplacitella@cprlaw.com
     Representing MDL Plaintiffs
16   Steering Committee
17
     COLE HAYES, ESQUIRE
18   601 S. Kings Drive
     Suite F-PMB #411
19   Charlotte, North Carolina  28204
     cole@colehayeslaw.com
20   Representing MDL Plaintiffs
     Steering Committee
21
22
23
24
```

```
 1   APPEARANCES: (via Zoom) CONT'D
 2
     LEVIN PAPANTONIO RAFFERTY
 3   BY:  CHRISTOPHER V. TISI, ESQUIRE
     316 South Baylen St.
 4   Pensacola, Florida  32502
     (850) 435-7000
 5   ctisi@levinlaw.com
     Representing MDL Plaintiffs
 6   Steering Committee
 7
     ASHCRAFT & GEREL, LLP
 8   BY:  JAMES F. GREEN, ESQUIRE
     1825 K Street NW, Suite 700
 9   Washington, DC 20006
     (202) 783-6400
10   jgreen@ashcraftlaw.com
     Repreesnting MDL Plaintiffs
11   Steering Committee
12
     BEASLEY ALLEN
13   BY:  LEIGH O'DELL, ESQUIRE
     218 Commerce Street
14   Montgomery, Alabama  36104
     (800) 898-2034
15   leigh.odell@beasleyallen.com
     Repreesnting MDL Plaintiffs
16   Steering Committee
17
     ASHCRAFT & GERAL
18   BY:  MICHELLE PARFITT, ESQUIRE
          JAMES F. GREEN, ESQUIRE
19   1825 K Street NW,
     Suite 700
20   Washington, DC 20006
     (202) 783-6400
21   Repreesnting MDL Plaintiffs
     Steering Committee
22
23
24
```

```
 1   APPEARANCES: (via Zoom) CONT'D
 2   KTBS LAW LLP
     BY:  NIR MAOZ, ESQUIRE
 3        SAMUEL M. KIDDER, ESQUIRE
     1801 Century Park East
 4   Twenty-Sixth Floor
     Los Angeles, California  90067
 5   (310) 407-4010
     nmaoz@ktbslaw.com
 6   Representing Aylstock, Witkin,
     Kreis & Overholtz, PLLC
 7
 8   ESSEX RICHARDS, P.A.
     BY:  JOHN C. WOODMAN, ESQUIRE
 9   1701 South Blvd.
     Charlotte, North Carolina  28203
10   (704)377-4300 Ext. 106
     jwoodman@essexrichards.com
11   Representing certain claimants
     represented by Fears Nachawati
12   and Kazan McClain Satterley & Greenwood
13
     JONES DAY
14   BY:  JAMES M. JONES, ESQUIRE
          MARK W. RASMUSSEN, ESQUIRE
15        DAN B. PRIETO, ESQUIRE
     250 Vesey Street
16   New York, New York  10281
     (212) 326-7838
17   jmjones@jonesday.com
     Representing the Debtor and
18   the Witness
19
20   Also Present:
     Eric Haas
21   Andrew White
22
23
24
```

```
 1                      -  -  -
 2                   I N D E X
 3                      -  -  -
 4    WITNESS                              PAGE
 5    JOHN KIM, ESQUIRE
 6            By Mr. Satterley     8, 265, 273
              By Mr. Silverstein          144
 7            By Mr. Jones                272
 8                      -  -  -
 9                 E X H I B I T S
10                      -  -  -
11    NO.        DESCRIPTION               PAGE
12    No. 1      Agreement For Transfer of
                 Assets and Bill of Sale    48
13
      No. 2      Shook Hardy Letter dated
14               9/16/2021
                 LTL 0000080 to 084         88
15
      No. 3      Shook Hardy Letter dated
16               10/21/2021
                 LTL 0000097 to 0100        95
17
      No. 4      Travelers letter dated
18               8/24/20
                 LTL 0012447 to 12449      269
19
      No. 5      Debtor's Answers and
20               Objections to Plaintiffs'
                 Steering Committee First
21               Set of Interrogatories    154
22
23
24
```

```
 1   No. 6      North American Asset Purchase
                Agreement among Johnson & Johnson
 2              Consumer Companies, Inc. and
                Valeant Pharmaceuticals
 3              International, Inc. 9/9/2012
                LTL 0000954 to 1049            180
 4
     No. 7      Indemnification Agreement
 5              between Valeant and JCI 9/9/12
                LTL 0001050 to 1057            185
 6
     No. 8      Indemnification and Defense
 7              Agreement 12/22/16
                LTL 0019834 to 19837           198
 8
     No. 9      E-mail string, top one dated
 9              8/22/17 [redacted]
                LTL 0020073 to 20081           205
10
     No. 10     Shook Hardy letter 4/10/17
11              LTL 0020917 to 20918           207
12   No. 11     Shook Hardy letter 4/10/17
                LTL 0020766 to 20767           211
13
     No. 12     Shook Hardy letter 2/2/21
14              LTL 0020776 to 20778           214
15   No. 13     Amended and Restated
                Funding Agreement between
16              J&J and JJCI and LTL 10/12/21
                LTL 0000001 to 020             228
17
     No. 14     Declaration of John K. Kim
18              in Support of First Day
                Pleadings                      236
19
20                       — — —
21
22
23
24
```

1                      PREVIOUSLY MARKED

2                                              REF'D

   No. 13    Minutes of A Regular

3             Meeting of Board of

              Directors of Johnson &

4             Johnson 12/12/78

              LTL 0000021 to 034             148

5

   No. 16    Stipulation in Kleiner v.

6             Johnson & Johnson, et al.    249

7

8                         — — —

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1             JOHN KIM, ESQUIRE, having been duly

2        sworn as a witness, was examined and

3        testified as follows:

4   BY MR. SATTERLEY:

5        Q.     Good morning, please state your

6   full name.

7        A.     John K. Kim, K-I-M.

8        Q.     Mr. Kim, my name is Joe Satterley,

9   you and I have met previously.  Today's deposition

10  will, hopefully, only be a few hours, at least for

11  my questions.  There may be some questions from

12  other folks.

13             Have you ever given a deposition

14  before?

15       A.     I have not.

16       Q.     You have, obviously, sat through

17  many depositions, correct?

18       A.     I have.

19       Q.     So you're generally familiar with

20  the deposition process, correct?

21       A.     I am.

22       Q.     Can we dispense with the usual

23  instructions about a deposition?

24       A.     Yes, you can.

1          Q.     Okay.  Let me just give you one

2    piece of information.  If any of my questions are

3    confusing or you don't understand them, will you

4    let me know so I can reask the question?

5          A.     I will.

6          Q.     And if you need to take a break for

7    any reason, you know, I will accommodate you and

8    take the break, but try not to do it right in the

9    middle of a question; is that fair?

10         A.     Sure.

11         Q.     So you are currently employed by

12   LTL Management, correct?

13         A.     I am seconded to LTL Management.  I

14   am employed by Johnson & Johnson Services, Inc.

15         Q.     And when were you first employed by

16   Johnson & Johnson Services, Inc.?

17         A.     It was October 12.  I'm a little

18   hesitant because there are offer letters and when

19   I actually get off payroll and things that I'm

20   actually not sure of the time frame, but it's

21   around the 12th.

22         Q.     And so did you formally resign your

23   position at Johnson & Johnson enterprise?

24                MR. JONES:  Object to form.

```
 1                THE WITNESS:  I resigned my former

 2           position as the head of product liability

 3           for Johnson & Johnson and started with

 4           Johnson & Johnson Services, Inc.

 5  BY MR. SATTERLEY:

 6           Q.    So is there a letter or an e-mail

 7  where you resigned from your former position?

 8           A.    There's no e-mail about

 9  resignation.  There is an offer letter and

10  acceptance where I took on a new position.

11           Q.    And who conveyed that offer to you?

12           A.    It was done through the HR group,

13  the -- yeah, the HR group.

14           Q.    HR group for who?

15           A.    I think it's an enterprise HR

16  group.  I believe it's a service provided -- it's

17  a group that services all of Johnson & Johnson.

18           Q.    And do you know the name of the

19  individual who conveyed that offer to you for your

20  current position with J&J Services?

21           A.    I'd have to look at the letter.

22           Q.    Now, J&J Services, is that a

23  subsidiary of Johnson & Johnson enterprise?

24           A.    It is.
```

```
 1          Q.      Today in this deposition when I

 2   refer to Johnson & Johnson, I'm going to refer to

 3   them as Johnson & Johnson, the enterprise, and

 4   when I refer to consumer, I'm going to refer to

 5   them as JJCI; is that acceptable?

 6          A.      It's confusing because there are,

 7   of course, you know -- yeah, there's JJCI,

 8   there's -- sometimes I think you are going to

 9   refer to old JJCI versus new JJCI.  So I think,

10   you know, we can go -- you can call it what you

11   want, we'll try to get the general sense, but

12   because of the differences in names or

13   similarities in names, it might get a little

14   confusing but I'm happy to give it a shot.

15          Q.      Let me know at any point if you are

16   confused as to which J&J I'm talking about, okay?

17          A.      Sure.  Like that last sentence you

18   just said is sort of an ambiguous statement so --

19   but I understand what your intentions are.

20          Q.      Have you ever been a direct

21   employee of Johnson & Johnson Consumer?

22          A.      No.

23          Q.      When were you first hired to work

24   for Johnson & Johnson, the corporate enterprise?
```

Confidential - John Kim, Esquire

```
 1            A.    I was hired in --
 2                  MR. JONES:  Let me object.  Joe,
 3            are you referring to Johnson & Johnson,
 4            the parent company, when you say that?
 5                  MR. SATTERLEY:  Yes.
 6                  MR. JONES:  So I think the
 7            questions will go better if we say Johnson
 8            & Johnson, the parent company, as opposed
 9            to the enterprise, when you are referring
10            to the parent company.
11                  MR. SATTERLEY:  Well, other
12            depositions I've been involved with the
13            J&J folks refer to themselves as J&J
14            enterprise when referring to the parent
15            company.
16                  MR. JONES:  I don't want to talk
17            over anyone.  I'm just trying to be as
18            precise as we can be to help the witness.
19                  So, John, you can answer the
20            question but my objection has been noted.
21                  THE WITNESS:  So Johnson & Johnson,
22            the enterprise, when generally people will
23            say the enterprise they refer to all of
24            Johnson & Johnson and its companies.  The
```

Confidential - John Kim, Esquire

```
 1              enterprise, generally, when people talk

 2              about -- this is why things get confusing.

 3                   Most people, when they say

 4              enterprise, think of it as the Johnson &

 5              Johnson corporate plus J&J subsidiary, the

 6              entire ball of wax is the enterprise and

 7              so, you know, if you call the enterprise

 8              just Johnson & Johnson the corporate

 9              headquarters then, again, it gets

10              confusing.

11                   So what I will say is I was hired

12              by Johnson & Johnson, the corporate

13              headquarters, in about 2000 -- I want to

14              say 2000, 2001.  I've been here 20 years

15              so I think 2001.

16  BY MR. SATTERLEY:

17         Q.    Okay.  And when you were hired in

18  2001, what was the first position you had with

19  Johnson & Johnson, the parent company?

20         A.    I was hired as a senior counsel.

21         Q.    And what was your responsibilities

22  as senior counsel beginning in 2001?

23         A.    In 2001 I was in the litigation

24  group so I handled generally all -- many different
```

```
 1   types of litigation that affected the companies

 2   that make up Johnson & Johnson.

 3           Q.    Give me sort of a summary of some

 4   of the litigation you began to handle in 2001 when

 5   you were hired as senior counsel?

 6           A.    Okay.  So I handled Ethicon endo

 7   surgery cases.  I handled McNeil consumer cases,

 8   primarily on the Tylenol litigation.  I handled

 9   latex glove, the mass tort.  I handled insurance

10   coverage disputes.  I also advised various

11   operating companies on legal issues, both product

12   liability and general legal issues.

13                 How far forward do you want me to

14   go because as I've been here 20 years, as I --

15   during the first five years I probably handled,

16   you know, a gazillion other things.  I'm not sure

17   how far forward you want me to go.

18           Q.    Let's break it up this way, how

19   long did you have the title senior counsel?

20           A.    Up until I think 2007 -- five years

21   after I joined I had a change of title.

22           Q.    Okay.  What was your next title?

23           A.    The next title was assistant

24   general counsel.
```

```
 1          Q.      Before I get to the assistant

 2   general counsel let me go back to when you were

 3   senior counsel, who was your boss?

 4          A.      At the time my boss was Taysen Van

 5   Itallie.

 6          Q.      And did that person remain your

 7   boss until you were promoted to assistant general

 8   counsel?

 9          A.      Yes, he did.

10          Q.      In that time frame, 2001 to 2007,

11   did you have any role or responsibilities with any

12   talc litigation issues?

13          A.      I may have.  During that time

14   period at some point, I don't remember when, I

15   became the liaison, the litigation liaison or lead

16   of the consumer sector.  So in that role I was

17   monitoring and helping others, you know, I was

18   acting as a liaison between the consumer sector

19   and any other lawyer who was doing litigation or

20   helping with litigation for the consumer sector.

21                  So in that role, at some point I'm

22   sure I was made aware of whatever litigation

23   involving talc or bits of litigation that was

24   involving talc.
```

Confidential - John Kim, Esquire

```
1            Q.      That time frame, in the early
2    2000s, who within the office of general counsel
3    managed the talc litigation?
4            A.      That would be John O'Shaughnessy.
5            Q.      And how long did John O'Shaughnessy
6    manage the talc litigation?
7            A.      He was sort of the day-to-day
8    person on talc litigation up until I want to say
9    -- I don't have a clear recollection when he
10   stopped.  I want to say five years ago but that
11   could be off.
12           Q.      At some point in time did you take
13   over managing the talc litigation from John
14   O'Shaughnessy?
15           A.      So while John was managing the talc
16   litigation, at some point I became his boss and so
17   I -- again, when you say manage, he did the
18   day-to-day management of things but, you know, I
19   oversaw the management of talc at some point.
20                   So I would say when I became the
21   head of product liability litigation I started
22   overseeing all the -- all the product liability
23   litigation reported up to me.  More significant
24   litigation I had, you know, more of a hand in.
```

 1          Q.    So let's continue through your

 2   career.  You said in 2007 you became assistant

 3   general counsel.

 4                How long did you have that job

 5   title?

 6          A.    That job title I had until I left

 7   and started at LTL.

 8          Q.    And you mentioned a few minutes ago

 9   that you took over managing all product liability

10   litigation for J&J, when did you do that?

11          A.    Can I refer to my declaration

12   because I put the date in there?

13          Q.    Sure.  And this is your first day

14   declaration, right?

15          A.    Yes.  I guess it's not in there.  I

16   would say I think it was like 20 -- 2015, 2016.

17          Q.    I didn't hear you?

18          A.    I have to go back to my records to

19   find out when I actually started that.  I

20   apologize.  I thought it was in my first day

21   pleading.

22          Q.    Did you say 2015 or 2016?

23          A.    I honestly don't recall sitting

24   here when I took that over.  It was newly created.

Confidential - John Kim, Esquire

1          Q.      And who from Johnson & Johnson, the

2     parent company, gave you that position managing

3     all products liability for Johnson & Johnson, the

4     parent company?

5          A.      So at the time my boss was Joseph

6     Braunreuther but it was -- in the law department,

7     in the litigation group, it was a reorganization

8     of the entire group and heads of divisions, heads

9     of practice areas were appointed, and so I was

10    appointed the head of the product liability group.

11         Q.      And the reorganization of the

12    general counsel's office you described, was that

13    approved by the Johnson & Johnson Board of

14    Directors?

15         A.      It was reorganization of the

16    litigation group and I do not believe that it had

17    to be approved by the Board of Directors or didn't

18    get up to that level.

19         Q.      So was it the general counsel that

20    that did that reorganization of the litigation

21    department?

22         A.      I'm sure the general counsel knew

23    about it or had say in it.  I don't know that

24    there's an actual official approval, you know,

1   when they -- when that was done.

2         Q.      And the litigation department has a

3   budget, correct?

4         A.      I don't believe the litigation

5   group itself has a budget, no.

6         Q.      Is there a -- I read something the

7   last year, last few years that Johnson & Johnson

8   spends $1.9 billion on its litigation budget; is

9   that true?

10        A.      Well, I think -- I'm not sure what

11  the amount is, but that would be that's the amount

12  spent on litigation, not a litigation budget, but

13  that would be an amount spent on litigation.

14        Q.      And is that consistent --

15        A.      I can't verify what that number was

16  or when that number would be for.

17        Q.      Well, what's your understanding of

18  the amount of money Johnson & Johnson, the parent

19  company, spends on litigation each year?

20        A.      I don't know that I know that

21  number.  I know that I don't know that number.

22        Q.      So other than being senior counsel,

23  assistant general counsel and managing products

24  liability litigation have you had any other job

```
1    title with Johnson & Johnson?

2         A.     Not job title, no.

3         Q.     Who from Johnson & Johnson made the

4    decision to create LTL Management?

5         A.     That was the decision -- I'm sorry,

6    what was the question one more time?

7         Q.     Sure.  Who from Johnson & Johnson

8    made the decision to create LTL Management?

9         A.     I have seen the decision memo, a

10   document that tells you at what level that

11   decision was made.  I think it was on the business

12   side -- I would have to look at it but it was, I

13   think, the president of the operating company

14   that's the parent of JJCI.

15              So I think it would have been up to

16   the Janssen board, I believe that's it, but,

17   again, there's a document -- I would refer to the

18   decision memo document that lays out the process.

19        Q.     Do you know the names of any of the

20   individuals involved in the decision to create LTL

21   Management?

22        A.     Yeah, can I get that question one

23   more time.

24        Q.     Sure.  Do you know the names of any
```

Confidential - John Kim, Esquire

```
 1    of the individuals involved in the decision to

 2    create LTL Management?

 3              A.      I think there are lots of people

 4    that were involved in that decision, you know,

 5    including people from the law department and in

 6    the business, so I do know lots of names of people

 7    who were involved in that decision.

 8              Q.      Were you involved in the decision

 9    to create LTL Management?

10              A.      I was involved.  I did not make the

11    decision but I was involved in that decision.

12              Q.      This memo that you speak of, what's

13    the date of the memo?

14              A.      I would have to look at the memo to

15    see.

16              Q.      Do you know the month of the memo?

17              A.      I think it was around October, in

18    October that there would have been that memo.  The

19    memo is, basically, just a specific memo that's

20    based on a template so there are -- decisions are

21    made by a process and so there's a process memo

22    that tells you what the process should be and the

23    memo goes through that process with this

24    transaction.
```

Confident Call - John Kim, Esquire

```
 1          Q.     And you said this memo is a
 2    template, where did the template originate?
 3          A.     I think the template has been
 4    around in the corporate -- in the business
 5    development side of the business.  So any time
 6    there's a transaction actually involving creation
 7    or fail of a business, there's a process that has
 8    to be followed.
 9          Q.     So give us the names of the
10    individuals that you believe made the decision to
11    create LTL Management?
12          A.     Again, I would have to look at the
13    decision memo to see who actually -- who it was
14    brought to and who made the decisions.  What I can
15    do is I would defer, frankly, to the documents
16    that were signed as part of the closing of the
17    transaction and those have all the people who had
18    to sign in order to get the transaction done.
19                 So the board, for example, of
20    Janssen Pharmaceutical, which is one of the
21    companies in the chain of ownership, had to sign.
22    You know, there are a number of individuals that
23    signed those documents that I would defer to.
24          Q.     So I may get to some of those
```

```
 1   documents later, I wasn't asking about documents.

 2                I was actually asking about the

 3   decision to create LTL Management.  Can you give

 4   me the names of any individuals that were actually

 5   involved in making that decision to create that

 6   entity?

 7                MR. JONES:  Object as asked and

 8        answered.  He just told you what he knew

 9        about it.

10                MR. SATTERLEY:  No, he didn't.  He

11        went somewhere else.

12   BY MR. SATTERLEY:

13        Q.    Mr. Kim, do you understand my

14   question?

15        A.    I would say the people on those

16   memos are the people who decided to create the

17   entity.

18        Q.    Can you give me the names of any of

19   those, as you sit here today?

20        A.    I would defer to the actual

21   document.

22        Q.    This decision memo you speak of, is

23   your name on the memo?

24        A.    I do not believe it is, no.
```

Confident Call - John Kutz, Esquire

```
 1          Q.     Do you have the memo with you

 2   today?

 3          A.     I may.  I am in my office.  In my

 4   vast files I may have it somewhere.

 5                 MR. SATTERLEY:  Mr. Jones, has that

 6          memo been produced?

 7                 MR. JONES:  I do not believe it has

 8          been.  I do not believe it's been

 9          requested.

10                 MR. SATTERLEY:  Can you e-mail that

11          to me so at a break I can print it out and

12          look it over?

13                 MR. JONES:  I decidedly will take a

14          look at it and discern whether it's

15          privileged and has been requested and

16          we'll let you know.  If we can readily

17          access it.

18                 THE WITNESS:  I think was the

19          closing binder -- I'm sorry.

20                 MR. JONES:  The closing binder

21          documents has been produced and I think

22          he's referred to the names that you can

23          find, they have been produced.

24                 THE WITNESS:  It might be in the
```

Confident Carr - John Kim, Esquire

```
 1              closing binder.

 2                   MR. SATTERLEY:  I want this memo he

 3              is speaking of.  I haven't seen it.

 4                   MR. JONES:  At a break Mr. Kim and

 5              I will look, we'll discuss and look and

 6              we'll give you a determination about

 7              whether, A, it can be accessed and whether

 8              or not it is privileged.

 9                   THE WITNESS:  Okay.

10     BY MR. SATTERLEY:

11         Q.      You've signed two declarations, the

12     first one, the first day pleadings and then you

13     signed one last week ago Thursday, the 21st,

14     correct?

15         A.      I did.

16         Q.      Have you signed any additional

17     declarations in support of LTL Management and the

18     petition in the bankruptcy court?

19         A.      I have not.

20         Q.      Are you currently working on any

21     declarations?

22         A.      I have not.

23         Q.      Do you have any additional

24     information that you intend to offer next Thursday
```

1  or Friday at the hearing that's not included in

2  the two declarations?

3         A.     I don't think I can answer that

4  question.  I don't know and -- yeah, I don't know,

5  yeah, I don't know the answer to that question.

6         Q.     What have you done to prepare for

7  today's deposition?

8         A.     Can you go back and ask the

9  question one more time.  I want to make sure I got

10  a clear question.

11         Q.     My previous question was do you

12  have any additional information that you intend to

13  share with the court next Thursday or Friday that

14  relates to this bankruptcy, other than what you've

15  included in your two signed declarations?

16         A.     I think it's hard to answer that

17  question.  I have additional information, you

18  know, that I've -- that I've had.  Whether we are

19  going to share it or not, I think that's a

20  decision that we have not made yet.

21         Q.     What additional information do you

22  have that you believe is significant and important

23  with regards to the hearing scheduled next week

24  that you have not included in your two

```
 1   declarations?

 2               MR. JONES:  I'm going object to the

 3         extent it may call for privileged

 4         communications.  Mr. Kim, you are not to

 5         share those, but if you have an

 6         assessment, you can tell him.

 7               THE WITNESS:  I think we -- I think

 8         it's impossible for me to answer that

 9         question.

10               What I will say is I will defer to

11         the letter Mr. Jones sent about what was

12         intended to be covered at the hearing and,

13         you know, we can go through that and what

14         information I know about those topics, you

15         know, whether it's additional information

16         that's significant that I am going to

17         present, I really can't make -- I can't

18         answer that question.  I don't know how to

19         answer that question.

20   BY MR. SATTERLEY:

21         Q.    I might come back to that in a

22   minute.

23               What have you done to prepare for

24   today's deposition?
```

Confidential - John Kim, Esquire

```
 1              A.     I had meetings with my attorneys.

 2              Q.     And how many meetings did you have

 3    with your attorneys?

 4              A.     Two.

 5              Q.     When did those occur?

 6              A.     One occurred on Friday and the

 7    other occurred yesterday.

 8              Q.     And how long were those meetings?

 9              A.     About two hours each, one and a

10    half to two hours each.

11              Q.     And how many attorneys participated

12    in these meetings?

13              A.     Six.

14              Q.     Who were they?

15              A.     Okay.  So Mr. Jones was there,

16    Mr. Prieto was there.  So people may have been

17    there for parts of either or one of those

18    meetings.  Mr. Rasmussen was there.  There were

19    lawyers for Johnson & Johnson that were there

20    so -- oh, and just other LTL lawyers.  There were

21    Krystn Fournier was there.  Kat Frazier.  For J&J

22    John Shakun was there.  I think that's all I can

23    remember at this point.

24              Q.     So let me see if I can understand
```

Confidential - John Kim, Esquire

```
 1    that.  Representing LTL it's your understanding

 2    that Jones, Prieto, Rasmussen, Fournier and

 3    Frazier all were representing LTL in the meetings

 4    that you had over the last two days?

 5         A.    So representing LTL, there's also

 6    joint representation, there may be joint

 7    representation also for J&J also in certain of

 8    those, like Krystn Fournier or Kat Frazier may

 9    also have some representation of J&J.

10         Q.    And are they King & Spalding?

11         A.    One is King & Spalding, one is

12    Shook.

13         Q.    And you mentioned some J&J

14    attorneys, you mentioned John Shakun.  Who else?

15         A.    In-house lawyers for J&J were

16    there.

17         Q.    And who was there in-house?

18         A.    Eric Haas and Andrew White.

19         Q.    Was Mr. Lisman present at either

20    the meetings that you had with these attorneys?

21         A.    No.

22         Q.    Were any other LTL employees

23    present in any meetings that you've had with these

24    attorneys?
```

Confidential - John Kim, Esquire

```
 1            A.      You are talking about the meetings

 2     to prepare for this deposition, right?

 3            Q.      Sure, right now I am.

 4            A.      No.

 5            Q.      Was any other J&J employees

 6     present?

 7            A.      No.

 8            Q.      Other than the attorneys?

 9            A.      No.  I think I listed everyone I

10     can remember being present.

11            Q.      Did you speak to any LTL employees

12     in connection with your proposed testimony

13     either -- well, let's break it down, first at the

14     first hearing last week?

15            A.      I reported to LTL employees about

16     what was going on in the bankruptcy, including my

17     testimony.

18            Q.      And who did you speak with with

19     regards to LTL employees?

20            A.      I spoke to Rich Dickinson and Rob

21     Wuesthoff.

22            Q.      And Bob Wuesthoff, where is he

23     located?

24            A.      He actually was visiting the
```

1    offices for LTL business.

2         Q.    They are in New Jersey, right?

3         A.    In New Jersey, yes.  So I actually

4    had lunch with them.

5         Q.    Both Rich and Bob?

6         A.    Yes.

7         Q.    And are they -- where do they

8    reside, those two individuals?

9         A.    Mr. Wuesthoff resides in Florida,

10   he has a house in New Jersey as well but he splits

11   his time between New Jersey and Florida.

12   Mr. Dickinson lives in New Jersey, I'm not sure

13   where.

14        Q.    And Mr. Dickinson, before he was a

15   LTL Management employee, was he a J&J employee?

16        A.    He was employed by one of the J&J

17   companies, yes.

18        Q.    Which one?

19        A.    I'm actually not sure.  His role

20   was in the business development group.  I'm not

21   sure which J&J company actually employed him.

22        Q.    Bob, before he worked at LTL he

23   worked at J&J as well, correct?

24        A.    He was at one of the J&J companies

Confidential - John Kim, Esquire

```
 1   in the supply chain organization.

 2           Q.     And do you know what's the formal

 3   name of the J&J company he worked for?

 4           A.     I do not.

 5           Q.     Did he work for JJCI?

 6           A.     I don't know.  He may have.

 7           Q.     Mr. Dickerson, did he work for

 8   JJCI?

 9           A.     I don't believe so.  I think he

10   was -- actually, I don't know but for some reason

11   I thought he may have been in the pharm sector or

12   the device sector.

13           Q.     With regards to the meetings to

14   prepare yourself Friday and yesterday, who was

15   your lawyer?

16           A.     My lawyer, I would say Jim Jones.

17           Q.     Did you consider yourself to be

18   also represented by John Shakun?

19           A.     I think we have a joint defense

20   privilege with Mr. Shakun.

21           Q.     And do you consider yourself to be

22   represented by all these attorneys?

23           A.     I'm either represented by or we

24   have a joint defense agreement with them.
```

1          Q.      You mentioned the Janssen board had

2     approved the creation of LTL Management; is that

3     true?

4          A.      I believe that's true.  Again, if

5     you look at the closing binder, which I think is

6     produced, you'll see who had to sign off on all

7     these transactions.

8          Q.      Is Janssen part of the ownership

9     chain?

10         A.      I believe it is, it's one of the

11    intermediate owners from Johnson & Johnson down.

12         Q.      If you could describe for me the

13    ownership chain from Johnson & Johnson, the

14    parent, down to LTL?

15         A.      So I would defer to -- there is a

16    chart that's in my first day declaration that

17    shows that.  Can I refer to that?

18         Q.      Let's try it off the top of your

19    head first and if you can't -- can you off the top

20    of your head?

21         A.      I think I would miss -- I may miss

22    things in between.  Yeah, I would defer, again, to

23    the chart that's in my declaration.

24         Q.      The chart in your declaration, did

```
 1    you create that chart or did somebody else?

 2           A.      Someone created it after conferring

 3    with me and others about the ownership structure

 4    and where to find it.

 5           Q.      Who created that chart?

 6           A.      I actually don't know who actually

 7    physically created it.

 8           Q.      Who gave you that chart?

 9           A.      Well, it was sent to me as a draft,

10    you know, when I was doing -- preparing my

11    declarations and I confirmed the chart through the

12    office of the corporate secretaries and approved

13    it being included in my declaration.

14           Q.      You mentioned a few minutes ago a

15    joint defense agreement.  Did you sign the joint

16    defense agreement?

17           A.      I think I did sign a joint defense

18    agreement.

19           Q.      And when was that signed?

20           A.      At or around the time when LTL was

21    formed and I became its chief legal officer.

22           Q.      So who all signed this joint

23    defense agreement?

24           A.      I'd have to look at the agreement
```

 1    to refresh myself on the signatories.

 2         Q.    What are the entities included on

 3    this joint defense agreement?

 4         A.    Again, I would have to defer.  I

 5    know it's at least Johnson & Johnson and LTL,

 6    whether there are others that are in that or

 7    whether the definition includes others, I'd have

 8    to defer to the document on that.

 9         Q.    And did you tell me the date the

10    joint defense agreement was signed?

11         A.    No.  I think some time around the

12    time that LTL was formed.

13         Q.    Did you review documents to prepare

14    for today's deposition?

15         A.    I reviewed documents, yes.

16         Q.    Describe for me the documents you

17    reviewed.

18              MR. JONES:  They were all produced

19         in the litigation, Joe, and what he

20         reviewed is subject to work product

21         protection, but everything he saw in the

22         two meetings was produced in litigation.

23              MR. SATTERLEY:  Mr. Jones, I

24         appreciate your commentary but that's not

1          a valid objection so please refrain from

2          making statements like that.

3   BY MR. SATTERLEY:

4          Q.    Mr. Kim, did you understand my

5   question?

6                MR. JONES:  Let me finish my

7          objection.  It is a proper objection, it's

8          to work product, it's privileged.  He is

9          not going to disclose to you the documents

10         he reviewed to prepare.  They were

11         presented to him as a part of my

12         selection.  I am counsel for purposes of

13         the deposition and counsel for the debtor.

14         So it's a proper objection, I've made it.

15         He told you he reviewed documents.  I've

16         shared with you they have all been

17         produced.

18                If you want to ask him, when you

19         show him a document, whether he has seen

20         it before, you may, but he is not going to

21         tell you our selection.

22   BY MR. SATTERLEY:

23         Q.    Mr. Kim, I'm not asking you legal

24   advice from Mr. Jones.  I'm asking you what

 1    documents you reviewed.

 2                    Would you tell me what documents

 3    you reviewed yesterday?

 4          A.    I'm going to follow the advice of

 5    my counsel and not answer on privileged grounds.

 6          Q.    Johnson & Johnson did not file for

 7    bankruptcy, correct?

 8          A.    You're talking about the parent

 9    company did not?

10          Q.    Yes.

11          A.    That's correct.

12          Q.    And the reason why Johnson &

13    Johnson didn't file for bankruptcy is because they

14    have -- they're very, very wealthy, correct?

15                    MR. JONES:  Object to foundation.

16                    MR. SATTERLEY:  What's that?

17                    MR. JONES:  I said I object to the

18            foundation for the question.

19    BY MR. SATTERLEY:

20          Q.    Did you hear my question, sir?

21          A.    I heard your question.  I would say

22    I disagree with that.

23          Q.    You disagree that Johnson &

24    Johnson, the parent company, is very wealthy?

```
 1          A.    I disagree that that's the reason

 2   why they didn't file.  I thought that's the

 3   question.

 4          Q.    What's the reason why Johnson &

 5   Johnson didn't declare bankruptcy?

 6                MR. JONES:  Objection.

 7                THE WITNESS:  I would say that it

 8          was unnecessary for the purpose that we

 9          were seeking to create LTL in the first

10          place so it was -- I would say it was

11          unnecessary for that purpose.

12   BY MR. SATTERLEY:

13          Q.    You would agree that if J&J

14   declared bankruptcy, it would affect its credit

15   rating, correct?

16          A.    That's a hypothetical question I'm

17   not going to answer.

18          Q.    You don't know whether or not it

19   would affect a credit rating?

20          A.    I think it's hypothetical.

21          Q.    If Johnson & Johnson declared

22   bankruptcy it would affect their reputation, you

23   would agree with that?

24          A.    I don't know that to be true.
```

Confidential - John Kim, Esquire

```
 1    Again, that's speculation.
 2           Q.     You would agree that Johnson &
 3    Johnson's assets far exceed any liabilities it
 4    has, correct?
 5           A.     Again, not knowing every liability
 6    that Johnson & Johnson has, I would agree that
 7    generally it has more assets than liabilities,
 8    yes.
 9           Q.     I mean, it far exceeds any
10    liability, you know that, right?
11           A.     Again, I'm not sure what all the
12    liabilities are and how -- seems to me like an
13    accounting question that I'm not sure that I
14    understand.
15                  In a layperson's view I would say
16    that Johnson & Johnson has more assets than
17    liabilities.
18           Q.     And I appreciate your point there.
19    We deposed Mr. Lisman yesterday, he is the
20    accounting person put up.
21                  You don't have any specialized
22    knowledge on the accounting side of the Johnson &
23    Johnson entities, correct?
24           A.     I'm not sure what specialized
```

Confidential - John Kim, Esquire

```
 1   knowledge is.  I do have some knowledge of the

 2   accounting at Johnson & Johnson and, you know, I

 3   have seen the records and accounts from time to

 4   time.

 5          Q.     I've seen records, some of the

 6   records also and I guess my question to you, are

 7   you intending to come to court Thursday and Friday

 8   and speak as an expert on accounting matters?

 9          A.     I am not an expert on accounting

10   matters.  I may know things about how Johnson &

11   Johnson keeps its books.

12          Q.     Now, in preparation for the

13   deposition did you review any documents to refresh

14   your recollection about anything?

15          A.     No.

16          Q.     None of the documents you looked at

17   yesterday or Friday was done -- was for -- so they

18   could refresh your recollection for anything?

19          A.     I don't think it was, no.

20          Q.     Because it seemed to me earlier

21   when you said you have to refer to documents that

22   you don't have in your memory the details of every

23   document, true?

24          A.     I don't have details of every
```

```
 1    document.

 2          Q.     And so you have to review documents

 3    from time to time to refresh your memory, right?

 4          A.     I want to review documents to make

 5    sure that I'm correct in what I remember.

 6          Q.     And so in that regard you are

 7    reviewing documents to make sure you are correct

 8    to refresh your recollection, correct?

 9          A.     I wouldn't say it was refreshing my

10    recollection.  I would say that I just want to

11    make sure -- I have a recollection of things, I

12    want to make sure that it's correct before I say

13    them.

14          Q.     Well, you reviewed all the

15    documents, you haven't seen any documents that

16    demonstrate that there's talc liabilities on the

17    Johnson & Johnson books in 1978, correct?

18                 MR. JONES:  Object to the form of

19          the question.  I don't know what you mean

20          by all the records.

21    BY MR. SATTERLEY:

22          Q.     Any document -- all the documents

23    you looked at.  Do you understand my question,

24    sir?
```

```
 1              A.     I don't think I do understand your

 2     question.  Can you repeat it.

 3              Q.     Sure.  There were no talc

 4     liabilities in any documents listed in J&J books

 5     as of 1978, correct?

 6                     MR. JONES:  Object to the form,

 7              foundation.

 8                     THE WITNESS:  I don't know that

 9              that's true.

10     BY MR. SATTERLEY:

11              Q.     Have you seen any documents to

12     indicate there's talc liabilities on the books and

13     records of Johnson & Johnson in 1978?

14              A.     I've seen the agreement that says

15     that basically the, you know, there's an

16     assumption -- all liabilities of the company, of

17     J&J related to talc, and I do know that there was

18     talc business going on.  And so, you know, I think

19     that document says that any talc liabilities that

20     were there were transferred over so, you know ...

21                     MR. SATTERLEY:  Move to strike as

22              nonresponsive.

23     BY MR. SATTERLEY:

24              Q.     Sir, you understand you are under
```

Confidential - John Kim, Esquire

```
 1   oath, correct?

 2          A.     I do.

 3          Q.     And you're saying there's a 1978 or

 4   1979 document that talks about talc liabilities?

 5          A.     What I'm saying talks about all

 6   liabilities related to all businesses and I do

 7   know that there were businesses involving talc

 8   prior to that and so, by necessity, that document

 9   shows that all talc liabilities were assumed.

10          Q.     And that document you're referring

11   to, is that the document called the Agreement For

12   Transfer of Assets and Bill of Sale?

13          A.     Among others.

14          Q.     And this document was located after

15   the hearing, correct?

16          A.     It was.

17          Q.     Who located the document?

18          A.     One of our -- not sure what her

19   actual title is.  She works in the records group.

20   Her name is Susan and I'm going to butcher her

21   last name.

22          Q.     She's identified in our witness

23   disclosure?

24          A.     Yeah.
```

Confidential - John Kim, Esquire

```
 1          MR. JONES:  Her name is

 2     Schreiger-Ward, I believe.

 3          MR. SATTERLEY:  Mr. Jones, you

 4     don't need to testify for the witness.  If

 5     he doesn't remember the name, he can say

 6     he doesn't remember the name.  Please stop

 7     interrupting to help out the witness.  If

 8     he doesn't have a recollection of

 9     something, he can tell me.

10          MR. JONES:  No, he did tell you --

11     let me finish, Mr. Kim.

12          He did tell you he didn't remember.

13     I was trying to just help you to speed

14     things along.  I apologize, I will stop.

15          MR. SATTERLEY:  Please stop because

16     you are not under oath and if you want me

17     to put you under oath and question you

18     later, I will, but I want to get testimony

19     from Mr. Kim, okay.

20          MR. JONES:  Joe, you are doing what

21     you are doing, you don't need to be smart

22     about it.

23          MR. SATTERLEY:  I'm not being

24     smart.  I want to do what we're supposed
```

Confident Call - John Kull, Esquire

```
 1              to do so please stop making statements.

 2                    MR. JONES:  Let me finish, Joe.

 3                    MR. SATTERLEY:  All you're doing is

 4              prolonging the deposition and trying to

 5              throw me off, so please stop.

 6                    MR. JONES:  I honestly was trying

 7              to be polite to you.  I ask for the same

 8              reciprocally.  Now please proceed.

 9     BY MR. SATTERLEY:

10              Q.    My question to you, sir, was who

11     located the document?

12              A.    It was a woman in our records group

13     and, again, I'm going to butcher her name, Susan

14     Schreiger, I just, you know, can't.

15              Q.    I take it you have no knowledge of

16     how she located the document, you have no personal

17     knowledge of that?

18              A.    I had spoken to her about it.

19              Q.    Okay.  And --

20              A.    I've spoken to her about it and I

21     was part of the process to find it.

22              Q.    Okay.  So describe for me the

23     process that you found this document.

24              A.    Well, I did not find it but Susan
```

1   found it.  So we started looking for the document

2   over the weekend and we had previously looked for

3   this document.  My instruction was forget about

4   what we did in the past, start from scratch, look

5   for everything that you can related to the

6   document.  We enlisted the help of our records

7   manager, Suzanne Kovacs.  Susan reports to

8   Suzanne.

9              Suzanne -- in addition to looking

10  at the materials that the corporate secretary

11  keeps, they did a search of the computer systems

12  that we have and so -- I mean, I don't know how

13  much detail you want me to get into,

14  Mr. Satterley, but let me know when you want me to

15  stop.

16             We, basically, have two computer

17  systems that are now sort of the documents of

18  record for the company.  One is Memotech, one is

19  iManage.  Susan looked in the Memotech system on

20  Sunday and doing a search based on date found the

21  document -- in fact, they found many documents,

22  one of the documents that she came across was

23  misidentified in the system as relating to Johnson

24  & Johnson Canada.  Despite that, she looked at the

Confidential - John Ruth, Esquire

1    document and it turned out to be the document that

2    we were looking for.

3           Q.    And the document you're looking for

4    is described as Agreement For Transfer of Assets

5    and Bill of Sale that is signed December the 1st,

6    1978, correct?

7           A.    I don't have it in front of me so I

8    believe that's the document that we were looking

9    for.

10          Q.    This has got LTL0000557 through

11   564.

12                Is this the document you were

13   referring to?

14          A.    Yes.

15          Q.    Okay.  And this was signed December

16   the 1st, 1978 by these people here, right?

17          A.    Yes, it looks like it's signed by

18   those people.

19          Q.    Do you know who any of these people

20   are?

21          A.    I do not.

22          Q.    I was trying to make out their

23   handwriting to figure out the actual names of

24   these people.

Confidential - John Kim, Esquire

```
 1                    Do you know the actual names of any
 2     of these people?
 3          A.      I'm sure we can look it up.
 4          Q.      No, my question was do you know?  I
 5     didn't ask whether you could look it up.  I asked
 6     do you know the names of any of these people?
 7          A.      I think Richard Steitz, the
 8     president, that's there.
 9          Q.      You think right here the president
10     of Johnson & Johnson Baby, that's Richard Steitz?
11          A.      I'm sorry, I didn't see that.  I'm
12     not sure.
13          Q.      You had not had any discussions
14     with any of these people that signed this 1978
15     document, correct?
16          A.      Oh, no.
17          Q.      I'm going to mark this as Exhibit 1
18     to your deposition, Bates number 561, 000561 there
19     is discussions about transferring liabilities and
20     obligations.
21                    (Document marked for identification
22             as Kim Deposition Exhibit No. 1.)
23     BY MR. SATTERLEY:
24          Q.      Do you see that?
```

Confidential - John Kim, Esquire

```
 1            A.      I see it.

 2                    MR. JONES:  Joe, do you have a copy

 3            you could transmit to Mr. Kim?

 4                    MR. SATTERLEY:  No.

 5                    MR. JONES:  We're doing our best

 6            here, we want to be accommodating, it

 7            might be difficult for him to testify

 8            without having the whole document before

 9            him.

10                    Mr. Kim, do you have this, a clean

11            copy of this document handy?

12                    THE WITNESS:  I don't believe I

13            have a printout of it.

14                    MR. JONES:  Let's do our best here

15            but if you need to see more context, you

16            need to tell Mr. Satterley.  Please

17            proceed.

18     BY MR. SATTERLEY:

19            Q.      This document, you said it was

20     found last Sunday; is that correct, a week ago

21     today?

22            A.      Yes.

23            Q.      And did you -- were you given a

24     copy of this last Sunday?
```

```
 1            A.      Yes, I think I was.

 2            Q.      And did you read the document?

 3            A.      I did.

 4            Q.      And did you read this paragraph

 5    four that I've got displayed on the screen?

 6            A.      Yes.

 7            Q.      And it says right here with regards

 8    to "liabilities and obligations of every kind and

 9    description which are allocated on the books or

10    records".

11                    Do you see that?

12            A.      I see that.

13            Q.      Have you seen any books and records

14    that describe talc liabilities as of December 1st,

15    1978?

16            A.      We know that --

17                    MR. JONES:  Let me object to the

18            form.  You may answer.

19    BY MR. SATTERLEY:

20            Q.      This calls for a yes or no answer,

21    Mr. Kim.

22                    Do you understand my question?

23            A.      No.

24                    MR. SATTERLEY:  Court reporter, can
```

1                you read back my question.

2                    (The court reporter read back the

3           record as follows:

4                    "Q. Have you seen any books and

5           records that describe talc liabilities as

6           of December 1st, 1978?")

7                    MR. JONES:  Same objection.

8                    THE WITNESS:  I think I -- I would

9           say yes.

10   BY MR. SATTERLEY:

11       Q.    And what document describes talc

12   liabilities as of December 1st, 1978 on J&J books

13   and records?

14       A.    Well, the records of J&J would be,

15   I believe, all -- we know, again, in the

16   underlying litigation there are tons of records

17   involving the talc liabilities, the business, you

18   know, that the business had prior to '78.  So

19   there are tons of records about the business and

20   how it was being run that have been produced and I

21   would say those are all, you know, records of --

22   you know, that show that there are liabilities

23   prior to '78 so I guess I'm not understanding you.

24                    If you're suggesting that there

Confidential - John Kim, Esquire

```
 1   were no talc liabilities at all before '78 I would

 2   say, you know, J&J was running a business back

 3   then, of course there are liabilities prior to

 4   '78.

 5          Q.     On the books or records.

 6                 Do you see that?  I'm circling it

 7   right there.  On the books or records, right, what

 8   book has talc liabilities described in 1978?

 9          A.     I would have to go back to all the

10   business documents and see where they came from.

11          Q.     Can you identify for me a single

12   book, J&J book that describes talc liabilities as

13   of December 1st, 1978?

14          A.     Again, I would have to go back and

15   look.

16          Q.     At you sit here today, Mr. Kim, can

17   you identify for me a single document where J&J

18   has talc liabilities described in books in 1978?

19          A.     Again, I don't recall as we're

20   sitting here right now.

21          Q.     As you sit here today can you

22   describe a single J&J record that describes talc

23   liabilities as of December the 1st, 1978?

24          A.     Again, I know that there were lots
```

Confidential - John Kim - Esquire

 1    of things produced about the business before '78.

 2    I would have to go back and look at them.  I can't

 3    think of them sitting right here today but they're

 4    in production.

 5         Q.    J&J had a 10-K filed with the

 6    Securities and Exchange Commission in 1978,

 7    correct?

 8         A.    I assume so.

 9         Q.    And nowhere in the 10-K filed with

10    the SEC in 1978 does J&J describe any talc

11    liabilities, correct?

12         A.    Yeah, I would have to look at the

13    10-K.

14         Q.    Did you look at the 10-K over the

15    last week from 1978?

16         A.    I did but not for that particular

17    purpose.

18         Q.    Did you identify in any 10-Ks in

19    the 1970s, J&J 10-Ks in the 1970s any description

20    of talc liabilities?

21         A.    Again, I was not looking for that.

22         Q.    Have you identified any description

23    of talc liabilities in any J&J document in the

24    1970s?

Confidential - John Kim, Esquire

```
 1          A.    I have not gone through the search

 2   of the production but I do know that there are

 3   lots of documents produced in that era that

 4   describes the business that J&J was in and those

 5   certainly have liabilities attached to them.

 6          Q.    Can you identify for me a document

 7   that describes talc liabilities, a J&J document

 8   that describes talc liabilities in the books or

 9   records before December the 1st, 1978?

10          A.    Sitting here I don't recall any but

11   I haven't looked.

12                MR. JONES:  Joe, we've been at it

13          an hour.  Might be a good time for five

14          minute facilities break.

15                MR. SATTERLEY:  Give me a couple

16          more minutes.  Let me --

17   BY MR. SATTERLEY:

18          Q.    With regard to talc liabilities --

19          A.    Sorry, I would defer to the

20   financial records as well, which I have not seen

21   all the financial records.  So, again, if they're

22   in the financial records, I have not seen them but

23   they may be there.

24          Q.    Okay.  Yesterday we talked to
```

1    Mr. Lisman about financial records.

2                   Have you reviewed his deposition?

3         A.       I have not.

4         Q.       Have you spoken to him?

5         A.       I have not.

6         Q.       We're going to take a break in just

7    a couple minutes because your attorney asked for

8    one but let me just ask you, have you seen any

9    document, signed document or instrument that

10   specifically says JJCI will indemnify J&J for talc

11   liabilities in the 1970s?

12        A.       I think the documents we produced

13   say that.

14        Q.       Well, the document I just showed

15   you, Exhibit 1, doesn't say -- doesn't talk about

16   talc liabilities at all, didn't say talc at all.

17        A.       No, it doesn't.

18        Q.       Respectfully, we disagree, but my

19   question:  Have you seen an actual document signed

20   in the 1970s that discuss talc liabilities?

21        A.       Sitting here I don't recall.

22        Q.       Have you seen any document in the

23   1970s that describe liabilities for personal

24   injuries caused by talc exposure?

Confidential - John Kim, Esquire

```
 1              A.     You know, again, any documents --
 2    there were lots of documents produced in the
 3    underlying litigation and some of them do talk
 4    about liabilities associated with talc so I
 5    would -- again, I have not gone back through the
 6    production to find those documents but I do know
 7    that there were documents from that era that talk
 8    about talc liabilities.
 9              MR. SATTERLEY:  Move to strike
10         portions nonresponsive.
11    BY MR. SATTERLEY:
12              Q.     My question, sir, relates to
13    agreement to indemnify J&J by JJCI where they
14    specifically talk about personal injury
15    liabilities from talc prior to December 1st, 1978?
16              MR. JONES:  Object to form.
17              THE WITNESS:  I don't recall if I
18         saw a document that had those words in
19         them.
20    BY MR. SATTERLEY:
21              Q.     Are you aware of any documents
22    prior to December 1st, 1978 where JJCI agrees to
23    indemnify J&J for mesothelioma lawsuits?
24              A.     That would be included in all
```

1    liabilities.

2                   MR. SATTERLEY:  Move to strike

3          nonresponsive.

4    BY MR. SATTERLEY:

5          Q.    You and I disagree about that

6    document and the court will ultimately decide but

7    my question was very specific.

8                   Is there any document that you're

9    aware of that J&J -- between J&J and JJCI in the

10   1970s that discuss liabilities for mesothelioma?

11                  MR. JONES:  Object as asked and

12         answered.

13                  THE WITNESS:  I don't recall seeing

14         something with that -- those words in them

15         but, again, I have not reviewed all the

16         production documents.

17   BY MR. SATTERLEY:

18         Q.    Is there any document you've seen

19   from the 1970s between J&J and JJCI or any of its

20   predecessors that discuss liabilities relating to

21   ovarian cancer?

22         A.    I have not seen a document with

23   those words in them, no.

24         Q.    And there was no lawsuits ongoing

Confident Call - John Kim, Esquire

```
 1    against Johnson & Johnson in the 1970s for

 2    exposure to talc, true?

 3            A.     I don't believe there were any.

 4            Q.     The first lawsuit relating to

 5    Johnson & Johnson and talc occurred in 1983, the

 6    Gambino case, true?

 7            A.     I believe that's true but I would

 8    defer to the production.

 9                   MR. SATTERLEY:  Your attorney asked

10            for a break.  Let's take a five-minute

11            break, okay.

12                   MR. JONES:  Thanks, Joe.  Thank you

13            all.

14                   (Brief recess taken at 11:07 a.m.)

15                   (Deposition resumes at 11:20 a.m.)

16                   MR. JONES:  Mr. Satterley, I have

17            your e-mail of a moment ago again

18            requesting which Mr. Kim referred earlier

19            today.  In any event, I think we've

20            located it.  I'm going to discern whether

21            we have.  We're going to review the extent

22            to which it was requested and is

23            privileged or not and I will get back to

24            you maybe at the lunch break on that but
```

1           we are in the process so I will update you

2           after the lunch break.

3                MR. SATTERLEY:  Are we ready to

4           continue?  The witness is ready to go.

5                THE WITNESS:  Sure, yes.

6     BY MR. SATTERLEY:

7           Q.     The first mesothelioma case against

8     Johnson & Johnson was the Darlene Coker case in

9     1997, correct?

10          A.     I actually don't know if that's the

11    first.  I do know the case, I don't know where it

12    fits in the timeline.

13          Q.     Are you aware of the name of any

14    other mesothelioma case that existed against

15    Johnson & Johnson prior to the Coker case?

16          A.     Sitting here I don't.  I don't have

17    the chronology.

18          Q.     Are you aware of the name of the

19    first ovarian cancer case alleging talc caused --

20    Johnson & Johnson talc caused ovarian cancer?

21          A.     The first case I recall is Berg but

22    I don't recall whether that was the first or not.

23    That's the first I recall.

24          Q.     The Deane Berg case that was, what

Confidential - John Kim, Esquire

 1    year was that filed?

 2            A.      I don't know the filing year.

 3            Q.      It was in the 2000s, correct?

 4            A.      Yes.

 5            Q.      And did you participate in the Berg

 6    case at all?

 7            A.      I was aware of the case and was

 8    monitoring it as it was being tried.

 9            Q.      And when you say "monitoring" were

10    you actually physically at the courthouse?

11            A.      No.  Someone who reported to me was

12    at the courthouse.

13            Q.      And who was that?

14            A.      Denise Houghton.

15            Q.      You've been at several of my

16    trials.

17                    When did you start monitoring

18    trials by actually physically going to the

19    courthouse?

20            A.      I believe the first trial I

21    attended was the trial after the Fox trial.  I did

22    not attend the Fox trial, which was the first

23    trial in St. Louis, but the next trial, and I

24    can't recall, it may have been Gina Keeney, I just

Confidential - John Paul Esquire

 1    can't recall the name of the second trial that was

 2    tried in Saint Louis, but I did attend that trial.

 3           Q.    Gloria Ristesund?

 4           A.    Could have been Ristesund, yes.

 5    Again, I don't know the -- I attended both -- Gina

 6    Keeney -- actually I attended virtually every

 7    trial in St. Louis.  I can't remember the name of

 8    the first one.  It could have been Ristesund.

 9           Q.    Did you -- after that 2016, that

10    first trial that you attended, did you attend all

11    the various talc trials?

12           A.    I attended a fair number of talc

13    trials.  I don't think it was all of them but it

14    was most of them; if not live, by CVN, Courtroom

15    View Network, or reading transcripts.

16           Q.    And so you have seen that attorneys

17    for these various plaintiffs that allege they have

18    cancer, whether it be mesothelioma or ovarian

19    cancer, you've seen them give opening statements,

20    you've seen them give closing arguments, you've

21    seen the arguments they make, correct?

22           A.    I have.

23           Q.    And you've been there when I have

24    made closing argument, correct?

Confidential - John Kim, Esquire

1        A.      I have.

2        Q.      And you have seen in each of the

3    trials that I separate out Johnson & Johnson from

4    Johnson & Johnson Consumer and explain to the jury

5    in closing arguments they're independent

6    liability, true?

7        A.      Sometimes, sometimes not.

8        Q.      All the time with me.

9        A.      So, again, I would say you may try

10   or think you do but I know -- my understanding, my

11   experience has been that throughout the trial it

12   gets conflated all the time, similar to what

13   happens here.  A blanket statement -- there's a

14   lot of overlap in the trials.

15       Q.      So have you independently attempted

16   to segregate out Johnson & Johnson parent

17   company's conduct versus Johnson & Johnson

18   Consumer conduct?

19            MR. JONES:  Let me object to the

20        extent it calls for privileged advice

21        and/or work product.  He can, I think,

22        testify to what has happened at trials and

23        is public record.

24   BY MR. SATTERLEY:

```
 1           Q.    No, I'm not asking to give any

 2    advice Mr. Jones may have given you.

 3                 I'm asking you independently, have

 4    you sat down and segregated out the conduct of

 5    Johnson & Johnson, the parent company, with

 6    regards to talc and the conduct of Johnson &

 7    Johnson Consumer with regard to talc?

 8                 MR. JONES:  Same objection.  You

 9           can answer if you can, Mr. Kim.

10                 THE WITNESS:  I'm not sure I

11           understand the question about me

12           segregating out conduct between the two.

13           Yeah, I'm not sure I understand what you

14           mean by that.

15    BY MR. SATTERLEY:

16           Q.    So if you don't understand what I

17    mean, is it fair to say you haven't done that, you

18    haven't sat down and said, okay, these actions

19    were done by the parent company and these actions

20    were done by the consumer division or consumer

21    subsidiary and segregate those out?

22                 MR. JONES:  Let me object again to

23           the extent it may call for advice or work

24           product in the defense of the underlying
```

```
 1          litigation.
 2               THE WITNESS:  What I can say is
 3          when I hear evidence I can tell, you know,
 4          either the lawyer says who did what or
 5          doesn't, you know, that's what I've
 6          observed.
 7               You know, I'm not sure, again, the
 8          process of segregating out conduct, I'm
 9          not sure what that process is.
10  BY MR. SATTERLEY:
11          Q.    Well, you will agree that Johnson &
12  Johnson, the parent company, is based in New
13  Brunswick, correct?
14          A.    It is.
15          Q.    And consumer, with regard to baby
16  powder, Skillman?
17          A.    At this time, yes.  Well, it was at
18  times, yes.
19          Q.    And so have you sat down and tried
20  to segregate out memorandums from Skillman to
21  memorandums from New Brunswick with regard to talc
22  liability?
23               MR. JONES:  Same objection.
24               THE WITNESS:  Again, I'm not sure
```

Confidential - John Kim, Esquire

```
 1            what that -- what that means.  I've looked

 2            at the evidence, I've seen the evidence,

 3            you know.  I would defer to the evidence

 4            as to who did what when.

 5   BY MR. SATTERLEY:

 6            Q.    You don't know what that means, to

 7   segregate out the liabilities from J&J, the

 8   parent, versus JJCI?

 9            A.    I think that calls for a legal

10   conclusion as to what actions constitute liability

11   and who would be responsible for that.  So that,

12   you know, I'm not sure -- let me back up for a

13   second.

14            What you're asking -- if you're

15   asking do we have a view as to who's liable for

16   the litigation, you know, I think, you know, we

17   have from time to time done that.  You know,

18   generally it's, you know, if the question is who

19   is responsible for the litigation, that would be

20   JJCI.

21            So I'm not sure, again, the

22   segregating out the liability is sort of a legal

23   process that, you know, takes into account, you

24   know, sort of a legal analysis.
```

Confidential - John Kim, Esquire

```
 1              MR. SATTERLEY:  Move to strike

 2         portions that are nonresponsive.

 3  BY MR. SATTERLEY:

 4         Q.    You're a member of the New Jersey

 5  bar?

 6         A.    I -- in a manner of speaking I'm an

 7  in-house counsel bar member, so there's a special

 8  membership for people who are barred in other

 9  jurisdictions but act as in-house counsel in New

10  Jersey.

11         Q.    I'm sorry, you lost me there.

12              Are you licensed in New Jersey as

13  an attorney?

14         A.    I'm licensed as an in-house counsel

15  in New Jersey.  I have my license, general license

16  to practice law from New York.

17         Q.    And you understand, for example,

18  the law of the State of New Jersey, Johnson &

19  Johnson remains responsible for its actions

20  concerning the manufacture of talc, regardless of

21  the 1978 agreement that I marked as Exhibit 1,

22  true?

23              MR. JONES:  That calls for a legal

24         conclusion and opinion.
```

Confidential - John Kim, Esquire

```
 1    BY MR. SATTERLEY:

 2         Q.    Go ahead, sir.

 3              MR. JONES:  You can answer if you

 4         can.

 5              THE WITNESS:  I'm going to follow

 6         counsel's advice.  I think he is saying

 7         it's privileged.  I'm not going to answer

 8         a privileged --

 9              MR. SATTERLEY:  No, he didn't

10         assert a privilege.  He said it calls for

11         a legal conclusion.  That's a different

12         objection, so you can answer the question.

13              THE WITNESS:  So I think my general

14         understanding would be that even though

15         JJCI assumed all the liability, when it

16         comes to an individual claimant they can

17         still make a claim against Johnson &

18         Johnson.

19    BY MR. SATTERLEY:

20         Q.    And under the law of New Jersey and

21    many other states, J&J remains responsible,

22    despite that agreement, correct?

23              MR. JONES:  Object to form, calls

24         for a legal conclusion and if it calls for
```

1          advice, Mr. Kim, let us know.

2                    THE WITNESS:  Yeah, again, I

3          would -- I don't want to give legal

4          advice.  My understanding would be that,

5          again, you know, even though JJCI assumed

6          all the liability related to talc, that

7          plaintiffs can still sue Johnson & Johnson

8          if their -- if it did things that were --

9          made it liable to the claimant.

10   BY MR. SATTERLEY:

11          Q.    You will agree it's J&J's position

12   that none of the thousands of cases against it

13   have any factual or legal merit, correct?

14          A.    I would agree with that.

15          Q.    And that's because it's J&J's

16   position that talc does not and never has

17   contained asbestos, true?

18          A.    I believe the science supports

19   that, yes.

20          Q.    And it's J&J's position and your

21   position that there's no credible evidence that

22   talc causes disease, true?

23          A.    I would modify that.  So there are

24   certain talc-related diseases that have been

1    reported, talcosis, for example.  There are -- as

2    with any particulate that someone inhales there is

3    a risk of harm there so I would not say that talc

4    doesn't -- can't cause any disease, it just

5    doesn't cause mesothelioma or ovarian cancer, I

6    can say that for sure.

7         Q.    So it's your position and Johnson &

8    Johnson's position that there's no credible

9    evidence that talc causes cancer?

10        A.    Again, I prefer to limit it to

11   mesothelioma and ovarian cancer.  I don't think it

12   causes any cancer but I haven't looked at that

13   issue.  I would say certainly with respect to

14   mesothelioma and ovarian cancer, talc does not

15   cause it.  I do not believe it causes any cancer.

16        Q.    And, obviously, you are not a

17   medical doctor, you have no medical training,

18   true?

19        A.    That is true.

20        Q.    Did you on Sunday, last Sunday,

21   when you read this Exhibit 1, the Agreement For

22   Transfer Of Assets and Bill of Sale, did you ask

23   for anyone to search for additional documents

24   relating to books or records?

Confidential - John Kim, Esquire

```
 1          A.    I think generally you asked --

 2                MR. JONES:  I'm going to object to

 3          the extent it may call for work product or

 4          advice of counsel but I think he has

 5          answered we looked for the document as

 6          part of the document request search.

 7   BY MR. SATTERLEY:

 8          Q.    My question was directed to

 9   Mr. Kim.  Did you direct anyone, sir, to look for

10   books or records after you read Exhibit 1?

11          A.    I don't recall saying specifically

12   books or records.  We are doing document searches,

13   again redoing what we had done previously, for any

14   documents related to this topic.

15          Q.    Did you speak to anyone last Sunday

16   or thereafter employed by Johnson & Johnson

17   wherein you requested a search for books or

18   records?

19          A.    I have been working with employees

20   of Johnson & Johnson on searches generally.  So,

21   again, I don't recall saying books or records but

22   we're looking for any documents related to this

23   topic.

24          Q.    Who have you spoken to at Johnson &
```

Confidential - John Kim, Esquire

```
 1   Johnson to direct searches for records since last

 2   Sunday, when you found Exhibit 1?

 3          A.    I've been working with the legal

 4   team at Johnson & Johnson.  I've discussed this

 5   with our records manager and office manager,

 6   Suzanne Kovacs, who the records people report to.

 7   I've spoken to Susan, as I mentioned, her

 8   colleague, Ellen Butyl -- again, I'm butchering

 9   these last names, I apologize.

10               I've spoken to Laura Jaracino who

11   is the -- manages all the -- she's at the

12   corporate secretary's office and manages the books

13   of the corporate secretary's office.

14          Q.    Anyone else?

15          A.    I spoke to Adam Lisman about

16   financial records.

17          Q.    When did you speak with Adam

18   Lisman?

19          A.    Last week.

20          Q.    Did you ask him to provide you

21   books and records from the 1970s?

22               MR. JONES:  I'm going to object to

23          the question as calling for work product

24          and/or privileged communication.  He has
```

Confident Kam - John Kim, Esquire

```
 1              told you the name of the person he spoke

 2              to and he has told what you the topic was.

 3              I don't think you are entitled to more

 4              than that.

 5                   MR. SATTERLEY:  I disagree.  Are

 6              you directing him not to answer what he

 7              asked Mr. Lisman for?

 8                   MR. JONES:  Mr. Kim, you can tell

 9              him generally the topic of conversation

10              but I caution you not to share anything

11              more privileged or work product.

12                   MR. SATTERLEY:  I don't want to

13              muddy the water here.  I asked a specific

14              question, let me ask it again.

15    BY MR. SATTERLEY:

16              Q.     Did you ask Mr. Lisman for books

17    and records from the 1970s in your conversation

18    with him?

19              A.     I don't believe I used the word

20    books and records, I think I used the word

21    documents.  We were looking for documents related

22    to the talc liability.  And, in fact, now going

23    down that line, I also spoke to a few members of

24    the finance group whose names are escaping me
```

1    right now, also to look for entries about the talc

2    liability and responsibility for the talc

3    liability.

4         Q.    And you don't recall the

5    individuals' names?

6         A.    I have them somewhere but I don't

7    recall their names right now.

8         Q.    Did you ask anyone since last

9    Sunday to provide you books or records from 1978

10   and beforehand?

11              MR. JONES:  Object as asked and

12              answered.

13              THE WITNESS:  So I asked for

14              documents.  I don't recall if I used the

15              words books or records.  We speak in terms

16              of documents.

17   BY MR. SATTERLEY:

18        Q.    And I appreciate the distinction.

19   I'm using the term books or records, you are using

20   the term documents.

21              If I understand you correctly, you

22   never directly asked someone search for books or

23   records as referenced in Exhibit 1?

24        A.    No, I did not reference that

Confidential - John Kim, Esquire

```
 1   Exhibit 1 and tell them books and records, no.  I

 2   asked for -- we were searching for documents.

 3            Q.     Did you ask anyone in finance or

 4   accounting what books or records means?

 5            A.     No.

 6            Q.     Do you know what it means when it

 7   says allocated on books or records?

 8            A.     I have my understanding of that.  I

 9   don't know what, you know -- I have my

10   understanding of it.  I don't know if there's a

11   technical definition of this.

12            Q.     I'm sorry, I didn't mean to cut you

13   off.

14                   Did you ask anyone in accounting or

15   finance what does it mean when it says allocated

16   on the books or records?

17            A.     I don't believe I asked anyone from

18   finance or accounting, no.

19            Q.     You mentioned you spoke with an

20   assistant to the corporate secretary.  Do you know

21   that person's name?

22            A.     Laura Jancino.

23            Q.     And who is the corporate secretary?

24            A.     Oh my God, right now, I'm
```

1    embarrassed, I forgot his name.  He sits right

2    down the hall from me and I've known him for years

3    and it's just -- I apologize.  I could look that

4    up for you though.  I can get that at a break.

5          Q.    So as you sit here today you can't

6    tell me the name of the corporate secretary for

7    Johnson & Johnson, the parent?

8          A.    I'm just blanking right now.  I

9    apologize.  I must be tired.

10         Q.    Who is Tina French?

11         A.    Tina French was an assistant

12   corporate secretary.  Matt Orlando, there, got it.

13   Matt Orlando is the corporate secretary.  Tina

14   French was an assistant corporate secretary at one

15   time.

16         Q.    And did you participate in any of

17   the depositions she gave in talc cases?

18         A.    I may have participated -- I may

19   have spoken to her about it at one point or

20   another but I was not at the deposition and I

21   actually have not read her deposition.

22         Q.    Do you understand she had the

23   authority to speak and bind Johnson & Johnson at

24   these talc depositions, correct?

Confidential - John Kim, Esquire

```
 1          A.     I don't know in what capacity she
 2   was deposed.
 3          Q.     As the assistant secretary of the
 4   corporation she had the authority to speak for the
 5   board when she testified; did she not?
 6          A.     I'm not sure that's within the
 7   scope of her authority, no.
 8          Q.     She had authority to bind the
 9   company when she spoke and testified as a witness
10   in talc litigation, correct?
11               MR. JONES:  That's a legal
12          conclusion.  Object to the legal
13          conclusion.  If you give me a beat,
14          Mr. Kim, it will help.  Thanks.
15               THE WITNESS:  I don't know in what
16          capacity she was -- she gave her
17          deposition.  As any employee, she can only
18          give -- bind the corporation with, you
19          know, with whatever authority she has.
20          I'm not sure what authority she had to
21          bind the corporation with her deposition.
22   BY MR. SATTERLEY:
23          Q.     You know what a 30(b)(6) witness
24   is, correct?
```

1        A.      I do.

2        Q.      And a 30(b)(6) witness is a witness

3    designated by the corporation to speak for the

4    corporation on topics, correct?

5        A.      Yes.

6        Q.      And you know that Ms. French was a

7    30(b)(6) witness for J&J with regards to talc

8    issues, correct?

9        A.      I don't know that.

10       Q.      And you're telling me you've never

11   read any of her depositions?

12       A.      I have not.

13       Q.      You understand that a 30(b)(6)

14   deposition, that there's been several of them that

15   Johnson & Johnson has authorized to speak for

16   them, correct?

17       A.      I do.

18       Q.      And Johnson & Johnson, the parent

19   company, has authorized John Hopkins to serve as a

20   witness to speak for Johnson & Johnson, the parent

21   company, true?

22       A.      I believe that's true for certain

23   depositions.

24       Q.      And in addition to a 30(b)(6)

1    deposition, in certain states there's deposition

2    called the person most qualified for the

3    corporation, correct?

4         A.    I have heard that term, yes.

5         Q.    And John Hopkins has been

6    designated as the person most qualified for

7    Johnson & Johnson, the parent company, on numerous

8    occasions, correct?

9         A.    I believe that's true.

10         Q.    And you understand that Johnson &

11    Johnson and Johnson & Johnson Consumer can

12    designate an individual to be the person most

13    qualified or to be the 30(b)(6) deposition for its

14    independent actions, correct?

15              MR. JONES:  Object to form.

16              THE WITNESS:  I'm not sure what

17         that means, "its independent actions."

18    BY MR. SATTERLEY:

19         Q.    Well, J&J and JJCI are two distinct

20    entities, correct?

21         A.    They are.

22         Q.    Okay.  And under the law when a

23    30(b)(6) deposition notice comes in to J&J, J&J

24    gets to select the witness to speak on those

```
 1   topics, correct?

 2          A.      I think ordinarily, yes.

 3          Q.      And, likewise, when a 30(b)(6)

 4   deposition notice comes in for JJCI, JJCI gets to

 5   select who speaks for them, correct?

 6          A.      I believe that's true, yes.

 7          Q.      And in the trials that you've

 8   attended, you have seen depositions played of

 9   30(b)(6) witnesses for the jury to consider, true?

10          A.      I have.

11          Q.      You have seen judges instruct the

12   jury with regard to those depositions and what

13   those depositions mean, right?

14          A.      I may have.  I just don't recall

15   specifically.

16          Q.      Do you recall judges telling juries

17   that this individual that you're going to see on

18   videotape is speaking for J&J, the parent?

19          A.      I think most of the time they speak

20   for both.

21          Q.      And you understand with regards

22   to -- well, let me explore that.

23                  There's cases that Johnson &

24   Johnson is a defendant where JJCI is not a
```

1    defendant, true?

2         A.    I think that's pretty rare.  There

3    may be but that's generally not the general

4    circumstance.

5         Q.    Well, I tried a case in Kentucky,

6    the Hayes case, Donna Hayes, and there was only

7    one Johnson & Johnson defendant, that was Johnson

8    & Johnson, the parent company.

9              Do you remember that?

10        A.    I do remember that.

11        Q.    And in that situation we tried it

12   all the way to verdict, you guys won that one,

13   it's up in the Kentucky Supreme Court now, but

14   Johnson & Johnson, the parent company, was the

15   only entity in that case, correct?

16        A.    I believe that's true.  I would

17   have to go back to see how that happened because

18   that is an unusual circumstance.  It's rare that

19   only Johnson & Johnson is a defendant.

20        Q.    In that case I deposed Johnson &

21   Johnson's corporate representative, John Hopkins,

22   and he was there to -- he spoke on behalf of

23   Johnson & Johnson regarding talc issues, correct?

24        A.    He spoke, again, I would have to

Confidential - John Kim, Esquire

```
 1   review the deposition to see how much it was

 2   limited just to Johnson & Johnson, but I do know

 3   he was a part of that case, yes.

 4          Q.     Now, these 30(b)(6) depositions,

 5   these person most qualified, those witnesses, they

 6   have the opportunity to review and sign the

 7   deposition, true?

 8          A.     I think it --

 9          Q.     They can make changes to the

10   deposition, right?

11          A.     I think it depends on the

12   stipulations that are entered into.

13          Q.     Like at the beginning of this

14   deposition, I think your attorney said you are

15   going to read and sign the deposition, right?

16          A.     That's what -- people agree to that

17   but sometimes it just doesn't happen.

18          Q.     But you understand the process that

19   after a deposition concludes, the corporate

20   representative can read and make changes and sign

21   off on those changes, correct?

22          A.     I know that's a lot of processes

23   call for that, allow for that.

24          Q.     Let me ask you some other questions
```

1    here.  You don't consider --

2         A.    I'm sorry, Mr. Satterley, you just

3    went on mute.

4         Q.    Sorry about that.  Must have hit a

5    button there.

6               You don't consider yourself to be

7    an expert of law on products liability in all 50

8    states, do you?

9         A.    I'm trying to think whether I've

10   had cases in all 50 states.  I think it's close to

11   all 50 states.

12        Q.    And you know what the law is, for

13   example, in California on a defective product

14   being sold through the chain of distribution?

15        A.    I'm sorry, are you asking me if I'm

16   familiar with that concept?

17        Q.    Sure, sure.

18        A.    I am familiar with the concept.  I

19   have to look at, again, sort of the legal research

20   on that for a definitive answer.

21        Q.    And you will agree that under laws

22   of most states the independent actions of

23   retailers, those retailers are liable for any

24   injuries that occur from any products, true?

Confidential - John Doe, Esquire

```
 1              MR. JONES:  Object to form.

 2              THE WITNESS:  I think it depends on

 3         what independent actions means, you know.

 4         So, for example, if a retailer adulterates

 5         product, then they would be liable for

 6         that adulteration.

 7              A pass-through retailer that just

 8         takes a product and sells it as is

 9         generally would not be liable or at least

10         have indemnification rights on the

11         manufacture for that.

12              So, again, I don't know what

13         independent -- you know, the fact that

14         someone sells a product, if you call that

15         independent, I would say no, that

16         generally does not result in liability.

17    BY MR. SATTERLEY:

18         Q.    Really.  You specialize in products

19    liability and you think that selling a product, a

20    retailer has no liability?

21         A.    I didn't say that.  I said --

22    again, I'm questioning the -- or I'm -- I don't

23    understand when you say independent liability,

24    what independent means in that situation.
```

Confidential - John Kim, Esquire

```
 1          Q.     So you know under strict products

 2   liability that a retailer is independently liable

 3   for a defective product that injures someone, you

 4   know that?

 5               MR. JONES:  Object as asked and

 6          answered.

 7               THE WITNESS:  Again, I'm not sure

 8          what independence means in that situation.

 9   BY MR. SATTERLEY:

10          Q.     So you don't know what independent

11   liability is?

12          A.     Yeah, I think if you could define

13   what you consider independent liability versus

14   dependent liability versus vicarious liability

15   versus, you know, joint and several liability.  I

16   think independent liability is ambiguous.

17          Q.     So do you know what independent

18   liability means?

19          A.     Again, not the way you are using

20   it.

21          Q.     Under state law who bears the risk

22   of insolvency of a product manufacturer?

23               MR. JONES:  Object to form and

24          foundation.
```

Confidential - John Kim, Esquire

```
 1                    THE WITNESS:  I would have to look

 2              state by state I guess on that to see if

 3              there were any distinctions.

 4    BY MR. SATTERLEY:

 5         Q.      If a product manufacturer files for

 6    bankruptcy, the retailer of the defective product

 7    can still be held liable, true?

 8                    MR. JONES:  Object to form and

 9              foundation.

10                    THE WITNESS:  Again, I think it's

11              going to depend on circumstances and I

12              think a blanket statement -- I can't

13              answer true or false to that.

14    BY MR. SATTERLEY:

15         Q.      At the hearing on the 22nd I asked

16    you questions about in the event that a retailer

17    is found to be liable and they had a claim against

18    old JJCI through these indemnification agreements,

19    I asked you whether it's your understanding they

20    would just be an unsecured creditor, just like

21    some of my mesothelioma clients, do you recall

22    that question?

23         A.      I do.

24         Q.      And have you had time to think
```

1    about that?

2            A.      I have not.

3            Q.      Do you know the answer to that?

4            A.      I'm sorry, one more time.

5            Q.      Sure.  A retailer that's found

6    responsible for Johnson's Baby Powder, assume a

7    jury finds a retailer responsible, and that

8    retailer wanted to make a claim for

9    indemnification against the old JJCI, that claim

10   would be an unsecured claim in bankruptcy, true?

11                  MR. JONES:  Object to foundation.

12                  THE WITNESS:  I think you have to

13              look at the situation and the agreements

14              that were entered into between the

15              retailer and the manufacturer to know

16              whether there's security interests or not.

17              I don't think I can answer that question

18              without knowing more details.

19   BY MR. SATTERLEY:

20           Q.      The letters that were written by

21   Shook Hardy & Bacon to these various retailers,

22   who authorized those letters to be written?

23           A.      I think it depends on the time

24   frame.  Generally, I have reviewed I think most of

1    that, most of those but, again, I think it

2    would -- it would depend on the time frame as to

3    who made the determination for each one, who

4    basically gave the authorization.

5              I mean, they're all generally

6    authorized by me but, you know, again, there are

7    people who report to me that may have had

8    day-to-day dealings on those agreements.

9         Q.    Do any of those letters written by

10   Shook Hardy & Bacon to these retailers, do they

11   contain any security that would make the retailer

12   anything other than a unsecured creditor?

13        A.    I'm not sure that the letters would

14   do that.  Yeah, I just don't know what the

15   underlying agreements were with these.

16        Q.    Is there any other agreements that

17   you're aware of between the old JJCI and any

18   retailers that provide any security that would

19   make the retailer anything other than an unsecured

20   creditor?

21        A.    I don't know that.  I think we have

22   produced whatever we can find in the short period

23   of time that we had and I don't know whether there

24   are other agreements out there.  I would defer to

```
 1    the actual agreements.

 2         Q.      And I've looked at the actual

 3    agreements and you said you, I think, authorized

 4    those letters to go out, right?

 5         A.      The letters, I've authorized

 6    generally that we would be idemnifying retailers.

 7         Q.      And you've seen those letters,

 8    you've read them, right?

 9         A.      I reviewed I think most of them,

10    yes.

11         Q.      And nowhere in those letters from

12    Shook Hardy & Bacon to the retailers does it

13    provide any extra security that would make a

14    retailer anything other than a unsecured creditor,

15    correct?

16         A.      Again, I would have to -- I would

17    defer to the letters.  I don't recall.

18         Q.      Okay.  Let's do this then, let's

19    look at one of the letters.  This is Shook Hardy

20    Bacon, it going to be Exhibit Number 2, put a

21    little 2 at the top here.  This is a letter dated

22    September 16, 2021.

23               (Document marked for identification

24         as Kim Deposition Exhibit No. 2.)
```

1    BY MR. SATTERLEY:

2         Q.    This is September 16th, 2021,

3    right?

4         A.    That's what it says there.

5         Q.    And by this point in time you and

6    and other individuals were actively working on the

7    creation of LTL, right?

8         A.    I think we're -- at that stage we

9    were looking at many options and doing due

10   diligence on whether it was a possible option that

11   we could do.

12        Q.    Because you said at the hearing on

13   the 22nd that you've been working on the Texas

14   Two-Step bankruptcy for about six months, right?

15             MR. JONES:  Object to the

16             characterization of his testimony.  I do

17             not think he used those words.

18             THE WITNESS:  What I would say is

19             we were doing -- reviewing options,

20             including a divisional merger for about

21             six months, looking at whether it was

22             feasible and whether it's something that

23             we would do.  So, you know, no decisions

24             have been made at that time and we were

1          just reviewing the process and

2          feasibility.

3    BY MR. SATTERLEY:

4          Q.     I thought I heard your testimony

5    that you had been reviewing options for about two

6    years but you were actively working on it for the

7    last six months; is that not accurate?

8          A.     No, I think what I was trying to

9    say was that from time to time for two years this

10   issue of divisional mergers came up, but we

11   started actively reviewing that option

12   specifically as to feasibility and, you know, and

13   appropriateness starting about six months ago, we

14   started focusing on that.

15         Q.     So for six months prior to the

16   October 12 filing; is that fair?

17         A.     That's fair.

18         Q.     So that puts us back in what,

19   March, April?

20         A.     Maybe April.

21         Q.     And what do you -- and I'm going to

22   come back to this letter in a minute, but what do

23   you recall the first steps that you did in

24   reviewing the options back in April?

1          A.      I think we had a presentation by

2    counsel explaining how it would work.

3          Q.      And which counsel was that?

4          A.      That was Jones Day.

5          Q.      At that point in time was Jones Day

6    already hired or was that a presentation to think

7    about hiring Jones Day?

8                  MR. JONES:  Object to form and

9          foundation.

10                 THE WITNESS:  Yeah, I would have to

11         go back, I believe it was a presentation

12         to think about hiring Jones Day.

13   BY MR. SATTERLEY:

14         Q.      And eventually did Johnson &

15   Johnson hire Jones Day?

16         A.      Eventually it did, yes.

17         Q.      And when did that occur?

18         A.      I'd have to go back and see.

19         Q.      Was it immediately in April or did

20   it take a little bit of time in May or June or

21   July?

22         A.      I would say it was fluid.  We don't

23   generally use retention agreements so I'd have to

24   go back to, frankly, billing records.

Confidential - John Kim, Esquire

1          Q.     So what's your best estimate of

2    when Jones Day was actually retained to pursue

3    this divisional merger?

4          A.     I think the first step would be

5    Jones Day would be retained to do -- so when we

6    first met with Jones Day they had very little

7    information about --

8                 MR. JONES:  Mr. Kim, let me make

9          sure you don't divulge privileged

10         information.  The question is as to

11         timing.

12                THE WITNESS:  Yeah, I don't recall

13         the time.  The timing I'd have to -- you

14         know, I don't recall when we first

15         retained Jones Day.

16   BY MR. SATTERLEY:

17         Q.     You will agree the presentation was

18   before the retention because they were presenting

19   information to you and then the retention came

20   later, correct?

21                MR. JONES:  Object to foundation.

22         You may answer.

23                THE WITNESS:  I would say it's very

24         fluid as to whether that was an actual

```
 1             retention or not.  I don't think we -- I

 2             would have to think about that and look at

 3             the records.

 4                  Sitting here, I actually don't

 5             recall what was actually presented or done

 6             early on.

 7   BY MR. SATTERLEY:

 8        Q.    Who made the decision to hire Jones

 9   Day after the presentation?

10        A.    Some time at some point it was a

11   consensus reached among myself, Andrew White and

12   Eric Haas, my boss.

13        Q.    Other than Andrew White, Eric Haas

14   and you, was anyone else involved in the decision

15   to hire Jones Day?

16        A.    I don't believe so.

17        Q.    And you say Andrew White is your

18   boss?

19        A.    No, Eric Haas is my boss.

20        Q.    And who is Andrew White?

21        A.    Andrew reported to me.

22        Q.    Okay.  We may come back to that in

23   a little bit.  Let's go back to this letter here.

24                  This is a -- in September of this
```

1    year and it's addressed to Gary Crossen and this

2    is a form letter with regards to idemnification

3    and defense, right?

4            A.    I'm not sure it's a form letter.

5    It's a letter.

6            Q.    And you approved of this type of

7    letter to go to these retailers?

8            A.    Generally, yes.

9            Q.    And in this -- in all of these

10   letters it gives Johnson & Johnson the ability to

11   select a law firm that is going to represent these

12   retailers, correct?

13           A.    I believe that's true for virtually

14   all of them, yes.

15           Q.    And the law firm that is selected

16   by Johnson & Johnson is Barnes & Thornburg, true?

17           A.    I believe that's true for -- yeah,

18   it's true here.  I'm not sure if it's true for

19   everyone.  I would have to go check.

20           Q.    I didn't print out all the letters

21   but my reading of the letters were Barnes &

22   Thornburg was listed as the -- here's another one,

23   make this Exhibit 3, this is October of 2020.

24           A.    I believe they're all virtually --

Confidential - John Kim, Esquire

```
 1   I don't know if there's a exception is all.

 2                (Document marked for identification

 3        as Kim Deposition Exhibit No. 3.)

 4   BY MR. SATTERLEY:

 5        Q.    If we go to page 3 of this letter

 6   this relates to CVS, this is Barnes & Thornburg,

 7   right?

 8        A.    Yes.

 9        Q.    Okay.  And Barnes & Thornburg is

10   also the law firm for Johnson & Johnson, correct?

11        A.    I'm not sure what you're asking.

12   In these cases or -- not in these cases where

13   there's an indemnity retailer involved.

14        Q.    Well, Barnes & Thornburg has

15   represented Johnson & Johnson in talc litigation

16   for several years, correct?

17        A.    I don't know that that's true

18   actually.  I don't think they represent us in the

19   actual litigation.

20        Q.    Well, I tried a case to verdict

21   against Barnes & Thornburg, the Schmitz versus

22   Johnson & Johnson case.

23                Do you recall that case?

24        A.    You know, sorry, I don't recall
```

1    that.  Where was that case?

2          Q.    Alameda County.  I think you were

3    present as part of that trial.

4          A.    Oh, Schmitz.

5          Q.    Alex Calfo was there and several

6    lawyers from Barnes & Thornburg representing

7    Johnson & Johnson.

8          A.    Yeah, I don't recall the Barnes &

9    Thornburg folks there.  I know Alex Calfo would

10   have been there for Johnson & Johnson.

11         Q.    And Barnes & Thornburg is the

12   counsel for Johnson & Johnson for national

13   negotiations for talc settlements, true?

14         A.    A lawyer at Barnes and -- well,

15   let's go back for a second.  Alex Calfo is not at

16   Barnes & Thornburg, let's just make that clear.

17   Alex Calfo is a King and Spalding attorney.

18               The Barnes & Thornburg, a lawyer

19   there has helped us in negotiations on talc cases,

20   yes.

21         Q.    And so Barnes & Thornburg is

22   representing that retailers and also representing

23   Johnson & Johnson at the same time, true?

24         A.    They're representing us in

```
 1   negotiations and --

 2          Q.     And you --

 3                 MR. JONES:  Mr. Satterley, please

 4          let him finish.  You may finish, Mr. Kim,

 5          you said "and".

 6                 THE WITNESS:  Barnes & Thornburg is

 7          representing Johnson & Johnson in certain

 8          negotiations.

 9   BY MR. SATTERLEY:

10          Q.     And you have approved the law firm

11   of Barnes & Thornburg to use the threat of the

12   Texas Two-Step divisional merger in settlement

13   negotiations, true?

14          A.     I would disagree with that.

15          Q.     You know that the law firm of

16   Barnes & Thornburg has used the threat of

17   divisional merger in settlement negotiations,

18   true?

19          A.     I don't know.

20                 MR. JONES:  I'm going to object to

21          the form of the question.  Mr. Kim, I'm

22          going to caution you about not revealing

23          any advice or work product.

24                 THE WITNESS:  Any communications
```

Confidential - John Kim, Esquire

```
 1            with Barnes & Thornburg would be
 2            privileged.
 3   BY MR. SATTERLEY:
 4            Q.    So these letters, these recent
 5   letters, they're post-litigation, right?  Lawsuits
 6   are already ongoing?
 7            A.    They're post-filing, yes.
 8            Q.    Yes.  And so these letters offering
 9   indemnification allows J&J to have full control
10   over the handling of the case, right?
11            A.    I would defer to the letter.
12            Q.    Well, it says "full control" right
13   there.
14            A.    I see that.
15            Q.    So you agree that this gives
16   Johnson & Johnson full control over the case,
17   right?
18            A.    I would defer to whatever -- we
19   have full control to the extent that that
20   paragraph gives us whatever control there is in
21   that paragraph.
22            Q.    And these letters that you approve
23   also indicate that Johnson & Johnson can tender
24   back to the retailer the defense at any time it
```

1    wants, correct?

2         A.    I don't believe that -- so like

3    paragraph six there are conditions that are

4    attached to this.  So while it says full control,

5    for example, in paragraph six, it can't do -- like

6    if you read the last sentence, you know, that J&J

7    may settle this matter -- I'm sorry, you are

8    moving it.

9         Q.    Sorry, go ahead.

10        A.    With conditions.  So full control

11   doesn't mean you can do anything you want, you

12   know, there are conditions and the same was true

13   with the tender back.  If you can point to that,

14   if I recall these letters, there are conditions

15   where we can tender it back but it's not -- we

16   can't just tender it back because we feel like it

17   so maybe if you can go to that section, we can

18   look at that.

19        Q.    I'm looking for -- there we go,

20   right there, paragraph two, they can tender back

21   to the retailer, right?  Reserve the right to

22   retender the defense back to the retailer, right?

23        A.    Upon certain conditions being

24   present.

Confidential - John Kim Esquire

```
 1            Q.     Is it your view that these letters

 2   from this law firm Shook, Hardy & Bacon, they

 3   extinguish the rights of individual plaintiffs

 4   against retailers?

 5                   MR. JONES:  Object to the legal

 6            conclusion and a opinion requested.  You

 7            have a view, Mr. Kim?

 8                   THE WITNESS:  My view would be that

 9            they don't extinguish rights that

10            plaintiffs may have against the

11            claimant -- sorry -- plaintiffs may have

12            against the retailer.

13   BY MR. SATTERLEY:

14            Q.     They do not, correct?

15            A.     I don't believe they do.

16            Q.     Okay.  By the way, now that we've

17   looked at Exhibit 2, is there anywhere in this

18   letter that you've approved that gives extra

19   security for retailers that make them anything

20   more than an unsecured creditor in bankruptcy?

21            A.     Again, I don't believe there's

22   anything in the letter that does that.  To make a

23   legal conclusion you would have to look at other

24   documents, for example, if there was any other
```

Confident Larry - John Kim - Esquire

```
 1    agreement that led to the idemnification in the

 2    first place.

 3         Q.    And you are not, as you sit here

 4    today, aware of any other contracts, agreement

 5    that give extra security to these third party

 6    retailers or distributors, true?

 7         A.    Yeah, I don't recall sitting here

 8    right now.

 9              MR. SATTERLEY:  I'm going to have

10         about 15 or 20 more minutes and I know you

11         guys probably want to take a lunch --

12              MR. JONES:  I believe calories

13         would be prudent, yes.

14              MR. SATTERLEY:  Do you mind if we

15         go for 20 more minutes and take a lunch

16         break at 12:30, something like that?

17              MR. JONES:  Let's ask Mr. Kim.  Are

18         you up for 15 more minutes before eating?

19              THE WITNESS:  That's fine.

20              MR. JONES:  So let's proceed and

21         we'll shoot for 12:30, Joe.  Please

22         proceed.

23              MR. SATTERLEY:  Okay.  Adam, is

24         that okay with you?
```

Confidential - John Kim - Esquire

```
 1              MR. SILVERSTEIN:  I was going to

 2         say that time works well because it will

 3         give me an opportunity to get the exhibits

 4         numbered correctly so, yeah, that works.

 5              MR. JONES:  Is that okay with you

 6    Madame Court Reporter?

 7              THE COURT REPORTER:  Yes, of

 8    course.

 9              MR. SATTERLEY:  Are we ready to

10         keep going?

11              MR. JONES:  Yes.

12    BY MR. SATTERLEY:

13         Q.    Has LTL hired any additional

14    employees since its creation on October the 12th?

15         A.    No, not hired yet, no.

16         Q.    Did the devisive merger plan that

17    was discussed in April moving forward, did J&J

18    give that a project name?

19              MR. JONES:  Object to form.  You

20         may answer.

21              THE WITNESS:  At some point as we

22         were doing -- looking into these

23         divisional merger issues and other

24         options, there was a project name that was
```

```
 1              given to the process.

 2     BY MR. SATTERLEY:

 3              Q.      And what was the project name?

 4              A.      It was called Project Plato.

 5              Q.      Can you spell that?

 6              A.      P-L-A-T-O, like in the philosopher.

 7              Q.      Who devised that name?

 8              A.      I do not know.

 9              Q.      And when was Project Plato first

10     created?

11              A.      Actually, I would have to refer to

12     documents when that name first came up.  I don't

13     recall when that was first done.

14              Q.      And was the Project Plato kept

15     secret within a number of people?

16                      MR. JONES:  Object to form.

17                      THE WITNESS:  I believe it was a

18              nonpublic deal so that we did keep it

19              confidential among a number of people.

20     BY MR. SATTERLEY:

21              Q.      Who were the people that knew of

22     the Project Plato by name?

23              A.      Well, it's going to be hard for me

24     to figure out the number -- the names, and it also
```

1   changed over time.

2         Q.      Prior to October the 12, when

3   public filing occurred, who were the people within

4   J&J that knew of Project Plato?

5         A.      I don't recall.  There are -- there

6   must have been at least 30 or 40 people.  I'm not

7   sure whether there were any documents that list

8   them all out, but there was a group of people that

9   were involved in the due diligence process, which

10  the list was extensive.

11        Q.      So tell me the names of the folks

12  you know that knew of Project Plato, prior to it

13  becoming public?

14        A.      It would have been members of the

15  corporate business development teams that were

16  handling this, so Chris Andrew was heading that.

17  We had a project manager, Tom McCann, who was

18  helping Chris out on that.  We had people from

19  finance.

20              It would be easier to give you sort

21  of the categories.  I actually don't know the

22  names of the people off the top of my head but we

23  had people from finance, from risk management,

24  from tax.  We had a bunch of people looking

1    through contracts.  So it was an extensive team

2    that was looking to see, you know, basically doing

3    the diligence process where they were seeing

4    whether there were any, for example, impediments

5    in contracts that would prevent us from doing

6    this.

7              Did I mention tax was involved?

8        Q.    All these 30 to 40 people, were

9    they all Johnson & Johnson, the parent company,

10   employees?

11       A.    I don't know that that's true.  I

12   would have to see what companies they actually

13   worked for so there are shared services, people

14   who -- that may work for Johnson & Johnson

15   Services, Inc. and are deployed in different

16   departments, you know, there are -- I have to see

17   each individual to see who actually hired that

18   person.  There probably were people also from JJCI

19   at some point and, again, I would have to go see

20   who was on that project.

21       Q.    Was this Project Plato, individuals

22   that were involved in this, were they segregated

23   off in a separate work area for Project Plato?

24       A.    No.

1        Q.      These individuals that were

2    employed by Johnson & Johnson, the parent company,

3    that worked on Project Plato, they did so in their

4    normal office or their home because of COVID?

5        A.      I believe, yeah, there was no

6    requirement as to where they needed to do their

7    work.

8        Q.      No segregated area to keep people

9    working in different locations than normal Johnson

10   & Johnson business, correct?

11       A.      I don't believe so but I think, as

12   you mentioned, I think most of them were working

13   from home.

14       Q.      When did -- did Johnson & Johnson

15   reopen at some point post-COVID?

16       A.      It did, there are ways that they

17   have.  So, again, I don't -- the time frames

18   are -- I don't have right now.  I think the last

19   wave was about a month ago and that -- the

20   expectation was that people would work at the

21   office three days a week.

22               Prior to that the expectation was

23   take people would work two days a week, but the

24   expectations, I think in practice, a lot of --

1    many people did not do as expected.

2          Q.      Now, this Exhibit 1, this 1979

3    agreement that was located after the hearing on

4    the 22nd, located last Sunday, you, obviously, had

5    never seen that before the corporate restructuring

6    of 2021, correct?

7          A.      Yeah, I don't think I had seen

8    that, no.

9          Q.      During the time when the Plato

10   project was ongoing, you never saw this 1979

11   agreement, correct?

12         A.      We did not see the agreement but we

13   did have the corporate minutes and we did have an

14   understanding as to how accounts were being kept,

15   so the document itself just reinforced everything

16   that we knew had happened so ...

17         Q.      You cannot testify as what the

18   parties intended in the 1979 agreement, correct?

19               MR. JONES:  Object to form.

20               THE WITNESS:  I can read the

21         document.

22               MR. SATTERLEY:  So can I but my

23         question is different.  I didn't ask you

24         if you can read the document.

Confidential - John Kim, Esquire

```
 1   BY MR. SATTERLEY:

 2         Q.    My question is you can't testify as

 3   to what the parties intended in the language in

 4   the 1970 -- I guess 1978 agreement I should say?

 5               MR. JONES:  Object to form and

 6         asked and answered.

 7               THE WITNESS:  What I can say is

 8         that --

 9   BY MR. SATTERLEY:

10         Q.    Was that a yes or no?  I didn't

11   hear.

12               MR. JONES:  Mr. Satterley, he does

13         not have to answer your questions yes or

14         no, please quit suggesting that.

15               You can answer the question as you

16         see fit, Mr. Kim, over my objection, which

17         was asked and answered and to form.

18               MR. SATTERLEY:  Well, I

19         respectfully disagree, Mr. Jones, the

20         judge will determine if it's responsive or

21         nonresponsive at some point in future.

22   BY MR. SATTERLEY:

23         Q.    But do you understand my question,

24   Mr. Kim?
```

Confidential - John Kim - Esquire

```
 1            A.      I understand the question.  I think
 2    it's ambiguous about, you know, what was intended.
 3    I didn't have an understanding as to what was
 4    intended from not only that document, from the
 5    course of dealing -- and, you know, my experience
 6    about how these liabilities were treated
 7    throughout the history of Johnson & Johnson.
 8            Q.      You did not speak to anyone
 9    involved in negotiation or drafting of that 1978
10    agreement, correct?
11            A.      I'm sorry, one more time.
12            Q.      You did not speak to anyone
13    involved in the negotiations or drafting of the
14    1978 agreement, true?
15            A.      That is true.
16            Q.      Are there similar agreements that
17    speak of liabilities allocated on the books or
18    records of J&J?
19            A.      Yes, there are -- if you look at
20    the resolution, there were six divisions that were
21    operating as -- not as subsidiaries.  At that time
22    those six divisions, including Johnson & Johnson,
23    you know, the division that we're dealing with,
24    were incorporated and liabilities were given to
```

Confidential - John Kim, Esquire

1    them.

2              The rationale behind that was that

3    Johnson & Johnson at that time, through the '70s,

4    was trying to really become a holding company and

5    have the operations being done like separate

6    subsidiaries.

7              In that transaction all liabilities

8    were being put to the subsidiaries so that Johnson

9    & Johnson would have none and be a holding

10   company.

11             So if you look at the other five

12   divisions that are listed, I believe you will see

13   similar agreements with them.

14             MR. SATTERLEY:  Move to strike

15        portions that were nonresponsive.

16   BY MR. SATTERLEY:

17        Q.    You will agree there were no talc

18   records reflected on the books and records of J&J

19   in 1978, true?

20             MR. JONES:  Asked and answered.

21             THE WITNESS:  What was the question

22        again?

23   BY MR. SATTERLEY:

24        Q.    There were no talc lawsuits

1    reflected on the books and records of J&J 1978?

2                   MR. JONES:  Object to form and

3              asked and answered.

4                   THE WITNESS:  Yeah, I would go back

5              to what I said, I haven't seen any but,

6              again, there are documents about

7              liabilities.

8    BY MR. SATTERLEY:

9         Q.    Do you plan on returning to Johnson

10   & Johnson, the parent company, when the bankruptcy

11   is over?

12        A.    It's speculative.  I have no plans

13   to.

14        Q.    You know what Windsor Minerals is?

15        A.    I do.

16        Q.    Windsor Minerals was never a part

17   of Johnson & Johnson Consumer, true?

18                   MR. JONES:  Object to foundation.

19                   THE WITNESS:  You know what, I

20             would have to look at that.  I don't think

21             I've looked at that issue.

22   BY MR. SATTERLEY:

23        Q.    As you sit here today you have no

24   evidence that Windsor Minerals was a part of

1    Johnson & Johnson Consumer?

2              MR. JONES:  Same objection.

3              THE WITNESS:  I don't recall.

4         Windsor Minerals was its own subsidiary,

5         not J&J.  So I actually have not looked

6         into what happened with Windsor Minerals.

7    BY MR. SATTERLEY:

8         Q.    Actually, Windsor Minerals was

9    created by Johnson & Johnson, Roger Miller, who

10   was the president of Windsor Minerals, was an

11   employee of Johnson & Johnson, correct?

12        A.    Again, I would have to go see who

13   he actually was employed by.  I would have to see

14   who he was actually employed by.  If he was the

15   president of Windsor Minerals I would assume that

16   he was employed by Windsor Minerals.

17        Q.    Have you looked at the creation of

18   Windsor Minerals, the letter creating it and how

19   it was created?

20        A.    I have seen it.  I just don't

21   sitting here -- I have not seen it in a while.

22        Q.    In 1989, when Johnson & Johnson

23   sold Windsor Minerals to Cypress, it was sold by

24   Johnson & Johnson, not the consumer section, true?

```
 1                    MR. JONES:  Object to foundation.

 2                    THE WITNESS:  Again, I would have

 3           to look at it, I defer to the documents as

 4           to what it says.

 5  BY MR. SATTERLEY:

 6           Q.     You've seen the contract between

 7  Johnson & Johnson and Cypress in 1989, correct?

 8           A.     I have.

 9           Q.     And you saw the actual contract

10  discusses indemnification, do you recall that?

11           A.     If you can show me the document, it

12  would help.  I do recall there is idemnification

13  language in the agreement.

14           Q.     And I don't have the document

15  printed out.  I might show it to you next week

16  when we're together.  But you've seen it in the

17  past many times, correct?

18           A.     I have seen it, yes.

19           Q.     Do you recall that in that

20  particular agreement between Johnson & Johnson and

21  Windsor they actually listed out the number of

22  claims that existed, talc-related claims that

23  existed in 1989?

24           A.     I don't know -- I don't recall
```

Confident of John Kull, Esquire

```
 1   that.  Again, if I saw the specific language, it

 2   would help me answer that.

 3          Q.      Why don't we do this, why don't we

 4   take a lunch break and I'll look over my notes.  I

 5   might have just a little bit of follow-up after

 6   the lunch break and then Mr. Silverstein will take

 7   over.  You guys want to do 45 minutes or an hour,

 8   what do you want to do?

 9                  MR. JONES:  I don't know, what's

10          convenient for people?  John, would you

11          prefer 45 minutes or an hour?

12                  THE WITNESS:  I would prefer try to

13          get this over with as soon as we can so 45

14          minutes minimal.

15                  MR. SATTERLEY:  Fifteen minutes

16          then.

17                  THE WITNESS:  Unfortunately, I'm in

18          the office.  Everything is closed.  I have

19          to find someplace to get lunch now.  Let's

20          say 45 minutes.

21                  (Luncheon recess taken at 12:31

22          p.m.)

23                  (Deposition resumes at 1:15 p.m.)

24   BY MR. SATTERLEY:
```

Confidential - John Kim - Esquire

1          Q.     We're back on the record.  Mr. Kim,

2    did you have a good lunch?

3          A.     Yes, thank you.

4          Q.     Are you ready to proceed?

5          A.     Yes.

6          Q.     All right.  I'll probably have 15,

7    20 more minutes, I just have some follow-up here.

8               MR. SATTERLEY:  Before I do,

9          Mr. Jones, what's the status of the

10         decision memo that we talked about

11         earlier?

12              MR. JONES:  I don't know if that's

13         what we called it, but we located the memo

14         that I think you were examining Mr. Kim

15         regarding.  It has been marked privileged.

16         We will review it and inform you whether

17         we'll withhold, produce or produce with

18         redactions either later today or by

19         10:00 a.m. tomorrow.  If we end up

20         producing it -- if we don't produce it and

21         withhold it, we'll give you a letter log

22         information for it.

23              If we end up producing it or

24         producing it with redactions, we will make

```
1              Mr. Kim available before the hearing for

2              another hour of deposition on the memo,

3              but we can't make that determination until

4              I look at it with the client, and I

5              haven't looked at it with Mr. Kim, and

6              make the determination but it is not long.

7              I will tell you you could get this from a

8              privilege log, it's about six pages with

9              an attachment, so any additional

10             examination shouldn't be long either, but

11             we'll make that determination and either

12             produce or not by 10:00 a.m. tomorrow.

13                  MR. SATTERLEY:  Appreciate that.  I

14             reserve the right to ask additional

15             questions so let's proceed.

16                  MR. JONES:  One more piece of

17             business I would like now, just before I

18             forget, to designate the transcript today

19             provisionally confidential, I'm not sure

20             if we need any of that, but we'll either

21             continue with that designation or let you

22             know that by 10:00 a.m. in the morning

23             too, but not having heard all that will be

24             said, I don't want that to be forgotten at
```

```
 1              the end of the day.

 2                   MR. SATTERLEY:  Well, I would

 3              object.  I haven't used any confidential

 4              documents in the deposition,

 5              Mr. Silverstein may, but I think we should

 6              meet and confer on that at the end of the

 7              deposition.

 8                   MR. JONES:  We can certainly meet

 9              and confer but I am provisionally marking

10              it and designating it confidential, Madame

11              Court Reporter, and we'll see how it goes.

12    BY MR. SATTERLEY:

13         Q.   Mr. Kim, the name Plato that you

14    talked about was given to this project, divisional

15    merger project, was that name -- when was that

16    name -- when was it created?

17         A.   Again, I don't recall when it was

18    created or who created it.  I'm not sure when that

19    name popped up.

20         Q.   Was that before the April

21    presentation by the Jones Day lawyers?

22         A.   Oh, no.

23         Q.   Was it -- then it was after the

24    retention of Jones Day later on?
```

1        A.      I believe, yeah, at some point as

2   we were working on this and we were investigating

3   the transaction, a project name showed up, as far

4   as I was concerned.

5        Q.      And the project name Plato then,

6   during that time frame when it was confidential

7   and not disclosed to the public, there are

8   documents that have the name Plato on them,

9   correct?

10       A.      I believe there are.

11       Q.      And do you know who from Johnson &

12  Johnson has the Plato and Project Plato documents?

13       A.      Again, there's a large team doing

14  diligence on this project, they would all have

15  some documents I assume about the project.  There

16  was a project manager, Tom McCann, who was on the

17  project, he probably has most of the documents.

18       Q.      And who is Tom McCann?

19       A.      He's a project manager.

20       Q.      And is he employed by Johnson &

21  Johnson, the parent company?

22       A.      I would have to check.  It's either

23  Johnson & Johnson or Johnson & Johnson Services,

24  Inc., I'm not sure which one.

Confidential - John Kim - Esquire

```
 1              MR. SATTERLEY:  Mr. Jones, I don't

 2         believe the Project Plato documents have

 3         been produced.  Can you produce those as

 4         well?

 5              MR. JONES:  I have no idea what

 6         those are nor do I know if they were

 7         requested at this moment, so I will take

 8         it under advisement.

 9              MR. SATTERLEY:  I'm requesting them

10         now and let's meet and confer on that as

11         well and reserve rights to ask questions

12         about those once those are produced.

13              MR. JONES:  Joe, just let me put on

14         the record this is an enormously expedited

15         proceeding so realize we can meet and

16         confer but we can only do what's practical

17         so let's move on.

18              MR. SATTERLEY:  Meet and confer is

19         my specialty, I do it all the time.

20    BY MR. SATTERLEY:

21         Q.    So did the devisive merger plan go

22    by any other project name other than the Project

23    Plato?

24              MR. JONES:  Object to form.
```

Confidential - John Kim, Esquire

```
 1                    THE WITNESS:  I would say the
 2           Project Plato, while focused on the
 3           divisional merger, I think would encompass
 4           any options that we would be considering
 5           and there was no other name that was given
 6           to reviewing our options.
 7   BY MR. SATTERLEY:
 8           Q.     In the decision, the ultimate
 9   decision, I think it's six pages with some
10   attachment that your counsel mentioned, does that
11   memorandum discuss the harms that a bankruptcy
12   would have on the mesothelioma victims and the
13   ovarian cancer victims?
14                    MR. JONES:  Object to the form of
15           the question and ask the witness not to
16           answer to extent he has a recollection and
17           it would reveal the advice of counsel.
18                    THE WITNESS:  Let me just start by
19           saying since Mr. Jones and I have not
20           discussed anything since this deposition
21           started, I actually don't know whether the
22           document he has, is the document I'm
23           thinking of, so let me just start with
24           that.
```

```
1                And so the document that I am

2        talking about only has -- just lists who

3        needed to sign off on the various parts of

4        the divisional merger.

5                So, for example, I do know that

6        Janssen's board has to sign off on

7        creating a entity below it and the memo

8        just lists, you know, that process and who

9        would that be.  So that's what I'm

10       thinking about.  So, again, I don't know

11       whether what Mr. Jones has is the same

12       thing that I'm talking about but that's

13       what I'm thinking about.

14               MR. JONES:  For the record and as

15       swiftly as we can do it to help out here,

16       we tried to locate what I think is the

17       document.  I may be mistaken but we will

18       apprise you as soon as we know.

19               MR. SATTERLEY:  If there are two

20       documents, we would request both of them.

21               MR. JONES:  I understand.

22               MR. SATTERLEY:  Let me dig into

23       this for a few minutes.

24  BY MR. SATTERLEY:
```

1        Q.      So the document you're thinking

2    about that talks about Janssen having to also give

3    the go ahead, do you recall approximately how big

4    of a document that was?

5        A.      I don't recall.  I didn't think it

6    was that long, actually.

7        Q.      Okay.  And in that document it does

8    say that Janssen has to actively say, okay, yes,

9    we're going to do this divisional merger thing?

10       A.      Again, to create an entity

11   underneath Janssen, right, you have to have

12   Janssen's board approval for that, that's what

13   this memo lays out, who needs to approve what

14   parts of the transaction.

15       Q.      Was Janssen at some point made the

16   parent of the old JJCI?

17       A.      Janssen was made the parent of the

18   new JJCI.

19       Q.      And when did that occur?

20       A.      During the divisional merger

21   process.  Again, if I can refer to my declaration

22   and that chart, I can just confirm that.

23       Q.      Okay.  You need to -- you want to

24   tell me what page number you're looking at?

```
 1          A.      Yeah, it's -- the addendum -- annex

 2   one, defendant's corporate structure chart.

 3          Q.      Okay.

 4          A.      You see Janssen Pharmaceuticals

 5   Inc. above Johnson & Johnson Consumer, Inc. over

 6   LTL Management.

 7                  So, you know, Johnson & Johnson

 8   Consumer, of course, that's the new JJCI and so in

 9   order to have a subsidiary under Janssen

10   Pharmaceuticals, Inc., Janssen Pharmaceutical,

11   Inc. would have to approve that.

12          Q.      All right.  So let me just screen

13   share so that you and I are on the same page with

14   this chart.  This is organizational structure of

15   LTL Management LLC, this is attached to your first

16   day pleading, correct?

17          A.      Correct.

18          Q.      And so what you're telling me is

19   this is the new structure after the divisional

20   merger, correct?

21          A.      Correct.

22          Q.      All right.  And so it goes from

23   Johnson & Johnson to Janssen --

24          A.      There may be others.  The hatch
```

Confidential - John Kim - Esquire

```
 1    mark means there may be other intermediate

 2    companies also so.

 3           Q.     Then there is the new JJCI here?

 4           A.     Yes.

 5           Q.     And then under the new JJCI you

 6    have LTL Management?

 7           A.     Correct.

 8           Q.     And then under the new JJCI there's

 9    still other indirect subsidiaries and direct

10    subsidiaries?

11           A.     Under new JJCI they have the same

12    subsidiaries that old JJCI had, so during the

13    divisional merger other structures below old JJCI

14    were not disturbed.

15           Q.     Prior to the divisional merger

16    Janssen wasn't in direct line between Johnson &

17    Johnson and Johnson & Johnson Consumer, correct?

18           A.     I believe it was.

19           Q.     It was?

20           A.     Yes, I believe it was.

21           Q.     And how long has that been the

22    case?

23           A.     I actually have to look at the

24    records but I think it's around the same time that
```

1    there was the creation of Johnson & Johnson

2    Consumer, Inc. with the merger of McNeil PPC,

3    Neutrogena and others.  So I think that's -- I

4    want to say '81 or so but it could have been

5    later.

6            Q.    So this structure here, Johnson &

7    Johnson to Janssen to JJCI, it's your belief that

8    this has been a structure since 1981?

9            A.    I have to go back and look to see

10    when that structure happened.  I'm sorry, I don't

11    think it was '81 now.  I would have to see when

12    the McNeil PPC merger happened.  It may be 2015.

13            Q.    So it's your testimony whenever the

14    McNeil merger happened, that's when Janssen became

15    in between Johnson & Johnson and Johnson & Johnson

16    Consumer?

17            A.    I'd have to -- again, I'm going by

18    memory.  I would have to refer to the record.  We

19    have records on this so, you know, it's easily

20    ascertainable, I just don't have it in front of

21    me.

22            Q.    So back to my question I was asking

23    earlier, this memo that you said that has

24    Janssen's name on it to give authority to make the

1   decision to do the divisional merger, anywhere in

2   that memo is there any discussion of the harm this

3   may cause to the mesothelioma creditors?

4          A.     The document doesn't talk about any

5   underlying considerations, it just lists out who

6   has to authorize what.

7          Q.     Is there any document wherein the

8   decision to do this divisional merger, wherein the

9   harm to the mesothelioma creditors are discussed?

10                MR. JONES:  Object to the form and

11           foundation for the question, presumes

12           facts not in evidence.

13                THE WITNESS:  I don't know

14           specifically there was a title harms to

15           the mesothelioma plaintiffs in any

16           document.

17                I do know that, for example, in the

18           LTL board minutes on its decision to file

19           bankruptcy considerations are listed,

20           including, you know, the litigation

21           background sections.

22                So, again, I don't know that the

23           word harms to mesothelioma claimants is

24           anywhere but, you know, the litigation and

```
 1            effects of the litigation were discussed

 2            and are reflected in the board minutes.

 3    BY MR. SATTERLEY:

 4            Q.    Do you believe in the constitution?

 5            A.    Do I believe in the constitution?

 6    I'm not sure what you're asking.

 7            Q.    Well, you know in the constitution

 8    there's a right of trial by jury, right?

 9            A.    I do know that right, yes.

10            Q.    Does Johnson & Johnson trust the

11    jury system?

12            A.    I'm not going to make statements

13    about Johnson & Johnson, whether it trusts the

14    jury system.

15            Q.    Do you trust the jury system?

16            A.    I'm not sure that my personal

17    opinion matters in this context.  I abide by the

18    jury system and we do our best to follow it.  It

19    is the law of the land and we try to follow that.

20            Q.    And so Johnson & Johnson does

21    follow the law of the land when a jury makes a

22    decision and the appeals are exhausted, Johnson &

23    Johnson abides by the jury's decision, right?

24            A.    It has, yes.
```

1          Q.     And this year you guys wire

2    transferred $2.5 billion because 20 women -- it

3    was determined that 20 women had cancer as a

4    result of the product, right?

5                    MR. JONES:  Object to form.

6                    THE WITNESS:  I am actually not

7          sure of the exact amount but we did make a

8          payment on the Ingram verdict, which I

9          think you are referencing.

10   BY MR. SATTERLEY:

11         Q.     So did you participate in the

12   valuation of future claims for all 30 some odd

13   thousand cancer victims that have made claims

14   against Johnson & Johnson and Johnson & Johnson

15   Consumer?

16                   MR. JONES:  Object to form and

17         foundation.

18                   THE WITNESS:  I'm not sure what you

19         mean by evaluation of future claims.

20   BY MR. SATTERLEY:

21         Q.     Well, there's been statements made

22   publicly that there will be $2 billion funded for

23   LTL, right?

24                   MR. JONES:  Object to form.

Confidential - John Kim, Esquire

```
 1                   THE WITNESS:  So I think the

 2           statements are that there is a pre-funding

 3           agreement where $2 billion will be put

 4           into a trust to pre-fund resolution of

 5           this, of these issues, to the extent that

 6           2 billion is needed.

 7   BY MR. SATTERLEY:

 8           Q.    So my question was did you

 9   participate in the evaluation of the claims with

10   regards to how much money is necessary to

11   adequately fund the trust?

12                   MR. JONES:  Object to form and

13           foundation, presumes facts not in

14           evidence.

15                   THE WITNESS:  So there has been no

16           determination thus far as to how much

17           is -- is -- would be adequate to fund a

18           trust for these, for the claimants, but it

19           is the understanding that 2 billion would

20           be more than enough to do so.

21                   MR. SATTERLEY:  Move to strike

22           portions that are nonresponsive.

23   BY MR. SATTERLEY:

24           Q.    Sir, my question, did you
```

Confidential - John Kim, Esquire

1    participate in creating that number, that

2    2 billion-dollar number?

3         A.    I was part of the discussions on

4    how much a fund such as this should be, yes.

5         Q.    And who else participated in the

6    discussion of the 2 billion-dollar trust fund?

7         A.    I had discussions with my boss and

8    Andrew White, who reported to me, and I was aware

9    of discussions with others in finance and -- I'm

10   trying to think because I think there was a QSF

11   trustee that was involved in discussions.

12        Q.    Okay.  You've told me your boss,

13   Eric Haas, you talked to him.

14              Who else was it, by name, who was

15   involved in coming up with this 2 billion-dollar

16   number?

17        A.    Andrew White, who reports to me,

18   and is the day-to-day person in charge of the talc

19   litigation.

20        Q.    Anybody else by name involved in

21   coming up with this 2 billion-dollar number?

22        A.    I'm thinking there were people in

23   finance but I'm not sure who was involved in that

24   discussion.  Those are the people that I had

1    discussions with.

2         Q.    So there's somebody in finance but

3    you can't identify by name anybody?

4         A.    So I wasn't in that -- I was aware

5    of conversations in finance, so I don't know who

6    that might have been.

7         Q.    Are there documents that set forth

8    the calculation on how this $2 billion was arrived

9    at?

10        A.    I don't know.

11        Q.    Did you do any type of calculations

12   yourself to come up to the $2 billion?

13        A.    I did not myself do calculations.

14             MR. JONES:  Let me object to

15             foundation.

16   BY MR. SATTERLEY:

17        Q.    Were you provided -- I'm sorry,

18   were you finished?

19        A.    I am.

20             MR. JONES:  I'm sorry, go ahead,

21             John.  He's finished and I'm finished, I

22             think.

23   BY MR. SATTERLEY:

24        Q.    Were you provided any calculations

1   of how this $2 billion was arrived at?

2         A.      I think there were discussions

3   about the 2 billion-dollar -- I don't recall

4   anyone doing like a spreadsheet or anything on

5   that.  I know that others looked at the number of

6   cases that were out there and looked at various

7   different figures and it was -- the consensus was

8   that 2 billion was more than sufficient.

9         Q.      I didn't ask you about the

10  consensus.  I was asking you about calculation.

11              Did somebody provide you any

12  calculations how this 2 billion-dollar was

13  arrived?

14        A.      So numbers were discussed.  I'm not

15  sure what you mean by provided me calculations,

16  numbers were discussed.  Numbers were discussed is

17  all I can say.

18        Q.      So you say you discussed with Eric

19  Haas and Andrew White and you can't think of

20  anybody in finance by name.

21              Anybody else you talked about this

22  2 billion-dollar number with?

23        A.      I may have talked to the board of

24  LTL.  I believe there was a discussion in a board

1    meeting talking about the funding, the funding

2    mechanism, the amount.

3         Q.    The board being the Johnson &

4    Johnson parent board?

5         A.    No, LTL, LTL board of managers.

6         Q.    Did you talk with the Johnson &

7    Johnson parent board about funding?

8         A.    No.

9         Q.    Have you ever spoken to the

10   board -- the Johnson & Johnson parent board about

11   LTL?

12        A.    No.

13        Q.    Has the Board of Directors of

14   Johnson & Johnson ever approved the

15   2 billion-dollar funding?

16        A.    I don't believe it has.

17              MR. JONES:  Object to foundation.

18        John, object to foundation.

19              THE WITNESS:  I don't believe so.

20   BY MR. SATTERLEY:

21        Q.    Does Janssen, do they have a

22   separate Board of Directors from Johnson &

23   Johnson, the parent?

24        A.    I believe Janssen does.

Confidential - John Kim, Esquire

```
 1              Q.      So Janssen is a wholly-owned

 2      subsidiary of J&J, the parent?

 3              A.      Yes.

 4              Q.      And JJCI has no Board of Directors,

 5      true?

 6              A.      I don't think that's true.

 7              Q.      Does JJCI have a Board of

 8      Directors?

 9              A.      I believe it does.

10              Q.      Who is the chairman of the board of

11      JJCI?

12              A.      I would have to see currently.

13              Q.      So the 2 billion-dollar amount, was

14      that decided upon by you, Eric and Andrew?

15                      MR. JONES:  Objection to

16              foundation.

17                      THE WITNESS:  Those are the

18              conversations I had but my understanding

19              is that there were other conversations

20              had.

21      BY MR. SATTERLEY:

22              Q.      So who ultimately decided upon the

23      number to fund this trust at $2 billion?

24                      MR. JONES:  Object to foundation.
```

Confidential - John Kim, Esquire

```
 1                    THE WITNESS:  That might be the

 2           decision memo.  I would have to defer to

 3           that, at what level it had to be approved.

 4  BY MR. SATTERLEY:

 5           Q.     So can you tell me by name who

 6  decided and approved the $2 billion should be the

 7  amount to put in a trust fund?

 8           A.     Sitting here I don't know who

 9  actually made the ultimate determination and I

10  would have to check.

11           Q.     Was that decision presented to the

12  Johnson & Johnson Board of Directors?

13           A.     I do not believe it was.

14           Q.     Was that decision presented to the

15  Janssen Board of Directors?

16           A.     I would have to -- again, I'd have

17  to defer to the process and what the process

18  document says, who needs to approve that.

19           Q.     Have you reviewed any board of

20  director minute meetings wherein the discussions

21  of talc liabilities and the amount it was going to

22  cost for those liabilities were discussed?

23                    MR. JONES:  Object to form.

24                    THE WITNESS:  I think, you know,
```

Confidential - John Kim, Esquire

1          again, I think we discussed it at the LTL

2          board.

3    BY MR. SATTERLEY:

4          Q.    I'm not talking about LTL.  I'm

5    talking about Janssen or J&J, the parent.

6               Have you reviewed any board minutes

7    where they discussed these liabilities?

8          A.    I may have reviewed them.  Sitting

9    here today I don't recall specifically but they --

10   there may be board minutes in the closing binders.

11         Q.    So early in the deposition this

12   morning I asked about closing documents and you

13   reference closing documents, I think your counsel

14   said the closing documents were produced in

15   discovery.

16               Do you recall that discussion on

17   closing documents?

18         A.    I recall my talking about it, yes.

19         Q.    Okay.  So I want to ask who were

20   the counsel involved in the closing documents?

21         A.    That would be Jones Day.

22         Q.    Any law firms other than Jones Day

23   in the closing documents?

24               MR. JONES:  Object to foundation.

```
 1                    THE WITNESS:  I'm not sure.  I

 2            can't recall any others.  There could have

 3            been tax counsel, there could have been

 4            people on the trust.  I would have to go

 5            through to see if there were any other

 6            lawyers involved, but Jones Day put

 7            them -- put all the documents together.

 8   BY MR. SATTERLEY:

 9            Q.    And what were the names of the

10   attorneys at Jones Day involved in the closing

11   documents?

12                    MR. JONES:  Object to foundation.

13                    THE WITNESS:  Actually, I don't

14            know who organized that.  I reviewed them,

15            I can look in my e-mail to see who sent

16            them to me, but I don't recall right now.

17   BY MR. SATTERLEY:

18            Q.    Do you have your computer up and

19   e-mails up?

20            A.    I do.

21            Q.    Have you been receiving e-mails

22   during the deposition?

23            A.    I have not.

24            Q.    Have you been receiving any text
```

Confidential - John Kim - Esquire

```
 1   messages or anything during the deposition?

 2          A.     No, thank God.

 3          Q.     You want to take a look at your

 4   e-mail and tell me who the attorneys were that

 5   were involved in the closing documents?

 6                 MR. JONES:  Joe, these haven't been

 7          requested, we're not going to go e-mail by

 8          e-mail.  If he has a recollection, he can

 9          tell you.  He happens to be at his office,

10          at your convenience, so he didn't have to

11          travel.  We could have been in a

12          conference room anywhere in America.  If

13          he can tell you, he can tell you.

14                 MR. SATTERLEY:  Thank you, I

15          appreciate that.

16   BY MR. SATTERLEY:

17          Q.     Mr. Kim, can you look at your

18   e-mail and tell me who the attorneys were that

19   were involved in the closing documents?

20                 THE WITNESS:  Can I ask my counsel

21          whether I should do this?

22                 MR. JONES:  John, if you have a

23          recollection, you can share it.  We're not

24          going through your folders live.
```

Confidential - John King, Esquire

```
 1                    THE WITNESS:  I don't recall who

 2            put them together.  I can tell you the

 3            name of the attorney who was helping us

 4            through the process was Troy Lewis.

 5   BY MR. SATTERLEY:

 6            Q.    At Jones Day?

 7            A.    At Jones Day, yeah.

 8                    MR. JONES:  Troy Lewis is a partner

 9            in the Dallas office of Jones Day.

10   BY MR. SATTERLEY:

11            Q.    Anybody else that you know of,

12   attorneys, that were involved in the closing

13   documents?

14            A.    I got them sent to me.  I'm not

15   sure who actually put them together.

16            Q.    Who were the attorneys involved in

17   the Texas divisional merger?

18                    MR. JONES:  Object to form and the

19            foundation.

20                    THE WITNESS:  It certainly would

21            have been Troy was involved in that.  Dan

22            Prieto was our counsel on that.

23   BY MR. SATTERLEY:

24            Q.    When you are saying our counsel,
```

1    you are talking our counsel for LTL?

2           A.     Well, it depends on -- so prior, of

3    course, they took care of the transactions before

4    the formation of LTL.

5           Q.     And were the same counsel

6    representing old JJCI?

7           A.     In that transaction, yes.

8           Q.     And were the same counsel

9    representing the new JJCI?

10               MR. JONES:  Objection, foundation.

11               THE WITNESS:  So after the

12          divisional merger and bankruptcy, of

13          course, the new JJCI and Johnson & Johnson

14          were represented by White & Case.

15   BY MR. SATTERLEY:

16          Q.     I'm sorry?

17          A.     After the divisional merger and the

18   bankruptcy filing, Johnson & Johnson and old JJ --

19   new JJCI were represented by White & Case.

20          Q.     And which attorney at White & Case?

21          A.     Jessica Lauria.

22          Q.     Just so I understand, during the

23   transactional of the Texas division merger, both

24   LTL and old JJCI and was represented jointly by

1    Jones Day, this Mr. Lewis and others?

2           A.    Again, before the divisional merger

3    there was no LTL, it was all old JJCI and Johnson

4    & Johnson, and after the divisional merger LTL was

5    represented by Jones Day.  New JJCI and J&J were

6    represented by White & Case.

7           Q.    And Michelle Goodrich, who is that?

8           A.    Michelle Goodrich is the president

9    of JJCI.  New JJCI, old JJCI.

10          Q.    Okay.  Old JJCI and new JJCI?

11          A.    Well, when it was old JJCI.  She

12   retained the position before and after the

13   transactions.

14          Q.    And she was the individual who

15   signed off on the board of directors meeting?

16          A.    I assume so.  I would have to,

17   again, defer to the document.

18                MR. JONES:  Object to foundation

19          and form.

20   BY MR. SATTERLEY:

21          Q.    Does she continue in her same job

22   that she had before?

23          A.    For new JJCI, yes.

24          Q.    To your knowledge has any employee

1    been fired that were old JJCI when it converted

2    over and created new JJCI?

3         A.    Not as a result of the transaction,

4    I have no idea.

5         Q.    And that was my point.

6         A.    Who has been fired or not but I

7    don't believe any as a result of the transaction.

8         Q.    As a result of the transaction

9    everybody's job remains the same, nothing changed

10   in terms of laying off people or getting rid of

11   employees or anything like that, right?

12              MR. JONES:  Object to form.

13              THE WITNESS:  I don't believe so.

14        I don't know though.

15   BY MR. SATTERLEY:

16        Q.    The only individuals that changed

17   job titles to your knowledge would be you,

18   Mr. Dickerson and Mr. Robert Wuesthoff?

19        A.    As a result of the transaction, I

20   believe that's true.

21        Q.    What does LTL stand for?

22        A.    I believe -- I didn't come up with

23   the name but I think I've been told that genesis

24   was Legacy Talc Litigation.

Confidential - John Kim - Esquire

 1          Q.      And who advised that you genesis

 2    was Legacy Talc Litigation?

 3          A.      I think it was discussed in calls

 4    we've had.

 5          Q.      And so who do you recall telling

 6    you that LTL stands for Legacy Talc Litigation?

 7          A.      May have been Chris Andrew.

 8          Q.      And who is that?

 9          A.      He's the business development

10    attorney that oversaw the transaction.

11          Q.      And he is an employee of Johnson &

12    Johnson?

13                  MR. JONES:  Object to foundation.

14                  THE WITNESS:  I think he is.  He

15          could be with Johnson & Johnson Services,

16          Inc., but it's one of those.

17    BY MR. SATTERLEY:

18          Q.      Do you have a copy of the joint

19    defense agreement you signed?

20          A.      I may, I don't know actually.  I

21    don't have it handy.

22                  MR. SATTERLEY:  I request a copy of

23          the joint defense agreement and with that

24          I'll reserve and turn the questioning over

Confidential - John Kim - Esquire

1           to Mr. Silverstein.

2                Mr. Kim, I appreciate your time

3           today.  I may or may not have follow-up

4           later today but I'm going to stop asking

5           questions at the current time.

6                THE WITNESS:  Okay.

7                MR. SATTERLEY:  Thank you, sir.

8                MR. JONES:  Thank you, Joe.

9                MR. SATTERLEY:  And, Mr. Jones, if

10          you could let me know about that memo and

11          also the joint defense agreement.

12               MR. JONES:  The joint defense

13          agreement has been withheld as privileged,

14          we shared that in the last meet and confer

15          call and in my letter about privilege

16          logging, and so that's already been

17          withheld and the folks generally know that

18          but the other issues we talked about I

19          will get back to you as I said I would.

20               MR. SATTERLEY:  Thank you.

21     BY MR. SILVERSTEIN:

22          Q.    Good afternoon, Mr. Kim.  I'm Adam

23     Silverstein, we saw each other briefly in the

24     courtroom last week.  I represent the MDL

Confidential - John King, Esquire

 1   Plaintiff Steering Committee.

 2              Are you okay to proceed or do you

 3   need any time?

 4        A.    No, happy to go forward.

 5        Q.    All right.  I'm going to follow-up

 6   on a small number of areas that Mr. Satterley

 7   addressed with you and then cover some new

 8   terrain.

 9              First, when you left the courtroom

10   last week on October 22nd was there anything in

11   your mind that you wish the attorneys had asked

12   you about and had been given the opportunity to

13   testify to in the courtroom last week that you did

14   not get the chance to say?

15        A.    I don't think I had a thought about

16   that.

17        Q.    Have you subsequently had any

18   thoughts, independent of any conversations with

19   counsel, about matters as to which you wish you

20   had been given the opportunity to testify but did

21   not get that opportunity?

22        A.    I'm sure if I thought about it, I

23   would but I don't think I thought -- I know I have

24   not thought about that.

1          Q.     Okay.

2          A.     In that way.

3          Q.     Were you satisfied with the

4     testimony that you gave last Friday?

5          A.     I -- I'm not sure how to answer

6     that.  I thought that it was very one-sided and at

7     points misleading but that's my general

8     impression.

9          Q.     I know you have testified you have

10    never given a deposition before.

11               Have you ever testified in any

12    format previously?

13         A.     Yes.

14         Q.     And when was that?

15         A.     I've testified twice both in Motrin

16    product liability matters in California and I

17    don't recall the dates of those.  It was probably

18    ten years ago.

19         Q.     Was that a multi-district

20    litigation or was that an individual claim?

21         A.     They were individual lawsuits.

22         Q.     Do you remember which court you

23    were in when you testified?

24         A.     One was the Superior Court in Los

1   Angeles and one was the Superior Court in -- it's

2   the beach area west of Los Angeles.  They no

3   longer have a courthouse there.  It's escaping me.

4   It's one of the beach courts right outside of LA.

5          Q.     Do you remember the names of any of

6   the litigants in the two cases or two proceedings

7   in which you testified?

8          A.     One was the Johnson case, Serena

9   Breyerton Johnson and the other was -- the name is

10  escaping me right now.  It's the one in Los

11  Angeles is -- I can't recall.

12         Q.     If it comes back to you during the

13  course of the deposition, please let me know.  I

14  want to switch subjects and go back to the 1978

15  board minutes for a few questions.

16                When was the first time that you

17  saw the 1978 board minutes?

18                MR. JONES:  Maybe you can show the

19                witness, Adam, so we're all on the same

20                page.  I believe Mr. Kim knows what you

21                are referring to but I would like to be

22                sure.

23                MR. SILVERSTEIN:  Yes, I can and if

24                you bear with me a moment, I wasn't

Confidential - John Kim - Esquire

 1          planning on showing it to Mr. Kim, but I

 2          did show it to Mr. Lisman yesterday and I

 3          can pull that folder up in a moment.

 4                    THE WITNESS:  Trejo.

 5  BY MR. SILVERSTEIN:

 6          Q.    I'm going to share to the chat

 7  room.

 8          A.    Trejo was the name of the case in

 9  Los Angeles, T-R-E-J-O.  My mind just keeps

10  working until it comes up, that's all.

11          Q.    Did that just come to you or did

12  you look at anything to refresh yourself?

13          A.    It just came to me as you were

14  talking.

15          Q.    That happens to me as well.  Okay,

16  I'm going to share to the chat room and also share

17  to the screen what was marked or what will be

18  marked as Exhibit 13 yesterday.  I'm sharing it to

19  the chat and now I'm going to share it to the

20  screen.  So the exhibit numbering system is a

21  little bit thrown off but we'll proceed as best we

22  can.

23                    So, Mr. Kim, can you see on your

24  screen what I'm now showing you?

Confidential - John Kim - Esquire

```
1            A.    Yes.

2            Q.    Minutes of A Regular Meeting of

3   Board of Directors of Johnson & Johnson, do you

4   see that where you are?

5            A.    Yes.

6            Q.    Okay.  So this is a document that

7   is multiple pages, begins with Bates number

8   LTL000021.  And when I was referring to the 1978

9   board minutes, this is the document I was

10  referring to.

11               Would you like me to scroll down to

12  refresh yourself on this?

13           A.    If you could keep going down.

14           Q.    Sure.  Slowly scrolling down so

15  Mr. Kim can satisfy himself that he has seen this

16  before.

17               MR. JONES:  Mr. Kim, while Adam is

18           scrolling, you can also download or upload

19           the PDF to your desktop if you like and

20           you can scroll yourself independently of

21           Adam.

22  BY MR. SILVERSTEIN:

23           Q.    I'm actually not going to ask you

24  anything about the contents of this.
```

Confidential - John Kim, Esquire

```
 1          A.      I was waiting to get to the part

 2   with the baby products company.

 3          Q.      And let me get to that.

 4          A.      I think you just passed it.

 5          Q.      Did I pass it?  I apologize.

 6          A.      Yeah, these are the minutes, I

 7   know.

 8          Q.      The question for you, Mr. Kim, was

 9   when was the first time, to the best of your

10   recollection, that you saw these?

11          A.      I believe I saw these a few years

12   ago, I want to say 2018 but I can't be sure when

13   they were actually found and produced to the

14   plaintiffs in the underlying litigation.

15          Q.      Do you recall which litigation or

16   litigations these board minutes were produced in?

17          A.      I don't recall which ones

18   specifically but they would have been produced to

19   all of them.  It was at a time when I think

20   plaintiffs were asking about the corporate history

21   of the product.

22          Q.      Did there come a time after you

23   initially saw the board minutes when you asked to

24   see any of the agreements referenced in the board
```

 1    minutes?

 2          A.    I don't believe I asked to see any

 3    of the agreements.  We were in the process of

 4    looking for all documents that related to this and

 5    so there was, generally, a request internally to

 6    try to find the documents that related to that

 7    board meeting.

 8          Q.    What was the purpose for the search

 9    of all documents related to the board minutes?

10          A.    I think it was just in discovery

11    responses primarily and also an inquiry internally

12    about trying to nail down the history of the

13    product.

14          Q.    Did there come a point in time when

15    in connection with the devisive merger efforts

16    were made to look for documents related to the

17    board minutes?

18          A.    Yes.

19          Q.    And when was that, to the best of

20    your recollection?

21          A.    I want to say it started -- I want

22    to say late September I think we were looking for

23    those.

24          Q.    Of 2021?

1          A.     2021, yes.  Recently.

2          Q.     Okay.  And who was tasked with

3    looking for the documents?

4          A.     The request went to Chris Andrew,

5    who I mentioned was the lead on the business

6    development side and -- but we all were involved.

7    When I say "we", I was involved, Andrew White was

8    involved.  We generally, with that type of

9    inquiry, would go directly to Laura Giacino, who I

10   mentioned, who would be the person responsible for

11   the corporate records, for example, minute books

12   and things like that.  The document that you

13   showed me comes out of a J&J minute book.  And so

14   at that point we searched again for the document.

15             I believe we also contacted outside

16   counsel that had done prior searches to see what

17   they had done.

18          Q.     Outside counsel in connection with

19   the talc litigations?

20          A.     The underlying litigation so

21   originally when we looked for these documents

22   years ago, Shook Hardy took the lead on that and

23   so we contacted them again last month as to the

24   search for the agreements.

1          Q.    To the best of your recollection,

2    what were all of the various individuals and firms

3    that you identified asked to look for?

4                    MR. JONES:  Mr. Kim, if you made

5            the request and you know, you can share.

6            I'm just objecting to foundation.  If you

7            don't know what they were asked to look

8            for, then you need to say that.

9                    THE WITNESS:  So I know that people

10           were asked to look for the documents that

11           are referenced in the minute book with

12           respect to the baby products company.

13    BY MR. SILVERSTEIN:

14           Q.    Where did you look?

15           A.    I asked people to look.

16           Q.    Oh, okay.  And who did you ask to

17    look?

18                    MR. JONES:  Object as asked and

19           answered this morning.

20                    THE WITNESS:  You're talking about

21           recently or back then, I guess, in 2018?

22    BY MR. SILVERSTEIN:

23           Q.    I'm asking in 2021, September.

24           A.    Again, the request --

1          Q.     I'm sorry, Mr. Kim, just so we're

2     clear, who did you personally ask, as opposed to

3     the entire list that you gave?

4          A.     Well, again, I think it was done in

5     communications in either group settings or

6     meetings or, you know, where the inquiry was made

7     among several people to -- that we should look for

8     this document.

9          Q.     I'm going to share to the chat and

10    share on the screen what I marked as Exhibit 5,

11    it's LTL's Management responses to interrogatories

12    so bear with me one moment.

13               (Document marked for identification

14          as Kim Deposition Exhibit No. 5.)

15               MR. JONES:  Adam, could you tell us

16          whose interrogatories?

17               MR. SILVERSTEIN:  Yes, the

18          responses to Plaintiff's Steering

19          Committee Interrogatories, and I'm going

20          to share them with you in the chat room

21          right now and on the screen right now.

22    BY MR. SATTERLEY:

23          Q.     So, Mr. Kim, I've put up on the

24    screen and I'm going to scroll down, just so that

Confidential - John Kim - Esquire

```
1    you can satisfy yourself you've seen this before,

2    it's a document entitled Debtor's Answers and

3    Objections to Plaintiffs Steering Committee First

4    Set of Interrogatories.  I'm going to scroll down

5    slowly, just so you can determine if you've seen

6    this before, and then, of course, I'll stop and

7    you can read whatever you like, but for now I want

8    to familiarize you with the document.

9                    Mr. Kim, I have just scrolled down

10   slowly through the document.

11                   Have you seen this Exhibit 5

12   before?

13        A.      Yes, I have.

14        Q.      Did you understand these are

15   verified responses to written questions that were

16   posed by my client, the MDL Plaintiff Steering

17   Committee?

18        A.      I do.

19        Q.      And the responses are on behalf of

20   the debtor LTL Management?

21        A.      Correct.

22        Q.      And you authorized your electronic

23   signature to verify these responses?

24        A.      I did.
```

1          Q.      And by that you understood that you

2     were acknowledging that to the best of your

3     knowledge and information, the answers in these

4     responses were truthful and accurate?

5          A.      Yes.

6          Q.      I want to bring your attention to

7     question one, which was to identify the date on

8     which and location by reference to office server,

9     hard drive, microfilm, et cetera, from which the

10    agreement for Transfer of Assets and Bill of Sale

11    bearing Bates numbers LTL0000557 to 64 was

12    discovered.

13              Do you recall that question?

14         A.      Yes.

15         Q.      And the response is set out below

16    that the document which you and your attorneys

17    defined as the 1979 transfer document was located

18    on Sunday, October 24, 2021, correct?

19         A.      Correct.

20         Q.      And what was the basis for your

21    verification that that was accurate?

22         A.      On Sunday, October 24, 2021 I

23    received a communication that this document was

24    found with a copy of it, and then I discussed the

1   circumstances behind how we found it, where we

2   found it and who found it.

3        Q.    Okay.  And you were informed or --

4   withdrawn.

5             You came to understand that the

6   document was located by Ms. Schreiger-Ward,

7   correct?

8        A.    Correct.

9        Q.    And it was found in the Memotech

10  database?

11       A.    Correct.

12       Q.    And I do apologize if you described

13  in any detail what the Memotech database is but

14  could you, just for my benefit, tell me what the

15  Memotech database is?

16       A.    Sure, sure.  So the Memotech

17  database is one of our older databases where we,

18  years ago, were trying to take the old paper files

19  that we were keeping, our business records, and

20  putting them into a searchable database and then

21  we could get rid of the paper.

22             So the Memotech database is a --

23  what we consider of sort of the document

24  repository of record for our business records that

Confidential - John Kim - Esquire

1   has -- the documents are indexed and you can do

2   searches on the index then a visual

3   representation, scanned copy of the document shows

4   up and can be printed.

5            Do you want me to talk about the

6   iManage database as well?

7        Q.    I am going to ask you about the

8   next sentence which says an additional copy of the

9   1979 transfer agreement was located on Monday,

10  October 25 in the iManage storage system.

11           What was your basis for verifying

12  that to be accurate?

13       A.    I was in the office on Monday and

14  was talking to Susan, among others, and she

15  indicated how she found another copy in the

16  iManage database that day and showed us the

17  document.

18       Q.    What is the iManage database?

19       A.    So the iManage database is a newer

20  document system for our business records and

21  the -- unlike the Memotech database, the iManage

22  database really consists of PDF files and so for

23  newer documents it's more readily searchable now.

24  That wouldn't apply to, for example, this 1979

1   document, that's always going to be -- that's a

2   picture file, not a searchable PDF, but the

3   Memotech database is outdated now and so a project

4   was started a few years ago to shift all the

5   documents from Memotech or to -- the business

6   records from Memotech to iManage so that iManage

7   could takeover.  And so the duplicate was found --

8   another copy of that document was found in the

9   newer system.

10          Q.     And who has access to the Memotech

11  system?

12                 MR. JONES:  Mr. Kim, let me object

13          to foundation.  Give me a beat.

14  BY MR. SILVERSTEIN:

15          Q.     Let me rephrase it.  Do you know

16  who has access to the Memotech database?

17          A.     I knew people who were trained on

18  it, I think, I'm not sure whether there's access

19  or not access granted.  I know of two people who

20  are trained on it.  There may be more because

21  Memotech started out as a patent database and so I

22  assume there are numerous people in the patent

23  department that are trained on using Memotech but,

24  you know, for us Susan and Ellen Butalite(ph.) are

1   the two people that I know that are trained on the

2   Memotech database.

3          Q.     To the best of your knowledge, who

4   has access to the iManage system?

5          A.     IManage is a little more

6   complicated because there are iManage systems that

7   span the law department.  So, for example, there's

8   an iManage system that the litigation group uses.

9                 This particular iManage system with

10  the business records are -- people in the file

11  room at J&J have access to that, I don't know who

12  besides Ellen and Susan, but I think it would

13  be -- there are probably more people familiar with

14  the iManage system than the Memotech system.

15         Q.     Okay.  So moving on to the second

16  interrogatory, the question was posed to the

17  debtor, I'm going to paraphrase and Mr. Jones can

18  object if he thinks I have done it inaccurately,

19  but the question was posed as to what locations

20  were searched for the 1979 transfer agreement

21  and/or any other documents evidencing the

22  transaction prior to when the 1979 transfer

23  agreement was located last weekend, is that how

24  you understood the question to be posed?

1          A.     I mean, the interrogatory says what

2     it says.

3          Q.     When you verified the answer did

4     you understand that the answer was intended to

5     identify all locations for which the 1979 transfer

6     agreement, as the debtor defined it, was searched

7     prior to the bankruptcy filing?

8          A.     Yes, although in my mind related to

9     the -- I testified earlier to an earlier search

10    and I thought you were asking what did you search

11    for before.

12         Q.     And when you say "before," what's

13    the time period that you're thinking of?

14         A.     That would be the time frame that I

15    discussed, like the 2018 time frame, when this

16    came up, the last time that I discussed earlier.

17         Q.     So the answer to interrogatory

18    number two, as you understood it, was referring to

19    where the agreement was searched for in 2018?

20         A.     That's the focus I thought of this.

21         Q.     Okay.

22         A.     What did you say, 2018?  I

23    testified at the hearing that we had looked for

24    the document before and I thought the purpose of

1    this interrogatory was when you looked for that

2    document at that time, where did you look.

3            Q.      Okay.  So does the response to

4    interrogatory number two describe all locations

5    where the document was looked for prior to

6    October 22, when you testified?

7            A.      I believe it does.

8            Q.      Am I correct that prior to

9    October 22, to the best of your knowledge, no one

10   looked on the iManage system for the agreement?

11           A.      I was looking at that, I don't know

12   that to be true.  I base this upon searches that I

13   seen, I just don't know when iManage went online

14   and when it was looked at.  It could have been

15   based upon the limited views that, you know, of

16   what we saw, I believe this is what was searched.

17           Q.      So do you have any knowledge or

18   information as to whether the iManage system was

19   searched prior to October 22 for the 1979 transfer

20   agreement?

21           A.      It may have been.  I don't have a

22   document that shows that.

23           Q.      Do you have any knowledge or

24   information that iManage was searched prior to

Confidential - John Kurt Esquire

```
 1   October 22 for the 1979 transfer agreement?

 2                MR. JONES:  Object as asked and

 3         answered.

 4                THE WITNESS:  I don't have any

 5         firsthand knowledge that it was but I

 6         don't know that it wasn't.

 7   BY MR. SILVERSTEIN:

 8         Q.    Okay.

 9         A.    What we answered was the ones that

10   we knew, based upon documents, were searched but

11   it does not mean that it wasn't searched.

12         Q.    I understand.  We're going to get

13   through this quickly if you can stay on my

14   questions.  There's going to be a lot of other

15   questions that I don't ask that you may want to

16   answer and you will get the opportunity.  I don't

17   suggest that my questions are covering everything.

18   I'm asking what I want to ask and I ask that you

19   just answer that and I understand that you may

20   think that it's not complete in my questions.

21   Let's carry on.

22                One other question, do you recall

23   the names of any of the attorneys who questioned

24   you in California at trial, either their
```

1    individual names or the law firms?

2            A.     The Witzer firm and Green Broillet.

3            Q.     And do you recall any other law

4    firms or individuals involved with that lawsuit

5    when you testified in court?

6            A.     No, those were the firms -- those

7    were the plaintiff firms.

8            Q.     Very good.  We're switching

9    subjects.

10               So prior to accepting the role as

11   chief legal officer of the debtor, you were the

12   practice group lead for the product liability

13   litigation group, correct?

14           A.     Yes.

15           Q.     And, as such, were you familiar

16   with the MDL litigation that my client is the

17   steering committee for?

18           A.     I was.

19           Q.     Okay.  And what has your role been

20   in connection with that talc MDL litigation prior

21   to the formation of the debtor?

22               MR. JONES:  Given the obvious risk

23          of privilege and work product disclosure

24          here, I would like you to frame your

1          answer, Mr. Kim, to avoid that, if

2          practical.

3    BY MR. SILVERSTEIN:

4          Q.     I'm looking for a general

5    description of your role, not for anything more

6    specific than that.

7          A.     So I oversaw the attorneys with

8    day-to-day responsibility for the MDL and

9    participated when needed in strategy, you know,

10   and decision-making on those cases.

11         Q.     As inside attorneys who were the

12   day-to-day attorneys that you were referring to?

13         A.     Well, it's changed over time so...

14         Q.     So we're going to, hopefully, get

15   through this quickly.  So as of the end of

16   September 2021 who was managing the day-to-day

17   activities in-house in connection with the MDL

18   litigation?

19         A.     Andrew White.

20         Q.     For how long has Mr. White been the

21   day-to-day manager of the litigation in-house,

22   approximately?

23         A.     These time frames all sort of melt

24   together.  I'm going to guess four or five years,

1  could be longer.  Time flies.

2        Q.     And who prior to Mr. White,

3  immediately prior to Mr. White was involved in

4  day-to-day litigation management in-house?

5        A.     That was two people, John

6  O'Shaughnessy and Denise Houghton.

7              MR. JONES:  Again, are these

8        MDL-specific questions?

9              MR. SILVERSTEIN:  Yes, yes.

10 BY MR. SILVERSTEIN:

11       Q.     Did you understand that, Mr. Kim,

12 when you answered?

13       A.     Yes, they actually handle all the

14 talc litigation, including the MDL.

15       Q.     Again, this is posed to you

16 generally and not looking for any attorney-client

17 information, but what was your understanding of

18 the status of the MDL litigation, the talc

19 litigation, at the end of September, immediately

20 prior to the formation of the debtor?

21       A.     The MDL had been going on for about

22 five years, we were now at the point where we were

23 doing workups of various cases.  The way that the

24 judge set it up was that there were a number of

1    cases that plaintiffs chose, a number of cases

2    that defendants chose and a number of cases that

3    the court chose.

4              The plaintiffs kept dropping their

5    case.  The cases that defendants chose, they were

6    being replaced or the number of workups was being

7    affected by that, and my understanding was that

8    some time in the second quarter of 2022 the judge

9    indicated that she would be trying some cases only

10   and that after that, all the cases would have to

11   go back to the jurisdictions from which they came.

12        Q.    To the best of your understanding

13   what was the status of fact discovery at the end

14   of September in the MDL?

15        A.    There's actually -- the discovery

16   that was going on was case specific so was related

17   to the -- you know, to the plaintiffs.  Generally,

18   we had made available to the plaintiffs in the MDL

19   the large amount of discovery that we had provided

20   to other plaintiffs in all the cases.  There was

21   also expert discovery that was done in the MDL as

22   part of the Daubert proceedings and so that was

23   the status of discovery.

24        Q.    Am I correct that the talc MDL

Confidential - John Kim, Esquire

```
 1   litigation is not the only MDL litigation with

 2   which you have been involved in either a

 3   day-to-day capacity or an overseeing capacity at

 4   Johnson & Johnson?

 5           A.      That is correct.

 6           Q.      Were you involved with MDL

 7   litigation involving Tylenol?

 8           A.      Yes.

 9           Q.      And where was that MDL litigation?

10           A.      Philadelphia, Pennsylvania.

11           Q.      And what is the status of the

12   Tylenol MDL?

13           A.      That has been resolved.

14           Q.      When was the Tylenol MDL resolved?

15           A.      I think for all intents and

16   purposes the resolution was about I want to say

17   three years ago.  I see others on this call that

18   could probably answer that question.

19           Q.      In due course but what was your

20   role in the settlement?  And I'm speaking again in

21   the broadest terms, not asking for you to disclose

22   any attorney-client information but in very broad

23   terms what was your role in connection with the

24   settlement of the Tylenol litigation?
```

1          A.     I settled that case.  I had the

2    principal role of the negotiator and settling it.

3          Q.     Okay.  Am I correct that there was

4    MDL litigations involving hip implant products?

5          A.     Yes.

6          Q.     Were those MDL litigations that you

7    were involved with?

8          A.     Yes.

9          Q.     Where were those MDLs?

10          A.     One MDL was in Texas and the other

11    MDL -- I'm forgetting now where ASR was.  I know

12    others on this phone call could say but I don't

13    recall.  It will come to me if we give it enough

14    time.

15          Q.     If you recall, please let me know.

16    Today I'm only asking for your best recollection

17    and I do understand that not everything -- I think

18    I'm roughly around the same age as you and it

19    doesn't always come back as quickly as we like.

20                 So the Texas MDL, was that

21    involving a product called DePuy ASR?  I may be

22    mispronouncing it.

23          A.     So Texas was Pinnacle.

24          Q.     Okay.  And the other MDL was ASR?

Confident Gal - John Kim - Esquire

1          A.     Yes.

2          Q.     What is the status of the Texas

3    MDL?

4          A.     It is basically resolved so, you

5    know, these mass torts, you know, Tylenol was

6    basically completely resolved, I don't think there

7    are any claims left.

8                You know, for other mass torts

9    generally what happens is the bulk of cases are

10   resolved through settlement.  There may be

11   handfuls of cases that have not been resolved, but

12   at some point often the MDL gets disbanded when,

13   you know, a settlement may be done but then it

14   gets disbanded but it really depends upon the

15   circumstance of an MDL and the allegations of the

16   MDL, how -- what the time frame is where there are

17   potential claims and whether there's an actual end

18   to the claims.

19               So MDLs like, for example, in

20   Pinnacle are not resolved but we do know there's

21   only so many years that claims can be made and

22   that the bulk of the claims have been settled.  So

23   when they say "resolved," it doesn't always mean

24   that it's completely gone, it just means that for

1   the ones that, we have the ones that had settled,

2   the bulk of them settled and there isn't anything

3   more significant left.

4         Q.      When was the Pinnacle MDL resolved

5   on whatever basis it was resolved?

6         A.      So, again, that's a good example.

7   So we entered into agreements with plaintiffs I

8   want to say two years ago but not everyone has

9   accepted and so there still may be cases left, you

10  know, when I say resolved that means, you know,

11  for the most part the MDL is now in the business

12  of administering sort of the settlement, but there

13  may be additional trials left that have to be done

14  for people who don't settle.

15        Q.      So when was -- the claims that did

16  settle, when did that occur?

17        A.      I think it started a couple years

18  ago but it's still ongoing.

19        Q.      And what about the ASR MDL, what is

20  the status of that?

21        A.      It's the same.  So we entered into

22  many agreements much earlier so I would say seven

23  years ago or something like that, again, I would

24  have to look at the documents, but, you know, a

1   bolus of plaintiffs accepted the settlement, some

2   did not and so there's continuing -- it continues

3   even though the bulk of it has resolved, but based

4   upon, when you are talking about these medical

5   devices, there's only a period of time where the

6   devices were used and so there is more of an end

7   date that you can look at and predict how many

8   cases would go on after that.

9         Q.     Are there other MDL litigations at

10  Johnson & Johnson which you've been involved?

11        A.     Yes, Xarelto, which is a

12  pharmaceutical product.

13        Q.     I'm sorry, just going back to ASR

14  and Pinnacle, what was your role again, in broad

15  terms, in the resolution, to whatever extent you

16  are defining it occurred?

17        A.     I was more involved in overseeing

18  the attorneys who resolved the cases.

19        Q.     You had mentioned Xarelto, which

20  was a pharmaceutical product.  Where was that MDL?

21        A.     Xaralto MDL was in Louisiana.

22        Q.     What is the status of that MDL?

23        A.     We have entered into settlement

24  agreements with I think the vast majority of

1    plaintiffs and that's being processed right now.

2           Q.    What was your role, again in broad

3    strokes, in connection with the Xarelto settlement

4    agreements and negotiations?

5           A.    So I was overseeing the attorneys

6    that were responsible for that.

7           Q.    Are there any other MDL litigations

8    that you have overseen or been the day-to-day

9    person at Johnson & Johnson, other than those that

10   you have identified?

11          A.    Propulcid.

12          Q.    What kind of product was that?

13          A.    That's a pharmaceutical product.

14          Q.    Where was that MDL?

15          A.    That was in Louisiana.

16          Q.    What is the status of that MDL?

17          A.    That has, I think, finally been

18   resolved.

19          Q.    When was the resolution, to

20   whatever extent it was?

21          A.    I have to say I think 12 years ago,

22   maybe longer, older.

23          Q.    Did you have any involvement in the

24   resolution?

1           A.      I was involved in negotiation and

2     settlement of those.

3           Q.      Are there any other Johnson &

4     Johnson MDL litigations that you have either been

5     the day-to-day manager of or overseeing?

6           A.      Latex gloves.

7           Q.      And what is the status of that MDL?

8           A.      That's been resolved.

9           Q.      Where was that MDL litigation?

10          A.      That was in Philadelphia.

11          Q.      When was that MDL resolved?

12          A.      I'm sorry, you know what, that may

13    have been Chicago.  That may have been Chicago.

14    It was resolved about 16 years ago.

15          Q.      What was your role, if any, in the

16    resolution?

17          A.      I negotiated the settlement and

18    settled that.

19          Q.      Are there any other MDL litigations

20    that you've been involved with at Johnson &

21    Johnson?

22          A.      Elmiron.

23          Q.      I'm sorry?

24          A.      E-L-M-I-R-O-N pharmaceutical

1    product.

2            Q.      Where was that MDL?

3            A.      New Jersey.

4            Q.      What is its status?

5            A.      It's just beginning.

6            Q.      Any others?

7            A.      Mesh.

8            Q.      Where was that MDL?

9            A.      That is MDL in Charleston, West

10   Virginia.

11           Q.      What is the status of that MDL?

12           A.      We have settlement programs going

13   but they're still active litigation.  Yes, it's

14   active, although we've settled a fair number of

15   cases.

16           Q.      What has your involvement been in

17   the settlement of those cases that have settled?

18           A.      I've been overseeing the attorney

19   responsible for that.

20           Q.      Any other MDL litigations that you

21   have overseen or handled day-to-day in-house at

22   Johnson & Johnson?

23           A.      Ortho Evra.  There are more, I just

24   can't recall them all.  Ortho Evra is another one.

1          Q.     Where was that?

2          A.     New Jersey.

3          Q.     What is the status of that MDL?

4          A.     That is we've entered -- that's

5    been settled and disbanded.

6          Q.     When did that occur?

7          A.     I'm going to say six years ago,

8    seven years ago.

9          Q.     Was there any MDL litigation

10   involving a product called Propulcid?

11         A.     I mentioned that.

12         Q.     I'm sorry.

13         A.     Invokana is another one.

14         Q.     Where was that?

15         A.     I want to say Indiana but you know,

16   I have to look, now that I'm thinking about it.

17         Q.     What is the status of that MDL?

18         A.     I think we settled most of the

19   cases out of there.  That's a prescription

20   product.

21         Q.     Other than the MDL talc litigation

22   and the one that just began in New Jersey, and I

23   didn't really fully catch the name of the product,

24   are there any other MDL litigations that you have

1  been involved with at Johnson & Johnson that have

2  not been resolved or mostly resolved at this

3  point?

4         A.    Again, some of these cases, I say

5  resolved, they're not fully resolved but you can

6  consider them resolved because unlike the talc

7  cases, all these have very short tales.  In other

8  words, for a consumer, a medical device and a

9  prescription product, generally the injury occurs

10  shortly after implantation or after taking the

11  pill and so they're sort of a defined endpoint or

12  there's a label change that cuts off liability and

13  you know that subsequent to that there's a period

14  for injury is very short so talc, of course, is

15  very different from those.

16              And so when you are talking about

17  resolution of these MDLs, again, I was a little

18  sloppy in that term because while the bulk of them

19  may be settled, there may still be cases ongoing

20  but generally they're not going to be of great

21  magnitude.

22         Q.    Just a couple more questions and

23  then I'm going to suggest that we take a break

24  before we switch subjects.

```
 1                 With regard to the settlements of

 2   each of these MDL litigations that you've

 3   identified, and I understand that not every

 4   settlement has been complete, there's some

 5   overhang, I do understand that, but with regard to

 6   those claimants that have settled in the MDL

 7   litigation, do you believe that those claimants

 8   were treated fairly and equitably?

 9         A.     Often not -- I think it depends, I

10   think it depends.  So the way that we do these

11   settlements, you know, even MDL settlements there

12   could be -- we generally settle with law firms for

13   their inventory.  So, you know, I think it's hard

14   to describe those as fair and equitable when you

15   look at the whole entire process.

16                 I think the MDL process itself is

17   flawed in that, I know there's been criticisms of

18   settlements in MDLs.  They are -- we negotiate

19   what we can negotiate on those.

20         Q.     Were there any settlements that you

21   participated in where you believed that there were

22   claimants that were being treated unfairly and

23   inequitably?

24         A.     I wouldn't know.  We often don't --
```

1    yeah, we don't get to the detail of each

2    individual claimant in these mass tort settlements

3    often, so what the lawyer does with his client is

4    not known to us.

5         Q.    And in connection with the

6    claimants that did settle in the MDL litigations

7    with which you were involved at Johnson & Johnson,

8    did you believe that the claimants received

9    lottery-like results?

10              MR. JONES:  Objection, if you

11         formed a view.

12              THE WITNESS:  Sorry, can you repeat

13         the question again.  With the people that

14         were settled?

15   BY MR. SILVERSTEIN:

16         Q.    Yes.  In connection with the claims

17   that were settled in the MDL litigations that you

18   participated in, did you believe that the

19   claimants were receiving lottery-like results in

20   the settlements?

21              MR. JONES:  Same objection.

22              THE WITNESS:  In the settlements, I

23         wouldn't know because, again, what the

24         plaintiff's lawyer does with his mass of

Confidential - John Kim - Esquire

```
 1              clients, I have no visibility to, for the

 2              most part.

 3    BY MR. SATTERLEY:

 4         Q.    Okay.

 5         A.    Settlements are very different in

 6    an MDL than the trials, let's put it that way.

 7         Q.    Right.

 8              MR. SILVERSTEIN:  Okay.  So I'm

 9              going to propose that we take a ten minute

10              break, come back at 3:00.  I'm going to

11              switch subjects and we're going to start

12              to look at some documents.

13              MR. JONES:  Okay.

14              (Brief recess taken at 2:48 p.m.)

15              (Deposition resumes at 3:00 p.m.)

16              (Document marked for identification

17              as Kim Deposition Exhibit No. 6.)

18    BY MR. SILVERSTEIN:

19         Q.    I'm going to share what will be

20    marked as Exhibit 6.  Mr. Kim, I'm sharing on the

21    screen with you a document that the debtor has

22    produced bears Bate numbers LTL 954 through 1,049.

23    It's cover page is entitled North American Asset

24    Purchase Agreement among Johnson & Johnson
```

1    Consumer Companies, Inc. and Valeant

2    Pharmaceuticals International, Inc. dated as of

3    September 9th, 2012.  I will scroll down.  This is

4    the document as presented to us and I'm not going

5    to ask you any detailed questions about the

6    contents but I do want to scroll down just to see

7    if you're familiar with this document.  If we get

8    to a point, Mr. Kim, you're satisfied you've seen

9    it, just let me know.

10          A.     I've seen this document before.

11          Q.     All right.  When was the first

12   time, to the best of your recollection, you saw

13   this agreement?

14          A.     Probably some time in 2013.

15          Q.     And without revealing any

16   confidences, can you describe the context in which

17   you first saw this document?

18          A.     It was in connection with Valeant

19   seeking indemnification.

20          Q.     What is your understanding of what

21   this document is?

22          A.     This is a Purchase Agreement where

23   Johnson & Johnson Consumer companies sold certain

24   assets to Valeant Pharmaceuticals and included in

Case 21-03032-MBK   Doc 142-2   Filed 12/22/21   Entered 12/22/21 16:54:31   Desc
Confident[a] to John Kim - Esquire
Exhibit A to MLC Declaration   Page 183 of 278

1    that was Shower to Shower.

2           Q.     Did you have any involvement in the

3    negotiation or preparation of this agreement?

4           A.     I don't recall.  I don't think I

5    did.  From time to time I'm asked to do due

6    diligence on transactions, I just don't recall

7    whether I was part of this due diligence effort.

8           Q.     Okay.  Have you ever read this

9    agreement?

10          A.     I read definitely portions of it.

11   I can't say that I read it cover to cover.

12          Q.     I'm going to scroll down to the

13   indemnification section or at least the article

14   entitled indemnification, which appears on

15   LTL0999, there's an Article VIII entitled

16   "Indemnification and Limitation of Liability,"

17   scroll down.  It begins on page 41.  I'm going to

18   scroll down.

19                 Again, not to ask you any specific

20   about the contents but only to ask whether this is

21   a section that you've read before and are familiar

22   with?

23          A.     I have read it before.  I was

24   familiar with it at one time.

1          Q.      For what period of time were you

2    involved with any communications with Valeant

3    regarding indemnification?

4          A.      We started discussing

5    indemnification I want to say 2017 or so.  It

6    resulted in a clarification of this section but I

7    was involved in the negotiations and on that

8    issue.

9          Q.      If you could, what did Valeant

10   describe its position as to indemnification to be?

11         A.      I believe it wanted indemnification

12   for all liability, including after they purchased

13   the product.  So I think originally the

14   indemnification period ended on -- with respect

15   to -- we were going to indemnify them for all past

16   liabilities where JJCI sold the product and they

17   would be responsible for liabilities after they

18   sold the product and they wanted indemnification

19   for all product.

20         Q.      And what position did JJCI convey

21   to Valeant with regard to that, prior to there

22   being a clarification that you described?

23         A.      Prior to that we thought the

24   language suggested that we -- our position was

1    that it ended upon -- JJCI would only be

2    responsible for product that it had sold.

3            Q.      In the communications between

4    Valeant and JJCI was there ever any communication

5    regarding Valeant receiving indemnification from

6    any entity other than JJCI?

7            A.      I don't recall.  I don't recall.

8            Q.      With whom at Valeant did you

9    interact with as to indemnification, if anyone?

10           A.      I can't remember his name.  There

11   was an attorney in-house there that I communicated

12   with.  They were also represented by Simpson

13   Thacher and we had dealings with them as well.

14           Q.      Okay.  I'm now going to close that

15   and now share in the chat a document that I've

16   marked as Exhibit 7 and now I'm going to share it

17   on the screen, Mr. Kim.

18           A.      I'm sorry, going back to that old

19   question when I say at all times, basically what

20   I -- it's when -- the demarcation would be when

21   Valeant sold the product versus when JJCI sold the

22   product and so they wanted indemnification for the

23   time that Valeant sold the product as well.

24           Q.      That's what I understood from your

1    answer.

2                A.      Okay.

3                        (Document marked for identification

4            as Kim Deposition Exhibit No. 7.)

5    BY MR. SATTERLEY:

6                Q.      Okay.  So I've now shared in the

7    chat and on the screen a document produced by the

8    debtor bearing Bates numbers LTL 0001050 to 57.

9    It's entitled Indemnification Agreement Execution

10   Version.  I'm going to slowly scroll down so you

11   can be satisfied as to whether you've seen this

12   document before.  I've now scrolled down through

13   page LTL10657.

14                       Are you familiar with this

15   document, Mr. Kim?

16                A.      I am, I am.

17               Q.      What is Exhibit 7?

18               A.      This is the modification of the

19   indemnification portion of the agreement that we

20   just saw.

21               Q.      What was your role, if any, in the

22   preparation of this agreement?

23               A.      I don't know who prepared it.  I

24   reviewed drafts of this, of the agreement and

1    signed it.

2          Q.    Were you involved with -- I believe

3    you said you were in negotiating the terms of

4    this?

5          A.    Yes.

6          Q.    Was it Mr. Ackermann who was

7    in-house counsel at Valeant with whom you dealt?

8          A.    No.  Ms. Ackermann was the GC who

9    signed it.  I was dealing with one of her reports.

10         Q.    I see.  And -- withdrawn.

11               What is your understanding of where

12   Johnson & Johnson, speaking not for any particular

13   company but, as you put it, the enterprise and

14   Valeant or its successor, Bausch Health ended up?

15               MR. JONES:  Mr. Kim, please,

16         Mr. Kim, object to the form of the

17         question.  You may answer.

18               THE WITNESS:  So the agreement

19         speaks for itself.  You know, the

20         resolution was that there was a date up to

21         a date certain, if you go down I could

22         tell you what that date was, that we would

23         be responsible -- JJCI would be

24         responsible for to indemnity Valeant for

1          certain cause of action up through a date

2          certain, even though that date extended

3          past after the date that JJCI sold the

4          product.  If you keep going down I can

5          tell you.

6    BY MR. SILVERSTEIN:

7          Q.     Sure.  I'm going to scroll down,

8    you tell me where you would like me to stop.

9          A.     Hold on right there.  So March 1st,

10   2020 would be the date.

11         Q.     So this indemnification agreement

12   is by its terms made between Valeant Health

13   Companies, Inc. on the one hand and Johnson &

14   Johnson Consumer, Inc. and its affiliates,

15   collectively JJCI on the other; is that correct?

16         A.     That's correct.  And, you know, the

17   signature page just reminded me of something that

18   I want to correct about an answer I gave to

19   Mr. Satterley.

20              The question was did I hold any

21   other titles, and I did, I actually held two

22   additional titles.  One was assistant secretary to

23   Johnson & Johnson and one was assistant secretary

24   to Johnson & Johnson Consumer, Inc.  I also held

Confidential - John King, Esquire

```
 1    the title assistant secretary to Ethicon, Inc. and

 2    Ethicon Endo Surgery, Inc.  This just reminded me

 3    that I did hold those positions as well.

 4              Q.    Okay.  And which affiliates of

 5    Johnson & Johnson Consumer, Inc. are parties to

 6    this agreement?

 7              A.    If you go back to the original

 8    agreement, I think that copies what was in the

 9    verbiage of the original agreement, and if you

10    could do that, I have this recollection but I

11    don't -- if you could go back.

12              Q.    I'm going to try to accommodate you

13    on that.  Bear with me.

14                    Do you see the original Valeant

15    agreement?

16              A.    Yes.

17              Q.    Tell me where you would like me to

18    go.

19              A.    With what the parties are in the

20    first paragraphs.  See the first whereas clause,

21    seller directly or indirectly through its

22    affiliates.

23                    And then if you go to article, it's

24    definitions, I think we just included -- we just
```

1    copied the language of the affiliates language in

2    the original agreement.

3         Q.    So the affiliates would include

4    Johnson & Johnson, the ultimate parent company?

5         A.    I don't believe it would.  I think

6    the affiliates are the people that actually had

7    rights in the products that were being sold so

8    there may have been products that other operating

9    companies would have owned, intellectual

10   properties, whatever, there might be some other

11   products that were part of an affiliate and what

12   this would do is a encompass all that.

13            If it was Johnson & Johnson

14   generally, we would have the agreement marked as

15   the Johnson & Johnson agreement and then list

16   other affiliates, but the fact that this is JJCI

17   agreement talking about affiliates, it's really

18   just, you know, other companies, operating

19   companies that had product.

20            If you go up the first sentence.

21   Yeah, owns the rights so it's the affiliates that

22   are manufacturing, marketing, selling the product.

23        Q.    So to the best of your

24   recollection, the use of the word affiliates in

1    the 2019 clarification was the same definition of

2    affiliate in the original 2012 agreement?

3           A.     I think it was to encompass the

4    same people but, you know, I would have to go back

5    and review my notes.  Sitting here today, that's

6    what I believe, but I haven't looked at this in

7    years.

8           Q.     Are you able to identify here today

9    which affiliates of JJCI either parent companies,

10   subsidiaries, sister companies, would be included

11   within -- as parties to the indemnification

12   agreement?

13          A.     I'd have to go back to the original

14   agreement and go through it.

15          Q.     I understand.  And my question to

16   you is as you sit here today, as you're answering

17   these questions right now, are you able to

18   identify the affiliates of JJCI that are parties

19   to the indemnification agreement that was marked

20   as Exhibit 7?

21          A.     Then I'm happy to take a look at

22   the indemnification agreement and the original

23   agreement but it might take me a while.

24          Q.     Without going back and studying

1    this agreement and the prior agreement, am I

2    correct you are not able to answer that question

3    as to which affiliates?

4         A.    I'm happy to do it right now but if

5    you don't want me to do that, then sitting right

6    here today right now, I would have to, again,

7    without going back I wouldn't be able to answer

8    that question.

9         Q.    Okay.  Fair enough.  And were there

10   any affiliates of JJCI, other than Johnson &

11   Johnson, Ethicon and Ethicon Industries that you

12   were authorized to sign on behalf of?

13        A.    Janssen Pharmaceutical I think I

14   was also assistant secretary of.

15        Q.    Any other Johnson & Johnson --

16   withdrawn.

17             Any other JJCI affiliates that you

18   had authority to enter into an agreement on behalf

19   of at the time that you executed this agreement?

20        A.    I'm actually not sure.  I would

21   have to go back to the corporate secretary's

22   office for the complete list.

23        Q.    Okay.  Very quickly going back --

24             MR. SILVERSTEIN:  Jim, should I

```
 1              proceed or would you like me to wait?

 2                   MR. JONES:  I'm sorry, I was just

 3              drawing a blind.  The sun is setting

 4              through my window, that was all.  I was

 5              within earshot but thank you, appreciate

 6              it.

 7                   MR. SILVERSTEIN:  Thank you.

 8    BY MR. SILVERSTEIN:

 9         Q.     Mr. Kim, just very quickly

10    backtracking, and I'm going to really try not to

11    do that, but with regard to the MDL litigation,

12    have there been any settlement discussions of the

13    MDL that you're aware of?

14                   MR. JONES:  Let me object.  Are you

15              speaking the MDL in which you are

16              representing folks on the steering

17              committee, that MDL?

18                   MR. SILVERSTEIN:  Yes, the talc

19              litigation.  I'm only asking right now for

20              yes or no.

21    BY MR. SILVERSTEIN:

22         Q.     Have there been settlement

23    discussions of the MDL talc litigation?

24                   MR. JONES:  And before you answer,
```

```
 1              my objection is, Mr. Kim, I want you to

 2              think about whether that's public or

 3              confidential or not and whether you can

 4              share it in this deposition.  I assume

 5              this deposition will become public, I just

 6              don't know the answer to that.

 7                   THE WITNESS:  Yes, so I think it is

 8              confidential and I think, Mr. Silverstein,

 9              your clients would know.

10    BY MR. SILVERSTEIN:

11         Q.     I'm sorry, the question of whether

12    there have been settlement discussions, you're not

13    comfortable answering that for confidentiality

14    reasons?

15                   MR. JONES:  Mr. Kim, if you're not

16              comfortable, you need to say so.

17                   THE WITNESS:  Frankly, I would like

18              to consult counsel on that issue.  I'm not

19              comfortable without speaking to counsel

20              about settlement negotiations, but,

21              Mr. Silverstein, I think your clients

22              would know if there were conversations.

23    BY MR. SILVERSTEIN:

24         Q.     I understand but I'm asking you
```

```
 1    questions today.

 2              MR. JONES:  So the answer is if

 3         you --

 4              MR. SILVERSTEIN:  I can't force you

 5         to answer so if you don't want to answer,

 6         then that's your choice.

 7              MR. JONES:  I think he would like

 8         to talk to counsel.

 9              THE WITNESS:  I'm not refusing to

10         answer.  I have a legal question about the

11         question that I would discuss before I

12         answer that.

13              MR. SILVERSTEIN:  Okay.

14              MR. JONES:  So if you want us to do

15         that now we can or we can save that up for

16         the next break.

17              MR. SILVERSTEIN:  Save it up for

18         the next break.  I'm really not going to

19         be getting into too much detail on that, I

20         just had a couple questions.

21              MR. JONES:  But my point is even

22         the fact of negotiations --

23              MR. SILVERSTEIN:  I don't know that

24         and, like I said, I can't force him to
```

Confidential - John Kim - Esquire

```
 1              answer any questions he doesn't want to

 2              answer.  So we can carry forward.

 3   BY MR. SILVERSTEIN:

 4         Q.     When was the first time, Mr. Kim,

 5   that you had any contact with any attorney from

 6   Jones Day regarding legacy talc litigation?

 7         A.     Well, recently, six months ago.

 8              MR. JONES:  Let me interrupt for a

 9              moment.  The company name or the

10              litigation itself?

11              MR. SILVERSTEIN:  The subject of

12              the litigation.

13   BY MR. SILVERSTEIN:

14         Q.     And I understand about the

15   presentation six months ago.

16              I'm asking the very first time,

17   whenever that was, maybe it was the presentation,

18   maybe it was earlier.

19         A.     So a couple years ago there were a

20   bunch of law firms that came and spoke to us about

21   options to resolve this matter.  I don't recall

22   whether Jones Day was part of that or not.  They

23   may have.

24              It was in connection with we were
```

1   looking for also counsel to retain in the Imerys

2   bankruptcy and in that process there were lots of

3   lawyers with opinions on how we could resolve our

4   cases and I just don't recall whether Jones Day

5   was part of that but, if not, then it would have

6   been when they made their presentations.

7           Q.    So if Jones Day was a part of that,

8   and I understand you don't remember, but if that

9   was the time when you first met with any

10  attorneys, it was after the Imerys bankruptcy

11  filing?

12          A.    It was around the time of the

13  Imerys bankruptcy filing I guess.

14          Q.    Okay.  And is there anything that

15  you could look at that would refresh your

16  recollection as to which law firms that you met

17  with at that time?

18          A.    I know it was Weil because we

19  retained Weil.  I don't know whether if I would

20  have anything about Jones Day, whether they left

21  the presentation or not, I don't know.

22          Q.    To the best of your recollection

23  when did Imerys file for bankruptcy?

24          A.    I would have to look at a document

1    to see that.

2          Q.    Do you recall which year that was

3    in?

4          A.    I want to say it was three years

5    ago but that's easily ascertainable.

6          Q.    Okay.  So between the time of the

7    Imerys bankruptcy filing, and I'm not suggesting

8    that you spoke to anybody from Jones Day at that

9    time, but from that time through the time of the

10   presentation in late April did you have any

11   contact with any Jones Day attorneys?

12         A.    I don't believe we did.

13         Q.    When was the first time, if at all,

14   when you had any contact with Dr. Charles Mullen?

15         A.    I think about two years ago.

16         Q.    And I don't want you to disclose

17   anything confidential or privileged and so with

18   that instruction, can you describe the context in

19   which you first had contact with him?

20         A.    It was in connection with the

21   Imerys bankruptcy.

22         Q.    How many times have you, if at all,

23   met in person with Dr. Mullen?

24         A.    I think I met with him once.

Confidential - John Kim - Esquire

```
 1            Q.     When was that?

 2            A.     About two years ago.

 3            Q.     Okay.  How many telephone

 4   conversations or video conversations have you

 5   participated in in which Dr. Mullen also

 6   participated?

 7            A.     I don't believe I've had any

 8   contact with Dr. Mullen since then.

 9            Q.     Okay.  I'm going to now share with

10   you a document that I'm marking as Exhibit 8.

11   First I'll put it in the chat and now I'll share

12   it to the screen.

13                   (Document marked for identification

14            as Kim Deposition Exhibit No. 8.)

15   BY MR. SILVERSTEIN:

16            Q.     I'm sharing Exhibit 8, which is a

17   document produced by the debtor bearing Bates

18   numbers LTL 0019834 through 19837, it's entitled

19   Indemnification and Defense Agreement.  And,

20   Mr. Kim, I'm going to scroll down and would like

21   you to review this only for the purpose of

22   determining if you have seen this document before?

23            A.     Can you just go back up for a

24   second.
```

1          Q.      Yes, tell me where you want me to

2     stop.

3          A.      Okay, stop.  So if you go back to

4     the top.  I didn't know how long it was, now I

5     will read it.  Thank you.  If you go down further.

6     Go down further.  Okay.

7          Q.      Have you just read Exhibit 8 to

8     yourself now?

9          A.      Yes.

10         Q.      Was this the first time you had

11    read this document?

12         A.      No, no.

13         Q.      When was the first time?

14         A.      Around the time that it was

15    executed.  This is one of our early agreements,

16    indemnification agreements, yes.

17         Q.      And what leads you to testify that

18    it was an early defense agreement?

19              MR. JONES:  Sorry, he didn't say

20         defense agreement.

21              THE WITNESS:  No, indemnification.

22    BY MR. SILVERSTEIN:

23         Q.      I'm sorry, I apologize,

24    indemnification agreement.

1          A.      The date of it and who signed it so

2     who was responsible for litigation at the time.

3          Q.      So prior to December of 2016 there

4     had not been indemnification agreements or at

5     least not a large number of indemnification

6     agreements with retailers?

7          A.      I can't recall when retailers

8     started tendering indemnification to us.  I think

9     there was -- there may have been a handful early

10    on.  I don't recall sort of the chronology of them

11    but, you know, this is -- as Mr. Satterley pointed

12    out, the vast majority of the ones now do not have

13    Shook representing the retailers, it's Barnes &

14    Thornburg.  So this would have been one of the

15    early -- I say early, just relatively earlier than

16    the current ones we have.

17         Q.      Well, that's what I'm trying to

18    figure out when is early, when is middle and when

19    is -- I know when current is, but when you use the

20    word early, what time period are you talking

21    about?

22         A.      So I think 2016 is when, I think, a

23    lot of lawsuits began being filed so prior there

24    were some lawsuits.  I think we talked earlier

1  about the Berg lawsuit but, you know, a number of

2  lawsuits started rising after the Fox verdict,

3  which I think was in around 2016 and so as more

4  lawsuits were filed, retailers started getting

5  sued, mostly to try to keep these cases in state

6  courts and try to I think divert jurisdiction, so

7  this would have been towards that period.

8           So this is December 2016, I can't

9  remember when the Fox verdict actually happened.

10 So I would say that, you know, the litigation tide

11 started in around 2016 so, you know, this would

12 correspond to that.

13      Q.    So around 2016 is early and we're

14 in 2021, that's current and in between is

15 everything else in your chronology?

16      A.    I'm not sure that's a scientific

17 way of looking at things.

18      Q.    I'm just trying to understand sort

19 of the time frame in which you are thinking of

20 this.

21      A.    Well, I think of it in terms of --

22 I think it's laid out pretty well in both the

23 information statement and my declaration.

24           I think the litigation, the number

1    of cases started rising after the Fox verdict,

2    which I think is 2016, so prior to that we had the

3    Berg case.  After the Berg verdict there was cases

4    being filed but, you know, it really started

5    exploding in 2016.

6         Q.    Okay.  And what was your role, if

7    any, in the preparation or negotiation or

8    execution of this agreement?

9         A.    So I was overseeing, again, the

10   attorneys with the day-to-day responsibility,

11   which at this time period was Denise Houghton John

12   O'Shaughnessy.  Denise had the responsibility of

13   dealing with indemnification and so I oversaw

14   that.

15        Q.    Did you approve the execution of

16   this agreement?

17        A.    I think generally I would say yes,

18   I was aware that these agreements were being made.

19   I believe I read this agreement prior to it being

20   signed.

21        Q.    Was this a standard form of

22   agreement during the early period as you've

23   described it?

24        A.    I'm not sure if there was a

1    standard because at first there weren't a lot of

2    indemnification request tenders and so I think a

3    lot of this was being done case by case.

4             Q.    Was there a time when it stopped

5    being case by case and it became standardized?

6             A.    I think as we did more of these,

7    you know, it was -- it didn't make sense to sort

8    of change the form so my -- I think there is a

9    template that's used.  There can be exceptions to

10   the template if there's negotiation but,

11   generally, it's off a template.

12            Q.    And when was the template -- when

13   did the template start being used?

14            A.    I have to go and look at the

15   various agreements to see.

16            Q.    And how would you know whether any

17   agreement you looked at was the template or was

18   not the template?

19            A.    I think it's pretty obvious.  As

20   Mr. Satterley showed you, I think the template is

21   pretty uniform.

22            Q.    So what Mr. Satterley showed you

23   earlier was a template agreement?

24            A.    Well, it was from a template.  So,

1   again, template is the basis, you know, that those

2   are the things that we, you know, believe were the

3   right clauses, but from time to time there are

4   modifications made.

5         Q.      And I think we can both read that

6   in this particular case the indemnification was

7   provided both by Johnson & Johnson, the parent

8   company, and Johnson & Johnson Consumer Companies,

9   Inc. in this particular case?

10        A.      In this particular case those are

11  the parties.

12        Q.      And are there other cases during

13  the early period when Johnson & Johnson was party

14  to indemnification of talc lawsuits tendered by

15  retailers?

16        A.      I don't think so.  This was very

17  unusual so generally, you know, we often get

18  requests for Johnson & Johnson to act as a

19  guarantor, basically, and generally we try to

20  avoid that.  I'm not sure, I can't recall why in

21  this particular instance we basically allowed

22  that, but, generally, how negotiations go would be

23  we resist basically having J&J guarantee these

24  types of agreements, but in this case I guess it

1    got through.

2         Q.    And so if Johnson & Johnson and

3    Johnson & Johnson Consumer, Incs are co-obligor in

4    any indemnification agreement, the way you think

5    of it Johnson & Johnson Consumer, Inc. is the

6    obligor, Johnson & Johnson is the guarantor?

7              MR. JONES:  Object to form and

8         foundation.

9    BY MR. SILVERSTEIN:

10        Q.    Is that the way you were thinking

11   of it?

12        A.    The agreement is what the agreement

13   is.  I have to go back and think about what my

14   actual recollection is for every -- for each of

15   these, you know.

16        Q.    Okay.  Well, it so happens that we

17   have a few others so let's now look at what I've

18   marked as Exhibit 9.  I'm going to first share

19   that in the chat.

20             (Document marked for identification

21        as Kim Deposition Exhibit No. 9.)

22   BY MR. SILVERSTEIN:

23        Q.    And now, Mr. Kim, I'm going to put

24   it on the screen for you.  I'll show you Exhibit 9

Confidential - John Kim - Esquire

```
 1   anyway but it's not what I had in mind.
 2              So, Mr. Kim, I'm sharing with you
 3   Exhibit 9, it's an e-mail thread that the debtor
 4   produced bearing Bates numbers LTL 0002073 through
 5   81.  I'm going to scroll down slowly first to give
 6   you an opportunity to determine if you've seen it
 7   before and then I'll show you any portion that you
 8   want to focus on.
 9              Mr. Kim, is this e-mail thread
10   familiar to you?
11        A.    I don't recall this thread, no.
12        Q.    Okay, all right.  That's fair.  I'm
13   going to focus you -- I understand you may not
14   recall this, you may not have seen it before.
15              There's a reference in this top
16   e-mail on August 22, 2017 to a Johnson & Johnson
17   Defense and Indemnity Agreement.
18              Do you have any understanding as to
19   what that refers to?
20        A.    No.
21        Q.    Okay.  Was there any template that
22   Johnson & Johnson referred to as the Johnson &
23   Johnson Defense and Indemnity Agreement?
24        A.    I don't believe so.
```

Confidential - John Kim, Esquire

1          Q.     To the best of your knowledge, was

2    there any template that retailers referred to in

3    shorthand as the Johnson & Johnson Defense and

4    Indemnity Agreement?

5          A.     I don't know.  I've never seen that

6    verbiage before.

7          Q.     All right.  I'm going to now show

8    you a document that I marked as Exhibit 10 and I'm

9    going to put it into the chat.

10                (Document marked for identification

11         as Kim Deposition Exhibit No. 10.)

12   BY MR. SILVERSTEIN:

13         Q.     And now I will share it on the

14   screen with you, Mr. Kim.

15                Exhibit 10 is a document produced

16   by the debtor bearing Bates numbers LTL 0020917

17   through 18.  I'm going to scroll down slowly and,

18   of course, give you the opportunity to go back and

19   review anything you like more carefully but now

20   just I would like you to review it to determine if

21   you've seen it before?

22         A.     I don't recall whether I saw this.

23   I may have.

24         Q.     Was Exhibit 10, to your knowledge,

1    created from a template?

2         A.    I don't know.  This is Shook

3    Hardy's letter.  Can you keep going down.

4         Q.    Yes, tell me where you would like

5    me to stop.

6         A.    Stop right there.  Keep going down.

7    I don't recall whether this was a template Shook

8    was using.  It could be they were modeling these

9    after a prior agreement that they had used, sort

10   of cut and paste of that.  I just don't know.

11        Q.    And if you were asked to go back

12   and determine when the template was created, what

13   would you do to determine whether a Shook Hardy

14   agreement letter was created from the template or

15   not?

16        A.    I would have to ask Shook Hardy.

17        Q.    Who did you ask at Shook Hardy as

18   to whether they started to work off of a template?

19        A.    Can I ask who signed this, is this

20   Deb Moeller?  I'm not sure that she's still there.

21              My first stop would be Kat Frazier,

22   who handled a lot of litigation currently.

23        Q.    So you would not want to go back

24   historically to find out when the template was

1    used?

2           A.      I'm not sure what that question

3    means.

4           Q.      It sounds like Ms. Frazier is being

5    used currently for the litigation.  I'm asking

6    about when the template first started being used?

7           A.      I think she would know if there was

8    a template and whether it was being used.

9           Q.      When did she start working on the

10   litigations?

11          A.      She's been involved since the

12   beginning of the Bird case.

13          Q.      Okay.  So you would rely on

14   Ms. Frazier to identify when Shook Hardy began to

15   work off a template?

16          A.      When and if.  You say a template

17   but, again, I think like a lot of things, it's cut

18   and paste.  So I don't know whether you call that

19   a template but if you have a prior agreement,

20   instead of starting from scratch, you might just

21   cut and paste from that agreement, so whether you

22   call that a template or not, you know, you would

23   have to ask her what they consider.

24          Q.      When you referred to it as a

1   template -- when you referred to letters,

2   indemnification agreements being created from a

3   template what were you referring to?

4        A.    I think as you do this cut and

5   pasting it becomes apparent, so maybe it's a de

6   facto template.  Basically, as you did more of

7   these agreements, they become uniform or

8   standardized.

9            So, again, I would say that the

10  genesis of this and what versions there were and

11  when they used particular versions, I think that's

12  something that Shook Hardy would know.

13       Q.    And from looking at this now you're

14  unable to determine whether this letter was cut

15  and paste from prior versions or not?

16       A.    Yeah, I couldn't tell just by

17  looking at one letter.

18       Q.    I see.  Okay.  But whether this was

19  created anew or whether it was cut and paste, you

20  would agree that in this case as well, the

21  indemnification was from both Johnson & Johnson

22  and Johnson & Johnson Consumer, Inc.?

23       A.    Yeah, I think what's going on

24  because you call it Johnson & Johnson defendants,

1    my guess would be that they're all named

2    defendants in the action so they're just using all

3    the defendants in the action as parties.

4         Q.    And Shook Hardy was authorized on

5    behalf of both Johnson & Johnson and Johnson &

6    Johnson Consumer, Inc. to execute this letter; is

7    that correct?

8         A.    Yes.

9         Q.    Let's move forward.  I'm going to

10   share now in the chat a document marked as Exhibit

11   11.

12              (Document marked for identification

13         as Kim Deposition Exhibit No. 11.)

14   BY MR. SILVERSTEIN:

15        Q.    And I'm now going to share this

16   with you on the screen, Mr. Kim.  Exhibit 11 is a

17   document produced by the debtor.  Just going to

18   scroll down for a second, Mr. Kim, just to confirm

19   the numbers.  Yes, this is a document bearing

20   Bates numbers 20766 to 67.  I'm going to now go

21   back to the top and scroll down for you, Mr. Kim.

22        A.    Is this the same letter?

23        Q.    Well, they do look similar but

24   they're not the same letter?

1          A.     I thought Richard Gering was on the

2    other letter too but I may be wrong.  I'm just

3    looking at the name of the recipient.

4          Q.     So I'm now going to show you

5    Exhibit 10 so you will see that this pertains to

6    Kim Knight versus Johnson & Johnson, et.al.

7          A.     I see.

8          Q.     And Exhibit 11 is to the same

9    recipient from the same person, it pertains to

10   another case, I guess called Harris and Harris

11   versus Johnson & Johnson.

12                Do you see that?

13         A.     Yes, yes.

14         Q.     Let me scroll down for you.  Are

15   you familiar with this document?

16         A.     I see it.  I don't know whether I

17   saw this particular document before.  I think I've

18   seen versions like this.

19         Q.     Is it fair to say that Exhibits 10

20   and 11, based on your review, appear to be cut and

21   paste from either one to the other or from

22   something else?

23         A.     Yeah, of course, it goes to the

24   same recipient and when you're dealing with

1    multiple indemnifications to the same recipient,

2    generally they want the same terms and so it would

3    make sense to have different versions going to the

4    same person.  And, frankly, the issue about

5    Johnson & Johnson, Johnson & Johnson Consumer

6    Companies, if you could down further and having

7    all these people be parties is because we're

8    actually asking for a waiver -- go back a little.

9         Q.     Tell me where you would like me to

10   stop.

11        A.     Stop right there.  If we go down.

12   We're asking for a waiver of conflicts here so we

13   want to have the waiver to be as broad as

14   possible.  So we don't want them bringing up

15   issues because there might be a conflict and not

16   waive with respect to any one of these defendants,

17   which is why all the defendants are in there.  So

18   this is -- these terms are uniform because you

19   can't ask a single indemnitee to sign the

20   agreement with different terms in them, so that's

21   why these are all similar.

22        Q.     I see.  So was there a period of

23   time at least in 2017 when Exhibits 10 and 11

24   represented the standard indemnification of

Confidential - John Kim - Esquire

```
 1   Walgreens with respect to talc litigation?
 2          A.      Again, I think the best people to
 3   answer that would be people at Shook Hardy, but,
 4   again, it would not make sense to send another
 5   letter with different terms due to the same
 6   recipient.
 7          Q.      That may be a good segue to the
 8   next document.  So now I'm going to share in the
 9   screen.  I'm going to share Exhibit 12.  I've now
10   shared that in the chat and, Mr. Kim, I'm going to
11   share that with you.
12                  (Document marked for identification
13          as Kim Deposition Exhibit No. 12.)
14   BY MR. SATTERLEY:
15          Q.      Mr. Kim, you should have on your
16   screen a letter produced by the debtor bearing
17   Bates numbers LTL 20776 through 77.
18                  Are you familiar with this
19   document?
20          A.      I'm not sure if I saw this
21   particular document but I'm familiar with
22   documents like this, yes.
23          Q.      Okay.  When you say "documents like
24   this" what do you mean?
```

Confidential - John Kim - Esquire

1       A.      So, generally, indemnification

2   agreements I've been looking at from time to time,

3   you know, over time.

4       Q.      So documents like this refers to

5   indemnification documents?

6       A.      To retailers, yes.

7       Q.      You are aware that the contents of

8   this letter from Shook Hardy to Walgreen is

9   different from the contents of the prior letters

10  we were just looking at from 2017?

11      A.      Yes, appears different.

12      Q.      Yeah.  And did there come a point

13  in time where the template or the cutting and

14  pasting changed from one set of terms to another?

15      A.      I'm actually not sure.  Can you

16  keep going down.  I just want to see the rest of

17  this.  Hold on right there.  Keep going.  Thank

18  you.

19      Q.      Was there a point in time, Mr. Kim,

20  where the template or cutting and pasting or

21  however you want to think about it changed?

22      A.      I'm actually not sure.  Barnes &

23  Thornburg now will be representing the retailers.

24  At some point the management, the day-to-day

```
 1   management of the cases switched from Denise

 2   Houghton and John O'Shaughnessy to Andrew White.

 3   I don't recall what may have happened in terms of

 4   reviewing the documents, these identification

 5   agreements and whether there was some changes made

 6   specifically at or why they were changed.  I'm not

 7   certain of that.

 8        Q.    Was there a point in time when

 9   there was an institutional decision that Johnson &

10   Johnson the parent no longer would provide

11   indemnification to Walgreens?

12        A.    I don't know whether there was an

13   institutional decision made or practically it

14   became unnecessary.  Again, I'm not sure what the

15   genesis of that change in language was.

16        Q.    When you say "practically it became

17   unnecessary", what do you mean?

18        A.    That, for whatever reason, if they

19   didn't need to seek a waiver, for example, on

20   Johnson & Johnson, you have to remember the

21   earlier drafts, you know, the waiver language is

22   broad to encompass all J&J defendants or consent

23   to waive.  I just don't know what the genesis of

24   this change was.
```

Confident and John Kim Esquire

1      Q.      Do you recall any occasion on which

2  you were involved with a decision to change the

3  form of the indemnification letters provided to

4  retailers to exclude Johnson & Johnson as a party

5  to the indemnifications?

6      A.      There was an internal project done

7  for all indemnification letters so, as you can

8  imagine, with all the mass torts that you went

9  through, we had indemnification letters all the

10  time from various parties and there was an attempt

11  to standardize what we're asking for.  I'm not

12  sure whether this came out of that process but

13  that may be an explanation, I just don't recall.

14      Q.      Was that process undertaken after

15  all law firms came in after the Imerys bankruptcy

16  filing?

17      A.      I don't think it was related to

18  that. It may --

19      Q.      I wanted to say I was using it as a

20  benchmark, not necessarily connecting the two.

21      A.      I don't recall when I initiated

22  that project.  It was not talc related, it was

23  general to all the product liability cases.

24      Q.      Are there any -- sorry.

1           A.      That's just conjecture.  You know,

2    I'm not sure how this change happened.

3           Q.      Are there any projects you have

4    undertaken that have been calculated?

5           A.      I'm sorry?

6           Q.      You wanted to make the point that

7    this wasn't a calculated project.  Are there

8    projects that you've initiated that are

9    calculated?

10                  MR. JONES:  Adam, I think you

11          misheard him.  He said "related."

12                  MR. SILVERSTEIN:  I'm sorry.  I did

13          mishear, I apologize.

14                  THE WITNESS:  I'm not sure what

15          calculated --

16                  MR. SILVERSTEIN:  I thought you

17          said calculated.

18                  THE WITNESS:  The project itself is

19          unrelated to the talc litigation.  It was

20          just a general project for all

21          indemnification agreements.

22    BY MR. SILVERSTEIN:

23          Q.      I see.  And what year was that

24    project undertaken?

```
 1         A.      I think it must have been 2019,

 2   2020.

 3         Q.      And is it your best recollection

 4   that after the undertaking of this project, that

 5   the terms of the indemnification letters that went

 6   to retailers was modified from earlier iterations?

 7         A.      To the extent that they needed to

 8   be, I guess.  The project was to try to get I

 9   think what we called it was best practices for

10   indemnification letters and so some people were

11   already using best practices, you know, so I

12   think, you know, it was something that we put

13   together and then individual attorneys took from

14   it what they wanted, but there probably was a

15   review of the indemnification letters, each

16   attorney was using, to try to make sure that they

17   were using best practices.

18         Q.      And who was involved in the project

19   that you initiated?

20         A.      I want to say Aviva Wein, who

21   reported to me.  Andrew White was actually part of

22   it, which why I think this may have something to

23   do with it because at this time Andrew White was

24   involved in the talc litigation but was also
```

1    involved in the project looking at indemnification

2    to retailers but those were the principal lawyers

3    that were responsible for that project.

4              MR. SILVERSTEIN:  Okay.  I'm going

5         to switch subjects and, therefore, suggest

6         a short break, if that's okay.  I'm happy

7         to keep going but it would make sense

8         maybe for five minutes.

9              MR. JONES:  I think we should take

10        a break.  It's been more than another

11        hour.  And I'm going to ask Madame Court

12        Reporter Peg to let us know where we stand

13        on the running time.  Take five, Adam.

14             (Brief recess taken at 4:06 p.m.)

15             (Deposition resumes at 4:15 p.m.)

16   BY MR. SATTERLEY:

17        Q.    Mr. Kim, other than the agreement

18   that was defined in the interrogatories responses

19   as the 1979 transfer agreement, are there any

20   other agreements that you believe reflect a

21   contract by Johnson & Johnson Consumer, Inc. or

22   any of its predecessors or successors to assume

23   liabilities and/or indemnify Johnson & Johnson,

24   the parent, in connection with talc lawsuits?

1          MR. JONES:  Object to form.

2          THE WITNESS:  There's also the

3      agreement in the LTL papers to indemnify

4      J&J.

5  BY MR. SILVERSTEIN:

6      Q.     And which agreement is that, sir?

7      A.     I think it's the merger support

8  agreement at least.  There might be others.  But I

9  understand generally that there is a

10  indemnification obligation for LTL to indemnify

11  new JJCI and J&J for any talc liabilities.

12      Q.     So as part of the devisive merger,

13  LTL executed an agreement that indemnified new

14  JJCI and Johnson & Johnson for talc liabilities?

15      A.     Actually, cross-indemnity.  So J&J

16  and new JJCI indemnify LTL for non-talc liability

17  get sued as well.  So all the talc liabilities go

18  to LTL, they indemnify J&J if they get sued for it

19  and otherwise if LTL gets sued for non-talc

20  liabilities, then new JJCL would take care of

21  that.

22      Q.     Any other agreements?

23          MR. JONES:  Object to form.

24  BY MR. SILVERSTEIN:

```
 1            Q.      Any other agreements under which

 2   the debtor or Johnson & Johnson Consumer, Inc.

 3   and/or any of its predecessors or successors

 4   agreed to indemnify Johnson & Johnson for

 5   talc-related liabilities that you are aware of?

 6                    MR. JONES:  Form, objection.

 7                    THE WITNESS:  So there are

 8            documents that evidence that.  I'm not

 9            sure whether you consider those agreements

10            or not but, you know, there are, you know,

11            the internal documents, annual reports,

12            SEC filings that show that all talc

13            liabilities are being assumed by or were

14            assumed by JJCI so those I would include

15            but, you know, I don't know if you

16            consider those agreements or not.

17   BY MR. SILVERSTEIN:

18            Q.      Well, it's hard for me to know

19   without knowing what they are.

20                    What are you referring to?

21            A.      Well, I'm referring to documents

22   that show that -- for example, the documents that

23   I believe Mr. Lisman showed that shows the course

24   of conduct and dealings that show the agreement
```

 1    that JJCI is responsible, has assumed all the

 2    liability for all talc issues.

 3           Q.    Okay.  So I want to try to get them

 4    out on the table so I can at least between now and

 5    next week determine whether I agree with you or

 6    not.

 7           A.    Sure.

 8           Q.    So there's the Excel spreadsheets

 9    that Mr. Lisman discussed yesterday.

10                 What else falls into the category

11    of documents evidencing the agreement to indemnify

12    or assume liabilities that you were thinking of?

13           A.    The board minutes.

14           Q.    Okay.  What else?

15           A.    Well, the SEC filings that show

16    that the board minutes happened, what was

17    described in the board minutes took place, annual

18    reports that showed --

19           Q.    I'm only going to interrupt only

20    for the purpose of just getting clarification on

21    this and I'm going to ask you to please continue

22    to tell me all the other evidence but just so

23    while we're on it, with regard to the SEC filings

24    where should I be looking in the SEC filings to

1    see the corroboration?

2         A.    Well, there are SEC filings that

3    showed the transactions that were in the board

4    minutes took place.  There are SEC filings that

5    show the allocation that talc liability was

6    allocated to the consumer group.

7         Q.    Okay.  And what -- I'm sorry to

8    interrupt, it's just that --

9              MR. JONES:  Adam, I'm going to

10             insist, let him finish his answer.  It's

11             not fair to the witness.

12   BY MR. SILVERSTEIN:

13        Q.    Go ahead and give your answer and

14   then we'll go back over each item.  Go ahead.

15        A.    Annual reports that show, you know,

16   which company was responsible for what products.

17   Generally course of conduct, course of dealing

18   between JJCI and J&J on these liabilities.

19        Q.    Before I go back over what you just

20   testified to, are there any other documents that

21   you're aware of that evidence the course of

22   conduct or the agreement that you're testifying

23   to?

24             MR. JONES:  Object to form.

1                    THE WITNESS:  There may be.

2              Sitting here right now it's really the

3              financial statements, internal, you know,

4              internal documents about responsibility

5              and I think that's it.  I can't think of

6              any others sitting here right now.  There

7              may be others, I just can't think of any.

8   BY MR. SILVERSTEIN:

9         Q.    Have all of the documents that you

10  have just referred to been turned over in this

11  lawsuit, in this adversarial proceeding, to the

12  best of your knowledge?

13        A.    I'm not -- I don't know about the

14  annual reports and SEC filings because they're

15  public documents.

16        Q.    And to locate where in the SEC

17  filings there's corroboration of the allocation

18  between Johnson & Johnson and Johnson & Johnson

19  Consumer, Inc. as to talc liabilities, where

20  should I look for that?

21        A.    I think it's in the segment

22  sections.  There's a section of the report that

23  gives the sector financials, so in the consumer

24  sector section.

1          Q.     Is there anyplace else I should

2     look in the SEC filings to evidence the

3     corroboration?

4          A.     I think in certain older filings it

5     lists subsidiaries and what they're responsible

6     for in terms of what products they're responsible

7     for and you will see the baby products, you know,

8     and powders listed there.

9          Q.     Any other documents that come to

10    mind that corroborate the agreement by Johnson &

11    Johnson Consumer, Inc. or any of its predecessors

12    or successors to indemnify or assume liabilities

13    of Johnson & Johnson with respect to talc?

14             MR. JONES:  Objection, asked and

15          answered.

16             THE WITNESS:  I think that's it,

17          that's all I can recall.  We talked about

18          the '78 agreement, the transfer agreement

19          that we had spoken about.

20    BY MR. SILVERSTEIN:

21          Q.     Okay.  Let's carry on.  I'm going

22    to share with you a document marked as 13 -- and

23    just before I do, one other question comes to mind

24    on this topic, I don't recall seeing any reference

1    in your -- either of your declarations about the

2    merger support agreement or any other agreement

3    executed in October of 2021 as being something

4    that the debtor is relying on in the context of

5    supporting its request for a preliminary

6    injunction.  And it may be that I missed it but is

7    that -- is it the case that the debtor is relying

8    on the merger support agreement for the purposes

9    of the preliminary injunction motion?

10                MR. JONES:  Object to foundation,

11           may call for a legal conclusion.  Mr. Kim,

12           if you can share, you can.

13                THE WITNESS:  I would have to go

14           back into my declaration and the

15           preliminary injunction papers.

16    BY MR. SILVERSTEIN:

17           Q.    Okay.  And without going back and

18    reading what's been written before, you are not

19    able to answer that?

20           A.    I would defer to what's in the

21    papers and I thought we were but I would have to

22    go back and see.

23                MR. SILVERSTEIN:  Now, without

24           further adieu, I'm going to share in the

1               chat Exhibit 13 and on the screen.

2                    (Document marked for identification

3               as Kim Deposition Exhibit No. 13.)

4    BY MR. SILVERSTEIN:

5         Q.    Mr. Kim, are you -- let me withdraw

6    that.  So Exhibit 13 is a document the debtor has

7    produced, it was attached to your first day of

8    declaration, this particular version bears Bates

9    numbers LTL 0001 through 20, it's entitled Amended

10   and Restated Funding Agreement.  I'm going to

11   scroll down and please let me know if and when you

12   reach a point where you are satisfied that you are

13   familiar with this agreement.

14        A.    I'm familiar with this document.

15        Q.    Okay, very good.  What was your

16   involvement, if any, in the negotiation or

17   preparation of this agreement?

18        A.    I was involved in discussions

19   concerning the agreement.  I did not negotiate it

20   or draft it.

21        Q.    Who did negotiate it, to your

22   knowledge?

23        A.    I don't know.  I think internally

24   it would have been -- because it's an agreement

1    among J&J subsidiaries and J&J, it would have been

2    looked at just for fairness.  So I'm not sure

3    negotiation is the right word, but, yeah, I'm

4    actually not sure who actually opined on that.

5         Q.    Who looked at it for fairness?

6         A.    Again, I'm not sure who was

7    responsible for that.  It would have been the, you

8    know, internal review.

9         Q.    Was any external fairness opinion

10   received in connection with any aspect of the

11   October transactions?

12        A.    I'm not aware.

13             MR. JONES:  Object to foundation

14        but you can answer.

15   BY MR. SILVERSTEIN:

16        Q.    To your knowledge?

17        A.    I'm not aware of any.

18        Q.    Okay.  I guess it's fair to say

19   that you have never seen an external fairness

20   opinion relating to any of the transactions that

21   occurred in October of 2021?

22        A.    I have not.

23        Q.    Okay.  And is there a department or

24   group that is tasked with internal fairness

Confidential - John K. Kim - Esquire

1    reviews?

2           A.      I do not know.

3           Q.      Well, in this particular case of

4    the transactions that transpired in October of

5    2021 that led to the formation of the debtor, is

6    there anyone that you're aware of who was involved

7    in the internal fairness review?

8           A.      Well, all parts of the transaction

9    have to be approved internally so there is a

10   process for doing that, I'm just not aware of,

11   sitting here right now, who had done that.

12          Q.      And what is your understanding of

13   the process?

14          A.      That any transaction needs to be

15   reviewed by certain levels of executives in order

16   for the transaction to be approved.

17          Q.      So the approval by whatever the

18   necessary levels are is the internal fairness

19   review that you're referring to?

20          A.      Yes.

21          Q.      And how is the internal fairness

22   review different from any other approval process

23   involving a transaction in which a Johnson &

24   Johnson company is involved with, to the best of

1    your knowledge?

2              MR. JONES:  Object to form.

3              THE WITNESS:  I don't think it

4         differs.

5    BY MR. SILVERSTEIN:

6         Q.    Okay.  So to the best of your

7    knowledge there is no different review undertaken

8    with regard to inter-company transactions than

9    there is with regard to transactions between a

10   Johnson & Johnson entity and an outside entity?

11        A.    So when I said -- when I brought up

12   the fairness -- internal fairness issue I was

13   distinguishing that from negotiation.  In other

14   words, when you're dealing with a third party

15   they're negotiated terms.  When it's an internal

16   transaction, then it's just -- you know, there's

17   no negotiation, people are just looking at it for

18   whether it's fair or not.

19        Q.    I see.  And the fact that the

20   transaction took place indicates that the

21   transactions cleared the internal fairness

22   process?

23        A.    Yeah, you see a term internal

24   fairness process.  It went through the approval

Confidential - John Kim - Esquire

1   process is how I would say it.

2            Q.    Okay.  And, again, if this -- you

3   testified to this with Mr. Satterley, I do

4   apologize, I paid attention but I don't remember

5   everything.

6                 Who, to the best of your knowledge,

7   was involved in the internal approval process?

8            A.    Again, yeah, I would defer to -- I

9   have to look at a document to refresh my

10  recollection as to who was involved but, you know,

11  I think -- I'm not -- in the closing documents so,

12  you know, documents were signed approving these

13  transactions and the people who signed those

14  documents would have been the people involved.

15                For example, the board of Janssen

16  Pharmaceutical, which is one of the parent

17  companies, had to approve that transaction in

18  order to have the subsidiary formed underneath

19  and, likewise, with this amended funding

20  agreement, you know, it was -- can you go to the

21  bottom of it for signatories.

22                So all these people would have had

23  to review and approve the transaction.  Sorry, so

24  if you could go up.  So right there, you can stop.

```
1              Michelle Ryan, who is the treasurer
2   of Johnson & Johnson, had to execute this
3   agreement.  Michelle Goodridge, the president of
4   JJCI, would have had to have approved this
5   agreement so they're the ones that would be
6   responsible for looking at the terms and approving
7   this and, of course, on the LTL side it's Bob
8   Wuesthoff.
9         Q.    And which attorneys, to your
10  knowledge, were involved in the preparation of
11  this document, either in-house or outside?
12        A.    I think the principal attorney
13  involved would have been Chris Andrew.
14        Q.    And was any outside counsel
15  involved, to the best of your knowledge?
16        A.    Jones Day was involved.  Could you
17  go further up.  I just want to see what other --
18        Q.    Tell me where you would like me to
19  stop.
20        A.    Right there, stop.  Can you go down
21  for the notices.
22              I believe Jones Day was involved.
23        Q.    Was there any attorney in
24  connection with this funding agreement
```

1    representing the interests of Johnson & Johnson,

2    to your knowledge?

3         A.    I'm sorry, outside attorney or I'm

4    not sure what you're asking.

5         Q.    Any inside, outside, any other

6    attorney, any attorney whatsoever representing the

7    interests of Johnson & Johnson?

8         A.    I think there were numerous

9    attorneys involved.  Chris Andrew is one, he is an

10   attorney that does these types of transactions so

11   he was sort of leading this but other attorneys

12   were involved.

13        Q.    Okay.  Was there any attorney, to

14   your knowledge, utilized or engaged to represent

15   the interests of Johnson & Johnson in the

16   preparation or execution of this amended and

17   restated funding agreement?

18             MR. JONES:  Object to foundation.

19             THE WITNESS:  I think I said there

20        were lots of attorneys involved.

21   BY MR. SILVERSTEIN:

22        Q.    Well, just so that we're all

23   understanding each other, what I'm trying to

24   figure out is whether there were attorneys for one

1   party, attorneys for another party and attorneys

2   for the third party and maybe we can skip through

3   all that if you can't identify one from the other?

4           A.     I would say there were attorneys

5   looking out for all the parties.  Again, this is

6   an internal funding agreement.  It's not a

7   negotiation, per se, between adverse parties.

8           You know, I think people were --

9   there were attorneys involved in the transaction

10  to, you know, to help make sure that everything

11  was appropriate and, you know, done correctly.

12          Q.     Okay.  To the best of your

13  knowledge, all the attorneys involved with this

14  funding agreement were representing the interests

15  of all of the parties to the agreement?

16          MR. JONES:  Object to foundation

17          and form.

18          THE WITNESS:  To the extent -- it's

19          a little -- I agree they were all looking

20          out because at the time this agreement was

21          really put together it was -- while the

22          process was happening, the divisional

23          merger process was happening.

24          So I would say all the attorneys

Confidential - John Kim - Esquire

```
 1              were looking at this from a joint

 2              perspective to make sure that all

 3              processes were being followed and the

 4              agreement was appropriate.

 5    BY MR. SILVERSTEIN:

 6         Q.    Okay.  I'm now going to share what

 7    will be Exhibit 14, first to the chat.

 8              MR. JONES:  So we could see --

 9              MR. SILVERSTEIN:  I understand.

10              MR. JONES:  I just wanted you to

11              know that.

12              MR. SILVERSTEIN:  Thank you.

13              Exhibit 14 is being shared to the chat and

14              now, Mr. Kim, I'm going to share it to the

15              screen.

16              (Document marked for identification

17              as Kim Deposition Exhibit No. 14.)

18    BY MR. SILVERSTEIN:

19         Q.    Mr. Kim, one question before I ask

20    you to turn your attention to this particular

21    document, did you recall anyone on the board of

22    Janssen who was involved in the internal approval

23    process?  I understand you want to refer to

24    documents, I'm just asking to the best of your
```

```
 1    recollection as you sit here now?

 2          A.    No, I was not involved in that

 3    process so my information comes from the document.

 4          Q.    Okay.  Let me ask you this:  You

 5    are a representative of the debtor today, correct?

 6          A.    Yes.

 7          Q.    You've been a representative of the

 8    debtor since you were appointed chief legal

 9    officer, correct?

10          A.    Yes.

11          Q.    Do you have confidence that the

12    series of transactions that were entered into in

13    October of 2021 were fair to the debtor?

14          A.    Yes.

15          Q.    And what is it that gives you that

16    confidence?

17          A.    A review of the terms and my

18    experience and understanding of the litigation and

19    my discussions with the folks that help put the

20    transaction together.  Advice of counsel.

21          Q.    Which counsel are you referring to

22    for that level of confidence?

23          A.    Jones Day.

24          Q.    Does the fact that the transactions
```

1    cleared the approval process at Johnson & Johnson

2    contribute to the confidence that you have in the

3    fairness of the transaction?

4         A.     Yeah, I assume it does because the,

5    you know, if the process was followed, I believe

6    that would result in a transaction that's

7    appropriate.

8         Q.     I can represent to you, Mr. Kim,

9    that I will certainly scroll down, if you don't

10   believe me, that on the screen now and what was

11   shared in the chat is a true and correct copy of

12   what the debtor filed as the First Day Declaration

13   that you executed.

14              You're familiar with this, correct?

15        A.     Yes.

16        Q.     I just want to focus your attention

17   on a couple of paragraphs about the funding

18   agreement that we just looked at.  I'm going to

19   put paragraph 27 on the screen for you, just read

20   it to yourself and let me know when you're through

21   and let me know when you need me to scroll down

22   for you.  And if there's any other paragraphs that

23   would help you, let me know.  I want to focus you

24   on 27 but if there's more context you would like,

1    just let me know.

2          A.    Once I hear the question, there

3    might be.

4          Q.    Okay.  So in paragraph 27 you

5    attest that the funding agreement requires new

6    JJCI and J&J to, up to the full value of new JJCI,

7    funds amount necessary, A, to satisfy the debtor's

8    talc related liabilities at any time whether is no

9    bankruptcy case and, B, in the event of a Chapter

10   11 filing, to provide the funding for a trust in

11   both situations, to the extent that any cash

12   distributions received by the debtor from Royalty

13   A & M are insufficient to pay such costs and

14   expenses.  And, further, in the case of the

15   funding of a trust, the debtor's other assets are

16   insufficient to provide that funding.

17               Do you see that?

18         A.    I do.

19         Q.    And that was your understanding of

20   the requirement of Johnson & Johnson and new JJCI

21   to fund under the funding agreement, correct?

22         A.    It is.

23         Q.    Okay.  And am I correct that your

24   understanding is that Johnson & Johnson is

Confident Case of John Kim - Esquire

```
 1  required to fund, to the extent that the debtor's

 2  assets are insufficient, such amounts as would be

 3  required to fund the trust to pay for all allowed

 4  bankruptcy claims approved under a plan?

 5             MR. JONES:  Object to the form of

 6        the question, mischaracterizes.

 7             THE WITNESS:  I would defer to the

 8        language that's there.  It's very specific

 9        as to what the requirement is.

10  BY MR. SILVERSTEIN:

11        Q.     Do you have any understanding as to

12  whether or not Johnson & Johnson would be

13  required, under the funding agreement, to fund any

14  amounts the debtor does not have in order for the

15  trust to be able to pay for all claims allowed

16  under a plan of reorganization?

17             MR. JONES:  Same objection, the

18        form.

19             THE WITNESS:  I'm not understanding

20        what your -- the distinction is.  A, this

21        is up to the limit of the value of new

22        JJCI so, you know, that's -- I don't think

23        you said that in your question but, again,

24        I would defer to the statement in the
```

Confidential - John Kim Esquire

```
 1              funding agreement for the terms that are

 2              laid out quite specifically.

 3    BY MR. SILVERSTEIN:

 4         Q.      Okay.  Do you have any

 5    understanding as to -- withdrawn.

 6              Do you have any understanding,

 7    other than the words that are in this paragraph,

 8    as to what Johnson & Johnson is required to fund,

 9    if anything, under the funding agreement?

10         A.      I would defer the funding

11    agreement.  This is, you know, a description of

12    the funding agreement.  If the question is the

13    funding agreement, I would defer to the funding

14    agreement.

15         Q.      I do understand that and I will

16    stipulate that the funding agreement says what it

17    says but I am asking what your understanding is.

18              So my question is do you have any

19    understanding as to what Johnson & Johnson, under

20    the funding agreement, is required to fund?

21              MR. JONES:  Object as asked and

22         answered.

23              THE WITNESS:  It's laid out in this

24         document right here as to what Johnson &
```

1          Johnson and new JJCI is required to fund.

2   BY MR. SILVERSTEIN:

3          Q.      Just so that we're clear and we can

4   move on, your understanding of what Johnson &

5   Johnson is required to fund under the funding

6   agreement is limited to how you've expressed it

7   and what you've expressed in paragraph 27; is that

8   correct?

9          A.      Again, I would defer to the funding

10  agreement for all its terms.  This is just sort of

11  a synopsis of what it is.  If you want to go to

12  the funding agreement and point to the language in

13  the funding agreement, I'm happy to do that.  I

14  would defer to what's in the funding agreement.

15  This is a synopsis of what's contained in there

16  and I would leave it at that.

17         Q.      I understand but you're the

18  representative of the debtor who has been put

19  forward for the first day hearings and for this

20  preliminary junction motion.  I'm trying to

21  discern what your understanding is of Johnson &

22  Johnson's responsibilities under the funding

23  agreement.  I agree that the funding agreement

24  says what it says.  I'm trying to understand what

1    you understand it to mean.

2         A.    So what I would say is this is a

3    synopsis of what I think the salient portions of

4    the funding agreement are.  There may be some

5    discrepancies and I would defer to the funding

6    agreement but, again, I would have to look at the

7    funding agreement for the -- any nuances that may

8    be lost here.

9         Q.    Okay.  Let me ask this: in terms of

10   prong A, where you wrote that the funding

11   agreement requires new JJCI and J&J to, up to the

12   value of new JJCI, fund amounts necessary to

13   satisfy the debtor's talc-related liabilities at

14   any time when there is no bankruptcy case, is it

15   your understanding that such talc-related

16   liabilities would include indemnity liabilities?

17              MR. JONES:  Objection as asked and

18        answered.  He's told you what his

19        understanding is premised on and what it

20        is.

21              MR. SILVERSTEIN:  Please don't say

22        anything more than objection, asked and

23        answered.

24              MR. JONES:  Objection, asked and

```
 1              answered.  This is becoming harassing,

 2              Adam, is the point.  I'm suggesting to you

 3              that asking him again and again to tell

 4              you again where he finds the meaning is

 5              harassing so let's -- I'll say no more

 6              about it.

 7                   MR. SILVERSTEIN:  Okay, you have

 8              now said it and I'm going to ask it one

 9              more time and I'm going to stipulate there

10              is a standing objection that this question

11              has been asked and answered, I'm going to

12              ask it anyway.

13     BY MR. SILVERSTEIN:

14              Q.     In the sentence that I just read

15     with respect to the portion that says that Johnson

16     & Johnson -- withdrawn.  I'm going to read it

17     again.

18                   The funding agreement requires new

19     JJCI and J&J to, up to the full value of new JJCI,

20     fund amounts necessary to satisfy the debtor's

21     talc-related liabilities at any time when there is

22     no bankruptcy case.

23                   In that context did you understand

24     and do you understand whether talc-related
```

Confidential - John King, Esquire

1    liabilities include indemnity liabilities relating

2    to talc?

3         A.    I would have to go back and see

4    whether indemnities are talc-related liabilities.

5    I would defer to the agreement.

6              Sitting here right now I would

7    think that they are talc-related liabilities, but,

8    again, I would defer to the actual agreement and

9    definitions therein.

10        Q.    Okay.  What is your -- withdrawn.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - John Kim, Esquire



Confidential - John Kim, Esquire



Confidential - John King, Esquire

1

2

3

4

5

6        Q.      Okay.  And do you have knowledge of

7   information of the value of old JJCI immediately

8   before -- withdrawn.  I don't want to be in any

9   way argumentative.

10               Are you -- do you have any

11  knowledge or information about the value of old

12  JJCI immediately before the devisive merger in

13  October of 2021?

14       A.      No, I do not.

15       Q.      Have you ever seen any documents

16  ascribing a value to Johnson & Johnson Consumer,

17  Inc. prior to the series of transactions that

18  occurred in October of 2021?

19               MR. JONES:  Object to form.

20               THE WITNESS:  Yes, but not fair

21          market value.

22  BY MR. SILVERSTEIN:

23       Q.      And what documents have you seen?

24       A.      There's a stipulation that we've

1    entered into that discusses the net worth number

2    of old JJCI and that number, of course, is just

3    assets liability type calculation, it's not a fair

4    market value of the business so I have seen that

5    valuation.

6              Q.    Okay.  So that we don't have to

7    talk theoretically, I'm going to show you one such

8    stipulation.  We're skipping ahead, it's already

9    marked as Exhibit 16, I'm going to share it in the

10   chat.  And I'm going to now share it on the

11   screen.  This is a publicly filed document

12   entitled Stipulation, filed in a lawsuit entitled

13   Ellen Kleiner and Yury Kleiner versus Johnson &

14   Johnson and Johnson & Johnson Consumer, Inc.

15              Have you seen this document before?

16              A.    Not this document but a document

17   similar to this.

18              Q.    Okay.  And have you approved the

19   filing of documents similar to this in talc

20   litigations?

21              A.    Yes.

22              Q.    Okay.  And am I understanding you

23   correctly that in the stipulations that you've

24   approved, the use of the word net worth reflects

Confidential - John Kim, Esquire

```
 1    the book value of the entity to which it refers?
 2              MR. JONES:  Form.
 3              THE WITNESS:  Yes, this stipulation
 4         comes from work that was done in the first
 5         New Jersey case and there is a deposition
 6         of Mark Schneider that goes through the
 7         calculation of how this is calculated.
 8         It's not a fair market value calculation.
 9         It is a calculation just based upon assets
10         and liabilities.
11    BY MR. SILVERSTEIN:
12         Q.    Are you familiar with the term book
13    value?
14         A.    I've heard the term, I think
15    that's -- I just don't -- I'm not comfortable
16    affirming, you know, what book value might be but
17    I believe that's correct, but it's a basis of
18    just, you know, what a company owns and what it
19    owes.
20         Q.    Okay.  So is it fair though that
21    when you approved the filing of stipulations
22    referring to a net worth for a particular company,
23    you had in your mind net worth being the
24    difference between the total assets of the company
```

Confidential - John Kim, Esquire

1    on the books and the total liability of the

2    company on the books?

3                    MR. JONES:  Objection.

4                    THE WITNESS:  This is a

5            stipulation, this is what plaintiffs

6            agreed to would be the definition of net

7            worth.  So as far as I know, there's no

8            standard definition of net worth.  We

9            spent a lot of time with different

10           plaintiffs' counsel, trying to come up

11           with a value because, again, fair market

12           value is a very difficult -- difficult

13           concept to try to get and so this net

14           worth number was a stipulated number and

15           way of getting it that we agreed to with

16           various plaintiffs' attorneys.

17   BY MR. SILVERSTEIN:

18           Q.    Have you ever at any point in time

19   during the course of your employment at Johnson &

20   Johnson seen any documents ascribing a fair market

21   value to Johnson & Johnson Consumer, Inc.?

22           A.    I don't believe I've seen that,

23   that number, no.

24           Q.    Other than Mr. Lisman, have you

1   spoken with any other finance person about the

2   value of new JJCI?

3          A.    I think there was -- so when we

4   spoke with Mr. Lisman there were other finance

5   folks I believe on the call and the consensus was

6   that net worth -- that fair market value would be

7   fair greater than book value or assets minus

8   liabilities number.

9          Q.    I'm sorry, there were --

10         A.    There were other --

11         Q.    The consensus among who?

12         A.    Other finance people, so there were

13  other finance people on the call, I just can't

14  recall who they were or their names.

15         Q.    I'm sorry, when was the call?

16         A.    Earlier this week.

17         Q.    When was the first time that you

18  heard anyone discuss a 60 billion-dollar valuation

19  in connection with the value of new JJCI?

20              MR. JONES:  Object to form.

21              THE WITNESS:  I don't recall.  It

22         was -- I don't recall the first time this

23         topic was discussed.

24  BY MR. SILVERSTEIN:

1          Q.     Was it before or after the filing

2     of the bankruptcy?

3          A.     It was after the filing of the

4     bankruptcy.

5          Q.     Okay.  So when the funding

6     agreement was executed, by that point in time you

7     had not heard anyone mention a 60 billion-dollar

8     valuation in connection with new JJCI?

9          A.     No, because at the time -- the

10    funding agreement was set out to put -- to put

11    claimants in a better position than they were and

12    in order to put them in a better position,

13    basically, we wanted to have a funding agreement

14    that at least replaced what the value of JJCI was

15    and then, you know, there were other additions,

16    like having a Johnson & Johnson guarantee.  So

17    they're in a better position than they were and

18    the way that you get there, it's a relative

19    position of what the value of the funding

20    agreement is and so if it's pegged to the value of

21    new JJCI, then by definition, you know, the

22    claimants are in a better position.

23               So you don't actually have to do

24    the valuation to understand that the way it works

```
 1    puts claimants in a better position, all right.

 2    So we didn't do the calculation but we did know

 3    that by doing it this way, by having this

 4    calculation, it put the claimant in a better

 5    position than they were.

 6          Q.    Okay.  Let me skip ahead.  What are

 7    your responsibilities as the chief legal officer

 8    at LTL, in general?

 9          A.    So my primary responsibility is to

10    effect a equitable and efficient resolution to the

11    talc liability, so my principal objective is to

12    try to settle this liability fully, fairly,

13    finally.

14          Q.    Okay.  Do you have any

15    responsibilities within the Johnson & Johnson

16    enterprise meaning, you know, all of the

17    companies, outside of your responsibilities as

18    chief legal officer of LTL?

19          A.    No, I resigned all those posts and

20    my only duty now is the fair and equitable

21    resolution to this, talc liabilities.

22          Q.    Has Mr. White been seconded to LTL?

23          A.    He has not been seconded to LTL.

24    In fact, he has taken over my duties at J&J.
```

Confidential - John K. Kim - Esquire

1          Q.     Who has been seconded to LTL

2     besides yourself?

3          A.     So far it's myself and Bob

4     Wuesthoff and Rich Dickinson, but we do have an

5     agreement, a services agreement.  We have been

6     looking for further support so we anticipate that

7     others may be seconded or at least part-time

8     allocated to us.

9          Q.     Okay.  And I'll give you the

10    opportunity to give me this answer, what -- if the

11    MDL and other litigation continue against Johnson

12    & Johnson, how would your efforts to reorganize

13    the debtor be impacted?

14         A.     It would be severely impacted.

15         Q.     Okay.  So if you have no

16    responsibilities as to the bankruptcy, how is that

17    so?

18         A.     Because the fact that the

19    litigation continues against Johnson & Johnson

20    creates a situation where, frankly, the exact

21    claims that are being brought against LTL or that

22    LTL has is being litigated, so any I think we -- I

23    think I'm going to be forced to have to deal with

24    that but, secondly, it defeats the whole purpose

1    of a bankruptcy where you're looking for fair and

2    equal treatment among claimants, where you have

3    some claimants now in the tort system litigating

4    the very same claims they have against LTL and

5    getting, you know, differing results.

6              So I think as it's laid out in my

7    statement, first of all, you know, old JJCI has

8    been winning most of the cases but every once in a

9    while, you know, a plaintiff's verdict will appear

10   that is an outlier.  So the whole issue of having

11   this sort of unfair treatment of claimants

12   continues on and all of that will be detrimental

13   to my purpose of trying to come up with a fair,

14   equitable, efficient resolution to the entire

15   litigation.  So I believe it's untenable to have

16   all this other litigation going on while trying

17   to, at the same time, come up with a so-called

18   global, you know, solution to this issue.

19              Q.    Is there any other impact that you

20   have in mind that would deter the debtor from its

21   reorganization efforts if litigation against

22   Johnson & Johnson continued, other than what

23   you've just described?

24              A.    I mean, I think what I described

1    encompasses a lot.  So, for example, the res

2    judicata effect, you know, the effect of allowing

3    certain claimants to go around the bankruptcy

4    system to try to fashion a claim that they think

5    survives bankruptcy.

6                    For example, there was a recently

7    filed complaint just against J&J that alleges the

8    exact same things but just doesn't mention old

9    JJCI or LTL.

10                   There's also the example of a judge

11   in South Carolina who has denied our motion to

12   limit the case against J&J and her view is that

13   everything is the same in that she is not going to

14   allow us to limit any evidence with respect to old

15   JJCI or change anything about how these cases were

16   tried previously.  So, you know, with those

17   situations going on right now, it is -- it is

18   impossible for us to reorganize in a manner that

19   would -- that's necessary to deal with this --

20   these issues.

21          Q.      And so you would agree that for

22   those reasons, it is preferable for the claims

23   against Imerys to have been resolved in the Imerys

24   bankruptcy, as opposed to in the MDL litigation;

1    is that right?

2            A.      I'm not sure where the Imerys

3    situation comes up and how you're equating that.

4    What I'm saying is because of these issues, there

5    needs to be a stay against -- for the benefit of

6    Johnson & Johnson and retailers, for example, or

7    else the very same claims that are being litigated

8    against -- against them are going to effect LTL.

9                    So I'm not sure where you're going

10   with Imerys.

11           Q.      Okay.  Are you aware of any

12   payments by -- if I misstated it, I apologize, the

13   name came up yesterday, is it Middlesex Insurance,

14   the captive insurance company?

15           A.      Yes, Middlesex Insurance Company.

16           Q.      Okay.  Are you aware of any

17   payments by Middlesex Insurance Company to any

18   third parties on talc claims?

19           A.      Yes, Middlesex is the first line of

20   insurance and has been paying claims -- expenses

21   and I believe some settlements, although I'm not

22   sure when the actual settlements happened, whether

23   the settlements are exhausted by that time, but,

24   certainly, it has paid expenses related to the

1    talc litigation.

2          Q.     Do you have any role with

3    Middlesex?

4          A.     I do.

5          Q.     Or did you have any role?

6          A.     I did, I did.

7          Q.     What was your role?

8          A.     So I handled -- I'm the principal

9    attorney for insurance coverage litigation and I

10   am the attorney that advises Middlesex as a

11   subsidiary.

12         Q.     Do you still do any work with

13   Middlesex?

14         A.     Not since I changed positions.

15         Q.     Okay.  And what was -- I understood

16   from Mr. Lisman yesterday --

17         A.     Although, you know, the

18   Middlesex -- the insurance liability is also LTL's

19   liability so I don't do it in the capacity as I

20   did before but as an LTL liability, I would still

21   be responsible for the insurance coverage issues.

22         Q.     I understood from Mr. Lisman

23   yesterday that the Middlesex insurance coverage

24   was exhausted in the fourth quarter of 2018.

Confidential - John Kim Esquire

```
 1                    Is that your understanding?

 2         A.      That is my understanding.

 3         Q.      Okay.  And what was the coverage

 4    that was exhausted at that point?

 5         A.      Middlesex had an underlying layer

 6    of $100 million and an excess layer of

 7    $200 million for a total layer of $300 million.

 8         Q.      Okay.  And has the debtor produced

 9    the copies of the Middlesex policies?

10         A.      I believe it has.  My understanding

11    was that the insurance policies that we had were

12    produced but I believe we have but, you know,

13    that's my understanding.  I have not reviewed the

14    production to confirm that.

15         Q.      Okay.  And where are records

16    relating to Middlesex located?

17         A.      Middlesex, in the risk department

18    at Johnson & Johnson in New Brunswick, but I think

19    they're all produced in underlying litigation.

20         Q.      And to your knowledge is any --

21    withdrawn.

22                 Do you have any knowledge of any

23    information about talc that is provided to PWC?

24         A.      I have been involved in the process
```

Confidential - John Kim - Esquire

1  of -- it would be part of the reserving process

2  where we talked to PWC.

3         Q.    Do you have any understanding as to

4  whether any of Middlesex's records have been

5  provided to PWC?

6         A.    Middlesex has its own auditing done

7  by a firm in -- actually, it may be both PWC and a

8  firm in Vermont.  I'd have to check to see what

9  they've provided to PWC.  PWC, I know that they

10  are involved in Middlesex review but they're not

11  the auditors for Middlesex.  Middlesex has its own

12  auditors in Vermont.  It's a Vermont captive.

13         Q.    Does Middlesex, to your knowledge,

14  make regulatory filings in Vermont?

15         A.    It does.

16         MR. SILVERSTEIN:  Okay.  Let's take

17         a short break.  I'm going to look through

18         my notes and I will have a little bit more

19         cleanup but we're almost done, and I

20         appreciate all of your time.

21         MR. JONES:  Thanks.  By my clock

22         you've got about ten or 12 minutes, Adam.

23         MR. SATTERLEY:  I'm going to have

24         about three or four minutes of questions.

```
1              MR. SILVERSTEIN:  I will make sure

2         that I leave Mr. Satterley that time.

3              MR. JONES:  Okay.  You guys can arm

4         wrestle while we're off the record.  We'll

5         come back in five.

6              (Brief recess taken at 5:19 p.m.)

7              (Deposition resumes at 5:25 p.m.)

8  BY MR. SILVERSTEIN:

9         Q.    We have so much to ask you,

10 Mr. Kim, but we will abide by what we said we

11 would.

12              You indicated you were seconded to

13 LTL.  Where do you do your work for LTL from?

14        A.    My office has stayed the same at

15 One Johnson & Johnson Plaza.

16        Q.    Okay.  And is there anything

17 different about your office now that you're

18 seconded to LTL?

19        A.    Less files, fewer files I guess.

20        Q.    Okay.  Is there any -- is your

21 office the dedicated LTL office space at the

22 moment?

23        A.    No, it's not.  The LTL offices are

24 across the street, at a building called Johnson
```

1    Hall, that's where Rich Dickinson's office is.

2          Q.     Okay.  So the dedicated LTL space

3    is at Johnson Hall?

4          A.     Yes.

5          Q.     And that's where Rich Dickinson is

6    located?

7          A.     Correct.

8          Q.     And is that -- I've never been

9    there.  If I walked in, would I know where to go

10   for LTL?

11         A.     I don't think that's -- no, I don't

12   believe there's a sign or anything up for that.

13         Q.     If I wanted to speak to somebody

14   about LTL business and I went to that address, how

15   would I know where to go within the building?

16         A.     So that just happened last week,

17   there was a representative from Serberus that LTL

18   Management wanted to talk to and so he wound up in

19   the cafeteria at One Johnson Hall and they had a

20   business meeting there.

21         Q.     Is that the LTL conference room at

22   the moment?

23         A.     It's the cafeteria that has -- so

24   it's open space, so, you know, like a lot of

1  offices, there are areas that is hotelling,

2  there's no dedicated offices for people and you

3  squat in places.

4       Q.    Just one last matter and then I'm

5  going to turn you over to Mr. Satterley.

6            Prior to the Imerys bankruptcy

7  filing did you have any experience with any

8  bankruptcy matters in your professional capacity?

9       A.    Yes.

10      Q.    Okay.  Just can you quickly tell me

11  the cases, you don't have to give me a full

12  description.

13      A.    So I was involved in -- my first

14  bankruptcy case was In Re: Braniff, the Braniff

15  bankruptcy. I was involved in the Continental

16  bankruptcy.  I was involved in the Harris

17  bankruptcy in New Orleans.  I was involved in

18  the -- one of the savings and loan bankruptcies,

19  Oaktree -- it was the savings and loan that owned

20  the PGA West in La Quinta, I was involved in that

21  bankruptcy.

22      Q.    And these were all prior to your

23  employment at Johnson & Johnson?

24      A.    Yes, yes.  I did a lot of

Confidential - John Kim, Esquire

```
 1   bankruptcy work at Simpson.

 2              MR. SILVERSTEIN:  Okay.  Mr. Kim, I

 3         really do appreciate the time you spent

 4         with us.  Mr. Jones, I appreciate your

 5         general professionalism and,

 6         Mr. Satterley, I'm going to turn it over

 7         to you.

 8              MR. SATTERLEY:  Thank you.

 9   BY MR. SATTERLEY:

10         Q.    Mr. Kim, hopefully I will have less

11   than ten minutes for today and we'll meet and

12   confer regarding the documents we requested, if

13   need be, for later questioning.

14              I just want to ask you there were

15   some documents produced by LTL recently addressed

16   to you from Travelers wherein there's discussion

17   of Johnson & Johnson talc claims.

18              Are you familiar with those

19   letters?

20         A.    You would have to show me.

21         Q.    I'll show you one as an example and

22   I'm not going to dig into the details, just

23   because we don't have time.  Let me see if I

24   can --
```

Confident Law - John Kim, Esquire

```
1              A.    I've been working with Travelers

2      for a while.  I'm not sure which letters you are

3      talking about.

4              Q.    So this -- is that -- can you see

5      it?

6              A.    No.

7                    MR. JONES:  Can't make it out,

8              whatever it is, Joe.

9                    MR. SATTERLEY:  You couldn't see

10             the letter?

11                   MR. JONES:  No, it just was a gray

12             base.  We're looking at you now.

13                   MR. SATTERLEY:  Let me see.  I'm

14             going to close out my -- I'm going chew up

15             all my time on technical problems here.

16             Let me reboot the visualizer there.  Here

17             we go.  Let me try this way.

18     BY MR. SATTERLEY:

19             Q.    So this is -- let me go all the way

20     to the top here, from Travelers addressed to you

21     and Thomas Ladd, it's confidential and got Bates

22     number beginning 12447.

23                   Do you see that?

24             A.    I do.
```

Confidential - John Kim - Esquire

 1          Q.     And it says Johnson & Johnson talc

 2    claims.

 3                 When you submitted talc claims to

 4    Travelers, you did on behalf of Johnson & Johnson,

 5    correct?

 6          A.     I think we did it on behalf of

 7    both.  I would have to look at both the actual

 8    claims that we submitted.

 9          Q.     So there would be letters written

10    like, for example, right here it says, "During

11    August 13 conference call Mr. Murdica and Mr. Kim

12    were unable to answer basic questions about how

13    J&J's proposed settlements are being valued," and

14    goes on to talk about that.

15                 My question is with regards to

16    Travelers, Travelers was asserting that J&J was

17    not giving them adequate information to make

18    claims decisions, correct?

19          A.     I would say, first, this is a

20    perfect example of imprecise use of J&J.  When

21    we're dealing with Travelers, Travelers like to

22    think of it as one big enterprise, so they refer

23    to the J&J enterprise, and so I would start with

24    that, and now I've forgotten what your specific

1    question was on that line.

2              MR. SATTERLEY:  Move to strike

3          everything that was nonresponsive.

4    BY MR. SATTERLEY:

5          Q.    My question was Travelers was

6    complaining to Johnson & Johnson that Johnson &

7    Johnson was not giving them sufficient information

8    for them to evaluate the claims, correct?

9          A.    I would -- the letter speaks for

10   itself.  I think there's a long reservation of

11   rights letter that they already sent us that lists

12   all their bases for denying coverage but I would

13   refer to their specific letter.

14         Q.    Well, there was several letters

15   produced from Travelers addressed to you regarding

16   their view that Johnson & Johnson wasn't giving

17   them sufficient information to evaluate claims,

18   correct?

19         A.    I would say that they were

20   complaining about the insureds -- all the insureds

21   in a -- what they would consider insufficient

22   information.

23         Q.    And they also told you that it was

24   their view, Travelers' view, that J&J could not

Confidential - John Kim - Esquire

1   receive a channeling injunction with regards to

2   the Imerys bankruptcy, true?

3        A.    I would have to see the context of

4   that.

5        Q.    They advised you that a claim -- a

6   claim against Imerys is not derivative of J&J,

7   correct?

8        A.    Again, I would have to look at

9   their legal assertions and, frankly, we disagreed

10  with virtually everything Travelers said at all

11  times so it would not be surprising for me that

12  they would make incorrect assertions in a letter

13  where they're denying coverage.

14           MR. SATTERLEY:  I'll mark an

15           exhibit, I think I left off on Exhibit 4

16           and Adam has picked up on Exhibit 5, so

17           that letter I showed you I'll mark as

18           Exhibit 4.  Adam what was your last

19           exhibit number?

20           (Document marked for identification

21           as Kim Deposition Exhibit No. 4.)

22           MR. SILVERSTEIN:  There's a couple

23           of gaps but the last one I just showed

24           was -- Exhibit 15 is available.

Confidential - John Kim - Esquire

```
 1              MR. SATTERLEY:  Fifteen?

 2              MR. SILVERSTEIN:  Yes.

 3              MR. SATTERLEY:  I'll pick up at 15

 4         if I can get this thing to work here.  I

 5         don't think it's going to work.

 6              MR. JONES:  Joe, you've got about

 7         one minute in any event.

 8              MR. SATTERLEY:  Okay.

 9    BY MR. SATTERLEY:

10         Q.    Well, you said, Mr. Kim that there

11    are more defense verdicts than there are plaintiff

12    verdicts; in fact, there have been 17 plaintiffs

13    verdicts and 17 defense verdicts, true?

14         A.    I would have to look through my

15    chart but my understanding is that's -- I'm not

16    sure how you are counting that.  I have to go

17    through and look at it.

18         Q.    LTL has produced a list of the

19    various case numbers, the verdicts and the status,

20    you're familiar with that list?

21         A.    I am.  I would have to look at that

22    list.

23         Q.    Who put that list together?

24         A.    That was with the help of our
```

Confident Page - John Kim - Esquire

1   outside counsel.

2          Q.     And that list has not been used at

3   all to evaluate the value of cases in terms of a

4   total number that should be put in a trust?

5                  MR. JONES:  Object to form.

6                  THE WITNESS:  That list is

7           incomplete and doesn't include all the

8           no-pays that we've had.  That's just a

9           list of verdicts.  And, again, I think

10          I've testified, we haven't sat down and

11          done a, you know, an analysis yet.

12                 MR. SATTERLEY:  Move to strike

13          portions that are nonresponsive.

14   BY MR. SATTERLEY:

15          Q.     My question is that list that has

16   the verdicts hasn't been used to do any type of

17   evaluation or calculations, true?

18          A.     It's used for calculations, it's

19   used for -- you know, we use it, that list

20   internally, you know, but there's not been a

21   calculation of total liability.

22          Q.     Final question, is the 10-K from

23   December 31st, 1978, that was produced as

24   LTL019235, and in that 10-K there is a listing of

 1    legal proceedings, true?

 2            A.     I'd have to look at it.

 3            Q.     Have you looked at it?

 4            A.     Not recently.

 5            Q.     Nowhere in the 1978 10-K is there

 6    any legal proceedings involving talc whatsoever,

 7    correct?

 8            A.     Again, I'd refer to the document.

 9            Q.     You don't know?

10            A.     I just don't know.  I don't have it

11    in front of me.

12                   MR. SATTERLEY:  I guess I'm out of

13            time, Mr. Jones, so why don't you let me

14            know tomorrow morning -- before tomorrow

15            morning or tomorrow morning by 10:00

16            Eastern time about the document requests.

17                   MR. JONES:  I'm going to do that,

18            as I said I would.  Thank you, Joe.

19                   Mr. Kim, I just have one or two

20            questions quickly.

21    BY MR. JONES:

22            Q.     Real quickly I think

23    Mr. Silverstein asked you questions about your

24    testimony at the last hearing; you recall that?

Confidential - John Kim - Esquire

 1          A.      Yes.

 2          Q.      And I thought you gave an answer

 3   you thought it was one-sided and perhaps

 4   misleading.  I want to give you a chance to tell

 5   me an answer to this question.

 6                  Did you testify accurately last

 7   Friday?

 8          A.      Yes.  I thought the question was

 9   misleading.  I'm sorry.  The question was

10   misleading.

11          Q.      Thank you.  Have you testified

12   accurately?

13          A.      Yes, I have.

14          Q.      When Mr. Satterley asked you a few

15   questions earlier in the day, he used the word

16   harm in connection with I think mesothelioma

17   claimants.

18                  And my question to you is do you

19   have a view about whether the bankruptcy filing

20   itself has imposed any harm on anyone?

21          A.      No, I don't believe the bankruptcy

22   filing has imposed any harm on anyone.

23                  MR. JONES:  That's all I have.

24          Thank you, sir.

1    BY MR. SATTERLEY:

2        Q.    One follow-up question.

3            So the questions that your

4    attorneys asked you last Friday were one-sided you

5    said?

6        A.    No, Mr. Satterley.  I think you

7    understood what my complaint was.

8            MR. SATTERLEY:  We'll see you next

9        week in North Carolina.  Thank you for

10        your time today.

11            MR. JONES:  Thanks everybody.

12            MR. SILVERSTEIN:  Thank you.

13            (Witness excused.)

14            (Deposition concluded 5:39 p.m.)

15                    – – –

16

17

18

19

20

21

22

23

24

```
1              C E R T I F I C A T I O N

2                       I, MARGARET M. REIHL, a

3         Registered Professional Reporter,

4         Certified Realtime Reporter, Certified

5         Court Reporter, Certified LiveNote

6         Reporter, do hereby certify that the

7         foregoing is a true and accurate

8         transcript of the testimony as taken

9         stenographically, by and before me,

10        remotely, via Zoom, to the best of my

11        ability, and on the date hereinbefore set

12        forth.

13                      I DO FURTHER CERTIFY that I am

14        neither a relative nor employee nor

15        attorney nor counsel of any of the parties

16        to this action, and that I am neither a

17        relative nor employee of such attorney or

18        counsel, and that I am not financially

19        interested in the action.

20

21        Margaret M. Reihl

22        -------------------------------------------------

          Margaret M. Reihl, RPR, CRR, CLR

23        CCR License #XI01497

          NCRA License #047425

24
```

1          ACKNOWLEDGMENT OF DEPONENT

2              I, JOHN KIM, ESQUIRE, do hereby

3          certify that I have read the foregoing

4          pages and that the same is a correct

5          transcription of the answers given by me

6          to the questions therein propounded,

7          except for the corrections or changes in

8          form or substance, if any, noted in the

9          attached Errata Sheet.

10

11

12   _____    11/30/21

     JOHN KIM, ESQUIRE                   DATE

13

14

15

16

17

18

19

20

21

22

23

24

```
1                          ERRATA

2      Page      Line

3      109       3      change "didn't" to "did" (TR)
       ------:--------------------------------------------

4      162       13     change "seen" to "saw" (TR)
       ------:--------------------------------------------

5      172       1      change "bolus" to "bulk" (TR)
       ------:--------------------------------------------

6      186       24     change "for to indemnity" to
       ------:-------------- "for indemnifying" (TR)

7      ------:--------------------------------------------

8      202       11     change "Denise Houghton John" to
       ------:-------------- "Denise Houghton and John" (TR)

9      ------:--------------------------------------------

10     213       3      change "make sense" to "not make sense" (TR)
       ------:--------------------------------------------

11     221       17     change "get sued as well." to
       ------:-------------- "if it gets sued as well." (TR)

12     252   :   7      change "fair greater" to "far greater" (TR)

13     ------:--------------------------------------------

14     TR = Transcription Error
       ------:--------------------------------------------

15     ------:--------------------------------------------

16     ------:--------------------------------------------

17     ------:--------------------------------------------

18     ------:--------------------------------------------

19     ------:--------------------------------------------

20     ------:--------------------------------------------

21     ------:--------------------------------------------

22     ------:--------------------------------------------

23     ------:--------------------------------------------

24
```