# EXHIBIT 1

1                     UNITED STATES BANKRUPTCY COURT
                     WESTERN DISTRICT OF NORTH CAROLINA
2                          CHARLOTTE DIVISION

3    IN RE:                        :      Case No. 21-30589-JCW

4    LTL MANAGEMENT LLC,           :      Chapter 11

5        Debtor,                   :      Charlotte, North Carolina
                                          Friday, October 22, 2021
6                                  :      1:29 p.m.

7    : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8    LTL MANAGEMENT LLC,           :      AP 21-03032-JCW

9        Plaintiff,                :

10            v.                   :

11   THOSE PARTIES LISTED ON       :
     APPENDIX A TO COMPLAINT and
12   JOHN AND JANE DOES 1-1000,    :

13       Defendants.               :

14   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15

16                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE J. CRAIG WHITLEY,
17                  UNITED STATES BANKRUPTCY JUDGE

18   Audio Operator:               COURT PERSONNEL

19
     Transcript prepared by:       JANICE RUSSELL TRANSCRIPTS
20                                 1418 Red Fox Circle
                                   Severance, CO  80550
21                                 (757) 422-9089
                                   trussell31@tdsmail.com
22

23   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
24

25

```
 1   APPEARANCES:

 2   For the Debtor/Plaintiff:      Jones Day
                                    BY:   GREGORY M. GORDON, ESQ.
 3                                        DAN B. PRIETO, ESQ.
                                    2727 North Harwood St., Suite 500
 4                                  Dallas, TX  75201-1515

 5                                  Jones Day
                                    BY:   ROBERT W. HAMILTON, ESQ.
 6                                  325 John H. McConnell Blvd., #600
                                    Columbus, Ohio  43215
 7
                                    Jones Day
 8                                  BY:   JAMES M. JONES, ESQ.
                                    250 Vesey Street
 9                                  New York, NY  10281

10                                  Rayburn Cooper & Durham, P.C.
                                    BY:   JOHN R. MILLER, JR., ESQ.
11                                        C. RICHARD RAYBURN, JR., ESQ.
                                    227 West Trade Street, Suite 1200
12                                  Charlotte, NC  28202

13   For Johnson & Johnson and      Moore & Van Allen PLLC
     Johnson & Johnson Consumer     BY:   HILLARY B. CRABTREE, ESQ.
14   Inc.:                          100 N. Tryon Street, Suite 4700
                                    Charlotte, NC  28202
15
     For The Continental           Parker Poe
16   Insurance Company:            BY:   ASHLEY A. EDWARDS, ESQ.
                                    620 South Tryon Street, Suite 800
17                                  Charlotte, NC  28202

18   For The Plaintiffs' Steering  COLE HAYES, ESQ.
     Committee:                     601 S. Kings Dr., Ste. F PMB #411
19                                  Charlotte, NC  28204

20                                  Otterbourg P.C.
                                    BY:   ADAM C. SILVERSTEIN, ESQ.
21                                        MELANIE L. CYGANOWSKI, ESQ.
                                    230 Park Avenue
22                                  New York, NY  10169

23   For Certain Claimants:         Kazan McClain
                                    BY:   JOSEPH SATTERLEY, ESQ.
24                                        DENYSE F. CLANCY, ESQ.
                                    55 Harrison Street, Suite 400
25                                  Oakland, CA  94607
```

```
 1    APPEARANCES (continued):

 2    For Maune Raichle, et al.:      Waldrep Wall
                                      BY:   THOMAS W. WALDREP, JR., ESQ.
 3                                          KEVIN L. SINK, ESQ.
                                            JENNIFER B. LYDAY, ESQ.
 4                                    370 Knollwood Street, Suite 600
                                      Winston-Salem, NC  27103
 5
      For Certain Claimants:          Levy Konigsberg LLP
 6                                    BY:  JEROME BLOCK, ESQ.
                                      605 Third Avenue, 33rd Floor
 7                                    New York, NY  10158

 8    For Aylstock Witkin, etc.:      Offit Kurman
                                      BY:  PAUL BAYNARD, ESQ.
 9                                    301 South College St., Suite 2600
                                      Charlotte, NC  28202
10
                                      KTBS Law LLP
11                                    BY:  ROBERT J. PFISTER, ESQ.
                                      1801 Century Park East
12                                    Los Angeles, CA  90067-2328

13    For Arnold & Itkin:             Moon Wright & Houston PLLC
                                      BY:  CALEB BROWN, ESQ.
14                                    121 West Trade Street, Suite 1950
                                      Charlotte, NC  28202
15
      For Certain Insurers:           Katten Muchin Rosenman LLP
16                                    BY:  KATHERINE A. SCHERLING, ESQ.
                                      575 Madison Avenue
17                                    New York, NY  10022-2585

18                                    Mendes & Mount LLP
                                      BY   EILEEN T. McCABE, ESQ.
19                                    750 Seventh Avenue
                                      New York, NY  10019
20

21    ALSO PRESENT:                   SHELLEY K. ABEL
                                      Bankruptcy Administrator
22                                    402 West Trade Street, Suite 200
                                      Charlotte, NC  28202
23

24

25
```

```
 1   APPEARANCES (via telephone):

 2   For Certain Claimants:        Essex Richards, P.A.
                                   BY:  JOHN C. WOODMAN, ESQ.
 3                                 1701 South Boulevard
                                   Charlotte, NC  28203
 4
     For Arnold & Itkin:           Pachulski Stang Ziehl & Jones
 5                                 BY:  LAURA DAVIS JONES, ESQ.
                                   919 North Market St., 17th Floor
 6                                 Wilmington, DE  19801

 7   For Johnson & Johnson and     White & Case LLP
     Johnson & Johnson Consumer    BY:  JESSICA LAURIA, ESQ.
 8   Inc.:                         1221 Avenue of the Americas
                                   New York, NY  10020
 9
     For The Continental           DAVID CHRISTIAN, ESQ.
10   Insurance Company:            3515 West 75th Street, Suite 208
                                   Prairie Village, KS  66208
11
                                   Clyde & Co US LLP
12                                 BY:  CLINTON CAMERON, ESQ.
                                   55 West Monroe Street, Suite 3000
13                                 Chicago, IL  60603

14   For Travelers Casualty &      Simpson Thacher & Bartlett LLP
     Surety Company:               BY:  ANDREW T. FRANKEL, ESQ.
15                                      KATHRINE A. McLENDON, ESQ.
                                   425 Lexington Avenue
16                                 New York, NY  10017

17   For the State of Texas:       Office of Texas Attorney General
                                   BY:  AUTUMN D. HIGHSMITH, ESQ.
18                                      RACHEL R. OBALDO, ESQ.
                                   P. O. Box 12548 MC008
19                                 Austin, TX  78711-2548

20   For Bestwall LLC:             King & Spalding LLP
                                   BY:  RICHARD A. SCHNEIDER, ESQ.
21                                 1180 Peachtree Street, N.E.
                                   Atlanta, GA  30309
22
                                   J. JOEL MERCER, JR., ESQ.
23                                 133 Peachtree Street, N.E.
                                   Atlanta, GA  30303-1808
24

25
```

```
1   APPEARANCES (via telephone continued):

2   For Certain AIG Member          Zeichner Ellman & Krause LLP
    Companies:                      BY:  MICHAEL S. DAVIS, ESQ.
3                                   40th Floor
                                    1211 Avenue of the Americas
4                                   New York, NY  10036

5   For Bausch Health:              Simpson Thacher & Bartlett LLP
                                    BY:  SANDEEP QUSBA, ESQ.
6                                   425 Lexington Avenue
                                    New York, NY  10017
7
    For Rio Tinto America Inc.      Nexsen Pruet, PLLC
8   and Three Crowns Insurance      BY:  HARRIS M. WATKINS, ESQ.
    Company:                        P. O. Box 3463
9                                   Greensboro, NC  27402

10                                  WilmerHale
                                    BY:  ISLEY M. GOSTIN, ESQ.
11                                  1875 Pennsylvania Avenue, NW
                                    Washington, DC  20006
12
                                    Farella Braun & Martel LLP
13                                  BY:  JOHN D. GREEN, ESQ.
                                    235 Montgomery Street,17th Floor
14                                  San Francisco, CA  94104

15  For Certain Plaintiffs:         JD Thompson Law
                                    BY:  JUDY D. THOMPSON, ESQ.
16                                  Box 33127
                                    Charlotte, NC  28233
17

18

19

20

21

22

23

24

25
```

1                              INDEX

2

                             Cross      Redirect    Recross
3  WITNESSES FOR THE
     PLAINTIFF/DEBTOR:
4
   John K. Kim                   43        131         138
5

6  EXHIBITS:                               Marked      Received

7        Supplemental declaration
           of John Kim                                    16
8
         Claimants' A   Stipulation         30           31
9
         1     Declaration of John Kim      53          119
10
         2-A   12/12/78 board minutes       66          119
11
         3     Testimony excerpts of
12               Dr. John Hopkins           50          119

13       4     Memorandum of Law            54          119

14       5                                               119

15       6     Oral argument excerpt       58          119

16       6-A   Transcript excerpts         62          119

17       7     Advertisement               77          119

18       8     Testimony excerpts of
                 Dr. John Hopkins          81          119
19
         9                                               119
20
         10    Sworn testimony of
21               Dr. John Hopkins          85          119

22       11    Testimony excerpts of
                 Dr. John Hopkins          89          119
23
         12    6/4/2000 e-mail             92          119
24
         13    12/17/18 e-mail             96          119
25

1                         INDEX (continued)

2    EXHIBITS:                              Marked        Received

3        14    Gorsky video                101           119

4        15    Screenshot of Alex Gorsky   101           119

5        16    4/26/19 letter              102           119

6        17    Transcript                  104           119

7        18    Transcript                  106           119

8        19&
         20    Jury verdict forms          107           119
9
         21    Jury verdict form           108           119
10
         22    Jury verdict form           110           119
11
         23                                              119
12
         24    Discovery responses         111           119
13
         25    Discovery responses         115           119
14
15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2       (Call to Order of the Court)

3              THE COURT:  Have a seat, everyone.  Good afternoon.

4       (Counsel greet the Court)

5              THE COURT:  Okay.  We are back in the LTL Management

6  case, an outgrowth of the first day hearings and with,

7  specifically with regard to the debtor's motion to enforce the

8  stay and now what has become a TRO as well.

9              Let me get your appearances first and then we'll take

10  stock of where we are, starting with the middle table.

11             MR. GORDON:  Good morning, your Honor.  Greg Gordon,

12  Jones Day, on behalf of the debtor.  I'm here with Robert

13  Hamilton from Jones Day, Jim Jones is here from Jones Day, Dan

14  Prieto from Jones Day, and then we've got Jack Miller and Rick

15  Rayburn from the Rayburn Cooper firm as well.

16             MR. MILLER:  Afternoon, your Honor.

17             THE COURT:  Uh-huh (indicating an affirmative

18  response).  All right.

19             Mr. Waldrep?

20             MR. WALDREP:  Morning, your Honor.  Actually,

21  actually, good afternoon.  I'm Tom Waldrep with Waldrep Wall

22  and my two partners are with me, Kevin Sink and Jennifer Lyday.

23             THE COURT:  Okay.

24             Ms. Cyganowski.

25             MS. CYGANOWSKI:  Your Honor, Melanie Cyganowski of

1   Otterbourg P.C., counsel to The MDL Plaintiffs' Steering

2   Committee.  With me is my partner, Adam Silverstein, and Mr.

3   Cole Hayes of Hayes --

4           THE COURT:  Okay.

5           MR. HAYES:  Powerhouse Law of Hayes.

6           MS. CYGANOWSKI:  A firm well known.

7           THE COURT:  At least by Mr. Hayes.

8           Others?

9           Yes.

10          MR. BLOCK:  Good morning, your Honor.

11          THE COURT:  Yes, sir.

12          MR. BLOCK:  Good morning, your Honor.  Jerome Block

13   from Levy Konigsberg LLP, representing claimants whose cases

14   that my firm is litigating in the civil system against Johnson

15   & Johnson and Johnson & Johnson Consumer Inc.  Good afternoon.

16          THE COURT:  Afternoon.

17          MR. SATTERLEY:  Good afternoon, your Honor.  Joe

18   Satterley and Denyse Clancy from Kazan McClain Satterley &

19   Greenwood.  Mr. Woodman, who sponsored our *pro hac vice*, he's

20   on the telephone because of --

21          THE COURT:  Uh-huh (indicating an affirmative

22   response).

23          MR. SATTERLEY:  -- a surgery.  We appreciate the

24   opportunity to be before your Honor.

25          THE COURT:  Sure.

 1          Ms. Abel?

 2          MS. ABEL:  Shelley Abel, Bankruptcy Administrator.

 3          THE COURT:  Okay.

 4          Good?

 5      (No response)

 6          THE COURT:  Okay.  Others in the courtroom needing to

 7  announce?  Come on up where you can get to a microphone and --

 8          MS. CRABTREE:  Good morning -- sorry -- good

 9  afternoon, your Honor.  Hillary Crabtree, Moore & Van Allen,

10  representing Johnson & Johnson and Johnson & Johnson Consumer

11  Inc.  On the phone is Jessica Lauria from White & Case.

12          THE COURT:  All right, very good.

13          MS. EDWARDS:  Good afternoon.  Ashley Edwards on

14  behalf of The Continental Insurance Company and on the phone we

15  have Clinton Cameron and David Christian as well.

16          THE COURT:  Okay.

17          Mr. Baynard?

18          MR. BAYNARD:  Your Honor, Paul Baynard for, with Offit

19  Kurman here in Charlotte.  We represent Aylstock, Witkin, Kreis

20  & Overholtz and with me, as local counsel, and with me is Rob

21  Pfister with the --

22          THE COURT:  Okay.

23          MR. BAYNARD:  -- law firm of KP, KPTS [sic] in Los

24  Angeles.

25          THE COURT:  All right.  Thank you.

1      MR. BROWN:  Good afternoon, your Honor.  Caleb Brown

2  of Moon Wright & Houston.  Joining us on the phone are, is

3  Laura Davis Jones of the Pachulski Stang Ziehl & Jones law

4  firm.  We represent Arnold & Itkin.

5      THE COURT:  Okay.

6      MS. SCHERLING:  Morning, your Honor.  Katherine A.

7  Scherling from Katten Muchin Rosenman on behalf of the

8  Plaintiff Insurers in the New Jersey coverage action and with

9  me today is Eileen McCabe from the Mendes & Mount firm, our co-

10  counsel.

11      THE COURT:  Very good.

12      Anyone else announcing in the courtroom?

13  (No response)

14      THE COURT:  Anyone needing to announce that has not

15  been called out on the telephone?

16      IT TECH:  Star 6.

17      THE COURT:  Pardon?

18      IT TECH:  Star 6.

19      THE COURT:  Oh, yes.

20      You need to hit Star 6 in order to announce.  I don't

21  know how many of you there are, but let's try it the way we did

22  yesterday.  If your name, last name starts A through G, please

23  announce now.

24  (No response)

25      THE COURT:  That didn't work very well, did it?

1          How about H through M?

2               MS. HIGHSMITH:  Your Honor, this is --

3               MR. DAVIS:  This is --

4               MS. HIGHSMITH:  --Autumn Highsmith and joined by

5     Rachel Obaldo with the Texas Attorney General's Office on

6     behalf of the State of Texas.

7               THE COURT:  Okay.

8               Someone else was --

9               MR. FRANKEL:  Good afternoon, your Honor.  Good

10    afternoon.  I'm, I'm in A through G, but I didn't unmute.  This

11    is Andy Frankel from Simpson Thacher.  With me on the phone is

12    Kathleen McLendon, also from Simpson Thacher, for Travelers

13    Casualty & Surety Company.

14              MR. DAVIS:  Your Honor, this is Michael Davis from

15    Zeichner Ellman & Krause on behalf of certain AIG Member

16    Companies.

17              THE COURT:  Okay.

18              Anyone else?

19       (No response)

20              THE COURT:  How about N through Z?

21              MR. QUSBA:  Your Honor --

22              MR. WATKINS:  Good afternoon, your Honor.

23              MR. QUSBA:  Your Honor, Sandy Qusba, Q-U-S-B-A, from

24    Simpson Thacher & Bartlett, counsel for Bausch Health.

25              THE COURT:  Okay.

1          MS. THOMPSON:  Your Honor, Judy Thompson from JD

2    Thompson Law.  I am local counsel for Certain Plaintiffs who

3    are represented by the Barnes Law Group.

4          THE COURT:  Thank you.

5          MR. WATKINS:  Good afternoon, your Honor.  Harris

6    Watkins from Nexsen Pruet, appearing as local counsel for Rio

7    Tinto America Inc. and Three Crowns Insurance Company.  Also on

8    the line we have Isley Gostin from WilmerHale and John Green

9    from Farella Braun.

10          THE COURT:  Okay.

11          Others?  Anyone?

12       (No response)

13          THE COURT:  Same ground rules as yesterday.  If you

14    are not listening, we're going to mute your receivers for you.

15    If you speak, try not to speak on a speakerphone.  Pick up

16    either with your receiver or headset so it comes through

17    clearly.

18          Folks in the courtroom, you're welcome to wear masks

19    unless you are addressing the Court and in that case, I'd ask

20    you to remove them for that length of period of time, so.

21          MR. SCHNEIDER:  Your Honor, just briefly, Richard

22    Schneider from King & Spalding, representing Bestwall LLC as a

23    party in interest, along with Bestwall's Chief Legal Officer,

24    Joel Mercer.  I didn't get myself unmuted in time and sorry to

25    interrupt the Court.

1          THE COURT:  No problem.

2          Anyone else?

3       (No response)

4          THE COURT:  Okay.

5          All right.  Are we ready to proceed?  Are there any

6    preliminaries?

7          MR. GORDON:  Greg Gordon, Jones Day, on behalf of the

8    debtor.  Just a few preliminaries, your Honor.

9          We did, as your Honor knows, file our preliminary

10   injunction and TRO papers --

11         THE COURT:  Uh-huh (indicating an affirmative

12   response).

13         MR. GORDON:  -- yesterday.  I think we missed the noon

14   deadline by a bit, but, hopefully, it wasn't too, too far

15   beyond the deadline.  And those were all served on the, I think

16   the counsel list, which is in, I think, Appendix A to the

17   document.  And then we also delivered later in the day

18   yesterday about, I think it was about 42 documents, about 5 or

19   600 pages of documents along the lines of what we talked about

20   on Wednesday.  I'm sure your Honor recalls there were a number

21   of counsel who asked for --

22         THE COURT:  Uh-huh (indicating an affirmative

23   response).

24         MR. GORDON:  -- certain documents and we did our best

25   to compile what we could in, in the short timeframe.  I think

1    we covered all the categories of information.  In some cases,

2    we had exemplars, for example, with respect to insurance

3    policies and I think with indemnification agreements.

4         And then I did want to, as a preliminary matter, move

5    into evidence the supplemental declaration of Mr. Kim which was

6    attached to the papers that we filed yesterday.  Mr. Kim,

7    obviously, is here in the courtroom again today.  I introduced

8    him to you on Wednesday.  And my understanding at this point is

9    we're basically turning the podium over to the other side to

10   take, cross-examine Mr. Kim if they want to do that and make

11   whatever arguments they want to make in opposition to the

12   requested TRO.

13        THE COURT:  Any other preliminaries?

14      (No response)

15        THE COURT:  Okay.

16        Any objection to receiving the declaration and

17   supplemental declaration subject to cross-examination?

18        MR. SILVERSTEIN:  Your Honor, we would object based

19   upon lack of foundation regarding some of the statements in the

20   dec, supplemental declaration.

21        Also, we'd request the opportunity to do a full cross-

22   examination on the next appearance, I think it's November the

23   4th.  And so at this point we do object to the introduction.

24        THE COURT:  Okay.  At some point you'll need to let me

25   know which portions you believe lack foundation.

1          MR. SILVERSTEIN:  And I think we'll be able to

2     establish that during some of the cross-examination today and

3     certainly on the 4th.

4          THE COURT:  Okay.

5          MR. SILVERSTEIN:  Thank you.

6          THE COURT:  In, in the main, though, otherwise?  All

7     right.

8          I will receive those subject to cross-examination and

9     subject to the objections that may come up as to specific

10    statements made in the declaration, so.

11       (Supplemental declaration of John Kim admitted in evidence)

12         MS. CYGANOWSKI:  Your Honor, is that the same ruling

13    with respect to the first day declaration?  That was not,

14    technically, formally received by the Court.

15         THE COURT:  The declaration of Mr. Kim or the --

16         MS. CYGANOWSKI:  Yes.

17         THE COURT:  Yeah.  That's what I was ruling, yes.

18         MS. CYGANOWSKI:  No.  I'm sorry.  Not just the

19    supplemental, but the, the main declaration that he submitted.

20    So that both of them are being received subject to cross-

21    examine --

22         THE COURT:  Absolutely.

23         MS. CYGANOWSKI:  -- examination today as well as at

24    the continued hearing on November 4th?

25         THE COURT:  Right.

1          MS. CYGANOWSKI:  Thank you.

2          THE COURT:  And that was what I wanted to touch base

3   with you.  This has kind of morphed as we've been doing it and

4   we're doing the best we can.  And I appreciate everyone being

5   as flexible as they have been.

6          But the way I'm viewing this is we're looking at it as

7   a TRO today as if notice was given and all were contesting it

8   on the first day and the 4th, the November 4th is, technically,

9   a preliminary injunction.

10          Does everybody see it the same way?

11          MS. CYGANOWSKI:  No, your Honor.  Melanie Cyganowski.

12          With all, with all due respect, I believe the Court

13   can consider this more as it would the presentation of a, of an

14   *ex parte* TRO subject to a further hearing ten days later.

15   Given that we didn't really have notice, I mean, notice was --

16          THE COURT:  Uh-huh (indicating an affirmative

17   response).

18          MS. CYGANOWSKI:  -- dropped on us on Wednesday, I

19   think it's more than fair to consider that and then the

20   preliminary injunction can be, assuming -- well, whether or not

21   a TRO issues on November 4th, frankly, the hearing then on the

22   preliminary injunction can be whenever the Court sets it after

23   a full plenary hearing.  I believe in Aldrich Pump that took a

24   significant amount of time.

25          THE COURT:  Yeah.  That was done by consent.  What I

1   under --

2          MR. SILVERSTEIN:  I, I was just going to add, your

3   Honor -- I apologize -- that last night at 6:30 we got 600 and

4   some odd pages of documents that we've seen for the first time

5   and obviously, we tried to do our best to prepare, but I think,

6   given the time limits of the Court, there may be need to

7   examine the witness again on the 4th.

8          So I agree with counsel.

9          THE COURT:  Okay.

10          MR. HAMILTON:  Your Honor, Robert Hamilton of Jones

11  Day on behalf of the debtor.

12          I'm, I'm not exactly sure what the position is that

13  The Steering Committee just articulated, but we agree with the

14  Court that today is a TRO hearing.  The hearing scheduled for

15  the 4th, the one modification I would add is it is both, we

16  anticipate it would be both a hearing on our request for

17  preliminary injunctive relief in the adversary.  But

18  technically, the motion to enforce the stay is also pending

19  before the Court and you could rule on that on the 4th as well,

20  if you choose to.  And that would not be a PI.  That would be a

21  determination that the stay applies and you could make that

22  determination on the 4th, if you think it's appropriate.

23          THE COURT:  If I'm in the position to do so.

24          Essentially, the Rule contemplates that if the TRO

25  issues and you didn't have notice -- and we can debate who got

1    notice and who didn't in this -- but then on two days' notice

2    you come back.  I've told you my problems for the next week.  I

3    don't mind, if someone wants to reconsider the TRO, to do it on

4    the 4th and 5th.  As to whether we're in a position to make a

5    final ruling on the stay, if this runs like that, the past two

6    cases I've had it took a year to get ready to, to rule on those

7    things.  But the question is -- and I, I'm sure the debtor

8    also, if there's a TRO entered, would also want to extend it.

9    At some point in time we get an ACC in here, a claimants'

10   committee, and that tends to bend these things as well.

11           So at least we understand.  We're talking about

12   whether to issue a TRO today and then we go from there on the

13   4th.  Please don't file a motion in between the two points.  I

14   don't have the time to hear you and especially not the length

15   that we're going to talk about, okay?

16           Is that satisfactory to everyone?

17           MR. HAMILTON:  Yes, your Honor.

18           MS. CYGANOWSKI:  Yes -- yes -- yes, your Honor.  Yes.

19           UNIDENTIFIED SPEAKER:  Yes, your Honor.

20           THE COURT:  All right, very good.

21           MS. CYGANOWSKI:  Okay.

22           THE COURT:  We've got about three hours today to do

23   this.  I would encourage y'all, I know there's a temptation to

24   ask so many questions that we can't finish, but necessity is

25   going to make me rule on this matter about 5:00 today, no

1   matter what happens.  So I would say be circumspect in your

2   questioning and be efficient, if you can.

3           Let's get Mr. Kim sworn and, and --

4           MS. CYGANOWSKI:  Your Honor, we would like to present

5   some argument in evidence first before that takes place.

6           MR. BLOCK:  Your Honor, Jerome Block from Levy

7   Konigsberg.

8           I am prepared to cross-examina, to cross-examine

9   Mr. Kim now and if that is your Honor's preference, I am

10  prepared to do that right now.

11          THE COURT:  All right.

12          What did you want to do, Ms. Cyganowski?

13          MS. CYGANOWSKI:  I would like to, with all due

14  respect, set the table and remind the Court, although the Court

15  probably needs no reminding, of what the issues are before you

16  and, and the standards.  It, it won't take long.

17          THE COURT:  Okay.  I'll treat that more like opening

18  statements, but I would ask if, unless you really need to make

19  one, the number of parties who just announced, we could use the

20  three hours in making opening statements.

21          But given that your client has the, the most

22  significant share, Ms. Cyganowski, please go ahead.  Most

23  significant at least by ovarian cancer numbers.

24          MS. CYGANOWSKI:  Understood, your Honor.  Every, every

25  one of the claimants is significant.  We appreciate that.

1          Your Honor, Melanie Cyganowski for The Plaintiffs'

2    Steering Committee in the MDL action.  I will try to be brief,

3    but I, I think there are a few points that need to be --

4          THE COURT:  Uh-huh (indicating an affirmative

5    response).

6          MS. CYGANOWSKI:  -- made at the outset.

7          First, as we've just discussed, we're here at a

8    continuation of the hearing which was initiated upon the oral

9    request to the debtor at the conclusion of Wednesday's hearing.

10   The Court has scheduled a further trial or hearing on the TRO

11   on November 4th and 5th.

12         So we believe that the question today is whether or

13   not a TRO should issue on the preliminary record that's being

14   presented to you as of this point in time between now and

15   November 4th as opposed to the Court's original request that

16   the debtor wait until the November 4th hearing to present its

17   papers and proposed restraint.

18         An important matter just arose before the court

19   hearing.  We were just advised that the debtor is trying to

20   serve the summons and complaint on the law firms in lieu of the

21   direct recipients of, of the, the summons and complaint that

22   the debtor is commencing.  For the record, we are declining to

23   accept such service for anyone whose interest the MDL Steering

24   Committee represents.  We believe that there's no good reason

25   why they cannot comply with the Rules of 7005.  We do not

1   believe the case management order yesterday that permitted

2   notice of the commencement of the bankruptcy case on the 15

3   largest law firms or the 15 law firms that had the largest

4   constituents be a substitute for good-ole proper service of a

5   summons and complaint.

6           Equally importantly, the debtor clearly had these

7   papers prepared.  Yesterday, as counsel indicated, in less than

8   24 hours from Wednesday they filed a 98-page motion in support

9   of a TRO and preliminary injunction, a 714-page complaint of

10  which 24 pages set forth allegations, and a 14-page

11  supplemental declaration of Mr. Kim.  Counsel had promised

12  these documents by noon.  We received them shortly thereafter,

13  at 12:25.  Other documents rolled throughout the day, beginning

14  at 1:48.  It was not until 6:38 on, last night that we, the

15  debtor provided many of the documents that were referred to.

16          Now I share this timeline to place our standing

17  objection on the record that the manner in which we are

18  proceeding continues to reflect what we believe is the bad

19  faith of this debtor and I do not say that lightly.  Indeed, I

20  have not said that in any court with respect to any matter in

21  which I've been an advocate since leaving the bench.  To

22  recall, the debtor clearly could have filed the injunctive

23  complaint seeking an extension of 362 under 105 on the first

24  day.  Instead, it filed a notice without anything more, no

25  motion, no injunct, adversary proceeding, no order, baldly

1    announcing to federal courts and state courts across the

2    country that LTL had filed for bankruptcy.  That's acceptable.

3    That's what happens.  But further, and they went further, they

4    said as a result, in their minds, the automatic stay, which

5    arises under 362 to protect the debtor, also somehow stayed all

6    litigation against the parent, Johnson & Johnson, two tiers

7    removed, a company whose sheer wealth places it on par with the

8    financial strength of the United States.  And if this was not

9    bold enough, the debtor's notice also declared, again without

10   notice or adversary proceeding or order, that more than 150

11   other non-debtor affiliated parties were also protected by the

12   automatic stay against claims filed against them in the talc

13   litigation.

14           We submit that the debtor proceeded in this fashion

15   not in good faith, that they knew that they were seeking this

16   unprecedented and extraordinary relief, which is beyond

17   anything that's been done in Aldrich Pump or, or Bestwall,

18   without first coming to this Court, that it was improper and

19   that it might create confusion in the courts.  And then they

20   dared return here to argue that this unprecedented expansion of

21   the automatic stay is now required on an expedited basis

22   without providing any of us the appropriate time to prepare and

23   study whether or not they meet their burden.

24           Let us not forget that this entire bankruptcy has been

25   a staged, self-created emergency, that the Texas twostep was

1    created and planned by them without any external emergency

2    being in existence.  We submit that this unprecedented

3    extension of 362 against Johnson & Johnson as well as the other

4    parties is without basis.

5         This afternoon we will all collectively demonstrate on

6    the plaintiffs' side that this debtor, a non-operating shell

7    holding company, has failed to meet its burden of establishing

8    by clear and convincing evidence that all four of the elements

9    required under 105 have been met, that the debtor has a

10   reasonable likelihood of a successful reorg; that there is

11   imminent risk of irreparable harm to the debtor's estate in the

12   absence of an injunction; that there's a balance of harms

13   between the debtor and its creditors which weighs in favor of

14   the debtor; and that the public interests weigh in favor of an

15   injunction.  We submit that this is the debtor's burden, it is

16   not ours, and they have not met it.  And we know they have not

17   met it, in large part, for all the other reasons that they

18   still have not, frankly, closed their case-in-chief.

19        We are here -- I appreciate, we all appreciate there's

20   limited time.  I want to briefly address the section 362(a)(1)

21   arguments.  My partner, Adam Silverstein, will present on the

22   failure of the debtor to satisfy certain other prongs that are

23   required to be shown by the debtor.  At that point, Mr. Jerome

24   Block of Levy Konigsberg as well as Joseph Satterley of the

25   Kazan Law Firm will rise to cross-examine Mr. Kim followed by a

1    brief cross-examination by Mr. Silverstein.  Mr. Tom Waldrep

2    and myself will then present closing arguments.  Obviously,

3    there will be other counsel who may rise.

4           I'm assuming, even though I haven't spoken with them,

5    that time should also be reserved for counsel to then complete

6    the case to renew their application for relief from stay in the

7    event that an injunction is found to arise.

8           With that, to just briefly turn to the 362(a) stay

9    requirements, again the Court is very well familiar with Robins

10   and the unusual circumstances that were found in A. H. Robins.

11   Those unusual circumstances may exist when there is "an

12   identity between the debtor and the third-party defendant that

13   the debtor may be said to be the real party defendant."  We

14   believe in this case that is not the case.  We appreciate that

15   the debtors are arguing that Old JJCI assumed J&J's liabilities

16   on or about 1979 and they claim that there are no independent

17   direct claims against J&J that might exist because of this

18   assumption.  We believe that this is not the case.  We believe

19   there are key distinctions between Robins and the Aldrich

20   cases.  We believe that J&J and, and New JJCI sit differently

21   than the parallel companies in those cases.  As a result, even

22   if the claims against J&J and JJCI might result in claims

23   against the estate, given here the incredible solvency of J&J

24   and the fact that J&J has agreed to stand behind this shell

25   company, it would not dissipate any finite fund which existed

1   in the other companies.  There is no identity of interest here

2   for all these reasons and we will flush that out during the

3   examination.

4           Lastly, and with respect to 362(a)(3), again, I don't

5   think the Court needs to be reminded that 362(a)(3) has a very

6   limited purpose and I would direct the Court to cases,

7   including All Seasons Resorts at 79 B.R. 901, where they said,

8   among other things, that:

9           "Although there may be a closeness between the debtor

10          and the co-defendants by reason of their officer and

11          agent status and right to indemnification, the

12          magnitude of the harm to debtor if there is no stay in

13          force does not approach the scope of the potential

14          injuries besetting the debtors in Robins.

15          And similarly, in the Credit Alliance case at 851 F.2d

16  121, the court there refused to expand the automatic stay to

17  include the guarantor of a note despite the fact that the

18  guarantor would be entitled to bring claims for reimbursement

19  through the bankruptcy process.

20          There are other factors that the Court needs to

21  consider and I appreciate the Court is well familiar with them.

22          Thank you.

23          And let me cede --

24          THE COURT:  Thank you.

25          MS. CYGANOWSKI:  -- cede the podium to

1   Mr. Silverstein.

2            THE COURT:  Yes, sir.

3            And again, as people speak, for the benefit of those

4   on the telephone if you will reintroduce yourselves, I would

5   appreciate it, okay?

6            MR. SILVERSTEIN:  Good afternoon, your Honor.  Adam

7   Silverstein of Otterbourg P.C. for the MDL Plaintiffs' Steering

8   Committee.

9            I appreciate the homework your Honor gave us on, on

10  Wednesday to read up on your Honor's decisions in D, DMBP [sic]

11  and Aldrich Pump and I've spent a fair amount of time doing

12  that and, and I can understand that from where your Honor is

13  sitting this looks like a movie your Honor has seen before.

14           THE COURT:  Uh-huh (indicating an affirmative

15  response).

16           MR. SILVERSTEIN:  But we -- we have - it's definitely

17  in the same genre.

18           THE COURT:  Uh-huh (indicating an affirmative

19  response).

20           MR. SILVERSTEIN:  We have the same director, but this

21  is a different script, your Honor.  This, this script has a

22  more cringeworthy plotline and, and a more sinister and greedy

23  plotline.  The movie your Honor has seen has involved an

24  operating company with a substantial amount of legacy asbestos

25  claims and the operating company reorganized in order to deal

1  with those asbestos claims by dividing into two and, and

2  assigning all of the legacy asbestos claims to a company that

3  became the debtor and put all of the other assets into a

4  Goodco.

5        So in the case of Aldrich Pump, there was Ingersoll-

6  Rand, which was the operating company, Aldrich Pump became the

7  debtor, and, and, and a Trane entity became the good, the good

8  company.  And the, the premise is that the claimants are in no

9  worse position because they have recourse through a funding

10  agreement to the same assets after the reorganization that they

11  had beforehand.  That's the premise.  And the operating company

12  is, in effect, saying, "We're putting all of our chips on the

13  table.  We're directing all of the claims to the debtor, but we

14  are backstopping the debtor through all of the other assets.

15  And so you are in no different position than you were before."

16  And in that context the Court in Aldrich Pump and in DMBP

17  issued or extended the stay to include, of course, the debtor,

18  where it belonged, to the, to the predecessor, to the good, to

19  the good company, and to certain indemnitors of the original

20  operating company.

21        But that is not what is happening here.  Part of the

22  movie is the same, or similar at least.  You have, you have an

23  operating company with legacy, in this case, talc liabilities

24  instead of asbestos liabilities, and that's J&J Consumer Inc.

25  and J&J Consumer Inc. has dealt with those legacy talc

1    liabilities by creating two entities, LTL Management, the

2    debtor, to which it is directing all of its direct claimants to

3    that entity and it's being backstopped by a new entity, that's

4    New Johnson & Johnson Consumer Inc., New JJCI.  Old JJCI no

5    longer exists.  And this part of the movie is what your Honor

6    has, has seen before.  There's, there's more to the movie,

7    though.  And, and so for purposes of this presentation today

8    and only on behalf of the MDL plaintiffs, I'm not going to try

9    to persuade your Honor to revisit the parts of the movie you've

10   already seen before and I'm going to ask you to fast forward to

11   that.  I want to focus on the new parts of the movie.

12          THE COURT:  Okay.

13          MR. SILVERSTEIN:  So what, what's different in this

14   situation than what your Honor has seen before?  What, what,

15   what's different in this situation is that the ultimate parent

16   company, which has 38,000 direct claims against it for its own

17   legacy talc liability, is seeking to piggyback on the

18   reorganization of its operating subsidiary.  And so one of the

19   richest companies in the world, Johnson & Johnson, is seeking

20   to channel all of its legacy talc liabilities to the debtor and

21   cut off the exposure at the operating subsidiary level.  And,

22   and that starts here today with this TRO.  It's not --

23   ultimately, the goal is for Johnson & Johnson to channel all of

24   its direct liabilities to the debtor and to have the debtor

25   subsidiary backstop that and, and, and put claimants in the

1   same position that they were in had they just been suing the

2   subsidiary.

3          Johnson & Johnson is not putting all of its chips on

4   the table and just to illustrate that point, I'm going to, I'm

5   going to ask Mr. Cole to put up a stipulation, which I think

6   your Honor has a binder.  It's --

7          THE COURT:  You may.

8          MR. SILVERSTEIN:  Oh, I apologize, your Honor.

9          THE COURT:  Go ahead.

10         MR. SILVERSTEIN:  So I'll offer it into evidence in a

11  minute.  This is a -- it's a, it's a public record.  It's a

12  stipulation that was entered into in one of the talc cases

13  called Ellen Kleiner v. Johnson & Johnson in the Court of

14  Common Pleas in Philadelphia and, and I'll offer it into

15  evidence.

16         MR. JONES:  Which tab is it?

17         MR. SILVERSTEIN:  I'm sorry.  Tab 6.

18         THE COURT:  In the interest of time.

19         MR. SILVERSTEIN:  It's a stipulation, it's a

20  stipulation signed by counsel for Johnson & Johnson and Johnson

21  & Johnson Consumer Inc.  I, I'd offer it into, into evidence as

22  Claimants' Exhibit A.

23         THE COURT:  Thought we were doing opening statements

24  at the moment.

25         MR. SILVERSTEIN:  Okay.

1          THE COURT:  Anyone want to stand on circumstance?  Our

2    time is limited.

3       (No response)

4          MR. SILVERSTEIN:  Okay.

5          THE COURT:  Is there any objection to receipt of that?

6          MR. JONES:  No objection, your Honor.

7          MR. SILVERSTEIN:  Okay.  Thank you.

8          THE COURT:  All right.  Received.

9          Thank you.

10      (Claimants' A admitted in evidence)

11         MR. SILVERSTEIN:  Thank you, your Honor.

12         So -- so -- so for, for, for context, the operating

13   subsidiary stipulated that its net worth was $14.19 billion

14   based on year-end data.  And this was on August 11, 2021, just

15   a couple of months ago.  So as of today when I checked on

16   Market Watch, Johnson & Johnson, the parent company, was

17   trading at about $164 per share and at a market capitalization

18   of over $431 billion.

19         So what's happening in this movie, your Honor, is that

20   Johnson & Johnson is seeking to direct all of its direct talc

21   claims to that, and, and recourse that claimants have in those

22   claims to a company that has 400, a market value of $431

23   billion, to a subsidiary that even with the backstop of its

24   sub, the Goodco, has a market value of one-quarter of one-tenth

25   percent of what Johnson & Johnson has.  And these claims

1    against Johnson & Johnson are direct claims.

2         I, I did some research before coming here today on

3    Westlaw and I could not find a single decision dismissing a

4    case against Johnson & Johnson on a motion to dismiss or a

5    motion for summary judgment in any of these 38,000 cases or any

6    case finding that Johnson & Johnson did not have a direct duty

7    to any plaintiff.  And I represent corporate defendants, your

8    Honor.  The first thing that I would do if I was representing a

9    parent company sued by a party that was buying products for the

10   subsidiary would be to seek to dismiss the claim against the

11   parent on the argument that there was no direct duty.  There's

12   no decision anywhere finding that.  In fact, it's, it's just

13   the opposite.  Juries have come back -- and I, I can offer

14   evidence at the end, your Honor, but to, to speed this along --

15   but juries have found on verdict forms, which I will offer at

16   the end of the presentation, direct claims for negligence

17   against Johnson & Johnson.  And your Honor knows that a claim

18   for negligence involves a duty directly from the defendant to

19   the plaintiff.  And there are multiple verdict forms in which,

20   your Honor could be deluged with them, in which, in which the

21   jury found specifically that Johnson & Johnson violated a duty.

22        Moreover, your Honor, Mr. Kim in his first day

23   declaration referred to and, in fact, bemoaned a, an excess of

24   $2 billion judgment that was issued by a Missouri jury.

25        THE COURT:  Uh-huh (indicating an affirmative

 1   response).

 2         MR. SILVERSTEIN:  And that verdict went up on appeal.

 3   And, and there's a decision that we'll also offer, although

 4   it's not, you know, really evidence.  It's a decision by the

 5   Missouri Court of Appeals in the Eastern District in a case

 6   called Robert Ingham v. Johnson & Johnson that was issued on

 7   June 23, 2020.  And in that decision a couple of things

 8   happened that are, are noteworthy.

 9         First, it reduced the award, but it did affirm an

10   award against both Johnson & Johnson Consumer Inc. and Johnson

11   & Johnson.  It, it affirmed the denial of a directed verdict on

12   negligence against both Johnson & Johnson and Johnson & Johnson

13   Consumer Inc. and moreover, your Honor, in that decision the

14   court found there was insufficient evidence of either alter ego

15   or agency such that Johnson & Johnson Consumer Inc.'s, Old

16   JJCI's, contacts in Missouri could be attributed to the parent

17   company.

18         So in other words, putting the two rulings together,

19   your Honor, the court sustained claims directly against Johnson

20   & Johnson for negligence not, not on any basis of alter ego or

21   agency, but standing alone on a direct duty from Johnson &

22   Johnson to, to the plaintiffs.

23         And that, in and of itself, separates this situation

24   from what your Honor has seen previously.  There was no oper,

25   there was no parent company of Ingersoll-Rand that had legacy

1    asbestos liability.  There was no parent company that had

2    legacy asbestos claims that was trying to channel those into

3    its subsidiaries that had done the Texas twostep.

4          The, the arguments, moreover, your Honor, that -- that

5    the -- that -- that -- that a claim against Johnson & Johnson

6    is the debtor's estate 'cause it's tantamount to a claim

7    against the debtor is either really not supported or it really

8    doesn't make a lot of sense.

9          So you're going to hear from Mr. Kim on cross-

10   examination by Mr. Block and Mr. Satterley about the, the, the

11   assumption of 1979 liabilities and I'm not, I'm not going to go

12   in, get, get, get into that.  What, what I will say is there's

13   no evidence whatsoever of any indemnification agreement for any

14   liabilities of Johnson & Johnson, the parent company, after

15   1979.  And moreover, Mr. Kim in his, in his first day

16   declaration puts into the record a funding agreement by which

17   Johnson & Johnson apparently is required to fund up to the

18   amount of its Old JJCI subsidiary.  It's required to fund the,

19   the claims against the estate.

20         So if, if claims against Johnson & Johnson are, in

21   effect, claims against the debtor and the debtor, therefore,

22   has, has assumed those claims, well, Johnson & Johnson has

23   agreed to pay them in the funding agreement, anyway.  The

24   debtor's not harmed by any claims continuing against Johnson &

25   Johnson.

1          Moreover, the debtor talks about insurance agreements

2    under which it is a co-insured with, with Johnson & Johnson.

3    First off, according to Mr. Kim, there, there's no insurance

4    company that's paying anything on any of these insurance

5    claims.  So at least for the next two weeks there's going to be

6    no wasting of insurance policies.  And, and moreover, any, any

7    dollar that Johnson & Johnson were to get from insurance would

8    reduce any indemnity obligation dollar for dollar.  So it adds

9    nothing.

10          The, the question that I would ask your Honor to

11   consider today as, as your Honor listens to all of the argument

12   and the testimony is I understand, coming back to where your

13   Honor was at Aldrich Pump and DM, DBMP for today -- not

14   conceding anything.  We're reserving all of our rights -- I, I

15   understand that, but your Honor is being asked on a Friday

16   afternoon with no opposition briefing, bare, barely any time to

17   digest the evidence that was presented, very limited cross-

18   examination, to now extend what your Honor has done twice

19   before to an entirely separate level.  And there, that has not

20   been done by your Honor before and you're being asked to do

21   that without any opposition on a Friday afternoon with, with,

22   at best, 48 hours' notice.

23          So why, why would your Honor do that?  What is the

24   harm that's going to befall this debtor if for two weeks your

25   Honor did not extend the automatic stay to Johnson & Johnson?

1    I understand why Johnson & Johnson doesn't want the, why

2    Johnson & Johnson wants the automatic stay extended, but what

3    is the harm to the debtor?

4            So, your Honor in this context, Johnson & Johnson is,

5    essentially, the equivalent of the Sacklers in the Purdue case.

6    Purdue was the, was the operating entity that put its chips on

7    the table for the benefit of creditors and the Sacklers also

8    put chips on the table beyond what was, what was at the, at the

9    company level.  And in that case, your Honor, it's not

10   precedential but just as by way of example, there wasn't even

11   an attempt to enjoin or to extend the stay to the Sacklers on a

12   TRO basis.  It was done on notice on a preliminary injunction

13   and ultimately, was granted a month into the case.  There was

14   no chaos, your Honor.  There was no decisions where Purdue was

15   in a case and the Sacklers were in a case and one court was

16   saying the stay extends and the other court was saying it

17   doesn't extend.  That didn't happen.  There was no chaos that

18   rained across the country and the debtor's reorganization

19   proceeded just as it was going to.  It had no impact on it,

20   whatsoever.

21           Moreover, your Honor, I, I practice law outside of

22   bankruptcy court more than I do in it and I, I'm mostly in the

23   financial circumstances and I have a lot of cases where there's

24   a corporate debtor and a guarantor in the same case and the

25   corporate debtor files for bankruptcy and the guarantor and the

1  corporate debtor are in the same case.  The judges know what to

2  do.  They -- they're not -- they're not bound by any script

3  but, in general, they take a pause.  They want to see what

4  happens in the bankruptcy court case.  When they determine that

5  the debtor -- the -- there's no stay applied to the guarantor.

6  They know how to allow a case to go forward against the

7  nondebtor.  It's not that unusual.  It's not that complicated.

8  It's not that prejudicial.

9          Moreover, your Honor, Johnson & Johnson as the parent

10  has been very comfortable litigating these claims for the past

11  five years in the MDL.  The Imerys bankruptcy, which

12  happened --

13          THE COURT:  Uh-huh (indicating an affirmative

14  response).

15          MR. SILVERSTEIN:  -- at this point almost, I think,

16  two years ago, was filed almost two years ago, Imerys was --

17  was -- involved many of the same claimants that are -- that --

18  that are at stake here and Johnson & Johnson actually sought to

19  lift the stay in the Imerys bankruptcy to allow the MDL

20  litigation to continue against Imerys so that Johnson & Johnson

21  could defend and continue to litigate these claims.

22          So Johnson & Johnson is very comfortable picking and

23  choosing when they want the stay to apply, when they don't want

24  the stay to apply, and your Honor, respectfully, is being used

25  in this circumstance today as a matter of timing as, as to when

1    Johnson & Johnson has decided, "We don't want to be in the MDL

2    anymore.  Now, and we don't want to be in Imerys.  So now we're

3    going to pick up and we're going to go to the Western District

4    of North Carolina and we're going to see how we do there."

5           Your Honor's very familiar with, with the standards.

6    First is likelihood of a successful reorganization.  There --

7    there's -- it's way too early to tell, but I understand that's

8    been the circumstance in these other cases and that wasn't

9    dispositive for your Honor.  But especially in light of what's

10   happening in Imerys, that does change this situation from,

11   from, from what's happened in Aldrich Pump and the others.  And

12   so especially in light of the fact that a plan has failed in

13   Imerys, it's more than speculative to assume that there's a

14   likelihood of reorganization in this case.

15          Irreparable harm.  Again, there, there's nothing

16   that's going to, nothing precipitous that's going to befall

17   this debtor that's going to send this reorganization offtrack

18   in the next two weeks.

19          But on the flipside in terms of balancing of harms,

20   it's not like, your Honor, the, the world just stops for two

21   weeks and then there's a stopwatch and it just picks up again

22   in, in two weeks.  If your Honor extends the stay today to

23   38,000 cases and -- and -- now it takes the Aldrich and the DM,

24   DBMP decision and takes it to another level and now makes that

25   the new standard in this, in this District, then all of these

1   individual claimants will be, in this case and in all future

2   cases, that will, they will now come to a stop.  And if your

3   Honor decides in two weeks to change the Court's mind, it's not

4   like they'll just be able to pick up in two weeks and start

5   where they were.  This is going to be an exponential delay.

6   Your Honor also knows that these TROs get rolled over and, and

7   rolled over and two weeks is not two weeks.

8           THE COURT:  Uh-huh (indicating an affirmative

9   response).

10          MR. SILVERSTEIN:  Finally, with regard to public

11  interest.  I have been reading the papers.  I don't think the

12  public really likes this.  I don't see how this is in the

13  public interest and your Honor doesn't have to look very far to

14  see that.

15          So I, I appreciate the time.  I will have some

16  exhibits to offer to the Court.  Again, I really would, as your

17  Honor listens to the cross-examination of, by Mr. Block and

18  Mr. Satterley, ask whether it's really necessary today to

19  extend what your Honor has previously done to an entirely

20  different level under these circumstances.

21          I appreciate your time, your Honor.

22          THE COURT:  Thank you, Mr. Silverstein.

23          MR. PFISTER:  Your Honor, I know we have limited time,

24  but could I make a very brief opening?

25          THE COURT:  As long as everyone understands about 5:00

1   I'm going to rule on what I have, so.

2           MR. PFISTER:  I understand.

3           THE COURT:  Okay.

4           MR. PFISTER:  I'll be very brief, I promise.  Rob

5   Pfister on behalf of the Aylstock firm.

6           Your Honor, one point.  First point, lawyers push

7   principles to the broadest point.  That's called advocacy, but

8   that's also how our common law develops.  Sometimes something

9   works in one circumstance, but pushing it to the edge shows

10  that it has limitations.  The A. H. Robins case was correctly

11  decided.  A. H. Robins was the debtor.  A. H. Robins was the

12  tortfeasor.  The actions that were against third parties in

13  that matter were attempts to get around the A. H., the stay

14  that protected A. H. Robins, but that doesn't mean that the

15  principles enunciated there can be pushed to the farthest

16  extreme.  Let me give the Court one hypothetical.

17          Mr. Gordon could walk out of this courtroom, walk down

18  to state court, find a defendant in an auto accident case, say,

19  "Have I got a deal for you.  Create something called Bad

20  Driver, LLC, contribute all your liability to it, promise to

21  fund it, guarantee it, I'll put it into bankruptcy.  Sign a

22  one-page paper."  He puts it into bankruptcy.  Boom, the

23  automatic stay applies.  You don't have to do a Texas divisive

24  merger because that goes to the fraudulent transfer question.

25  Under the 362 analysis in Robins and in this Court's prior

1    decisions, doing just what I said, just that hypothetical,

2    would stay the action against the individual debtor.  I'm going

3    to try and persuade your Honor on November 4th and 5th that

4    that's not right.

5            For today, the Court has before it two procedural

6    mechanisms.  One is 362.  One is section 105.  There's

7    unquestioned authority on the Court's part under section 105 to

8    enter appropriate equitable relief when necessary and

9    appropriate.  The Court wouldn't have to make any findings

10   about things like these fundamental issues in order to issue an

11   injunction under 105.

12           Second, if the Court were to consider the matter under

13   section 105, what that does is it gives the Court the power to

14   use a scalpel and not a chainsaw.  Johnson & Johnson is trying

15   to get a chainsaw here that cuts off 38,000 lawsuits and

16   results in a notice to courts that say 38,000 lawsuits are

17   stayed indefinitely and that's it.  Those cases will go to the

18   bottom of the pile, as counsel has just indicated.  That will

19   drastically change the *status quo*.

20           What the Court can and should do, I respectfully

21   submit, is issue a 105, if the Court is inclined to grant

22   relief, would be to issue a 105 injunction, make it a scalpel,

23   tailor it to specific things in the next 14 days.  Is there a

24   trial that's set to start in five days?  If so, list it, say

25   that trial is stayed.  Is there a deposition that's about to be

1   taken in the next ten days?  If so, list it.  Provide that that

2   is stayed.  Is there a, anything that is coming up in the next

3   14 days where there's a specific problem?  List it.  Stay it.

4   If, if that is the remedy, if that's what J&J is entitled to

5   based on what they persuade your Honor of, that's the remedy it

6   should be.  And most importantly, provide expressly in the

7   order that it expires in 14 days.  That takes us to November

8   5th.  The Court can then consider on November 5th what, if any,

9   further relief is required.

10          Thank you, your Honor.

11          THE COURT:  Thank you.

12          Anyone else by way of opening, or are we ready to get

13   the witness?

14          MR. BLOCK:  I think we're ready for the witness, your

15   Honor.

16          THE COURT:  All right.

17          Mr. Kim?

18          MR. KIM:  Thank you, your Honor.

19          MR. BLOCK:  Let's see.

20          THE COURT:  You may approach.

21          JOHN K. KIM, PLAINTIFF/DEBTOR'S WITNESS, SWORN

22          THE WITNESS:  I'm sorry.  Is there water?

23          THE COURTROOM DEPUTY:  Right here.

24          THE WITNESS:  Thank you.

25          THE COURT:  Okay.

1         MR. BLOCK:  There's no pitcher of water, but I have a,

2    I have a little left in my --

3         THE WITNESS:  Half used, Mr. Block.  That's fine.

4    Thank you.

5         THE COURT:  You may have missed this, but we had an

6    issue with the Charlotte water this week.  After telling us the

7    water was fine, our landlord reversed course yesterday while we

8    were in court and said "Don't drink the water."  The local

9    paper today says it's fine, but we thought, we told everyone it

10   might be best to bring your own just to make sure.

11        Go ahead.

12                          CROSS-EXAMINATION

13   BY MR. BLOCK:

14   Q    Good afternoon, Mr. Kim.

15   A    Good afternoon

16   Q    Sir, when were you first employed by Johnson & Johnson,

17   which is headquartered in New Brunswick, New Jersey?

18   A    In 2000, April.

19   Q    All right.  And what month in 2000 were you first employed

20   by Johnson & Johnson in New Brunswick, New Jersey?

21   A    I think it was April.

22   Q    April 2000?

23   A    Yes.

24   Q    And when were you last employed by Johnson & Johnson?

25   A    I think officially it was October, I, I want to say 10th.

1   Q    So you worked for Johnson & Johnson as a lawyer in New

2   Brunswick, New Jersey from April of 2000 all the way up until

3   approximately October 10th of 2021, correct?

4   A    Correct.

5   Q    And on October 10th of 2021 you then went to work for an

6   entity named LTL Management LLC, correct?

7   A    Technically, I worked for Johnson & Johnson Services, Inc.

8   seconded to LTL Management.

9   Q    Are you currently an employee or officer of LTL Management?

10  Yes or no.

11  A    I am an officer as seconded by Johnson & Johnson Services.

12  Q    Where do you live, sir?

13  A    I live in Princeton, New Jersey.

14  Q    And how long have you lived in New Jersey?

15  A    I think around 2002, I want to say.  I don't -- I'm sorry I

16  can't be more precise, yeah.

17  Q    Have you ever lived in North Carolina?

18  A    No, I have not.

19  Q    Have you ever visited North Carolina before you came down

20  here for the bankruptcy proceedings?

21  A    Several times, yes.

22  Q    Several times?

23  A    Yes.

24  Q    For business or pleasure?

25  A    Mostly for business.

1   Q   Okay.

2       And, sir, where is LTL Management LLC's office in North

3   Carolina?

4   A   Oh, LLC.  The -- LTL does not have an office in North

5   Carolina.

6   Q   Where do formal notices for LTL Management LLC get sent?

7   A   I believe it's 501 George Street in New Brunswick, New

8   Jersey.

9   Q   And other than you, sir, who are the other officers of LTL

10  Management?

11  A   There's a President, Bob Wuesthoff, and there's a CFO,

12  Richard Dickinson.

13  Q   And Mr. Wuesthoff, where does he work?

14  A   Since COVID, he's been working out of Florida.

15  Q   Okay.  Is, is he someone who has worked in New Jersey for

16  many years?

17  A   I actually, I don't know Mr. Wuesthoff's background on

18  where he, he worked.  He was a former J&J  -- he is -- he was a

19  Johnson & Johnson, one of the Johnson & Johnson entity

20  employees and I -- I -- I actually don't know where his office

21  was.

22  Q   Okay.  To be clear, did Mr. Wuesthoff work at Johnson &

23  Johnson in New Jersey at some point?

24  A   I think that might be true.  He, he may have worked in

25  Pennsylvania, also.  I'm just not clear on where, what his past

1   history was.

2   Q    You have no evidence that Mr. Wuesthoff ever worked in

3   North Carolina, correct?

4   A    I don't -- I, I believe he never worked in North Carolina.

5   Q    Okay.

6        And this Mr. Dickinson, another officer from LTL Management

7   LLC, where does he work?

8   A    He works in New Jersey.

9   Q    Okay.  And can you identify any officer, employee, anyone

10  associated with LTL Management LLC that actually works in North

11  Carolina?

12  A    No.

13  Q    Sir, you in 2001 were Senior Counsel in the Litigation

14  Group at Johnson & Johnson, correct?

15  A    Correct.

16  Q    And you were involved in product liability litigation and

17  supervising that at Johnson & Johnson from 2001 all the way up

18  until about ten days ago, correct?

19  A    Yes.  Well, I, I had a change -- yeah.  So I also became

20  head of Product Liability during that span.

21  Q    Right.  So just to be clear for the Court, you became the

22  head lawyer for Product Liability at Johnson & Johnson in what

23  year?

24  A    I'm going to have to look back at my declaration.

25  Q    Could you give us your best estimate?

KIM - CROSS                                                                    47

1    A    Probably about 12 years ago, 10 years ago.

2    Q    And that's an important job, is it not?

3    A    I like to think so.

4    Q    And in doing that important job you had to closely

5    supervise litigation involving talc and asbestos as applied to

6    Johnson's Baby Powder, correct?

7    A    I did.

8    Q    And, in fact, you read deposition transcripts, did you not?

9    A    I did.

10   Q    You read trial transcripts, correct?

11   A    I did.

12   Q    You attended trials, correct?

13   A    I did.

14   Q    You have read the testimony of Dr. John Hopkins, who

15   testified on many occasions as the corporate representative for

16   both Johnson & Johnson and Johnson & Johnson Consumer Inc.,

17   correct?

18   A    I, I have.

19            MR. BLOCK:   Let's go to the next slide.

20   BY MR. BLOCK:

21   Q    Sir, it's true that -- and I have two logos, two entities

22   up on the screen.   One is Johnson & Johnson on the left and on

23   the right is Johnson & Johnson Consumer Inc.   Do you see that?

24   A    Yes.

25   Q    And does your screen in front of you work?

1   A    Oh, yeah, it does.

2   Q    Okay.

3   A    Thank you.

4   Q    And Johnson & Johnson was incorporated in the 1800s, right?

5   You said 1887?

6   A    Yes.

7   Q    And just so the Court understands the two entities, Johnson

8   & Johnson is based in New Brunswick, New Jersey and that has

9   been your employer and that's where you've worked all these

10  years, right?

11  A    That's correct.

12  Q    And Johnson & Johnson became the corporate parent of a

13  separate corporation called Johnson & Johnson Consumer Inc. at

14  some point, correct?

15  A    At some point, yes.

16  Q    Okay.  And Johnson & Johnson is sometimes referred to as

17  J&J Corporate or Johnson & Johnson Corporate, correct?

18  A    I -- I -- I'm actually not sure --

19  Q    Okay.

20  A    -- officially whether that --

21  Q    Are, are you aware of Johnson & Johnson being referred to

22  as the Enterprise?

23  A    Sometimes, yes.

24  Q    Okay.

25          MR. BLOCK:  Next slide.  Or, actually, keep on this

1  slide.

2  BY MR. BLOCK:

3  Q   And on the right side, let's look at Johnson & Johnson

4  Consumer Inc.  And to be clear, that is a separate corporation

5  from Johnson & Johnson, correct?

6  A   It is.

7  Q   And Johnson & Johnson Consumer Inc. became a subsidiary of

8  Johnson & Johnson in December of 1978, true?

9  A   I'd have to go check my, either my declaration or the

10 records on that.  I --

11 Q   Does that, does that sound like a fair approximation to

12 you?

13 A   It could be.  The, the only issue I have is whether --

14 Johnson & Johnson Consumer Inc. has gone through a bunch of

15 corporate changes over the years.  And so depending on what

16 corporate change you're talking about, I'm not sure whether the

17 date fits or not.

18 Q   Okay.  You, you have said in your declaration that there

19 was a transaction in approximately 1979 in which the company

20 that was ultimately named Johnson & Johnson Consumer Inc.

21 became the subsidiary of Johnson & Johnson, correct?

22 A   I have to go back to my declaration to see what, what

23 corporate title that was at the time.

24 Q   All right.

25     Sir, you do know that Johnson & Johnson Consumer Inc. is

1  based in Skillman, New Jersey, right?

2  A    Currently, it is, yes.

3  Q    Okay.

4  A    Uh-huh (indicating an affirmative response).

5  Q    I mean, you never worked there, right?

6  A    I, I represented Johnson & Johnson Consumer Inc. through

7  the McNeil Companies.  So I did work partly there, but that was

8  in Pennsylvania.

9  Q    Right.  You've never been an employee of this separate

10 corporation Johnson & Johnson Consumer Inc., correct?

11 A    Correct.

12 Q    And --

13       MR. BLOCK:  Go to the next slide, please.

14 BY MR. BLOCK:

15 Q   so let's look at the next slide.  And I just want to

16 explain to you how I've organized the materials.

17     I've put some testimony up on the screen and this testimony

18 is from Dr. John Hopkins and I have excerpts of that testimony

19 in the notebook as Exhibit 3, if, if you should need to look at

20 it, but it's right up on the screen for you to look at.  And

21 I'm going to tell you, I'm just going to read you some of the

22 testimony and ask if it's consistent with your knowledge and

23 your recollections, okay?

24 A    Yes.

25 Q    All right.

1   A   Can I take a look at my declaration?

2   Q   Sir, I -- let me ask my next question, please.

3   A   Oh, sure.

4   Q   All right.

5       So Dr. Hopkins testified on September 27, 2008, or

6   September 27, 2018 at Page 47, Line 14 of the transcript:

7   "Q   December of 1978, the Baby Products Company became a wholly

8   owned subsidiary of Johnson & Johnson, correct?

9   "A   That is correct, yes.

10  "Q   And they called themselves the Johnson & Johnson Baby

11  Products Company originally, correct?

12  "A   They did, yes."

13      Now do you dispute that testimony by the corporate

14  representative of Johnson & Johnson and Johnson & Johnson

15  Consumer Inc., Dr. Hopkins?

16  A   I think he's a little confused.  I -- yeah.  I disagree

17  with this testimony, yeah.

18  Q   If you can go to Exhibit 3 in the binder, please.

19  A   Yes.

20  Q   And do you see in Exhibit 3 of the binder, if you go to

21  Page No. 8 at Line 21, do you see that this is the sworn

22  testimony of John Hopkins?

23  A   I do.

24  Q   All right.  And you admit, sir, that Dr. John Hopkins in

25  litigation testified for many years as the corporate

KIM - CROSS                                                                    52

1   representative of both J&J and JJCI, correct?

2   A    He did.

3   Q    Okay.

4        Sir --

5            MR. BLOCK:   If we can go to the next slide, please.

6   BY MR. BLOCK:

7   Q   And looking at the next slide, we see Dr. Hopkins'

8   testimony on September 27, 2018, Page 47, Line 22:

9   "Q And so prior to that date, December 12, 1978, the Baby

10  Powder, talcum powder, would have been made, sold, and

11  distributed by Johnson & Johnson, correct?

12  "A  Prior to that date?

13  "Q  December 12, 1978.

14  "A  From a legal perspective, that, that would be my

15  interpretation, yes."

16      Do you see that testimony that Dr. Hopkins gave?

17  A    I do.

18  Q    And do you agree with it?

19  A    To, to a degree, yeah.  Johnson & Johnson did sell Baby

20  Powder prior to a date.  I'm just -- right now, because -- I'm

21  just not sure what that date was.

22  Q    Okay.

23      Sir, let's go to your declaration --

24  A    Thank you.

25  Q    -- in this case, which is Exhibit 1.  And if we look at

1    Exhibit 1 in your binder, Paragraph 10 of your sworn

2    declaration.

3    A    Yes.   Thank you.

4    Q    And you identify 1979, which was the date before which

5    Johnson & Johnson manufactured and sold Johnson's Baby Powder,

6    correct?

7    A    Correct.

8    Q    All right.

9         MR. BLOCK:   Let's go to the next slide.

10   BY MR. BLOCK:

11   Q    So we can agree, sir, that Johnson & Johnson manufactured

12   and sold Johnson's Baby Powder prior to 1979 and Johnson &

13   Johnson Consumer Inc. manufactured and sold Johnson's Baby

14   Powder after 1979, correct?

15   A    Yes.

16   Q    And, sir, the fact is is that in tort litigation Johnson &

17   Johnson Consumer Inc. has taken the position that JJCI did not

18   assume the liabilities of Johnson & Johnson for pre-1979

19   exposure.   That's true, isn't it?

20   A    I don't believe that's true.

21   Q    And I will show you some documents about that, sir, but let

22   me ask you another question.

23   A    Uh-huh (indicating an affirmative response).

24   Q    In litigation isn't it true that Johnson & Johnson Consumer

25   Inc. took the position that it was not even a proper party

1   defendant unless there was exposure to Johnson's Baby Powder in

2   1979 or later, isn't that true, sir?

3   A   I don't recall.  I'd have to look at the documents.

4            MR. BLOCK:  Let's go to the next slide, please.

5   BY MR. BLOCK:

6   Q   And, sir, please open up Exhibit 4.

7   A   Uh-huh (indicating an affirmative response).

8   Q   And, sir, Exhibit 4 is a Memorandum of Law in Opposition to

9   plaintiff's brief in support of their position that Johnson &

10  Johnson Consumer Inc. is a proper party to this action, do you

11  see that?

12  A   I have to look at this document.

13  Q   Sir, look at Page 2 and tell me if I read that title

14  correctly.

15  A   I, I don't think I've ever seen this document before, so.

16  Q   Sir, look at Page 2.

17  A   Uh-huh (indicating an affirmative response).

18  Q   Did I read that title correctly?  Memorandum of Law in

19  Opposition, do you see it?

20  A   Yes.

21  Q   Okay.  And this was in a case called Etheridge, right?

22  A   That's what's on the title.

23  Q   All right.  I mean, you were the head of, head lawyer for

24  Product Litigation for Johnson & Johnson at this time, correct?

25  A   I'm not sure what date this was.  2019.

1   Q   It's August of 2019.  Were you the head lawyer for Johnson

2   & Johnson?

3   A   I wouldn't say "head lawyer."  I was in charge of Product

4   Liability, the Product, Product Liability Group --

5   Q   Okay.

6   A   -- at Johnson & Johnson, yeah.

7   Q   And in the Etheridge case, you know that was a trial in the

8   New Jersey asbestos litigation, correct?

9   A   I really can't place the Etheridge case.

10  Q   All right.  Let me see if you, let me just see if you can

11  answer this question.

12  A   Uh-huh (indicating an affirmative response).

13  Q   The person who filed this Memorandum of Law is a lawyer

14  named John Garde, correct?

15  A   Yes.

16  Q   John Garde is with the law firm of McCarter & English,

17  correct?

18  A   Yes.

19  Q   John Garde has worked for Johnson & Johnson in product

20  liability, in product liability litigation for how many years,

21  sir?  Decades?

22  A   Yeah.  I, I don't know how long John Garde's --

23  Q   I mean --

24  A   -- been working for us.

25  Q   -- Mr. Garde is, is the head lawyer for Johnson & Johnson

1 | and Johnson & Johnson Consumer Inc. in the New Jersey asbestos

2 | litigation, correct?

3 | A   He is one of our lawyers in the New Jersey litigation, yes.

4 | Q   And when Mr. Garde makes representations to courts you

5 | expect those representations to be true, correct?

6 | A   I do.

7 | Q   Okay.

8 |     So let's look at the slide that is on the screen and the

9 | slide is a blowup of Page 4 of the brief that Mr. Garde filed

10 | in New Jersey August 27, 2019.  And looking at the screen you

11 | could see that Mr. Garde argued to the court that

12 | Mr. Etheridge's, that Mr. Etheridge's exposure to Johnson's

13 | Baby Powder was from 1960 to 1963, do you see that?

14 | A   I agree.

15 | Q   So that's before 1979, right?

16 | A   Yes.

17 | Q   And did Johnson & Johnson argue to that court, "We're the

18 | responsible party.  We assumed the liabilities"?

19 | A   Oh, of course not, no.

20 | Q   Of course not.  They argued the opposite, didn't they?

21 | A   Well, it -- it -- they argued that Johnson & Johnson -- you

22 | can read, read right here -- but, you know, Johnson & Johnson

23 | Consumer Inc., who they're trying to name, was not the seller

24 | of the product at the time, the manufacturer.

25 | Q   Let -- let's -- let's show the Court what Mr. Garde on

1   behalf of Johnson & Johnson said to the court.  They identified

2   Mr. Etheridge, Mr. Etheridge's exposure as being between 1960

3   and 1963, correct?

4   A    Correct.

5   Q    And in the final two sentences, let's, it says,

6   "Accordingly, JJCI could not have manufactured or sold the

7   cosmetic talcum powder products plaintiffs allege Mr. Etheridge

8   used during the relevant time period."  And then they, then

9   Mr. Garde says for Johnson & Johnson, "Absent this threshold

10  showing, plaintiffs cannot state a claim against JJCI,"

11  correct?

12  A    That's what it says, yes.

13        MR. BLOCK:  And going to the next slide.

14  BY MR. BLOCK:

15  Q    Mr. Garde continues in his brief to the New Jersey asbestos

16  litigation judge that, "Indeed," Mr. Garde says, "Indeed, the

17  evidence is directly to the contrary and establishes that it

18  was Johnson & Johnson, the only defendant named in plaintiff's

19  complaint, that was responsible for manufacturing and selling

20  Johnson's Baby Powder during the relevant period, 1960 to

21  1963."

22      Is that what it says?

23  A    That's exactly what it says.

24  Q    And In, in this brief Mr. Garde does not say to the court

25  that Johnson & Johnson Consumer Inc. assumed any liabilities

KIM - CROSS                                                                    58

1   for Johnson & Johnson that occurred before 1979, does he?

2   A    Of course he doesn't.

3           MR. BLOCK:  And if we go to the next slide.

4   BY MR. BLOCK:

5   Q   Mr. Garde certifies to the court that those statements that

6   he made that we read were true, correct?

7   A    Correct.

8           MR. BLOCK:  Going to the next slide, Exhibit 6.

9   BY MR. BLOCK:

10  Q   And this is from an argument, oral argument with the court

11  in the same case that occurred on August 22, 2019.

12          MR. BLOCK:  And just for your Honor and Mr. Kim and

13  the lawyers, this is Exhibit 6 in the binder and the statements

14  by Mr. Garde to the court on August 22, 2019 starting at Page

15  184, Line 18.  And this is also in the slides that I've

16  distributed.

17  BY MR. BLOCK:

18  Q   It says:

19      "Mr. Garde:  Your Honor" -- and I'm going to read from it

20  and then ask you some questions.  It says:

21      "Your Honor, John Garde on behalf of Johnson & Johnson."

22      And going down a few lines.  Mr. Garde says:

23      "The proofs, as they have come in at trial, indicate that

24  in the Etheridge case, which is at issue here, Mr. Etheridge's

25  exposure was from 1960 to 1963," do you see that?

1   A    Yes.

2   Q    And Mr. Garde says:

3        "JJCI did not exist in those years," right?  Is that what

4   he said?

5   A    Yes.

6   Q    And then Mr. Garde says to the court that:

7        "JJCI didn't come into existence until 1979," correct?

8   A    Yes.

9   Q    So in tort litigation, just so it's clear for the Court, if

10  a plaintiff was exposed to Johnson's Baby Powder prior to 1979,

11  Johnson & Johnson Consumer Inc. took the position with the

12  courts that Johnson & Johnson Consumer Inc. is not a proper

13  party defendant and is not liable, correct?

14  A    Correct, to the extent that this relates to who should be a

15  proper party in the lawsuit.

16  Q    And, in fact, what we saw Mr. Garde say was that, as far as

17  pre-1979 exposure, Johnson & Johnson is responsible, correct?

18  A    Well, responsible in the sense that it should be the named

19  party in the lawsuit.

20  Q    And the named -- and, and a party has to be named in a

21  lawsuit to be liable, right, sir?

22  A    Yes.

23  Q    Yes?

24  A    Yes, yes.

25  Q    All right.

1      But now that you've come into the bankruptcy court in your

2    new job for LTL Management LLC you've now taken the position

3    that Johnson & Johnson Consumer Inc. is, in fact, responsible

4    for all the liabilities of Johnson & Johnson related to talc

5    that occurred before 1979, right?

6    A    I've taken the position that Johnson & Johnson Consumer

7    Inc. assumed the liabilities of Johnson & Johnson for those

8    liabilities prior to 1979, yes.

9    Q    In, in courtrooms in litigation like we saw in the

10   Etheridge case Johnson & Johnson Consumer Inc. never argued

11   that it had assumed any liabilities before 1979, true or not

12   true?

13   A    True, but that's really not the issue for -- it's a, it's a

14   different issue.

15           MR. BLOCK:  Move to strike --

16           THE WITNESS:  True, fine.

17           MR. BLOCK:  Move to strike the portion that was not

18   responsive.

19           THE COURT:  Sustained.

20   BY MR. BLOCK:

21   Q    And, in fact, you swore in a declaration, which we have

22   marked as Exhibit 1, on October 14, 2021 about this very

23   subject, didn't you?

24   A    Yes.

25   Q    And you had plenty of time to think about the statements

KIM - CROSS                                                               61

1   you made in your declaration before you made them in October of

2   2021, didn't you?

3   A    Yes.

4   Q    In fact, you have been planning with Johnson & Johnson for

5   this bankruptcy for how long?

6   A    I'm not sure "planning for this bankruptcy."  I would say

7   we started looking at a transaction -- so the divisional merger

8   and bankruptcy -- from time to time for the last couple of

9   years, but most recently about maybe six months ago.

10  Q    And so when you --

11            MR. BLOCK:  If we can go to the next slide, please.

12  Next slide.  Next slide.  Actually, go back to the previous

13  slide.  Go back to the previous slide.

14  BY MR. BLOCK:

15  Q    Who is Diane Sullivan?

16  A    She is an attorney at Weil Gotshal.

17  Q    Not just any attorney at Weil Gotshal, one of Johnson &

18  Johnson's top trial lawyers in product liability litigation,

19  true?

20  A    She is a top trial lawyer.

21  Q    And, in fact, she is the head lawyer for Johnson & Johnson

22  in the Imerys bankruptcy that's in Delaware, right?

23  A    I'm not sure they have sort of "head lawyers" at Weil

24  Gotshal in the bankruptcy.  She is involved in the Imerys

25  bankruptcy, yes.

KIM - CROSS                                                                62

1  Q   She's one of the head lawyers there, right?

2  A   Again, I don't know what "head lawyer" means.

3  Q   And in that same Etheridge case --

4        MR. BLOCK:  I -- we added this slide just this morning

5  when I, when I found out about this.

6  BY MR. BLOCK:

7  Q   -- Ms. Sullivan as the trial lawyer in the Etheridge

8  case --

9        MR. BLOCK:  And we're looking at a court transcript,

10  your Honor.  This is Exhibit 6-A in your notebook.  And I'm

11  sorry.  I don't have the slide printed out for you.  This is

12  from August 19, 2019.

13  BY MR. BLOCK:

14  Q   And you know that Diane Sullivan was the lawyer who tried

15  the Etheridge, Barning, Ronning, and, and McNeill case in New

16  Jersey, right?  Those four, the four-plaintiff mesothelioma

17  case in New Jersey, Diane Sullivan tried the case?

18  A   No.  I'm trying to -- you mentioned a bunch of the

19  plaintiffs.  I, I don't actually recognize those plaintiffs,

20  but --

21  Q   Well, that was the one where her entire closing argument

22  was struck, you remember that?

23  A   I do remember that.

24  Q   Right.  So that was the four-plaintiff mesothelioma case in

25  New Jersey, right?

1    A    It was a four, four-plaintiff case.  I thought it was a

2    three-plaintiff case.  I'm just --

3    Q    Okay.

4    A    Yeah.

5    Q    And so in the Etheridge case, which was one of the four

6    cases, Ms. Sullivan on August 19th represented to the court

7    that Johnson & Johnson objected to JJCI being added to the

8    verdict sheet in the Etheridge case and Ms. Sullivan, like

9    Mr. Garde, said that JJCI was not a proper party and

10   Ms. Sullivan said, "Mr. Etheridge's usage doesn't cover the

11   time JJCI would have been responsible.  They didn't come into

12   the picture until 1979."

13        Is that what Ms. Sullivan said in August 2019?

14   A    It is.

15   Q    And Ms. Sullivan, again like Mr. Garde, said, "Wait.  This

16   is all pre-1979 exposure," right?

17   A    Yes, in the context of -- yes.

18             MR. BLOCK:  Next slide, please.

19   BY MR. BLOCK:

20   Q    And then Ms. Sullivan came back to the court when they were

21   working on jury instructions September 3, 2019, and the quote's

22   right up on the screen:

23        "Ms. Sullivan:  Maybe that's the way to fix it, your Honor.

24   That, just say as part of the charge that Johnson & Johnson was

25   responsible for the product up until 1979.  After that, it's

1    JJCI," do you see that?

2    A    I do see that.

3    Q    And that's what Ms. Sullivan requested that a trial court

4    charge the jury on in that case, correct?

5    A    Correct.

6    Q    So having had plenty of time to --

7              MR. BLOCK:  Next slide, please.

8    BY MR. BLOCK:

9    Q    -- to consider the words and the support laid out in your

10   declaration from, from October 14th of 2021, you made the

11   following statement at Paragraph 10:

12       "In 1979, J&J transferred all its assets associated with

13   the Baby Products division to J&J Baby Products."

14       Next sentence:

15       "In connection with this transfer, J&J Baby Products

16   assumed all liabilities associated with the Baby Products

17   division."

18       Do you see that statement you made?

19   A    Yes.

20   Q    And you as a lawyer know when you make a statement to the

21   court most often if you have a document that supports the

22   statement that you made, that you would cite the document in

23   the declaration and attach it, right?

24   A    Not always, no.

25   Q    And not always was one of these times, right?

1    A    Yes.

2    Q    And, in fact, there is no supporting document that is cited

3    after the statement that I just read, right?

4    A    That is true.

5    Q    But then --

6              MR. BLOCK:   Go to the next slide, please.

7    BY MR. BLOCK:

8    Q    Looking at your supplemental declaration, which was filed

9    yesterday, on October 21, 2021, now you cite a document, right?

10   A    I do.

11   Q    And if we look at the supplemental declaration and I'm just

12   going to read your words.   This is from Paragraph 5 of your

13   supplemental declaration to this Court:

14        "Effective as of January 1, 1979, J&J transferred all its

15   assets associated with the Baby Products division to J&J Baby

16   Products Company, and J&J Baby Products Company assumed all

17   liabilities associated with the Baby Products division."

18        Is that what you said?

19   A    It is.

20   Q    And just to be clear for this Court, J&J Baby Products

21   Company, ultimately through many name changes, ultimately

22   became Johnson & Johnson Consumer Inc., correct?

23   A    Correct.

24   Q    So as we saw in litigation JJCI said it was not responsible

25   for any liabilities before 1979, but in this bankruptcy you've

KIM - CROSS                                                                    66

1    said just the opposite, that JJCI is responsible for all

2    liabilities after 1979.  Fair statement?

3    A    No, not a fair statement.

4    Q    Have you not represented to this bankruptcy court that

5    Johnson & Johnson Consumer Inc. assumed liabilities for talc

6    that Johnson & Johnson had prior to 1979?  Yes or no.

7    A    Yes.

8    Q    And the one document that you rely upon are the board of

9    directors minutes from Johnson & Johnson dated December 12,

10   1978, correct?

11   A    The one document that's here, yes.

12   Q    Right.  After I and the lawyers for the claimants

13   challenged you to produce even a single document that supports

14   your position that you've taken in this bankruptcy, after

15   looking you produce one document, right?

16   A    Correct.

17   Q    All right.  Let's look at that document.

18           MR. BLOCK:  Next slide, please.

19   BY MR. BLOCK:

20   Q    And in that one document dated December 12, 1978 --

21           MR. BLOCK:  This is Exhibit 2-A, your Honor --

22           THE COURT:  Uh-huh (indicating an affirmative

23   response).

24           MR. BLOCK:  -- in, in your notebook.

25           THE COURT:  Uh-huh (indicating an affirmative

1  response).

2  BY MR. BLOCK:

3  Q   We see this is a minutes of the board of directors of

4  Johnson & Johnson, do you see that?

5  A   Yes.

6  Q   This is not the minutes of the board of directors of any

7  subsidiary, right?

8  A   No.

9  Q   These are the minutes of the parent company, Johnson &

10  Johnson, right?

11  A   It is.

12  Q   And the people listed as being present are Johnson &

13  Johnson officers or they're the boards of, board of directors

14  of Johnson & Johnson, right?

15  A   I can only assume that.  I actually don't know --

16  Q   All right.  One --

17  A   -- most of these names.

18  Q   -- would think if it was the meeting of the board of

19  directors of Johnson & Johnson that these are the members of

20  the board of directors, right?

21         THE COURT:  Give him time to answer the questions,

22  okay?

23         MR. JONES:  Yeah.  Thank you, your Honor.

24         MR. BLOCK:  Yes, your Honor.

25         MR. JONES:  Thank you, your Honor.

1          THE WITNESS:  Yeah.  I, I don't know most of these

2    names.  So I just can't say.

3    BY MR. BLOCK:

4    Q   Right.  This is a document you're relying upon?

5    A   Correct.

6    Q   Okay.  And as, being that this is a document that you're

7    relying upon, would you, would you say that the people listed

8    in the board of directors meeting for Johnson & Johnson are

9    likely members of J&J's --

10   A   No -- yeah.

11   Q   -- board of directors?

12   A   I did say I assume they are.  I just can't--

13   Q   Right.

14   A   -- confirm that, yeah.

15   Q   And my last question, you cut me off before I was finished.

16   A   I'm sorry.

17   Q   So if we can make that agreement --

18   A   Okay.

19   Q   -- I'll abide by the, by the Court's admonition to make

20   sure you can answer and if you can do the same thing so I could

21   finish my question.

22   A   I'm sorry, yes.

23   Q   Fair?  Okay.

24   A   Absolutely.

25   Q   Okay.

KIM - CROSS                                                                69

1        So at this board of directors meeting, December 12, 1978, a

2   Johnson & Johnson board of directors meeting --

3                MR. BLOCK:  Let's go to the next slide.

4   BY MR. BLOCK:

5   Q   All right.  Now we're looking at Page 6 of the meeting.

6                MR. BLOCK:  Actually, go to the next slide.  Next

7   slide.  Go to the previous one.  Okay.  I like when I have the

8   clicker better.

9                THE COURT:  Right.

10  BY MR. BLOCK:

11  Q   So let's look at Pages 8 and then going on to Page 9 and

12  see what happened at this board of directors meeting.

13               MR. BLOCK:  Go forward one more, Joe.

14               MR. SATTERLEY:  Forward or back?  This way

15               MR. BLOCK:  Next -- okay.

16  BY MR. BLOCK:

17  Q   It was resolved at this J&J board of directors meeting

18  that:

19       "That the proper officers of this Corporation be and they

20  hereby are authorized and directed to do and to cause to be

21  done all such acts and things and to execute and deliver and to

22  cause to be executed and delivered all such instruments."

23       Do you see that?

24  A   I do.

25  Q   All right.  So they were -- there was an agreement that

1   Johnson & Johnson was authorizing people to go forward and do

2   things having, involving Johnson & Johnson and various

3   subsidiaries and then the directive was once those things are

4   done, to execute and deliver the instruments to Johnson &

5   Johnson, correct?

6   A    I would disagree with that.

7   Q    All right.  Does it say that "execute and deliver and to

8   cause to be executed and delivered all such instruments"?

9   A    Yeah.  I'm looking -- when you said "authorized to do

10  things" and then "once authorized directed," I see "authorized

11  and directed."

12       So I would say they're directed to do these things.

13  Q    Okay.

14            MR. BLOCK:  Go back.

15            THE COURT:  Says what it says.

16            THE WITNESS:  Yes.

17            THE COURT:  Let's go.

18            THE WITNESS:  Sorry.  Yes, your Honor.

19            BY MR. BLOCK:  Yeah.  Go back to the --

20            MR. SATTERLEY:  Go back this way?

21  BY MR. BLOCK:

22  Q    Okay.  Let's, let's start with this.  All right.

23       Page -- this is Page 6 of the board of directors meeting,

24  okay?  It says, "The next matter to come before the Board

25  related to the incorporation of seven principal operating

1    divisions of Johnson & Johnson effective January 1, 1979 as

2    wholly-owned subsidiaries as follows," is that what it says?

3    A    Yes.

4    Q    All right.  So then it goes on to list seven operating

5    divisions that were going to become wholly-owned subsidiaries,

6    true

7    A    True.

8    Q    All right.  And one of those operating divisions that was

9    going to become a wholly-owned subsidiary based on what was

10   agreed to at this meeting was the division of Johnson & Johnson

11   known as Johnson & Johnson Baby Products Company, correct?

12   A    Correct.

13   Q    And then it says, "The incorporation will be accomplished

14   by a transfer of assets from the divisions to the corporations

15   respectively which will also assume the liabilities of the

16   divisions respectively," correct?

17   A    Correct.

18   Q    And that says nothing about indemnification, correct?

19   A    I think -- I'm not sure -- when it says "assume the

20   liabilities," I assume that means, you know, if they assumed

21   the liabilities and someone sues the, the, the former company,

22   assumption of the liabilities would mean that, yeah, you have

23   to indemnify them for that.

24   Q    If -- if -- if Johnson & Johnson Baby Products Company is

25   sued in the future, correct?

1   A    Yes.

2   Q    Okay.  And it doesn't say anything about past liabilities,

3   though, does it?

4   A    Well, "assume," "assume" means take over everything you

5   had.

6   Q    It, it doesn't say anything about any past liabilities,

7   does it?  It just says "the liabilities," right?

8   A    It says what it says, but --

9   Q    Right.

10  A    -- "assume the liabilities" --

11  Q    Okay.

12  A    -- would --

13  Q    Right.

14  A    -- to me, would mean take, take all the liabilities --

15  Q    Okay.

16  A    -- they had.

17  Q    And the -- and -- and -- and when it says "the liabilities

18  of the divisions," here as relevant to this action it's

19  referring back to Johnson & Johnson Baby Products Company,

20  right?

21  A    One -- yeah.  One of the divisions.

22  Q    Right.

23  A    So, I mean, it says -- it says what it -- it's pretty clear

24  what it says.  So I'm not sure I can add anything to that.

25  Q    Sir, Johnson & Johnson Baby Products Company, that division

1    of Johnson & Johnson, did not come into existence until 1972,

2    correct?

3    A    I believe that's right, yes.

4    Q    So it's, it's not saying it's assuming the liabilities for

5    Johnson & Johnson that came into existence in the late 1800s,

6    correct?

7    A    Again, it, it says what it says.  The corporate history of

8    Johnson & Johnson Baby Products and what it was responsible for

9    vis-à-vis Johnson & Johnson prior to being part of -- part

10   of -- prior to being formed, I -- I -- you'd have to go back to

11   other, other issues, other documents.

12   Q    Right, but the, but the plain words used in these board

13   minutes is that it says "assume the liabilities of the

14   divisions" and the divisions that is named here for Baby

15   Products is Johnson & Johnson Baby Products Company that first

16   came into existence in 1972, correct?

17   A    Well, it first got formed.  Of course, divisions are not

18   juridical entities.  So, you know, it -- it was -- basically,

19   they put all the, you know, the employees, they put into a

20   group, basically.

21   Q    So I take it --

22   A    John -- in other words, Johnson & Johnson Baby Products

23   Company is actually Johnson & Johnson because it's a division,

24   not a separate corporation.

25   Q    Sir, yes or no.  Johnson's, Johnson & Johnson Baby Products

1   -- strike that.

2        Johnson & Johnson Baby Products Company, that division was

3   first formed in 1972?  Yes or no.

4   A   Yes.  That, that grouping was formed in 1972.

5             MR. BLOCK:  Next slide.

6   BY MR. BLOCK:

7   Q   Okay.  And in this, in these minutes it says with respect

8   to Johnson & Johnson Baby Products Company that prior existing

9   debt for that division of Johnson & Johnson in the amount of

10  approximately $124 million would be forgiven and "deemed a

11  contribution to the capital of such division's respective

12  corporate successor in return for which such subsidiary shall

13  issue to this Corporation common stock."

14       Do you see that?

15  A   I do.

16  Q   Okay.  So this division of Johnson & Johnson is becoming a

17  subsidiary.  This division of Johnson & Johnson has over a

18  hundred million dollars in debt and Johnson & Johnson has

19  decided that it's going to forgive that debt but in exchange

20  for that, Johnson & Johnson is going to receive common stock in

21  this subsidiary, correct?

22  A   I believe that's right.  Again, the words are there, so.

23            MR. BLOCK:  Next slide, please.

24  BY MR. BLOCK:

25  Q   Okay.  And then back to what I was talking about earlier,

1   which is Page 8, it does authorize this corporation -- it says

2   "that the proper officers of this Corporation" --- these are

3   minutes for Johnson & Johnson, correct?

4   A    Correct, yes.

5   Q    All right.

6        -- that "they are hereby and authorized and directed to do

7   and to cause to be done all such acts and things, and to

8   execute and deliver and to cause to be executed and delivered

9   all such instruments."

10       Is that what it says?

11  A    It, it does.

12  Q    Okay.  And an -- you're a corporate lawyer, right?

13  A    I work for a corporation, yes.

14  Q    Okay.  And, and where is -- and an "instrument," is a

15  contract an instrument?

16  A    I believe it is, yes.

17  Q    Is the formation of a new corporation an instrument?

18  A    I, I believe that would be considered an instrument, yes.

19  Q    Okay.  And where is any contract where anyone from Johnson

20  & Johnson Consumer Inc. ever signed anything accepting any of

21  the liabilities relating to talc or anything else that occurred

22  before 1979?

23  A    So we've been looking for these documents for some time.

24  We haven't found any.  So, you know, we're, we continue to look

25  for these documents and now we're looking at sort of, for

1    ancillary documents that might be associated with this.  But

2    these particular documents, we, we've looked for diligently and

3    could not find.

4        Having said that, you know, the, you know, when you look at

5    how things operate, it's, it's clear that, that from course of

6    conduct this was done.  We just haven't been able to find the

7    documentation for it.

8    Q   You have not seen any document where anyone from this

9    separate corporation, Johnson & Johnson Consumer Inc., ever

10   signed anything accepting liabilities relating to the Johnson &

11   Johnson Baby Product division that occurred prior to 1979?

12   True or not true.

13   A   I think that's true.  We -- again, we're diligently

14   searching for them, but we haven't found, found these

15   documents.

16   Q   And you know that Johnson & Johnson preserved and has

17   produced in litigation millions of documents, right?

18   A   I do.

19   Q   And, and so what happened -- strike that.

20       And just to be clear, not only have you not found any

21   document where Johnson & Johnson Consumer Inc. ever accepted

22   any liabilities that, that arose prior to 1979 relating to

23   Johnson's Baby Products, you have never seen any such document,

24   correct?

25   A   That's true.

1  Q    And so once this, once a separate entity for Johnson's Baby

2  Products was formed in approximately 1979, isn't it true that

3  Johnson & Johnson, the parent company, continued to advertise

4  and market the product as the parent company?

5  A    I have not seen that, no.

6  Q    Okay.

7          MR. BLOCK:  Let's go to the next exhibit, then,

8  Exhibit 7.

9  BY MR. BLOCK:

10  Q    Exhibit 7 is a document produced in litigation by Johnson &

11  Johnson in their document productions and it's an ad.  And the

12  ad, you can't read the small print, but it's for Johnson's Baby

13  Powder.  And do you see the logo of Johnson & Johnson on the

14  front?  The logo on the container, sir.

15  A    I do see that.

16  Q    Whose logo is that?

17  A    It says Johnson & Johnson, but I'd like to see -- I would

18  have to see the bottle to see.  There's a trademark on the back

19  that tells you, you know, who's actually manufacturing it.

20  So --

21  Q    Sir, do you know what a copyright symbol is?

22  A    I do.

23  Q    And do you see that the ad is copyrighted J&J 1980?

24  A    Right.  The, the ad may be copyrighted.  That means that

25  the intellectual property is being owned by Johnson & Johnson,

KIM - CROSS                                                                          78

1    which is what we typically do at J&J, but it doesn't

2    necessarily mean -- well, it doesn't mean that the product was,

3    was manufactured --

4    Q    Right.

5    A    -- by Johnson & Johnson.

6    Q    The Court's looking at an advertisement that has a

7    copyright Johnson & Johnson 1980 and it's an advertisement for

8    Johnson's Baby Powder, right?

9    A    Absolutely, yes.

10   Q    And, and the print is small, but can you make out, it says,

11   "Helps you feel food, Johnson's Baby Powder"?

12   A    I'm sorry.

13   Q    It's in the record.  You don't have to try to make it out.

14        You, you certainly --

15   A    It says, "It helps bring out your best"?

16   Q    You, you certainly don't -- you certainly don't see a, a

17   warning on this advertisement that is copyrighted Johnson &

18   Johnson 1980, do you?

19   A    A warning on this?  No.

20   Q    Sir, there is a separate talcum powder product that has not

21   come up yet in this bankruptcy proceeding called Shower to

22   Shower, correct?

23   A    Yes, there is.

24   Q    And ---

25            MR. BLOCK:  Let's go to the next slide.

1   BY MR. BLOCK:

2   Q    And I have Dr. Hopkins' testimony as the corporate

3   representative for J&J and JJCI from May 3, 2019.  And

4   Dr. Hopkins is asked the following question:

5   "Q   Shower to Shower is not a baby product, correct?

6   "A   Correct."

7        And do you agree that the talcum powder product, Shower to

8   Shower, that Johnson & Johnson manufactured and sold from the

9   1960s to 2012 is not a baby product?

10  A    I agree.

11  Q    And because Shower to Shower is not a baby product it was

12  never part of J&J's Baby Products division that you referred to

13  in your previous testimony and going through those questions

14  about the board minutes, correct?

15  A    That might be true.  Actually, I'm not sure what division

16  Shower to Shower belonged in.  'Cause it is a consumer product,

17  so.

18  Q    Okay.  You do know that Shower to Shower --

19           MR. BLOCK:  Go to the next slide, please.

20  BY MR. BLOCK:

21  Q    You do know that Shower to Shower was a product that

22  contained talc that Johnson & Johnson manufactured and sold

23  from approximately the late 1960s to 2012, true?

24  A    So I'm not sure which company of Johnson & Johnson actually

25  sold that.

1  Q   Let's go -- and, sir, because you may not be familiar with

2  all the history, you have relied upon the sworn testimony of

3  your corporate rep, of the corporate representative for J&J and

4  JJCI, Dr. John Hopkins, correct?

5  A   I have not, no.

6  Q   You haven't relied on it?

7  A   No.  I would not rely on -- so I, I know that he's given

8  testimony.  I'm not sure that I've relied on John Hopkins.  I

9  rely on my own investigation and --

10  Q   Okay.  You, you, you do, as the person who is the head of

11  Product Liability Litigation at Johnson & Johnson, you

12  certainly expect the sworn testimony of Dr. John Hopkins that

13  he gave to courts and to juries to be true, right?

14  A   To the best of his ability, yes.

15  Q   Okay.

16        BY MR. BLOCK:  Let's go to the next slide.

17  BY MR. BLOCK:

18  Q   So this is the testimony of Dr. John Hopkins from May 3,

19  2019:

20  "Q  And Shower to Shower has been around for, what, since 1960?

21  "A  The very late '60s, yes.

22  "Q  So 1960s.  And Johnson & Johnson -- what happened in 2012

23  with Shower to Shower in Johnson & Johnson?"

24        Answer by Dr. Hopkins:

25  "A  Oh, it was sold to, I can't remember, another corporation

KIM - CROSS                                                                    81

1   completely different.

2   "Q   Valeant?

3   "A   Valeant.   Thank you.   Yes."

4        Do you see that?

5   A    I do.

6   Q    All right.   And you don't dispute that, right?

7   A    That -- 2012, Shower to Shower was sold to, to Valeant?   I

8   believe that's true.

9   Q    Okay.

10       And let's look at the next question and answer.   May 3,

11  2019.

12            MR. BLOCK:   And, your Honor, this is Exhibit 8 in your

13  binder, starting at Page 7750, Line 22.   And it's in the

14  slides.

15  BY MR. BLOCK:

16  "Q   Right.   What I'm saying is that Johnson & Johnson has been

17  ultimately responsible for manufacturing, selling,

18  distributing, and testing Shower to Shower through the entire

19  history of that product with Johnson & Johnson, correct?

20  "A   Yes, up until its sale to Valeant."

21       Do you see that?

22  A    I do see that.

23  Q    And so you see that Dr. Hopkins as the corporate

24  representative for Johnson & Johnson and Johnson & Johnson

25  Consumer Inc. has sworn under oath that it was Johnson &

 1  Johnson who manufactured, sold, distributed, and tested Shower

 2  to Shower from the 1960s all the way up until the time that

 3  Johnson & Johnson sold Shower to Shower to Valeant in 2012,

 4  correct?

 5  A   It -- it -- that's what it says.  My interpretation would

 6  be that Johnson, when he talks about Johnson & Johnson, like

 7  most people he's talking about the umbrella company, the

 8  umbrella of Johnson & Johnson.

 9      So one of the Johnson & Johnson -- and Dr. Hopkins knows

10  well that it would be one of the companies within Johnson &

11  Johnson that manufactured, sold, distributed Shower to Shower.

12  That's -- it's not controversial.

13  Q   Sir, sir, are you disputing that Johnson & Johnson, the

14  parent company, was ultimately responsible for manufacturing,

15  selling, distributing, and testing Shower to Shower for the

16  entire history of that product from the 1960s all the way up

17  until 2012?  Are you disputing it?

18  A   I would say that I would dispute it for the latter part of

19  this.  So certainly after the '70s that -- that -- I'm sure is

20  not true, that, that Johnson & Johnson, the, the larger entity,

21  the, the parent company, did that.

22      So I would dispute that.  Prior to that, I actually haven't

23  looked at, at who may have manufactured or distributed Shower

24  to Shower prior to that.  But in the latter years, you know,

25  Johnson & Johnson is a, was a holding company and actually

1   didn't have any manufacturing or distribution or testing

2   facilities.

3   Q   Sir, you admit that Johnson & Johnson was the company that

4   manufactured and sold and that was responsible for the talcum

5   powder product Shower to Shower in the 1960s and in the 1970s,

6   true?

7   A   I, I actually have not looked at that.  So I don't know.  I

8   don't know.

9   Q   Shower to Shower was never in the Baby Products division

10  because you acknowledge it wasn't a baby product?

11  A   Just because it's not a baby product doesn't mean it wasn't

12  in the Baby Products division.

13      And secondly, there might be, it might have been a

14  different division that it was in.  I just don't -- I just

15  don't, have not looked at the history, refreshed myself on the

16  history of --

17  Q   Okay.

18  A   -- of Shower to Shower.

19  Q   So your explanation to the Court with regard to

20  Dr. Hopkins' testimony that we're all looking at is you think

21  Dr. Hopkins was confused when he said it was Johnson & Johnson,

22  the parent company, that was ultimately responsible for Shower

23  to Shower from the 1960s to 2012.  Your explanation is you

24  think Dr. Hopkins was being imprecise?

25  A   It was imprecise.  I don't think it's confusion.  I think a

1   lot of people, including people in this courtroom, call

2   something Johnson & Johnson when, really, it belongs to one of

3   the subsidiaries.  And --

4   Q    And if --

5   A    -- it's common.

6   Q    And if we were to submit to the Court testimony from

7   several other cases where Dr. Hopkins said the same thing under

8   oath, that it was Johnson & Johnson that was responsible to,

9   for Shower to Shower from the late 1960s all the way up to

10  2012, you would have the same testimony that you believe that

11  Dr. Hopkins was wrong or imprecise?

12  A    Yeah.  I think the easiest way to do would be to look at

13  the corporate records 'cause that would tell you exactly which

14  company was responsible for Shower to Shower.  And --

15  Q    And, and as you sit here today in this bankruptcy

16  proceeding you cannot point the Court to any entity other than

17  Johnson & Johnson that was ever responsible for Shower to

18  Shower at any time from the late 1960s to 2012, true statement?

19  A    That is a true statement, but again, the latter years it

20  clearly, you know, Johnson & Johnson was a holding company, did

21  not do any manufacturing or, or testing of, of products.  But

22  prior to that, we would, I would refer to the corporate

23  documents.

24  Q    Sir, my, my question was you cannot identify any company

25  other than Johnson & Johnson that was responsible for the

KIM - CROSS                                                                    85

1    Shower to Shower product from the 1960s all the way up until

2    2012?  True or not true.

3    A    I would not identify Johnson & Johnson as that.  So your

4    question is other than Johnson & Johnson.  I wouldn't put

5    Johnson & Johnson in that category.  I'm not sure which

6    company.  It may have been Johnson & Johnson.  I just don't

7    know, but it could have been any of the companies that, that

8    distributed Shower to Shower.

9    Q    Okay.  So Dr. Hopkins says it was Johnson & Johnson and,

10   and Mr. Kim says that you don't know, right?

11   A    Yes.  That's -- you have the testimony and an explanation

12   for what, what people say.

13   Q    Sir, you would have to admit that it was Johnson & Johnson,

14   the parent company, located in New Brunswick, New Jersey that

15   has always made all health and safety policy decisions with

16   regard to asbestos and talc products, correct?

17   A    I don't think that's true, no.

18            MR. BLOCK:  Let's go to the next slide, please.

19            This is the sworn testimony of Dr. John Hopkins.  It

20   is Exhibit 10 to this examination.

21   BY MR. BLOCK:

22   Q    And this is a sworn testimony of Dr. Hopkins from July 22,

23   2019, do you see that?

24   A    I, I do.  Let me -- I have to go back.

25            So on policy decisions, yeah, I would agree that for

1   policy, there are lots of policy decisions that are made at,

2   at, at the Johnson & Johnson level.  I, I'm sorry.  I didn't --

3   I didn't hear -- I didn't hear your question.  I apologize.

4   Q   Okay.  Mr. Kim admits that all health and safety policy

5   decisions with regard to asbestos and talc products were made

6   by Johnson & Johnson located in New Brunswick, New Jersey,

7   right?

8   A   I would modify that with some policy decisions.

9   Q   So, I mean, just to be clear.  Let's go to Page 12, Line

10  14.  If you can go ahead and pick up the notebook and go to Tab

11  10, let's look at Page 12, Line 14, where Dr. Hopkins tells

12  citizens serving on a jury who he is.  Page 12, Line 14, July

13  22, 2019.  Just let me know when you're there, sir.

14  A   I am there.

15  Q   And in front of a jury Dr. Hopkins is asked:

16  "Q   Okay.  Now you are here as the corporate representative for

17  Johnson & Johnson and Johnson & Johnson Consumer Inc., correct?

18  "A   Yes."

19      Do you see that testimony?

20  A   I, I do.

21  Q   And did you, yourself, help select Dr. Hopkins to go in

22  front of juries and to give sworn testimony that Johnson &

23  Johnson and its subsidiary would ask jurors to rely upon?

24  A   I don't -- I did not select Mr., Dr. Hopkins.

25  Q   And in that case that I, I just read the testimony from

1   Page 12, if we skip to Page 20, Dr. Hopkins speaking for

2   Johnson & Johnson and Johnson & Johnson Consumer Inc. in a

3   court of law under oath gives the following testimony:

4   "Q   Johnson & Johnson Corporate in New Brunswick made all

5   health and safety policy decisions with regard to asbestos and

6   talc products, correct?"

7   A   I'm sorry.  Can we get back to -- what, what page --

8             THE COURT:  Slow down.

9             THE WITNESS:  -- is this in the transcript?

10  BY MR. BLOCK:

11  Q   Sure.  Yes, sir.  Page 20.  Yes, sir.  Page 20, Line 11.

12  Just let me now when you're there.

13  A   Thank you.

14  Q   And Dr. Hopkins as the, the corporate representative of J&J

15  and JJCI gave the following testimony on July 22, 2019:

16  "Q   Johnson & Johnson Corporate in New Brunswick made all

17  health and safety policy decisions with regard to asbestos and

18  talc products, correct?

19  "A   The -- yes.  The company in New Jersey is the parent

20  company for all the global companies, made those decisions,

21  yes."

22      Do you see that?

23  A   I do see that.

24  Q   And do you agree or disagree with that testimony that I

25  just read from Dr. Hopkins from July of 2019?

1   A    Yeah.  I would just quibble with "all" -- "all" -- "all."

2   'Cause I, I have to assume there are some decisions that are

3   made elsewhere.  But I --

4   Q    So, Mr. Kim, you assume that some decisions must be, must

5   have been made elsewhere, but your corporate representative

6   says all health and safety policy decisions with regard to

7   asbestos and talc products were made by the parent company,

8   Johnson & Johnson?  Yes or no.

9   A    That's what he said, yes.

10  Q    I mean, certainly Johnson & Johnson -- well, you know their

11  name was always on the container, right?

12  A    I, I don't think so.  It's -- I know Johnson's is.  I, I

13  don't know that Johnson & Johnson has always been there.

14  Q    Okay.  We'll take a look at that issue.  But, but --

15  A    Yeah.

16  Q    -- Johnson & Johnson is the parent company.  As, as the

17  head company certainly it had the authority the entire time

18  Johnson's Baby Powder was sold to require warnings on those

19  products, correct?

20  A    I'm not sure technically, you know.  It definitely had a --

21  had -- could weigh in on that, yes, absolutely.

22          MR. BLOCK:  Let's go to the next slide.

23  BY MR. BLOCK:

24  Q    I mean, the next slide is testimony again from Dr. Hopkins.

25  This is from another trial, May 3, 2019, at Page 7752, Line 11.

1    And if you look at the screen, question to Dr. Hopkins.  This

2    is the question:

3    "Q  And you would agree that Johnson & Johnson has the

4    authority to require warnings on Johnson's Baby Powder about

5    cancer, correct?

6    "A  They have the authority to require warnings,.  If that were

7    a medical requirement, they would, yes."

8        Do you see that?

9    A   I do see that.

10   Q   And certainly -- is it, is it your testimony you don't know

11   if the name Johnson & Johnson was always on Johnson's Baby

12   Powder containers?

13   A   Yeah.  Only because some, at some point I think we took the

14   whole Johnson & Johnson off and now I think it's Johnson's

15   Baby, was the brand.

16   Q   Okay.  Let's go to Exhibit 11.

17   A   So yeah.  I just don't know.

18   Q   Let's go to Exhibit 11.

19          MR. BLOCK:  Or, I'm sorry.  Let's go to the next

20   slide.  Next slide.

21   BY MR. BLOCK:

22   Q   Okay.  So Exhibit 11 is the testimony of the corporate

23   representative of J&J and JJCI again.  And this is from January

24   28, 2019 at Line [sic] 22, Line 10:

25   "Q  But Johnson's Baby Powder has the Johnson & Johnson logo on

1  it, correct?

2  "A   It does, yes."

3       Do you see that testimony?

4  A    Yes.

5  Q    And is the Court looking at a Johnson's Baby Powder

6  container that has the Johnson & Johnson logo on, in cursive

7  writing in blue in the front of the container?

8  A    Absolutely.   There's absolutely no question that Johnson &

9  Johnson was on some containers.   I'm just not sure if it was

10  ever taken off at some point.   I just don't know.

11  Q    And that's a nice logo, isn't it?

12  A    Sure it is.

13  Q    Yeah.   And that's a nice logo that's always been owned by

14  Johnson & Johnson, right?

15  A    I believe that's true.   I -- which company has the

16  intellectual property, I think, is the question, but I think it

17  is Johnson & Johnson.

18            MR. BLOCK:   And let's go to the next slide, please.

19  BY MR. BLOCK:

20  Q    And, and Dr. Hopkins says, really, what you said.   And, and

21  Dr. Hopkins said it on January 28, 2019, that the logo belongs

22  to Corporate.   It does not belong to any subsidiary.   It

23  belongs to Johnson & Johnson, correct?

24  A    Correct.   Johnson & Johnson owns all the intellectual

25  property for all the subsidiaries.

1    Q    And when Johnson & Johnson -- strike that.

2         And when issues came up about asbestos and talc it was

3    Johnson & Johnson that made the statements to the public about

4    asbestos and talc, correct?

5    A    I'm not sure what time period you're talking about, what

6    statements that you're talking about.

7    Q    Always, sir.  Johnson & Johnson always told the public that

8    there was never asbestos in Johnson's Baby Powder, correct?

9    A    See, again, I don't want to fall into the same trap of

10   John, you know, Johnson & Johnson versus Johnson & Johnson

11   Consumer Inc. and stuff.

12        There were statements made, I'm sure, by Johnson & Johnson.

13   There may have also been statements made by Johnson & Johnson

14   Consumer Inc.

15   Q    Can you, sir, can you, sir, identify for this Court John,

16   any time in which someone from Johnson & Johnson Consumer Inc.

17   ever made a statement to the public about the issue of asbestos

18   and talc?

19   A    I think facts about talc is a Johnson & Johnson Consumer

20   Inc. website that has all the information about talc.

21   Q    Sir, Johnson & Johnson, itself, has been in charge of facts

22   about talc?

23   A    I'd have to see the -- the -- where -- who owns that site.

24   Q    Well, let's look at what some of the documents show about

25   whether it was Johnson & Johnson or Johnson & Johnson Consumer

1   Inc. that was making the statements to the public about

2   asbestos and talc, fair?  Look at the documents?

3   A    Sure.

4           MR. BLOCK:  Let's go to Exhibit 12, please.

5   BY MR. BLOCK:

6   Q    And if we look up on the slide, now the Court can see an

7   acronym next to the name of a John McKeegan, JJCUS.  Do you see

8   that?

9   A    Yes.

10  Q    And that is Johnson & Johnson Corporate United States,

11  right?

12  A    I'm looking at this.  So we changed these designations a

13  while ago. I think it is Corporate US.

14  Q    Let's take some names.  Mr. John O'Shaughnessy is listed

15  here.  He worked for Johnson & Johnson, right?

16  A    He did.

17  Q    Clayton Patterson, he's an attorney on this e-mail dated

18  June 4, 2000.  He was an attorney for Johnson & Johnson, right?

19  A    He, he is.

20  Q    Jeff Levaugh (phonetic) was in the area of Communications

21  or Public Relations with Johnson & Johnson, right?

22  A    He was.

23  Q    Willard Nielson, was he also in the area of Communications

24  or Public Relations --

25  A    I --

KIM - CROSS                                                                    93

1   Q    -- for the company, Johnson & Johnson?

2   A    Yeah.  I, I don't know Willard Nielson.

3   Q    Do you know, do you know of a Mr. John McKeegan, who worked

4   for Johnson & Johnson as the head of Communications?

5   A    I did not know Mr. McKeegan.

6   Q    Do you know that Mr. John McKeegan has had his deposition

7   taken in litigation and that he formerly worked for Johnson &

8   Johnson, do you not?

9   A    I don't think I reviewed Mr. McKeegan's deposition.

10  Q    All right.

11       As distinguished from Johnson & Johnson Corporate US that's

12  listed on this e-mail, there's something else called CPCUS,

13  right?

14  A    Yes.

15  Q    And that would be Consumer Products Company US, JJCI,

16  right?

17  A    I believe that's true.

18  Q    Okay.  So we have JJCUS on the e-mail.  That's Johnson &

19  Johnson and then we have some people from Johnson & Johnson

20  Consumer, which is CPCUS, correct?

21  A    Yes.

22  Q    So let's look at who made the statement to the public about

23  asbestos and talc.

24       Sir, do you see that this e-mail refers to an Associated

25  Press version of the story which went to newspapers around the

1   country which is attached, do you see that?

2   A    I, I see that.

3   Q    Okay.  And if we go to the second page of Exhibit 12, we

4   see the statement, "Johnson's Baby Powder never contained any

5   asbestos, Johnson & Johnson spokesman, John McKeegan, said," do

6   you see that?

7   A    I do see that.

8   Q    And then Mr. McKeegan goes on to tell the public in an

9   Associated Press news article that went around the country that

10  "Johnson's Baby Powder is mined at a talc mine in Vermont," do

11  you see that?

12  A    I do see that.

13  Q    And do you see where it says "McKeegan said," so that's

14  Mr. McKeegan talking more to the press, right?

15  A    Yes.

16  Q    And, and Mr. McKeegan says about this Vermont talc mine

17  that, "The mine itself goes through many tests to make sure

18  that there are no asbestos fibers," right?  That's what

19  Mr. McKeegan told consumers who -- well, he stated that in the

20  story to the Associated Press, correct?

21  A    That is.

22  Q    And just to be clear for the Court, John McKeegan is

23  identified as a spokesperson and he is from Johnson & Johnson,

24  correct?

25  A    Well, that's what the article says.  I actually don't know

 1  which division John McKeegan wrote for.  Again, I --

 2  Q   Well, I mean, sir, you just told the Court that JJCUS on

 3  the e-mail is Johnson & Johnson, right?

 4  A   That's just a designation for e-mails.  It doesn't

 5  necessarily tell you where the person actually worked.

 6  Q   Right.  So the people that, that have the designation JJCUS

 7  next to their names on the e-mail that we're looking at, those

 8  are people from Johnson & Johnson.  The CPCUS is Consumer, you

 9  told us that, right?

10  A   Yeah, sometimes.  So again, these designations were gotten

11  rid of because they weren't always accurate 'cause they were e-

12  mail address from where you were located in your office.  And

13  so we got, we got rid of all that.

14      So I don't know who John McKeegan is and he may very well

15  have been, well, with Johnson & Johnson.  I just don't know.

16  Q   Okay.  Sir, if John McKeegan gave sworn deposition

17  testimony that I took on Zoom during the COVID pandemic and he

18  said he worked for Johnson & Johnson and that he made these

19  statements on behalf of Johnson & Johnson, would you dispute

20  it?

21  A   No.

22  Q   Okay.

23  A   Again, I'm just disputing, just looking at an e-mail

24  address, what, what it might mean.

25  Q   And, sir, you know that in December of 2018 the Reuters

1   News organization wrote a story investigating the issue of

2   asbestos in Johnson's Baby Powder, true?

3   A    I know the article, yes.

4   Q    Yeah.  And, sir, it wasn't Johnson & Johnson Consumer that

5   went to the public and made statements responding to that

6   Reuters article.  It was Johnson & Johnson, wasn't it?

7   A    I'm not sure they made all the statements.  I know some

8   statements were made by Johnson & Johnson.  I'm not sure --

9   Q    You certainly remember the statements by the Chief

10  Executive Officer of Johnson & Johnson, Alex Gorsky, correct?

11  A    Again, I said I know there were statements made by Johnson

12  & Johnson.  I'm not sure that they were the exclusive people

13  that said anything about --

14  Q    Let's --

15  A    -- about this.

16           MR. BLOCK:  Could we go to the next exhibit, Exhibit

17  13?

18  BY MR. BLOCK:

19  Q    This is an e-mail.  This e-mail is December 17, 2018 and

20  this is, basically, the day after or the same week that Reuters

21  issued the story publishing its investigation about asbestos in

22  Johnson's Baby Powder, correct?

23  A    Correct.

24  Q    And, and, you know, if we look at the people on this e-

25  mail, these are all Johnson & Johnson people, right?

1   A    Yeah.  Again, I don't know where these designations came

2   from 'cause they -- yeah.  I, I, I don't know.  I'm trying to

3   figure out who these people are.

4   Q    Sir, Danielle Devine is the head of Communications.  That

5   e-mail's sent to her.  She's the head of Communications for

6   Johnson & Johnson, right?

7   A    No.  She, she is.  I'm just trying --

8   Q    She --

9   A    You said all of these people.  I just don't know who all of

10  these people are.

11  Q    Let me take some easy ones.

12  A    Uh-huh (indicating an affirmative response).

13  Q    Danielle Devine, head of Communications for Johnson &

14  Johnson, right?

15  A    Yes.

16  Q    You know she's been deposed, right?  She's given sworn

17  testimony?

18  A    Yes.

19  Q    And you know that she said that she's responsible for all

20  statements that come from the CEO's office at Johnson &

21  Johnson?

22  A    Yes.

23  Q    And, and you know that Ernie Knewitz -- he's, he's on

24  here -- you know he's a Johnson & Johnson person in

25  Communications, high level, right?

KIM - CROSS                                                                      98

1   A    I don't actually, you know.  I don't think he's actually at

2   Johnson & Johnson.  He's, I mean, even this designation, JRDUS,

3   is different.  I'm not sure what division he's actually with.

4   Q    Okay.  Let's take the easiest one of all.  Johnson &

5   Johnson Chairman and CEO, Alex Gorsky.  Is he employed by

6   Johnson & Johnson?

7   A    Yes.

8   Q    And you know that after the Reuters News story it wasn't

9   someone from Johnson & Johnson Consumer that did a video that

10  was put out on Twitter.  It was Alex Gorsky, the CEO for the

11  parent company, Johnson & Johnson, right?

12  A    Of course it was.

13  Q    And if, if you go -- if we -- and, and it says here in this

14  e-mail from December 17, 2018, 9:44 a.m., "Watch Johnson &

15  Johnson Chairman and CEO, Alex Gorsky, respond to the recent

16  news coverage on talc," do you see that?

17  A    Yes.

18  Q    And at this time Johnson & Johnson was still selling Baby

19  Powder that contained talc, right?

20  A    Yes.

21           MR. BLOCK:  And if we go to the next slide.

22  BY MR. BLOCK:

23  Q    I mean, this is -- you've seen this video, right, the Alex

24  Gorsky video responding to the news coverage about asbestos and

25  talc in December of 2018, correct?

1   A    I have, yes.

2   Q    And you know -- and, and in the video it's the J&J logo,

3   right?  We can see it right there on the screen, right?

4   A    Yes.  He's the Chairman of Johnson & Johnson.

5   Q    And that's a picture of Alex Gorsky we're looking at,

6   right?

7   A    Of course.  This, this involved a huge stock drop of

8   Johnson & Johnson stock.  So of course, Alex Gorsky talked

9   about this.

10  Q    Right.  I mean, of course he talked about it since there

11  were so many financial implications for Johnson & Johnson.  Of

12  course he talked about it, right?

13  A    Well, it was the stock drop that, you know, that this

14  Reuters article started.

15  Q    And that stock drop was very bad for Johnson & Johnson,

16  right?

17  A    It was bad for all the shareholders, yes.

18  Q    Including you, right?

19  A    Including me, yes.

20  Q    Okay.  And, and Mr. Gorsky said to the American public in

21  December of 2018 in that video, "J&J's Baby Powder has never

22  contained asbestos."  You know he said that in the video,

23  correct?

24  A    Yes.

25  Q    And he called it J&J's Baby Powder, didn't he?

1   A   Well, again, this is the informal way that people talk

2   about J&J and its companies.  J&J is, you know, just like, just

3   like when you talk about J&J's vaccine, a vaccine is

4   manufactured, of course, by Janssen Pharmaceutica, but --

5              MR. BLOCK:  Next slide, please.

6              THE WITNESS:   -- J&J.

7   BY MR. BLOCK:

8   Q   And --

9              MR. BLOCK:  Previous slide.

10  BY MR. BLOCK:

11  Q   And, and, and Mr. Gorsky told the American public in

12  December of 2018 in that video that was widely disseminated

13  around the country and the world, "J&J's Baby Powder is safe

14  and does not cause cancer."  He told the American public that

15  in December of 2019 -- 18, didn't he?

16  A   He, he, he did.

17  Q   And he also told the --

18             MR. BLOCK:  Next slide.

19  BY MR. BLOCK:

20  Q   And he also told the American public as the CEO of Johnson

21  & Johnson in December of 2018, "We know our talc is safe."

22  That's what he said, right?

23  A   Of -- yes, he did.

24  Q   And not only did he do a video that was put out on Twitter

25  that was seen by millions of people, but Mr. Gorsky also went

1  on to the show Mad Money, right?

2  A    Yes.

3  Q    Because -- he went on the show Mad Money because he wanted

4  to say things to the American public that would help J&J's

5  stock price, right?

6  A    I would say he wanted to tell the truth about the, about

7  this article and, and how it was based on false assumptions and

8  misrepresentations.  That's why he wanted to go on the show.

9  Q    And, and Mr. Gorsky told the American public again on the

10  show Mad Money that there has never been asbestos in Johnson's

11  Baby Powder.  He said that, didn't he?

12  A    I think he did, yes.

13          MR. BLOCK:  Go to the next slide, please.  Next slide.

14  Okay.  Play it.

15          MR. SATTERLEY:  No, we don't have time.

16          MR. BLOCK:  All right.  Next slide.

17          MR. SATTERLEY:  I, I get to cross.

18          MR. BLOCK:  Yes.  Just -- just so -- your Honor, just

19  so you know, it's in the record.  Exhibit 14 is the video of

20  Alex Gorsky.  It's on a flash drive.  It's in your binder.

21  BY MR. BLOCK:

22  Q    Looking at Exhibit 15, that is a screenshot of Alex Gorsky

23  on Mad Money, right?

24  A    If you say so.  I, I don't --

25  Q    Well, I mean, you know what Jim Cramer looks like?

1   A    Yes.

2   Q    Okay.  And that's a picture of Alex Gorsky on Mad Money and

3   you can see the caption says Johnson & Johnson CEO Responds to

4   Claims that It Knew for Decades About Asbestos in its Products,

5   do you see that?

6   A    I see what's on the screen, yes.

7   Q    And, and, and Mr. Gorsky as CEO for the parent company,

8   Johnson & Johnson, assured the public that there was never

9   asbestos in Baby Powder, never, right?

10  A    That's -- I believe that's what he said, yes.

11  Q    And, and, and, Mr. Kim, you authorized lawyers to make that

12  same representation in courtrooms across the country, correct?

13  A    I did, yes.

14  Q    And, sir, when members of legislatures wanted to know about

15  asbestos in Baby Powder it wasn't Johnson & Johnson Consumer

16  that responded.  It was Johnson & Johnson, right?

17          MR. BLOCK:  Next slide, please.

18          THE WITNESS:  I'm not sure what the context of that

19  is.

20  BY Mr. BLOCK:

21  Q    I mean, look at Exhibit 16.  Exhibit 16 is a letter with

22  Johnson & Johnson letterhead and it's from Dr. Susan Nicholson.

23      Do you know who she works for?

24  A    I'm actually not entirely sure.  She's with the Medical

25  Office.

1   Q    Okay.  Well, let's, let's see if we can infer --

2   A    Uh-huh (indicating an affirmative response).

3   Q    -- who she worked for by the letterhead she used in Exhibit

4   16, okay?

5   A    I -- I -- I'm not sure what you're meaning by that.

6   Q    Okay.  So, I mean, let's, let's look at the top center of

7   the letterhead.  Is that Johnson & Johnson letterhead?  Yes or

8   no.

9   A    I'm not -- this -- so what I have on my screen doesn't look

10  like an actual letter, so.

11  Q    Oh, sir, Exhibit 16.

12  A    Oh, I'm sorry.

13  Q    Yeah, of course.

14  A    I was looking at the screen.

15  Q    Yeah.  No, take your time.  Exhibit 16.

16  A    Yeah.  I see that, yes.

17  Q    All right.  So are you -- are you now -- do you now agree

18  with me that Dr. Susan Nicholson worked for Johnson & Johnson?

19  A    Yeah.  She could be.  I just don't --

20  Q    Okay.

21  A    I'm not sure where the Chief Medical Office sits in the

22  organization.

23  Q    All right.

24  A    That's all.

25  Q    Can we agree that Exhibit 16 is a letter from Dr. Susan

1   Nicholson produced by Johnson & Johnson in litigation with the

2   letterhead of Johnson & Johnson, the parent company?

3   A    Yeah, absolutely.

4   Q    Okay.  And do we see that on, in this letter from Johnson &

5   Johnson, the parent company, dated April 26, 2019, Johnson &

6   Johnson said, "Johnson's Baby Powder is safe and does not

7   contain asbestos," do you see that?

8   A    I do.

9   Q    And that letter from Johnson & Johnson through

10  Dr. Nicholson was written to Senator Ronald L. Rice, Chairman,

11  The New Jersey Legislative Black Caucus, located in Newark, New

12  Jersey, correct?

13  A    That's what the letter is addressed to, yes.

14          MR. BLOCK:  Next slide, please.  Next slide, please.

15  BY MR. BLOCK:

16  Q    And, sir, as my colleague said earlier, you know as someone

17  who is in charge of Product, as someone who was in charge of

18  Product Liability Litigation at Johnson & Johnson for so many

19  years that when these cases involving Johnson's Baby Powder

20  have gone to verdict juries have been able to determine whether

21  Johnson & Johnson was negligent, correct?

22  A    Along with Johnson & Johnson Consumer, yes.

23  Q    So look, looking at Exhibit 17 we see a transcript from May

24  21, 2019 and the jury in Question 1 is asked, "Question 1.

25  Were the following defendants negligent in failing to

1  adequately warn about any danger related to asbestos associated

2  with the use of Johnson's Baby Powder or Shower to Shower talc

3  products?"

4      Do you see that?

5  A   I do.

6  Q   Okay.  And the foreperson of the jury on behalf of the, of

7  that jury in May of 2019 in the Olson case answered, "Yes," for

8  Johnson & Johnson, correct?

9  A   It did.

10 Q   And then there was a separate question, separate as to

11 Johnson & Johnson Consumer Inc., and that, and the foreperson

12 on behalf of that jury answered, "Yes," correct?

13 A   It -- yes.

14 Q   And so just put simply and just so the Court understands,

15 you know that when the cases that are either ovarian cancer or

16 mesothelioma go to trial there are separate lines on the

17 verdict sheet to determine whether Johnson & Johnson is liable

18 versus whether Johnson & Johnson Consumer Inc. is liable.  You,

19 you acknowledge that, correct?

20 A   In some cases.  I think there have been different verdict

21 sheets in different cases.

22 Q   Well, you, you can't cite a case where a court has found it

23 inappropriate to list Johnson & Johnson and Johnson & Johnson

24 Consumer Inc. separately, can you?

25 A   I'm sorry.  I'm not sure that issue has ever come up.

1    Q    Right.

2    A    Yeah.

3    Q    But you -- you're -- you're not able to inform the Court of

4    any situation where a trial court judge or an appellate court

5    judge said it was improper to have separate questions for

6    Johnson & Johnson and Johnson & Johnson Consumer Inc., correct?

7    A    Yeah.   Again, I, I don't know that that issue has ever come

8    up.

9    Q    All right.

10             MR. BLOCK:   So next slide.

11   BY MR. BLOCK:

12   Q    So in these cases we see, in looking at Exhibit 17 in the

13   Olson case, the jury was asked to decide the issue of punitive

14   damages for Johnson & Johnson separate from Johnson & Johnson

15   Consumer Inc., correct?

16   A    Yes.

17             MR. BLOCK:   Next slide.

18   BY MR. BLOCK:

19   Q    And in the Olson case as the Court can see -- and this is

20   part of Exhibit 18 -- the jury was allowed to consider the

21   financial condition and the conduct of Johnson & Johnson and

22   the financial condition and the conduct of Johnson & Johnson

23   Consumer Inc. in deciding the amount of punitive damages,

24   correct?

25   A    Yeah.   Yes, in this case.

KIM - CROSS                                                                    107

1   Q   And, in fact, in <u>Olson</u>, in this case, the jury awarded

2   different amounts for Johnson & Johnson versus Johnson &

3   Johnson Consumer Inc., do you see that?

4   A   I do.

5   Q   And you know that happened and you are aware of that case

6   that I tried, correct?

7   A   I am aware of the case that you tried, yes.

8           MR. BLOCK:  And going to, and going to the next slide.

9   BY MR. BLOCK:

10  Q   Jurors, jurors are also regularly permitted to apportion

11  the fault between Johnson & Johnson and Johnson & Johnson

12  Consumer Inc. and we could see that on the screen, Exhibit 19,

13  at Page 5, is that correct?

14  A   In, in this case, yes.

15  Q   Yeah.  And you know that case that Mr. Satterley tried, the

16  jury actually found that Johnson & Johnson was 85 percent

17  liable and that the separate company, Johnson & Johnson

18  Consumer Inc., was only 15 percent responsible, is that

19  correct?

20  A   That's, that's what this says.  I, I assume --

21  Q   Okay.

22  A   -- this is right, yeah.

23          MR. BLOCK:  And, and just going to the next slide,

24  Exhibit 20, quickly.

25  BY MR. BLOCK:

1    Q    You're familiar with the case Barden and there, the jury

2    put 80 percent on Johnson & Johnson, 20 percent on Johnson &

3    Johnson Consumer Inc., correct?

4    A    That's what this jury did, yes.

5    Q    And the very same jury that was considering those four

6    mesothelioma cases found a different apportionment under the

7    facts of a different plaintiff's case, going to the, 50-50,

8    right, the Barden, or the Ronning case?

9    A    Yeah.   That's, that's what this jury did, yes.

10   Q    Okay.   And really --

11            MR. BLOCK:   If you go to the next slide, Exhibit 21.

12   BY MR. BLOCK:

13   Q    -- Johnson & Johnson and Johnson & Johnson Consumer Inc.

14   are treated, as co-defendants are always treated in tort

15   litigation where there is a separate line for each.   So even in

16   Exhibit 21, we can see in the Leavitt case --

17   A    Yeah.

18   Q    -- from California --

19   A    I -- I --

20   Q    -- the jury, the jury was able to consider Cyprus Mines

21   Corporation and how much, and whether they were liable versus

22   the Johnson & Johnson, or versus Johnson & Johnson and JJCI,

23   correct?

24   A    I'm sorry.   I lost the track of your, when you first

25   started.   I was -- I didn't -- I don't think I -

1        THE COURT:  It didn't sound like you agreed with the

2   first statement.

3        THE WITNESS:  Yeah.  I'm not sure what --

4        THE COURT:  Could you try that one again?

5        THE WITNESS:  Yeah.  I, I just --

6        MR. BLOCK:  Yes.  Thank you, your Honor.  I'm sorry.

7        THE WITNESS:  I just wasn't sure what he said, your

8   Honor.

9   BY MR. BLOCK:

10  Q    Mr. Kim, we're just looking at Exhibit 21, which is part of

11  the verdict sheet in the Leavitt case.

12  A    Uh-huh (indicating an affirmative response).

13  Q    And the jury was asked whether the following defendants

14  were negligent, whether their negligence was a substantial

15  factor in contributing to Teresa Leavitt's risk of developing

16  mesothelioma, do you see that?

17  A    Yes.

18  Q    Okay.  And the jury was allowed to answer separately for

19  Cyprus Mines Corporation, which was one of the talc suppliers

20  for, for Johnson's Baby Powder, correct, one of the talc

21  suppliers?

22  A    Yeah.  I -- I -- so -- that, that -- I think that went by a

23  bunch of different names.  So I -- I -- I'm going to assume

24  that that's true.

25  Q    Okay.

1  A    I'm just not sure what the Cyprus -- yeah.

2  Q    And, and really, the point of my question is the jury was

3  able to give separate answers for three separate companies,

4  Cyprus Mines Corporation, J&J, and JJCI in the Leavitt case

5  that was tried in California, as we can see by looking at

6  Exhibit 21, correct?

7  A    Correct.

8  Q    And as my colleague stated earlier, going to Exhibit 22,in

9  the Ingham case, which was more than 20 women who developed

10  ovarian cancer, Exhibit 22 are the verdict sheets for that case

11  for the Court's consideration.  The jury was asked to circle

12  either the name of the plaintiff or defendant, Johnson &

13  Johnson; the name of the plaintiff or the defendant, Johnson &

14  Johnson Consumer Inc.; and you could see here in this example

15  from the Ingham verdict the plaintiff's name was circled and

16  Johnson & Johnson and Johnson & Johnson Consumer Inc. were

17  considered separately in the verdict sheet, correct?

18  A    Correct.

19  Q    And Mr. Gordon in his opening remarks to the Court talked

20  about the Ingham case and Mr. Gordon told this Court that the

21  Ingham case was unfair, that, something along those lines, do

22  you remember that?

23  A    I don't know exactly what he said, but yeah.  I agree.

24  Q    And as the person in charge of Product Liability Litigation

25  at Johnson & Johnson during the time the Ingham case was tried

1   and appealed, that's your view, that the Ingham case was

2   unfair?

3   A    Yes.

4              MR. BLOCK:  Next slide.

5   BY MR. BLOCK:

6   Q    And you took that case and that case involving separate

7   consideration for Johnson & Johnson and Johnson & Johnson

8   Consumer Inc. all the way up to the  United States Supreme

9   Court, didn't you?

10  A    We did.

11  Q    And the United State Supreme Court declined to hear that

12  case, didn't they?

13  A    It, it did.

14             MR. BLOCK:  Next slide, please.  Hold on that one.

15  BY MR. BLOCK:

16  Q    Sir, isn't it true that in litigation Johnson & Johnson and

17  Johnson & Johnson Consumer Inc. have taken the position that

18  there are no claims of indemnification between these two

19  separate companies?

20  A    I'm, I'm not sure what that --

21             MR. BLOCK:  Let's go --

22             THE WITNESS:  -- means, yes.

23             MR. BLOCK:  -- to the next slide, Exhibit 24, please.

24             THE COURT:  I didn't get all your answer.  You're not

25  sure what?

KIM - CROSS                                                                112

1              THE WITNESS:  I'm, I'm not sure what that, what you

2     said, what that means.

3              THE COURT:  Okay.

4              THE WITNESS:  There's no --

5              MR. BLOCK:  Oh.

6              THE WITNESS:  -- claims.  Could you --

7     BY MR. BLOCK:

8     Q   Oh, no, no.  I'll state it again.

9     A   Yeah.

10    Q   Isn't it true, Mr. Kim, will you tell this Court, is it

11    true that in litigation prior to this bankruptcy filing that

12    Johnson & Johnson and Johnson & Johnson Consumer Inc. took the

13    position with courts and litigants that there were no

14    indemnification claims as between Johnson & Johnson on the one

15    hand and Johnson & Johnson Consumer Inc. on the other?  Is that

16    true or not true?

17    A   Yeah.  I don't know that we ever took a position on that in

18    litigation.

19             MR. BLOCK:  Let's go to Exhibit 24.  It's, it's on the

20    screen.  We're looking at Page 2 of Exhibit 24.

21             And thank you for your patience, your Honor, and

22    Mr. Kim.  I, I have about five more minutes, okay?  Thank you.

23    BY MR. BLOCK:

24    Q   So we could look at Exhibit 24 and I want you to carefully

25    look at Exhibit 24, just the heading.  Do you see that these

1  are discovery responses in the case of D'Angela McNeill-George.

2  This was a case in New Jersey.  And, and these discovery

3  answers were filed by Johnson & Johnson and Johnson & Johnson

4  Consumer Inc.?

5  A    I mean, do you want to go -- I'm not sure what you --

6  Q    Okay.

7  A    Do you want to go --

8  Q    So, sir, I'm just going to direct your --

9  A    -- want me to go through the whole --

10 Q    I'm just going to direct your attention to a statement on

11 Page 2.  It says, "Defendants, Johnson & Johnson and Johnson &

12 Johnson Consumer Inc.," and then it says, "hereby answers

13 plaintiff's requests for admissions, interrogatories, and

14 requests for production, stating as follows," do you see that?

15 A    Uh-huh, yes.

16 Q    Okay.  So let's go to Page 22 and 23 of Exhibit 24.  And I

17 have it on the screen.  And actually, Page 21 going on to Page

18 22.  The answer to Interrogatory, Mr. Kim and your Honor, is

19 "Please set forth all parties to this lawsuit that this

20 defendant asserts a claim against for indemnification," do you

21 see that?

22 A    Yes.

23 Q    All right.  So Johnson & Johnson and Johnson & Johnson

24 Consumer Inc. are answering these interrogatories in a court

25 and they're being asked to identify any defendants that they're

1   asserting a claim for indemnification, right?

2   A    Yes.  I see the question.

3   Q    All right.  If we go to the answer on the next page, the

4   answer of Johnson & Johnson and Johnson & Johnson Consumer Inc.

5   is, "None," right?

6   A    Yes.

7   Q    J&J did not identify any indemnification claims or rights

8   it was asserting against JJCI and JJCI did not identify any

9   indemnification rights that it was claiming against J&J.  Both

10  defendants' answer was, "None," correct?

11  A    Not in this lawsuit, right.

12  Q    And can you identify any lawsuit where Johnson & Johnson or

13  Johnson & Johnson Consumer Inc. ever took the position that

14  they had indemnification claims against one another that would

15  differ from the sworn answers here that are dated May 13, 2019

16  from J&J and JJCI?

17  A    No.  We would not seek indemnification through litigation

18  in these cases, no.

19          MR. BLOCK:  Move to strike everything after "No."

20          THE COURT:  Overruled.

21  BY MR. BLOCK:

22  Q    Now insurance has been, has been mentioned in this

23  proceeding and insurance is mentioned in your declaration,

24  correct?

25  A    Correct.

1 | Q   But in litigation isn't it true when plaintiffs, counsel

2 | for plaintiffs asked Johnson & Johnson and Johnson & Johnson

3 | Consumer Inc. to identify relevant insurance policies the

4 | response of J&J and JJCI was that they could satisfy the

5 | judgments.  So insurance wasn't relevant?

6 | A   I'd have to see that.  I -- I -- that wouldn't surprise me,

7 | no.

8 | Q   It wouldn't surprise you because both Johnson & Johnson and

9 | Johnson & Johnson Consumer Inc. are multi-billion dollar

10 | companies, right?

11 | A   Yes.

12 | Q   Okay.

13 |         MR. BLOCK:  Let's go to Exhibit 25.

14 | BY MR. BLOCK:

15 | Q   So the final exhibit, Exhibit 25, is, if you just look at

16 | the heading of the exhibit in the notebook, Defendants Johnson

17 | & Johnson Consumer Inc. and Johnson & Johnson's Responses to

18 | Plaintiff's Request for Disclosure, do you see that?

19 | A   I'm sorry.  One more time?  25.

20 | Q   Sure.  Exhibit 25, I -- I'm just -- I've just recited the

21 | heading of the document.

22 | A   Yep.

23 | Q   And we could see the very first thing they say is "Come

24 | now, defendants Johnson & Johnson Consumer Inc. and Johnson &

25 | Johnson provide their responses to plaintiff's request for

1 | disclosure, as follows," do you see that?

2 | A    Yes.

3 | Q    So these were answers by both Johnson & Johnson and Johnson

4 | & Johnson Consumer Inc., right?

5 | A    Yes.

6 | Q    And let's go to Page 10, which is sub (g), and I have it up

7 | on the screen.  And the question is the plaintiffs want to know

8 | "any indemnity and insuring agreements described in Rule

9 | 192.3(f)," do you see that?

10 | A    Yes.

11 | Q    And what Johnson & Johnson and Johnson & Johnson Consumer

12 | Inc. says is that, "Defendants state that the policy underlying

13 | the disclosure of insurance information is implicated where

14 | such documents would bear on the issue of a defendant's ability

15 | to satisfy a judgment."  And then it says, next sentence,

16 | "Defendants state that they have a reasonable and good faith

17 | belief that the above policy concern is unlikely to be

18 | implicated in this action," do you see that?

19 | A    I do.

20 | Q    So, so in the tort system what Johnson & Johnson and

21 | Johnson & Johnson Consumer Inc. has told plaintiffs about

22 | insurance is, essentially, "Don't worry.  We have plenty of

23 | money to satisfy these judgments.  And so our insurance isn't

24 | relevant"?

25 | A    The words speak for themselves.  I mean, it is what it is.

KIM - CROSS                                                          117

1  Q    That's essentially what J&J and JJCI said in response to

2  these interrogatories, right?

3  A    For this particular, for any particular lawsuit, yes.

4            MR. BLOCK:  Thank you, your Honor.

5  BY MR. BLOCK:

6  Q    And thank you, Mr. Kim.

7  A    Yeah.

8            THE COURT:  That all?

9       (No response)

10           THE COURT:  Why don't we take.  We hadn't had any

11  recess at all this afternoon.  So let's take ten minutes.  I

12  would ask everyone to get back in your seats as quickly as

13  possible.

14           The witness shouldn't discuss his testimony with

15  anyone.

16           There are restrooms on all of the court floors which

17  would include 4, 5, 1, and 2 out in the public area, so.  All

18  right?

19       (Recess from 3:54 p.m., until 4:06 p.m.)

20                          AFTER RECESS

21           THE COURT:  Okay.  Have a seat, everyone.

22           Witness, of course, remains under oath.

23            JOHN K. KIM, DEBTOR'S WITNESS, ON THE STAND

24           THE COURT:  We need to talk timing, folks.  The day is

25  running very quickly.

1           Any idea about how much time you think you're going to

2     need, sir?

3           MR. SATTERLEY:  Yes, your Honor.  Fifteen, twenty

4     minutes.

5           THE COURT:  Uh-huh (indicating an affirmative

6     response).

7           MR. SATTERLEY:  I've already told all counsel 'cause

8     they want to give little closing arguments.  I've cut my cross-

9     examination real short, but reserving additional should we have

10    other, other days.

11          MR. WALDREP:  Thirty minutes to close.

12          THE COURT:  Well, we're not going to have that much

13    time and I'm sure Mr. Jones wants to ask some questions in

14    redirect.  We're going to have to use what we have.

15          So 15 minutes, 15 minutes, and 15 minutes and then

16    we're going to, we'll do what we can, okay?

17          MR. SATTERLEY:  Yes, your Honor.

18          THE COURT:  Being mindful that we are talking about a,

19    whether a TRO should issue and we'll be back in two weeks,

20    anyway, so.

21          MR. SATTERLEY:  And I've got that in mind --

22          THE COURT:  Go ahead.

23          MR. SATTERLEY:  -- in my questions.

24          THE COURT:  Please.

25          MR. SATTERLEY:  May I proceed?

1              THE COURT:  Yes.

2              MR. SATTERLEY:  Your Honor, Joe Satterley for many of

3    the claimants, the creditors.

4              First, before I talk with Mr. Kim, we'd move into

5    evidence all 25 of the exhibits that Mr. Block put in the

6    binders, move into evidence on behalf of creditors.

7              MR. JONES:  Your Honor, we haven't seen those exhibits

8    until this moment.  We're going to have the same reservations

9    that our adversaries had, if you, if I may, that we will take a

10   look at them and let you know if we have any objections.

11             THE COURT:  Okay.  But I may have announced a decision

12   before you get to look.  So understand.

13             Conditionally admitted subject to the reservation that

14   was made on both sides and the same for the, the debtor's

15   exhibits, all right?

16      (Creditors' Exhibits 1 through 25 conditionally admitted in

17   evidence)

18             MR. SATTERLEY:  I appreciate it, your Honor.

19             May I proceed?

20             THE COURT:  Yes.

21                        CROSS-EXAMINATION

22   BY MR. SATTERLEY:

23   Q   Mr. Kim, you and I know each other.  We've seen each other

24   at many trials, correct?

25   A   We have.

KIM - CROSS                                                                    120

1    Q    And I'm only going to have 15 minutes of questions --

2    A    Thank you.

3    Q    -- probably left now.

4    A    Thank you --

5    Q    But --

6    A    -- sir.

7    Q    -- I want to ask you a, a, a big question.  The decision to

8    file chapter 11 bankruptcy was a business decision, correct?

9    A    A -- a -- yeah, I guess.  Yes, I would say it was a

10   business decision partly, yes.

11   Q    You say in your declaration on Page, Paragraph 58, rather,

12   Paragraph 58, that it was "the only alternative," correct?

13   A    The only viable alternative.  I, I don't know what the

14   exact wording was, but along those lines, yeah.  It was the

15   only --

16   Q    And --

17   A    -- viable alternative, yes.

18   Q    And in doing that, did you balance the harms to the

19   creditors, to these women and these men with mesothelioma, did

20   you balance the harms to them?

21   A    We considered those harms, yes.

22   Q    And you have personally sat through trials where you've

23   seen my clients and other clients with mesothelioma suffering

24   from these diseases, correct?

25   A    I have.

1  Q   Now I want to talk with you about, first of all, your

2  declaration.  You didn't write your declaration, correct?

3  A   I edited it.  I commented on it.  I made revisions to it.

4  The original draft was done by others with my input.  But, you

5  know, that, that's how declarations are generally done.

6  Q   The lawyers for Jones Day drafted it and they let you look

7  it over and you reviewed it and made some corrections, correct?

8  A   Well, it was more complicated than that.  Because we had

9  many discussions before the declaration was, was done and then

10 they based upon all the discussions we had put together a

11 declaration that I reviewed, commented on, and signed, yes.

12 Q   And, and we may get into more details in a few weeks in

13 the --

14 A   Uh-huh (indicating an affirmative response).

15 Q   -- the foundation for some of the statements, but, as you

16 said earlier, some of the things you really don't have personal

17 knowledge about, right?  You, you didn't investigate some of

18 those things, correct?

19 A   I would have to -- you have to point me to the, the

20 specific paragraphs, but I was fairly deep, deeply involved in

21 most of the things that are in the declaration.  So I --

22 Q   Well, let me just go to the 1978 board of directors.  You,

23 you --

24 A   Right.

25 Q   -- didn't even know any of those folks.  You weren't around

1   there.  You didn't do anything --

2   A    Right.

3   Q    -- have any personal knowledge of that, right?

4   A    I had, I actually had looked at those minutes years before.

5   So I had done a prior investigation years ago about corporate

6   structure relating to talc.  So that's where those, I had seen

7   those minutes.

8   Q    And I have seen those minutes, too.  But --

9   A    Yes.

10  Q    -- my question --

11  A    They were produced to you.

12  Q    My question, my question to you is you weren't a part of

13  that.  You have no personal knowledge of that, right?

14  A    That's -- I was not there at the time, no.

15  Q    And you have not, you've never seen any, any signed

16  instruments between J&J and J&JCI regarding any

17  indemnification, correct?

18  A    Correct.  We've been looking for those documents and have

19  not seen them.

20  Q    All right.  Now I want to switch gears and talk about the

21  Appendix B to the information brief and then the Appendix B

22  that was filed yesterday to the motion.

23       Are you familiar with Appendix B with the list of the

24  protected parties?

25  A    Oh.  Yes.

 1  Q    Okay.  Did you put together that list of the --

 2  A    No.  I reviewed the list, but I did not put that list

 3  together.

 4  Q    Because the, the information sheet asks this Court to

 5  protect 139 different companies, distributors, retailers, such,

 6  right?

 7  A    Correct.

 8  Q    And then yesterday's filing, Appendix B, asks this Court to

 9  protect over 700 companies, correct?

10  A    Correct.

11  Q    Okay.  And you did, you were not involved in the decisions

12  to pick out which companies to try to protect, correct?

13  A    Well, I think there were -- well, part of the decision.  So

14  the -- yes.  I, I think we wanted to protect anyone that could

15  be sued in relationship to J&, the, the talc.  So it was, you

16  know, sort of a broad-bucket based decision.

17  Q    And the broad-bucket based decision that was made from 139

18  when the information brief was filed to 710 yesterday at 2:00,

19  who made those decisions?

20  A    Again, I think they were broad decisions based -- they were

21  decisions -- we made the decision about what categories of

22  people.  I think that's how, the best way to explain it.  We

23  tried to get what categories we wanted and then others put

24  together the list of those categories and, and put them in the,

25  in the brief.

KIM - CROSS                                                                          124

1    Q    My question was who?

2    A    I think it was a consensus by the lawyers and -- yeah.  The

3    attorneys, yeah.

4    Q    And you have not provided the Court or us 710 different

5    agreements between Johnson & Johnson Consumer or even Johnson &

6    Johnson in those 710 entities, correct?

7    A    Correct.  We, we've done the best we can in, in, in this

8    short time period and we tried to put together what we, sort

9    of, as ten exemplars of, of what we could get.

10   Q    You -- last, last evening at 6:30 I was given 27 letters

11   from a law firm of Shook, Hardy & Bacon to various retailers

12   after the litigation in those individual cases began.  Are you

13   familiar with those documents?

14   A    Yes.

15   Q    Okay.  For example, I believe they, you guys filed at --

16   LTL00057 is a letter dated August 24, 2021.  That's an example

17   of a letter from you all's lawyer, Shook, Hardy & Bacon,

18   telling the retailer, a retailer, that you would agree to

19   indemnify, right?

20   A    I think -- I would describe it as it's a letter after they

21   tendered to us the defense based upon supply agreements or

22   state law that we then answered and said, "Yes, we're going to

23   indemnify you."

24   Q    You, you didn't provide any supply agreements with regards

25   to that letter, did you?

KIM - CROSS                                                            125

1   A    I think we may have, actually, put -- isn't there a, like a

2   Rite-Aid and a Walmart?

3   Q    No.   No.   There's an unsigned Costco document --

4   A    Okay.

5   Q    -- from 2004, an unsigned Costco document from 2004, right?

6   A    So these are exemplars of, of the types of documents.   So

7   yeah.   So we did not supply all of them, I agree.

8   Q    You -- you -- you only -- you supplied an unsigned Costco

9   document from 2004, correct?

10  A    That's a template, yes.

11  Q    Okay.   You did not provide any, any actual agreements to

12  indemnify to most of those companies, correct?

13  A    Yeah.   We supplied you what we, what we could readily put

14  together.

15  Q    And these letters, these post-litigation private agreements

16  between Johnson & Johnson lawyers and these other entities,

17  they, that is all you have with regards to these retailers,

18  correct?

19  A    No, no.   These are things that we could get together

20  quickly to provide to you, you know.   I am sure there are more

21  of these letters.   I'm sure there's correspondence.   I'm sure

22  there's -- there could be, you know -- usually -- so every time

23  we enter into -- sometimes -- every time you do a shipment of

24  product, it comes with a form agreement on it.   And so, you

25  know, sort of a bill of sale that has terms on it.   We just

KIM - CROSS                                                           126

1  haven't had the time to go through and get, get everything

2  related to this and produce them.

3  Q   You're a lawyer, right?

4  A   I am.

5  Q   And you're an experienced litigation lawyer, right?

6  A   I am.

7  Q   Managing litigation, right?

8  A   Yes.

9  Q   And you're familiar that the states, the laws of various

10 states around the country allow for individual liability

11 against companies in the chain of distribution of a defective

12 product, correct?

13 A   I think it -- well, I'm not going to give my legal opinion

14 on that.

15 Q   Well, you're -- you -- you --

16 A   Yeah.

17 Q   -- you researched this.  You know this?

18 A   Yeah.  I, I, I don't feel comfortable giving my, you know,

19 legal research or, on, on the issue of individual liability for

20 retailers.

21 Q   Well, let me ask you this.  You would agree if this Court

22 were to grant the Old JJCI an automatic stay with regards to

23 each of, with regards to Old JJCI, each of those retailers or

24 distributors of talc products, should they try to make a claim

25 against Old JJCI, they would just be an unsecured creditor just

KIM - CROSS                                                             127

1  like my mesothelioma victims, correct?

2  A    Yeah.  I'm not comfortable giving advice on how the

3  Bankruptcy Rules would affect this.

4  Q    You do know that under state law my clients have an

5  independent tort liability claim against retailers under strict

6  products liability?

7  A    Yeah.  I think it depends on the state.  I just -- I don't

8  -- I haven't done a 50-state survey of that law.

9  Q    Final area, although I got a lot of other things I could

10 talk with you about and I probably, I will at some point,

11 maybe, is funding.

12     In the funding document you guys say that you're funding up

13 to $2 billion, right?

14 A    No.  That's -- that's not what I -- the funding document --

15 Q    Okay.  Well, let me ask you --

16 A    That's not how the funding works.

17 Q    Okay.  Let me ask you a different question.

18     You know who Kevin Neil is, correct?  Or Kevin Neat,

19 N-E-A-T?

20 A    It's escaping me right now.

21 Q    He's the Vice President of Finance at Johnson & Johnson

22 Consumer Inc. --

23 A    Okay.

24 Q    -- right?

25     And you know just two months ago, on August the 6th, I took

1    his deposition where he described JJCI's ability to pay

2    damages.  You're familiar with that?

3    A    I was not familiar you took his deposition, no.

4    Q    Okay.  Are you aware that just two months ago Johnson &

5    Johnson Consumer said that they had, their net, net worth was

6    $14 billion?

7    A    I know that there's a stipulation to that effect, yes.

8    Q    And so my question to you is from $14 billion, the $14

9    billion that was available two months ago, where did that go?

10   A    I think you're conflating two issues.  The net worth of

11   JJCI versus the $2 billion prefunding, that it's, that's not

12   the total amount that's available.  The, the $2 billion is a

13   pre-funding amount, which is a portion of what the value of

14   JJCI is.

15       So when you say, you know, where did the rest of the money

16   go, I, I actually don't know -- yeah.  I can't answer that

17   question 'cause I don't know what you're referring to.

18   Q    Okay.  Final, final area of question with regard to Johnson

19   & Johnson.

20       Two months ago when I took Kevin Neat's testimony regarding

21   Johnson & Johnson's ability to pay he said they had a market

22   cap of $470 billion.  Was that truthful testimony?

23   A    That could be true.  I, I actually haven't looked at the

24   market cap.

25   Q    And you know Christopher Picariello?

1   A    Yes.

2   Q    Who's Christopher Picariello?

3   A    He's in Finance.

4   Q    Okay.  And Ms. Clancy in 2019, on January 11th, took his

5   testimony and he testified that J&J's market cap at that time,

6   in 2019, was $380 billion.  Did you review his, his testimony?

7   A    No.  I know -- I've seen his testimony from time to time in

8   various forms.  I would, you know, I would defer to him on, on

9   what his market cap --

10  Q    And so --

11  A    -- valuation is.

12  Q    -- if that's the case, since January of 2019 J&J's market

13  cap went from 380 billion to, say, it's only 450 billion or 430

14  billion, you would say J&J's growing as a company and is a

15  healthy company, correct?

16  A    Yeah.  I, I'm not sure if I could add anything to that.

17              MR. SATTERLEY:  Your Honor, given the time limits, I'm

18  going to stop right now, reserving time for in a couple weeks.

19              THE COURT:  Okay.

20              MR. SATTERLEY:  And I apologize --

21              THE COURT:  Thank you, Counsel.

22              MR. SATTERLEY:  -- that we've gone a long time today.

23  It's a Friday afternoon.  We appreciate your Honor's

24  indulgence.

25              THE COURT:  Other way around.  I'm, I'm sorry to have

1    to cut you off.  We're new in this building and we didn't know

2    you were coming this week until --

3              MR. SATTERLEY:  I didn't know I was coming, either.

4              THE COURT:  So we might have made arrangements for

5    security and, and the use of this courtroom late if we had

6    known, but --

7              All right, Mr. Waldrep.

8              MR. SATTERLEY:  Thank you, your Honor.

9              MR. WALDREP:  Thank you, your Honor.

10             Your Honor, as, at the outset, my client firms also

11   decline to accept service of the complaint by e-mail.  We

12   believe this violates Rule 7004.

13             THE COURT:  Uh-huh (indicating an affirmative

14   response).

15             MR. WALDREP:  Your Honor, this case is different.

16   This case is different on many, many levels from the other

17   pending chapter 11 cases before this Court.  And we'll start

18   with the extraordinary proposition that the debtor wants this

19   Court to accept all liability for Johnson & Johnson, this

20   debtor --

21             THE COURT:  Did you need to say something, Mr. Jones?

22             MR. JONES:  Excuse me, your Honor.  I, I thought we

23   were going to finish up the examination of the witness before

24   we had any other remarks and I, this sounds like an argument to

25   me.

 1          MR. WALDREP:  I am closing, your Honor.  I have no

 2   questions for Mr. Kim.

 3          THE COURT:  Okay.  Thank you.

 4          MR. WALDREP:  All right.

 5          THE COURT:  We'll come back to that.

 6          All right.

 7          MR. JONES:  Your Honor, Jim Jones for the debtor.

 8   Unless there are others.  I'm not inviting any.

 9          THE COURT:  Come on around and ask questions.

10          MR. JONES:  I will ask a very few, your Honor.

11          THE COURT:  Redirect.

12          I'll come back to you, Mr. Waldrep.

13          MR. JONES:  Thank you, Mr. Waldrep.  I apologize.

14                        REDIRECT EXAMINATION

15   BY MR. JONES:

16   Q   Good afternoon, Mr. Kim.  Thank you, thank you for bearing

17   with us.  I have just a few questions.

18       You were asked a number of questions about the 1978 board

19   minutes --

20   A   Yes.

21   Q   -- and the formation or incorporation of the predecessor of

22   JJCI.  Do you remember that testimony?

23   A   Yes.

24   Q   And you, I think, gave at least some testimony about your

25   efforts, personal and through others, to locate the underlying

1  transactional documents, do you recall that --

2  A   I do.

3  Q   -- bit of testimony?

4      And you have, indeed, committed efforts to that endeavor?

5          MR. BLOCK:  Objection.  Leading his own witness.

6          THE COURT:  Overruled.  We're on a --

7          MR. JONES:  Thank you.

8          THE COURT:  -- an expedited time period.

9          Try not to lead too much.

10         MR. JONES:  I will do my best, your Honor.  Thank you.

11         THE COURT:  Okay.  Preliminary matters only.

12 BY MR. JONES:

13 Q   And you were involved, sir?

14 A   Yes, I was.

15 Q   Thank you.

16     And that effort involved, what?

17 A   A few years ago, we had outside counsel do an extensive

18 search for those records, looking at the, you know, other

19 documents that Finance had, going through documentation.  They

20 could not find those records.  And more recently, as we were

21 preparing for this transaction, we also looked for those

22 records again and were, were unable to locate those, those

23 records.

24 Q   And, sir, are there other sources of information within

25 either JJCI's records or J&J's records that would reflect the

1   separate --

2   A    Yes.

3   Q    -- existence of JJCI as of that 1979 timeframe?

4   A    Yeah.  There, there are definitely records that show that

5   (a) JJCI was formed and had, was a different company, you know.

6   We just can't find the, the records that show the actual

7   assumption of, of the, those instruments.  So those, those are

8   missing.

9        There are also, you know, sort of practice, from a

10  practical standpoint, I, I know personally that the finance

11  systems are set up so that all costs that relate to this talc

12  matter get sent to, to JJCI.  JJCI is ultimately responsible

13  for them.  That's just the way the accounting works in our, in

14  our systems.

15  Q    You have no doubt as you testified both in declaration and

16  today that JJCI separately existed as of about that

17  timeframe --

18  A    No.

19  Q    -- or its predecessor, that is?

20  A    I agree, yes.

21  Q    Thank you, Mr. Kim.

22       And it's fact, it's not just the assumption agreements that

23  you couldn't find.  You can't find the transactional documents

24  writ large, is that fair?

25  A    Right.  The, the agreements that relate to that, that

1   resolution, the, the documentation for that, we, we cannot

2   locate.

3   Q   Let me ask you, then, just a few questions about some of

4   the testimony and interrogatory answers and jury

5   interrogatories and the like you were shown by one of the, the

6   folks who asked you questions earlier today.

7       Mr. Kim, you have been involved in defending product

8   liability litigation for quite some time?

9   A   I have.

10  Q   And you're aware that not only Johnson & Johnson, but other

11  defendants in product liability litigation from time to time

12  have to make choices about arguments they will or will not

13  make?

14  A   Yes.

15  Q   And you're also aware that they make judgments about

16  arguments they will or won't make about co-defendants?

17  A   Correct.

18  Q   And, and Johnson & Johnson has had to make those kind of

19  decisions?

20  A   Yeah.  We make those decisions for litigation purposes, you

21  know, what, what we need for a particular litigation.  We'll

22  take a position.

23  Q   And are those, do those decisions involve highlighting,

24  whether or not to highlight differences between companies?

25  A   So the, the questions asked about, you know, are we going

1   to tell a jury that J&J is not liable, but Johnson, you know,

2   JJCI's not liable, that's not something we, we try.  That's not

3   something that comes up in, in a case and that's not something

4   where we would affirmatively tell a jury that there's this

5   agreement between the two parties.  It, it really doesn't

6   matter.  As Mr. Block showed on these verdict forms, you have

7   two lines and you have one line for damages.

8       So, you know, how those lines get split up on the verdict

9   form is, is sort of irrelevant for how we account for them

10  internally.

11  Q   And speaking of that, Mr. Kim, who ultimately is

12  responsible on the books of the two companies for the payment

13  of judgments, costs, and defense costs in connection with talc

14  litigation?

15  A   Yeah.  All the talc liability litigation is accounted for

16  on, on JJCI's books.

17  Q   Thank you, sir.

18      You were asked some questions about who was responsible for

19  what with respect to, I think, health and safety was, was a

20  topic.  Let me ask you a few follow-ups there.

21      Are you familiar with a gentleman named Ed Kuffner, or, if

22  I'm mispronouncing it, forgive me.

23  A   No.  It is Dr. Ed Kuffner, yes.

24  Q   Forgive me.  Dr. Ed Kuffner.

25      Is Dr. Kuffner -- what's his role?

1  A    He's in the Medical Affairs Department.

2  Q    And is he with JJCI or J&J?

3  A    He's, I think, JJCI's Chief Medical Officer.

4  Q    And, and what are his responsibilities, generally?

5  A    He's responsible for the health and safety of, of, you

6  know, the products that, that JJCI distributes.

7  Q    And are you familiar with a person named Lynne Szczepaniak?

8  A    Szczepaniak, yeah.  She's head of Regulatory for JJCI.

9  Q    For JJCI?

10 A    CI, yes.

11 Q    Yes.  And, and she is responsible for all Regulatory

12 Affairs for that enterprise?

13 A    For the enterprise, yes.  For that -- for that -- for JJCI.

14 Q    And then you were asked some questions about imprecision,

15 potentially, or generalization, potentially, with respect to

16 the reference to J&J.  Do you remember those questions?

17 A    I do.

18 Q    And is it sometimes more convenient and more appropriate,

19 in your judgment, to refer to that J&J shorthand?  Does that

20 come up in your business dealings?

21 A    Absolute -- I mean, again, the example of the vaccine is a

22 good example.  The vaccine is actually manufactured by Janssen

23 Pharmaceutica, but nobody calls it the Janssen vaccine.  It's,

24 it's the J&J vaccine.

25 Q    And, Mr. Kim, you mentioned at the outset of your testimony

1   that you had been employed by J&J for a number of years in, in

2   the Litigation Department and, later, in Product Liability

3   Litigation.

4        At some point were you, were you and others employed, I

5   think your declaration reflects, by an enterprise known as JJ

6   Services, or am I mistaken --

7   A   Yeah.

8   Q   -- in that regard?

9   A   So J&J Services, Inc. is another subsidiary of, of Johnson

10  & Johnson that basically houses employees that are separated

11  out from the company.

12       So, you know, and, generally, for our purposes we, I was

13  rehired, I was hired by JJ, Johnson & Johnson Services Inc. and

14  then seconded to LTL as its Chief Legal Officer.

15  Q   And I think you tried to tell us a little bit about, facts

16  about talc.  Do you remember that?

17  A   Yes.

18       So the statement was, you know, were there any statements

19  made about the health and safety of talc, did they all come

20  from Johnson & Johnson.  The, the biggest statement that we can

21  make about the safety of talc is in a massive website that I

22  would encourage people to go to called Facts About Talc which

23  lays out the JJCI position on this talc, the, the litigation,

24  and, and the safety of, of the product.

25       So that's, that's a JJCI website, I believe.  And that,

1   that will go through -- that has every statement that you need

2   about, about the litigation and the, and the issue.

3   Q   Mr. Kim, I appreciate your time this afternoon as much as

4   everybody else here, and more.

5           THE COURT:  Okay.

6           MR. SILVERSTEIN:  Your, your Honor?  I'm sorry.  Adam

7   Silverstein.  Can I ask about just four questions --

8           THE COURT:  Go ahead.

9           MR. SILVERSTEIN:  -- on, on recross?  I can stay here

10  if it's okay with your Honor, if it's faster.

11          THE COURT:  Bending so many procedural rules now, why

12  should we worry about this one.

13          Go ahead.

14          MR. SILVERSTEIN:  Thank you.

15                          REDIRECT EXAMINATION

16  BY MR. SILVERSTEIN:

17  Q   Mr. Kim, Adam Silverstein.  Nice to meet you.

18  A   Hello.

19  Q   I think you testified on, on redirect that Old JJCI has now

20  paid the costs of talc, correct?

21  A   Yeah.  All -- everything has been attributed or allocated

22  to, to JJCI.

23  Q   And, and that's totaled about $3.5 billion?

24  A   Yeah.

25  Q   Okay.

1    A    I think that's right.

2    Q    So just in your supplemental declaration in Paragraph 7

3    you, you stated:

4        "For administrative convenience, J&J initially paid these

5    costs and then, consistent with the fact that Old JJCI was

6    responsible for all claims alleging that Johnson's Baby Powder

7    and other talc-containing products cause cancer or other

8    disease, Old JJCI was charged for 100 percent of any amounts

9    paid by J&J through an intercompany charge," is that correct?

10   A    That's what it says, "an intercompany."  That -- so --

11   Q    Was, was there one single intercompany --

12   A    No.

13   Q    -- charge?

14   A    No.  There's more -- the -- the -- "an intercompany charge"

15   is just, you know, the way that we describe it.  There are

16   charges throughout the period.  And that -- you can -- you can

17   -- actually, it's -- if you look at the 2010 10-Q under the

18   Consumer Sector section there'll be a footnote that says

19   exactly that, that 3.4 billion was attributed to, to Johnson &

20   Johnson, to JJCI.

21   Q    When, when did the practice of billing to Old JJCI begin?

22   A    Oh, it starts from Day 1.  When -- when -- let's -- when,

23   when any lawsuit comes in about talc, it's attributed to JJCI,

24   even, even if Johnson & Johnson is a named defendant.

25   Q    Johnson, Johnson & Johnson paid the 2., 2.1 in excess

1  billion dollar Missouri judgment, correct?

2  A    Yeah.  So again, for, for what happens is there is a

3  central account that we pay most of our settlements out of.

4  That account is maintained by Johnson & Johnson.  And so those

5  payments will go out of Johnson & Johnson, but then there's an

6  intercompany charge that attributes that amount to JJCI.  And

7  that's reflected in the books and records and again, in the

8  securities filing.

9  Q    Okay.  And, and I'm sorry.  The, the pract -- which, which

10 decade did this practice begin?

11 A    Oh.  I think -- ever since I've been there, that's --

12 it's -- it's been there.

13 Q    So you --

14 A    So at least --

15 Q    Are you aware of it going back prior to --

16 A    Yeah.  I think --

17 Q    -- 2000?

18 A    I, I believe it goes back from, you know, the -- it's

19 always -- the responsible entity gets charged for the, the

20 charge for the litigation and that's, that's always been the

21 practice.

22 Q    All right.

23          MR. SILVERSTEIN:  Thank you.

24          THE COURT:  Thank you.

25          You need to ask a follow-up?

1        MR. JONES:  No, your Honor.  I do not.

2        THE COURT:  Mr. Waldrep, do you want to make a closing

3   statement?

4        THE WITNESS:  Your Honor, do you want me to --

5        THE COURT:  You can step down, yes, sir.

6        THE WITNESS:  Thank you, sir.

7        MR. WALDREP:  You said 15 minutes, Judge.  All right.

8        Your Honor, this case is different on many levels, as

9   I said before.  Through the corporate restructurings that have

10  occurred before, this debtor would propose that all liability

11  for Johnson & Johnson, a company with a cap rate you just heard

12  over 400, capitalization of over 470 billion, be encapsulated

13  in a two-day-old debtor with a stated value of 373 million.

14  That's less than 7/10ths of 1 percent of the value of Johnson &

15  Johnson.  Only two companies in the world have a perfect credit

16  rating from Moody's and Standard & Poor and that's Microsoft

17  and Johnson & Johnson.  It's a hundred percent payment case, no

18  denying that.  So why is the debtor attempting these tactics?

19  Newly-formed debtor has filed this adversary proceeding and

20  request for a TRO, requesting the immediate expansion of the

21  automatic stay for the benefit of 18 pages' worth of entities

22  on Appendix B.  We don't believe the debtor has carried its

23  burden required to obtain this extraordinary relief.

24        So the entities on, in Appendix B fall into three

25  categories.  About 490 of them are non-debtor affiliates,

1   including hundreds of foreign entities, the majority of which

2   were not mentioned in the complaint or the motion and for which

3   there is no factual basis for extending the stay.  Nothing on

4   the record demonstrate that the debtor has any liabilities to,

5   agreements with, or holds any equity in nearly all of the

6   listed entities.  Most importantly, that includes Johnson &

7   Johnson.  The debtor pretends that Johnson & Johnson should be

8   treated in this Texas twostep like every other affiliate.  The

9   debtor ignores that Johnson & Johnson was not a direct party to

10   the Texas twostep.  The debtor was a result of the divisive

11   merger with Old JJCI.  Despite this, the debtor asserts that

12   Johnson & Johnson is a protected party because in 1979 Old JJCI

13   assumed all J&J's liability.  All we have are the vague minutes

14   of a meeting of J&J's board, not the minutes of Old JJCI's

15   board.  The debtor hasn't produced any documents purporting to

16   make this transfer and you've heard that, well, they can't be

17   found, which means, legally, they don't exist.

18          In addition, you've heard uncontroverted evidence

19   today that J&J has direct liability for its own torts after

20   1979.  Even if you give credence to the Texas twostep, that

21   post-1979 liability of J&J is not derivative or subject to

22   indemnification from the debtor.  We presented evidence from

23   depositions, board minutes, interrogatories, J&J public

24   statements, and jury verdict sheets.  We demonstrated that J&J

25   has independent liability.  We demonstrated J&J's pre-1979

1   production of asbestos in many products and in litigation JJCI

2   denied being liable for pre-1979 talc liability.

3         With regard to --well, let's, let's, let's go back.

4         There are no documents on record to support JJCI

5   accepting any pre-1979 talc liabilities.  You heard a lot of

6   testimony about that.  They've been working on this for six

7   months.  Seems like they would have found them by now if they

8   existed.  Mr. Kim in that regard contradicts himself.  He did

9   testify that that liability exists, but then he tells us

10  there's nothing to support it.  In addition, with regard to the

11  Shower to Shower baby products, why Johnson & Johnson sold

12  those from 1960 to 2012.  Mr. Kim said it might be Johnson &

13  Johnson.  Testimony was imprecise, that of the corporate

14  representative, but the corporate representative, as your Honor

15  knows, represents the corporation.

16        Johnson & Johnson had the sole controlling corporate

17  authority to issue medical warnings for JJCI, marketing, and

18  public statements, advertised that all the powder products as

19  J&J, Johnson & Johnson products.  And separate jury verdicts

20  established indep3endnet finds of negligence as to Johnson &

21  Johnson and JJCI.

22        What else is on Exhibit B?  Some 140 retailers.  The

23  argument for retailer protection relies on Paragraph 8 of

24  Mr. Kim's supplemental declaration.  It simply says Old JJCI

25  has agreed to indemnify retailers.  There is no independent

1    evidence of when or if these transactions actually occurred,

2    whether they were memorialized, or whether such claims would be

3    viable under the laws of any particular state.  As this Court

4    noted in Aldrich Pump, the self-serving testimony of a

5    corporate director in the absence of supporting documentation

6    should not be regarded or granted weight in proceedings like

7    these, especially one they had six months to prepare for.

8         A third category of entities on the Exhibit B is a

9    hundred insurance companies.  Debtor's complaint only

10    explicitly referred to a handful of historical policies, one of

11    which is Amico.  Of course, they only produced nine policies

12    and all of them terminated from somewhere between 1970 and

13    1987.  Nothing after that.

14         So there's no support for including any of the non-

15    debtor entities, affiliates, realtors -- retailers, or insurers

16    in the requested relief.  And the sole evidentiary basis for

17    this extraordinary relief is the testimony of Mr. Kim, which

18    is, in fact, not supported by any documentary evidence.

19    Nothing in the record indicates any agreement of the debtor to

20    indemnify J&J for any talc-related liabilities.  This is a key

21    issue.  Why weren't these agreements attached or offered into

22    evidence?  Nothing, nothing, your Honor, not a single document.

23    Such a broad TRO as is requested here ignores the independent

24    liability of Johnson & Johnson and its current and former

25    officers and directors, facts that are apparent from the

1   debtor's own pleading.

2          Again, this case is different.  No matter how the

3   debtor seeks to characterize its corporate maneuvering, the

4   case is not comparable to Aldrich Pump or DBMP.  In Aldrich

5   Pump, all, Old Ingersoll-Rand and Old Trane U.S. Inc. were

6   themselves parties to the corporate restructuring, the Texas

7   twostep.  In those cases this Court, while not condoning the

8   transactions, extended the stay based on the express

9   indemnification provisions and arrangements that were proven.

10  And here, the separate corporate identity of J&J remains

11  unchanged as does its individual direct liability it would hold

12  for its own wrongdoing separate and apart from JJCI.  J&J

13  forced a subsidiary to dance the Texas twostep and now J&J

14  claims the same protections without restructuring.

15         Your Honor, the second reason for denial of this TRO

16  is this bankruptcy was filed in bad faith.

17         As to the balance of the hardships and the public

18  interest, the Court should, of course, not ignore the fact that

19  the emergency situation we have here today is entirely

20  artificial.  J&J and its counsel started a fire for the express

21  purpose of asking this Court to put it out.  The debtor was

22  created two days before the petition date for one reason.  And

23  as your Honor pointed out in Aldrich Pump and DBMP, it was

24  purely a legal strategy.  The debtor is and always will be a

25  purely fabricated entity.  J&J, the solvent parent, wants the

1   benefits of bankruptcy without subjecting its own finances and

2   assets to the administration, scrutiny, and consequences of

3   bankruptcy.  They created JTL [sic] Management LLC out of Old

4   JJCI and it created New JJCI to carry on business as usual.

5   The complaint and the TRO make it clear just how illusory this

6   entire transaction is.

7        J&J seeks to have the debtor indemnify J&J with J&J's

8   own funds to bootstrap itself into the automatic stay, but

9   avoiding the bankruptcy-related scrutiny of its deals,

10   administration of its own assets, of course the negative impact

11   that this would have on its credit rating and accountability,

12   of course, to its shareholders.  This is legal gamesmanship of

13   a highly solvent player, No. 36 on the 2021 Fortune 500 with

14   nearly 175 billion in assets and nearly 83 million in annual

15   revenues, hardly a distressed company.

16        This Court noted in Aldrich Pump the Texas twostep is

17   a lawyer-devised scheme meant to exploit the benefits of the

18   Bankruptcy Code, not a business strategy.  We're asking the

19   Court not to condone a legal strategy to attempt to limit the

20   liability of Johnson & Johnson.  Johnson & Johnson has a better

21   credit rating than the United States Government.

22        The debtor's complaints about the pursuit of claims

23   against J&J ignore the inflammatory conduct of the debtor.  The

24   misleading and premature bankruptcy notice filed in the MDL

25   cases sowed widespread discord, confusion regarding the scope

1    and permissibility of litigation against defendants like J&J

2    and other third parties.

3           Paragraph 61 of the TRO motion mentions the threats of

4    plaintiffs' counsel to continue litigation against J&J and

5    other third parties, but ignores that these responses arose

6    from the premature and overly broad bankruptcy notices filed

7    before any issue was submitted to this Court.  To remedy the

8    confusion that it created, debtor now seeks a TRO.  Debtor's

9    counsel believes they found a way to exploit the Bankruptcy

10   Code with a novel scheme.  Highly solvent company faces

11   nationwide tort litigation, they create a borderline insolvent

12   scapegoat shell company to stay and channel and frustrate

13   pending litigation and thereby saving money on legal defense

14   fees and meanwhile, the solvent company bears no consequences.

15          The hardship here, if any exists, is the result of the

16   debtor's sudden restructuring, misleading bankruptcy notices,

17   and eve-of-formation petition.  The hardship is borne by the

18   tort claimants and not by the debtor or certainly not by J&J.

19   The public interest is not benefited by rewarding blatant

20   gamesmanship and valueless restructurings with sweeping

21   protections, especially in the absence of competent evidence

22   tying those third parties to this estate.

23          The argument that granting the TRO for 14 days until

24   the preliminary injunction hearing cuts against and not for the

25   debtor.  On such a critical issue, the TRO cannot be issued

1   casually.  If, in doubt, this Court must deny it.  If the

2   debtor can come back in 14 days with actual evidence, it has

3   another opportunity.  It has failed in this first opportunity.

4   I don't know why they did it this way, Judge, but we're all

5   here.  We ask the Court not to prejudice innocent victims while

6   the debtor attempts to get its act together.

7          For these reasons, we ask you to deny the TRO.

8          THE COURT:  Thank you.

9          Any others?  I'll let the debtor bat cleanup.

10          Ms. Cyganowski.

11          MS. CYGANOWSKI:  And the debtor can, your Honor.

12   Just, just two closing thoughts and because of time I'll stay

13   here.  Mr. Waldrep did an eloquent job and I'll only add to it

14   this way.

15          First, as listening, as I was listening to Mr. Kim and

16   the testimony today, it occurred to me that what the debtor is

17   trying to do by this expansive reach of the injunction,

18   injunctive power of this Court is, is, essentially, to achieve

19   what they would only achieve at the end of the day when there

20   was a confirmed plan and that, you know, all, if all this

21   relief were granted now, one wonders, you know, what will we,

22   what we would be doing during the rest of the case other than,

23   perhaps, doing the procedures of implementing it.  Because the

24   end result would have been obtained and I believe that's

25   standing everything on its, on its, on its head.

1          And lastly, to remind the Court again -- I know you

2    need no reminding -- of, of the words of the Fourth Circuit in

3    <u>Williford v. Armstrong World Industries</u> at 715 F.2d 124, and I

4    quote:

5                "Of particular significance in balancing the competing

6                interests of the parties in the case at bar are the

7                human aspects of the needs of a plaintiff in declining

8                health as opposed to the practical problems imposed by

9                the proceedings in bankruptcy, which very well could

10               be pending a long, a long time."

11         Those needs are manifest and we need to protect them.

12         Thank you.

13         THE COURT:  Thank you.

14         Anyone else?

15         MR. PFISTER:  Just --

16         THE COURT:  You're okay.

17         MR. PFISTER:  I was good?  Okay.

18         Just, just a few closing comments, your Honor.  Rob

19   Pfister for Aylstock Witman [sic].

20         No relief is warranted here on this record, but if the

21   Court does grant relief it should do so under section 105 with

22   a scalpel, not a chainsaw.  Relief should expire in 14 days on

23   November 5.  Stay just what needs to be stayed, just the things

24   that are happening in specific actions and specific cases.  J&J

25   will complain about the cost of defense, but one of the quotes

1    I wrote down on Wednesday was, "J&J is going to provide

2    unlimited funding."  So if they're going to provide it, that's

3    not a consideration.

4              And finally, your Honor, as the Court weighs the

5    equities, it is easy for J&J to put together a Christmas list

6    of 130 protected parties that then ballooned into 700 protected

7    parties and heaven knows how big it'll be when we're back here

8    on November 4th.  It'll probably be a phonebook size 'cause

9    there's no cost to them in adding anything they want to this

10   list.

11             But this is a court of equity and don't, we

12   respectfully request that the Court not put the full burden of

13   any relief on the claimants.  If these non-debtor companies

14   want extraordinary equitable relief from this Court, there

15   should be some skin in the game.  The Court should condition

16   any such relief on something common sense, such as no change in

17   executive compensation during the 14 days, no transactions out

18   of the ordinary course of business in the 14 days, no dividends

19   in the 14 days.  Those are perfectly reasonable conditions to

20   put upon any kind of equitable relief and otherwise, what we're

21   going to see is more Christmas gifts from these non-debtors.

22             Thank you your Honor.

23             MR. SATTERLEY:  Your honor, if I could just -- I

24   respectfully disagree with learned counsel.  I have, we have a

25   dying victim that we've been trying to get a judgment, Ms. Van

1    Clive, who's caring for her 13-year-old daughter.  And so I

2    urge the Court.  The burden has not been proved, not been met.

3    The detriment to our client is so much, so much greater than

4    the detriment to Johnson & Johnson.  It'd be a horrible

5    miscarriage of justice if our clients cannot try to see their

6    case to the end.

7              I appreciate it, your Honor.

8              THE COURT:  Tell me again who the defendants are in

9    the Van Clive action.

10             MR. SATTERLEY:  Your Honor, Johnson & Johnson, the

11   mothership, the Enterprise, and Johnson & Johnson Consumer.

12   And I've met and conferred with counsel and said, "If you guys

13   will just -- if you want to split them and just, we'll proceed

14   against Johnson & Johnson," that was the offer I made.  They

15   said, "No."  They said, "No.  We're going to get this."

16             So we would request -- and there's another client,

17   another defendant called Whittaker Clark & Daniels, who's a

18   defendant just to be candid with your Honor.  But we would urge

19   your Honor to deny the TRO and let, allow us to proceed.  We

20   got to trust the jury system.  It's a good system.

21             Thank you, your Honor.

22             THE COURT:  Anyone else before the debtor?

23        (No response)

24             Mr. Hamilton?  Mr. Gordon?

25             MR. HAMILTON:  Your Honor, I'll make two points in 90

1 | seconds and turn it over for Mr. Gordon.

2 | THE COURT:  Okay.

3 | MR. HAMILTON:  One, with respect to the -- with

4 | respect to the --

5 | THE COURT:  It's hard to get used to North Carolina

6 | practice, isn't it?  You got to stand --

7 | MR. HAMILTON:  With --

8 | THE COURT:  -- but at the table.

9 | MR. HAMILTON:  With respect to the Christmas gift list

10 | of protected parties, I would just note that this issue is no

11 | different from the issue you've already dealt with in both DBMP

12 | and Aldrich with respect to our indemnification of all the

13 | distributors and retailers.  It's the same point and contrary

14 | to what counsel has said, in Aldrich you ruled that the actions

15 | against those parties was automatically stayed.  You did not

16 | extend the stay.  You said they're automatically stayed under

17 | 362(a)(1) based on Robins.

18 | With respect to whether or not we've established that

19 | the, that JJCI assumed the, assumed the liabilities of the

20 | parent for pre-'79 exposure, the fact that we have not been

21 | able to locate corporate organization documents from over 42

22 | years ago does not mean that we didn't assume.  I would bring

23 | to the Court's attention the decision in Kelly v. Town of

24 | Abingdon, Virginia -- the cite is 2021 WL 4074627 -- in which a

25 | city attorney sued for breach of contract.  He alleged that

1    there was a severance agreement in the written agreement with

2    the City.  Nobody could find the employment contract.  The

3    court said the fact that there were city council meeting

4    minutes that established the severance provision was sufficient

5    to send it to the jury to say that he had a right of severance.

6         We have produced the board minutes here that said that

7    the sub assumed all the liabilities and based on the assumption

8    of all those liabilities, all those liabilities now sit at LTL.

9         I'll turn it over to Mr. Gordon.

10        THE COURT:  Mr. Gordon.

11        MR. GORDON:  Your Honor, Greg Gordon on behalf of the

12   debtor.  Just, just a few points.

13        On Van Clive, I think the issue which your Honor

14   identified is that, the other day, is that any time there's a

15   filing by a company that's a subject of mass tort litigation

16   there's always, you know, the claims are affected in different

17   ways.  They're in, in, in different stages of litigation and

18   there's always going to be a case in trial or a case that's

19   days before trial or it's on appeal.  And the, the point is

20   that if you decide to accept one, where do you draw the line?

21        So if you agree that Van Clive can go forward, then

22   the next request for stay may be, "Well, my case is two days

23   from trial," or it may be two weeks.  And it's unfortunate, but

24   when there's a filing the music stops and it stops for

25   everybody in the same way.  No matter what stage your

1    litigation is, it stops.

2            With respect to the list of entities, that, that's

3    sort of the whole point of what we're dealing with with the

4    protected parties.  Mr. Waldrep indicated that there are 18

5    pages of entities and we heard that the list has grown, but a

6    lot of it, to me, is sort of a nonissue.  I, I think the

7    biggest list that people were complaining about was the list of

8    affiliates.  We've always included the affiliates and the

9    reason is that because against these parties the only basis for

10   a claim since they, they haven't otherwise manufactured or sold

11   a product is a derivate liability which, again, your Honor

12   addressed in your Aldrich and DBMP opinions.  It could only be

13   a claim that's property of the estate.  And, in addition, I

14   don't think there's any harm to the claimants, in any event,

15   'cause they haven't been suing these other parties.

16           But from the perspective of the debtor, we just want

17   clarity that all these same kinds of claims, no matter what

18   theory they can be brought on, what theory they can be based

19   on, are stayed or enjoined.

20           And obviously, the biggest issue you heard about today

21   was J&J.  But, as Mr. Hamilton indicated, there is an

22   assumption.  There's the best evidence rule, which is the case

23   he's talking about.  That's the best evidence we have right

24   now.  The evidence is uncontroverted at this point not only

25   between the board minutes, but the testimony of Mr. Kim, who

1    would, who's indicated that there's been a course of dealing

2    for years in terms of which entity has actually, has actually

3    paid the liability.

4         And I, I guess, probably, just two, two more points,

5    your Honor.  You know, we heard a lot about hardships to the

6    claimants and, you know, we know there's a hardship.  We know

7    there's delay, potential delay, but we also know based on the

8    information we have that the current state of play or, or the

9    state of play prior to the filing doesn't work well for the

10   claimants, either, because of what I said before, this lottery-

11   like system where the large majority of claimants don't get

12   anything and then there's a, there's a few that, that receive a

13   lot.

14        Oh.  And then the, the last point was just this

15   comment about the scalpel and the chainsaw.

16        THE COURT:  Uh-huh (indicating an affirmative

17   response).

18        MR. GORDON:  I would say a TRO is a scalpel.  That's

19   what it is.  It's just something that will bridge, bridge us

20   over to November the 4th.  It will impact those cases where,

21   that may be coming up.  I mean, cases that don't have any

22   activity won't be affected by a TRO.  What you're really doing,

23   I think, is just staying those cases that have some form of

24   activity during the period of the TRO.  So I would say it works

25   that way, in any event.

1          Thank you, your Honor.

2          THE COURT:   Thank you, all.

3          All right.   The hour's late and I'll try not to be

4   longwinded.

5          Obviously, from the Judge's chair, to have something

6   like this come in on such short notice and such passion is not

7   ideal at all.   I will be very interested in hearing later on as

8   to what precipitated this.   Even with the other divisional

9   merger cases, they didn't run in in this kind of hurry-up

10  fashion and what appears to me to be somewhat unprepared for

11  what has been undertaken.

12         If you want to know what I think preliminarily about

13  Texas two-step mergers and what they may or may not mean, you

14  might want to look at the Aldrich/Murray and DBMP decisions.

15  If you can't sleep, they're long enough that you'll get about

16  two pages in and it'll, it'll work on your insomnia.   But for

17  the benefit of, of those who may not be immersed in all of this

18  as yet, new stratagem untested on appeal as yet.   Indeed,

19  neither Judge Beyer nor I, I think we're the only judges to

20  have ever ruled on the propriety of it.   We've done those in

21  the form of preliminary injunctions, which are preliminary.

22         So I haven't had the occasion to talk about what, how

23  it might play out on the overall level as to good faith of a

24  bankruptcy case.   Didn't have motions to dismiss.   Did not have

25  the occasion to rule on whether it might be a fraudulent

1   conveyance, etc.  I have expressed some concerns about it and

2   it, my preliminary opinion -- I don't want to say too much

3   since I'm talking about two other pending cases -- but the

4   preliminary opinion was that there were colorable claims that

5   could be asserted.  I've just granted standing, as I mentioned

6   the other day.  Three hours before this case came in, I granted

7   standing to the claimants' representatives in the DBMP case to

8   initiate suit if they felt it appropriate.

9           Ultimately, a higher court will decide whether this

10  works.  This is either, depending on your perspective, a

11  brilliant strategy by which public corporations can access the

12  provision of the Bankruptcy Code that deals with asbestos

13  liabilities without immersing the entire company into the

14  throes of bankruptcy and all the negative things that come out

15  of that.  That's the debtor's side of these cases.  The idea is

16  that, if you followed the history of asbestos litigation,

17  nothing else much works.  It's hard to try these cases in the

18  tort system.  The costs are very high.  Doing it on a retail

19  level one case at a time is extremely expensive and at the end

20  of the day for a lot of businesses it ends up that if you were

21  not insolvent to begin with, you might be by the end of the

22  exercise and the latency period for asbestos is so long, that

23  that could be a prospect for anyone.

24          On the other side from the claimants' perspective, the

25  idea of an otherwise solvent company dividing itself in half

1    and putting the bad part into a bankruptcy seeking relief for

2    the benefit of the good part, well, that strikes you as

3    manifestly unfair.  I mean, after all, there are people who are

4    sick and suffering and dying, etc., and I don't want to

5    diminish that because those are all people.  From that

6    perspective, the idea that corporate profits might win out over

7    human tragedy is, is not something that is, sounds very

8    palatable.

9          Which is it?  I can't tell you in these cases today.

10   I can't decide that today.  The question is under the very

11   rushed and unprepared circumstances presented here, what do we

12   do?  Do we issue a TRO or not?  If so, to whom?  Effectively,

13   we're putting a Band-Aid on a situation that we all know is,

14   has a lot of issues to be addressed.

15         So for present purposes I am ruling for today and for

16   the next two weeks.  We are coming back to talk about this some

17   more on the 4th of November and go through the 5th.  For today

18   and for the reasons I went through at length in the two

19   cases --  and I was going to say.  The way this has been

20   presented, there, it's going to be difficult to do more than

21   rough justice.  I, I realize that.  For one thing, I don't know

22   all the particulars about the 38,000 claims that are being

23   asserted and who's being sued in each.  There's no way to, to

24   get all that in in the timeframe that we're talking about.  So

25   broad-brush strokes, if you will.

1          So from my vantage point, for the reasons I said in

2     Aldrich and Murray, claims against the debtor and claims

3     against Old JJCI, which no longer exists, I'm issuing the TRO

4     in those favors.  I'm not going any further.  I don't know

5     whose liabilities these are, but the evidence presented today

6     gives me grave concerns that these may be independent

7     liabilities of the Johnson & Johnson Company that were not

8     subject to the divisional merger and thus not brought into this

9     bankruptcy case, not liabilities of the debtor.

10          Are there indemnity agreements?  I don't have the

11     evidence that would make me feel comfortable making that

12     finding today.  It is hard to imagine that the documents are

13     lost, although I was, I will tell you, trying to explain to the

14     law clerks, who are a lot younger than a lot of us, what

15     computers were like in 1979 and we got to the point of me

16     describing what "basic" meant and that was as far as we went.

17          But the bottom line is that it is troubling that we

18     can't find those agreements and it sounds like some effort's

19     been made.  I don't have the evidence.  I don't know and what I

20     have been shown today on a preliminary basis shows me that J&J

21     was defending in its own name as well as under the name of

22     J&JCI or J&J Baby Powder and for that reason, at the moment

23     there may well be an independent right to pursue against J&J.

24          Now all these other affiliates, I don't know who they

25     are and who they're claiming through.  If they're claiming

1    through the debtor, then maybe they are automatically stayed

2    for the reasons in DBMP and Aldrich.  If they are claiming

3    through Johnson & Johnson, then they wouldn't be.  There's no

4    way to get down to that level for today's purposes.

5            Since you're going to have another shot at this -- and

6    I will, we've got two days.  Y'all are going to need to talk

7    about how to allocate the two days out between you so everyone

8    gets a full opportunity and we don't get hamstrung again and

9    where I'm having to tell people who are asking good questions

10   they have to stop.  You need to allocate that time out and see

11   where we can get it.

12           But for now, and to whatever fallout it, it

13   necessitates, Old JJCI and the debtor, it would appear to me

14   that those actions would be stayed by the Bankruptcy Code and

15   to the extent I need to extend the stay, that's where I'm

16   going.

17           That being the case, I will grant the, the injunction

18   to that extent.  We're late on a Friday afternoon.  So the

19   question is who wants the laboring oar of drawing a, a proposed

20   order?

21           Glad you stood up at that point.

22           MS. CYGANOWSKI:  I wasn't going to, but I will, you

23   know.  We're, we're happy to do the order, your Honor.

24   That's --

25           THE COURT:  Right.

1          MS. CYGANOWSKI:  I'm confident that the debtor would

2   like to, but I, we're, we're happy to undertake that

3   responsibility.

4          THE COURT:  Well, Mr. Gordon, if you'd like to, to

5   weigh in on that, I, I don't have pride of authorship, but I

6   know what I'm doing on Monday, so.

7          MS. CYGANOWSKI:  Right.

8          MR. SATTERLEY:  I just have one point of

9   clarification, your Honor.  They've already stipulated on

10  Wednesday that this would not apply to bonded appeals.

11         THE COURT:  Uh-huh (indicating an affirmative

12  response).

13         MR. SATTERLEY:  Because they're bonded and we, we

14  brought a case in the California Supreme Court that's just on

15  the edge of getting over, almost being finished --

16         THE COURT:  Right.

17         MR. SATTERLEY:  -- any day now.  And I'd just like to

18  include in the order that these don't --

19         MS. CYGANOWSKI:  Right.

20         MR. SATTERLEY:  -- these don't apply, this TRO doesn't

21  apply to any bonded appeals.

22         MR. GORDON:  So, your Honor, Greg Gordon on behalf of

23  the debtor.

24         We have a proposed TRO order.  I think it has that

25  provision in it.  I would suggest that we'll take the order and

1  modify it and send it around.

2          THE COURT:  Okay, very good.

3          MS. CYGANOWSKI:  That --

4          MR. WALDREP:  Your Honor, may I raise one other point?

5  What about witnesses, allowing depositions to go forward, to

6  preserve testimony so that if people are sick or dying, whether

7  they're --

8          THE COURT:  We mentioned that the other day --

9          MR. WALDREP:  -- whether they're defendants --

10          THE COURT:  --  did we not?

11          MR. GORDON:  That's also in the, in the form of order

12  as well.

13          THE COURT:  That would be my intention.

14          Now the one thing I did not mention is the individual

15  case where they are in trial and the like.  Nevertheless, I, I

16  have to stop as against the, the debtor and the, the Old

17  Consumer Division not just for the benefit of those entities,

18  but also for the benefit of other claimants.  If you come in

19  here and however many thousand claimants end up with a trust

20  and get claims under the trust distribution procedures, the

21  number they get may be substantially less than what might be

22  awarded in a punitive damages award.

23          So I --

24          MR. SATTERLEY:  And we understand your order and we --

25  we -- Ms. Clancy needs to be excused, if possible, because

1    Judge Brand is waiting.  Because he's got a jury out and coming

2    back on Monday.  He wanted to be reported -- may she be

3    excused --

4              THE COURT:  She may.

5              MR. SATTERLEY:  -- to advise that we can still proceed

6    against J&J, but JJCI is out of the case, is that correct?

7              THE COURT:  Well, it may change in two weeks, but --

8              MR. SATTERLEY:  It may change in two weeks, but I'm

9    going to get better, I promise.

10             THE COURT:  Okay.  All right.

11             Mr. Waldrep?

12             MR. WALDREP:  Your Honor, I, I just wanted to make the

13   point, though, of depositions going forward for either parties

14   or party or witnesses who are sick or old and may need to

15   proceed in order to preserve their testimony.  I would hope

16   that we would have that exception as well.

17             THE COURT:  I think they already acknowledged that.

18             MS. CYGANOWSKI:  They already agreed.

19             MR. GORDON:  Yes, your Honor.  We already agreed to

20   that and that's in the form of order.

21             And, your Honor, just for clarification.  Based on

22   what I heard, it sounds like you're denying the TRO with

23   respect to the retailers and distributors as well?

24             THE COURT:  For the next two weeks.

25             MR. GORDON:  Understood.

1          THE COURT:  I don't know.  I've got to have more to

2    know what the relationship is and who they're claiming through.

3    So if, if this is an Aldrich situation where they're claiming,

4    effectively, through the debtor, then it's one thing and if

5    it's, if they are retailers with agreements through J&J, the

6    big company, then something else.

7          Ms. Cyganowski?

8          MR. SATTERLEY:  And I was going to say, your Honor, my

9    duty, my role today was going to be the, the retailers and, and

10   I was going to go into much more, greater detail and I'll be

11   back in two weeks to address that.

12         MS. CYGANOWSKI:  Mine is more procedural.  Obviously,

13   the hearing is November 4th.  We're proceeding on an expedited

14   basis as a contested matter.  So with your permission, we would

15   like, plaintiffs, you know -- let me say, not say "we" --

16   plaintiffs would like to serve debtor's counsel with any

17   deposition requests, any document requests by close of business

18   on Monday, October 25th; we'd ask that documents begin to be

19   produced to us by October 27th, two days later, Wednesday, and

20   continue on a rolling basis; that depositions take place on

21   Thursday and Friday, October 28th and 29th; that our brief in

22   response to the TRO be due on November 1st, which is Monday;

23   their reply by November 3rd at noon,

24         THE COURT:  Let me ask.  Perhaps, this might be

25   appropriate.  I don't know how many sides are planning to ask

1    about discovery and you've got to absorb what I just did and,

2    and react to it.

3           Would it make sense for y'all to talk Monday morning

4    and those who wish to do discovery, get on a conference call

5    with me about 2:00 Monday afternoon?  Would that help?

6           MS. CYGANOWSKI:  That works.

7           UNIDENTIFIED SPEAKER:  Yes.

8           MR. GORDON:  I think that'd be helpful, your Honor.

9    It's impossible to react to that not having any idea even what

10   the scope of the requests would be.

11          THE COURT:  Well, that's what I figured, is we need to

12   talk about how much discovery and where are the depositions and

13   when and the like.  And --

14          MR. GORDON:  I guess as, as well, your Honor, if I, if

15   I might.  She's talk, she mentioned serving counsel.  They

16   raise their own issue that they're telling you they won't

17   accept service on behalf of the claimants.  And so how, how are

18   we going to address this issue?  Are we going to show up on

19   November 4th and be told that we can't proceed because our

20   service is inadequate?  And if that's the case, how practically

21   are we going to address that?  'Cause we don't have the

22   claimant addresses.

23          And if you seriously want us to serve the claimants,

24   then we're going to need like ASAP 38,000 addresses from you

25   guys.

1          MS. CYGANOWSKI:  I'm, I'm, I'm struggling to say

2     anything because counsel's, you know, these are plaintiffs who

3     have sued.  You, you have their addresses --

4          MR. GORDON:  I've never been in a case, though --

5          MS. CYGANOWSKI:  -- you know.  You have their

6     addresses.  I, I mean --

7          MR. BLOCK:  Could we address it Monday?

8          MS. CYGANOWSKI:  We could try to address it Monday,

9     but, I mean --

10          UNIDENTIFIED SPEAKER:  Your Honor, this is --

11          MS. CYGANOWSKI:  -- this, this, this is personal

12     jurisdiction, your Honor.  I mean, I, I don't see any way

13     around 7005.

14          THE COURT:  You would have enjoyed the morning

15     hearing, too.  We --

16          MS. CYGANOWSKI:  I, I'm confident, I'm confident I

17     would have.  But, I mean, we're also open to a process --

18          THE COURT:  Right.

19          MS. CYGANOWSKI:  -- but serving counsel is, is not

20     the, the answer.

21          THE COURT:  Well, that was part of what I was talking

22     about this morning, is how do we come to this pass where for

23     two decades it appears that certain practices have been

24     observed and there must be something in the water in North

25     Carolina because now all of a sudden they don't work, but, or

1      at least they're objectionable.

2              So why don't you talk about that.  We can chat on, on

3      Monday afternoon okay?

4              Anything else for the afternoon?

5          (No response)

6              THE COURT:  I hope you all travel safely.  Thank you

7      for the quality of your thoughts.

8              MR. SATTERLEY:  Oh, oh, your Honor.  There was a

9      statute of limitation issue.

10         (Indiscernible.)

11             MR. SATTERLEY:  Excuse me, Counsel.

12             Wasn't there a statute of limitation issue?

13             MR. HAMILTON:  Are statute of limitations tolled, your

14     Honor?

15             THE COURT:  Well, wouldn't claims against the debtor

16     be stayed --

17             MS. CYGANOWSKI:  They're stayed --

18             THE COURT:  -- so that 108 --

19             MS. CYGANOWSKI:  -- as against the debtor.

20             THE COURT:  -- comes in?  That would -- that would --

21             MR. SATTERLEY:  Exactly.  I understand the stay tolls

22     them into -- we understand.  I understand.

23             THE COURT:  Build that into the order so that we have

24     a little bit of comfort for everyone.

25             Anything else?

1    (No response)

2         THE COURT:  Okay.

3         MR. SATTERLEY:  Have a good weekend.

4         THE COURT:  Hope y'all travel safely.  Have a good

5    weekend.

6    (Proceedings concluded at 5:12 p.m.)

7

8

9

10

11

12                          CERTIFICATE

13         I, court approved transcriber, certify that the

14   foregoing is a correct transcript from the official electronic

15   sound recording of the proceedings in the above-entitled

16   matter.

17   */s/ Janice Russell*                    October 25, 2021

18   Janice Russell, Transcriber                    Date

19

20

21

22

23

24

25