**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
Mark W. Rasmussen, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
mrasmussen@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
ATTORNEYS FOR DEBTOR

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>             Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>            Plaintiff,<br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>            Defendants. | Adv. No.: 21-3032 (MBK)<br><br>**Hearing Date and Time:**<br>**January 11, 2022 at 10:00 a.m.** |

## DEBTOR'S OMNIBUS REPLY IN SUPPORT OF MOTION FOR AN ORDER (A) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR (B) PRELIMINARILY ENJOINING SUCH ACTIONS AND (C) GRANTING A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT ............................................................................................ 5

I.    THE COMMITTEE'S HOSTILITY TO THE LAWFUL 2021 CORPORATE
      RESTRUCTURING PROVIDES NO BASIS TO DENY THE RELIEF
      REQUESTED ................................................................................... 5

    A.    The Bankruptcy Code Takes the Debtor as it Comes Under State Law, and
            the 2021 Corporate Restructuring Complied With State Law .............. 6

    B.    Under Governing Law, the Debtor Talc Claims Assert a Liability That is
            the Debtor's ............................................................................. 9

II.   THE COMMITTEE'S ARGUMENTS AGAINST SUBJECT-MATTER
      JURISDICTION CONFUSE APPLICABLE LAW AND IGNORE THE
      EVIDENTIARY RECORD .................................................................. 10

    A.    The Court Has Both "Arising Under" and "Arising in" Jurisdiction to
            Grant Relief that Ensures the Effectiveness of the Automatic Stay and
            Would Have No Existence Outside of Bankruptcy ........................... 10

    B.    The Court Has "Related to" Jurisdiction Over Third-Party Claims Against
            the Protected Parties .................................................................. 11

III.  THE DEBTOR OWES INDEMNIFICATION TO J&J, THE RETAILERS AND
      THE INDEMNIFIED PARTIES FOR TALC-RELATED CLAIMS ............. 15

    A.    Old JJCI Assumed All Liabilities Associated with J&J's Baby Products
            Division .................................................................................. 15

        1.    Old JJCI and J&J's Subsequent Actions Are Consistent With the
                  1979 Agreement ............................................................... 21

    B.    Old JJCI Was Responsible for Liabilities Related to Shower To Shower .......... 23

    C.    The Debtor Has Indemnification Obligations to the Retailers and
            Indemnified Parties ................................................................... 24

IV.   PROSECUTION OF DEBTOR TALC CLAIMS IS AUTOMATICALLY
      STAYED ....................................................................................... 24

    A.    Actions Against the Protected Parties Are Stayed by Section 362(a)(1) of
            the Bankruptcy Code ................................................................. 24

    B.    Extension of the Stay Under Section 362(a)(1) to Cover the Protected
            Parties Is Justified .................................................................... 26

    C.    Section 362(a)(3) Stays the Assertion of the Debtor Talc Claims Against
            the Protected Parties .................................................................. 33

# TABLE OF CONTENTS
### (continued)

**Page**

V.    THE ADDITIONAL ALLEGATIONS THAT J&J IS INDEPENDENTLY
LIABLE FOR THE DEBTOR TALC CLAIMS ARE IRRELEVANT AND
INACCURATE ................................................................................................ 37

    1.    The Committee Omits Key Testimony From Dr. Hopkins ..................... 38

    2.    The Committee's Allegations Regarding Windsor Minerals Inc.
Are Incorrect and Should be Disregarded ................................................ 39

    3.    The Ingham Decision Does Not Illustrate Any Independent
Liability of J&J ......................................................................................... 41

VI.    THE DEBTOR HAS DEMONSTRATED THE NEED FOR INJUNCTIVE
RELIEF DURING ITS BANKRUPTCY CASE ............................................. 42

    A.    The Positions Taken By Old JJCI and J&J in Imerys Are Consistent With
the Preliminary Injunction Sought By the Debtor .................................... 43

    B.    The Debtor Has Established Likely Success on the Merits Given Its
Likelihood of a Successful Reorganization .............................................. 47

    C.    The Debtor and Its Reorganizational Efforts Will Be Irreparably Harmed
Without a Preliminary Injunction ............................................................. 51

    D.    The Irreparable Harm That the Debtor Would Suffer Absent An Injunction
Substantially Outweighs Any Prejudice to the Defendants ...................... 54

    E.    The Public Interest Supports the Preliminary Injunction .......................... 55

CONCLUSION ........................................................................................................ 56

# TABLE OF AUTHORITIES

**Page**

CASES

A.H. Robins Co. v. Piccinin,
788 F.2d 994 (4th Cir. 1986) ...............................................4, 24, 26, 27, 29, 31, 32, 51, 52, 53

Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to
Complaint (In re Aldrich Pump LLC),
2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)..........................................................48

Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.,
133 B.R. 176 (W.D. Pa. 1991).................................................................................................53

Belcufine v. Aloe,
112 F.3d 633 (3d Cir. 1997)....................................................................................................26

Bestwall LLC v. Those Parties Listed on App. A to Compl. and John and Jane
Doe 1-1000 (In re Bestwall LLC),
606 B.R. 243 (Bankr. W.D.N.C. 2019)......................................6, 10, 12, 13, 47, 48, 51, 54, 55

Bippus v. Norton Co.,
437 F. Supp. 104 (E.D. Pa. 1977) ......................................................................................17, 18

Blackwell v. Rio Mgmt., Inc. (In re Blackwell ex rel. Estate of I.G. Servs. Ltd.),
267 B.R. 732 (Bankr. W.D. Tex. 2001) .....................................................................................6

Bouton v. Litton Inds., Inc.,
423 F.2d 643 (3d. Cir. 1970)...................................................................................................18

Cambridge Tempositions, Inc. v. Cassis, III (In re Cassis),
220 B.R. 979 (Bankr. N.D. Iowa 1998) .....................................................................................6

Carter-Wallace, Inc. v. Admiral Ins. Co.,
154 N.J. 312, 712 A.2d 1116 (1998).......................................................................................34

Conway v. 287 Corp. Ctr. Assocs.,
901 A.2d 341 (N.J. 2006)........................................................................................................16

DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP
LLC),
2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021).......................................................2, 48

Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.,
    426 B.R. 520 (E.D. Pa. 2010) ...............................................................................31

FPSDA II, LLC v. Larin,
    Nos. 10-75439, 12-08032, 2012 Bankr. LEXIS 5906 (Bankr. E.D.N.Y. Dec.
    21, 2012) ..............................................................................................................11

G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.),
    313 B.R. 612 (Bankr. D.N.J. 2004) ........................................................................8

Gold v. Johns-Manville Sale Corp.,
    723 F.2d 1068 (3d. Cir. 1983)...............................................................................32

Groetken v. Ill. Dep't of Rev. (In re Groetken),
    843 F.2d 1007 (7th Cir. 1988) ................................................................................9

Houston v. Holder (In re Matter of Omni Video, Inc.),
    60 F.3d 230 (5th Cir. 1995) .....................................................................................9

In re Booth,
    260 B.R. 281 (B.A.P. 6th Cir. 2001)......................................................................33

In re Caesars Entertainment Operating Co., Inc.,
    561 B.R. 441 (Bankr. N.D. Ill. 2016) ....................................................................48

In re Colonial Realty,
    980 F.2d 125 (2d Cir. 1992)............................................................................25, 26

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004).............................................................................14, 32

In re Dow Corning Corp.,
    86 F.3d 482 (6th Cir. 1996) .............................................................................14, 31

In re Elsinore Shore Assocs.,
    91 B.R. 238 (Bankr. D.N.J. 1988) .........................................................................11

In re Federal-Mogul Glob., Inc.,
    684 F.3d 355 (3d Cir. 2012)...................................................................................13

In re G-I Holdings, Inc.,
    327 B.R. 730 (Bankr. D.N.J. 2005) .......................................................................11

In re G-I Holdings, Inc.,
    580 B.R. 388 (Bankr. D.N.J. 2018) ...................................................................11

In re Garlock Sealing Techs. LLC,
    No. 17-00275, 2017 WL 2539412 (W.D.N.C. June 12, 2017)................................8

In re Heating Oil Partners,
    2009 WL 5110838 (D. Conn. Dec. 17, 2009)........................................................28

In re Imerys Talc America, Inc.,
    Case No. 19-mc-00103-MN (D. Del. April 18, 2019).....................................44, 45

In re: Imerys Talc America, Inc.,
    2019 WL 3253366 ...............................................................15, 43, 45, 46, 47

In re Irwin,
    457 B.R. 413 (Bankr. E.D. Pa. 2011) .................................................................29

In re Mid Valley, Inc.,
    No. 03-35592 (Bankr. W.D. Pa. Dec. 16, 2003)....................................................8

In re Monroe Well Serv., Inc.,
    67 B.R. 746 (Bankr. E.D. Pa. 1986) .............................................................11, 28

In re Purdue Pharm. L.P.,
    619 B.R. 38 (S.D.N.Y. 2020)...............................................................................48

In re Quigley Co., Inc.,
    No. 04-15739 (Bankr. S.D.N.Y. July 2, 2013) ....................................................47

In re Saxby's Coffee Worldwide, LLC,
    440 B.R. 369 (Bankr. E.D. Pa. 2009) .................................................................43

In re Scarborough-St. James Corp.,
    535 B.R. 60 (Bankr. D. Del. 2015) .....................................................................29

In re Seven Fields Dev. Corp.,
    505 F.3d 237 (3d Cir. 2007).................................................................................11

In re Specialty Prods. Holding Corp.,
    No. 10-11780 (Bankr. D. Del. Dec. 10, 2014)......................................................47

In re SunEdison, Inc.,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)..................................................................12

In re W.R. Grace & Co.,
    386 B.R. 17 (Bankr. D. Del. 2008) ....................................................................11, 48

In re W.R. Grace & Co.,
    475 B.R. 34 (D. Del. 2012) .........................................................................................8

In re Wedgewood Realty Group, Ltd.,
    878 F.2d 693 (3d Cir. 1989)......................................................................................27

Ingham v. Johnson & Johnson,
    608 S.W.3d 663 (Mo Ct. App. 2020)...................................................................41, 42

Instant Air Freight Co. v C.F. Air Freight, Inc.,
    882 F.2d 797 (3d Cir. 1989)......................................................................................43

Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare
    Fund v. Serv. Painting, Inc.,
    No. CV 18-3480, 2019 WL 2143370 (E.D. Pa. May 16, 2019) ................................31

Jackson v. Trump Ent. Resorts, Inc.,
    No. CV 13-1605 (JHR/JS), 2015 WL 13637411 (D.N.J. Feb. 11, 2015)..................26

Kaiser Grp. Int'l, Inc. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser
    Aluminum Corp., Inc.),
    315 B.R. 655 (D. Del. 2004)......................................................................................28

Kreisler v. Goldberg,
    478 F.3d 209 (4th Cir. 2007) .....................................................................................51

Levin v. Raynor,
    No. 03 CIV. 4697 GBKTHK, 2010 WL 2106037
     (S.D.N.Y May 25, 2010).........................................................................................50

Maaco Enters., Inc. v. Corrao,
    1991 WL 255132 (E.D. Pa. Nov. 25, 1991) .............................................................28

Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC),
    No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021)............................................12

McCartney v. Integra Nat. Bank N.,
    106 F.3d 506 (3d Cir. 1997)................................................................................26, 27

Monsanto Co v. Geetson Seed Farms,
    561 U.S. 139 (2010)...................................................................................................43

Novartis Con. Health, Inc. v. Johnson & Johnson - Merck Cons. Pharmaceuticals
Co.,
290 F.3d 578 (3d Cir. 2002)................................................................................43

NutraSweet Co. v. Vit-Mar Enterprises, Inc.,
176 F.3d 151 (3d Cir. 1999)................................................................................43

Official Asbestos Claimants' Comm. v. Babcock & Wilcox Co. (In re Babcock &
Wilcox Co.),
274 B.R. 230 (Bankr. E.D. La. 2002) ....................................................................8

Owens-Illinois, Inc. v. United Insurance Co.,
138 N.J. 437 (1994) ....................................................................................37, 38

Phillips v. United Heritage Corp.,
319 S.W.3d 156 (Tex. Ct. App. 2010) ...................................................................7

Plastronics Socket Parts., Ltd. v. Hwang,
No. 18-00014, 2019 WL 4386943 (E.D. Tex. June 11, 2019)..................................7

Queenie, Ltd. v. Nygard Intern.,
321 F.3d 282 (2d Cir. 2003)................................................................................31

Quigley Co, Inc. v. A.C. Coleman (In re Quigley Co., Inc.),
323 B.R. 70 (S.D.N.Y. 2005)..............................................................................14

Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency
Holdings (Cayman), Inc.),
216 B.R. 371 (Bankr. S.D.N.Y. 1998) ...................................................................6

State Farm Mut. Auto. Ins. Co. v. Simmons' Estate,
417 A.2d 488 (N.J. 1980)...................................................................................16

Vinal v. Fed. Nat'l. Mortg. Ass'n,
131 F. Supp.3d 529 (E.D.N.C. 2015)....................................................................33

Voices of the Wetlands v. State Water Res. Control Bd.,
257 P.3d 81 (Cal. 2011) ....................................................................................50

Voorhees v. Preferred Mut. Ins. Co.,
128 N.J. 165 (1992) ..........................................................................................34

Williford v. Armstrong World Industries, Inc.,
715 F.2d 124 (4th Cir. 1983) .............................................................................32

Winter v. Nat'l Resources Def. Council, Inc.,
  555 U.S. 7 (2008) .................................................................................................43

**STATUTES**

15 Pa. Cons. Stat. § 361 ...........................................................................................7

11 U.S.C. § 105 ...........................................................................................27, 43, 48

11 U.S.C. § 105(a) ..............................................................10, 11, 14, 27, 28, 48, 51

11 U.S.C. § 524(g)(4)(A)(ii)(IV) ...............................................................................6

28 U.S.C. §§ 157(b)(5) and 1334(b) ...............................................................44, 45

28 U.S.C. § 1334(b) ..................................................................................................10

Ariz. Rev. Stat. Ann. § 29-2601 .................................................................................7

Bankruptcy Code § 362(a)(1) .......................................................................24, 25, 26

Bankruptcy Code §§ 362(a)(1) and 362(a)(3) ........................................................27

Bankruptcy Code § 524(g) .....................................2, 4, 6, 8, 14, 47, 48, 49, 51

Del. Code Ann. Title 6, § 18-217(b)-(c) ....................................................................7

Tex. Bus. Orgs. Code Ann. § 1.101 ...........................................................................7

Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151 .........................7

Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3) .........................................................9

Tex. Bus. Orgs. Code Ann. § 10.008(a)(4) .............................................................9, 10

Texas Business Corporation Act .................................................................................7

Plaintiff LTL Management LLC, the debtor in the above-captioned chapter 11 case

(the "Debtor"), files this Omnibus Reply (a) in further support of the *Debtor's Motion for an*

*Order (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors or*

*(II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order*

*Pending a Final Hearing* [Adv. Pro. Dkt. 2 ] ("PI Motion") and the *Debtor's Supplemental*

*Memorandum of Law in Support of Preliminary Injunction Motion* [Adv. Pro. Dkt. 128]

(the "PI Supplemental Memorandum")[1] and (b) in response to the objections filed by (a) the

Official Committee of Talc Claimants (the "Committee") [Adv. Pro. Dkt. 142] (the "Committee

Obj."), and (b) Alystock, Witkin, Kreis & Overholtz, PLLC [Dkt. 249; Adv. Pro. Dkt. 143]

(the "Alystock Obj.", and together with the Committee Obj., the "Objections").[2]

## PRELIMINARY STATEMENT

The Debtor has established that a denial of its request to extend the automatic stay ruling

and preliminary injunction, now in place by order of the United States Bankruptcy Court for the

Western District of North Carolina (the "NC Bankruptcy Court"), would undermine the Debtor's

efforts to reorganize and impose substantial and irreparable harm on the estate. That is why it is

critical that the Court make final what the NC Bankruptcy Court approved on an interim basis:

order that the Defendants are stayed and enjoined from prosecuting actions against the Protected

Parties on account of any Debtor Talc Claim while the Debtor's Chapter 11 Case remains

pending. Without such a ruling, talc claimants will seek to prosecute the exact same talc-related

---

[1]     Capitalized terms not defined herein have the meanings given to them in the PI Supplemental
Memorandum.

[2]     The plaintiff-insurers in the New Jersey insurance coverage action (the "Objecting Insurers") filed a limited
objection and reservation of rights [Adv. Pro. Dkt. 141]. As before, the requested extension of the NC
Bankruptcy Court interim ruling will apply to stay and enjoin the Debtor Talc Claims asserted by the
Defendants only. It will not apply to claims of the Objecting Insurers. The Debtor reserves all rights with
respect to whether the automatic stay applies to the insurance coverage action or any claims asserted by the
Objecting Insurers, or whether the Court should enjoin them.

personal injury claims that are pending against the Debtor against J&J, other Non-Debtor

Affiliates, the Retailers and the Indemnified Parties, and the Debtor's Insurers.  The Debtor's

reorganization would "almost surely end" and "it would be all but impossible to negotiate or

confirm a Section 524(g), or any other, plan."  <u>DBMP LLC v. Those Parties Listed on Appendix</u>

<u>A to Complaint (In re DBMP LLC)</u>, 2021 WL 3552350, at *43 (Bankr. W.D.N.C. Aug. 11,

2021).

The objectors fail to dispute, much less rebut, the central reason why a preliminary

injunction is critical to the Debtor's reorganization.  Nowhere in the Objections do they explain

how ending the stay ruling and preliminary injunction—and permitting the Debtor Talc Claims

to be pursued day after day in thousands of individual actions across the country at the same time

the Debtor seeks to resolve the very same claims fully and equitably here—could do anything

other than thwart the Debtor's reorganization efforts, which efforts, in turn, stand to benefit

claimants.  That is the irreparable harm that the preliminary injunction prevents.  The stay ruling

and the preliminary injunction should be continued.

Instead, the objectors attempt to distract from the Debtor's entitlement to a stay and

preliminary injunction by casting aspersions on the Debtor and its affiliates and making

numerous unsubstantiated factual assertions.  They claim with no legal support that the 2021

Corporate Restructuring in which the Debtor was formed was improper; they urge the Court to

reject any notion that the Debtor filed its Chapter 11 Case in good faith; and they assail the

Debtor's conduct and that of non-debtor affiliates as collusive, scheming, and worse.

All these charges are groundless.  There was nothing improper about the 2021 Corporate

Restructuring.  The restructuring complied with long-standing Texas corporate law, was

effective, and must be recognized.  The objectors cannot show that the restructuring harmed

claimants or anyone else.  They provide no legitimate reason to challenge it.  The Bankruptcy

Code anticipates prepetition restructurings of a debtor, and it accepts a debtor in whatever form it

comes at the time of filing.  This Debtor likewise must be taken as it came into this Chapter 11

Case and, with that, all of the objectors' arguments collapse.

     The Committee advances three main arguments none of which has any merit.  <u>First</u>, the

Committee argues that this Court should not enjoin claims against J&J and certain of the other

Protected Parties because each of these other parties allegedly has independent and direct

liability to the Defendants.  The allegations of independent and direct liability are

unpersuasive.  But even if they were, numerous courts have acknowledged that they have the

power to enjoin claims against non-debtor third parties even if those claims are alleged to be

direct or relate to non-debtors' independent liability, so long as there is any impact on the debtor's

estate.  PI Supp. Memo, 38-39, 65-72.  This is especially the case where, as here, it is undisputed

that the alleged direct claims would involve litigation of the same key facts—the same products,

the same time periods and the same alleged injuries and damages—that are at issue in the claims

against the Debtor.  Every one of these alleged direct claims against J&J and the other Protected

Parties is simply an effort to collect on the very same claims at issue in this Chapter 11 Case.

     <u>Second</u>, the Committee argues that this Court lacks jurisdiction to consider the request for

the preliminary injunction.  But it misapplies law that establishes both "arising under" and

"arising in" jurisdiction over this Adversary Proceeding, and, in addressing "related to"

jurisdiction, it ignores the factual record that third-party actions will not have *any* effect on the

estate.  Here, the Committee seeks to permit claimants to pursue the Debtor Talc Claims in the

tort system—the exact same claims the Debtor is attempting to address through a reorganization

in this case.  Pursuing what are, in reality, claims against the Debtor outside of this Chapter 11

Case will undoubtedly affect the estate by, among other things, determining the value of the claims asserted against the Debtor.

Third, and finally, the Committee resorts to a tortured reading of the terms of the 1979 Agreement and inapposite case law to argue the agreement provides for no assumption of talc-related liabilities.  But the agreement is clear that all liabilities, including talc-related liabilities, associated with the Baby Products division were assumed by Old JJCI in 1979.

The prosecution of the Debtor Talc Claims against the Protected Parties, including J&J, is automatically stayed because it would liquidate indemnification claims against the Debtor outside of chapter 11, effectively seek to collect on claims against the Debtor, deplete available insurance coverage and eliminate the protections of the automatic stay.  The objectors do not challenge that actions against non-debtors are automatically stayed if the "unusual circumstances" identified in Robins are present; they instead ignore the factual record to argue that unusual circumstances do not exist here.  Because the Debtor is the real party in interest with respect to all the types of claims described by the objectors, the automatic stay is applicable here.

Further, the Debtor meets each of the four factors of the traditional test for issuance of a preliminary injunction.  The Debtor meets the first—likelihood of success—because it has the financial capacity to implement a plan of reorganization and is prepared to promptly commence negotiations to resolve this case.  The Committee insists that, in addition, the Debtor must now show that it is able to confirm a plan of reorganization under section 524(g).  That is neither required nor appropriate at this stage, but the Debtor nonetheless has explained why the Committee's novel plan arguments are misplaced.  The Committee asks the Court to ignore the irreparable harm that the preliminary injunction prevents, because, it argues, the harm is "negligible."  But the very purpose of the case would be defeated in the absence of the requested

injunction.  The objectors do not seriously dispute that the preliminary injunction is critical to the

fundamental purpose of the case—to achieve an equitable, final, and full resolution of the current

and future talc claims against the Debtor.  The third—the balance of harms—weighs decidedly in

favor of a preliminary injunction because it will preserve the Debtor's opportunity to pursue a

successful reorganization.  At the same time, halting the pursuit of the Debtor Talc Claims

outside this Court will not materially harm the Defendants.  The fourth—public interest—also

supports maintaining the preliminary injunction.  The objectors argue that the restructuring and

the protection of the Debtor afforded by the injunction serve no public interest, even though a

trust would establish a far more equitable and efficient process—both for current and future talc

claimants—than the tort system.

The Committee's speculation that granting the preliminary injunction will lead to a

"trend" of improper bankruptcies following divisional mergers fares no better.  Committee Obj.,

93.  The Committee's contention shows little faith in the legal system's ability to protect against

any such "abusive petitions".  Talc is a unique alleged tort given, among other reasons, the

multitude of plaintiffs and defendants, and the purported long latency period for the injuries

alleged.  Not only will the requested injunction help foster a successful chapter 11 reorganization

here, which is always in the public interest, it will do so by enabling the Debtor to achieve an

equitable resolution of the Debtor's talc liability for all parties in interest.

## **ARGUMENT**

## I. **THE COMMITTEE'S HOSTILITY TO THE LAWFUL 2021 CORPORATE RESTRUCTURING PROVIDES NO BASIS TO DENY THE RELIEF REQUESTED.**

Pervading the Committee's arguments against the PI Motion is its hostility to the pre-

petition 2021 Corporate Restructuring, which it denounces as a "charade", "corporate alchemy"

and "corporate shell games".  Committee Obj., 4, 54-58.  Alystock goes further calling the 2021

Restructuring "a brazen series of corporate maneuvers . . . that constitute an actual-intent

fraudulent transfer." Alystock Obj., 2. The Committee and Alystock urge the Court to disregard

the effects of the 2021 Corporate Restructuring to deny the requested extension of the

preliminary injunction. Committee Obj.,56; Alystock Obj., 3. But the Committee and Alystock

provide no legitimate reason to disregard the 2021 Corporate Restructuring, which complied

with long-standing Texas corporate law, was effective, and must be recognized.

### A.    The Bankruptcy Code Takes the Debtor as it Comes Under State Law, and the 2021 Corporate Restructuring Complied With State Law.

The Bankruptcy Code, as a general rule, takes a debtor's corporate structure as it comes

under state law.[3] Indeed, section 524(g) of the Bankruptcy Code expressly contemplates pre-

filing corporate restructurings, invariably involving state law, by providing that a channeling

injunction may bar actions "directed against a third party" and arising by reason of its

"involvement" in "a transaction changing the corporate structure" of "the debtor or a related

party." 11 U.S.C. § 524(g)(4)(A)(ii)(IV); see also Bestwall, 606 B.R. at 252-53.

Here, Texas provides that background state law and, under it, there was nothing improper

in the 2021 Corporate Restructuring. Rather, it met all requirements for a divisional merger, and

the Committee does not seriously argue otherwise.[4] Old JJCI (which became Chenago Zero

---

[3]    See, e.g., Bestwall LLC v. Those Parties Listed on App. A to Compl. and John and Jane Doe 1-1000 (In re Bestwall LLC), 606 B.R. 243, 252-53 (Bankr. W.D.N.C. 2019) ("Bestwall") ("[C]onsistent with the Bankruptcy Code more generally, [section 524(g)] takes a debtor's corporate structure as it comes under background state law."), appeal docketed, Nos. 20-00103, 20-00105 (W.D.N.C. 2020); Blackwell v. Rio Mgmt., Inc. (In re Blackwell ex rel. Estate of I.G. Servs. Ltd.), 267 B.R. 732, 740 n.12 (Bankr. W.D. Tex. 2001) ("As a general rule corporate forms are observed in bankruptcy unless there are clear state law grounds for piercing the corporate veil.") (internal quotation omitted); Cambridge Tempositions, Inc. v. Cassis, III (In re Cassis), 220 B.R. 979, 983 (Bankr. N.D. Iowa 1998) (the corporate form and "technical, legal distinctions . . . will be respected in bankruptcy cases"); Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) ("presumption" that corporate form is respected in bankruptcy).

[4]    The application of the automatic stay cannot constitute an abridgement of creditor rights, as the Committee alleges. Committee Obj., 51 n.26.

LLC) was eligible to effect the divisional merger because it was properly domiciled in Texas, and subject to Texas law. See *Declaration of John Kim in Support of First Day Pleadings* (Docket No. 5) (the "First Day Declaration"), ¶ 23. Although the Committee complains about the duration of that domiciling, there is no minimum period; Texas's Business Organizations Code "applies to all business entities, regardless of when such entities were formed." Phillips v. United Heritage Corp., 319 S.W.3d 156, 163 n.5 (Tex. Ct. App. 2010).[5] That Code establishes the procedures that an entity must follow to effect a divisional merger, including a plan of merger (specifying, among other things, the allocation of assets and liabilities) and a filing with the Secretary of State. See Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151. Old JJCI complied with them all. See generally Plan of Divisional Merger by Chenago Zero LLC, dated October 12, 2021. The Committee has not, nor could it, present evidence to the contrary.

Not only is there nothing unlawful about the 2021 Corporate Restructuring, there is also nothing novel. For over 30 years, Texas law has permitted divisional mergers that exclusively allocate liabilities (and assets) to a new entity created by the transaction. Huff, The New Texas Business Corporation Act Merger Provisions, 21 ST. MARY'S L.J. 109, 110 (1989). Several other states have since enacted similar statutes. See 15 Pa. Cons. Stat. § 361; Ariz. Rev. Stat. Ann. § 29-2601; Del. Code Ann. tit. 6, § 18-217(b)-(c). And that exclusive allocation is fully enforceable. See, e.g., Plastronics Socket Parts., Ltd. v. Hwang, No. 18-00014, 2019 WL 4386943 (E.D. Tex. June 11, 2019) (upholding allocation of assets effected through a Texas divisional merger as provided by the statute, despite challenges that it violated the rights and expectations of the predecessor company's contract counterparty).

---

[5]     See also Tex. Bus. Orgs. Code Ann. § 1.101.

Debtors in numerous mass tort bankruptcies have been involved in prepetition corporate transactions.[6] The Committee acknowledges the four asbestos-related chapter 11 cases pending in the Western District of North Carolina, which are recent similar examples, although still pending. But Garlock involved a similar prepetition corporate restructuring (under different law) leading to a confirmed section 524(g) plan.[7] The debtor's parent, Coltec Industries Inc. ("Coltec"), transferred substantially all of its assets to a "NewCo," which did not file for bankruptcy; Coltec's asbestos liabilities, a consulting business, and certain insurance rights were retained by an "OldCo," which then filed for chapter 11 protection. See Coltec Discl. Statement, at 32-34. NewCo and OldCo entered into a "Keepwell" agreement (like the Funding Agreement) by which NewCo committed to make future cash contributions to OldCo, as necessary, to maintain its solvency and financial stability. Id. at 33. After Coltec's restructuring and OldCo's filing, the court approved the Garlock-Coltec plan of reorganization, which was supported by the claimant representatives, and included a channeling injunction that extended to claims against NewCo. In re Garlock Sealing Techs. LLC, No. 17-00275, 2017 WL 2539412, at *3, 30-31 (W.D.N.C. June 12, 2017).

---

[6]    See, e.g., In re Garlock Sealing Techs., LLC, No. 10-31607 [Dkt. 6261] (Bankr. W.D.N.C. June 12, 2017) (effecting a similar prepetition restructuring under different state law); In re Mid Valley, Inc., No. 03-35592 [Dkt. 48] (Bankr. W.D. Pa. Dec. 16, 2003) (undergoing several restructurings in the years preceding the bankruptcy, including the formation of two of the debtors); G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.), 313 B.R. 612, 621 (Bankr. D.N.J. 2004) (debtor filing for bankruptcy soon after becoming successor-in-interest to entity with over 100,000 pending asbestos-related lawsuits); In re W.R. Grace & Co., 475 B.R. 34, 68 (D. Del. 2012) (spinning off various business activities to two non-debtor affiliates prior to bankruptcy filing); Official Asbestos Claimants' Comm. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.), 274 B.R. 230, 234 (Bankr. E.D. La. 2002) (distributing all shares of debtor's subsidiaries to debtor's immediate parent corporation prepetition).

[7]    See Disclosure Statement for Modified Joint Plan of Reorganization of Garlock Sealing Techs. LLC, et al. and Oldco, LLC Proposed Successor by Merger to Coltec Industries Inc. (the "Coltec Disclosure Statement"), In re Garlock Sealing Techs. LLC, No. 10-31607 [Dkt. 5444] (Bankr. W.D.N.C. July 29, 2016).

B.    **Under Governing Law, the Debtor Talc Claims Assert a Liability That is the Debtor's.**

The assets and liabilities of a debtor generally are determined under applicable state law. See, e.g., Houston v. Holder (In re Matter of Omni Video, Inc.), 60 F.3d 230, 232 (5th Cir. 1995) (Texas law applied to a settlement agreement because "the rights and liabilities adjudicated within bankruptcy proceedings are often created and determined by state law"); Groetken v. Ill. Dep't of Rev. (In re Groetken), 843 F.2d 1007, 1013 (7th Cir. 1988) (state statutes play an "important role in determining how a debtor's liabilities will be characterized," and "federal courts look to state law to determine the exact nature of a person's rights and obligations"). Under Texas's Business Organizations Code, upon a divisional merger in which the dividing entity does not survive, "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger." Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3). So, where the dividing entity does not survive, and the plan of merger allocates a particular liability or obligation to a single new entity, that designated new entity is exclusively liable for that obligation. Except as otherwise provided, "no other [entity] created under the plan of merger is liable for the debt or other obligation." Id. § 10.008(a)(4).[8]

---

[8]    Specifically, under § 10.008(a)(4), each entity to which a liability is allocated is the "primary obligor" for the liability and, "except as otherwise provided by the plan of merger or by law or contract, no other party to the merger, . . . and no other new domestic entity or non-code organization created under the plan of merger is liable for the debt or other obligation[.]" Tex. Bus. Orgs. Code Ann. § 10.008(a)(4). The term "primary obligor" addresses only the situation in which either (a) the divided entity survives the merger and continues in existence thereafter but is not allocated the liability at issue or (b) the liability is not allocated to any surviving or new entity and it becomes the joint and several liability of all the surviving and new entities, with each being the primary obligor for its pro rata portion, in accordance with Section 10.008(b).

Here, Old JJCI ceased to exist; all of its assets and liabilities were allocated to the newly created New JJCI or the Debtor in accordance with the Plan of Divisional Merger; and, under that plan, all of Old JJCI's liability for the Debtor Talc Claims was allocated to the Debtor.[9]

## II.    THE COMMITTEE'S ARGUMENTS AGAINST SUBJECT-MATTER JURISDICTION CONFUSE APPLICABLE LAW AND IGNORE THE EVIDENTIARY RECORD.

This Court has "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).  Although the Committee does not dispute that this Court has jurisdiction to interpret and enforce the automatic stay, it argues that this Court is powerless to issue an injunction under section 105(a) of the Bankruptcy Code. Committee Obj. at 80-82.   The Committee is incorrect.

### A.    The Court Has Both "Arising Under" and "Arising in" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and Would Have No Existence Outside of Bankruptcy.

The Committee primarily argues that this Court lacks "arising under" and "arising in" jurisdiction because the Debtor has allegedly not established that the pursuit of the Debtor Talc Claims against the Protected Parties "could have some conceivable impact on the estate." Committee Obj., 80-81.  But that is not the test for "arising under" or "arising in" jurisdiction.  A proceeding "aris[es] under" the Bankruptcy Code if it "invokes a substantive right created by the Bankruptcy Code."   See, e.g., Bestwall, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases") (enjoining asbestos-related actions against non-debtor affiliates, and collecting cases).  The Debtor's request for a section 105(a) injunction is necessary to guarantee the integrity of the automatic stay (if it does not apply by its own force).  Thus, the Court has "arising under"

---

[9]        Plan of Div. Merger § 5(d)(i); id., Sch. 5(c)(i) at 420).

jurisdiction.  FPSDA II, LLC v. Larin, Nos. 10-75439, 12-08032, 2012 Bankr. LEXIS 5906, at

*17 (Bankr. E.D.N.Y. Dec. 21, 2012) ("it is manifest that any proceeding to determine the scope

and applicability of the automatic stay 'arises under' the Bankruptcy Code").

     A proceeding "arises in" a bankruptcy case when it would "have no existence outside of

the bankruptcy."  In re G-I Holdings, Inc., 580 B.R. 388, 415 (Bankr. D.N.J. 2018) (citing Stoe

v. Flaherty, 436 F.3d 209, 261 (3d Cir. 2006)); accord In re Seven Fields Dev. Corp., 505 F.3d

237, 260 (3d Cir. 2007).  A claim for a preliminary injunction, tied to and lasting only during a

bankruptcy case, arises only in bankruptcy cases because such an injunction necessarily

"encompass[es] matters concerning the administration of the estate."  See In re Elsinore Shore

Assocs., 91 B.R. 238, 255 (Bankr. D.N.J. 1988) (citing In re Johns-Manville Corp., 801 F.2d 60,

63 (2d Cir. 1986); see also In re Monroe Well Serv., Inc., 67 B.R. 746, 754 (Bankr. E.D. Pa.

1986); In re G-I Holdings, Inc., 327 B.R. 730, 734 (Bankr. D.N.J. 2005) (exercising core

jurisdiction over a motion for a preliminary injunction).  In addition, as shown below and in its

prior briefing, the Debtor has demonstrated that pursuit of the Debtor Talc Claims against the

Protected Parties would have a conceivable impact on its estate.

     **B.**    **The Court Has "Related to" Jurisdiction Over Third-Party Claims Against the Protected Parties.**

     The Court has "related to jurisdiction *at a bare minimum*."  Transcript of NC Bankruptcy

Court Ruling on PI Motion (the "PI Tr."), 137:14-15, Nov. 10, 2021 (emphasis added).[10]  The

Committee argues that this Court lacks "related to" jurisdiction because the pursuit of the Debtor

Talc Claims against the Protected Parties will have "no conceivable effect on the Debtor's

bankruptcy estate."  Committee Obj.,81.  To reach this erroneous conclusion, the Committee

---

[10]    In re W.R. Grace & Co., 386 B.R. 17, 25-30 (Bankr. D. Del. 2008) (finding the court "at a minimum, [has] 'related to' jurisdiction."); accord Celotex, 514 U.S. at 309-311, 311 n.8 (§ 105(a) injunction issued to augment automatic stay was "at least a question 'related to' Celotex's bankruptcy").

ignores the record and instead assumes that (a) there are claims against J&J that are independent

from any claims against the Debtor, (b) there are no contractual indemnification obligations to

any of the Protected Parties, (c) shared insurance coverage does not exist or, if it does exist, it

will not be depleted by the pursuit of the claims against J&J or the Retailers, and (d) there is no

way the Debtor could be impacted by any judgment against the Protected Parties.  Id. at 81-82.

But, none of these assumptions is correct or supported by the record.  The prosecution of the

Debtor Talc Claims against the Protected Parties would plainly have a "conceivable effect" on

the Debtor' estate  because it would liquidate contractual indemnification claims against the

Debtor outside of chapter 11, effectively seek to collect on claims against the Debtor, deplete

available insurance coverage and eliminate the protections of the automatic stay.

In addition, this Court has "related to" jurisdiction over talc claims against J&J even if

they are characterized as "direct" or "independent" claims.  The Committee ignores that "courts

have made clear that th[e] standard [for "related to" jurisdiction] applies whether any claims

against a third party are alleged to be 'direct' or 'derivative.'"  Bestwall, 606 B.R. at 249 (citing

Pfizer Inc. v. Angelos (In re Quigley Co., Inc.), 676 F.3d 45, 56-57 (2d Cir. 2012)); PI Tr.

at 137:21-24 ("[J]urisdiction still exists [as to direct claims], to the extent that [such claims]

would have an effect on the estate or impair the debtor's rights.").[11]  A proceeding "need not

necessarily be against the debtor or against the debtor's property" to confer jurisdiction.  Pacor,

743 F.2d at 994.  Rather, "[a]n action is related to bankruptcy if the outcome could alter the

debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and

---

[11]    See Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC), No. 20-408, 2021 WL 523625, at *2-3 (D. Del. Feb. 11, 2021) (holding that even if non-debtors had independent liability the court had "related to" jurisdiction to issue preliminary injunction enjoining claims against them); In re SunEdison, Inc., 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017) ("Where a third party claim may give rise to a potential indemnification or contribution claim against the estate, the third party claim will have a conceivable effect on the estate, and accordingly, the [c]ourt has the jurisdiction to enjoin it.").

which *in any way impacts upon the handling and administration of the bankrupt estate*."  Id.

Moreover, any liability associated with the Debtor Talc Claims, including alleged "direct" or "independent" claims, is the responsibility of the Debtor.  Third-party litigation involving these claims is seeking to establish a claim against the Debtor and could at least "conceivably" affect the Debtor's estate (and, in fact, would materially and adversely impact this case).  See Bestwall, 606 B.R. at 249-51 (confirming court's jurisdiction over third party claims that assert the same liabilities as the debtor sought to reorganize in bankruptcy).

Finally, the Committee argues in a footnote that it is "clear that 'related to' bankruptcy jurisdiction exists only where '"the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit."'  Committee Obj., 81 n.38.  That is not the law.  The primary case relied upon by the Committee, In re Federal-Mogul Global, Inc., did not decide whether the court had "related to" jurisdiction.  300 F.3d 368, 384 (3d Cir. 2002) ("We, however, remain a step away from reaching the merits of whether the District Court has 'related to' jurisdiction.").  Moreover, Federal-Mogul left open the possibility that "related to" jurisdiction may exist over non-contractual indemnification claims where "each of the co-defendants was closely involved in using the same material, originating with the debtor, to make the same, singular product, sold to the same market and incurring substantially similar injuries."  Id. at 384 (quoting in Arnold v. Garlock, Inc., 278 F.3d 426, reh'g denied, 288 F.3d 234 (5th Cir. 2002).  The court found that such circumstances "created a unity of identity between the debtor and the co-defendants not present [in Federal-Mogul], where the co-defendants variously use asbestos for brake friction products, insulation, gaskets, and other uses."  Id. at 384.  Here, in contrast, such unity of identity between the Debtor and the Protected Parties exists.  See PI Tr. at 139:14-19 (finding that "the core of [the Debtor Talc Claims] or almost all of them are based

upon products that either Old JJCI had assumed and agreed to indemnify its parent for or based

on its products and conduct" and that the Debtor Talc Claims involve "the same products, the

same periods, etc."); id. at 140:21-24 (finding that claims against Retailers, even if "direct claims

for negligence and strict liability" are, "at their core" based on "the products and operations of

Old JJCI," including Johnson's Baby Powder).  Again, any proceeding that "possibl[y] … may

impact on 'the debtor's rights, liabilities, options, or freedom of action' or the 'handling and

administration of the bankrupt estate'" creates jurisdiction.[12]

       The Committee's reliance on In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004),

is likewise misplaced.  That case addressed whether certain non-debtors were entitled to a

*permanent channeling* injunction under section 524(g), not a *preliminary* injunction under

section 105(a).  See Quigley Co, Inc. v. A.C. Coleman (In re Quigley Co., Inc.), 323 B.R. 70, 78

(S.D.N.Y. 2005) (concluding that Combustion Engineering was not a basis to prevent court from

preliminarily enjoining direct claims against the debtor's non-debtor parent company).

Furthermore, Combustion Engineering is easily distinguishable from the circumstances here.

The injunction in that case sought to enjoin direct claims against third parties that were not

related to the claims against the debtor.  Those claims arose from "different products, involv[ing]

different asbestos-containing materials, [that] were sold to different markets."  Combustion

Eng'g, 391 F.3d at 231.  In contrast, any claims against J&J are the exact same claims asserted

against the Debtor; they involve the *same* products, almost always Johnson's Baby Powder, the

*same* time periods and the *same* alleged injuries.  In fact, they are virtually always asserted

jointly against both J&J and the Debtor.  *Supplemental Declaration of John K. Kim in Support of*

---

[12]     See, e.g., In re Dow Corning Corp., 86 F.3d 485, 491 (6th Cir. 1996) ("It has become clear following Pacor
that 'automatic' liability is not necessarily a prerequisite for a finding of 'related to' jurisdiction.") (citing In
re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 264 (3d Cir. 1991)).

*Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions* [Adv. Pro. Dkt. 3] ¶ 6.[13]

## III.  THE DEBTOR OWES INDEMNIFICATION TO J&J, THE RETAILERS AND THE INDEMNIFIED PARTIES FOR TALC-RELATED CLAIMS.

### A.  Old JJCI Assumed All Liabilities Associated with J&J's Baby Products Division.

As Judge Whitley found, in 1979 Old JJCI assumed all liabilities associated with J&J's Baby Products division pursuant to the 1979 Agreement.  See PI Tr. at 138:13-17 ("I believe under the circumstances that the language used effectively means that what we had was an assumption of all of the liabilities of the debtor and that is broad enough to cover future product liability claims.").  Notwithstanding the agreement's plain terms, the Committee disputes that the 1979 Agreement provides for *any* assumption of talc-related liabilities.  Committee Obj., 63.

The Committee begins by reciting the unremarkable legal principle that the assumption by Old JJCI of all talc-related liabilities of J&J's Baby Products division did not eliminate claimants' right to pursue claims against J&J, the predecessor.  Committee Obj., 63-64.  The Committee misses the point.  It is precisely because claimants may continue to assert talc claims against J&J notwithstanding that Old JJCI became liable for them that the relief requested by the PI Motion is necessary.  The continued pursuit of talc claims against J&J would result in the liquidation of the Debtor's liability outside of this chapter 11 case because the Debtor (previously Old JJCI) owes indemnity to J&J for those claims under the 1979 Agreement or otherwise.

The Committee next argues that contingent talc-related liabilities related to J&J's sale of talc-containing products could not have been assumed by Old JJCI under the 1979 Agreement

---

[13]     <u>Imerys</u> is also distinguishable.  In that case, the court ruled that the potential right to indemnification from the debtor was "contingent upon findings that [] the liabilities arose from a violation of law by Debtors and did not arise from the acts or omissions of Petitioners."  <u>In re: Imerys Talc America, Inc., et al.</u>, 2019 WL 3253366, at *4.  In contrast, here the record is clear that the Debtor has obligations to the Indemnified Parties.

because they purportedly were not on the "books or records" of J&J at the time.  Committee

Obj., 65.  But the Committee ignores the relevant circumstances, the broad terms of the 1979

Agreement, and the parties' course of performance under the agreement.

At the time of the 1979 Agreement, J&J was implementing a program to transfer all

assets and liabilities of seven principal operating divisions into separate wholly-owned

subsidiaries.[14]  See Debtor's PI Hr'g Ex. 6, Board of Directors Meeting Minutes, dated Dec. 12,

1978), at 6 (discussing "the incorporation of seven principal operating divisions of [J&J]

effective January 1, 1979 as wholly-owned subsidiaries" including J&J Baby Products, which

"will be accomplished by a transfer of assets from the divisions to the corporations respectively

which will also assume the liabilities of the divisions respectively").  This program was

implemented "in light of substantial potential state-tax savings, as well as additional legal

considerations" and was "[i]n-keeping with [J&J's] long-standing policy of decentralization of

corporate business."  Id.  Thus, the clear intent of the program was to allocate all assets and

liabilities of each applicable operating division among separate, wholly-owned subsidiaries to

realize the expected benefits.  And the intent and purpose of the 1979 Agreement was to

effectuate a portion of that program by assigning to J&J Baby Products the specific assets and

liabilities relating to the Baby Products division, as opposed to those assets and liabilities of

---

[14]     New Jersey law governs the 1979 Agreement since it does not have a governing law provision. See also
State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 417 A.2d 488, 492-93 (N.J. 1980) (holding that the law
of the place of the contract ordinarily governs unless another place has a more significant relationship).
Under New Jersey's liberal interpretation of the parol evidence rule, "'evidence of the circumstances is
always admissible in aid of the interpretation of an integrated agreement.'"  Conway v. 287 Corp. Ctr.
Assocs., 901 A.2d 341, 347 (N.J. 2006) (quoting Atl. N. Airlines v. Schwimmer, 96 A.2d 652 (N.J. 1953)).
"This is so even when the contract on its face is free from ambiguity."  Id.  New Jersey courts thus "allow a
thorough examination of extrinsic evidence in the interpretation of contracts."  Id.  "Such evidence may
'include consideration of the particular contractual provision, an overview of all the terms, the
circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on
the disputed provision by the parties' conduct.'"  Id. (quoting Kearny PBA Local # 21 v. Town of Kearny,
81 N.J. 208, 221, 405 A.2d 393 (1979)).

other operating divisions that were transferred to other subsidiaries, all on a division-by-division basis.

The 1979 Agreement assigns to J&J Baby Products "all the **businesses,** franchises, properties and assets of every nature and description, tangible and intangible, wherever located, which are now allocated on the books or records of J&J to its BABY Division." 1979 Agreement, 3 (emphasis added). Likewise, J&J Baby Products agreed to assume and pay, perform or discharge "**all** the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J **as pertaining to its BABY Division**" and to indemnify J&J and its officers, directors and stockholders against all such indebtedness, liabilities and obligations. Id. at 5 (emphasis added). The broad range of assumed liabilities thus complemented and mirrored the transferred assets to effect an orderly separation of the relevant divisions.

Courts that have considered similar broad language have found it to be inclusive of contingent product liability claims without any specific reference to the assumption of such claims. In Bippus v. Norton Co., 437 F. Supp. 104 (E.D. Pa. 1977), for example, the court held that a purchaser's agreement to "assume and agree to pay, perform and discharge all liabilities and obligations reflected on the Balance Sheet" as of a specified date included products liability claims relating to the purchased pneumatic tool business even in the absence of any specific reference to them on the balance sheet because the drafters "used broad categories, not narrow specifies, so the absence of a reference to products liability is . . . insignificant." Id. at 107.

The Committee tries to distinguish Bippus by arguing that the assumption language in that case "is the opposite of the language in the 1979 Agreement." Committee Obj., 67. In fact, the language in the 1979 Agreement is even broader than the operative language in Bippus. The

buyer in <u>Bippus</u> assumed all liabilities "reflected" on a specific balance sheet as of a date certain, while under the 1979 Agreement Old JJCI assumed "all liabilities of every kind and description" allocated on the books or records as pertaining to the Baby Products division.

Similarly, in <u>Bouton v. Litton Inds., Inc.</u>, 423 F.2d 643 (3d. Cir. 1970), the Third Circuit held that an asset purchaser's assumption of all liabilities as of a specified date "whether accrued, absolute, contingent, or otherwise, to the extent, and only to the extent, that the same are reflected or reserved against in the financial statements as supplemented" included certain future product liability claims not enumerated. <u>Id.</u> at 652. The absence of any specific reference to the claims was "not significant" because the agreement "referred to broad categories of liabilities, not to narrow specifics." <u>Id.</u> The Committee argues that <u>Bouton</u> is distinguishable because the assumption agreement in that case "contained broad language". Committee Obj., 67. But, as discussed above, so does the 1979 Agreement. Moreover, in interpreting the assumption agreement, the Third Circuit found it significant that the buyer was purchasing the seller's entire business. <u>Bouton</u>, 423 F.2d at 651 ("This was a contract for the purchase of the entire assets and businesses of M-T, with the clear intention of carrying that business forward."). Likewise, here, J&J Baby Products acquired "all the **businesses,** franchises, properties and assets of every nature and description, tangible and intangible, wherever located, which are now allocated on the books or records of J&J to its BABY Division." 1979 Agreement, at 3 (emphasis added).

The Committee argues that the court in <u>Deutsche Bank Nat. Trust Co. v. FDIC</u> "rejected the argument the Debtor makes here". Committee Obj., 66. That is incorrect. In <u>Deutsche Bank</u>, the clear intent of the buyer and seller was to limit the liabilities assumed by the buyer. 109 F. Supp. 3d 179, 188 (D.D.C. 2015). In fact, during the bidding process for the failed bank's assets, "different proposed structures were offered in order to provide options for prospective

acquires that did not want to assume liabilities." Id. at 189.  In contrast, J&J Baby Products did

not limit its assumption of liabilities.  The fundamental purpose of the 1979 transfer was for J&J

Baby Products to take over responsibility for the operations of all the Baby Products businesses.

Debtor's PI Hr'g Ex. 6, Dec. 12, 1978 Board of Directors Meeting Minutes, at 6-7.

In addition, the Committee ignores that key terms of the assumption agreement in

Deutsche Bank are starkly different from those in the 1979 Agreement.  As an initial matter, the

buyer in Deutsche Bank explicitly capped its assumption of liabilities by agreeing to assume only

the "book value" of the liabilities.   Deutsche Bank, 109 F. Supp. 3d. at 201-02.  The agreement

further limited the assumed liabilities to only those "reflected on" the books and records as of the

closing date of the transaction.  Id. at 199-200.  This is significant because, as the court found,

the phrase "reflected on" conveyed that only liabilities that were "manifest" or "apparent" were

assumed.  Id. at 199.  In sharp contrast, there is no cap of assumed liabilities under the 1979

Agreement.  It does not use the limiting phrase "reflect on".  Instead, all liabilities "allocated" to

the Baby Products businesses were assumed.  And, the 1979 Agreements uses "books or records"

which is broader than the term "books and records" used in Deutsche Bank.

Finally, the parties' course of performance under the 1979 Agreement further evidences

that Old JJCI assumed J&J's talc liabilities under the agreement.  In fact, all talc-related costs not

otherwise covered by insurance have been charged to Old JJCI since the assumption of liabilities

under the 1979 Agreement.  Debtor's PI Hr'g Ex. 50, Lisman Decl. ¶¶ 8-12.  The Committee has

not refuted (and cannot refute) this evidence.  Instead, it claims—through selective and out-of-

context citations to Mr. Lisman's deposition testimony—that this consistent practice was "purely

a function of accounting policy, not legal responsibility."  Committee Obj., 38.  Mr. Lisman

squarely rejected this nonsensical and entirely unsupported "accounting policy" vs. "legal

responsibility" distinction at his deposition.  As Mr. Lisman explained, J&J could not simply

choose to allocate talc-related litigation expenses without a foundational basis, as the accounting

must be based on an underlying obligation:

> Q. Am I correct when you used the term "owed," you are
> referring to it as a -- from an accounting perspective and
> you are not referring to any legal obligation from one
> company to the other.  Am I correct about that?
>
> A. So [from] an accounting perspective, **I can't set up a
> payable between companies if there is no basis for it**.  So
> money can only be owed between two companies, because
> Company A is obliged to pay back Company B for some
> kind of a reason, accounting or, to your point, there is a
> loan or there is something like that or Company B paid for
> something on behalf of Company A.  There needs to be an
> underlying event in order to create an
> accounting.  Accounting entries follow the substance of a
> transaction.  **Under GAAP, you can't create artificial
> accounting entries for amounts and numbers and
> reasons that we want to**.  There needs to be an underlying
> fact pattern.  Accounting follows the business and the
> economics of the transaction.
>
> Q. Okay.  So what was the underlying event that the
> accounting entries here followed?
>
> A. These would have been --
>
> Q. Specifically in Rows 2 through 5?
>
> A. Yep, from reading the description in Column J, **these
> are talc product liability costs that JJCI was ultimately
> responsible for, which is why it is showing up as an
> expense on their account**.

Lisman Dep. Tr. at 114:19-116:3 (objections omitted); see also id. at 194:21-195:10 ("Q.  A

couple of times during your testimony today you said something to the effect of accounting

follows the nature of the expense.  Do you recall that?  A.  Yes.  Q.  And does that mean that

accounting follows the legal obligation associated with the expense?  … A.  Yes.") (objections

omitted); *FASB Concepts Statement No. 8—Conceptual Framework for Financial Reporting—*

*Chapter 4, Elements of Financial Statements* (as amended 12/2021) at ¶ 7 ("The items

incorporated in financial statements are financial representations (depictions in words and

numbers) of certain resources of an entity, claims to or interests in those resources, and the

effects of transactions and other events and circumstances that result in changes in those

resources and claims or interests."); ¶ E39 ("Liabilities are based on a foundation of legal rights

and duties."), ¶ E41 ("Legally enforceable obligations include those arising from binding

contracts, agreements, rules, statutes, or other requirements that would be upheld by a judicial

system or government."), *available a*t

https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176179207571&acceptedDi

sclaimer=true.[15]  The unrebutted fact that J&J charged all talc-related litigation expenses to Old

JJCI remains powerful financial course of performance evidence that corroborates that Old JJCI

was legally responsible for those expenses.[16]

> ### 1.   Old JJCI and J&J's Subsequent Actions Are Consistent With the 1979 Agreement.

The Committee argues that J&J and Old JJCI have taken positions in litigation that are

contrary to the assumption of the talc-related liabilities by Old JJCI in 1979.  Committee Obj.,

21-22.  That is not true, and the evidence offered in support of the argument does not support it.

---

[15]   The Financial Standard Accounting Board's *Concept Statements* "are intended to serve the public interest by setting the objectives, qualitative characteristics, and other concepts that guide selection of economic phenomena to be recognized and measured for financial reporting and their display in financial statements or related means of communicating information to those who are interested."  FASB Concepts Statements, *available at*  https://www.fasb.org/jsp/FASB/Page/PreCodSectionPage&cid=1176156317989.  They are, in essence, the building blocks of Generally Accepted Accounting Principles.

[16]   The fact that Mr. Lisman was not aware of the 1979 Agreement is neither surprising (given the age of the document) nor of any relevance to whether the accounting for the talc-related litigation expenses is probative of whether Old JJCI was legally responsible for those expenses.

The Committee asserts that "[p]rior to the bankruptcy, J&J and JJCI took the position before certain juries that **'Johnson & Johnson** is responsible for any liability of Johnson & Johnson Consumer, Inc.,' not the other way around."  Committee Obj. at 21 citing Silverstein Decl. Ex. 20 (Cl. Ex. 155), at 3000:20-25) (emphasis added).  The statement cited, however, is taken out of context.  It was contained in jury instructions and was part of a negotiated stipulation between the parties for purposes of that lawsuit only.  Silverstein Decl. Ex. 20 (2/26/2020 *Moure-Cabrera* Trial Tr.), at 3000:20-25) ("The parties stipulated and agreed that Johnson & Johnson and Johnson & Johnson Consumer, Inc. are one entity for purposes of this lawsuit.").  In fact, this was necessary to avoid jury confusion because the plaintiff in that case, like virtually every plaintiffs in the talc litigation, did not distinguish between the two entities:

> It's against Johnson & Johnson. You've heard
> that there are actually two entities, it's
> Johnson & Johnson and then Johnson & Johnson
> Consumer, Inc., we'll talk about that in closing.
> But for the trial -- for purposes of the evidence
> and everything, it's just going to be
> Johnson & Johnson

2/5/2020 Moure-Cabrera Trial Tr. at 404:2-8 (Plaintiffs' Opening Statement).

The fact that J&J did not assert a claim for indemnification against Old JJCI in talc lawsuits is irrelevant.  Committee Obj., 22.  Similarly, although Christopher Picariello, a corporate representative for J&J and Old JJCI, testified that J&J had no indemnification agreements, the context of the questioning was focused on indemnification by third parties, not on internal, intercompany agreements.  Moreover, during the same deposition, Mr. Picariello described the fact that Old JJCI is responsible for certain expenses and reimburses J&J for them. (Cyganowski Decl., Ex. F, Transcript of Deposition of Christopher Picariello, January 11, 2019, at 121:23-25, 122:01-03.).  Finally, it is correct, as Old JJCI's Vice President of Finance testified, that Old JJCI has no "expense account" that "reimburses" J&J.  But that is because J&J sought

reimbursement from Old JJCI for all talc-related costs through intercompany charges that are

reflected on Old JJCI's general ledger.  Debtor's PI Hr'g Ex. 50, Lisman Decl. ¶¶ 8-12.  That is

entirely consistent with the recognition that Old JJCI owed indemnity to J&J.

### B.     Old JJCI Was Responsible for Liabilities Related to Shower To Shower.

The Committee suggests that liabilities associated with Shower to Shower were not

assumed by Old JJCI because the Debtor has not located an assumption agreement.  Committee

Obj. ¶ 10.  But, as the evidence shows, consistent with J&J's decentralization efforts and its

transition to a holding company, Personal Products Company assumed those liabilities from J&J

in 1978 when it became responsible for Shower to Shower products.  Hr'g Tr., 117:2-7, Nov. 4,

2021, Kim Direct; see id. at 98:3-13; Debtor's PI Hr'g Ex. 51.  Personal Products Company

ultimately became Old JJCI.  First Day Decl. ¶¶ 11, 14.  And Old JJCI's assumption of those

liabilities is confirmed by the fact that all talc-related costs have always been charged to Old JJCI

irrespective of the talc product that was the subject of the litigation.  Lisman Dec. ¶¶ 8-9; Hr'g

Tr., 341:1-10, Nov. 5, 2021, Kim Redirect.

The Committee further argues that a corporate representative for J&J testified that J&J

has independent liability for Shower to Shower products even after the product line was

transferred in 1978.  Committee Obj.,10 n.9.   But, as Mr. Kim clarified, this testimony was

imprecise.  See Kim 10/22/2021 H'rg. Tr. 83:19-84:14.  The contemporaneous records make

clear that J&J was not responsible for Shower to Shower after the transfer of the product line.

See, e.g., *Third Supplemental Declaration of John K. Kim in Support of Motion to Extend

Preliminary Injunction*, filed contemporaneously herewith (the "Third Supp. Kim Decl.") at

Ex. A (Personal Products Co. Product Specification for Shower to Shower Deodorant Body

Powder, JNJ 000058735, Apr. 11, 1980); Ex. B (Personal Products Co. Request for Clinical Test

of Shower to Shower, JNJ 000276279, Jul. 29, 1981); Ex. C (Johnson & Johnson Major

Executive Committee Actions, LTL 0019687 (discussing the plan to transfer of Shower to

Shower from Personal Products Co. to Baby Powder Products Co in 1988)).  Likewise, J&J and

Old JJCI's sworn discovery responses in the talc litigation clarified the issue and explained that,

after 1977, J&J was not the responsible entity for the manufacture of Shower to Shower.  See,

e.g., id. at Ex. D (Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc.'s

Responses to Plaintiff's Supplemental Interrogatories and Document Requests *Harpster v.*

*Brenntag N. Am. et al.,* No. MID-L-08173-19 (N.J. Super. Ct.), Apr. 18, 2020 at 13)).

> **C.    The Debtor Has Indemnification Obligations to the Retailers and
> Indemnified Parties.**

The Debtor has contractual, common law and statutory indemnification obligations to the

Retailers and the Indemnified Parties.  PI Suppl. Memo, 28-29.  The Committee insists that the

Debtor must prove the existence of an indemnity agreement with each Retailer.   Committee

Obj., 70.  But this ignores that the Debtor has provided a summary of all the Tender Agreements,

produced exemplars of many such agreements and also has common-law indemnification

obligations to the Retailers.

## IV.    PROSECUTION OF DEBTOR TALC CLAIMS IS AUTOMATICALLY STAYED.

The Court should overrule the Objections because the automatic stay bars actions to assert

Debtor Talc Claims against the Protected Parties.

> **A.    Actions Against the Protected Parties Are Stayed by Section 362(a)(1) of the
> Bankruptcy Code.**

In their objections both the Committee and Alystock gloss over the Debtor's first

argument with respect to the automatic stay in an effort to channel all arguments through the

"unusual circumstances" test first articulated by the Fourth Circuit in A.H. Robins Co. v.

Piccinin, 788 F.2d 994 (4th Cir. 1986).  Although, as described below, ample justification exists

for extending the automatic stay under the Robins test (as adopted by courts in this Circuit) to

cover the Protected Parties, under the plain language of the statute, no extension of the stay is

necessary with respect to any action that seeks to recover a claim against the Debtor, whether or

not that action is asserted against the Debtor itself.

The Second Circuit has recognized that section 362(a)(1)'s reference, not just to actions

"against the debtor," but also to actions "to recover a claim against the debtor" "must encompass

cases in which the debtor is not a defendant; it would otherwise be totally duplicative of the

former category and pure surplusage."  In re Colonial Realty, 980 F.2d 125, 131-23 (2d Cir.

1992).  The Committee improperly tries to distinguish Colonial Realty on the basis that it

involved a claim to recover a fraudulent conveyance from a third party.  Committee Obj.,46 n.22.

In Colonial Realty, the FDIC, as receiver of certain creditor-banks, brought fraudulent

conveyance actions against transferees of the debtor in an attempt "to recover the transferred

funds for the benefit of the estates of the failed banks."  Id. at 128.  The Second Circuit did not

rule, as alleged by the Committee, that the action was stayed because it involved "a claim

literally to recover the property of the debtor that allegedly was improperly transferred."

Committee Obj., 46 n.22.  Rather, the third-party litigation at issue in Colonial Realty was

automatically stayed because it amounted to an attempt to recover a claim against the debtor for

the particular benefit of the creditor plaintiffs.  Colonial Realty, 980 F.2d at 132.  The court held

that such actions were "to recover a claim against the debtor," because "if [the debtor] were not

liable to the [claimant], the [claimant] would have no independent claim against these

defendants."  Id. at 132.

The Committee's unremarkable and uncontested argument that a debtor's stay under

section 362(a)(1) is not automatically available to "sureties, guarantors, co-obligors" and

similarly situated entities misses the point.  Committee Obj., 46 (citing McCartney v. Integra

Nat. Bank N., 106 F.3d 506, 509–10 (3d Cir. 1997)); see also Maritime Elect. Co., 959 F.2d

1194, 1206 (3d. Cir. 1991) (holding that automatic stay of debtor principal did not apply to

nondebtor corporation); Jackson v. Trump Ent. Resorts, Inc., No. CV 13-1605 (JHR/JS), 2015

WL 13637411, at *2 (D.N.J. Feb. 11, 2015) (holding that the automatic stay may not be invoked

"by solvent codefendants, even if they are in a similar legal or factual nexus with the debtor.").

Section 362(a)(1) applies to the Debtor Talc Claims asserted against the Protected Parties not

merely because the claims have a similar legal or factual nexus to any that might be asserted

against the Debtor (which they obviously do).  Rather, just like the plaintiff in Colonial Realty,

section 362(a)(1) applies to the Debtor Talc Claims because they seek to recover on the same

claims—that is, the claims against the Debtor— by asserting them against the Protected Parties.

　　　　This result is not "absurd" or "demonstrably at odds with the intentions of the drafters."

Committee Obj., 52 (quoting In re Phila. Newspapers, LLC, 418 B.R. 548, 560 (E.D. Pa. 2009)).

Rather, it protects the central purpose of the automatic stay to provide the debtor with a

"breathing spell" by halting any effort by enterprising plaintiffs to make an end-run around the

automatic stay's protections by repackaging and recovering claims against the debtor simply by

naming a non-debtor party as defendant.  McCartney, 106 F.3d at 509.  Neither is it limitless.

Committee Obj., 53.  Only in circumstances where a plaintiff seeks to "recover a claim against

the debtor" by asserting it against a non-debtor party is that action automatically stayed by the

plain terms of the statute.  11 U.S.C. § 362(a)(1).

### B.　　Extension of the Stay Under Section 362(a)(1) to Cover the Protected Parties Is Justified.

　　　　The Committee concedes—as it must—that the Third Circuit has adopted the test for

extending the automatic stay under section 362(a)(1) in "unusual circumstances" articulated by

the Fourth Circuit in Robins.  Committee Obj.,48; see also Belcufine v. Aloe, 112 F.3d 633, 637

n.6 (3d Cir. 1997) (stating that the test "first articulated in [Robins] . . . has since been adopted

by this Circuit").  Notwithstanding that concession, however, the Committee proceeds to misread

and misapply the test.

The Fourth Circuit is clear in Robins that the authority to extend the automatic stay under

sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code is independent of the parallel authority

to issue a preliminary injunction under section 105(a) (and also of its general equitable power to

issue such an injunction).  See Robins, 788 F.2d at 1003–04 ("There are thus four grounds on

which the bankruptcy court may enjoin suits against the bankrupt or its assets and property.").

Thus, having adopted the Robins standard, the Third Circuit's reference in McCartney to the

court "relying on both the automatic stay provision and the bankruptcy court's equitable powers

under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants" indicates that both

provisions may provide an independent basis for staying actions in appropriate circumstances (in

addition to section 362(a)(3) and the Court's general equitable authority).  McCartney, 106 F.3d

at 510.[17]  Robins, therefore, provides the standard for the Court to apply in evaluating the request

for an extension of the automatic stay to cover the Protected Parties.  None of the cases that the

Committee cites suggesting some additional review under section 105(a) is binding on this

Court.  Neither do they comport with the Robins standard, as adopted by this Circuit, which is

binding.[18]

In addition, the Committee's attempt to paint the actions of the Debtor or any of the

---

[17]   The Third Circuit's prior decision in In re Wedgewood Realty Group, Ltd., 878 F.2d 693, 699-701 (3d Cir. 1989), cited by the Committee, merely addresses whether the court may re-impose an expired stay under section 105(a) and is otherwise entirely consistent with McCartney.

[18]   The Committee also suggests that a clear and convincing standard of review applies to this Court's evaluation of the requests for an extension of the automatic stay and preliminary injunction.  Committee Obj., 49-50.  Robins makes clear, however, that the clear and convincing standard applies specifically to requests for an injunction issued under the Court's inherent equitable power and not under sections 105(a) or 362(a) of the Bankruptcy Code.  Robins, 788 F.2d at 1003.

Protected Parties as somehow inequitable fall flat. The Committee suggests that J&J conjured up the array of commercial agreements and indemnity obligations with the Protected Parties out of thin air on the eve of bankruptcy. Committee Obj., 50. But these obligations existed long before the commencement of this Chapter 11 Case, in some cases for decades. To the extent the longevity of the obligations is relevant at all, as the Committee suggests, then that consideration weighs in favor of the requested relief.[19] For sure, these obligations were allocated from Old JJCI to the Debtor shortly before the Petition Date in connection with the 2021 Corporate Restructuring. But, as a result of the establishment of the Funding Agreement between the Debtor, on the one hand, and J&J and Old JJCI (on a joint and several basis) on the other, nothing in that transaction affected the ability of talc claimants to recover on their claims. See First Day Decl. ¶ 21 (stating that "[a] key objective of the restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring.").[20]

---

[19] The Committee cites a seemingly random selection of cases from the Debtor's Supplemental Memorandum, claiming that "*all* of the cases cited by the Debtor supporting its request for relief under § 362(a) involved commercial contracts that an operating *debtor* signed, or assumed, in the ordinary course of business, well in advance of its bankruptcy filing." Obj., 50-51 (emphasis in original). Many of the cases cherry-picked by the Committee were not even cited by the Debtor in support of its request under section 362(a). See PI Supp. Memo., 4, 36-37, 39, 64-65, 68, 70, 71, 76-77, 82. Moreover, in none of the cases the Committee cites was the amount of time between the assumption of the liabilities and the bankruptcy filing relevant to the court's consideration of whether the stay should be extended. See, e.g., In re Heating Oil Partners, 2009 WL 5110838, at *6-7 (D. Conn. Dec. 17, 2009) (holding that a default judgment entered as to a predecessor entity of the debtor was automatically stayed upon the successor entity's chapter 11 filing). In fact, in at least one of the cases the Committee highlights, the obligation to indemnify arose via the non-ordinary course, postpetition settlement of litigation between the debtor and its insurer. See Kaiser Grp. Int'l, Inc. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp., Inc.), 315 B.R. 655, 658 (D. Del. 2004). In several other cases, the courts' determination to extend the automatic stay was based, not upon the assignment of obligations to the debtor—ordinary course or otherwise—or its timing, but upon other identities of interest among the parties. E.g., Maaco Enters., Inc. v. Corrao, 1991 WL 255132, at *2 (E.D. Pa. Nov. 25, 1991) (holding that suit against the debtor's principals related to franchise agreement under which they were franchisees was stayed because debtor had identity of interest with its principals); In re Monroe Well Serv., Inc., 67 B.R. 746 (Bankr. E.D. Pa. 1986) (issuing injunction under section 105(a) based upon fact that enforcement of liens against nondebtor third parties would deprive debtor of all its operating income).

[20] A copy of the Funding Agreement is attached as Annex 2 to the First Day Declaration.

The authority that the Committee cites in support of its attempt to characterize the extension of the stay as "transform[ing] the stay from a shield into a sword" demonstrates precisely why that is not the case here. Committee Obj., 51. In In re Scarborough-St. James Corp., 535 B.R. 60 (Bankr. D. Del. 2015), a debtor-tenant objected to its landlord's request for relief from the stay to allow the landlord to continue prepetition eviction litigation while also removing the action and filing an adversary proceeding in bankruptcy court seeking an interpretation of the underlying lease. Id. at 70. The court ruled that relief from stay was appropriate, in part, because the debtor clearly did not require the breathing spell provided by the automatic stay with respect to the litigation but rather was using the stay to selectively "litigate only issues of its choosing and only in its preferred forum." Id. "The stay is not meant . . . to be used by a debtor to pursue its creditors, as more litigation is hardly consistent with the concept of a breathing spell for the debtor. Instead, the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors." Id. at 67 (quoting In re Residential Capital, LLC, 2012 WL 3249641, at *2 (Bankr. S.D.N.Y. Aug. 7, 2012)).[21] Here, the Debtor is not seeking an extension of the automatic stay as a means to pursue its creditors, but rather to bring a temporary halt to the deluge of prepetition litigation against the Debtor to provide the Debtor with the very breathing spell that is central to the automatic stay's purpose and with an opportunity to negotiate a consensual chapter 11 plan with the claimants.

None of the Protected Parties is attempting to "game" the Bankruptcy Code or achieve a "feigned" or "collusive" reorganization at the expense of the "integrity of the judicial system."

---

[21]    The Committee also cites In re Irwin, 457 B.R. 413, 418 (Bankr. E.D. Pa. 2011), for the proposition that the beneficiary of the stay generally should commit its assets to the satisfaction of its obligations. Committee Obj., 51-52. The Irwin case involved a request by a state-court receiver for confirmation that it could pursue the non-debtor wife and daughters of the debtor-Ponzi scheme operator. No party in the case argued that any unusual circumstances existed justifying an extension of the stay under the Robins standard.

Committee Obj., 53-54 (quoting <u>Poe v. Ullman</u>, 367 U.S. 497, 505 (1961)).  The Committee

cites a variety of cases on this point, none of which involve interpretation of the scope of the

automatic stay and most of which relate to collusive or discriminatory relationships between the

debtor and certain creditor groups that harmed others, in connection with bad faith dismissals,

substantive consolidation and so forth.  Committee Obj., 53-54.  The objectors have not shown

that the Debtor or its affiliates have acted in bad faith with respect to this Chapter 11 Case and, in

any event, that issue will be addressed by the Court in connection with the pending motions to

dismiss.

The only distinction the Committee is able to draw between this case and the three other

divisional merger cases in which the stay was extended to cover non-debtor affiliates and other

parties is the absence of claims against a parent company in those cases.  Committee Obj., 55-56.

But that distinction is not meaningful when, as a result of Old JJCI's assumption of all of J&J's

talc liabilities long ago, prosecution of the Debtor Talc Claims against J&J would liquidate

indemnification claims against the Debtor outside of chapter 11, deplete available insurance

coverage and thereby eviscerate the protections of the automatic stay.

The Committee's argument that the existence of the Funding Agreement means that the

Debtor's estate cannot be harmed by judgments against the Protected Parties because the Debtor's

indemnification obligation will merely be round-tripped back to J&J and New JJCI ignores the

terms of the Funding Agreement.  Committee Obj., 57-59.  The Funding Agreement only

backstops the Debtor's obligations to fund a trust, which will be established to pay Debtor Talc

Claims and related indemnification claims. The Debtor must first apply its own assets to fund

such a trust.  <u>See</u> Funding Agreement, § 1 (definition of "Permitted Funding Use").

In addition, the Committee's assertion that none of the Protected Parties shares an identity

of interest with the Debtor in respect of the Debtor Talc Claims is contrary to the record and

applicable law. Committee Obj., 66-73. <u>First</u>, the Committee's allegation that there is no

identify of interest because some of the indemnification agreements with the Retailers have

conditions that purportedly do not provide for "absolute" indemnification by the Debtor is

misplaced. Committee Obj. at 71. There is no requirement that there be "automatic" liability in

respect of indemnification obligations. <u>See</u>, <u>e.g.</u>, <u>In re Dow Corning Corp.</u>, 86 F.3d at 491 ("It

has become clear following <u>Pacor</u> that 'automatic' liability is not necessarily a prerequisite for a

finding of 'related to' jurisdiction.") (citation omitted). <u>Second</u>, the Committee attempts to

overcome the fact that litigation against the Protected Parties could create a risk of collateral

estoppel or record taint by arguing that "mere apprehension" of that risk is insufficient to create

an identity of interest.[22] Committee Obj., 72. But such risks here are significant because the talc

claims against the Protected Parties involve the same products, same time periods, same alleged

injuries and same evidence as the claims against the Debtor.[23] And, there is no basis for the

---

[22]    None of the cases cited by the Committee for this proposition involved a debtor with indemnity obligations to the codefendant parties. <u>See</u> <u>Queenie, Ltd. v. Nygard Intern.</u>, 321 F.3d 282, 287-88 (2d Cir. 2003) (holding that stay applied to debtor's wholly owned corporation because "adjudication of a claim against the corporation will have an immediate adverse economic impact on [debtor]" but not to codefendants with debtor as to which there was "solely" an "apprehended" later use of offensive collateral estoppel and distinguishing cases in which the debtor owed the non-debtor indemnity obligations); <u>Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.</u>, 426 B.R. 520, 526 (E.D. Pa. 2010) (determining stay did not apply to non-debtor codefendants where there was no relationship among debtor and codefendants or debtor's indemnity obligations to codefendants were uncertain); <u>Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v. Serv. Painting, Inc.</u>, No. CV 18-3480, 2019 WL 2143370, at *7 (E.D. Pa. May 16, 2019) (determining stay did not apply to non-debtor codefendant where debtor failed to demonstrate any basis to extend the stay to non-debtor codefendant, and noting that "collateral estoppel concerns arise when the debtor owes an indemnification obligation to the non-debtor. [Debtor] does not argue or offer evidence [non-debtor codefendant] owes him an indemnification obligation.)]

[23]    The cases relied upon by the Committee to argue that the risks of collateral estoppel can be ignored are distinguishable or have been criticized. For example, the Fourth Circuit in <u>A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)</u>, 788 F.2d 994, 999–1001 (4th Cir. 1986), criticized the <u>Metal Centers</u> court's conclusion that "the judgment in the suit against the third-party would not be binding on the bankruptcy court," even though the non-debtor third party was entitled to indemnity from the debtor, stating that "[w]e do not accept such reasoning with its shocking result and would find a stay under (a)(1) acceptable." 788 F.2d 994, 1000 (4th Cir. 1986).

Committee's argument that the Debtor's obligations to indemnify its affiliates to the extent they are held liable for the Debtor's talc liabilities should be ignored.

Finally, the fact that plaintiffs have asserted claims against J&J alleging direct liability does not change the conclusion that an identity of interest exists among the parties.  J&J is not a mere alleged joint tortfeasor with a potential claim against the Debtor for contribution to the extent required to pay more than its proper share like the co-defendants in Gold v. Johns-Manville Sale Corp., 723 F.2d 1068, 1076 (3d. Cir. 1983).  In fact, unlike the typical co-defendant, the claims against J&J are based on the same products, same alleged defect and same alleged harm as any claims against Old JJCI or the Debtor.  See PI Tr. at 139:14-19 (finding that the Debtor Talc Claims involve "the same products, the same periods, etc."); id. at 141:8-12 ("I believe there is, in effect, an identity of interest within the meaning of the Robins case and that, notwithstanding the potential that some of the claims may be direct, almost all of them, if not all of them, relate to the debtor's operations.").  This distinguishes the cases that the Committee relies upon.[24]  Moreover, a complete identity of interests also exists between J&J and the Debtor because of the Debtor's obligation to indemnify J&J for any liability in respect of Debtor Talc Claim established through any judgment against J&J and the parties' shared insurance coverage.  The Committee's claim that the Court should disregard this identity of interests because continuing this Chapter 11 Case could delay plaintiffs' ability to recover on their claims is not

---

[24]    See, e.g., In re Combustion Eng'g, Inc., 391 F.3d 190, 231 (3d Cir. 2004) (denying permanent, not preliminary injunction, in part because the claims against the non-debtors were not related to claims against the debtor and instead related to "different products, involv[ing] different asbestos-containing materials, [that] were sold to different markets."); Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1071, 1077 (3d Cir. 1983) (finding that court was without jurisdiction to consider appeals regarding district court refusal to stay claims against "several other manufacturers, distributors, and suppliers of asbestos fiber and asbestos products"); Williford v. Armstrong World Industries, Inc., 715 F.2d 124, 126 (4th Cir. 1983) (in case involving a single claimant, denying injunction as to non-debtor co-defendants for claims arising from exposure to "various asbestos products manufactured or supplied by" the co-defendants and not merely the debtor's products).

supported by the law and ignores that the Debtor stands ready, willing and able to negotiate a

consensual resolution of claims to bring this case to a conclusion at the earliest possible

opportunity.

    **C.**    **Section 362(a)(3) Stays the Assertion of the Debtor Talc Claims Against the Protected Parties.**

The Committee concedes that actions against J&J and the Retailers that would deplete

shared insurance coverage could be stayed under section 362(a)(3) but argues that because the

insurers dispute coverage the stay does not apply.  Committee Obj., 74-75.  The Debtor's rights

to insurance coverage, however, are indisputably property of the estate that are protected by the

automatic stay.  See In re Booth, 260 B.R. 281, 285-86 (B.A.P. 6th Cir. 2001) ("Courts have,

across a wide variety of circumstances, almost uniformly adhered to the view that contingent

interests are property of the estate"); Vinal v. Fed. Nat'l. Mortg. Ass'n, 131 F. Supp.3d 529, 537

(E.D.N.C. 2015) ("Contingent and unliquidated claims are considered property of the estate…").

There is simply no basis in law, and the Committee cites none, for its position that insurance

rights potentially worth almost $2 billion are not entitled to the protection of the automatic stay

or a preliminary injunction because the Insurers (as has been the case in many other mass tort

cases) are at this point contesting coverage.

The Committee asserts that, based on a "cursory review" of the alleged coverage

defenses, there is "ample support for the insurers' denial of coverage."  Committee Obj., 34-35.

But the Committee merely repeats the Insurers' arguments without explaining why they have any

particular merit or are likely to prevail.  The Debtor believes the Insurers' coverage defenses are

meritless and are unlikely to prevail.  Not one of the defenses has been adjudicated, and all of

them are subject to the many arguments, defenses, and cross-claims asserted by Old JJCI and

J&J against the Insurers in the New Jersey insurance coverage action.  The Insurers, not the

Debtor, bear the burden of proving that any exclusionary language in their policies applies to talc claims.  Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 712 A.2d 1116, 1125 (1998).

For example, the Committee's blithely suggests (without explanation) that policy provisions referring to "accidents" or "occurrences" (defined in part as "an accident") do not cover talc losses.  Committee Obj., 35 & n. 14.  But as one treatise has noted, "[t]here are few insurance words that have provoked more controversy and litigation than the word 'accident'."  Appleman on Insurance Law & Practice Archive § 4492 (2nd 2011).  Such issues cannot be summarily dismissed, as the Committee asks the Court to do here.  The Committee also suggests that talc losses cannot be covered by insurance because they were somehow "expected" or "intended."  Committee Obj.,  35.  But Old JJCI and J&J did not expect or intend any injury to any plaintiff.  And "expected/intended" provisions will not apply to defense costs for the many trials in which J&J and Old JJCI have prevailed and thus were found to have caused no injury at all.  In any event, these too are insurance terms of art frequently litigated and the subject of much case law.  In New Jersey, for example, if a policyholder did not intend to cause injury, the injury is deemed "accidental," even if the act that caused the injury was intentional.  Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 183 (1992).[25]  In short, the Court should not credit the

---

[25]    The Committee's references to false arrest, malicious prosecution, defamatory torts, and privacy torts are misrepresentations of the insurance policies under which the Debtor claims coverage.  Committee Obj., 35 n. 16.  Every single policy cited by the Committee contains broad bodily injury liability coverage.  *See* LTL0003138, LTL0003311, LTL0003554, LTL0003917 (each providing Coverage C "Bodily Injury Liability – Except Automobile").  The Committee's cherry-picked endorsements *extend* the coverage to personal injury liabilities like false arrest, they do not *constrain* the coverage to such liabilities.  LTL0003149, LTL0003359, LTL0003565, LTL0003965-66 (each a Personal Injury Liability Endorsement).  The Committee's invocation of asbestos exclusions evinces equal carelessness.  The Committee highlights four extraneous post-1986 policies that the Debtor does *not* contend cover talc claims.  Committee Obj., 35 n. 17.  A review of the chart contained in Debtor's Exhibit 8 makes clear the Debtor claims coverage under pre-1986 policies only; these later policies do not appear on the chart and bear no relevance to the PI Motion.

Committee's simplistic and largely unsupported analysis of the complex insurance issues of which it has little knowledge.

The Committee next relies on out-of-context testimony and discovery responses to argue that J&J or Old JJCI admitted there is no insurance coverage available for the Debtor. Committee Obj., 36. The Committee is wrong. First, the Committee references deposition testimony concerning J&J and Old JJCI's finances from Kevin Neat and Christopher Picariello. They are Vice Presidents of Finance and were designated pursuant to Rule 30(b)(6) to testify regarding the J&J and Old JJCI's financial information and condition, not the potential availability of their insurance coverage for talc claims. (Cl. Ex. 51, at 7:23-8:3; Cyganowski Dec., Ex. F, at 10:5-10.) Counsel for J&J and Old JJCI objected to the line of questioning regarding whether J&J and Old JJCI maintained product liability insurance because such questions were outside the scope of the notice for which Mr. Neat and Mr. Picariello were designated for testimony. (Cl. Ex. 51, at 77:14-14, Cyganowski Dec., Ex. F, at 59:21-22.)

Moreover, Mr. Neat's 2021 testimony states merely that J&J and Old JJCI were *presently* self-insured; he provided no detail about the availability of *historical* insurance coverage for the talc claims (*i.e.*, the policies that form the subject of the insurance coverage litigation pending in Middlesex County, New Jersey). (Cl. Ex. 51, at 76:23-79:6.)

The Committee similarly misrepresents Mr. Picariello's testimony. Reading beyond the Committee's self-serving excerpt reveals Mr. Picariello's complete response to the line of questioning was much less definitive:

> Q:     [Does] Johnson & Johnson have outside insurance companies to pay for any awards for talc litigation or is that something Johnson & Johnson is self-insured for?
>
> Mr. Cox: Object to form of the question. Beyond the scope of the notices. Go ahead and answer, if you know.

> A:      To my best knowledge, we have an internal insurance in-house, **but again, I don't know if we would require other insurance for other liabilities, including talc.**
>
> Q:      . . . [Y]ou don't know if you've supplemented your internal Johnson & Johnson insurance . . . with other external insurance for the talc litigation?
>
> A:      I don't have that information.

(Cyganowski Dec., Ex. F, at 59:17 to 60:7, emphasis added.)

The Committee's references to various interrogatory responses are equally misleading. J&J and Old JJCI responded to interrogatories regarding available insurance in various state court litigations, stating that:

- "the policy underlying the disclosure of insurance information is implicated where such insurance would bear on the issue of a defendant's ability to satisfy a judgment. Defendants state that they have a reasonable and good faith belief that the above policy concern is unlikely to be implicated in this action." (Silverstein Decl., Ex. 35 (Cl. Ex. 53), Interrogatory No. 4; Ex. 37 (CI. Ex. 55), at p. 10)[26];

- "it has sufficient assets to satisfy any realistic judgment against it, and therefore objects to providing further information in response to this Interrogatory." (Silverstein Decl., Ex. 36 (CI. Ex. 54), Interrogatory No. 4.1); and

- it was "self-insured for any verdict which may reasonably be awarded."  (Silverstein Decl., Ex. 34 (Cl. Ex. 52), Interrogatory No. 10).

Nowhere in these interrogatory responses did J&J and Old JJCI "indicate that they *lack[ed]* insurance coverage."  Committee Obj., 36.  The fact that J&J and Old JJCI took the position that

---

[26]      The Committee cites the incorrect interrogatory (19) in this exhibit.  The relevant interrogatory is no. 4.

they were capable of satisfying a judgment or paying a settlement, and therefore objected to

further disclosure of insurance information, does not at all suggest that insurance was not also

available (it was and is).

Finally, the Committee argues that past losses incurred by Old JJCI (and J&J) have

already exhausted any insurance coverage.  Committee Obj., 76.  But only payments made by the

policyholder's insurers under insurance policies erode or exhaust the limits of the policies.  All

payments made by the policyholder (its losses) are subject to a fair and appropriate allocation of

those losses across the policy periods triggered by the underlying claims.  See Owens-Illinois,

Inc. v. United Insurance Co., 138 N.J. 437, 479-80 (1994).  Either the insurers and the

policyholders must agree on that allocation, or a court must resolve the issue.  Old JJCI and J&J

have no doubt incurred significant losses arising from the underlying talc claims.  However, no

agreement as to allocation of the talc losses across the triggered policy periods has yet been

reached such that the limits of the policies at issue can be properly said to be exhausted (or

eroded) by the talc losses, and no court has had the opportunity to make that determination.

Therefore, the almost $2 billion of liability policy limits potentially available to provide coverage

to the Debtor and J&J for the underlying talc claims remain unexhausted.  Thus, if litigation

against the Protected Parties continues, it would certainly result in a depletion of the insurance

potentially available to the Debtor for the talc claims.

## V.   THE ADDITIONAL ALLEGATIONS THAT J&J IS INDEPENDENTLY LIABLE FOR THE DEBTOR TALC CLAIMS ARE IRRELEVANT AND INACCURATE.

The Committee argues that J&J is directly liability for talc-related claims against the

Debtor based on alleged conduct after 1979.  Committee Obj., 11-12, 17, 19-20.  These

allegations, however, do not change the reality that the claimants seek to recover from the

Protected Parties the same underlying damages allegedly caused by exposure to Old JJCI or

J&J's talc-containing products.  These "direct" claims are the exact same talc claims based on the exact same facts that are being asserted against the Debtor in this Chapter 11 Case.  They should therefore be enjoined.

### 1.    The Committee Omits Key Testimony From Dr. Hopkins.

The Committee uses incomplete record citations in a failed effort to support its argument that J&J has direct liability post-1979.  In its objection, the Committee argues that "J&J continued to make health and safety decisions governing the manufacture and sale of its subsidiaries' products . . . ."  Committee Obj., 11.  As support for this allegation, the Committee claim that the "corporate representative designated to testify on behalf of J&J and JJCI, Dr. John Hopkins, made that clear in binding testimony" and selectively cite to testimony in the talc litigation.  Id.  But Dr. John Hopkins' testimony expressly states the opposite.  Indeed, in the same transcript cited by the Committee, Dr. Hopkins states that Old JJCI was responsible for adding a cancer or asbestos warning.  (See Silverstein Decl., Ex. 5 (5/3/19 Olson Trial Tr.), at 7753:16-7754:7.).  As Dr. Hopkins repeatedly testified, although J&J was responsible for establishing health and safety *policy*, its operating subsidiaries, including Old JJCI, were charged with making health and safety *decisions* related to their operations.  See, e.g., Third Supp. Kim Decl. at Ex. E (excerpts of Hopkins testimony from *Hayes v. Colgate-Palmolive Co.,* Trial Tr. 51:20-52:5, 53:15-53:24, Jul. 30, 2019); Ex. F (excerpts of Hopkins testimony from *O'Hagan v. Johnson & Johnson,* Dep. Tr. 48:8-22, Oct. 1, 2019); Ex. G (excerpts of Hopkins testimony from *Leavitt v. Johnson & Johnson*, Dep. Tr. 246:4-9, Sept. 27, 2018).  Dr. Susan Nicholson, another corporate representative, also has testified to the same.  Id. at Ex. H (excerpts of Nicholson testimony from *Monroe v. Johnson & Johnson*, No. 2018RCSC01222 (Ga. Cty. Ct.), Dep. Tr. 260:15-262:1, Sept. 22, 2020).  As did Dr. Kuffner recently in this Adversary Proceeding.  See id. at Ex. I (excerpts of Kuffner testimony in this proceeding, Dep. Tr. 271:4-20, 275:11-16 ("But

when it comes to the decision-making authority, when it comes to medical safety issues, it's not the board of directors, it's me as the chief medical officer. It's not Alex Gorsky. It's me as the chief medical officer.")).

### 2. The Committee's Allegations Regarding Windsor Minerals Inc. Are Incorrect and Should be Disregarded.

The Committee asserts that "at all times until Windsor's sale, J&J maintained complete control of the Vermont mines, including the testing of talc ore (as well as end-products), and touted *J&*J's mining operations as a means of assuring safety".  Committee Obj., 11.  Based on that assertion, the Committee suggests that J&J has direct liability for talc-related claims on account of its "complete control" of Windsor Minerals, Inc. ("Windsor").  But the Committee's factual allegations are unsupported by the record and are false.

Windsor had independent control over the Vermont talc mines it owned and was in control of the testing of talc from those mines.  Contemporaneous records support the fact that operational and safety decisions were made by Windsor in the 1980s.  Indeed, records show that Windsor had its own board of directors, made decisions about property acquisitions, operations and personnel regarding the Vermont mines, interacted with federal agencies, and contracted with outside laboratories to regularly test Vermont talc samples for the presence of asbestos. See, e.g., Third Supp. Kim Decl. at Ex. J (Minutes of the Annual Meeting of Directors of Windsor Minerals, Inc., WTALC00002221, Apr. 25, 1979 (noting a discussion of the operations and plans of Windsor Minerals including sales, finance, capital expenditures, property acquisitions, personnel, operations and special projects)); Ex. K (Minutes of the Annual Meeting of Directors of Windsor Mienrals, Inc., WTALC00002224, Oct. 8, 1979 (noting discussion of the BOD regarding the operations of Clifton, Argonaut, Rainbow and Blackbear Mines, the Columbia Mill and West Windsor operations)); Ex. L (Letter from U.S. Dept. of Labor, Mine,

Safety & Health Admin., to Windsor Minerals, Inc., WTALC00000381, Sept. 21, 1983

(enclosing results of federal inspection of the Hammondsville Mine)); Ex. M (Letter from U.S.

Dept. of Labor, Mine, Safety & Health Admin., to Windsor Minerals, Inc., WTALC00000663,

Sept. 12, 1985 (same)); Ex. N (Letter from M. Palenik, Walter McCrone Assocs., Inc., to R.

Miller, Windsor Minerals, Inc., JNJ 000347440, Jun. 4, 1984); Ex. O (Letter from I. Stewart,

McCrone Associates, Inc., to D. Benninger, Armstrong World Indus., Inc., JNJ 000314361, May

21, 1987); Ex. P (Windsor Minerals, Inc. Memorandum on 1982 Operational Strategy Plan for

Hammondsville Mine, WTALC00008505, Jan. 5, 1982.)

Additionally, contemporaneous records show that Windsor, not J&J, interacted directly

with its customer, J&J Baby Products Company.  See, e.g., Third Supp. Kim Decl. at Ex. Q

(Johnson & Johnson Baby Products Co. Memorandum on Support to Baby Products Company

Departments, JNJ000249909, Oct. 31, 1980); Ex. R (Memorandum from Jame Utaski, Pres.,

Johnson & Johnson Baby Products Co., JNJTALC000466320, Mar. 12, 1982 (noting that the

Vice President of Personnel for the J&J Baby Products Company would serve as a member of

the Board of Directors for both the J&J Baby Products Company and Windsor Minerals, Inc.);

Ex. S (Johnson & Johnson Baby Products Co. Memorandum on Recommendation to Windsor

Minerals for Improving the Prevention of Microbial Contamination, JNJ000870963, Sept. 3,

1985); Ex. T (Johnson & Johnson Baby Products Co. Memorandum on Audit of Windsor

Minerals, JNJ000885770, May 28, 1987)

The documents cited by the Committee evidence broad statements regarding J&J's policy

of requiring its subsidiaries to make safe products and adhere to safety standards.  They are

devoid of any evidence that J&J had control over the operations of Windsor' Vermont talc mines,

including the testing of talc for asbestos and other contaminants.  In fact, the documents

themselves further support the fact that operational and safety decisions were made at the subsidiary level.  For example, the 1985 Question & Answer document cited by the Committee notes that research, testing and monitoring was conducted at the subsidiary level.  (*See* Cyganowski Decl. Ex C (JNJ 000018966-9024), at -968 [Dkt 142-4] ("It is unlikely that anyone knows more about safe, high-quality baby care than the ***Johnson & Johnson Baby Products Company***.  To ensure confidence in our baby powder, we will conduct research as needed to reconfirm the safety of the product." (emphasis added).)

These false allegations provide no basis for this Court to except from the automatic stay or the requested preliminary injunction the litigation of talc claims against J&J.

**3.     The <u>Ingham</u> Decision Does Not Illustrate Any Independent Liability of J&J.**

The Committee claims the Missouri Court of Appeals decision in <u>Ingham</u> illustrates "J&J's direct and  independent liability."  Committee Obj., 19.  The decision does no such thing.  As an initial matter, in the <u>Ingham</u> complaint, plaintiffs did not distinguish between J&J and Old JJCI and all allegations asserted were made against the "Johnson & Johnson Defendants".  <u>See</u> Ingham Compl. at ¶¶ 114-123, 131-159.  Moreover, the jury in <u>Ingham</u> awarded the same amount of compensatory damages to both J&J and Old JJCI, making no distinction at all in the conduct of the two entities.

The Committee cites one sentence from the 83 page <u>Ingham</u> decision in support of its argument.  Committee Obj., 20.  But that sentence refers to the Missouri Court of Appeals' view that different punitive damages awards were justified based on the different net worth of J&J and Old JJCI, not based on different theories of liability or different conduct of the entities.  In fact, the Missouri Court of Appeals lumps together J&J and Old JJCI when recounting conduct of the "Defendants" that it finds was sufficient to support an award of punitive damages.  <u>See Ingham</u>

v. Johnson & Johnson, 608 S.W.3d 663, 715-719 (Mo Ct. App. 2020), cert. denied, 141 S. Ct.

2716 (2021).  The court made no distinction between the conduct of the two entities or the

theories of liability asserted against the two entities, but rather treats them as the same.  Id. at 715

(referring to a 1969 memorandum in which the court finds "Defendants acknowledged their

Products contained tremolite asbestos").  Of course, Old JJCI did not even exist in 1969, which

highlights the court's failure to make any distinction between the two entities.

The Ingham court did not, as the Committee suggests, consider the issue of whether J&J

had independent liability for talc products it did not manufacture after 1978.  However, the

California Court of Appeals in Echeverria considered exactly this issue and held there was no

basis under the law to find J&J liable after it stopped manufacturing the product.  Third Suppl

Kim Decl. at Ex. U, at 3, 29-37, Echevarria v. Johnson & Johnson et al., No. B286283 (July 9,

2019 Ca. Ct. App) (holding that "was no evidence to support a finding of liability arising out of

Johnson & Johnson's continued involvement in talc issues or based on it 'directing' JJCI" and

affirming JNOV as to Johnson & Johnson's liability and punitive damages).)  Indeed, the

California Court of Appeals considered many of the same arguments advanced by the Committee

in its objection about why J&J would have independent liability – that J&J was involved in talc

issues, that J&J made talc safety statements, that documents from defendants' files referred to

"Johnson & Johnson" only, and that J&J participated in industry trade groups– and squarely

rejected those as a basis for liability.  See id. at 35-37.

## VI.    THE DEBTOR HAS DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF DURING ITS BANKRUPTCY CASE.

The Committee cannot dispute that every court that has considered the issuance of a

preliminary injunction in a mass tort chapter 11 case has granted the relief.  PI Supp. Memo, 64-

65.  Instead, it generically quotes from inapposite non-bankruptcy cases.[27]  The Debtor has

shown, through the lens of the four traditional factors employed in bankruptcy cases, how it

merits an extension of the preliminary injunction in this Adversary Proceeding.  See PI Supp.

Memo, 75-92.

> **A.    The Positions Taken By Old JJCI and J&J in Imerys Are Consistent With
> the Preliminary Injunction Sought By the Debtor.**

As an initial matter, the Committee asserts that Old JJCI and J&J took positions more

than a year ago in the Imerys chapter 11 cases that are allegedly inconsistent with the Debtor's

arguments to enjoin claims against J&J and others in this case.  Committee Obj., 22-23.  To

support its argument, the Committee takes phrases out of context from filings in Imerys.  A

closer review of the Imerys situation demonstrates the baselessness of this allegation and

establishes the consistency between Old JJCI and J&J's positions there and the relief the Debtor

seeks here.

---

[27]    See Winter v. Nat'l Resources Def. Council, Inc., 555 U.S. 7, 23 (2008) (non-bankruptcy case where court vacated a preliminary injunction on basis that lower court did not properly consider Navy's interest in training sailors); Monsanto Co v. Geetson Seed Farms, 561 U.S. 139, 165-66 (2010) (non-bankruptcy case where court found that preliminary injunction was not necessary where "a less drastic remedy . . . was sufficient to redress respondents' injury"); Instant Air Freight Co. v C.F. Air Freight, Inc., 882 F.2d 797, 801-02 (3d Cir. 1989) (non-bankruptcy case where court found that injunction was inappropriate where money damages could be provided); Novartis Con. Health, Inc. v. Johnson & Johnson - Merck Cons. Pharmaceuticals Co., 290 F.3d 578, 586 (3d Cir. 2002) (non-bankruptcy case where court affirmed grant of preliminary injunction in connection with false advertising claim); NutraSweet Co. v. Vit-Mar Enterprises, Inc., 176 F.3d 151, 153 (3d Cir. 1999) (non bankruptcy case where court denied preliminary injunction where plaintiff had already obtained similar relief through a writ of replevin).  The Committee also cites In re Saxby's Coffee Worldwide, LLC, 440 B.R. 369 (Bankr. E.D. Pa. 2009) a bankruptcy case (albeit a non-mass tort case), for the non-controversial proposition that the grant of an injunction is fact specific.  Id. at 383.  It is worth noting that the court in Saxby's Coffee granted an injunction under section 105 that prevented litigation against the debtor's principals on the basis that (1) litigation against the non-debtors would threaten the reorganization by creating a significant distraction, (2) the injunction was to be issued in the early stage of the case and the debtor is entitled to time to formulate its restructuring plan, (3) the lack of an injunction will threaten the debtor's ability to reorganize and (4) an injunction that fosters "the Debtor's reorganization [] serves 'one of the most important public interests.'"  Id.

Case 21-03032-MBK   Doc 146   Filed 01/05/22   Entered 01/05/22 23:31:23   Desc Main
Document     Page 53 of 66

The Committee argues that J&J and Old JJCI showed a "prior preference for the tort system over bankruptcy court" by filing a motion[28] (in 2019) in connection with the Imerys chapter 11 cases seeking to transfer venue for thousands of non-MDL talc claims pending in various courts across the country against J&J and Old JJCI to the District of Delaware under 28 U.S.C. §§ 157(b)(5) and 1334(b) on the basis that such claims were related to the Imerys chapter 11 cases.  Committee Obj., 22-24.  But that argument is nonsensical on its face.  J&J and Old JJCI's prior strategy of seeking to have thousands of talc claims consolidated and handled in the District where the Imerys *bankruptcy* cases were pending, *instead* of in hundreds of state courts *in the tort system*, is entirely consistent with the underlying purpose of this Chapter 11 Case.  The stated reason for attempting to fix venue in the Delaware District Court was to "centralize the adjudication of claims . . . ; ensure orderly and efficient resolution of these claims; . . . and ensure that similarly situated creditors are treated equitably."  See J&J/JJCI Venue Mot. at 2.  Those objectives perfectly align with (if not mirror) the Debtor's stated goals in this Chapter 11 Case, which include "establish[ing] a fully funded trust that will provide . . . current and future claimants with a simpler, more streamlined process to get funds in a timely manner than that currently available in the tort system"[29] and "equitably and permanently resolving all current and future talc-related claims against it."[30]

The J&J/JJCI's 2019 venue motion did not indicate any preference for the tort system over the bankruptcy system – just the opposite.  It suggested a preference not to have scattered, lottery-like litigation in the tort system that produced wildly inconsistent and inequitable results.

---

[28]     *Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b),* In re Imerys Talc America, Inc., Case No. 19-mc-00103-MN (D. Del. April 18, 2019) (ECF No. 1) (the "J&J/JJCI Venue Motion").

[29]     Informational Brief at 127.

[30]     First Day Decl. ¶ 58.

The reply brief filed by J&J and Old JJCI[31] in support of its venue transfer motion recognized the centralized discovery and evidentiary process of the MDL as workable and preferable to having thousands of non-MDL cases proceed in hundreds of different state courts around the country.[32]  But while the MDL may have advantages over completely unconsolidated litigation in the early stages of litigation, the MDL cannot provide a comprehensive resolution for all of the Debtor's talc claims, which is what the Debtor seeks to accomplish in this Chapter 11 case.  See Informational Brief at 70 ("Once the goals of the MDL ultimately have been achieved . . . the MDL judge must seek remand of all pending cases back to the courts from which they were transferred.") (citing 28 U.S.C. § 1407(a)).  Thus, J&J and Old JJCI's previous statements that the MDL has efficiencies over non-consolidated litigation demonstrates a preference for a centralized process, something that can best be achieved by having all claims against the Debtor processed in a single forum—this Chapter 11 Case in the District of New Jersey.

Next, in March 2020 Old JJCI and J&J filed a motion to lift the stay in the Imerys cases seeking to exercise their contractual rights under their indemnity agreements with Imerys to assume the defense of talc claims for which Imerys stated it would seek indemnity against Old JJCI and J&J and to allow those claims to proceed in the tort system with Old JJCI and J&J

---

[31]  *Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b),* In re Imerys Talc America, Inc., Case No. 19-mc-00103-MN (D. Del. May 28, 2019) (ECF No. 81) (the "J&J/JJCI Reply Brief").

[32]  The long quotation to the J&J/JJCI Reply Brief in the Committee's Objection is not a full quote of the relevant paragraph and confuses the issue—it was the plaintiffs in their objections to the J&J/JJCI Venue Motion, not J&J and Old JJCI, who supported having the claims against J&J and Old JJCI continue in the tort system over having them consolidated with the Imerys bankruptcy cases.  Compare J&J/JJCI Reply Brief at 38 with Committee Obj. at 23.

agreeing to pay the resulting settlement or judgment.  But that motion does not in any way cut against the relief the Debtor is seeking in this Adversary Proceeding.

First, Old JJCI and J&J argued that lifting the stay in <u>Imerys</u> would not harm those debtors, because Old JJCI  and J&J would be assuming the defense of such claims and paying any resulting liability.  Those claims would no longer exist against the Imerys estates, making reorganization easier.  The situation here presents the exact opposite scenario.  In this case, the failure to apply or extend the stay to J&J and other Protected Parties would harm the Debtor, because, among other things, allowing the litigation to continue against those parties would establish liability against the Debtor, negatively impacting the Debtor's estate and ability to reorganize.

Second, the context in which Old JJCI and J&J filed the lift stay motion in <u>Imerys</u> is important.  At the time the lift stay motion was filed, the Imerys debtors were on the verge of a deal where in exchange for a release benefiting Imerys's French parent, Imerys would allow the talc claimants' committee and future claimants' representative in that case to establish inflated claim values to be used against Old JJCI and J&J as indemnitors.  Even though J&J and Old JJCI believed they had good defenses to the indemnity under those circumstances, they decided it was better to try the Imerys talc claims with their own talc claims rather than face the prospect of massive manufactured liability being asserted against them through the indemnity.  In contrast to Imerys' eschewing of arms' length negotiations and improper use of chapter 11 to foist liabilities on a third party (Old JJCI and J&J), the Debtor seeks to use this Chapter 11 Case to reach a consensual resolution with the talc claimants and pay those claims.  Indeed, New JJCI and J&J have already agreed to set aside $2 billion for that very purpose.[33]

---

[33]     In <u>Imerys</u>, Old JJCI and J&J noted that lifting the stay would protect the debtors from liability; in this case, extending the stay will protect the Debtor from liability.  Unlike Imerys where the parent sought to secure a

Finally, the <u>Imerys</u> bankruptcy court denied Old JJCI and J&J's motion for procedural reasons.  The efforts of Old JJCI and J&J to protect their interests on the indemnity in <u>Imerys</u>— at a time when (i) the Debtor had not filed a bankruptcy case and (ii) Imerys was attempting to use its bankruptcy case to inflate claim values for the purpose of determining Old JJCI's liability—have no bearing on the Debtor's critical need for a stay to give its reorganization an opportunity to succeed.

### B.   The Debtor Has Established Likely Success on the Merits Given Its Likelihood of a Successful Reorganization.

The Committee and Alystock do not dispute that in bankruptcy proceedings, "success on the merits is to be evaluated in terms of the likelihood of a successful reorganization." <u>Bestwall</u>, 606 B.R. at 254 (quoting <u>Sudbury, Inc. v. Escott</u>, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992)).  Nor do they dispute that the "likelihood of success" standard is not particularly high.  <u>Bestwall</u>, 606 B.R. at 254; PI Supp. Memo, 77.  And it can be satisfied where the debtor has demonstrated the financial ability to carry out a reorganization.  <u>Bestwall</u>, 606 B.R. at 255.  Here, the Debtor easily satisfies its burden; there is no legitimate dispute as to whether the Debtor has the financial wherewithal to carry out a reorganization.  First Day Dec. ¶¶ 27, 59.

The Committee and Alystock's opposition to the Chapter 11 Case does not undermine that showing.  Even the most contentious mass tort bankruptcy cases have resulted in confirmed section 524(g) plans, including plans with a channeling injunction protecting third parties.[34]  To

---

release pursuant to a plan that would permit the plaintiffs to establish their own settlement values and thereby foist liability on Old JJCI and J&J, in this case the Debtor seeks to settle its own liability with the claimants and not transfer it to someone else.  Moreover, Old JJCI and J&J's objection to the Imerys parent receiving a release under the proposed plan was based on the particular facts at issue, and not on the basis that third-party releases for non-debtors are inappropriate in all cases.

[34]   <u>E.g.</u>, <u>In re Garlock Sealing Techs. LLC</u>, No. 10-31607 [Dkt. 6261] (Bankr. W.D.N.C. June 12, 2017) (confirming § 524(g) plan with channeling injunction prohibiting the pursuit of debtor's claims against third parties); <u>In re Specialty Prods. Holding Corp.</u>, No. 10-11780 [Dkt. 5261] (Bankr. D. Del. Dec. 10, 2014) (same); <u>In re Quigley Co., Inc.</u>, No. 04-15739 [Dkt. 2670] (Bankr. S.D.N.Y. July 2, 2013) (same).

rule otherwise would empower a committee to unilaterally prevent injunctive relief by avowing its opposition to the reorganization.  Indeed, this argument was rejected by the court in both DBMP and Aldrich Pump:

> [T]his Court is unable to conclude that our parties cannot reach agreement . . . .  To find otherwise would effectively be to prejudge the outcome of a Chapter 11 Case at its outset. Almost forty years of bankruptcy experience has impressed upon this Court that such prognostications cannot be accurately made in the early stages of a case.

DBMP, 2021 WL 3552350, at *40 (Bankr. W.D.N.C. Aug. 11, 2021); Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), 2021 WL 3729335, at *35 (Bankr. W.D.N.C. Aug. 23, 2021) (same).[35]

The Committee also seeks to heighten the applicable standard by claiming the Debtor must show it is likely to confirm a plan.  Committee Obj., 84-86.  That is not the rule.  Courts have rejected it,[36] and the Committee does not cite any case requiring it in bankruptcy, much less a mass tort bankruptcy.  Whether the Debtor is eligible for section 524(g) relief or can otherwise confirm a plan will be decided at confirmation.  See DBMP, 2021 WL 3552350 at *41 ("The current dispute after all concerns a preliminary, not a permanent, injunction.  And the primary

---

[35]    See also In re Purdue Pharm. L.P., 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105 injunction enjoining mass tort claims against non-debtors, noting "Appellants cannot say that a reorganization is unlikely simply because they intend to object to the plan as presently constituted"); In re Caesars Entertainment Operating Co., Inc., 561 B.R. 441, 452 (Bankr. N.D. Ill. 2016) (granting preliminary injunction notwithstanding creditors' argument that proposed restructuring support agreement "cannot serve as the basis for a successful reorganization," noting "[w]hatever merit the guaranty creditors' criticisms of the [restructuring support agreement] may have, they do not suggest a successful reorganization is less than likely. . .Objections to the specifics of the [restructuring support agreement]. . .prove that the parties have disagreements about the [restructuring support agreement], not that a resolution of those disagreements is out of the question").

[36]    In re Bestwall LLC, Adv. Pro. No. 17-03105, slip op. at 5-6 [Adv. Pro. Dkt. 190] (Jan. 31, 2020) (at claimants' request, clarifying that the order granting a section 105(a) preliminary injunction covering the debtor's affiliates "did not address whether New GP [a non-debtor affiliate] is entitled to 11 U.S.C. § 524(g) relief. . . . The Court will address whether any of the parties qualify for a § 524(g) channeling injunction in connection with confirmation."); W.R. Grace & Co., 386 B.R. at 33 ("The ACC asserts that Debtors cannot prevail on the merits because BNSF will never be entitled to a § 524(g) injunction on the basis of derivative liability. That, however, is not the test in a bankruptcy reorganization case.") (internal citation omitted).

function of a preliminary injunction in a chapter 11 case is to afford the parties the time to sort

out the finer points of a case and if necessary for the Court rule on their disputes.").

Nevertheless, the Committee attempts to cast doubt on the Debtor's ability to confirm a

plan by advancing a novel argument with no legal support — that the Debtor is ineligible for

section 524(g) simply because it was not substituted as a defendant in the talc litigation prior to

the filing of this Chapter 11 Case.  Committee Obj., 84-86.  But this ignores the 2021

Reorganization, the purpose and intent of section 524(g), and the applicable rules governing the

substitution of parties in the tort system.

The legislative history of section 524(g) is clear that Congress enacted the statute to assist

any company facing liability that involves asbestos.  H.R. REP. 103-835, 41, 1994 U.S.C.C.A.N.

3340, 3350  ("The asbestos trust/injunction mechanism established in the bill is available for use

by any asbestos company facing a similarly overwhelming liability.").  As a result of the 2021

Corporate Restructuring, there is no dispute that "the Debtor became solely responsible for Old

JJCI's liabilities arising from talc-related claims against it (other than claims for which the

exclusive remedy is provided under a workers 'compensation statute or similar laws), and the

defense of those claims."  First Day Decl. ¶ 24.  This includes liability in respect of

mesothelioma claims.  Id. ¶¶ 44, 45.  Accordingly, the Debtor has asbestos-related liability.

While the Committee focuses on whether the Debtor was "named in any lawsuit prior to

the bankruptcy filing," it ignores that there was no need to substitute the Debtor as the defendant

in the talc litigation following the 2021 Corporate Restructuring.  In federal court, Federal Rule

of Procedure 25(c) governs the substitution of parties in the event of a "transfer of interest"

including (but not limited to) a merger.  See 13 Charles Alan Wright & Arthur R. Miller et al.,

Fed. Prac. & Proc. § 1953 (3d ed.) ("The rule applies to ordinary transfers and assignments, as well as to corporate mergers.").

> The most significant feature of Rule 25(c) is that <u>it does not require that anything be done after an interest has been transferred</u>.  The action may be continued by or against the original party, and the judgment will be binding on the successor in interest even though the successor is not named.

<u>Id.</u> § 1958 (emphasis added).  If a non-named party is indisputably a successor in interest to pending litigation following a merger, parties need not seek substitution of the non-named party as there is "no need to."  <u>Levin v. Raynor</u>, No. 03 CIV. 4697 GBKTHK, 2010 WL 2106037, at *2 (S.D.N.Y May 25, 2010).  Federal Rule of Civil Procedure 25(c) is adapted from procedural rules originating in New York and California, which provide a similar result.  <u>See</u> Tolani, Madeleine (2013) "Transfer of Interest after Pendency—A Comparative Analysis of the Solutions Adopted by the American and German Civil Procedure Systems," Annual Survey of Intern'l & Comparative Law: Vol. 19: Iss. 1, Art. 13 (available at: http://digitalcommons.law.ggu.edu/annlsurvey/vol19/iss1/13); <u>see also</u> N.Y.C.P.L.R § 1018 (McKinney's Consul. Laws of N.Y. Annotated) ("The notion that a transfer of interest should not require a substitution of parties unless the court so orders has met with favor throughout the years and has not given rise to difficulty."); <u>Voices of the Wetlands v. State Water Res. Control Bd.</u>, 257 P.3d 81, 85 n.1 (Cal. 2011) (citing Cal. Civ. Proc. Code § 368 and observing that although cross-appellant's owner/real party in interest changed during the case, the new owner/real party in interest was entitled to continue the action in its predecessor's name without formally moving to substitute itself as a named party).

Finally, the Committee argues that the Debtor cannot demonstrate good faith because "there is no reorganization goal or purpose other than to enjoin and channel direct claims against J&J."  Committee Obj., 87.  The evidence is all to the contrary:

> The Debtor's goal in this case is to negotiate, obtain approval
> of and ultimately consummate a plan of reorganization that
> would, among other things, (a) establish and fund a trust to
> resolve and pay current and future talc-related claims and (b)
> provide for the issuance of an injunction that will
> permanently protect the Debtor, its affiliates and certain
> other parties from further talc-related claims arising from
> products manufactured and/or sold by Old JJCI, or for which
> Old JJCI may otherwise have had legal responsibility,
> pursuant to sections 105(a) and/or 524(g) of the Bankruptcy
> Code.

First Day Decl. ¶ 59.  The Committee has never suggested—nor has any court ever held—that

filing bankruptcy to fully and finally resolve mass tort claims is not a valid reorganizational

purpose.  See Bestwall, 605 B.R. at 49.[37]

### C.    The Debtor and Its Reorganizational Efforts Will Be Irreparably Harmed Without a Preliminary Injunction.

As stated above, "the critical, if not decisive, issue" in determining whether to enjoin

litigation against non-debtors is whether the litigation would, absent an injunction, "interfere[]

with the debtors' reorganization efforts."  Brier Creek, 486 B.R. at 694; Kreisler v. Goldberg, 478

F.3d 209, 215 (4th Cir. 2007) (section 105(a) injunction is appropriate if third-party action would

"put detrimental pressure on [the debtors'] reorganization effort"); Robins, 788 F.2d at 1003

(injunction is appropriate when third-party litigation "would adversely or detrimentally influence

and pressure the debtor through the third party") (internal citation omitted).

The entire purpose of this case—an equitable, final, and complete resolution of tens to

hundreds of thousands of current and future Debtor Talc Claims—would be thwarted without a

preliminary injunction.  There is no dispute that the objectors oppose the injunction so that talc

---

[37]    The Committee asserts additional section 524(g) arguments in a footnote, alleging that certain Protected Parties may not be eligible for permanent injunctive protection under a plan of reorganization.  Committee Obj., 88 n.44.  The Debtor disputes these misguided arguments and will address them at the appropriate time.

claimants can pursue in the tort system the exact same claims pending against the Debtor—

involving the same plaintiffs, the same products, the same time periods, and the same liability

and damage allegations—against the Protected Parties.

An injunction protects a debtor from "uncontrollable" and "uncoordinated proceedings in

different courts," allowing that debtor an "opportunity to formulate a plan of reorganization."

Robins, 788 F.2d at 998.  Putting "pressure" on the Debtor and seeking an effective dismissal of

this case through what is tantamount to lifting the stay against the Debtor to permit

uncoordinated, piecemeal tort litigation in hundreds of different courts across the country in

literally tens of thousands of cases is exactly what the objectors hope to achieve in objecting to

the extension of the preliminary injunction.

Denying an extension of the injunction also would prevent this case from achieving equal

treatment across similarly situated claimants.  Absent the injunction, the Defendants could seek

to liquidate the exact same talc claims that exist against the Debtor in the Chapter 11 Case

against Protected Parties outside of the Chapter 11 Case.  This non-bankruptcy litigation, if not

stayed, would undermine (or eliminate) the parties' and the Court's ability to achieve

confirmation of a plan that treats all talc claimants fairly and equitably.

The Committee argues that these significant harms might not occur because the Debtor's

indemnity obligations are purportedly illusory.  Committee Obj., 89.  But the record

demonstrates otherwise.  PI Tr. at 138:15-17 ("[W]hat we had was an assumption of all the

liabilities of the debtor and that is broad enough to cover future product liability claims."); id. at

139:14-17 ("[A]t the core of . . . these claims or almost all of them are based on products that

either Old JJCI had assumed and agreed to indemnify its parent for or based on its products and

conduct."); PI Supp. Memo, 79-85.

The Committee misses the point when it argues that the Debtor will suffer no harm because "the effect of the indemnity agreements would be . . . to replace talcum powder claimants with indemnity claims". Committee Obj., 89. The claims being liquidated against the Protected Parties would be the *exact same claims* as the (now contingent, unliquidated) claims being asserted against the Debtor. The Debtor's liability would have been liquidated outside this Chapter 11 Case, defeating its purpose and the Debtor's opportunity to reorganize. To accept the Committee's argument would be to ignore Robins, which holds that injunctive relief is appropriate when a "judgment against the third-party defendant will in effect be a judgment or finding against the debtor." 788 F.2d at 999. That is also why the Committee's reliance on Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc., 133 B.R. 176 (W.D. Pa. 1991), is misplaced. The underlying liability in that case was under a promissory note. No party, including the debtor, disputed the outstanding principal amount, the interest due or the authenticity of the note. Id. at 177. Accordingly, there were no concerns about claims being liquidated, res judicata, collateral estoppel or any litigation that the debtor would be required to defend with respect to the note.

Finally, the Committee argues that the Debtor's indemnification obligations are circular— that is, that the Debtor would simply assert a claim under the Funding Agreement for any claim of indemnity asserted against it by J&J. Committee Obj., 89. However, this misreads the Funding Agreement. As was set forth in the PI Motion, "[a]lthough the Funding Agreement with New JJCI and J&J serves as a backstop to ensure that the Debtor's ability to pay the Debtor Talc Claims has not been diminished as compared to that of Old JJCI, the New JJCI and J&J indemnity claims nonetheless would affect the estate because the Debtor's assets must be used first to fund a trust to pay these claims under a plan of reorganization." PI Mot. at 52 n.23.

### D.    The Irreparable Harm That the Debtor Would Suffer Absent An Injunction Substantially Outweighs Any Prejudice to the Defendants.

The sole harm the Committee argues the claimants will face if the injunction issues is delay.  See Committee Obj., 91-92.  However, this theoretical consequence to claimants has been raised in many other mass tort bankruptcy cases, yet, the relief has "uniformly been issued." Bestwall, 606 B.R. at 254 (citing cases).

The balance of harms weighs decidedly in favor of a preliminary injunction and giving the Debtor's reorganization effort an opportunity to succeed.  Halting the pursuit of the Debtor Talc Claims imposes no material harm.  See also PI Mot., 57 & n.28; PI Supp. Memo., 87-88. As the record reflects, based on the historical pace of resolution of these claims, it would take decades to resolve them in the tort system.  Hr'g Tr., 455:6-456:15, Nov. 5, 2021, Mullin Direct; Debtor's PI Hr'g Ex. 31, Expert Report of Charles H. Mullin PhD, at ¶ 17.  In contrast, a bankruptcy trust will provide claimants (and the Debtor) "with an efficient means through which to equitably resolve [the] claims." Id. (citing In re Federal-Mogul Glob., Inc., 684 F.3d 355, 357-62 (3d Cir. 2012)); see also, Hr'g Tr., 455:6- 456:15, Nov. 5, 2021, Mullin Direct; Debtor's PI Hr'g Ex. 31 at ¶ 25.

Even if this Court assumes that an injunction might cause delay for some Defendants, "it is well established that mere delay is insufficient to prevent the issuance of an injunction." Bestwall, 606 B.R. at 257 (citing In re United Health Care Org., 210 B.R. 228, 234 (S.D.N.Y 1997).  And, of course, the issuance of an injunction will not permanently deprive the Defendants of an opportunity to pursue the Debtor Talc Claims.  It will merely halt those claims, giving the Debtor time to reach consensus on a plan of reorganization.

The objectors have offered nothing to refute these and the other arguments raised in the PI Supplemental Memorandum.  For the reasons set forth in the PI Supplemental Memorandum

and herein, permitting litigation of the Debtor Talc Claims against the Protected Parties (to many

of whom the Debtor owes indemnity) to continue will irreparably harm the Debtor's estate and

thwart the entire purpose of this Chapter 11 Case.  Accordingly, the balance of harms clearly

weighs in favor of issuing an injunction.

### E.    The Public Interest Supports the Preliminary Injunction

The Committee's arguments on the public-interest prong focus on reiterating arguments

that there is "no purpose to the Debtor's reorganization efforts" or no "likelihood that the Debtor

can achieve a successful plan of reorganization."  Committee Obj., 92.  Contrary to the assertions

of the Committee, extension of the injunction to each of the Protected Parties is necessary for the

many reasons set forth above.  Permitting Debtor Talc Claims to continue against the Protected

Parties would jeopardize the very purpose of this Chapter 11 Case.  Without the requested relief,

the Debtor would not benefit from a reprieve of litigation to focus on its reorganization.  Indeed,

the Debtor, contrary to the assertion of the Committee, is not "advancing the interests of J&J in

halting all litigation and gaining a litigation advantage".  Committee Obj., 92.   Nor is it engaging

in "gamesmanship".  Alystock Obj., 10.  Rather, the Debtor is seeking to preserve its ability to

pursue a reorganization.  The Debtor and the Protected Parties fully understand that all liability

arising out of the Debtor Talc Claims will be "resolved and channeled only if [the Debtor]

succeeds in confirming a plan of reorganization that contains a channeling injunction that

extends to the Protected Parties."  Bestwall, 606 B.R. at 258.  The Court and parties in interest,

however, will be unable to comprehensively and equitably resolve all Debtor Talc Claims in this

Chapter 11 Case without the requested injunctive relief.

Finally, the Committee speculates that "there is no logical stopping point to the Debtor's

strategy" and that "[t]he bankruptcy court would be flooded with abusive petitions".  Committee

Obj., 92-93.  This shows little faith in the U.S. legal system, including its available safeguards

(e.g., state and federal fraudulent-transfer law, the ability to dismiss a bankruptcy case if filed in bad faith, and the plan-confirmation requirements under the Bankruptcy Code). None of those protections is affected by the preliminary injunction. Moreover, as described in the Debtor's Information Brief, talc is a unique tort involving, among other things, hundreds of potential defendants, tens of thousands of individual claimants each bringing a separate lawsuit (thereby involving huge costs to defend thousands of claims), and long alleged latency periods.

The Debtor's goal in this Chapter 11 Case is to provide current and future claimants with a simpler, more streamlined, more timely and more equitable process to obtain recoveries on their claims. There is a strong public interest in seeing that result come to fruition for the benefit of all parties in interest. That result, however, cannot be reached without extending the NC Bankruptcy Court's stay ruling preliminary injunction.

## CONCLUSION

For all the reasons stated herein and in the Debtor's prior briefing, the Objections should be overruled, and the PI Motion should be granted on a final basis.

Dated: January 5, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo
James N. Lawlor
Brad J. Axelrod (*pro hac vice*)
Lyndon M. Tretter (*pro hac vice*)
Joseph F. Pacelli (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
baxelrod@wmd-law.com
ltretter@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon
Brad B. Erens
Mark W. Rasmussen
Dan B. Prieto
Amanda Rush
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
mrasmussen@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
ATTORNEYS FOR DEBTOR