FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

LTL MANAGEMENT, LLC,

                Debtor.

LTL MANAGEMENT, LLC,

                Plaintiff,

        v.

THOSE PARTIES LISTED ON APPPENDIX A TO
COMPLAINT and JOHN AND JANE DOES 1-1000,

                Defendants.

Case No. 21-30589 (MBK)

Adv. Pro. No. 21-03032 (MBK)

Chapter 11

Hearing Date:  February 18, 2022

*All Counsel of Record*

## MEMORANDUM OPINION

        This matter comes before the Court by way Debtor's bankruptcy case (Case No. 21-30589)

and subsequent adversary proceeding (Adv. Pro. No. 21-03032) and motion  ("Motion") (ECF No.

2 in Adv. Pro. No. 21-03032)[1] filed by Plaintiff LTL Management, LLC ("LTL" or "Debtor")

seeking an Order (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-

Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining

---

[1] Unless otherwise specified, all ECF Nos. will refer to docket entries in the Adversary Proceeding, Adv. Pro. No. 21-03032.

Order Pending a Final Hearing.  The Motion was initially filed in the Western District of North

Carolina.  Debtor filed a Supplemental Brief (ECF No. 128) to incorporate applicable Third Circuit

law.  The matter was fully briefed and scheduled for a Final Hearing.  The Court has fully

considered the submissions of the parties and the arguments set forth on the record at a hearing

held on February 18, 2022.  For the reasons set forth below, the Court grants Debtor's Motion and

resolves the adversary proceeding in favor of Debtor.  The Court issues the following findings of

fact and conclusions of law as required by FED. R. BANKR. P. 7052.[2]  Contemporaneously with

filing this Memorandum Opinion, the Court is filing a separate Opinion Denying the Motions to

Dismiss with respect to the pending motions to dismiss this chapter 11 proceeding.  These matters

have been tried collectively at evidentiary hearings held on February 14-18, 2022.  The Court also

adopts and incorporates herein the factual findings and conclusions of law set forth in the separate

Memorandum Opinion dated February 25, 2022.

## I.      Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended

September 18, 2012, referring all Bankruptcy cases to the Bankruptcy Court.  As explained in

detail below, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and

(G). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such.
Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## II.    Background

On October 14, 2021, LTL filed a voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Western District of North Carolina (the "North Carolina bankruptcy court"). *Petition*, ECF No. 1 in Case No. 21-30589.  LTL is an indirect subsidiary of Johnson & Johnson ("J&J") and traces its roots back to Johnson & Johnson Baby Products, Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J. *Declaration of John K. Kim in Support of First Day Pleadings* ("*Kim Decl.*") ¶¶ 9-10, ECF No. 5 in Case No. 21-30589.  J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products. *Id.* at ¶¶ 10-14.  In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder. *Id.*  In 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby Products.  *Id.*  In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division. *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions ("Kim Supp. Decl.")* ¶ 5, ECF No. 3.  Over the next few decades, nearly all assets[3] of the Baby Products division were transferred in a series of transactions and mergers, ultimately resting with one of J&J's corporate subsidiaries, Johnson & Johnson Consumer Inc. ("Old JJCI") in 2015. *Kim Decl.* ¶ 10-14, ECF No. 5 in Case No. 21-30589. Following these intercompany transactions, Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing baby powder caused ovarian cancer and mesothelioma. *Id*. at ¶¶ 15, 32.

---

[3] The only exception being those assets allocated to its diaper programs.

Similarly, through a series of transfers and indemnification agreements, Old JJCI assumed responsibility for all claims alleging that another J&J product, "Shower to Shower" caused cancer or other diseases. *Debtor's Supplemental Memorandum in Support of Preliminary Injunction Motion* ("*Debtor's Supp. Mem.*") 12-14, ECF No. 128.  Old JJCI also agreed to indemnify various retailers ("Retailers") who sold Old JJCI's talc-containing products for claims related to the sale of such products. *Kim Supp. Decl.* ¶¶ 8-12, ECF No. 3.

On October 12, 2021, Old JJCI engaged in a series of transactions (the "2021 Corporate Restructuring") through which it ceased to exist and two new companies, LTL and Johnson & Johnson Consumer Inc. ("New JJCI"), were formed. *Kim Decl.* ¶ 16, 22-23, ECF No. 5 in Case No. 21-30589.  The alleged purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Id.* at ¶ 21.  As a result of the restructuring, LTL assumed responsibility for all of Old JJCI's talc-related liabilities. *Id.* at ¶¶ 16, 24.  Through the restructuring, LTL also received Old JJCI's rights under a funding agreement (the "Funding Agreement"). *Id.* at ¶ 24. Under the Funding Agreement, J&J and New JJCI are obligated to pay, *inter alia*, "any and all costs and expenses" LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case" to the extent necessary. *Funding Agreement* 6, *Annex 2 to Declaration of John K. Kim in Support of First Day Pleadings*, ECF No. 5 in Case No. 21-30589.

Shortly after filing for bankruptcy on October 14, 2021 in the Western District of North Carolina, Debtor initiated the instant adversary proceeding, seeking declaratory and injunctive relief.  Specifically, the Complaint requests an order declaring that the automatic stay applies to

certain actions against nondebtors (the "Protected Parties") or, in the alternative, asks the Court to

enjoin such actions and grant a temporary restraining order pending a final hearing. *Complaint*,

ECF No. 1.  Debtor simultaneously filed the instant Motion requesting a preliminary injunction

enjoining the prosecution of actions outside of the chapter 11 case on account of the same talc

claims that exist against the Debtor in the chapter 11 case. *Motion*, ECF No. 2.  The North Carolina

bankruptcy court held a two-day evidentiary hearing on November 4 and 5, 2021.  On November

10, 2021, Judge Whitley issued oral findings of fact and conclusions of law and granted the motion

on a preliminary basis. *North Carolina Bankruptcy Court's Order Granting Motion for

Preliminary Injunction*, ECF No. 102.  As the result of Judge Whitley's Order, the defendants were

"prohibited and enjoined, pursuant to sections 105 and 362 of the Bankruptcy Code, from

commencing or continuing to prosecute any [talc-related claims] against any of the Protected

Parties" for a period of 60 days. *Id.* at 7-8.  Judge Whitley made clear that his Order was without

prejudice and was "not intended to bind a subsequent Presiding Court." *Id.* at 7.  He then

transferred the bankruptcy case to the Bankruptcy Court for the District of New Jersey, and, on

November 17, 2021, this Court assumed exclusive jurisdiction of the adversary proceeding and

the underlying bankruptcy case.[4]

---

[4] This matter was initially scheduled to be heard on January 11, 2022, three days ahead of the January 14 expiration
date of the Preliminary Injunction imposed by the North Carolina Order.  However, after the case was transferred to
this Court, the Original TCC filed a Motion for Withdrawal of Reference (ECF No. 110) with the district court.
Because the district court had not ruled on that motion—and in light of an identity of issues and evidence with the
pending Motions to Dismiss in the main bankruptcy case—this Court adjourned the hearing date for this Motion to
February 18, 2022, the final scheduled date for argument on the Motion to Dismiss.  Accordingly, On January 15,
2022, this Court entered a Bridge Order (ECF No. 157) extending the Preliminary Injunction entered by the North
Carolina Bankruptcy Court to February 28, 2022.  In the interim, the District Court denied the Motion for Withdrawal
of the Reference (ECF No. 32 in Case No. 21-cv-20252).

Following the transfer of the case to the District of New Jersey, Debtor supplemented its initial brief and amended and restated its arguments in support of the relief sought to reflect Third Circuit precedent.  At its core, Debtor's argument remains the same and is two-fold.  First, Debtor cites to 11 U.S.C. § 362 and contends that the automatic stay prohibits prosecution of talc claims against the Protected Parties.  Second, Debtor asserts that the Court should exercise its authority under 11 U.S.C. § 105(a) to enjoin the continuation or commencement of the talc claims against the Protected Parties.

Several interested parties oppose the Motion, including: the Official Committee of Talc Claimants[5] (ECF No. 142), certain plaintiff-insurers (the "Objecting Insurers") (ECF No. 141), and attorneys for Alystock, Witkin, Kreis & Overholtz, PLLC ("AWKO") (ECF No. 143).  The Debtor submitted an omnibus reply (ECF No. 146).[6]

In opposition to the Motion, the Original TCC contends that an extension of the stay under § 362(a) is not warranted.  Moreover, the TCC asserts that this Court lacks subject matter jurisdiction to enjoin actions between nondebtors under § 105(a).  AWKO likewise opposes the Motion and raises similar arguments.  AWKO asserts that J&J must file its own bankruptcy

---

[5] At the time it filed its Opposition (ECF No. 142) on December 22, 2021, there existed only one Official Committee of Talc Claimants (the "Original TCC").  Soon thereafter, however, the United States Trustee reconstituted the Original TCC and appointed two separate committees: the Official Committee of Talc Claimants I (the "Ovarian Cancer Claimants Committee" or "TCC I")  and the Official Committee of Talc Claimants II (the "Mesothelioma Claimants Committee" or "TCC II").  The U.S. Trustee's actions were challenged by way of motions filed in the underlying bankruptcy proceeding, which the Court granted in an Opinion dated January 20, 2022 (ECF No. 1212 in Case No. 21-30589.  An Order memorializing the Court's ruling was entered on January 26, 2022 (ECF No. 1273).  However, given the procedural posture of, and pending motions in, both the underlying bankruptcy case and the instant adversary proceeding, the Court stayed the effect of its ruling, ordering that both TCC I and TCC II (collectively, the "Committees") "shall remain in full force and effect through March 8, 2022." *Order Granting Motions Challenging United States Trustees' Notice of Appointment* 2, ECF No. 1273 in Case No. 21-30589.

[6] On February 1, 2022, TCC II filed a Sur-Reply (ECF No. 166); however, that pleading was struck for the reasons set forth on the record during the hearing on February 10, 2022.

petition to enjoy the benefits and protections of the Bankruptcy Code's automatic stay and argues

that equitable relief under § 105(a) is not warranted.  Finally, the Objecting Insurers object to the

Motion only to the extent it seeks to enjoin pending litigation in the Superior Court of New Jersey

(the "New Jersey Coverage Action").

## III.  Discussion

### A.  The Automatic Stay

Section 362(a) of the Bankruptcy Code provides, in relevant part, that

a petition filed under section 301, 302, or 303 of this title . . . operates as a stay applicable
to all entities, of—

> (1)  the commencement or continuation, including the issuance or employment of
> process, of a judicial, administrative, or other action or proceeding against the
> debtor that was or could have been commenced before the commencement of the
> case under this title, or to recover a claim against the debtor that arose before the
> commencement of the case under this title;
>
> . . .
>
> (3) any act to obtain possession of property of the estate or of property from the
> estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a).

The Third Circuit has explained that the purpose of the automatic stay is "two-fold." *In re

Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019).  First, it serves to "protect the debtor, by

stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a

respite from creditors and a chance to attempt a repayment or reorganization plan or simply be

relieved of the financial pressures that drove him or her into bankruptcy[.]" *Id.* (quotations,

citations, and alterations omitted).  Second it "protect[s] creditors by preventing particular

creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors." *Id.*

Although the scope of the automatic stay is broad, its protections typically apply only to debtors, not nondebtor defendants. *ACandS, Inc. v. Travelers Cas. & Sur. Co.,* 435 F.3d 252, 259 (3d Cir. 2006) (noting that "the scope of the automatic stay is broad and covers all proceedings against a debtor"); *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509 (3d Cir. 1997) (holding that "the clear language of section 362(a) stays actions only against a 'debtor.'"); *see also In re SN Liquidation, Inc.*, 388 B.R. 579 (Bankr. D. Del. 2008). Nevertheless, by way of the Motion, Debtor seeks a declaration that the automatic stay enjoins actions against the Protected Parties, who are nondebtor entities.

### 1.  Authority for Extension of Stay to Nondebtors

Prior to engaging in analysis, this Court clarifies the framework within which motions seeking this type of relief are evaluated. As with the instant Motion, most motions seeking to prevent litigation against nondebtor third parties are premised on both the automatic stay under §362(a) and a court's equitable powers under § 105(a). However,

> [I]t is unclear whether the Third Circuit views staying an action to aid a debtor's reorganization the result of extending the § 362(a) stay or the result of issuing a separate injunction pursuant to, for example, a district court's inherent power to stay a pending action or a bankruptcy court's power under § 105(a).

*Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *1 n.7 (E.D. Pa. Apr. 15, 2009). Courts in this circuit have recognized that "caselaw concerning the use of authority conferred by section 105(a) to implement the substantive powers created by section 362(a) is not entirely consistent." *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 103 n.8 (E.D. Pa. 2010)

8

(citing *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009) (noting that courts have often conflated the analysis of sections 362(a) and 105(a), and confused the issue). Indeed, many courts have used some iteration of the phrases "extension of the stay" and "injunctive relief" interchangeably when discussing whether to permit actions against nondebtor third parties to proceed. Additionally, many courts have cited only to § 105(a). *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 568 (3d Cir. 2004) (reviewing a § 105(a) injunction); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986) (granting an injunction under § 105(a), without discussion of § 362(a)).

In this Court's view, ample authority exists to conclude that § 362(a), § 105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties. For example, in *In re A.H. Robins Co., Inc.*—a case which the Third Circuit has cited with approval—the Fourth Circuit meticulously set forth the courts' powers, discussing each different source of authority in a separate section of the decision. *See In re A.H. Robins Co (A.H. Robins Co. v. Piccinin)*, 788 F.2d 994, 1001-1003 (4th Cir. 1986) (cited with approval in *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997)). The *Robins* court stated that a bankruptcy court may preclude lawsuits directly under: (1) § 362(a); or (2) by way of an injunction under §105(a); or (3) pursuant to its inherent power. 788 F.2d at 1001-003. The following year, in a subsequent case also related to the A.H. Robins bankruptcy, the Fourth Circuit clarified that it held in *Robins* "that the district court had four independent grounds on which it could stay the plaintiffs' suit against [the nondebtor third party]." *In re A.H. Robins Co. Inc. (A.H. Robins Co. v Aetna)*, 828 F.2d 1023, 1024 (4th Cir. 1987) (referring to § 362(a)(1), § 362(a)(3), § 105(a), and a court's

inherent powers under 28 U.S.C. § 1334 as independent bases for extension of the automatic stay to nondebtor third parties).

Further, the Third Circuit in *McCartney v. Integra Nat. Bank N*. recognized "a number of cases where courts have applied the automatic stay protection to nondebtor third parties." 106 F.3d 506, 510 (3d Cir. 1997). In doing so, the Third Circuit cited to *Robins* and explicitly acknowledged that the *Robins* court had relied on "both the automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants." *Id.* (citing *Robins*, 788 F.2d. 994). In its analysis, the *McCartney* court held that the plaintiff "was stayed from pursuing a deficiency judgment action against the nondebtor third party" because— due to the unusual circumstances of the case—doing so would "defeat the purpose of § 362." *Id.* at 511. Thus, the Third Circuit in *McCartney* upheld extension of the stay to a nondebtor solely on the basis of § 362, and without mention of § 105(a) in its analysis. To this Court, the decision in *McCartney* appears to be an endorsement of § 362 as an independent basis for extending the stay.

Nevertheless, several courts still view this as an open-ended question. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 423 B.R. at 103 n.8; *In re Philadelphia Newspapers, LLC*, 407 B.R. at 611; *Stanford v. Foamex L.P.*, 2009 WL 1033607, at *1 n.7. In their view, however, the issue is "academic as the practical effect (i.e., the staying of an action) is the same regardless of the means employed." *Foamex*, 2009 WL 1033607, at *1 n.7; *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 103 n.8 (declining to "delve into this analytical quagmire . . . [regarding] . . . whether the order issued by the Bankruptcy Court constituted the extension of the

stay under section 362(a) or an injunction under section 105(a)" because it was "of no moment for

purposes of this appeal").  This Court disagrees.  Although a discussion of the ultimate *effect* may

be purely "academic" because the end result is the same, the proper *procedure* for getting there

under each basis employs different methodologies and, thus, cannot be brushed aside as semantics.

Significantly, if a court were to determine that § 362(a)(3), alone, serves as a proper basis to extend

the stay to a nondebtor, then the inquiry could end there.  However, to the extent a court wishes to

rely on § 105(a) to enjoin actions against nondebtors, the court must first decide that it has subject

matter jurisdiction. *See In re W.R. Grace & Co.,* 591 F.3d 164, 170–71 (3d Cir. 2009) (quoting *In

re Combustion Eng'g, Inc.,* 391 F.3d 190, 225 (3d Cir.2004)) (holding that, because § 105(a) does

not provide an independent source of federal subject matter jurisdiction, a court must establish that

it has subject matter jurisdiction prior to issuing an injunction under § 105(a)).

Ultimately, until the Third Circuit provides clearer guidance, this issue remains unsettled.

Indeed, in several cases out of the Eastern District of Pennsylvania, district courts have used and

re-used a three-step inquiry to determine whether the bankruptcy court's extension of a stay to a

nondebtor was appropriate: "(1) whether the Bankruptcy Court had jurisdiction to issue the

injunction; (2) whether the Bankruptcy Court properly extended the automatic stay under section

362(a) to the non-debtors; and (3) whether the Bankruptcy Court properly exercised its discretion

in issuing the injunction." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 102 (citing

*Philadelphia Newspapers II,* 407 B.R. at 611).  Therefore, although this Court maintains that

application of the stay to nondebtor third parties can be premised on several distinct grounds, this

Court will follow the framework established in the *In re Philadelphia Newspapers* line of cases.

Accordingly, the Court first addresses its jurisdiction.

### B.  Subject Matter Jurisdiction

"Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), as amended (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004) (citations omitted)).  "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)).  A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings. 28 U.S.C. §157(b)(1); *In re Roggio*, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020).

A proceeding "arise[s] under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d at 217. (3d Cir. 2006).  A proceeding "arise[s] in" a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Id.* at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) and explaining that a proceeding arises in a bankruptcy case if it has "no existence outside of the bankruptcy").  Finally, "a claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar*

*Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted); *see also In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009).

The Original TCC maintains that this Court lacks subject matter jurisdiction over this issue. First, the Original TCC contends that Debtor's request for injunctive relief is not a core proceeding because it does not "arise under" or "arise in" the bankruptcy case. The Original TCC does not develop this argument and asserts, broadly, that injunctive relief is not unique to bankruptcy cases and that "Debtor's mere invocation of § 105 (or § 362, for that matter) is insufficient to establish that the injunction it seeks" is a core proceeding. *Objection of Original TCC* 80, ECF No. 142. The Original TCC then adds that, "[e]ven if these statutory provisions fall under the Court's 'core' jurisdiction in a general sense, the Court is without any jurisdiction to stay actions between non-debtors unless those actions could have some conceivable impact on the estate." *Id.* at 80-81. As Debtor points out, the Original TCC is incorrect. To the extent a proceeding is a "core" proceeding, the Court has jurisdiction and the inquiry ends there. Courts need not consider the impact on the estate unless they are exercising "related-to" jurisdiction. The case law cited by the Original TCC in its supporting footnote supports this position. *See, e.g.*, *Stoe v. Flaherty*, 436 F.3d 209 (finding that the court lacked jurisdiction because the matter was *not* a core proceeding).

Although "the Third Circuit has not addressed this precise issue, other courts have concluded that motions to extend an automatic stay and injunction to non-debtor third parties pursuant to sections 362 and 105 qualify as 'core' proceedings." *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, No. 21-cv-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (collecting cases). Further, Debtor in this case invokes § 362 to obtain the relief it seeks.

Because the instant proceeding invokes a substantive right under the Bankruptcy Code and is a proceeding that, by its nature, could arise only in the context of a bankruptcy case, the Court determines that it is a core proceeding over which this Court can exercise jurisdiction. In denying the Original TCC's motion to withdraw the reference, the district court reached the same conclusion. *Id.* ("Here, the Adversary Proceeding is a 'core' proceeding.").

In any event, the Court determines that it also has "related to" jurisdiction. The Original TCC contends that talc-related claims against the nondebtor Protected Parties have "no conceivable effect on the Debtor's bankruptcy estate . . . ." *Objection of Original TCC* 81, ECF No. 142. As discussed in greater detail *infra*, this Court disagrees. "What will or will not be sufficiently related to a bankruptcy to warrant the exercise of subject matter jurisdiction is a matter that must be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n.9 (3d Cir. 2009). Here, the Court concludes that Debtor is liable for the talc claims as the result of pre-petition corporate transactions, including the 2021 Corporate Restructuring, and various contractual indemnification obligations. Additionally, although the extent of shared insurance coverage is disputed, it remains uncontested that Debtor shares insurance policies— which are estate property under 11 U.S.C. § 541(a)—with the Protected Parties. Therefore, continued litigation of talc claims against the Protected Parties has a "conceivable effect" on the bankruptcy estate because it effectively seeks to collect and liquidate claims against Debtor and could deplete available insurance coverage. The weight of the case law supports this conclusion. *See, e.g.*, *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 657 (E.D. Pa. 2011) (finding that debtor's potential indemnification obligations and the impact on debtor's reorganization efforts,

taken together, provide an adequate basis for the Court to find that the state court proceedings are sufficiently "related to" the underlying bankruptcy); *In re Philadelphia Newspapers, LLC*, 423 B.R. at 103 (finding "related to" jurisdiction where debtor might be obligated to indemnify third party in the event of a judgment); *Philadelphia Newspaper, LLC*, 407 B.R. at 614–15 (finding "related to" jurisdiction due to the impact of the litigation on the debtor's reorganization efforts as well as the debtor's practice of indemnifying its employees).[7]

### C.  § 362(a)(1)

In support of its position, Debtor first cites to subsection (1) of § 362(a).  Specifically, Debtor contends that the talc claims are—at their core—an attempt to liquidate and recover claims against Debtor.  Debtor explains that Old JJCI no longer exists and Debtor, alone, is responsible for the talc claims.  Debtor also contends that Old JJCI's and J&J's talc-related liabilities were transferred to Debtor as the result of the corporate transactions previously discussed.  Thus, Debtor asserts that talc-related claims against Old JJCI and J&J constitute "action[s] or proceeding[s] against the debtor" to collect pre-petition debts and are expressly precluded under § 362(a)(1). *Debtor's Supp. Mem.* 41, ECF No. 128 (citing *In re Heating Oil Partners*, No. 08-1976, 2009 WL 5110838, at *6-7 (D. Conn. Dec. 17, 2009)).

---

[7] In a footnote, the Original TCC relies on the Third Circuit's decision in *Federal-Mogul* for the proposition that "related to" bankruptcy jurisdiction "exists only where 'the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit.' " *Objection of Original TCC* 81, n.38, ECF No. 142. (quoting *In re Fed.-Mogul Glob., Inc.*, 300 F.3d 368, 382 (3d Cir. 2002)).  As Debtor points out, however, the court in *Federal-Mogul* did not reach the merits of whether the district court had "related to" jurisdiction. *In re Fed.-Mogul Glob., Inc.*, 300 F.3d at 384.  Instead, the appellate court reviewed the district court's denial of defendant's transfer motion in the context of deciding whether to grant a writ of mandamus. *Id.*  Thus, the Original TCC's reliance on *Federal-Mogul* does not alter this Court's conclusion with respect to subject matter jurisdiction.

Additionally, Debtor points out that it is responsible for claims asserted against the Retailers and certain other indemnified parties, including New JJCI and J&J (the "Indemnified Parties").  Accordingly, Debtor argues that although talc claims are asserted against these other entities, Debtor is the true defendant.  Indeed, Third Circuit precedent recognizes that the automatic stay under § 362(a)(1) can be extended to third parties where "unusual circumstances" exist. *See McCartney v. Integra Nat. Bank N.*, 106 F.3d at 510.  Such unusual circumstances may be found "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *Id.* (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)); *see also In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that unusual circumstances exist warranting extension of the stay to nondebtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization"); *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004).

The Original TCC and AWOK (collectively, the "Objecting Parties") vehemently object to Debtor's request to extend the automatic stay to the Protected Parties.  Their primary argument in opposition is bottomed on the Objecting Parties' distaste for the 2021 Corporate Restructuring and the use of the Texas divisional merger statute to create a special purpose vehicle in the hours before the bankruptcy filing to accomplish J&J's goals. *See Objection of Original TCC* 49-52, ECF No. 142, *Objection of AWOK* ¶12, ECF No. 143.  Both Objecting Parties ask this Court to

look beyond the plain statutory language and see the larger picture. *See Objection of Original TCC* 51-53, ECF No. 142; *Objection of AWOK* 7, ECF No. 143 (asking the Court to "take into account all the relevant circumstances"). In short, they contend it would be inequitable—and produce an "absurd result"—if courts were to permit nondebtors to "avail themselves of the automatic stay simply by unilaterally allocating to the debtor indemnity and other obligations on the eve of the bankruptcy filing." *Objection of Original TCC* 53, ECF No. 142.

This Court recognizes that it is obligated "to construe statutes sensibly and avoid constructions which yield absurd or unjust results." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014) (quoting *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L.Ed.2d 290 (1989)). However, as discussed at length in the Opinion Denying the Motions to Dismiss, this Court finds no impropriety in the divisional merger used here to create a special-purpose vehicle to address the talc claims and, thus, perceives no "absurd or unjust result" produced if the automatic stay is extended to the Protected Parties to enable Debtor to achieve its ultimate objective. As Debtor points out, and as expressly found by Judge Whitley after the initial hearing, if the stay is *not* extended to the Protected Parties, it is difficult to envision how a successful reorganization can be achieved in this case. *See Transcript of Hearing* 142:15-17, ECF No. 392 in Case No. 21-30589 (Nov. 10, 2021) ("We're not going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same claims that they would be asserting there.").

The Court acknowledges and appreciates the Objecting Parties' concerns regarding Old JJCI's pre-petition corporate restructuring and Debtor's subsequent bankruptcy filing.

Nevertheless, as detailed in the Opinion Denying the Motions to Dismiss, this Court determines that those valid concerns do not change the fact that Debtor was created pursuant to—and in compliance with—a long-standing Texas statute. Additionally, those concerns do not establish bad faith, nor do they undermine the legitimate purpose of this bankruptcy. In so ruling, this Court considered the totality of circumstances, including, but not limited to, litigation posture outside the bankruptcy court, the subjective intent of Debtor and management, the degree of financial distress facing Debtor, the pressures from non-moving creditors, pre-petition litigation conduct, the nature of the creditor body and the extent of assets, the structure and formation of Debtor, and Debtor's reorganizational purpose and exit strategy. In sum, the Court is not persuaded by the Objecting Parties' allegations of gamesmanship or inequity. Those arguments provide neither grounds for dismissal, nor a sufficient basis to decline to extend the stay to the Protected Parties. The case law on which the Original TCC relies is distinguishable.[8] Therefore—working from the baseline that the bankruptcy was filed in good faith—this Court focuses its attention on Third Circuit precedent as applied to the facts of this case in resolving the instant Motion.

---

[8] Citing *In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005) and *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), the Original TCC contends that "the Third Circuit has rejected similar attempts to 'game' the Bankruptcy Code." *Objection of Original TCC* 53, ECF No. 142. However, in *In re Owens Corning*, the court denied substantive consolidation where it was used as a means of giving debtor(s) an advantage over one group in plan negotiations, and the court in *In re Integrated* found a lack of good faith where the bankruptcy was filed with the sole purposes of prejudicing one creditor. As discussed at length in this Court's Opinion Denying the Motions to Dismiss, the bankruptcy in this case does not provide Debtor with an improper tactical advantage and does not result in prejudice to nondebtor creditors. Thus, *In re Owens Corning* and *In re Integrated* do not change this Court's analysis. The Original TCC also cites multiple cases for the proposition that "feigned" or "collusive" filings should be rejected. *Objection of Original TCC* 54, ECF No. 142 (citing *Poe v. Ullman*, 367 U.S. 497, 505, 81 S. Ct. 1752, 1757, 6 L. Ed. 2d 989 (1961); *United States v. Johnson*, 319 U.S. 302, 303, 63 S. Ct. 1075, 1076, 87 L. Ed. 1413 (1943); *Muskrat v. United States*, 219 U.S. 346, 31 S. Ct. 250, 55 L. Ed. 246 (1911). Again, this Court has resolved the issue of good faith and finds the instant bankruptcy is neither "feigned" nor "collusive" and serves a legitimate bankruptcy purpose. Accordingly, the cases cited by the Original TCC are unpersuasive and do not serve as a basis for denying extension of the automatic stay.

### 1. Identify of Interests

Here, the Court finds that the nondebtor Protected Parties and Debtor enjoy such an identity of interests that a lawsuit asserting talc-related claims against the Protected Parties is essentially a suit against Debtor. Following the two-day evidentiary hearing in the North Carolina Bankruptcy Court, Judge Whitley reached the same conclusion. *See Transcript of Hearing* 141:8-12, ECF No. 392 in Case No. 21-30589 (Nov. 10, 2021) ("I believe there is, in effect, an identity of interest within the meaning of the *Robins* case and that, notwithstanding the potential that some of the claims may be direct, almost all of them, if not all of them, relate to the debtor's operations."). As an initial matter, the talc claims against the Protected Parties involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor. *See id.* 138:14-19 ("They're being sued on, effectively, the same products, the same time periods, etc.). The Objecting Parties do not—and cannot—dispute that Old JJCI no longer exists and that Debtor assumed its liabilities. *See* TEX. BUS. ORGS. CODE ANN. § 10.008(a)(2), (3) (directing that "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger"). Likewise, the Objecting Parties do not—and cannot—deny the corporate transactions and indemnity agreements that left Debtor ultimately responsible for talc-related liabilities. Judge Whitley similarly concluded that Old JJCI assumed liability associated with the J&J Baby Products Division. *Transcript of Hearing* 138:13-17, ECF No. 392 in Case No. 21-30589 (Nov. 10, 2021) ("I believe under the circumstances that the language used effectively means that what we had was an assumption of all of the liabilities of the debtor and that is broad enough to cover future product liability claims.").

The Original TCC states in its opposition that "the claim of shared identities of interests is based solely on the allocation of agreements to the debtor on the eve of the bankruptcy filing for the very purpose of extending the stay." *Objection of Original TCC* 56, ECF No. 14.  The Court is willing to accept that summarization and views it as a valid basis for extending the stay to the Protected Parties—not as a reason to decline extension of the stay as advanced by the Original TCC.

### 2.  Impact on Bankruptcy Estate and Reorganization

The Original TCC additionally argues that "the existence of an indemnification from the debtor to a non-debtor . . . is an insufficient ground for extension of the automatic stay." *Objection of Original TCC* 57, ECF No. 14.  Rather, the Original TCC insists that a debtor must also demonstrate that "the indemnification obligation threatens the debtor's assets or reorganization." *Id.*  Relevant case law and the underlying purpose of the automatic stay support the Original TCC's interpretation.  The court in *Robins* provided an illustration, noting that a situation in which extension of the stay would be warranted "would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case [because] . . . [t]o refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute." *A.H. Robins Co. v. Piccinin*, 788 F.2d at 999; *see also McCartney*, 106 F.3d at 510.  Thus, a critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate and prospect of reorganization.

The Original TCC asserts that Debtor cannot prove that its indemnification obligations expose it to adverse consequences because "Debtor is a shell and has no actual estate to be impacted." *Objection of Original TCC* 58, ECF No. 142.  Again, the Original TCC's argument

is rooted in its contention that this bankruptcy is a "charade." *Id.* at 57.  The Court has already

addressed and dispelled this argument in the accompanying Opinion Denying the Motions to

Dismiss and will not belabor the point here.  The bottom line is that Debtor is valid corporate

entity, created properly and in accordance with Texas statute, with a bankruptcy estate comprised

of assets and liabilities—including talc-related liabilities and indemnity obligations assumed

from Old JJCI.  Although the Original TCC attempts to characterize the Funding Agreement as

a circular exchange of liability and payments that leaves Debtor's estate ultimately unaffected,

this argument ignores the fact that, pursuant to the terms of the Funding Agreement, Debtor must

first use its own assets to fund the trust—resorting only to financial contributions from J&J and

New JJCI as a backstop.  Thus, in this Court's view, the talc claims have an undeniable impact

on Debtor's estate.  Moreover, the Original TCC's unsupported allegations that Debtor and J&J

"will not honor its reimbursement obligations under the Funding Agreement" or intend to

"maroon [their] liability" represent mere speculation and wholly ignore this Court's role in

supervising the bankruptcy case, the creation and funding of a trust, and trust distributions.

*Objection of Original TCC* 58, ECF No. 142.  Given Debtor's and J&J's actions in this case—

which, to date, have been candid and transparent—there is simply no indication that the Funding

Agreement is a "scheme to hinder, delay, and defraud talc powder creditors" as the Original TCC

alleges. *Id.*  And, to the extent Debtor's actions drift in that direction, this Court is prepared to

take swift action and will honor its commitment of ensuring that claimants receive fair and timely

compensation under a comprehensive and transparent distribution scheme.

Given the facts of this case, the Court concludes that continued litigation against the

Protected Parties would liquidate pending tort claims, as well as indemnification claims, against Debtor outside of chapter 11 and potentially deplete available insurance coverage—frustrating the purpose of the automatic stay. *See, e.g.*, *In re Dow Corning Corp.*, 86 F.3d 482, 494 (6th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (June 3, 1996) ("The potential for Dow Corning's being held liable to the nondebtors in claims for contribution and indemnification, or vice versa, suffices to establish a conceivable impact on the estate in bankruptcy."). Moreover, continued litigation against the Protected Parties would divert funds and resources toward defense costs and potentially disrupt the flow of funds and resources to Debtor's trust pursuant to the Funding Agreement. *See, e.g. In re MCSi, Inc.*, 371 B.R. 270, 271–72 (S.D. Ohio 2004) (quoting *Gray v. Hirsch,* 230 B.R. 239, 243 (S.D.N.Y.1999) and collecting cases in which courts "stayed actions against non-debtor co-defendants 'where they have found that the bankrupt estate would be adversely affected because the creditor's action would prevent the non-debtor from contributing funds to the reorganization, or would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort' "). Furthermore, continued litigation against the Protected Parties would undoubtedly impair mediation efforts and negotiations within this bankruptcy and would complicate estimation hearings, with multiple uncoordinated hearings nationwide.

### 3. Joint Tortfeasor

The Original TCC also asserts that J&J is a joint tortfeasor with direct liability and, thus, the automatic stay should not preclude prosecution of those independent and direct claims against J&J as a nondebtor third party. The Original TCC cites a host of cases and asserts that

22

it is "settled law that 'joint tortfeasors' are not entitled to the benefit of the automatic stay upon a co-defendant's bankruptcy filing." *Objection of Original TCC* 60, ECF No. 142. This assertion and the selective portions of underlying case law are misleading. Indeed, as previously discussed, the automatic stay typically applies only to the debtor and, like any other nondebtor third party, does not extend to "joint tortfeasors." Also discussed, there exists an exception to this general rule in that the stay can be extended when the circumstances so warrant. Thus, even assuming direct liability exists, the analysis for whether an extension of the automatic stay is warranted based on "unusual circumstances" remains unaffected. The authority upon which the Original TCC relies does not convince this Court otherwise. Specifically, the Original TCC cites to *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 128 (4th Cir. 1983) and *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983), and quotes the *Robins* court. However, in both *Johns-Manville* and *Williford*, the joint tortfeasors sought to stay proceedings under the theory that the debtor co-defendants were "indispensable parties." Neither of those cases involved the situation presented here, wherein Debtor argues that suits against the Protected Parties (the "joint tortfeasors") will have an adverse impact on the bankruptcy estate. Additionally, the Original TCC quotes from the *Robins* decision and asserts that the *Robins* court "opin[ed]" that the automatic stay would "clearly not extend to such non debtor." *Robins*, 788 F.2d at 999. However, the language quoted is truly dicta in which the *Robins* court discusses the analysis of a bankruptcy court in the District of Connecticut, *see In re Metal Ctr., Inc.*, 31 B.R. 458 (Bankr. D. Conn. 1983). Further, in the very next sentence, the *Robins* court acknowledges the exception to the general rule in its continued discussion of the *In re Metal* opinion, explaining

that if "a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code. . . . Clearly, the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate." *Robins*, 788 F.2d at 999 (quoting *In re Metal Ctr., Inc.*, 31 B.R. at 462).

For the foregoing reasons, the Original TCC's "joint tortfeasor" argument does not preclude extension of the automatic stay to the Protected Parties.

### 4. Challenge to the 1979 Agreement

The Original TCC disputes Debtor's talc liability by challenging the 1979 transaction in which Old JJCI agreed to indemnify J&J (the "1979 Agreement"). Specifically, the Original TCC claims there is no legal or factual support in the record. The Court disagrees. The 1979 Agreement provides, in relevant part:

> WHEREAS, J&J has a number of operating divisions conducting various lines of business; and WHEREAS, one of these operating divisions is named the JOHNSON & JOHNSON BABY PRODUCTS COMPANY Division (sometimes hereinafter called the "BABY Division"); and
>
> WHEREAS, the Subsidiary corporation, is wholly-owned by J&J and J&J is desirous of **transferring to this Subsidiary all assets and liabilities** which are now allocated to the BABY Division on the books or records of Johnson & Johnson; …
>
> *1979 Agreement* (emphasis added), *Movants' Ex.* 600.02.

Section 1 of the 1979 Agreement clearly provides that J&J Baby Products assumed all

liabilities of every kind and description associated with the Baby Products division and

indemnified J&J for such liabilities:

> J&J . . . does grant, bargain, sell, assign, alien, remise, release, convey, transfer, set over and confirm, unto the Subsidiary, its successors and assigns, forever, all the businesses, franchises, properties and assets . . . which are now allocated on its books or records of J&J to its Baby Division . . . .
>
> . . .
>
> . . . Subsidiary agrees to assume . . . all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division and the Subsidiary hereby covenants and agrees with J&J that the Subsidiary will forever . . . indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed. . . .
>
> . . .
>
> [T]he covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and assigns.

*Id*. §§ 1, 4.   In interpreting the language of the 1979 Agreement and the relevant circumstances,

the Court concludes that J&J Baby Products assumed all liabilities, including contingent and

future product liability claims.   The Original TCC makes much of the fact that the 1979

Agreement uses the phrase "on the books or records."   In the Original TCC's view, the use of

this phrase has a specific meaning in the context of corporate law and, thus, limited the scope of

liability assumed to only those liabilities existing and reported on J&J's books and records at the

time of the transaction.   The Original TCC cites to *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit

Ins. Corp.*, 109 F. Supp. 3d 179 (D.D.C. 2015) in support of this position.   In *Deutsche*, the court

analyzed a contractual provision that provided for the sale of liabilities and used the phrase

"which are reflected on the Books and Records" to define those liabilities. *Deutsche*, 109 F. Supp

at 198.  When a dispute arose as to the amount of the liabilities assumed in the contract, the *Deutsche* court concluded that "the liabilities assumed by [the buyer] do not extend beyond the amounts listed [in the seller's] financial accounting records." *Id.*  However, the contractual clause at issue in *Duetsche* is distinguishable from the clause at issue in this case in several respects. First, the contract in *Duetsche* memorialized a sale between two unrelated entities as opposed to the inter-company transfer in the present case.  Second, the contract in *Deutsche* provided that the liabilities were assumed "expressly . . . at Book Value." *Id.*  The reference to "Book Value"— which is absent from the contract at issue in the instant case—suggests a finite value to the liability being transferred.   In contrast, the agreement at issue here does not include such definitive language.  Instead, it includes the word "forever" and explains that the contract will bind the parties as well as their successors and assigns. *1979 Agreement*, § 1.  Accordingly, it appears the 1979 Agreement contemplates continuing and future obligations resulting from the transfer of the business.  In this respect the Court is persuaded by the decision in *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), a case relied on by Debtor.  Like the parties in *Bouton*, the parties in this case expressed a clear intention of carrying that business forward after the transfer. *Bouton*, 423 F.2d at 651.

Additionally, the court in *Deutsche* used extrinsic evidence to determine the meaning of the contract. *Deutsche*, 109 F. Supp at 204-207.  The New Jersey Supreme Court "permit[s] a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties." *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 270, 901 A.2d 341, 347 (2006) ("Extrinsic evidence may be used to uncover the true meaning of contractual terms.") (citing *Atl.*

*N. Airlines v. Schwimmer*, 12 N.J. 293, 304, 96 A.2d 652, 657 (1953)); *see also Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 243–44 (3d Cir. 2005) (stating that "under New Jersey law, courts should interpret a contract considering the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction") (internal quotations and citations omitted); *Pier 541 LLC v. Crab House, Inc.*, No. 19-00437, 2021 WL 4438128, at *3 (D.N.J. Sept. 28, 2021).  While the *Deutsche* court ultimately concluded that the contract limited the amount of liability assumed, the factual distinctions between the circumstances in *Deutsche* and the case at hand compel this Court to reach an opposite conclusion.  The meeting minutes for the J&J Board of Directors Meeting held on December 12, 1978 provide insight into the purpose of the 1979 Agreement.  Specifically, the minutes reflect that, in furtherance of J&J's "long standing policy of decentralization of corporate business," the 1979 Agreement was intended to transfer all assets to subsidiaries who would, in turn, assume liabilities. *c* Thus, the construction of the 1979 Agreement advanced by the Original TCC, which limits the liability assumed to such reported in the books and records at the time of the transaction, is inconsistent with the stated purpose of the transaction as reflected in the Board Minutes.

During oral argument on this Motion, counsel for TCC II asserted that the language of the 1979 Agreement was "particular" and "specific," suggesting that the Court should not look beyond the plain meaning of the Agreement's terms for purposes of interpretation.  However, evidence of circumstances is admissible in aid of interpretation of an integrated agreement, even though the contract on its face is free from ambiguity. *See Conway*, 187 N.J. 259 (citing

*Schwimmer*, 12 N.J. 293). In point of fact, this Court finds the 1979 Agreement to be ambiguous as to the status and treatment of future liability. Indeed, the 1979 Agreement is silent in this respect. "Under New Jersey law, ambiguities in an indemnification agreement are generally construed against the indemnitee," which is the party receiving indemnity. *Caldwell Trucking PRP*, 421 F.3d at 244 (3d Cir. 2005) (citing *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 161 n.3 (3d Cir. 1996). Thus, in this case, any ambiguity in the 1979 Agreement should be construed in favor of Old JJCI as the indemnitor. The Court need not engage further in this analysis as the record demonstrates that both Old JJCI and the Protected Parties share a common understanding as to which party was responsible for talc-related liabilities following the 1979 Agreement.

In addition, when faced with the absence of a critical contractual term—here, future liability—"courts 'will imply a reasonable missing term or, if necessary, will receive evidence to provide a basis for such an implication.' " *Twp. of White v. Castle Ridge Dev. Corp.*, 419 N.J. Super. 68, 76–77, 16 A.3d 399, 404 (App. Div. 2011) (quoting *Satellite Entm't Ctr., Inc. v. Keaton,* 347 N.J. Super. 268, 276, 789 A.2d 662 (App. Div. 2002)). "In particular, courts will look to, among other things, all the relevant circumstances surrounding the transaction, as well as evidence of the parties' course of dealing, usage and course of performance." *Elliott & Frantz, Inc. v. Ingersoll–Rand Co.,* 457 F.3d 312, 328 (3d Cir. 2006) (applying New Jersey law); *see also* 49 N.J. PRACTICE PROCEDURE § 7:25 (2010 ed.) (citing RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1979)). Accordingly, the Court considers the parties' course of performance since the time of the 1979 Agreement to glean the intent of the parties.

Debtor represents, and the Original TCC does not dispute, that "all talc-related costs not otherwise covered by insurance have been charged to Old JJCI since the assumption of liabilities under the 1979 Agreement." *Debtor's Omnibus Reply* 19, ECF No 146. Although the Original TCC attempts to frame this course of action as "purely a function of accounting policy, not legal responsibility," *Objection of Original TCC* 38, ECF No. 142, deposition and trial testimony from Adam Lisman—who is the assistant controller for Johnson & Johnson and the Apex Company—confirms that the accounting was based on an underlying obligation. Specifically, Mr. Lisman confirmed that since the 1979 transaction, Old JJCI is legally responsible for, and has actually paid, all talc-related expenses. *Trial Tr.* 123:21-22, Feb. 16, 2022, ECF No. 1518 ("My understanding is that JJCI borne [sic] all financial responsibility [for the talc litigation]."); *Lisman Dep. Tr.* 117:1-3, Oct. 30, 2021, *Ex. H to Toroborg Decl.*, ECF No. 1444-9 ("[T]hese are talc product liability costs that JJCI was ultimately responsible for, which is why it is showing up as an expense on their account."); *id* at 194:21, 195:10 ("Q: And does that mean that accounting follows the legal obligation associated with the expense? . . . A: Yes.") (objections omitted). Accordingly, the parties' course of performance since the time of the 1979 Agreement reinforces this Court's conclusion that Old JJCI was legally responsible for talc-related liabilities as a result of the 1979 Agreement.

The 1979 Agreement also provides J&J Baby Products with an irrevocable power of attorney to substitute itself "for J&J and in its [J&J's] name and stead . . . on behalf of and for the benefit of the Subsidiary" to, among other things, "defend and compromise any and all actions, suits or proceedings in respect of any said Properties"—defined as the Baby Products

division's "businesses, franchises, properties and asset." *1979 Agreement* §2, *Movants' Ex.* 600.02. Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred. And, as the result of a series of transactions culminating in the 2021 Corporate Restructuring, Debtor assumed that liability and substituted in as the real party in interest. This, in turn, weighs in favor of extending the stay.

### 5. Retailers

The Original TCC next contends that an extension of the stay to the Retailers is inappropriate because no identity of interests exists between Debtor and the Retailers. In support of this position, the Original TCC revives its argument that the Retailers are joint tortfeasors who may owe direct liability to talc claimants. The Original TCC asserts that "the fact that Old JJCI, after the fact, may have entered into Tender Agreements [or indemnification agreements] with the retailers does not eliminate such liability." *Objection of Original TCC* 70, ECF No. 142. Nonetheless, as discussed, the existence of joint tortfeasor status or direct liability does not end the inquiry as to whether the automatic stay should be extended to a nondebtor co-defendant. Here, Debtor certifies that it owes contractual, common law, and statutory indemnification obligations to the Retailers and the Indemnified Parties. *Kim Decl.* ¶ 53, ECF No. 5 in Case No. 21-30589. These obligations—viewed in conjunction with the fact that the claims against the Retailers involve the same products, the same time period, the same alleged defect, and the same alleged harm as the claims against Debtor—are sufficient to establish the "unusual circumstances" warranting extension of the stay. In fact, the Court cannot identify a scenario

30

where a retailer would have liability without some action or inaction by Debtor's predecessor also forming the basis of a cause of action.  There is nothing in the record to demonstrate that any single lawsuit—out of the tens of thousands pending—consist of claims against Retailers in which J&J or Old JJCI have not been named as a defendant for the manufacture/sale of the product.

### 6.  Absolute Indemnification

The Original TCC asserts that Debtor's indemnification obligation must be "absolute" to warrant extension of the automatic stay.  *See, e.g. Robins* (giving example of "unusual circumstance" as where a debtor has "absolute" indemnity obligation to nondebtor); *Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *2 n.9 (E.D. Pa. Apr. 15, 2009) ("Even assuming that Foamex is the real party in interest, Foamex's indemnification obligations do not appear absolute, as required by courts extending the stay due to the existence of indemnification agreements; *id*. (collecting cases, including *Hess Corp. v. Performance Texaco, Inc.*, No. 3:08-CV-1426, 2008 WL 4960203 at *2 (M.D. Pa. Nov. 19, 2008) (reasoning that indemnification agreements constitute unusual circumstances only in "actions against non-debtors who are entitled to *absolute indemnity* by the debtor for a judgment against them") (emphasis added)) (citing *In re Mid-Atl. Handling Sys., LLC*, 304 B.R. 111, 128 (Bankr. D.N.J. 2003)).  In opposition, Debtor cites to *In re Dow Corning Corp.*, for the proposition that "[t]here is no requirement that there be 'automatic' liability in respect of indemnification obligations." *Debtor's Omnibus Reply* 31, ECF No. 146 (citing *In re Dow Corning, Corp.*, 86 F.3d 482 (6th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (June 3, 1996)).  Notably, in *In re*

31

*Dow Corning*, the Sixth Circuit observed that "[i]t has become clear following *Pacor* that 'automatic' liability is not necessarily a prerequisite for a finding of "related to" jurisdiction." *In re Dow Corning, Corp.*, 86 F.3d at 491 (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 987 (3d Cir. 1984)).  Thus, the discussion of "automatic" liability in that case—and in *Pacor*—was in the context of a jurisdictional analysis; not in the context here, in which this Court is considering whether an "unusual circumstance" exists warranting extension of the automatic stay to a nondebtor third party.  Nevertheless, this Court remains unpersuaded that "absolute" indemnity is a prerequisite for extension of the automatic stay.

The Fourth Circuit clarified in the follow-up case related to the A.H. Robins bankruptcy that it previously "found that a stay was authorized under 11 U.S.C. § 362(a)(3) because Aetna *might* seek indemnification from Robins for any damages it had to pay, thus implicating the debtor's property." *In re A.H. Robins Co. Inc. (A.H. Robins Co. v. Aetna)*, 828 F.2d 1023, 1025 (4th Cir. 1987) (emphasis added).  The Fourth Circuit's use of the word "might" suggests that conditional indemnification is sufficient to trigger extension of automatic stay.  Other courts which have addressed this issue likewise indicate that the mere possibility of indemnification obligations warrants extension of the automatic stay. *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 568–69 (3d Cir. 2004) (refusing to modify injunction precluding state court action against nondebtor third parties because the "prospect of indemnification" warranted a stay); *In re Philadelphia Newspapers, LLC*, 423 B.R. 98 (E.D. Pa. 2010) (holding that unusual circumstances existed to justify extension of automatic stay where debtor owed potential indemnification obligation); *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa.

2009) (holding that "the 'unusual circumstances' to warrant the extension of the section 362(a)

stay [were] present . . . [in part] because the Debtors owe potential contractual and common law

duties to indemnify the Non–Debtors").

Notwithstanding, Debtor asserted during trial that its indemnification obligation is, in

fact, automatic.  Counsel for Debtor argued that the only prerequisite to the indemnification

obligation is that Debtor manufactured the product, which its predecessor indisputably did.

Thus, Debtor concludes that indemnification obligations inarguably exist in this case and are

automatically triggered by lawsuits involving talc products.  The Objecting Parties did not

demonstrate—in their briefing or during trial—that Debtor's indemnification obligations are

conditional or that there exists a basis for Debtor to avoid indemnification liability.  Accordingly,

even assuming absolute indemnification is a prerequisite, or that Debtor's indemnification

obligations are conditional, nothing in the record provides this Court with a plausible basis for

concluding that the limitations on Debtor's obligations would come into play.  The Court

therefore determines that Debtor's indemnification obligations are automatic and, as a corollary,

rejects the Original TCC's objection premised on absolute indemnification.  *See, e.g.*, *Gulfmark*

*Offshore, Inc. v. Bender Shipbuilding & Repair Co.*, No. CIV. A. 09-0249, 2009 WL 2413664,

at *2 (S.D. Ala. Aug. 3, 2009) (rejecting party's objection premised on absence of absolute

indemnification because objecting party "points to no facts or circumstances tending to suggest

that those conditions [to indemnification liability] would or might be relevant here").

### 7.  Tender Agreements

The Original TCC further submits that Debtor has not "proven the existence, let alone,

terms, of all of these claimed Tender Agreements.  Scant few are in the record." *Objection of*

*Original TCC* 70, ECF No. 142.  In response, Debtor counters that "this [argument] ignores that

the Debtor has provided a summary of all the Tender Agreements, produced exemplars of many

such agreements and also has common-law indemnification obligations to the Retailers."

*Debtor's Omnibus Reply* 24, ECF No. 146.  Moreover, this Court would be willing at a later date

to review continuance of the stay if a record exists establishing the lack of a Tender Agreement

or other contractual obligation.

### 8.  Res Judicata, Collateral Estoppel, and Evidentiary Prejudice

The Debtor additionally relies on the principles of res judicata, collateral estoppel, and

record taint in support of its Motion.  Specifically, Debtor contends that permitting continued

litigation against the Protected Parties "creates risks of binding the Debtor through res judicata

and collateral estoppel, and creating an evidentiary record that prejudices the Debtor." *Debtor's*

*Supp. Mem.* 44, ECF No. 128.  The Court agrees.

In *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 206 L.

Ed. 2d 893 (2020), the Supreme Court explained the doctrines of res judicata and collateral

estoppel.  "[I]ssue preclusion (sometimes called collateral estoppel) . . . precludes a party from

relitigating an issue actually decided in a prior case and necessary to the judgment." *Id.* at 1594

(citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L.Ed.2d 308 (1980)) (other citations

omitted).  Claim preclusion (or res judicata), on the other hand, "prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated." *Id; see also Beasley v. Howard*, 14 F.4th 226, 231–32 (3d Cir. 2021).

### a.  Collateral Estoppel

The Court will first address the doctrine of collateral estoppel.  In order for collateral estoppel to apply, the following four elements must be satisfied: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247–48 (3d Cir. 2010) (quoting *Szehinskyj v. Att'y Gen.*, 432 F.3d 253, 255 (3d Cir. 2005)). Collateral estoppel will also apply to a person who is not a formal party, to the extent such person also had "the opportunity to present proofs and argument" in the previous litigation. *Taylor*, 553 U.S. at 895 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 39, cmt. a (AM. L. INST. 1980)).

In the instant case, the Original TCC contends that Debtor's apprehension regarding potential use of collateral estoppel in future litigation is "misplaced." *Objection of Original TCC* 72, ECF No. 142.  The Original TCC argues that collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue in the earlier case. *Id.* (citing *Allen v. McCurry*, 449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980)).  Debtor will not be a party to continued litigation against the nondebtor defendants, thus, in the Original TCC's view, Debtor cannot be collaterally estopped from later

litigating any issue decided in those actions.  The Third Circuit explicitly cautioned against this type of logic in *In re W.R. Grace & Co.*, 115 F. App'x 565 (3d Cir. 2004).  In that case, a debtor sought extension of the automatic stay to a co-defendant and relied, in part, on the theory of collateral estoppel.  The plaintiff in *In re W.R. Grace* set forth the same theory that the Original TCC advances here: If the debtor is not a party to the litigation against the nondebtor, the debtor will not be collaterally estopped from later litigating those same issues in an action against it. The Third Circuit cautioned that this theory should not be tested at the debtor's peril because "[i]t is more supposition than certainty at this juncture." *Id.* at 569.  In a footnote, the Third Circuit explained that it believed the issue to be "at least unclear," and cited several cases where courts had determined that a debtor may be adversely affected by liability determinations or witness testimony in suits against nondebtors. *Id.* at 569 n.4 (citing *United Nat'l Ins. Co. v. Equip. Ins. Managers,* No. 95–CV–0116, 1997 WL 241152, at *11–13 (3d Cir. May 6, 1997); *In re American Film Technologies, Inc.,* 175 B.R. 847, 850 (Bankr. D. Del. 1994); *In re Johns– Manville Corp.,* 40 B.R. 219, 225 (S.D.N.Y. 1984) (discussing the potential effect that witness testimony could have on the debtor)).  Further, the Third Circuit observed that "the courts have never adopted the absence of collateral estoppel as the test for preventing actions from proceeding against third parties when the debtor is protected by the automatic stay.  Rather, courts employ a broader view of the potential impact on the debtor." *In re W.R. Grace & Co.*, 115 F. App'x at 570 (quoting *In re A.H. Robins Co.*, 828 F.2d at 1025) (explaining that a proper test for extension of the stay "is generally whether the litigation 'could interfere with the reorganization of the debtor' ")).

36

This Court sees no reason to deviate from the prudent course navigated by the Third Circuit in *In re W.R. Grace*. The possibility that collateral estoppel may not adversely impact Debtor in subsequent litigation does not outweigh the many reasons why extension of the stay is appropriate. The cases cited by the Original TCC are distinguishable and do not suggest otherwise. First, the Second Circuit in *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003) denied extension of the to a nondebtor where the basis for doing so was premised "solely" on the apprehension of later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision. Here, Debtor's basis for extending the stay is not bottomed "solely" on collateral estoppel concerns. This Court additionally notes that, in *Queenie*, the Second Circuit observed that the stay can apply to nondebtors if a claim against the nondebtor will have an immediate adverse economic consequence for the debtor's estate and did, in fact, extend the stay to a different entity because it was wholly-owned by the debtor, and adjudication of a claim against that nondebtor entity would have an immediate adverse economic impact on the debtor. *Id.* at 287-88 (citing *A.H. Robins Co. v. Piccinin,* 788 F.2d at 999 (4th Cir. 1986)) (other citations omitted). Thus, the holding *Queenie* does not support the Original TCC's position regarding collateral estoppel and, instead, further buttresses this Court's decision to extend the stay in light of the adverse economic impact of the continued litigation on Debtor.

Next, *Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v. Serv. Painting, Inc.*, No. CV 18-3480, 2019 WL 2143370 (E.D. Pa. May 16, 2019)—another case relied on by the Original TCC—is distinguishable. In that case, the court explained that "collateral estoppel concerns arise when the debtor owes an indemnification obligation to

the non-debtor," and the court declined to extend the stay because  the nondebtor had neither

argued nor offered evidence that the debtor owed him an indemnification obligation. *Id.* at *9.

Here, Debtor's indemnification obligations are clearly established.  Likewise, *In re MCSi, Inc.*,

371 B.R. 270 (S.D. Ohio 2004) offers the Original TCC no help.  In that case, third parties sought

to lift the stay as to certain nondebtor co-defendants who had previously been covered by the

stay by way court order.  The nondebtor co-defendants objected.  In its analysis, the *MCSi* court

acknowledged that proceedings against nondebtor co-defendants can be properly stayed if

certain "unusual circumstances" exist. *Id.* at 271 (citing *Parry v. Mohawk Motors of Michigan,

Inc.,* 236 F.3d 299, 314 (6th Cir.2000), *cert. denied,* 533 U.S. 951, 121 S. Ct. 2594, 150 L.Ed.2d

752 (2001); *A.H. Robins Company, Inc.*, 788 F.2d 994).  However, the *MCSi* court rejected each

and every basis for extending the stay and found no such "unusual circumstances" present.  Thus,

when addressing the nondebtors' concern regarding collateral estoppel, the court observed that—

although it was a valid concern—"this concern has never been the sole justification for extending

the stay as to such co-defendants." *Id.* at 275.  Further, a critical factor in the *MCSi* court's

analysis was that the debtor did not oppose lifting the stay as to those nondebtor co-defendants

and "its silence is deafening." *In re MCSi, Inc.*, 371 B.R. at 275.  In the present case, Debtor is

not silent and instead is explicitly requesting extension of the stay, and, again, collateral estoppel

is not its sole basis for doing so.

### b.   Res Judicata

Res judicata—or claim preclusion—precludes relitigation of claims that could have been

asserted and decided in a prior action.  It bars not only claims that were brought in a previous

action, but also claims that could have been brought. *Beasley v. Howard*, 14 F.4th 226, 231 (3d Cir. 2021); *Post v. Hartford Ins. Co.,* 501 F.3d 154, 169 (3d Cir. 2007). The Supreme Court has explained that "[i]f a later suit advances the same claim as an earlier suit between the same parties [or their privies], the earlier suit's judgment 'prevents litigation of all grounds for, **or defenses to**, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Lucky Brand Dungarees, Inc.*, 140 S. Ct. at 1594-95 (quoting *Brown v. Felsen*, 442 U.S. 127, 131, 99 S. Ct. 2205, 60 L.Ed.2d 767 (1979)) (emphasis added). A party seeking to invoke the res judicata doctrine must demonstrate that there has been "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Duhaney v. Att'y Gen. of the U.S.*, 621 F.3d 340, 347 (3d Cir. 2010) (citing *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008)); *see also Kenny v. Schrading*, No. 20-cv-15786 (MASDEA), 2021 WL 5495898, at *2 (D.N.J. Nov. 23, 2021).

Although Debtor cites to both collateral estoppel *and* res judicata in its submissions, the substantive argument it presents is focused entirely on collateral estoppel. The cases on which Debtor relies in support of its position likewise focus on the potential prejudicial effect of collateral estoppel, as opposed to res judicata.[9] Indeed, the parties' briefs devote very little

---

[9] *See, e.g.*, *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 512 (3d Cir. 1997) (no mention of res judicata); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1000 (4th Cir. 1986) (using term "res judicata" only once while quoting another case and providing no analysis of the doctrine); *In re Mallinckrodt Plc*, No. AP 20-50850-JTD, 2021 WL 523625, at *8 (D. Del. Feb. 11, 2021) (no mention of res judicata); *In re Bestwall LLC*, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-105-RJC, 2022 WL 68763 (W.D.N.C. Jan. 6, 2022) (mentioning the term "res judicata" but citing to case law that analyzed risk of prejudice based on collateral estoppel only); *In re W.R. Grace & Co.*, 386 B.R. 17, 24 (Bankr. D. Del. 2008) (no mention of res judicata); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850 (Bankr. D. Del. 1994) (discussing only doctrine of collateral estoppel); *In re Sudbury, Inc.*, 140 B.R. 461, 464 (Bankr. N.D. Ohio

attention to this doctrine, mentioning the term only a few times without development.  It appears

to this Court that parties in situations similar to Debtor—and courts addressing issues similar to

those facing this Court—reference both doctrines in the interest of completeness, but do not

adequately acknowledge their different applications or develop their arguments.   Nevertheless,

this Court acknowledges that res judicata "is an affirmative defense, and 'the party asserting [the

doctrine] bear[s] the burden of showing that it applies.' " *Edwards v. U.S. Dep't of H.U.D.*, 799

F. App'x 113, 114 (3d Cir. 2020) (quoting *United States v. Athlone Indus., Inc.*, 746 F.2d 977,

983 (3d Cir. 1984)).  It is, therefore, unnecessary for this Court to explore in detail the potential

preclusive effect of final judgment against the Protected Parties. *See, e.g. In re Harang*, No. 21-

8003, 2021 WL 6128992, at *5 (B.A.P. 6th Cir. Dec. 28, 2021) (noting that the preclusive effect

of a ruling is an "open question for another court in a collateral proceeding").  Rather, it suffices

to acknowledge that there *exists a risk* that the doctrine of res judicata could adversely impact

Debtor in future litigation.  This risk weighs in favor of extending the stay under § 362(a)(1).

*See In re W.R. Grace & Co.*, 115 F. App'x 565 (holding that risk of future preclusive

consequences was enough to weigh in favor of extending the stay).

### c.  Record Taint

Finally, Debtor asserts that continued litigation could create an evidentiary record that

would negatively impact subsequent litigation—a concept otherwise known as "record taint."  In

---

1992) (finding that extension of stay was warranted where debtor had legitimate indemnity and collateral estoppel
concerns and not discussing res judicata); *In re Johns-Manville Corp.*, 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983), *aff'd*,
40 B.R. 219 (S.D.N.Y. 1984), and *appeal allowed, decision vacated in part*, 41 B.R. 926 (S.D.N.Y. 1984) (using the
term "res judicata" only once without analysis and instead finding basis to extend stay where debtor "could be
collaterally estopped in subsequent suits from relitigating issues determined against its officers and directors").

deciding whether to extend the stay, the Third Circuit has considered the risk of record taint as part of its "broad[] view of the potential impact on the debtor." *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 569 n.4 (3d Cir. 2004) (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) and acknowledging a risk that the evidentiary record created in a case against a nondebtor could later be used in a case against the debtor); *In re Mallinckrodt PLC*, Adv. Pro. No. 20-50850-JTD, 2021 WL 5275781, at *2 (D. Del. Nov. 10, 2021) (denying leave to file interlocutory appeal of order extending preliminary injunction because bankruptcy court appropriately performed "unusual circumstances" test and held that continued proceedings created "significant risk" of, among other thing, record taint); *In re W.R. Grace & Co.*, 386 B.R. 17, 35 (Bankr. D. Del. 2008) ("Under this 'broader view of the potential impact on the debtor,' this court takes into account the risks of collateral estoppel and record taint."). The Original TCC acknowledges that the possibility of record taint has been cited as a basis for extension of the automatic stay. *See Objection of Original TCC* 73 n.34, ECF No. 142). Nevertheless, the Original TCC asserts that the factors supporting such a finding are not present in the instant case. The Court disagrees. Because the talc-related claims against the Debtor and the Protected Parties implicate the same product, the same time period, the same alleged defect and the same alleged harm, it is possible that the evidentiary record developed in continued litigation against the Protected Parties could prejudice Debtor—especially considering that Debtor would be absent from the continued litigation. As stated previously, the risk that litigation against the Protected Parties could result in adverse consequences for Debtor—such as record taint—weighs in favor of extending the automatic stay.

### D.  § 362(a)(3)

Debtor also looks to § 362(a)(3) as a basis for staying proceedings against the Protected

Parties.  Subsection (a)(3) of the statute directs a stay of any action against an entity from

obtaining possession of or exercising control over the property of the bankruptcy estate.  11

U.S.C. § 362(a)(3).  "It has long been the rule in this Circuit that insurance policies are considered

part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d

252, 260 (3d Cir. 2006) (collecting cases); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 148–

49 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*,

532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re*

*WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).

Here, Debtor states that "J&J and the Debtor are both covered for talc-related claims

under various shared insurance policies" and that "[t]he Retailers are named as insureds in many

such policies." *Debtor's Supp. Mem.* 45, ECF No. 128.  Thus, Debtor asserts that prosecution of

claims against J&J or the Retailers would deplete insurance proceeds available to Debtor, thereby

diminishing the bankruptcy estate.  The Original TCC concedes that insurance policies are estate

property.  Nevertheless, the Original TCC maintains that § 362(a)(3) does not apply because

"[e]ither no coverage exists or, if it does, it has been exhausted." *Objection of Original TCC* 76,

ECF No. 142.  With respect to the existence of coverage, the Original TCC points out that the

insurance carriers are currently disputing coverage.  In the Original TCC's view, it remains

uncertain whether Debtor is entitled to coverage which, in turn, casts doubt on whether actions

against co-insureds would actually deplete the policies and affect the bankruptcy estate.  The

Original TCC further argues that J&J and its affiliates have already exceeded the limits of coverage as the result of past litigation and exhausted any coverage to which Debtor may have been entitled. Thus, the Original TCC contends that continued litigation against the co-insureds would not affect estate property because there can be no further depletion of exhausted policies.

Ultimately, it is unquestionable that shared policies exist. Admittedly, certain coverage is disputed, and no definitive determination has been made as to exhaustion. However, these uncertainties do not change the fact that that the policies are estate property. *See In re W.R. Grace & Co.*, 475 B.R. at 81 (collecting cases). Moreover, as Debtor points out, and contrary to the Original TCC's assertions, the insurance policies have not yet been exhausted because "only payments made by the policyholder's insurers erode or exhaust the limits of the policies." *Omnibus Reply* 37, ECF No. 146. Although Old JJCI and J&J have incurred significant losses from the underlying talc claims, no agreement has been reached—nor has a court ruling been issued—regarding the allocation of those talc losses across the policy periods in question. Thus, nearly the entire policy coverage of $2 billion is potentially still available to Debtor and J&J.

Furthermore, that there are tens of thousands of talc-related actions pending with potential indemnity and that these claims far exceed the $2 billion policy limit are facts well-established in the record.[10] *See A.H. Robins Co.*, 788 F.2d at 1008 (4th Cir. 1986) ("That there are thousands of Dalkon Shield actions and claims pending is a fact established in the record and

---

[10] As detailed in Dr. Bell's expert report, at the time of filing, Debtor faced nearly 40,000 pending tort claims, with thousands of additional claims expected annually for decades to come. *Expert Report of Gregory K. Bell, Ph.D.* ("*Bell Report*") at 10. Additionally, as of the petition date, Debtor anticipated billions of dollars in talc-related liability and defense costs. *Id.* Indeed, in the first nine months of 2021, more than 12,300 new lawsuits were filed. *Id.*

the limited fund available under Robins' insurance policy is recognized in the record.").  To the extent suits are permitted to proceed against additional insureds, those parties will incur costs that will undoubtedly deplete the insurance potentially available to Debtor for the talc claims.

This Court acknowledges that that—prior to finding "related to" jurisdiction over a nondebtor for purposes of extending the stay under § 105(a)—the Third Circuit has instructed that a court must make factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 232 (3d Cir. 2004), *as amended* (Feb. 23, 2005).  As an initial matter, this Court presently is analyzing whether extension of the automatic stay is appropriate under § 362(a)(3) and, thus, is not yet invoking its equitable powers under § 105(a).  However, regardless of the basis for extension of the stay, the message from *In re Combustion* is that a court must make adequate factual findings before staying proceedings against nondebtor co-insureds on the theory that asbestos-related personal injury claims against the nondebtors will automatically deplete the insurance proceeds available to the debtor and, thus, reduce the assets available to the bankruptcy estate. *See id.*, 391 F.3d at 232–33 ("Courts finding 'related to' jurisdiction over claims against non-debtors based in part on shared insurance policies have relied not only on extensive record findings regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor."); *see also In re Imerys Talc Am., Inc.*, No. 19-MC-103 (MN), 2019 WL 3253366, at *5 (D. Del. July 19, 2019) ("Here, Johnson & Johnson also fails to offer a sufficient record that the terms and operation of the policies establish subject matter jurisdiction."); *Kleiner v. Rite Aid Corp.*, 604 B.R. 1, 8 (E.D. Pa. 2019) ("We, like our Court of Appeals in *In re*

44

*Combustion Engineering, Inc.*, lack a sufficiently developed record of the relevant policies. And

we decline to rest subject matter jurisdiction solely upon counsel's or a corporate representative's

say-so.").  Admittedly, the record in the instant case is not as sufficiently developed with respect

to the insurance policies as in some of the other cases that have extended the stay on this basis.

However, the existence of shared insurance coverage and tens of thousands of lawsuits that could

exhaust that coverage is established. *See Bell Report* at 10.  As an illustration of this point, while

the trial in this matter was ongoing, a group of insurers filed a motion (ECF No. 1491) seeking

relief from the automatic stay to proceed with litigation on the very issue of coverage in New

Jersey state court.  Moreover, this Court is mindful that the insurance policies are not Debtor's

sole basis for extension of the stay to the Protected Parties in the instant case.  Finally, the court

heeds the advice given by the Third Circuit in *In re W.R. Grace & Co.*, discussed *supra.* 115 F.

App'x 565 (3d Cir. 2004).  In that case, the Third Circuit cautioned that a party's theory that a

debtor would not be later adversely affected by collateral estoppel should not be tested at the

debtor's peril. *Id.* at 569.  Likewise, the Original TCC's theory that Debtor's insurance will not

be affected—because Debtor is not entitled to it or because it has already been exhausted—will

not be tested at Debtor's peril.  Just as the risk of future preclusive consequences to the debtor

in *W.R. Grace* was enough to weigh in favor of extending the stay, the chance that Debtor in this

case could later prevail with respect to its insurance coverage demands weighs in favor of

extending the stay.

### E.  § 105(a) Injunction

Pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C.

§ 105(a). "The issuance of an injunction under section 105(a) is governed by the standards

generally applicable to the issuance of injunctive relief in non-bankruptcy contexts." *In re*

*Philadelphia Newspapers, LLC*, 423 B.R. at 105. To qualify for injunctive relief, a litigant must

demonstrate a likelihood of success on the merits, that it will suffer irreparable harm if the

injunction is denied, that the granting of preliminary relief will not result in even greater harm

to the non-moving party and that the public interest favors such relief. *Kos Pharmaceuticals Inc.*

*v. Andrex Corp.*, 369 F.3d 700 (3d Cir. 2004); *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J.

2009) (citing *In re Phila. Newspapers, LLC*, 407 B.R. 606, 617 (E.D. Pa. 2009); *Tenafly Eruv*

*Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)). However, "[a] preliminary

injunction is an 'extraordinary remedy, which should be granted only in limited circumstances.'

" *Kos Pharm., Inc.,* 369 F.3d at 708 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*,

882 F.2d 797, 800 (3d Cir. 1989)). In determining whether a preliminary injunction is

appropriate, the Court considers the following factors:

> (1) whether the movant has shown a reasonable probability of success on the merits;
> (2) whether the movant will be irreparably injured by denial of the relief; (3)
> whether granting preliminary relief will result in even greater harm to the
> nonmoving party; and (4) whether granting the preliminary relief will be in the
> public interest.

*McTernan v. City of York, Pa.,* 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell,*

414 F.3d 474, 478 n.4 (3d Cir. 2005)). "In considering a request for an injunction, these four

factors are not weighed simultaneously against one another. Rather, the Court determines

whether the first two threshold prongs are established, and if so, only then does it proceed to

consider the third and fourth factors." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 106 n.11

(citing *Tenafly*, 309 F.3d at 157).

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's

ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D.

Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986)

(explaining reasonable likelihood of success in terms of a successful reorganization)).  Here—

although the success of Debtor's reorganization is speculative at this early stage—there is

nothing in the record to suggest that Debtor does *not* have a reasonable likelihood of

reorganization.  To the contrary, Debtor has explained its strategy for reorganization and has

already executed a Funding Agreement which will aid in the reorganization process.[11]

Moreover, to demonstrate a reasonable likelihood of success, a movant need only show the

prospect or possibility that he or she will succeed, and need not prove same with certainty.  *See*

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d

377 (3d Cir. 2013) (Jordan, J., dissenting) *rev'd and remanded sub nom. Burwell v. Hobby Lobby*

*Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (collecting cases).  Debtor

has met its burden here.  The Original TCC's arguments in opposition are equally speculative

---

[11] The Original TCC asserts that Debtor has not demonstrated that § 524(g) is available to it because the statute requires that, as of the Petition Date, the "debtor" must "be named as a defendant in [a] personal injury" lawsuit. *Objection of Original TCC* 85, ECF No. 142 (quoting 11 U.S.C. § 524(g)(2)((B)(i)(I).  Counsel for AWKO echoed this argument in closing statements on February 18, 2022.  In the Objecting Parties' view, the term "debtor" in the statutory provision refers to LTL, who the Objecting Parties assert was *not* named in any lawsuit.  Thus, the Objecting parties conclude that LTL cannot utilize § 524(g) and § 105(a) cannot be utilized to afford LTL a substantive right to which they are not entitled under the Code.  However, the Original TCC's position ignores the fact that LTL assumed the liabilities of Old JJCI—who *was* the named defendant in personal injury lawsuits—and that Old JJCI ceased to exist.  Thus, Debtor/LTL, as successor, is substituted under Fed. R. Civ. P. 25(c).  In any event, a successful plan in this case also can be bottomed on a trust established under § 105(a), apart from § 524(g).

and, in large part, are again rooted in its general objection to the bankruptcy for lack of good faith—an argument which this Court has rejected. *See Objection of Original TCC* 87, ECF No. 142.

As to the second factor, the Court determines that Debtor is likely to suffer irreparable injury without relief.  As previously explained, continued litigation will have an adverse impact on the bankruptcy estate, will hinder reorganization efforts, and will serve as a constant drain on resources and time.  In reaching this conclusion, the Court considers Debtor's liability as a result of the 2021 Corporate Restructuring, Debtor's contractual indemnification obligations, and the potential disruption that continued litigation against New JJCI and J&J could cause to funding of Debtor's trust. *See In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011) (affirming bankruptcy court's finding that debtor would suffer harm without preliminary injunction because, without "unfettered assistance," the debtor's "ability to reorganize is clearly diminished and [its] estate risks substantial harm if it is deprived of [nondebtor's] assistance in reorganizing").  For reasons previously discussed, the Original TCC's arguments in opposition are not persuasive.

The Court must next consider whether granting preliminary relief will result in even greater harm to the nonmoving party—here, the talc claimants.  For reasons expressed in the Opinion Denying the Motions to Dismiss, the Court concludes that the talc claimants will not be prejudiced through the issuance of a preliminary injunction, and will—in fact—benefit from the extension of the automatic stay to the Protected Parties and the handling of their claims through the bankruptcy process. This method of dealing with claims also protects the interests of future

48

claimants, prevents a race for proceeds, and promotes equality in distribution. In the state and district courts, talc claimants struggle with the sluggish pace of litigation and face a legitimate possibility that they will not succeed in proving their claims. Should a judgment be awarded, claimants must then endure the appellate process, where—at worst—their judgment is overturned, and—at best—recovery is delayed. Extension of the automatic stay to the Protected Parties, on the other hand, ensures that all claims are reconciled through a bankruptcy trust, which would place reduced evidentiary and causation burdens on claimants. Resolution of claims and payments to claimants can be achieved at a far more expeditious pace in bankruptcy than through uncertain litigation in the tort system. A trust would establish a far simpler and streamlined process than currently available in the tort system. Indeed, the Multi-District Litigation ("MDL") has been ongoing since 2016, with only a handful of bellwether trials on the horizon. This Court is mindful that—as Professor Maria Glover acknowledges in her *amici curiae* brief—there is no perfect solution to the problems with mass tort litigation: "But no mechanism for handling the thorny challenges of mass torts is perfect, including bankruptcy. Indeed, it is the nature of mass torts to present different combinations of challenges, and those challenges follow mass torts wherever they go." *Glover* Brief at 25. However, this Court cannot ignore the reality that MDL is not meeting the needs of the claimants. The number of settlements reached in the talc-related lawsuits is dwarfed by the projected 10,000 new cases to be filed each year going forward. *See Expert Report of Charles H. Mullin, Ph.D.* at 5. And although MDLs may be a useful device to facilitate settlements, the MDL in the instant case is far from a global resolution and is ill-equipped to provide for future claimants. In short, a preliminary injunction

will not result in greater harm to the talc claimants.  Instead, it will "remedy[] some of the intractable pathologies of asbestos litigation." *In re Federal-Mogul Glob., Inc.*, 684 F.3d at 362.

In this same vein, the Court finds that granting the preliminary injunction would be in the public interest.  The Original TCC argues that this bankruptcy serves no interests other than J&J's own.  The Court disagrees.  As detailed in this Court's Opinion Denying the Motions to Dismiss, this Court holds no doubts that claim resolution through the bankruptcy process is in the public interest.  First, as previously explained, a settlement trust benefits existing claimants—whose time is valuable and may be limited due to their illnesses—by streamlining the claim recovery process.  Additionally, a bankruptcy trust protects the needs of future talc claimants—a class of individuals who have not yet developed symptoms or initiated litigation.  These individuals will have very real injuries; however, their interests are largely unrepresented in the tort system.  As noted by the court in *In re Bestwall LLC*, "a section 524(g) trust will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims." 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019).  Through adopted procedures, these trusts establish fixed criteria and common parameters for payments to claimants, ensuring a level playing field for all present and future claimants while taking into consideration the significance of preserving all due process rights. *See In re W.R. Grace & Co.*, 729 F.3d 311, 324 (3d Cir. 2013) ("Therefore, as long as a court correctly determines that § 524(g)'s requirements are satisfied, present and future claims can be channeled to a § 524(g) trust without violating due process.").  Indeed, both present and future "claimant's interests are protected by the bankruptcy court's power to use future earnings to compensate

50

similarly situated tort claimants equitably." *In re Federal-Mogul Glob., Inc.*, 684 F.3d at 359.

The Original TCC asserts that "there is no logical stopping point to the Debtor's strategy." *Objection of Original TCC* 92, ECF No. 142. It posits that "any rich company facing liabilities could completely stymie them simply by allocating them to a new entity and putting the entity into bankruptcy." *Id.* at 92-93. This argument was repeated at trial and Counsel for TCC I cautioned that extending the stay would "open the floodgate" for other companies to spin their liabilities off into a new company and then send that new company into bankruptcy. This position ignores statutory requirements, existing case law, and the courts' role in overseeing bankruptcies. First, a company—like Debtor—must invoke, and comply with, a statutory authority when engaging in corporate restructuring. Here, Debtor utilized the Texas Business Organizations Code to effect its divisional merger. While other companies can also utilize this statute, or another like it, those other companies must likewise follow procedures and requirements set forth in those statutes. Accordingly, a "rich company's" ability to effectuate the type of divisive merger present in this case is not unchecked or unregulated. Similarly, a company's ability to file for bankruptcy and—more significantly—a company's ability to extend the automatic stay to an affiliate nondebtor company are subject to limitation. *See, e.g.*, *McCartney*, 106 F.3d 506 (noting that automatic stay can be extended to nonbankrupt codefendants where "unusual circumstances" exist); *Robins*, 788 F.2d 994 (same); *In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249, at *5 (D. Del. Sept. 27, 2019) (collecting cases stating same). Finally, to the extent a "rich company" seeks to enter the bankruptcy system in bad faith or without a valid reorganization purpose, the courts serve as

51

gatekeepers for this type of abusive practice.

Ultimately, this Court determines that all factors weigh in favor of Debtor's position. The Court determines that a preliminary injunction pursuant to § 105(a) that extends the stay to the Protected Parties is appropriate given the circumstances of this case.

### F. Public Policy

At the heart of the Objecting Parties' argument is the allegation that Debtor and J&J have unclean hands. The Original TCC alleges both entities have engaged in bad faith and wrongful conduct that has caused further insult and injury to already-suffering talc claimants. The Court makes no determinations as to Debtor's, Old JJCI's, or J&J's conduct in other proceedings. However, as to the case before it, this Court finds no ill-intent or reprehensible behavior. The allegations of bad faith are insufficient to preclude Debtor from utilizing the bankruptcy system to achieve the goals it seeks—goals which this Court believes will ensure justice for existing and future talc claimants.

The Original TCC urges this Court not to use this case to "set new precedent." *Objection of Original TCC* 51, ECF No. 142. However, as discussed in this Court's Opinion Denying the Motion to Dismiss, corporate transactions similar to the 2021 Corporate Restructuring were effectuated pre-bankruptcy filing in several other mass tort bankruptcies—even apart from the other similarly structured filings currently pending in the Western District of North Carolina.[12]

---

[12] *See, e.g.*, *In re Garlock Sealing Tech., LLC,* 10-31607 (Bankr. W.D.N.C. 2017); *In re Mid Valley, Inc.,* No. 03-25592 (Bankr. W.D.Pa. 2003); *In re Babcock & Wilcox Co.* No. 00-10992-10995 (Bankr. E.D. La, 2002).

The existence of those cases suggests that a ruling in favor of Debtor will not set entirely new precedent.

Moreover, the Court determines that the Original TCC's concerns regarding the consequences of a ruling in Debtor's favor are unfounded. The Original TCC characterizes a ruling in Debtor's favor as providing "a blueprint to transform the Bankruptcy Code into a tool for unbridled corporate greed and manipulation." *Objection of Original TCC* 3, ECF No. 142. As discussed in this Court's Opinion Denying the Motions to Dismiss, the Court does not share the Original TCC's outlook. Congress implemented § 524(g) and granted the bankruptcy court broad equitable powers under § 105(a) to serve a purpose under a specific set of circumstances. When companies can utilize that statute for their benefit and the benefit of existing and future claimants, they should be permitted to do so. Admittedly, the bankruptcy system—like the mass tort system, or any tool in the proverbial "toolbox"—is susceptible to abuse. However, this Court does not believe that mere potential for abuse requires removal of a tool from the toolbox. Instead, the potential for abuse demands stronger scrutiny. Thus, courts must conduct a fact-specific inquiry in each case and determine—among other things—whether an appropriate set of circumstances are present, whether an entity is in compliance with statutory regulations, whether a valid reorganization purpose exists, and whether innocent third parties will be unduly prejudiced. After considering those factors in the context of this case, the Court determines that extension of the automatic stay to the Protected Parties is warranted. Given that this determination is limited to the unique facts of the case presently before the Court, this ruling will not open the floodgates to an unchecked, unregulated, or inherently abusive method of addressing liability.

IV.    **Conclusion**

For the reasons set forth above, the Court concludes that "unusual circumstances" are present warranting an extension of the automatic stay to the Protected Parties under § 362(a)(1) and (3).  To the extent § 362(a) does not serve as an independent basis for extension of the stay to nondebtor parties, the Court determines that a preliminary injunction under § 105(a) extending the automatic stay is appropriate.  The Court, thus, grants Debtor's Motion and resolves the instant adversary proceeding in Debtor's favor.  However, the Court concludes that taking measures in smaller steps will ensure that the parties progress in good faith towards mediation and plan formation.  The Court will revisit continuation of the automatic stay and preliminary injunction in 120 days, on June 29, 2022, and similar periods thereafter.

The Court understands that all sides are pointing fingers and suggesting that their adversaries will take advantage of these shorter periods of review and will endeavor to "run out the clock."  Let's be clear, the only clock of import sits on the Court's desk in Chambers and shows 1,869 days until retirement.  The Court is confident that it can outlast either side's efforts to slow-walk the proceedings and will not countenance such conduct.

The Court will enter a form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: February 25, 2022