**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**OFFIT KURMAN, P.A.**
Paul J. Winterhalter, Esquire (006961986)
99 Wood Avenue South, Suite 302
Iselin, New Jersey 08830
Telephone:    (267) 338-1370
Facsimile:    (267) 338-1335
E-mail:        pwinterhalter@offitkurman.com

**KTBS LAW LLP**
Michael L. Tuchin, Esq. (*pro hac vice*)
Robert J. Pfister, Esq. (*pro hac vice*)
Samuel M. Kidder, Esq. (*pro hac vice*)
Nir Maoz, Esq. (*Pro Hac Vice*)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090
Email:        mtuchin@ktbslaw.com
                rpfister@ktbslaw.com
                skidder@ktbslaw.com
                nmaoz@ktbslaw.com

*Attorneys for Aylstock, Witkin, Kreis & Overholtz,
PLLC*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>                    Debtor. | Chapter 11<br><br>Case No.:  21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>                    Plaintiff,<br><br>v.<br>THOSE PARTIES LISTED ON APPENDIX A TO<br>COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>                    Defendants. | Adv. Proc. No.:  21-3032 (MBK) |

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**NOTICE OF MOTION OF AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC FOR
CERTIFICATION OF DIRECT APPEAL TO THE UNITED STATES COURT OF
<u>APPEALS FOR THE THIRD CIRCUIT</u>**

**PLEASE TAKE NOTICE** that Aylstock, Witkin, Kreis & Overholtz, PLLC

("<u>AWKO</u>"), on behalf of more than three thousand holders of talc claims, by and through its

counsel, shall move before the Honorable Michael B. Kaplan, Chief United States Bankruptcy

Judge for the District of New Jersey, on **March 30, 2022 at 10:00 a.m.**, or as soon as counsel

may be heard, at the United States Bankruptcy Court for the District of New Jersey, 402 East

State Street, Trenton, New Jersey 08608, for entry of an order granting the relief sought in the

*Motion of Aylstock, Witkin, Kreis & Overholtz, PLLC for Certification of Direct Appeal to the

United States Court of Appeals for the Third Circuit* (the "<u>Motion</u>").[2]

**PLEASE TAKE FURTHER NOTICE THAT** opposition to the relief requested and/or

cross-motions, if any, shall be filed with the Clerk of the Bankruptcy Court and served upon all

parties in interest at least seven (7) days before the hearing date of the Motion in accordance with

D.N.J. LBR 9013-2(a).

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed, the

Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief

requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that pursuant to D.N.J. LBR 9013-3(a), in the

event the Motion is contested, there is a duty to confer to determine whether a consent order may

be entered disposing of the Motion or to stipulate to the resolution of as many issues as possible.

---

[2] AWKO is filing the Motion in both the main bankruptcy case (No. 21-30589 (MBK)) (the "<u>Bankruptcy
Case</u>") and in the related adversary proceeding (No. 21-03032 (MBK)) (the "<u>Adversary Proceeding</u>").

**PLEASE TAKE FURTHER NOTICE** that in accordance with D.N.J. LBR 9013-3(e),

unless the Court authorizes otherwise prior to the hearing date hereof, no testimony shall be

taken at the hearing except by certification or affidavit.

DATED:  March 11, 2022                     Respectfully submitted,

                                           **OFFIT KURMAN, P.A.**

                                           /s/ Paul J. Winterhalter
                                           _____
                                           Paul J. Winterhalter
                                           99 Wood Avenue South, Suite 302
                                           Iselin, New Jersey 08830
                                           Telephone:    (267) 338-1370
                                           Facsimile:    (267) 338-1335
                                           E-mail:        pwinterhalter@offitkurman.com

                                           - and -

                                           **KTBS LAW LLP**
                                           Michael L. Tuchin (*pro hac vice*)
                                           Robert J. Pfister  (*pro hac vice*)
                                           Samuel M. Kidder (*pro hac vice*)
                                           Nir Maoz (*pro hac vice*)
                                           1801 Century Park East, 26th Floor
                                           Los Angeles, California 90067
                                           Telephone:    (310) 407-4000
                                           Facsimile:    (310) 407-9090
                                           Email:        mtuchin@ktbslaw.com
                                                         rpfister@ktbslaw.com
                                                         skidder@ktbslaw.com
                                                         nmaoz@ktbslaw.com

                                           *Attorneys for Aylstock, Witkin, Kreis & Overholtz, PLLC*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**OFFIT KURMAN, P.A.**
Paul J. Winterhalter, Esquire (006961986)
99 Wood Avenue South, Suite 302
Iselin, New Jersey 08830
Telephone:    (267) 338-1370
Facsimile:    (267) 338-1335
E-mail:        pwinterhalter@offitkurman.com

**KTBS LAW LLP**
Michael L. Tuchin, Esq. (*pro hac vice*)
Robert J. Pfister, Esq. (*pro hac vice*)
Samuel M. Kidder, Esq. (*pro hac vice*)
Nir Maoz, Esq. (*Pro Hac Vice*)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090
Email:        mtuchin@ktbslaw.com
              rpfister@ktbslaw.com
              skidder@ktbslaw.com
              nmaoz@ktbslaw.com

*Attorneys for Aylstock, Witkin, Kreis & Overholtz,
PLLC*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[3]<br><br>                       Debtor. | Chapter 11<br><br>Case No.:  21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>                       Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>                       Defendants. | Adv. Proc. No.:  21-3032 (MBK) |

---

[3] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**MOTION OF AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC FOR
CERTIFICATION OF DIRECT APPEAL TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT**

Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO") respectfully requests the entry

of an order certifying the *Order Denying Motions to Dismiss* [Docket No. 1603] (the "MTD

Order"), and *Order (I) Declaring that Automatic Stay Applies to Certain Actions Against Non-

Debtors and (II) Preliminarily Enjoining Certain Actions* [Docket No. 1635 & Adv. Docket No.

187] ("Stay Order," and together with the MTD Order, the "Orders"), for direct appeal to the

U.S. Court of Appeals for the Third Circuit pursuant to section 158(d)(2) of the Judicial Code.[4]

## I. INTRODUCTION

The statute authorizing direct appeals from bankruptcy courts to the Courts of Appeal

was enacted by Congress in 2005.  *See* Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005, Pub. L. No. 109–8, § 1233, 119 Stat. 23, 202–204 (April 20, 2005).  Its purpose is

to allow expeditious review of "appeals that raise controlling questions of law, concern matters

of public importance, and arise under circumstances where a prompt, determinative ruling might

avoid needless litigation." *Weber v. U.S.*, 484 F.3d 154, 158 (2d Cir. 2007).[5]  If the appeals from

these Orders do not satisfy these criteria, it is difficult to imagine what appeals might.

---

[4] Copies of the MTD Order and the related *Memorandum Opinion* [Docket No. 1572] (the "MTD Opinion"), entered on February 25, 2022, are attached hereto as **Exhibit A** and **Exhibit B**, respectively, and copies of the Stay Order and the related *Memorandum Opinion* [Adv. Docket No. 184] (the "Stay Opinion," and together with the MTD Opinion, the "Opinions"), entered on February 25, 2022, are attached hereto as **Exhibit C** and **Exhibit D**, respectively.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Opinions.

AWKO joins the certification motions filed by TCC 1 [Docket No. 1709] and TCC 2 [Docket No. 1654], as well as all other filed and to-be-filed motions for direct certification of the Orders and adopts and incorporates the arguments provided for therein to the extent consistent with this Motion.

[5] Specifically, the statutory criteria are "(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance; (ii) the judgment, order, or decree

*(footnote continued)*

The 110 pages of combined rulings issued by this Court in this multi-billion-dollar case go to the very core of the bankruptcy system and its relationship to the broader civil justice system, grappling with questions that "have been the subject of academic, judicial, and policy debates for years."  MTD Opinion at 13.  The Court's considered examination of these issues references or relies on at least 100 published cases and scholarly articles, scores of statutory provisions, and the overall structure and interrelationship of various portions of the Bankruptcy Code.[6]  Ultimately, the rulings reflect and explicate the basis for the Court's "strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case – ensuring a meaningful, timely, and equitable recovery."  *Id*. at 19.

Having carefully set out the reasoning justifying the result reached in the Orders, the Court observed that it has "no expectation that [its] decision will be the final word on the matters."  *Id*. at 13.  Indeed, the very next step contemplated in this case is a mediation effort in which the aim will be to secure an agreement with at least 75% of the tort creditors who have almost uniformly challenged the Debtor's right to use chapter 11 under these circumstances.  The best way for the parties "to undertake a sensible, pragmatic and reasonable approach to [those] negotiations," *id*. at 32, is to allow the parties to simultaneously pursue definitive appellate guidance.  The issues raised in these appeals are not going away; most if not all of them will resurface at confirmation.  The most efficient path forward is to use this earliest opportunity for appropriate appellate examination on a parallel track with the mediation.

---

involves a question of law requiring resolution of conflicting decisions; or (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken …."  28 U.S.C. § 158(d)(2)(A).

[6]  *See, e.g.*, MTD Opinion at 18 ("All Code sections are not equal in import or impact."); Stay Opinion at 8–12 (describing the split in authority concerning whether protection for non-debtors may be grounded solely in section 362 or whether it requires relief under section 105).

## II.  RELEVANT BACKGROUND

The Opinions correctly describe the creation of the Debtor as the vehicle by which the talc liabilities of the J&J enterprise were to be separately ferried into bankruptcy (leaving the balance of the enterprise and its creditors intact and unaffected by the bankruptcy), and the substitution of the Funding Agreement in place of the hard assets of the J&J enterprise as a source for talc creditors' recovery.  *See generally* MTD Opinion at 2–7; Stay Opinion at 3–4. The Court's Orders essentially validate this structure as a legitimate use of the Bankruptcy Code to address mass tort liabilities, and deploy the full arsenal of powers under the Code – including the automatic stay – in aid of the Debtor's efforts.

The effect of the Orders is to allow this chapter 11 case to proceed, which at this stage means that the J&J enterprise and its talc creditors will engage in mediation in an effort to determine whether a plan can be negotiated in accordance with Bankruptcy Code section 524(g). In the interim, the talc creditors are enjoined from pursuing their cases in the tort system, yet all other creditors of the J&J enterprise are being paid in full in the ordinary course.  The ultimate beneficiaries of this arrangement are those non-talc creditors and J&J, which under any scenario will maintain its equity stake in what has been termed "New JJCI."

AWKO, which represents more than three thousand holders of talc claims, joined other parties in interest in seeking dismissal of this case as a bad faith filing, *see* Docket No. 1003, and opposed the Debtor's request for injunctive and declaratory relief, *see* Adv. Docket No. 143. AWKO participated in the week-long bench trial on these matters, as well as months of discovery in advance of that trial.  Among other points, AWKO has argued that this chapter 11 case transgresses "'the legitimate scope of the bankruptcy laws,'" *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (quoting *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)), because it

serves to benefit and preserve J&J's equity to the detriment of talc creditors.[7] AWKO has also consistently argued that the automatic stay of Bankruptcy Code section 362(a) is not applicable to claims against J&J, and that no extension of that stay or imposition of any other relief under Bankruptcy Code section 105(a) is proper.[8] In addition, joining an argument first raised by other moving parties, AWKO contends that the ultimate relief being sought – an injunction under Bankruptcy Code section 524(g) – is unavailable as a matter of law because the Debtor does not meet one of the statute's specific prerequisites.[9]

On March 7, 2022, AWKO timely noticed its appeals of the Orders. *See* Docket No. 1651; Adv. Docket No. 189. AWKO now respectfully requests that this Court certify a direct appeal to the Third Circuit under section 158(d)(2) of the Judicial Code. In the interim, AWKO is ready, willing, and able to participate in the mediation process directed by this Court.

## III. ARGUMENT

### A.    The Orders are Ripe for Certification

As a threshold matter, the Court has raised the question of whether either or both of the Orders are "final" for purposes of appeal, and directed the parties to address that issue in their

---

[7]  *See, e.g.*, Feb. 14, 2022 Hr'g Tr. at 56:21–57:4 (arguing that J&J "elected this structure to opt themselves out of the ordinary rules of Chapter 11," including "[r]ules like the absolute priority rule," which "Colliers has called the organizing principle of the modern law of corporate reorganizations"); Feb. 17, 2022 Hr'g Tr. at 84:7–9 ("The trial … has laid very bare that this is all about protecting the J&J family of companies ….); *id.* at 85:17–86:5 (explaining how the absolute priority rule is "the cornerstone of reorganization … practice and theory in this country" and "not just a Chapter 11 confirmation issue under [section] 1129(b)" and observing that "this case is all about creating a mechanism to preserve and shield equity and the larger J&J enterprise and to the detriment of tort [creditors]").

[8]  *See* Bankr. Docket Nos. 103 (objection to Debtor's *ex parte* motion to schedule hearing on its motion to "enforce" the automatic stay), 346 (response to order to show cause regarding venue transfer) & 1003 (motion to dismiss case); *see also* Adv. Docket Nos. 45 (preliminary objection to Debtor's preliminary injunction motion) & 143 (objection to preliminary injunction motion).

[9]  *See* Feb. 18, 2022 Hr'g Tr. at 220:23–222:23 (discussing 11 U.S.C. § 524(g)(2)(B)(i)(I)).

5

certification briefing.  Although AWKO submits that both Orders are in fact final orders that are

immediately appealable to the District Court as of right (without a motion for leave to pursue an

interlocutory appeal), that question is ultimately academic because the Court's certification

authority extends both to final order and interlocutory orders.[10]

Specifically, section 158(d)(2) of the Judicial Code provides that "[t]he appropriate court

of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a)" if

the proper certification is made.  The first sentence of subsection (a), in turn, embraces

appeals from final judgments and orders (§ 158(a)(1)) and also appeals from interlocutory orders

(§§ 158(a)(2) & (3)).  Accordingly, a certification from this Court or the District Court will

provide the Third Circuit with jurisdiction over the Orders regardless of whether they are

interlocutory.  *Bullard*, 575 U.S. at 508; 1 COLLIER ON BANKRUPTCY ¶ 5.06 (16th ed. 2021); *see*

*also* Fed. R. Bankr. P. 8004(e) ("If leave to appeal an interlocutory order or decree is required

under 28 U.S.C. §158(a)(3), an authorization of a direct appeal by the court of appeals under 28

U.S.C. §158(d)(2) satisfies the requirement.").

---

[10] There does not appear to be any question as to the finality of the Stay Order, which completely resolves
the Adversary Proceeding in favor of the Debtor.  *See* Stay Order ¶¶ 1 ("[T]he Adversary Proceeding is
resolved in favor of the Debtor.") & 15 ("This Order shall be promptly filed in the Clerk of Court's
office and entered into the record, and, except as the Court may otherwise determine, it shall remain
effective for the period through and including 30 days after the effective date of a confirmed plan
of reorganization in the Chapter 11 Case that is no longer subject to appeal or discretionary
review.").  *See generally Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020).

The MTD Order is a final order because a line of binding Third Circuit precedent beginning with *In re
Brown*, 916 F.2d 120 (3d Cir. 1990), and continuing through *In re Klaas*, 858 F.3d 820 (3d Cir. 2017) –
which explicitly considered the Supreme Court's intervening decision in *Bullard v. Blue Hills Bank*,
575 U.S. 496 (2015) – provides that it is final.  It is true that at least one Third Circuit judge has
asserted that this line of authority ought to be reconsidered, *see In re American Capital Equipment,
LLC*, 296 F. App'x 270, 275 (3d Cir. 2008) (Jordan, J., concurring in the judgment), but even that judge
observed that only the *en banc* Third Circuit could reconsider the rule.

**B.      This is a Paradigm Case for Certification**

The certification procedure was enacted to facilitate Circuit-level review of "appeals that raise controlling questions of law, concern matters of public importance, and arise under circumstances where a prompt, determinative ruling might avoid needless litigation." *Weber*, 484 F.3d at 158.  The appeals at issue here amply satisfy that standard.[11]

*First*, the Orders turn on purely legal issues, not disputed factual findings.  The Court observed that "[f]rom the outset, J&J and the Debtor have been candid and transparent about employing Debtor's chapter 11 filing as a vehicle to address the company's growing talc-related liability …." MTD Opinion at 15.  Given that candor, there are few if any disputed facts that are relevant to the core legal issues presented by the Orders.  Whether the divisional merger strategy adopted by J&J here is an effective and efficient way to "globally resolve [tort liability] through a chapter 11 reorganization without subjecting the entire … enterprise to a bankruptcy proceeding," *id*. at 5 (internal quotation marks omitted), or whether it is "an obvious legal maneuver to impose an unfavorable settlement dynamic on [tort] victims," *id*. at 9 (internal quotation marks omitted), is at bottom a legal question – not a factual question.

The legal issues involved here are of a piece with the legal issues the Third Circuit confronted in cases such as *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999), and *In re 15375 Memorial Corp.*, 589 F.3d 605 (3d Cir. 2009) – all of which concern the fundamental purpose and proper scope of bankruptcy law.  *Cf. In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) (explaining that "[t]he term

---

[11] The statute is written in the disjunctive, such that the presence of even one basis for certification is sufficient.  *See Bullard*, 575 U.S. at 508 ("Unlike § 1292(b), which permits certification only when three enumerated factors suggesting importance are all present, § 158(d)(2) permits certification when any one of several such factors exists, a distinction that allows a broader range of interlocutory decisions to make their way to the courts of appeals.").

'good faith' is somewhat misleading," because the question is less about "the debtor's subjective intent" than it about whether the filing transgresses "several, distinct equitable limitations that courts have placed on Chapter 11 filings … to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws").

*Second*, the Orders involve matters of exceptional public importance and directly impact the lives of countless individuals.  The Court has noted "the attention this case is receiving from the public, media, government regulators, policy makers," MTD Opinion at 48, and is keenly aware of the sheer number of litigants involved – including "nearly 40,000 current claimants and undetermined future injured parties (and families)," *id*. at 31, and a "profitable global supplier of health, consumer products and pharmaceuticals that employs over 130,000 individuals … whose families are dependent upon continued successful operations."  *Id*. at 47.

Greater even than the number of people directly affected by the Court's Orders is the sheer breadth of the legal and policy issues involved.  If in fact "the establishment of a settlement trust within the bankruptcy system offers a preferred approach to best serve the interests of injured tort claimants and their families," *id*. at 52, and if in fact this result can be accomplished even without a "failing company" facing the specter of "a forced liquidation," *id*. at 47, then "maybe the [flood]gates indeed should be opened."  *Id*. at 52.  There are few legal questions of greater public importance than "whether there is available to the Debtor and the tort claimants a more beneficial and equitable path" than the traditional tort system.  *Id*. at 18–19.

*Finally*, "a prompt, determinative ruling" by the Third Circuit on these fundamental issues, *Weber*, 484 F.3d at 158, will "materially advance the progress" of this case.  28 U.S.C. § 158(d)(2)(A)(iii).  The next step in this case is mediation, and any consensual resolution "will require extraordinarily large contributions by the J&J corporate family, and likely insurers,

toward a settlement fund." MTD Opinion at 48. It will also require an extraordinary change in position by the tort claimants, as at least 75% approval will be required from a group that at present is at close to 0% approval (aside from a handful of Canadian litigants). *Id*. at 32. Facilitating expeditious appellate review – in tandem with mediation – will allow all sides to secure the definitive appellate guidance necessary to cement any resolution. "The sooner we get there, the better all around." *Id*. at 48.

Without exhaustively canvassing every appellate issue and sub-issue presented, the necessity and expediency of appellate review is demonstrated in particular by the statutory construction issue under Bankruptcy Code section 524(g)(2)(B)(i)(II), which the Court described as "a challenging and interesting issue." MTD Opinion at 28. That provision requires as a prerequisite for relief that, "at the time of entry of the order for relief," the Debtor must have "been named as a defendant" in asbestos-related litigation. In a typical asbestos-related bankruptcy case, that requirement will presumably have been met many times over, as a flood of litigation likely brought about the filing. Here, however, the unique structure of the divisional merger – in which the actual named defendant does not itself seek bankruptcy protection – means that this Debtor has never been named as a defendant in any litigation.

The Debtor responds to this statutory construction argument by pointing to Federal Rule of Civil Procedure 25(c) and claiming that it has been automatically substituted as a defendant as a matter of law. The Court's ruling notes this argument but does not adopt it, positing instead that "chapter 11 can still offer the opportunity to reach consensus on a global resolution of present and future claims without express resort to § 524(g)," MTD Opinion at 29 – which is presumably a reference to section 105(a). Appellants maintain, however, that neither response works. Under the Rules Enabling Act, a Federal Rule of Civil Procedure cannot "abridge,

enlarge or modify any substantive right," 28 U.S.C § 2072(b), and, in any event, Congress knew how to carefully differentiate between a debtor and its predecessor-in-interest, *cf.* 11 U.S.C. § 524(g)(4)(A)(iii), yet did not do so in section 524(g)(2)(B)(i)(II).  And the Third Circuit has clearly and unequivocally rejected the argument that section 105(a) can be used to "extend a channeling injunction … in an asbestos case where the requirements of § 524(g) have not been met."  *In re Combustion Engineering, Inc.*, 391 F.3d 190, 233–34 (3d Cir. 2004).

In short, what may appear at first blush to be a narrow dispute concerning an obscure statutory provision is in fact a potential logjam to any negotiated resolution.  The same is true of the other fundamental questions presented by the Orders – including whether the divisional merger construct is actually an effective circumvention of the fundamental absolute priority rule, insofar as it purports to preserve and advantage equity to the detriment of tort creditors, and whether it as actually lawful to shunt an enterprise's tort creditors into a special purpose vehicle for separate treatment while paying all of the enterprise's other creditors in full in the ordinary course.

These same issues are going to return at confirmation, regardless of whether there is a global settlement in a mediation or not.[12]  Why should "the J&J corporate family" commit to making an "extraordinarily large contribution[,]" MTD Opinion at 48, when there are unsettled issues as to whether the divisional merger strategy used here will actually be effective?  Worse, the risk of delay here is solely on the claimants, who have the most to lose if the parties spend months or even years in negotiations only to find out that the divisional merger strategy was

---

[12] *Cf.* 11 U.S.C. § 1129(a)(7) (guaranteeing to each non-accepting creditor – regardless of whether the class as a whole accepts the plan – that such non-accepting creditor "will receive or retain under the plan … not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date").

fatally flawed from the outset.  Multi-billion-dollar negotiations require sure legal footing – and sure legal footing will only come from definitive appellate guidance.  "The sooner we get there, the better all around."  *Id*. at 48.

## IV.  CONCLUSION

For the foregoing reasons, as well as those set forth in the certification requests filed by other appellants, AWKO respectfully requests that this Court certify a direct appeal to the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C § 158(d)(2).

DATED:  March 11, 2022                    Respectfully submitted,

**OFFIT KURMAN, P.A.**

/s/ Paul J. Winterhalter
_____
Paul J. Winterhalter
99 Wood Avenue South, Suite 302
Iselin, New Jersey 08830
Telephone:      (267) 338-1370
Facsimile:      (267) 338-1335
E-mail:         pwinterhalter@offitkurman.com

- and -

**KTBS LAW LLP**
Michael L. Tuchin (*pro hac vice*)
Robert J. Pfister  (*pro hac vice*)
Samuel M. Kidder (*pro hac vice*)
Nir Maoz (*pro hac vice*)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone:      (310) 407-4000
Facsimile:      (310) 407-9090
Email:          mtuchin@ktbslaw.com
                rpfister@ktbslaw.com
                skidder@ktbslaw.com
                nmaoz@ktbslaw.com

*Attorneys for Aylstock, Witkin, Kreis & Overholtz, PLLC*

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**Order Filed on March 2, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

| | |
|---|---|
| In Re: | Case No.: _____21-30589_____ |
| LTL MANAGEMENT LLC, | Chapter: _____11_____ |
| Debtor. | Hearing Date: _____February 14, 2022_____ |
| | Judge: _____Michael B. Kaplan_____ |

## ORDER DENYING MOTIONS TO DISMISS

The relief set forth on the following pages, numbered two (2) through
_____2_____ is **ORDERED**.

..........

**DATED: March 2, 2022**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**THIS MATTER** comes before the Court upon motions filed by the Official Committee of Talc Claimants  (ECF No. 632) and the law firm of Arnold & Itkin, LLP, on behalf of certain talc personal injury claimants (ECF No. 766), seeking an order of the Court dismissing the within bankruptcy proceeding pursuant to § 1112(b) as not having been filed in good faith; And the Court having considered fully the submissions of the parties and the argument of counsel the week of February 14, 2022 - February 18, 2022; and for good cause; IT IS HEREBY

**ORDERED** that the Motions (ECF Nos. 632 and 766) are DENIED in their entirety for reasons set forth in the accompanying opinion on the docket (ECF No. 1572).

# Exhibit B

FOR PUBLICATION

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

In re:

LTL MANAGEMENT, LLC,

                Debtor.

</td><td>

Case No. 21-30589 (MBK)

Chapter 11

Hearing Date: February 14-18, 2022

Judge:  Michael B. Kaplan,
          Chief Judge

</td></tr>
</table>

*All Counsel of Record*

## MEMORANDUM OPINION

This matter comes before the Court upon motions (collectively, "Motions") filed by the Official Committee of Talc Claimants[1] (ECF No. 632) and the law firm of Arnold & Itkin, LLP, on behalf of certain talc personal injury claimants (ECF No. 766) (together, "Movants" or "Claimants"),[2] seeking an order of the Court dismissing the within bankruptcy proceeding

---

[1] On November 8, 2021, prior to transferring venue of the Case to this Court, the United States Bankruptcy Court for the Western District of North Carolina entered an order appointing the Official Committee of Talc Claimants (the "Original TCC") (ECF No. 355). On December 23, 2021, subsequent to the filing of the Motions, the United States Trustee for Region 3 docketed a Notice of the United States Trustee's Filing of Reconstituted and Amended: (i) Notice of Appointment of Official Committee of Talc Claimants I; and (ii) Notice of Appointment of Official Committee of Talc Claimants II (ECF No. 965) ("Amended Notice"). The Amended Notice effectively divided the membership of the Original TCC into two committees—the Official Committee of Talc Claimants I ("TCC I"), consisting of ovarian cancer claimants, and the Official Committee of Talc Claimants II ("TCC II"), consisting of mesothelioma claimants— and appointed additional members to each such committee. Each committee has expressed support for the within Motions. At a hearing held on January 20, 2022, this Court granted the motions filed by Debtor and the law firm of Arnold & Itkin, LLP, challenging the validity of the Amended Notice, and struck the Amended Notice, effectively reinstating the Original TCC.

[2] A separate motion and joinder to the Motions has been filed on behalf of Aylstock, Witkin, Kreis & Overholtz, PLLC, ("AWKO") (ECF No. 1003), as well as a joinder by the Barnes Law Group (ECF No. 1092). In addition, three *amici curie* briefs have been filed on behalf of Certain Bankruptcy Law Professors (ECF No. 1384), on behalf of Complex Litigation and Mass Torts Professors (ECF No. 1410), and on behalf of Erwin Chemerinsky, who is Dean of the University of California, Berkeley School of Law (ECF No. 1396). At the hearing held on February 17, 2022, the United States Trustee read a statement into the record supporting either dismissal of the case or the appointment of a chapter 11 trustee. Besides Debtor's objection to the Motions, the Court has also reviewed the Canadian Class

pursuant to § 1112(b) as not having been filed in good faith. For the reasons expressed below, the

Court denies the Motions in their entirety. The Court issues the following findings of fact and

conclusions of law as required by FED. R. BANKR. P. 7052.[3]  The Court has jurisdiction over this

contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United

States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy

cases to the Bankruptcy Court. This matter is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2)(A). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## I.    Background & Procedural History

On October 14, 2021, LTL Management, LLC ("LTL" or "Debtor") filed a voluntary

petition for chapter 11 relief (ECF No. 1) in the United States Bankruptcy Court for the Western

District of North Carolina (the "North Carolina Bankruptcy Court"). LTL is an indirect subsidiary

of Johnson & Johnson ("J&J") and traces its roots back to Johnson & Johnson Baby Products,

Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly-owned

subsidiary of J&J. *See Declaration of John K. Kim in Support of First Day Pleadings* ("*Kim Decl.*")

¶¶ 9-10, ECF No. 5. J&J, a New Jersey company incorporated in 1887, first began selling

JOHNSON'S® Baby Powder ("Johnson's Baby Powder") in 1894, launching its baby care line of

products. *Id*. at ¶¶ 10-14. In 1972, J&J established a formal operating division for its baby products

business, including Johnson's Baby Powder. *Id.* In 1979, J&J executed a transaction (the "1979

---

Action Plaintiffs' Opposition to Motions to Dismiss Chapter 11 Case (ECF No. 1432) (the "Canadian Plaintiffs' Opposition").

[3] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Agreement") transferring all assets associated with the Baby Products division to J&J Baby Products. *Id.* In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division. *Id.* J&J no longer manufactured or sold baby products, such as Johnson's Baby Powder after this transaction. *Id.* Today, J&J is a global company primarily focused on products relating to human health and wellbeing. *See Expert Report of Saul E. Burian, Ph.D., ("Burian Report")* at 25. J&J is composed of three business segments, including Consumer Health, Pharmaceutical, and Medical Devices. *Id.*

Prior or to October 12, 2021, one of J&J's corporate subsidiaries was Johnson & Johnson Consumer Inc. ("Old JJCI"). *See Kim Decl.* ¶¶ 10-14, ECF No. 5. As the result of a series of intercompany transactions, Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing Johnson's Baby Powder caused ovarian cancer and mesothelioma. *Id.* at ¶¶ 15, 32. In the talc lawsuits, claimants contend generally that multiple scientific studies have repeatedly found (i) that samples of Johnson's Baby Powder contain amphibole asbestos and fibrous talc; (ii) that perineal or genital application of talcum powder increases the risk of and can cause ovarian cancer; and (iii) that exposure to asbestos-contaminated talcum powders can cause mesothelioma. *Original TCC's Motion to Dismiss* ¶ 16, ECF No. 632. Despite this product being sold since 1894, prior to 2010, there were a limited number of isolated cases involving cosmetic talc filed against Old JJCI and J&J, asserting a range of claims including talcosis, mesothelioma, dermatitis, and rashes. *Kim Decl.* ¶ 34, ECF No. 5. Litigation escalated after the 2013 trial *Deane Berg v. J&J,* wherein plaintiff alleged she had developed ovarian cancer as a result of genital exposure to Old JJCI's talc-based product. *Id.* at ¶ 35. The jury found for the plaintiff but awarded no damages. Following that

verdict, over thirteen hundred ovarian cancer lawsuits were filed against Old JJCI and J&J by the end of 2015. *Id.* Since 2016, talc-related lawsuits have grown to over 38,000 cases. *Burian Report* at 35. In May 2020, Old JJCI announced their discontinuation of talc-based baby powder in the United States and Canada. *Expert Report of Gregory K. Bell, Ph.D.* ("*Bell Report*") ¶ 17. Debtor contends that from January 2020 to today, the company has been served on average with one or more ovarian cancer complaint every hour of every day, every single day of the week. *Debtor's Informational Brief* 125, ECF No. 3. The $4.69 billion verdict reached in the *Ingham* case[4] (the total award was reduced on appeal to $2.25 billion) certainly raised the stakes for all concerned.

The increase in talc-related litigation imposed a financial burden on Old JJCI. In the seven quarters of operations preceding the bankruptcy filing, the talc litigation led to financial statement charges totaling $5.6 billion and cash payments totaling $3.6 billion. *Bell Report* at ¶ 8. Talc litigation charges—otherwise referred to as "probable costs"—accounted for 51 percent of sales, and the talc litigation payments—or costs previously paid—accounted for 122 percent of the pre-tax cashflows estimated to be generated by operations. *Id.* Old JJCI's income before tax for the business segment dropped from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020. *Id.* Much of the reverse in profits, of course, were attributable to the *Ingham* charge and payment.

On October 12, 2021, Old JJCI engaged in a series of transactions (the "2021 Corporate Restructuring") through which it ceased to exist, and two new companies, LTL and Johnson & Johnson Consumer Inc. ("New JJCI"), ultimately were formed. *Kim Decl.* ¶¶ 16, 22-23, ECF No.

---

[4] *Robert Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *reh'g and/or transfer denied* (July 28, 2020), *transfer denied* (Nov. 3, 2020), *cert. denied*, 141 S. Ct. 2716, 210 L. Ed. 2d 879 (2021).

5. The labyrinthine progression toward the creation of Debtor is somewhat overwhelming. First, Old JJCI's then-direct parent, Janssen Pharmaceuticals, Inc., organized Currahee Holding Company Inc. ("Currahee") to become the new direct parent of Old JJCI. Currahee organized Chenango Zero LLC, a Texas limited liability company, as its wholly-owned subsidiary. After this, Old JJCI merged with Chenango Zero LLC, leaving Chenango Zero LLC as the surviving entity. A funding agreement, as discussed below, was agreed to by J&J and Currahee as payors and Chenango Zero LLC as payee. Using the Texas Business Organizations Code, Chenango Zero (Old JJCI) effected a divisional merger where Old JJCI was dismantled, leaving two new Texas limited liability companies—Chenango One LLC and Chenango Two LLC—to divide all the assets and liabilities of Old JJCI. Chenango Two LLC merged with and into Currahee. As the surviving entity, Currahee then changed its name to Johnson and Johnson Consumer Inc. ("New JJCI"). Chenango One LLC converted from a Texas limited liability company into a North Carolina limited liability company and changed its name to LTL Management, LLC. *Id*. at ¶¶ 22-23.

The supposed purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Id*. at ¶ 21. As a result of the 2021 Corporate Restructuring, LTL assumed responsibility for Old JJCI's talc-related liabilities. *Id*. at ¶¶ 16, 24. Through the restructuring, LTL also received Old JJCI's rights under a funding agreement (the "Funding Agreement"). *Id*. at ¶ 24. Under the Funding Agreement, J&J and New JJCI, on a joint and several basis, are obligated to

pay "any and all costs and expenses" up to the value of New JJCI[5] excluding the talc liability that

LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case"

to the extent necessary. *Funding Agreement* 6, *Annex 2 to Kim Decl.* ECF No. 5. In addition, the

Funding Agreement obligates New JJCI and J&J to fund amounts necessary:

> (a) to satisfy the Debtor's talc-related liabilities at any time when there is no
> bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding
> for a trust, in both situations to the extent that any cash distributions received by
> the Debtor from Royalty A&M are insufficient to pay such costs and expenses and
> further, in the case of the funding of a trust, the Debtor's other assets are insufficient
> to provide that funding.

*Id.* at ¶ 27. Debtor has no repayment obligation as the Funding Agreement does not establish a

loan. *Id.*

The 2021 Corporate Restructuring also lays out Debtor as the direct parent of a North

Carolina limited liability company, Royalty A&M LLC ("Royalty A&M"), which owns a portfolio

of royalty revenue streams, including royalty revenue streams based on third-party sales of

LACTAID®, MYLANTA® / MYLICON® and ROGAINE® products. *Burian Report* at 15.

Debtor asserts that it intends to review royalty monetization opportunities in the healthcare

industry and grow its business by reinvesting the income from these existing royalty revenue

streams into both the acquisition of additional external royalty revenue streams, as well as

financings to third parties secured by similar royalty streams. *Kim Decl.* ¶ 18. On October 11,

2021, Old JJCI organized Royalty A&M as a direct subsidiary of LTL and—in exchange for full

---

[5] As explained at trial by Debtor's Counsel, the "floor" of the Funding Agreement is the value of Old JJCI at the time
of the merger, minus the talc liability. The value of the Funding Agreement increases, however, as the value of New
JJCI post-transaction increases.

ownership of Royalty A&M's equity—contributed $367.1 million. *Id*. at ¶ 22. Subsequently, Royalty A&M used those funds to acquire certain royalty streams from Old JJCI and certain of its affiliates. *Id*. Debtor estimates that the fair market value of its interest in Royalty A&M was approximately $367.1 million as of the petition date. Together with the $6 million in cash it received for its bank account after the merger, Debtor's value is approximately $373.1 million, not including the Funding Agreement with New JJCI and J&J. *Id*. at ¶ 26. Thereafter, on October 14, 2021, LTL filed a voluntary petition for chapter 11 relief in the North Carolina Bankruptcy Court.

On December 1, 2021, the Original TCC filed a motion to dismiss Debtor's chapter 11 bankruptcy case with prejudice pursuant to § 1112(b) of the Bankruptcy Code (ECF No. 632). Shortly thereafter, the law firm of Arnold & Itkin LLP ("A&I") filed its own motion (ECF No. 766) also seeking dismissal of Debtor's case. Debtor filed opposition to the Motions (ECF No. 956). Two law firms representing talc claimants filed joinders to the Motions (ECF Nos. 1003 and 1092). A&I, TCC I, and TCC II (collectively, the "Movants") filed separate replies (ECF Nos. 1354, 1357 and 1358, respectively). The Canadian Class Action Plaintiffs opposed the Motions (ECF No. 1432). The Court approved a briefing schedule that allowed for the filing of sur-replies by Debtor and Movants (ECF Nos. 1444 and 1457, respectively). On February 14, 2022, the Court commenced a five-day trial to address the Motions and the related Preliminary Injunction Motion in the pending Adversary Proceeding (ECF No. 2 in Adv. Pro. No. 21-03032). Both sides made oral argument and introduced fact and expert witnesses. Specifically, the Court considered testimony from the following fact witnesses:

- John H. Kim, Chief Legal Officer of LTL Management LLC
- Adam Lisman, Vice President and Assistant Corporate Controller of Johnson & Johnson

- Thibaut Mongon, Executive Vice President and Worldwide Chair of Johnson & Johnson Consumer Health
- Michelle Ryan, former Treasurer of Johnson & Johnson (via recorded deposition testimony)
- Michelle Wang Goodridge, President of U.S. Self-Care with Johnson & Johnson Consumer Health and President of Johnson & Johnson Consumer Inc.
- Robert O. Wuesthoff, President of LTL Management, LLC and President of Royalty A&M LLC

The Court also heard testimony from five expert witnesses including:

- Gregory K. Bell, PhD, Group Vice President of Charles River Associates for Debtor
- John R. Castellano, Managing Director at Alix Partners for Debtor
- Charles H. Mullin, PhD, Managing Partner at Bates White Economic Consulting for Debtor
- Saul E. Burian, Managing Director at Houlihan Lokey for Movants
- Matthew Diaz, Senior Managing Director at FTI Consulting, Inc. for Movants

To the extent the Court finds the expert testimony helpful, reference has been made in this opinion to the applicable report or testimony. In rendering its decision, the Court also has reviewed declarations submitted by Rebecca J. Love, D.D.S., a member of TCC I, and Kristie Doyle, a member of the TCC II. Finally, the Court has considered brief statements offered by the United States Trustee and counsel for the Canadian Class Action Plaintiffs on the final day of trial, February 18, 2022.

## II. Discussion

### A. Overview

By way of brief overview, the Movants and other talc claimants, in their own words, view their tasks as a moral and legal imperative to vigorously oppose the efforts of **both** J&J and Old JJCI to utilize the bankruptcy system as a litigation tactic to address their talc-related litigation liabilities through this Debtor. Movants point to the fact that LTL was created within hours before the chapter 11 filing, as a special purpose vehicle, with the stated purpose of filing chapter 11 to

employ the bankruptcy's automatic stay and asbestos resolution schemes for the benefit of its solvent operating parent and affiliated entities, as well as certain third parties ("Protected Parties"), without such entities filing for chapter 11.[6] Movants further note that Debtor has no business purpose, no employees apart from those seconded by J&J, and that LTL's board, management and employees all work for J&J and owe 100% fealty to J&J. Movants assert that Debtor has no trade creditors, lenders, bondholders, customers, suppliers, vendors, landlords, tax creditors, etc., and, in general, the chapter 11 process offers nothing of value to this estate and its creditors. Moreover, Movants contend that Debtor's creation through the pre-petition restructuring mechanism—the divisional merger under the Texas Business Corporation Act widely referred to as the "Texas Two-Step" ("2021 Corporate Restructuring")—was intended to force talc claimants to face delay and to secure a "bankruptcy discount"; in Movants' words, "an obvious legal maneuver to impose an unfavorable settlement dynamic on talc victims." *TCC I Reply Mem*. 3, ECF No. 1357.

Not unexpectedly, Debtor takes a far more positive view of the chapter 11 foundation and its purposes: to produce an equitable resolution of both current and future talc claims by means of a settlement trust, established pursuant to § 105 or § 524(g), that can promptly, efficiently, and fairly compensate claimants. Indeed, from the very outset of the case, Debtor acknowledges through John Kim's First Day Declaration that the 2021 Corporate Restructuring was implemented to enable Debtor to fully resolve talc-related claims though a chapter 11 reorganization, without subjecting the entire enterprise to a bankruptcy proceeding. Debtor makes no effort to conceal its

---

[6] In the Committees' words, the bankruptcy lacks a proper purpose because LTL is a "dummy" corporation with "no business, no operations, no employees, no funded debt," limited "assets," and no need for a "fresh start." *Comm. Mot.* ¶¶ 4-5, 41, ECF No. 632.

9

reservations regarding redress through the tort system, which Debtor views as creating inefficiencies, inequities, and delay. Debtor characterizes the jury system as a lottery in which a few plaintiffs have obtained recoveries ranging from tens of millions to multiple billions in dollars, while others have been denied recoveries completely. Unsurprisingly, Debtor also disputes the negative portrayal of the intent and impact of the restructuring, noting that neither Debtor, nor any of its affiliated entities have escaped liability and also emphasizing that all of the assets and funding sources extant pre-restructuring, remain available through this proceeding. Debtor highlights that the Funding Agreement, which provides funding up to at least the fair market value of Old JJCI (pegged by Debtor's management at approximately $60 billion) serves to eliminate any prejudice to creditors and overcome fraudulent transfer challenges.

### B.  Applicable Legal Standard

The Third Circuit has held that "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith." *In re SGL Carbon Corp*., 200 F.3d 154, 162 (3d Cir. 1999). At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy:

> [A good faith standard] furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement [sic] of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .

*SGL Carbon*, 200 F.3d at 161–62 (quoting *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986)); *see also Carolin Corp.*

*v. Miller,* 886 F.2d 693, 698 (4th Cir. 1989) (holding that the good faith requirement is "indispensable to proper accomplishment of the basic purposes of Chapter 11 protection"). Once the movant establishes that there is an issue regarding good faith,[7] the debtor bears the burden of proving that a petition was filed in good faith. *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004); *In re GVS Portfolio I B, LLC*, No. 21-10690 (CSS), 2021 WL 2285285, at *5 (Bankr. D. Del. June 4, 2021) (quoting *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 208 (3d Cir. 2000) ("[O]nce a debtor's good faith is appropriately put at issue, it is the burden of the debtor to produce evidence of good faith.")); *In re Cloudeeva, Inc.*, No. 14-24874, 2014 WL 6461514, at *4 (Bankr. D.N.J. Nov. 18, 2014). The debtor bears the burden of proving good faith by a preponderance of the evidence. *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 761 (Bankr. E.D. Pa. 2020).

The good faith inquiry is based on "'the totality of facts and circumstances.'" *In re Integrated Telecom*, 384 F.3d at 118 (quoting *In re SGL Carbon*, 200 F.3d at 162). In determining whether a chapter 11 petition was filed in good faith, the court must undertake a "fact intensive inquiry" to determine where the petition "falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.*; *see also Perlin v. Hitachi Cap. Am. Corp.*, 497 F.3d 364,

---

[7] Debtor contends that a movant must first establish a *prima facie* case of "bad faith" before the burden shifts to the Debtor and cites to *In re Walden Ridge Dev. LLC*, 292 B.R. 58, 62 (Bankr. D. N.J. 2003). While this case, and others in fact so hold, this line of cases traces this proposition all the way back to *Matter of Century City, Inc.*, 8 B.R. 25 (Bankr. D.N.J. 1980), in which Judge DeVito simply noted that unlike chapter X of the Bankruptcy Act of 1898, the Bankruptcy Code does not explicitly require filings to be undertaken in good faith, and thus required the movant to make a *prima facie* showing of lack of good faith. The bulk of the case law in this Circuit has evolved in the past 42 years without employing this *prima facie* showing requirement. Notwithstanding, even if the Court were to do so, Movants have raised the issue of Debtor's good faith sufficiently to shift the burden upon Debtor. *See In re Mottilla*, 306 B.R. 782, 789 (Bankr. M.D. Pa. 2004) ("After scrutinizing the *Tamecki* decision, I can only conclude that the Circuit requires a movant to produce relatively little evidence to place a debtor's good faith at issue.").

372 (3d Cir. 2007). The focus of the inquiry is whether the petitioner sought "to achieve objectives outside the legitimate scope of the bankruptcy laws." *In re SGL Carbon Corp*., 200 F.3d at 165 (internal quotations omitted). The question of a debtor's good faith "depends on an amalgam of factors and not upon a specific fact." *Id.* (quoting *Idaho Dep't of Lands v. Arnold* (*In re Arnold*), 806 F.2d 937, 939 (9th Cir. 1986)). "[T]he courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd*.), 849 F.2d 1393, 1394 (11th Cir. 1988) (quoting *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984)); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 297–98 (Bankr. D. Del. 2011); *see also In re Schaffer*, 597 B.R. 777, 791 (Bankr. E.D. Pa. 2019), *aff'd sub nom. Matter of Schaffer*, 606 B.R. 228 (E.D. Pa. 2019), *aff'd sub nom. In re Schaffer*, No. 19-3664, 2020 WL 2529371 (3d Cir. Jan. 24, 2020).

All parties acknowledge that the general focus must be "(1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) (citing *In re SGL Carbon*, 200 F.3d 154,165 (3d Cir. 1995)). "[T]he 'good faith' filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings . . . to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." *SGL Carbon,* 200 F.3d at 165 (quoting *In re Marsch,* 36 F.3d 825, 828 (9th Cir. 1994)). In evaluating the legitimacy of Debtor's bankruptcy filing, this Court must also examine a far more significant issue: which judicial system—the state/federal court trial system,

12

or a trust vehicle established under a chapter 11 reorganization plan structured and approved by the United States Bankruptcy Court—serves best the interests of this bankruptcy estate, comprised primarily of present and future tort claimants with serious financial and physical injuries.[8] It goes without saying that this and related inquiries have been the subject of academic, judicial, and policy debates for years. In ruling today, however, this Court considers only the facts and applicable law relevant to this case, and this case only, and there is no expectation that this decision will be the final word on the matters.

As will be discussed below, the Court is unwilling to dismiss this case as a bad faith filing. The Court employs the standards cited above and followed by other courts within the Third Circuit. On aside, the Court acknowledges there is a much more stringent standard for dismissal of a case for lacking good faith in the Fourth Circuit, which would have governed a decision by Judge Whitley in North Carolina. The Court cannot help but ponder how a bankruptcy filing, which took place in North Carolina and most likely satisfied the good faith standards under the applicable law in that jurisdiction, suddenly morphs post-petition into a bad faith filing simply because the case travels 400 miles up I-95 to Trenton, New Jersey. Notwithstanding, the Court rules today that the chapter 11 filing also satisfies the standards this Court must apply under Third Circuit precedent.

---

[8] While Movants may take issue with the Court's decision to assess the merits of the competing judicial systems as part of the totality of circumstances underlying the chapter 11 filing, these issues are likewise relevant as to whether § 1112(b)(2) provides an alternative to dismissal. "[E]ven if 'cause' exists, § 1112(b)(2) precludes dismissal or conversion if 'unusual circumstances' exist such that that conversion or dismissal of the case is not in the best interests of the creditors or the bankruptcy estate and there is a reasonable likelihood that a chapter 11 plan will be confirmed within either a reasonable time or applicable statutory deadlines." *In re: 1121 Pier Village LLC, et al.*, No. 21-11466 (ELF), 2022 WL 102622 (Bankr. E.D. Pa. Jan. 11, 2022). As discussed *infra,* the Court finds that Debtor has pursued the chapter 11 filing in good faith. Even if this were not the case, the Court holds that the interests of current tort creditors and the absence of viable protections for future tort claimants outside of bankruptcy would constitute such "unusual circumstances" as to preclude either dismissal or conversion of the case.

1.  **Valid Bankruptcy Purpose Underlying LTL Management LLC's Decision to File Chapter 11**

To be filed in good faith, a chapter 11 petition must be supported by "a valid reorganizational purpose." *In re SGL Carbon*, 200 F.3d at 165–66. When a company "seek[s] the protections of bankruptcy when faced with pending litigation that pose[s] a serious threat to [a] compan[y's] long term viability," a valid reorganizational purpose exists only if the company is experiencing "serious financial and/or managerial difficulties at the time of filing . . . to establish the good faith of its present petition." *In re SGL Carbon*, 200 F.3d at 164. As the Supreme Court has explained, the two main functions of the bankruptcy law are (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *In re Integrated Telecom Express, Inc.*, 384 F.3d 119 (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453, 119 S. Ct. 1411, 143 L.Ed.2d 607 (1999)). "If **neither** of these purposes can be demonstrated, the petition will be dismissed." *In re Am. Cap. Equip., LLC*, 296 F. App'x 270, 274 (3d Cir. 2008) (citation omitted) (emphasis added).  In their oral and written arguments, Movants urge the Court to restrict its examination to the valid business purpose held by the Debtor, LTL, as opposed to the reorganizational needs of Old JJCI. The Court certainly agrees that it is the **Debtor's** good faith at issue. Yet, even the Movants' experts testified that the 2021 Corporate Restructuring and the ensuing bankruptcy filing should be viewed by this Court as "a single, pre-planned, integrated transaction" comprised of interdependent steps. *See Burian Report* at 8; *Expert Report of Matthew Diaz* ("*Diaz Report*") at 19. This Court must undertake an analysis that considers the totality of the circumstances and consider the financial risks and burdens facing both Old JJCI and Debtor.

While the parties may debate whether as a result of the 2021 Corporate Restructuring, LTL continues as a "going concern," this Court has little trouble finding that the chapter 11 filing serves to maximize the property available to satisfy creditors by employing the tools available under the Bankruptcy Code to ensure that all present and future tort claimants will share distributions through the court-administered claims assessment process. Movants' challenge to the manner the estate is to be maximized does not alter the fact that a successful reorganization and implementation of a settlement trust will dramatically reduce costs and ensure balanced recoveries for present and future claimants. *See, e.g.*, *In re Am. Cap. Equip., LLC*, 296 F. App'x at 274 ("As the District Court explained, while Appellants make a number of arguments that Debtors' plan does not maximize the value of the estate, what these arguments actually take issue with is 'how the value was maximized.' What is clear is that under Debtors' plan, both the asbestos claimants and the unsecured creditors will be able to share in the assets of the estate").

From the outset, J&J and Debtor have been candid and transparent about employing Debtor's chapter 11 filing as a vehicle to address the company's growing talc-related liability exposure and costs in defending the tens of thousands of pending ovarian cancer claims and hundreds of mesothelioma cases, as well as future claims. As Movants' own experts have acknowledged, the use of the Texas divisional merger statute and subsequent filing by the newly formed LTL constituted a single integrated transaction designed to allow "New JJCI to continue to operate Johnson & Johnson's Consumer Health business in the United States without interruption and provide LTL with the opportunity to pursue process to resolve current and future [cl]aims in an equitable and efficient manner." *Debtor's Exhibit* D-56.

15

Let's be clear, the filing of a chapter 11 case with the expressed aim of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code. *See, e.g., In re Bestwall LLC*, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency);[9] *In re SGL Carbon*, 200 F.3d at 163-64, 169 (distinguishing confined nature of litigation in *SGL Carbon* with efforts to resolve thousands of mass tort claims) (citing ALAN N. RESNICK, *Bankruptcy as a Vehicle for Resolving Enterprise–Threatening Mass Tort Liability*, 148 U. PA. L. REV. 2045, 2050–51 (June 2000*)); In re Muralo, Co. Inc.*, 301 B.R. 690, 706 (Bankr. D.N.J. 2003) (finding debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos . . . cases" a "significant factor evidencing the good faith of Debtors' filings"). At the time of filing, Debtor— as did its immediate predecessor—faced nearly 40,000 pending tort claims, with thousands of additional claims expected annually for decades to come. *Bell Report* at 10.  As of the petition date, Debtor also anticipated billions of dollars in talc-related liability and defense costs. *Id.* Indeed, in the first nine months of 2021, more than 12,300 new lawsuits were filed. *Id.* Additionally, there were pending (although contested) indemnification obligations owing to talc suppliers Imerys Talc America, Inc. and Cyprus Mines Corporation estimated at anywhere between $25 billion to $118.2 billion in damages. *Bell Report* at 12. These anticipated liabilities

---

[9] Movants contend that the Court should not rely upon *Bestwall* since that court was considering dismissal under the far more stringent *Carolin* standard of "objective futility." However, a determination as to the existence of a "valid business purpose" is separate and apart from the futility of a debtor's reorganization efforts and the court's opinion retains relevance.

are not merely speculative, given the history of actual defense spending and verdicts rendered to date. Since June of 2018, there have been 13 mesothelioma verdicts awarding $320.6 million in punitive damages and $155.2 million in compensatory damages for a total of $475.8 million. S*ee Diaz Report* at 13. By this Court's math, that averages to approximately $36.6 million per claim. With approximately 430 mesothelioma claims filed as of the chapter 11 petition date, one could argue that the Debtor's financial exposure exceeded $15 billion, not including the tens of thousands of ovarian cancer claims and all future cancer claims. Debtor's efforts to address the financially draining mass tort exposure through a bankruptcy is wholly consistent with the aims of the Bankruptcy Code.

The Court is cognizant of the Third Circuit's admonition, as pointed out by Movants, that "a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone . . . does not . . . establish[] *good* faith." *In re Integrated Telecom*, 384 F.3d at 127-128 ("Just as a desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law. Given the truism that every bankruptcy petition seeks some advantage offered in the Code, any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings."). However, Debtor here has demonstrated an intent to make use of the Bankruptcy Code as a whole, apart from any single Code section, to address its financial needs. There is no question as to the import and value to Debtor of implementing an asbestos trust under § 524(g). Nonetheless, this tool does not operate in a vacuum. Rather, the Debtor seeks to take advantage of the centrality of the bankruptcy forum, the breathing spell available under § 362, the efficiencies found in the claims allowance and

estimation processes, and most significantly the opportunity to negotiate a global resolution to torrents of talc-related litigation as to present and future cancer victims. Moreover, the creation of a settlement trust is not wholly dependent upon § 524(g)—numerous non-asbestos mass tort cases have established trust mechanisms under confirmed plans bottomed on other Code provisions.

All Code sections are not equal in import or impact. In *Integrated Telecom,* a nonoperating liquidating debtor desired to take advantage of the § 502(b)(6) cap on the landlord's claim and argued that this purpose, in and of itself, established good faith. *See In re Integrated Telecom*, 384 F.3d 108. *Integrated* involved an effort to file a chapter 11 to reduce a singular type of claim for an isolated creditor. In contrast, Congress added 11 U.S.C. § 524(g) to the Bankruptcy Code to "help asbestos victims receive maximum value" from bankrupt entities. 140 Cong. Rec. S14,461 (Sept. 12, 1994) (statement of Sen. Heflin); *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 159 (3rd Cir. 2012) ("[T]he [bankrupt] company remains viable . . . [and] continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims." (alterations in original)); *In re ACandS, Inc.* 311 B.R. 36, 42 (Bankr. D. Del. 2004). Section 524(g) was meant to "strengthen . . . trust/injunction mechanisms," 140 Cong. Rec. 20, 27, 692 (1994), and, to the extent possible, account for "the interests of future claimants," H.R. Rep. No. 103–835, 3349 (1994). Quite simply, this Court will not equate the use of this provision with merely an effort to cap a landlord's rent.

Determining whether Debtor is pursuing a valid bankruptcy purpose through this chapter 11 proceeding also requires the Court to examine a far more difficult issue—whether there is

available to Debtor and the tort claimants a more beneficial and equitable path toward resolving Debtor's ongoing talc-related liabilities. For the reasons which follow, this Court holds a strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case—ensuring a meaningful, timely, and equitable recovery.

There is no question that, over time, our bankruptcy courts have witnessed serious abuses and inefficiencies, striking at the heart of the integrity of our bankruptcy courts. For instance, the approval of overly broad nonconsensual third-party releases, and the propriety/necessity for twenty-four hour accelerated bankruptcy cases have drawn deserved scrutiny. Likewise, the selection of case venue, as in the matter at hand, has warranted critical attention and debate.[10] In point of fact, there has been a deluge of critical commentary in recent months by academics, commentators, and even policymakers[11] challenging the shortfalls of the bankruptcy system and calling for reform. Some have even employed such distasteful, click-generating insidious phrases as "morally corrupt" or "lawless" in reference to the bankruptcy courts. No one can deny that there are situations in which tools and strategies have been abused and warrant critical review. Unfortunately, however, these commentators choose to focus on the limited failings of the system, as opposed to its innumerable successes. Every one of the Court's 370 plus colleagues on the

---

[10] This case is venued now where it should be. The appropriateness of the original filing in North Carolina can be debated, but that discussion should not color the primary inquiry as to whether the case at this point should proceed in the bankruptcy court.

[11] By way of example, upon direct and cross examination, Mr. Kim was shown correspondence dated November 10, 2021, from certain members of Congress taking issue with the Debtor's approach in this bankruptcy proceeding. As these policymakers have not had the benefit of reading the briefs, examining the evidence, or listening to oral arguments, the correspondence holds no weight. As is well-established, Congress speaks with one voice through enacted legislation *Cf.* MICHAEL B. W. SINCLAIR, *Guide to Statutory Interpretation* 103 (2000) ("[O]ur legislatures speak only through their statutes; statutes are their only voice. . . .")

bankruptcy bench can point to successful case outcomes where large and small businesses are reorganized, productive business relationships are maintained, jobs preserved and, most importantly, meaningful returns distributed to creditors—all in situations where outside of the bankruptcy system there would be fewer if any identifiable benefits, and the parties left to expensive and time-consuming litigation. This holds especially true for mass tort situations, including asbestos bankruptcies, in which § 524(g) trusts and comparable non-asbestos trust vehicles have been established to ensure meaningful, timely recoveries for present and future suffering parties and their families.

While this Court recognizes and appreciates the passion and commitment of the Committee members and every one of the attorneys advocating for the interests of the injured cosmetic talc claimants in this case, the Court simply cannot accept the premise that continued litigation in state and federal courts serves best the interest of their constituency. Many of these cases, both in the United States and abroad, have been pending for a half dozen or more years and remain years away from trial dates, not to mention the substantial delays they face in the inevitable appeals process. Notably, since 2014, there have been only 49 trials that have proceeded to verdict. True, in this same period, there have been approximately 6,800 cases which have settled outside of court. *Movants' Exhibit* 161. This number is dwarfed, nonetheless, by the projected 10,000 new cases to be filed each year going forward. *See Expert Report of Charles H. Mullin, PhD* ("*Mullin Report*") at 5. As noted in her *amici curiae* brief, Professor Maria Glover acknowledges there is no perfect solution to the problems with mass tort litigation: "But no mechanism for handling the thorny challenges of mass torts is perfect, including bankruptcy. Indeed, it is the nature of mass torts to

present different combinations of challenges, and those challenges follow mass torts wherever they

go." *Memorandum of Law of Amici Curiae by Certain Complex Litigation Law Professors*

("*Glover Brief*") 25, ECF No. 1410.

For instance, a class action is not usually suitable for mass tort cases, since there typically

exists too much variation concerning claimants' injuries, illnesses, and related losses. In the 1990s,

the United States Supreme Court issued two decisions that effectively terminated the use of class

actions, at least for product liability cases. In *Georgine v. Amchem Prods., Inc*., 521 U.S. 591, 138

L.Ed.2d 689 (1996), an asbestos case, the Supreme Court held that class actions under FED. R. CIV.

P. 23 could not be used to manage mass tort cases. The cases were too dissimilar, and there were

also some "future" plaintiffs, individuals exposed to asbestos, but not yet manifesting disease.

Likewise, in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 144 L.Ed. 715 (1999), the Supreme Court

shut the door with respect to class actions for mass tort cases involving a "limited fund," where

the parties attempted to structure the settlement as a mandatory class—that is, without opt-out

rights for class members—on the theory that a "limited fund" existed. The Supreme Court took

issue with the settlement class in *Ortiz* for failing to assure the necessary level of cohesiveness of

interests among absent class members, the representative plaintiffs, and class counsel to justify

class treatment. The Court held that the class failed to provide structural protections against the

likely conflicts of interests among class members. *Ortiz*, 527 U.S. at 856-57. The attempt to

describe the litigation as a limited fund also received minimal sympathy. In the Court's view, a

limited fund class had to demonstrate both necessity and equitable distribution. *See id.* at 850–53

(admonishing lower courts for accepting, without investigation, the litigants' attempt to create a limited fund by discounting the value of assets available for payment to class members).

Significantly, as Debtor points out, the *Ortiz* Court highlighted the difference between due process concerns in representative suits (*e.g.* class actions) versus bankruptcy cases. *Id.* at 846; *see also Debtor's Omnibus Response to the Amicus Briefs* 20-21, ECF No. 1554. The Supreme Court rejected the use of class actions under FED. R. CIV. P. 23 to aggregate unliquidated tort claims under a limited fund rationale and, in examining commentary to the Rule, observed that if such action were allowed, "in mass torts, (b)(1)(B) 'limited fund' classes would emerge as the functional equivalent to bankruptcy by embracing 'funds' created by the litigation itself[.]" *Ortiz*, 527 U.S. at 843 (quoting HENRY PAUL MONAGHAN, *Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members*, 98 COLUM. L. REV. 1148, 1164 (1998). Thus, in *Ortiz*, the Supreme Court recognizes bankruptcy as a sound and appropriate approach to addressing mass tort claims. *Id.*

> As further noted by Professor Troy A. McKenzie:
>
> The Court's strict formalism in *Amchem* and *Ortiz* also derived from an unhidden skepticism about the use of the Federal Rules of Civil Procedure as license to undertake essentially legislative reforms. The question presented in *Amchem*, as Justice Ginsburg phrased it, was "the *legitimacy under Rule 23* of the Federal Rules of Civil Procedure of a class action certification sought to achieve global settlement of current and future asbestos claims." The unspoken assumption in both cases, then, was that methods of global resolution that did not invoke the Federal Rules of Civil Procedure could escape the rigid strictures placed on the class action by the Court.

TROY A. MCKENZIE, *Toward a Bankruptcy Model for Non-Class Aggregate Litigation*, 87 N.Y.U. L. Rev. 960, 977 (2012) (emphasis in original).

Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system does not run afoul of the concerns expressed above and provides a judicially accepted means of aggregating and resolving mass tort claims. There is no authority to the contrary ruling that use of § 105 or § 524(g) settlement trusts contravene *Amchem* and *Ortiz.* Moreover, there is no evidence before this Court that Debtor or its predecessor, Old JJCI, manufactured a limited fund by undervaluing or limiting assets. Rather, the Court finds that any such limited fund is the product of overwhelming potential talc liabilities, which far exceed Debtor's (and Old JJCI's) capacity to satisfy through current available assets.

The multi-district litigation ("MDL") poses its own set of significant challenges and inefficiencies. Here in New Jersey, for instance, the MDL being handled by Chief Judge Wolfson —which does not include mesothelioma cases, the Canadian class actions, state court proceedings, or the claims of future tort victims—will at best produce a handful of bellwether trials later in 2022, offering some insight into the strength of the cases, but will also necessarily return nearly 40,000 cases to federal courts across the country to await pre-trial proceedings and eventual trials and appeals. Notwithstanding the pre-trial work undertaken through the MDL, the fact remains that plaintiffs and defendants will be forced to relitigate causation, and damages, and apportion liability among defendants in every case, which will be both costs prohibitive and "burden the tort system with unnecessarily drawn-out litigation." *Mullin Report* at 9.

Again, in her *amici curiae* submission, Professor Glover touts the "flexibility and adaptiveness" of MDL in facilitating settlements and global resolutions by experienced MDL judges. *Glover Brief* at 24. The Court has no doubt that talented federal judges have produced

significant settlements though MDL devices. To be sure, this Court knows of no better jurist at bringing about settlements than Chief Judge Wolfson. Yet, in nearly six years, there has been no progress toward a global resolution through the current MDL. The Court is unaware of any meaningful settlement talks apart from the near global settlement in the *Imerys* bankruptcy.

The fact remains that since 2014—over seven years ago—only 49 trials have gone to verdict, and many of those remain on appeal or have been remanded to retry. Given the pace of the litigations to date, as well as the mounting escalation in the number of new actions being brought monthly,[12] the vast majority suffering from illness in the existing backlog of cases will not see a penny in recovery for years. The tort system has struggled to meet the needs of present claimants in a timely and fair manner.[13] The system is ill-equipped to provide for future claimants. The Court has no reason to believe this will differ for the talc plaintiffs here.

This Court is neither blind nor deaf to the stated preferences of plaintiffs who seek to remain in the tort system and have their cases tried before a jury. The tort claimants have not chosen the bankruptcy forum. Indeed, creditors rarely choose to have their rights vindicated in the bankruptcy courts, but our Constitution and the laws passed by Congress countenance such a result. Undeniably, there have been sizable multi-million and multi-billion dollar verdicts in favor of handful of plaintiffs who were fortunate to have their claims brought in front of a jury. Movants

---

[12] New ovarian cancer filings have been accruing at more than 10,000 claims per year. *Mullin Report* at 5.

[13] *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 598 (1997) ("[D]ockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.") (quoting *Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation* 2-3 (Mar. 1991)).

contend that the loss of jury trial rights would violate claimants' Seventh Amendment jury rights. Nonetheless, there have been numerous asbestos trusts implemented under § 524(g) which provide tort victims with choices between receiving guaranteed compensation under the trusts, or alternatively pursuing recovery against the trusts through jury trials.[14] The trust distribution procedures ("TDP") and plans, however, will usually place timing restrictions and caps on compensatory and punitive damage recoveries. These limitations are critical to the process since one of Congress's primary intentions in creating § 524(g) was to ensure uniform treatment of all claimants. *In re W.R. Grace & Co.*, 475 B.R. 34, 171 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd,* 532 F. App'x 264 (3d Cir. 2013), and *aff'd,* 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013). If the talc claimants were not subject to such a cap on jury verdicts and judgments, they would be receiving preferential treatment in comparison to other similarly situated claimants.

---

[14] By way of example, § 7.6 of the Trust Distribution Procedures in the *Duro Dyne National Corp.* bankruptcy case provides:

> 7.6 Suits in the Tort System. If the holder of a disputed claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim or the claimant's exposure history, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder may file a lawsuit against the Asbestos Trust in the Claimant's Jurisdiction as defined in Section 8.3 below. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

*Trust Distribution Procedures* 43, *Exhibit F to Third Amended Plan*, ECF No. 1-2 in Case No. 19-cv-15433 (also available at ECF No. 784-3 in Bankr. Case No. 18-27963).

Critically important is that § 524(g) ensures that present claimants do not exhaust the debtor's assets before future claimants have even manifested injuries. *Id*. The Seventh Amendment jury rights of talc plaintiffs would remain intact under a properly drafted and approved plan and TDP, and no case cited to the Court provides otherwise.

This Court also has factored into its decision the substantial risks facing the talc claimants in the tort system. There have been countless plaintiffs denied any recovery and many of the plaintiffs' verdicts have been reversed ultimately on appeal.[15] "The results of the 49 [t]alc [l]itigation cases to proceed to trial are inconsistent in terms of liability and damages awards. Defendants prevailed in 18 cases; plaintiffs prevailed in 17 cases; eight cases resulted in mistrials; and six cases settled during trial." *Bell Report* at 14. It is inarguable that continued litigation of talc claims in the state and federal tort system comes with a meaningful risk of recovery. Debtor points to prior multiple litigation successes by J&J and Old JJCI over the years by securing dismissals of roughly 1,300 ovarian cancer cases and over 250 mesothelioma cases without payment and trying sixteen cases to defense verdicts. *See Kim Decl*. ¶ 38. ECF No. 5. Old JJCI secured reversal of numerous plaintiff verdicts. *Id.* Of equal concern to this Court is the capacity for the state and federal courts to protect future claimants, whose claims may surface in the next half century given the acknowledged latency period for the types of cancer at issue. The needs of these victims are wholly ignored by the current rush to secure judgments against Debtor in the

---

[15] *See Hrg. Tr.* 34:11-12, Oct. 20, 2021, ECF No. 178 ("Old JJCI . . . ultimately prevailed in most of the talc cases it tried."); *Hrg. Tr.* 15:16-17, Dec. 15, 2021, ECF No. 846 ("[T]he company was prevailing in the majority of cases . . . ."); *Hrg. Tr.* 75:8-11, Jan. 11, 2022, ECF No. 1118 ("And most of the cases ended up with a defense verdict, and even where there's a plaintiff verdict most of them are reversed on appeal.").

federal and state courts. In the eyes of this Court, the tort system produces an uneven, slow-paced

race to the courthouse, with winners and losers.  Present and future talc claimants should not have

to bear the sluggish pace and substantial risk if there exists another viable option.

      The Court's comments are not intended to dismiss or discredit the inarguable benefits of

our tort system and the essential work of our plaintiffs' bar in bringing about corporate

transparency and vindicating the rights of those victims who are ill-equipped to pursue their rights

against large corporate defendants.  In this vein, we can all point to concrete illustrations where

such litigation has been responsible for necessary safety reforms and health measures. What the

Court regards as folly is the contention that the tort system offers the **only fair and just pathway**

of redress and that other alternatives should simply fall by the wayside. It is manifestly evident

that Congress did not share this narrow view in developing the structure of asbestos trusts under

§524(g). There is nothing to fear in the migration of tort litigation out of the tort system and into

the bankruptcy system.[16] Rather, this Court regards the chapter 11 process as a meaningful

opportunity for justice, which can produce  comprehensive, equitable, and timely recoveries for

injured parties. The bankruptcy courts offer a unique opportunity to compel the participation of all

parties in interest (insurers, retailers, distributors, claimants, as well as Debtor and its affiliates) in

a single forum with an aim of reaching a viable and fair settlement. As the Third Circuit noted in

*In re Federal-Mogul Global, Inc.*:

      Bankruptcy has proven an attractive alternative to the tort system for corporations
      [facing mass tort claims] because it permits a global resolution and discharge of

---

[16] *But cf.* BRUBAKER, RALPH, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy* (November 9, 2021). The Yale Law Journal Forum, forthcoming, University of Illinois College of Law Legal Studies Research Paper No. 22-01, Available at SSRN: https://ssrn.com/abstract=3960117.

> present and future liability, while claimant's interests are protected by the
> bankruptcy court's power to use future earnings to compensate similarly situated
> tort claimants equitably.

684 F.3d 355, 359 (3d 2012). Indeed, the Third Circuit has taken notice that the asbestos

bankruptcy trusts achieved Congress's expressed aims in best serving the interests current and

future asbestos victims,[17] as well as corporations saddled with such liabilities:

> Furthermore, the trusts appear to have fulfilled Congress's expectation that they
> would serve the interests of both current and future asbestos claimants and
> corporations saddled with asbestos liability. In particular, observers have noted the
> trusts' effectiveness in remedying some of the intractable pathologies of asbestos
> litigation, especially given the continued lack of a viable alternative providing a
> just and comprehensive resolution. Empirical research suggests the trusts
> considerably reduce transaction costs and attorneys' fees over comparable rates in
> the tort system.

*In re Federal-Mogul Glob., Inc.,* 684 F.3d at 362 (citing studies).

The Court acknowledges that Movants have raised a challenging and interesting issue as

to whether Debtor can take advantage of a §524(g) trust: "[B]ecause LTL has never been named

as a defendant in a talc case, then a channeling injunction and Section 524(g) trust will be

unavailable under the plain language of the statute." *TCC II Reply Mem.* at 19 n.11, ECF No.

1358 (citing 11 U.S.C. § 524(g)(2)(B)(i)(I), which dictates that the injunction, together with the

trust, must "assume the liabilities of a debtor which at the time of entry of the order for relief *has*

*been named as a defendant* in personal injury, wrongful death, or property-damage actions

seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or

---

[17] The legislative history of § 524(g) is clear that Congress enacted the statute to assist any company facing liability
that involves asbestos. H.R. REP. 103-835, 41, 1994 U.S.C.C.A.N. 3340, 3350 ("The asbestos trust/injunction
mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming
liability.").

asbestos-containing products") (emphasis added). The causes of action held by the talc plaintiffs are owing by Debtor as successor in interest to Old JJCI and, consequently, Debtor substitutes for Old JCCI in all federal actions as a matter of law. *See* FED. R. CIV. P. 25(c). At closing during the hearing, Debtor's counsel apprised the Court and all parties that Debtor in fact has been named in pending suits. Notwithstanding, as we have seen in other non-asbestos mass tort cases, referenced below, chapter 11 can still offer the opportunity to reach consensus on a global resolution of present and future claims without express resort to § 524(g).

In recent weeks and months, we have seen comprehensive and productive mediated settlements, producing hundreds of millions of dollars in funding of settlement trusts. Indeed, we need look only at the USA Gymnastics settlement approaching $400 million, the proposed Mallinckrodt $1.7 billion trust and the Boy Scouts proposed settlement nearing $3 billion as examples. Likewise, settlement trusts are in some stage of negotiation in over thirty Catholic Church diocese cases across the country. The Court places these positive results against a backdrop of dozens of successful asbestos trust cases created over the years pursuant to § 524(g), which continue to fund payments to asbestos victims. Claims reconciliation through these bankruptcy trusts place reduced evidentiary and causation burdens on the injured and their families, and resolution of claims and payments to victims can be achieved at a far more expeditious pace than through uncertain litigation in the tort system. A trust would establish a far simpler and streamlined process—both for present and future cosmetic talc claimants—than

currently available in the tort system.[18] As noted by the court in *In re Bestwall LLC*, 606 B.R. at

257: "[A] section 524(g) trust will provide all claimants—including future claimants who have

yet to institute litigation—with an efficient means through which to equitably resolve their

claims."

Through adopted procedures, these trusts establish fixed criteria and common parameters

for payments to claimants, ensuring a level playing field for all present and future victims, taking

into consideration the significance of preserving all due process rights. *See In re W.R. Grace &

Co.*, 729 F.3d 311, 324 (3d Cir. 2013) ("Therefore, as long as a court correctly determines that

§ 524(g)'s requirements are satisfied, present and future claims can be channeled to a § 524(g)

trust without violating due process."). In recent years, state attorneys general and the United

States Justice Department have undertaken numerous investigations of existing trust funding and

trust distribution procedures and have brought issues before courts aimed at safeguarding the

availability of funding for future claimants. In sum, the bankruptcy system, through use of a

§524(g) trust, will "provide all claimants—including future claimants who have yet to institute

litigation—with an efficient means through which to equitably resolve their claims." *In re

Bestwall LLC*, 606 B.R. at 257.   A settlement trust, with proper oversight and funding, can best

serve the needs of Debtor and talc claimants alike.

---

[18] "A plan of reorganization can implement a trust with administrative procedures to resolve claims with far lower
transaction costs [attorneys' fees] and in a timelier manner for both the claimants and Debtor than continued litigation
in the tort system." *Mullin Report* at 5, 12.

Throughout their submissions and oral argument, Movants have decried Debtor's (and its affiliated entities') efforts to "cap" the liabilities owing the injured parties.[19] Likewise, there have been emotive contentions that the chapter 11 process offers Debtor—as well as J&J and other affiliates—an unfair advantage, or upper hand in protecting assets and escaping liabilities and exposure. The Court does not share these views. Frankly, it is unsurprising that J&J and Old JJCI management would seek to limit exposure to present and future claims. Their fiduciary obligations and corporate responsibilities demand such actions. Nonetheless, merely seeking to limit liabilities, standing alone, does not demonstrate "bad faith" for purposes of filing under chapter 11. If that were so, nary a debtor would meet the "good faith' requirements. Rather, the Court finds this chapter 11 is being used, not to escape liability, but to bring about accountability and certainty.

The record before the Court does not reflect assets that have been ring-fenced, concealed, or removed. Neither J&J nor New JJCI (nor any J&J affiliate for that matter) are to be released from liability, or their assets placed out of reach of creditors, absent a negotiated settlement under a plan in which J&J's and New JJCI's roles and funding contributions warrant a release as a matter of both law and fact. True, a handful of claimants who have secured judgments may be delayed by the bankruptcy process, but this Court must act to ensure justice for all the nearly 40,000 current claimants and undetermined future injured parties (and families) who face years in litigation. Also, it is nonsensical to accept the notion that J&J and Old JJCI would bear the brunt of public and judicial scrutiny, as well as the time and costs to implement this integrated transaction, simply to

---

[19] *See, e.g.*, *A&I Reply Mem.* 23, ECF No. 1354 ("J&J created LTL to file for bankruptcy not only to "cap" the talc liabilities of Old JJCI that had been imposed on the Debtor, but also to 'cap' the talc liabilities *of J&J* and shield it from any talc litigation and any more judgments in favor of talc victims.").

stall claimants or walk away from its financial commitments under the Funding Agreement. Moreover, remedial creditor actions addressing the pre-petition divisive merger and restructuring remain available for creditors to pursue, if necessary. It is appropriate to note that the true leverage remains where Congress allocated such leverage, with the tort claimants who must approve of any plan employing a § 524(g) trust by a 75% super majority.[20] In filing this chapter 11, Debtor faces a risk that good-faith negotiations will not produce the consensus necessary to confirm a plan; notwithstanding, the Court hopes and expects the parties to undertake a sensible, pragmatic and reasonable approach to negotiations.

---

[20] As noted by Judge Beyer in *In re Bestwall, LLC*, 606 B.R. 243, 251 (Bankr. W.D.N.C. 2019), "claimants will be afforded due process in this case as a result of the requirements of the Bankruptcy Code and, in particular, section 524(g). Section 524(g) contemplates the active participation and support of the Committee, requires the affirmative vote of at least 75% of asbestos claimants in connection with confirmation of a plan seeking the benefits of that section (*see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)), and calls for approval of the plan of reorganization by both this Court and the District Court (*see* 11 U.S.C. § 524(g)(3)(A))."

### 2. Debtor's Financial Distress

Debtor is the successor to Old JCCI and has been allocated its predecessor's talc-based liabilities, including verdicts, settlements, and defense costs, "as reflected in Old JJCI's general ledger." *Debtor's Sur-Reply* 9, ECF No. 1444. As testified in detail by Mr. Adam Lisman, Assistant J&J Controller, at both his deposition and during trial, the talc-related expenses were charged to Old JJCI because it had legal responsibility for them. *Deposition Tr. of Adam Lisaman Lisman Dep. Tr.* 117:1-3, Oct. 30, 2021, *Ex. H to Toroborg Decl.*, ECF No. 1444-9 ("[T]hese are talc product liability costs that JJCI was ultimately responsible for, which is why it is showing up as a [sic]expense on their account.").[21] One cannot distinguish between the financial burdens facing Old JCCI and Debtor. At issue in this case is Old JJCI's talc liability (and the financial distress that liability caused), now the legal responsibility of Debtor. Absent a global settlement, neither entity would be able to defend or economically resolve the current and future talc-related claims. As Debtor's expert, Dr. Gregory Bell testified, and as reflected in J&J's public filings, talc-related litigation was the "primary driver" that caused J&J's entire Consumer Health segment "to drop from a $2.1 billion profit (14.8 percent of sales) in 2019 to a $1.1 billion loss (-7.6 percent of sales) in 2020." *Bell Report* at 4; *see also id.* at 6 ("This current and potential future financial drain imposed by the Talc Litigation . . . was threatening Old JJCI's ability to sustain the marketing, distribution, and R&D expenditures needed to compete in the U.S. market . . . placing Old JJCI at a significant competitive disadvantage.").

This chapter 11 followed denial of review by the U.S. Supreme Court of a multi-billion dollar award in the *Ingham* litigation, as well as other more recent verdicts for hundreds of millions

of dollars. There was also a break-down of a potential multi-billion dollar global settlement in the *Imerys* bankruptcy. The evidence before the Court establishes that at the time of the chapter 11 filing, this Debtor, LTL, had contingent liabilities in the billions of dollars and likely would be expending annually sums ranging $100-200 million in its defense of the tens of thousands of talc personal injury cases for decades to come.[22] The evidence confirms that the talc litigation payments and expenses forced Old JJCI into a loss position in 2020. *Bell Report* at 4-5. Indeed, to date, the talc-related litigation charges have eradicated all profits earned by Old JJCI from sales of talc-based consumer products, since inception, by more than four times over and have displaced more than 140% of the cash generated from the sales. *Bell Report* at 14. As highlighted in Debtor's Reply Memorandum, even plaintiffs' attorneys have recognized the substantial exposure facing Debtor (as successor to Old JJCI):

> Mr. Klein: "If the last seven jury awards in mesothelioma trials are any indication, and I submit to Your Honor that they are, then my Committee's constituents' claims are worth ten[s] of billions of dollars." [transcript citations omitted]

> Mr. Finch: "You know, Mr. Rice resolved the tobacco litigation 20 some years ago for $250 billion. I happen to think that the, the dollar figure here has to be a lot closer to 250 billion than the 2 billion that Johnson & Johnson has put on the table." [transcript citations omitted]

*Debtor's Sur-Reply* at 8, n.12, 13, ECF No. 1444 (citing transcripts of hearings held on Jan. 19, 2022 and Nov. 4, 2021 (*Toroborg Decl. Ex. E, F*, ECF No. 1444-6, 1444-7)).

---

[21] In the accompanying Memorandum Opinion Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors and Preliminarily Enjoining Such Actions, dated February 28, 2022, the Court analyzes in greater detail the bona fides of J&J's 1979 transfer of assets to and assumption of liabilities by Old JJCI's predecessor, which serves as the basis for the latter's legal responsibility for all talc-related liabilities.

[22] "$1 billion in defense costs over the prior five years; $3.5 billion in verdicts and settlements over that same timeframe; billions more in indemnification claims from Imerys; and (given latency) the immense costs of decades more of the same." *Debtor's Obj.* at 8. "It would cost $190 billion in defense costs just to try the *current* claims." *Id.*

Claimants repeatedly have called to the Court's attention the market capitalization ($450 billion) and stellar credit-rating of Debtor's indirect parent, J&J. Nonetheless, apart from voluntarily undertaking such an obligation or a judicial finding as to alter ego status, J&J (like all parent corporations) have no legal duty to satisfy the claims against its wholly-owned or affiliated subsidiaries. *See, e.g., Travelers Indem. Co. v. Cephalon, Inc.,* 32 F. Supp. 3d 538, 556 (E.D. Pa. 2014), *aff'd*, 620 F. App'x 82 (3d Cir. 2015) (a parent company is not liable for the actions of its subsidiaries unless the parent company itself has engaged in wrongdoing, or exercises control over the subsidiary entity).

It is true that Debtor, under the Funding Agreement, could compel J&J to deplete its available cash (amounting to nearly 7% of its entire market cap) or pursue a forced liquidation of New JJCI to tap into its enterprise value of $61 billion. Needless to say, such actions would have a horrific impact on these companies, with attendant commercial disruptions and economic harm to thousands of employees, customers, vendors, and shareholders, and threaten their continued viability. The Court is at a loss to understand, why—merely because Debtor contractually has the right to exhaust its funding options—the Debtor is not to be regarded as being in "financial distress."

It is of no moment that the Debtor, by virtue of the Funding Agreement, was not insolvent on the date of the chapter 11 filing. "As a statutory matter, it is clear that the bankruptcy law does not require that a bankruptcy debtor be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of reorganization." *Marshall v. Marshall*

*(In re Marshall)*, 721 F.3d 1032, 1052 (9th Cir. 2013). Prior to the chapter 11 filing, J&J and Old JJCI incurred compensatory damages awards in ovarian cancer cases which ranged from $5 million to $70 million, while punitive damage awards ranged from $50 million to $347 million. Likewise, in mesothelioma cases, there were compensatory damages awards ranging from $2.5 million to $40 million, while punitive damages ranged from $100,000 to $300 million. As acknowledged by all parties, in the *Ingham* case, a jury awarded $4.14 billion in punitive damages, one of the largest personal injury verdicts ever seen in the United States, ultimately reversed in part and reduced on appeal to $2.24 billion.[23] Even without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims, and see that the continued viability of all J&J companies is imperiled.

> As Dr. Bell testified at trial,
>
> Old JJCI was not positioned to continue making substantial Talc Litigation payments from working capital or other readily marketable assets. . . . As a consequence, it is apparent that Old JJCI had no significant excess net current assets available for the satisfaction of future Talc Litigation payments. In addition, Old JJCI had no other assets that were readily marketable in order to satisfy liabilities associated with the Talc litigation, which could be substantial.

*Bell Report* at 19-21, 32. At the time of filing, the prospects of continued monthly $10-20 million defense expenditures, with rapidly increasing numbers of new claims being filed, warranted seeking action in this Court. By comparison, the administrative burdens and costs to oversee the trust distributions under a § 524(g) trust represent a small fraction of the funds being expended currently to litigate these cases through the trial and appellate courts.

---

[23] *Debtor's Informational Br.* at 119-20.

Several years ago, Judge Laurie Selber Silverstein noted in *In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364 (Bankr. D. Del. 2018), that a valid business purpose assumes an entity in distress. Well, such distress is patently apparent in the case at bar. *Id.* at 375. The Debtor has estimated that the costs to try a single ovarian cancer claim ranges between $2 million to $5 million. Defending just the over 38,000 pending ovarian cancer claims through trial would cost up to $190 billion. In addition, Old JJCI and J&J are facing billions of dollars in indemnification claims from their talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys").[24]

No public or private company can sustain operations and remain viable in the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward. The Court must also factor in the negative impact of ongoing regulatory investigations by state attorneys general. The Third Circuit in *In re SGL Carbon* noted that there exists a "need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." 200 F.3d at 163; *see also In re Johns-Manville*, 36 B.R. 727, 736 (Bankr. S.D.N.Y 1984) (holding debtor "should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition," and noting that the "'Congressional purpose' in enacting the Code was to encourage resort to the bankruptcy process"). While the Third Circuit requires "some" degree of financial distress, *see In re*

---

[24] "In its bankruptcy case, Imerys has contended that it has claims against Old JJCI and J&J for indemnification and joint insurance proceeds," claims allegedly in the billions of dollars. *Kim Decl.* ¶ 55, ECF No. 5. Similarly, Cyprus Mines Corporation and its parent company, which had owned certain Imerys talc mines, filed an adversary proceeding in the Imerys bankruptcy against Old JJCI, J&J, Imerys Talc America, Inc., and Imerys Talc Vermont, Inc. seeking a declaration of indemnity under certain contractual agreements. Cyprus Mines Corporation has since filed its own bankruptcy case. *Id.* at ¶ 56.

*Integrated*, *supra*, the Bankruptcy Code does not "require any **particular** degree of financial distress as a condition precedent to a petition seeking relief." *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (quoting *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994) (emphasis added)). Old JJCI need not have waited until its viable business operations were threatened past the breaking point. Movants ask the Court to require the highest level of distress,[25] for which there is no precedent.

At the hearing, Movants attempted to make the case that J&J would have continued to fund all talc-related obligations of Old JJCI without any bankruptcy filing. This was merely supposition, offered without evidentiary support. The focus then shifted to Old JJCI's rising profits, year after year, of J&J's Consumer Health Sector, allegedly undermining any claim of financial distress. Movants' expert, Saul E. Burian, testified, on both direct and cross examination, that none of the entities (LTL, J&J, Old JJCI or New JJCI) needed to file bankruptcy. *Burian Report* at 34-39. To be sure, Mr. Burian highlighted that *after taking out payments and charges relative to the talc litigation*, the sales and adjusted income before tax for J&J's Total Consumer Health sector have grown steadily since 2016; pointedly, the loss experienced in 2020 by Old JJCI is attributable primarily to the one-off payment of the *Ingham* judgment. *Id.* Movants also call to the Court's attention Debtor's access to funding through the Funding Agreement:

> Here, the totality of facts and circumstances conclusively show that LTL was not in serious financial distress when it filed its bankruptcy petition. To the contrary, prior to the bankruptcy, J&J entered into a Funding Agreement with LTL pursuant

---

[25] " Because those tort claims were not a **terminal threat** to the company, as detailed above, LTL's intent plainly was to use the bankruptcy system to gain advantages that J&J and Old JJCI were unable to obtain in the tort system." *TCC II Reply Mem.* 28, ECF No. 1358 (emphasis added).

to which it and New JJCI agreed to fund LTL's current and future talc liabilities up to the value of New JJCI—roughly $61 billion.

*TCC II Reply Mem*. 8, ECF No. 1358. As a result, Movants contend that "LTL had the ability to require that J&J and New JJCI fund up to $61 billion to satisfy talc liabilities." *Id*. at 9. Similarly, Movants insist that LTL was not in serious financial distress because it could "have relied on the Funding Agreement to [settle its liabilities] before filing for bankruptcy, because at the moment of the divisive merger, J&J had approximately $31 billion in cash on its balance sheet, and a half trillion-dollar market cap." *Id*. at 11, n.7.

Movants appear to suggest that due to Old JJCI's pre-petition sales revenues, as well as Debtor's financial capacity (primarily derivative from funding provided by J&J and New JJCI), this Court cannot find that Debtor suffered from financial distress at the time of filing. This suggestion, as a corollary, would mean that neither J&J nor Old JJCI (which had an even greater asset base than New JJCI) could have filed for chapter 11 in good faith. Yet, this is wholly inconsistent with Movants oft repeated contention:

> If the Debtor and/or J&J wanted the Court to focus on the financial condition of Old JJCI in evaluating the good faith of this proceeding, ***Old JJCI should have filed for bankruptcy.*** It did not. . . . J&J or Old JJCI could have chosen what it perceived to be the difficult path of obtaining the benefits and complying with the burdens of Chapter 11.

*TCC II Reply Mem*. at 23, ECF No. 1358 (emphasis in original).

More significantly, the Court is troubled by Movants' conflicting positions as to whether any chapter 11 filing had to be undertaken at all, as claimants submit that J&J and Old JJCI could have satisfied the extant claims without resorting to the bankruptcy court. On the one hand, Movants minimize Debtor's true talc-related financial exposure by pointing out that over 6,800

ovarian cancer and mesothelioma claims have been settled since 2017 for under $1 billion. *Movants' Ex.* 161. Similarly, during trial, Movants presented video testimony of two Directors at S&P Global, a rating agency, as well as supporting documentary evidence (contemporaneous notes and emails) reflecting the understanding of these witnesses that J&J allegedly viewed their overall talc-related liabilities at no greater than $7 billion. These understandings were reached after communications with J&J personnel. In sum, Movants press that J&J could have managed its talc-related liabilities without resort to the bankruptcy court.

Yet, on the other hand, Movants' counsel compelled Mr. Kim to acknowledge on cross examination that plaintiffs have prevailed in the last seven mesothelioma trials, for verdicts totaling over $360 million. *Diaz Report* at 13. These verdicts average to over $50 million for each mesothelioma claim and hardly can be characterized as manageable. Movants also highlighted significant events in the timeline which point toward greater talc exposure for Debtor:

- October 2019: FDA finds asbestos in Johnson's Baby Powder
- June 2020: Missouri Court of Appeals affirms *Ingham*
- April 21, 2021: Health Canada confirms its 2018 finding of a significant association, indicative of a causal effect, between exposure to talc and ovarian cancer
- May/June 2021: Settlement in *Imerys* falls apart
- June 2021: U.S. Supreme Court denies *certiorari* in the *Ingham* case

*TCC I Closing* at 19. Simply put, there is a clear inconsistency in the message to the Court: either JJCI was facing increased unmanageable financial risk from the talc litigation, warranting bankruptcy consideration, or it was not.  At the end of the day, this Court concludes that the weight of evidence supports a finding that J&J and Old JJCI were in fact facing a torrent of significant talc-related liabilities for years to come. The evidence at trial, including the testimony of S&P Global witnesses Arthur Wong and David Kaplan, raise doubts about the intentions underlying the

communications to S&P Global—were they truly projections of amounts necessary to resolve current and future talc liabilities, or estimates of anticipated short-term reserves or bankruptcy settlements? What is not in doubt are a series of events which pointed to the need for bankruptcy consideration: the $4.16 billion *Ingham* verdict and ultimate denial of appellate review, the shift by claimants to multi-billion dollar damage demands, as well as the failure to reach an accord in *Imerys*. These were triggering events that changed the landscape for future talc settlements and litigation. Neither the settlements nor verdicts which predated these events could thereafter serve as dependable guideposts for expectations going forward.

### 3. Debtor's Chapter 11 Filing Was Not Undertaken to Secure an Unfair Tactical Advantage

As noted, in addition to gauging whether a chapter 11 filing serves a valid bankruptcy purpose, courts must also consider "whether the petition is filed merely to obtain a tactical litigation advantage." *In re Integrated Telecom Express, Inc.*, 384 F.3d at 120; *SGL Carbon*, 200 F.3d at 165. In this regard, the thrust of Movants' challenge to Debtor's filing appears bottomed on the 2021 Corporate Restructuring and the use of the Texas divisional merger statute to create a special purpose vehicle in the hours before the filing to accomplish J&J's goals. Pertinently, Movants contend that the 2021 Corporate Restructuring "hindered," "delayed," and "prejudiced" talc claimants—by "blocking talc creditors from obtaining access" to "Old JJCI's substantial business assets" and "remov[ing] Old JJCI's business assets and operations from the reach of its talc creditors." *Original TCC's Mot. to Dismiss* ¶¶ 2-4, 41, 50, ECF No. 632; *A&I's Mot. to Dismiss* ¶¶ 4, 55-63, ECF No. 766. Yet, notwithstanding the barrage of academic and media criticism leveled at the use of the divisional merger provisions under the Texas Business

Organizations Code, the Court concludes that there have been no improprieties or failures to comply with the Texas statute's requirements for implementation, and that the interests of present and future talc litigation creditors have not been prejudiced.

Debtor was incorporated and domiciled in Texas prior to effectuating the 2021 Corporate Restructuring, albeit only days before implementation. The Texas statute "applies to all business entities, regardless of when such entities were formed." *Phillips v. United Heritage Corp*., 319 S.W.3d 156, 163 n.5 (Tex. Ct. App. 2010). The Texas Business Organizations Code establishes the procedures that an entity must follow to effect a divisional merger, including development of a plan of merger (specifying, among other things, the allocation of assets and liabilities) and a filing with the Secretary of State. *See* Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151. Moreover, under Texas's Business Organizations Code, upon a divisional merger in which the dividing entity does not survive, "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger." Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3). So, where the dividing entity does not survive (such as Old JJCI), and the plan of merger allocates a particular liability or obligation to a single new entity, that designated new entity is exclusively liable for that obligation. Except as otherwise provided, "no other [entity] created under the plan of merger is liable for the debt or other obligation." *Id.* § 10.008(a)(4). The record establishes conclusively that Old JJCI complied with all requirements under Texas law.

Movants posit that the 2021 Corporate Restructuring left Debtor undercapitalized from the outset and placed the contingent talc creditors at greater risk.[26] Indeed, Movants have raised several challenges as to the efficacy of the Funding Agreement, including that: (1) J&J and New JJCI may refuse to make payments under the Funding Agreement; (2) the Funding Agreement substitutes the assets of valuable operating businesses with "an amorphous, artificially capped contract right, the value of which would take years to adjudicate;" and (3) enforcement of the agreement rests with the Debtor, which is under the control of both Payors under the Funding Agreement. *Original TCC's Mot. to Dismiss* ¶ 23, ECF No. 632. Accordingly, Movants contend that "[t]alc claimants have thus been intentionally rendered worse off than they were prior to the divisional merger, an outcome prohibited by the statute." *Id.*

The divisional merger under the Texas statute, in the absence of any subsequent bankruptcy filing by LTL, may possibly have prejudiced creditors by requiring them to await LTL's draw upon the Funding Agreement; however, that did not occur and is not the situation presented. Rather, a bankruptcy filing for the newly created, smaller entity housing the talc liabilities was a critical component of the 2021 Corporate Restructuring from the outset. As noted above, it is uncontested that the restructuring was intended as a single integrated transaction. Indeed, no one contests that J&J and Old JJCI looked to the Bankruptcy Code for a way to globally address all talc-related claims. With Debtor's chapter 11 filing, this Court now has jurisdiction and oversight over the bankruptcy estate, which controls LTL's rights under the Funding Agreement, and can ensure that Debtor pursues its available rights against J&J and New JJCI. It is inexplicable

---

[26] The Court previously raised the inconsistency of Movants' argument, given the repeated contention that neither Old JJCI nor the Debtor was in financial distress at the time of the filing.

that Movants would want to dismiss this proceeding and lose such leverage and access to an immediate enforcement vehicle. The Court is unpersuaded that the tort claimants have been placed in a worse position due to either the 2021 Corporate Restructuring or implementation of the Funding Agreement.

The Funding Agreement between Debtor, on the one hand, and J&J and New JJCI (on a joint and several basis) on the other, is not intended to—and is unlikely to—impair the ability of talc claimants to recover on their claims. *See Kim Decl.* ¶ 21, ECF No. 5 ("A key objective of the restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring.") In this regard, under the Funding Agreement, all creditors, including talc claimants, maintain the ability to enforce any liquidated and fixed claims against LTL, with the added benefit of having both J&J and New JJCI backstop such obligations, up to the fair market value of Old JJCI as a floor amount, along with any additional value in New JJCI.[27] Thus, as a result of the 2021 Corporate Restructuring, Debtor would have the funding available to satisfy present and future claims against Old JJCI, with the added contractual right to look to J&J and New JJCI as primary obligors without having to establish independent liability. Moreover, with

---

[27] Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. *Declaration of John K. Kim in Support of First Day Pleadings* ¶ 27, ECF No. 5. In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding. *Id.*

the bankruptcy filing, the bankruptcy estate succeeds to all rights held by Debtor, with the oversight and jurisdiction of this Court as needed for enforcement. Significantly, the resources under the Funding Agreement will be available upon confirmation of a plan—whether or not the plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under § 524(g).

This Court agrees with Judge Beyer in *In re Bestwall LLC,* in analyzing a comparable funding agreement facing similar challenges:

> The Court disagrees with the [c]ommittee's argument [that the divisional merger 'enabled Old GP to replace the assets against which asbestos creditors had a claim with a much smaller subset of assets'] for several reasons. First, because of the [f]unding [a]greement, the [d]ebtor's ability to pay valid Bestwall [a]sbestos [c]laims after the 2017 [c]orporate [r]estructuring is identical to Old GP's ability to pay before the restructuring.

606 B.R. at 252. Debtor, in argument and its submissions, points out that for over thirty years, Texas law has permitted divisional mergers that exclusively allocate liabilities (and assets) to a new entity created by the transaction, *see* CURTIS W. HUFF, *The New Texas Business Corporation Act Merger Provisions*, 21 St. Mary's L.J. 109, 110 (1989), and that several other states have since enacted similar statutes, *see, e.g.,* 15 PA. CONS. STAT. § 361; ARIZ. REV. STAT. ANN. § 29-2601; DEL. CODE ANN. tit. 6, § 18-217(b)-(c). Debtor further underscores that corporate transactions similar to the 2021 Corporate Restructuring were effectuated pre-bankruptcy filing in several other mass tort bankruptcies—even apart from the other similarly structured filings currently pending in the Western District of North Carolina.[28] Indeed, the Court has come to learn that in *G-I Holdings,*

---

[28] *See, e.g., In re Garlock Sealing Tech., LLC,* 10-31607 (Bankr. W.D.N.C. 2017); *In re Mid Valley, Inc.,* No. 03-25592 (Bankr. W.D. Pa. 2003); *In re Babcock & Wilcox Co.* No. 00-10992-10995 (Bankr. E.D. La, 2002).

*Inc.* (Case No. 01-30135 (RG)), a case which graced our court's hallways here in New Jersey for nearly a decade, was filed by a successor-in-interest entity which assumed liability for over 100,000 then pending asbestos-related lawsuits. While all of these cases may indeed have factual distinctions from the case at bar, the important takeaway is that the 2021 Corporate Restructuring was not such a novel ploy and the attention it has received is likely attributable more to the significant financial capacity of J&J, the controversial venue effort, and the timing of the bankruptcy filing given the uproar surrounding the *Purdue Pharma* confirmation battle. None of these factors, however, bear upon on this Court's resolution of the pending Motions.

Movants point to the indisputable fact that the current Debtor had no liabilities (and thus no need for a bankruptcy filing) until the divisional merger was completed hours before the filing. The Court fully understands the refrain that if J&J or New JJCI are to obtain the benefits under the Bankruptcy Code, they should file their own chapter 11 cases and bear the burdens under the Bankruptcy Code. As noted in Movants' Reply Memorandum:

> Under the law, J&J and New JJCI must shoulder burdens commensurate to such benefits: "Since a discharge is an extreme remedy, stripping a creditor of claims against its will, it is a privilege reserved for those entities which file a petition under the bankruptcy code and abide by its rules. Simply put, 'the enjoyment of the benefits afforded by the code is contingent on the acceptance of its burdens.'" *In re Arrowmill Dev't Corp*., 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (citation omitted). J&J and New JJCI thus must file for bankruptcy for this kind of benefits package. *See id*. at 506.

*TCC I Reply Mem*. at 10, ECF No. 1357. While that argument has facial appeal, it falters when the Court reviews and weighs the harm such filings would cause to Debtor, its affiliates, the bankruptcy estate, all creditors and claimants, and non-insider third parties. Filings by these companies would create behemoth bankruptcies, extraordinary administrative costs and burdens,

46

significant delays and unmanageable dockets. One need only look at the conflict list in this case—

revealing pages and pages of domestic and global affiliated entities and related parties—to confirm

that such filings would pose massive disruptions to operations, supply chains, vendor and

employee relationships, ongoing scientific research, and banking and retail relationships—just to

name a few impacted areas. The administrative and professional fees and costs associated with

such filings would likely dwarf the hundreds of millions of dollars paid in mega cases previously

filed—and for what end? Even if Old JJCI had itself filed for bankruptcy, the talc actions would

still be subject to the automatic stay, the assets available to pay those claims would be no greater,

and the sole issue in the case would still be the resolution of the talc liabilities.

Let me be clear, this is not a case of too big to fail… rather, this is a case of too much value

to be wasted, which value could be better used to achieve some semblance of justice for existing

and future talc victims. The Court is not addressing the needs of a failing company engaged in a

forced liquidation. Instead, the J&J corporate enterprise is a profitable global supplier of health,

consumer products and pharmaceuticals that employs over 130,000 individuals globally, whose

families are dependent upon continued successful operations. Why is it necessary to place at risk

the livelihoods of employees, suppliers, distributors, vendors, landlords, retailers—just to name a

few innocent third parties—due to the dramatically increased costs and risks associated with all

chapter 11 filings, when there is no palpable benefits to those suffering and their families? Clearly,

the added hundreds of millions of dollars that would be spent on professional fees alone would be

better directed to a settlement trust for the benefit of the cancer victims. As acknowledged by other

courts, bankruptcy filings by J&J, Old JJCI, or New JJCI would pose potential negative consequences, without offering a positive change in direction or pathway to success in this case.[29]

And what are the important burdens of bankruptcy that J&J, Old JJCI and New JJCI have avoided through use of the Texas divisional merger statute? The Bankruptcy Code requires full transparency of all assets, liabilities and financial conduct through scheduling and reporting. Moreover, the Code mandates accountability for all assets and expenditures. Likewise, the Code requires judicial oversight over all non-ordinary course of business conduct. Finally, the Code burdens a debtor with the need to reach a consensus with its creditor base though the plan process and voting requirements. Given what will be required to confirm a plan in this case, as well as the attention this case is receiving from the public, media, government regulators, policy makers—let alone the Court, the United States Trustee and the dozens of attorneys involved—the Court is disinclined to view any of these entities as escaping the scrutiny or burdens.

There is no question that a fair resolution of this chapter 11 proceeding will require extraordinarily large contributions by the J&J corporate family, and likely insurers, toward a settlement fund. The sooner we get there, the better all around. Grossly multiplying the costs and complexity of this proceeding will not help the process. The J&J corporate family will not attain the benefits sought in this proceeding unless and until the parties can reach a court-approved global resolution under a confirmed plan of reorganization. This dynamic does not change whether Debtor, as a special purpose vehicle, filed the chapter 11 or the J&J family filed independent

---

[29] *See In re Aldrich Pump, LLC,* 2021 WL 3729335, at *8 (acknowledging the "serious negative consequences" of a hypothetical bankruptcy filing of Old IRNJ and Old Trane); *In re DBMP LLC,* 2021 WL 3552350, at *8 (acknowledging adverse effects of hypothetical bankruptcy filing of Old CertainTeed).

chapter 11 cases. The potential loss in market value, the disruptions to operations, and the excessive administrative costs associated with independent chapter 11 filings justify the business decision to employ the divisional merger statute as a means of entering the bankruptcy system.

The decision to seek resolution of the present and future talc claims within the bankruptcy system, through a § 524(g) asbestos settlement trust in lieu of continued state court litigation, is consistent with congressional objectives dating back to implementation of the § 524 asbestos provisions, which codified the approach taken in *In re Johns-Manville*. Congress has not made significant modifications to the statute, so we must assume that such mass tort resolutions—at least as to asbestos claims—are consistent with public policy. Notwithstanding, Movants and the plaintiffs' committees in the cases pending in North Carolina are vigorously challenging the chapter 11 process. As noted previously, Congress placed the tort claimants in a strong position by implementing a 75% super majority class voting requirement to confirm a plan with a § 524(g) trust. This leverage comes with responsibility, however, to engage in good faith and pursue the best interests of the collective class. In exchange, this Court will endeavor to ensure that those who are suffering currently, and in the future, have their day in court—this Court—and receive fair compensation under a comprehensive and transparent distribution scheme.

As to whether the divisional merger or the desired implementation of a § 524(g) trust should be regarded as an abusive or unfair "litigation strategy" warranting dismissal of the case for bad faith, this Court is tasked to define the permissible parameters of a debtor's pre-petition litigation strategy. In doing so, this Court takes into account the totality of circumstances, such as litigation posture outside the bankruptcy court, the subjective intent of the debtor and management,

the degree of financial distress facing the debtor, the pressures from nonmoving creditors, pre-petition litigation conduct, the nature of the creditor body and the extent of assets, the structure and formation of the debtor, and—most importantly in this Court's view—the debtor's reorganizational purpose and exit strategy. Here, Debtor did not undertake the corporate restructuring and bankruptcy filing as litigation tactics designed **solely** to gain a litigation advantage or hinder a plaintiff in any of the thousands of pending tort actions. Rather, Debtor seeks to employ the tools provided by Congress under the Bankruptcy Code (the automatic stay and §105 or § 524(g) trust) to attain a bankruptcy resolution of its mass tort liabilities. Without more, merely availing itself of chapter 11 tools does not constitute an improper litigation tactic. *See In re Am. Cap. Equip., LLC*, 296 F. App'x. 270, 274 (3d Cir. 2008) (finding no intent to confer "a particular litigation advantage to Debtors, over and above the advantages that a typical debtor may properly obtain by availing himself of the bankruptcy system").

A finding that there exists an abusive litigation strategy, warranting dismissal of the case, is made most often in such obvious circumstances as a filing intended to simply delay the inevitable entry of judgment, to forestall collection efforts to allow the transfer of assets, a filing without any real prospects of confirming a plan or reorganizing, or where there is pointed effort to exploit the Bankruptcy Code—to name just a few examples. Certainly, this case differs from the above scenarios. The Claimants cite to *In re Integrated Telecom Express, Inc*., 384 F.3d 108 (3d Cir. 2004), and *In re 15375 Memorial Corp.*, 589 F.3d 605 (3d Cir. 2009), for the proposition that a desire to use a particular provision in the Bankruptcy Code is "by itself" insufficient to establish

good faith.[30] *Comm. Mot. to Dismiss* ¶ 48, ECF No. 632; *Arnold & Itkin Mot. to Dismiss*. ¶¶ 51-

52, ECF No. 766. Yet, Claimants fail to explain how Debtor's filing effectuated any "tactical

litigation advantage" in any of the tens of thousands of talc claims pending as of the Petition Date.

It is evident from the record that Debtor filed this case to resolve the potentially crippling costs

and financial drain associated with defending—over the next several decades—tens of thousands

(if not hundreds of thousands) of personal injury claims with a multi-billion dollar exposure to

Debtor and nondebtor affiliates.[31] Indeed, as this Court has emphasized throughout this Opinion,

far from a means to  "hinder and delay talc claimants," a global resolution of these claims though

the bankruptcy may indeed accelerate payment to cancer victims and their families.

    With respect to the use of the now infamous "Texas Two-Step," the Court finds nothing

inherently unlawful or improper with application of the Texas divisional merger scheme in a

manner which would facilitate a chapter 11 filing for one of the resulting new entities. This Court

does not find that the rights of the talc claimants and holders of future demands are materially

affected by the divisional merger.  Certainly, I can say with some confidence, that the legislature

---

[30] The Court finds many of the other cases cited by Movants to be inapposite, in that they involve efforts by a debtor to hinder, delay or disrupt a pending two-party disputes, as opposed to the circumstances present in this matter. *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 829 (9th Cir. 1994) (finding debtor with clear ability to pay judgment filed solely to avoid paying a judgment or posting appeal bond); *In re Ravick Corp.*, 106 B.R. 834, 851 (Bankr. D.N.J. 1989) (finding debtor sought to upend previous decision of trial court ordering specific performance against debtor); *Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp.)*, 206 B.R. 757, 759-60 (E.D. Pa. 1997) (finding financially health debtor filed bankruptcy three days after state appellate court vacated earlier order staying proceeding); *Furness v. Lilienfield*, 35 B.R. 1006, 1007-08 (D. Md. 1983) (finding debtor filed bankruptcy on the eve of trial after repeated delays and multiple unsuccessful attempts to postpone trial).

[31] It is uncontested that during the twenty-one months (January 1, 2020 through September 30, 2021) preceding the petition date, Old JJCI expended roughly $3.6 billion of litigation expenses relating to the Talc Claims—34% of the company's sales, resulting in a pre-tax loss of nearly a billion dollars ($893.4 million) in the 21 months leading up to the petition date. *See JJCI Income Statements* (for the periods Jan. 1, 2020 to Dec. 31, 2020 and Jan. 1, 2021 to Sept. 30, 2021), *Torborg Decl. Exhibits C, D*, ECF No. 956-4.

which passed the statute into law probably did not foresee its current popular use. Notwithstanding, the statute makes clear the legislative intent that there be a neutral impact upon creditors. If current use of the divisional merger scheme as a foundation for chapter 11 filings conflicts with Texas' legislative scheme and goals, it can be repealed or modified. Until such time that there is legislative action, I am not prepared to rule that use of the statute as undertaken in this case, standing alone, evidences bad faith.

Argument has been put forward by Movants, other parties in interest, and the drafters of the *amici curie* brief that allowing this case to proceed will inevitably "open the floodgates" to similar machinations and chapter 11 filings by other companies defending against mass tort claims. Given the Court's view that the establishment of a settlement trust within the bankruptcy system offers a preferred approach to best serve the interests of injured tort claimants and their families, maybe the gates indeed should be opened. Nonetheless, for most companies, the complexity, necessary capital structure, and financial commitments required to lawfully implement a corporate restructuring as done in this case, will limit the utility of the "Texas Two-Step." Not many debtors facing financial hardships have an independent funding source willing and capable of satisfying the business's outstanding indebtedness. Moreover, the Court notes that in the fifteen years since having been appointed to the bankruptcy bench, there have been roughly 60 asbestos case filings under chapter 11 across the country, and under 100 filings since the very first case in 1982—hardly a flood. There have been, of course, dozens of additional mass tort cases not involving asbestos, primarily filings by a handful of pharmaceutical companies, manufacturers and several dozen catholic dioceses. With respect to the latter, the Court doubts very much that the dioceses will be

utilizing the Texas Business Code to restructure in advance of filing under the Bankruptcy Code.

Quite simply, the Court does not anticipate the forecasted parade of horribles.

### 4. Application of Equitable Considerations

Movants urge the Court to exercise its equitable powers in dismissing this proceeding:

> Bankruptcy courts are courts of equity. *See, e.g.*, *Young v. United States*, 535 U.S. 43, 50–51 (2002) (explaining that bankruptcy courts "appl[y] the principles and rules of equity jurisprudence") (citation omitted); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.") (citation omitted); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."); *Pepper v. Litton*, 308 U.S. 295, 304 (1939) ("for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'" (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934))). . . . A bankruptcy court can exercise its equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper*, 308 U.S. at 305.

*TCC II Reply Mem.* at 33, ECF No. 1358. The Court is unsure how this argument aides Movants' position. Indeed, the last quote above from the *Pepper* opinion suggests—and the Court agrees— that form should not supplant substance.  Such is the very reason the Court is disinclined to dismiss this case based on Debtor's 2021 corporate reorganization efforts. At the risk of being labeled didactic, the Court observes that notwithstanding the ubiquitous acceptance by courts and attorneys, bankruptcy courts are not courts of equity. Rather, bankruptcy courts exercise authority granted by statute and may address both legal and equitable claims. *See* Hon. Marica S. Kreiger, *"The Bankruptcy Court is a Court of Equity": What does that Mean?,* 50 S.C.L. Rev. 275 (1999).

True, for purposes of jurisdiction and authority, the Bankruptcy Act of 1898[32] granted the district courts exclusive bankruptcy jurisdiction at law and equity. A comparable grant of equitable jurisdiction is wholly absent in the Bankruptcy Code or Judicial Code. Bankruptcy courts are specialized courts with limited jurisdiction that apply statutory law. Included within these statutory powers is § 105(a) of the Bankruptcy Code which empowers this Court to "[i]ssue any order, process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Pursuant to this provision, the Court has certain authority to fashion any order or decree that is in the interest of preserving or protecting the value of a debtor's assets. *See e.g., In re Morristown & Erie Railroad Co.*, 885 F.2d 98, 100 (3d Cir. 1990) (noting that § 105(a) of the Bankruptcy Code is a powerful and versatile tool).

In permitting this case to proceed going forward, this Court stands prepared to employ its limited equitable authority under § 105(a) to facilitate and assist Debtor and all tort claimants to achieve a fair and just result, consistent with the social policies and objectives intended by Congress in enacting the Bankruptcy Code. As noted by the late District Judge Jack B. Weinstein, the use of equitable concepts is particularly appropriate to address the social needs involved with mass tort cases:

> Once the province of common law courts and judges, mass tort cases now forced the courts to adopt an equitable posture. Courts of equity traditionally have taken into account the equities-the concrete issues of fact and fairness of the particular situation-in fashioning remedies. In the mass tort context these include: (1) fairly and expeditiously compensating numerous victims, and (2) deterring wrongful conduct where possible; while (3) preventing over deterrence in mass torts from shutting down industry or removing needed products from the market, (4) keeping the courts from becoming paralyzed by tens or even hundreds of thousands of

---

[32] Bankruptcy Act of 1898, ch. 541, 30 Stat. 545 (1898).

repetitive personal injury cases, and (5) reducing transactional costs of compensation.

JACK B. WEINSTEIN & EILEEN B. HERSHENOV, *The Effect of Equity on Mass Tort Law,* 991 U. ILL. While class actions offer no pathway for redress with personal injury mass tort litigation and MDL's have been employed in the past with only limited success, and neither address the needs of future claimants, the use of the tools found within the Bankruptcy Code may well be the key here to fashion the remedies envisioned by Judge Weinstein.

### III.    Conclusion

For the reasons discussed, the Court denies the Motions in their entirety. The Court is aware that its decision today will be met with much angst and concern. Nonetheless, the matter before the Court is so much more than an academic exercise or public policy debate. These issues impact real lives. This Court lives with the distress in the voice of Vincent Hill, a mesothelioma plaintiff, when he testified about wanting his day in court and the need to care for his family. Sadly, Mr. Hill passed away recently and his death reaffirms for this Court the horrible truth that many of these cancer victims will not live to see their cases through the trial and appellate systems, but certainly deserve the comfort in knowing that their families' financial needs will be addressed timely. The Court remains steadfast in its belief that justice will best be served by expeditiously providing critical compensation through a court-supervised, fair, and less costly settlement trust arrangement.

During closing arguments, the U.S. Trustee suggested that if the case were not dismissed, the Court should consider the appointment of a chapter 11 trustee. This same argument was raised by counsel for the Canadian Class Plaintiffs. In apparent response, Debtor offered to consent to

(1) the appointment of an examiner to investigate and (2) derivative standing for the Original TCC to pursue any valid claims for possible avoidance actions or other claims relative to the 2021 Corporate Restructuring. The record does not support a finding of Debtor's pre-petition or post-petition malfeasance, or other cause warranting the appointment of a chapter 11 trustee and the attendant costs. The Court, nonetheless, agrees that there is a need for independent scrutiny of possible claims while the case progresses through the appointment of a Future Talc Claims Representative, mediation and towards the plan formulation process. The Court will take up these issues at the upcoming March 8, 2022, omnibus hearing. The Court will enter an order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: February 25, 2022

# **Exhibit C**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>Plaintiff,<br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>Defendants. | Adv. No.: 21-3032 (MBK) |

Order Filed on March 7, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey

**ORDER (I) DECLARING THAT AUTOMATIC STAY**
**APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS**
**AND (II) PRELIMINARILY ENJOININ**

**DATED: March 7, 2022**

The relief set forth on the following pages is heret

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

(Page 2)
Debtor: LTL Management LLC
Case No. 21-3032-MBK
Caption:  Order (I) Declaring that Automatic Stay Applies to Certain Actions Against
Non-Debtors and (II) Preliminarily Enjoining Certain Actions

This matter coming before the Court on the *Complaint for Declaratory and Injunctive*

*Relief (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors or*

*(II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order*

*Pending a Final Hearing* [Adv. Dkt. 1] (the "Complaint"), the *Debtor's Motion for an Order*

*(I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or*

*(II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order*

*Pending a Final Hearing* [Adv. Dkt. 2] (the "Motion"),[2] both filed by the above-captioned

plaintiff and debtor (the "Debtor");[3] the Court having considered (i) the submissions of the

parties, including the Complaint, the Motion, the Debtor's supplemental memorandum of law,

and the responses, objections and replies in respect of the Motion or the Complaint,[4] (ii) the

arguments set forth on the record at a hearing held on February 18, 2022, and (iii) the evidence

submitted by the parties, including declarations, testimony and exhibits filed with or presented to

---

[2]    Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.
For purposes of this Order only, the term "Enjoined Talc Claims" shall mean, collectively, any
talc-related claims against the Debtor, including all claims relating in any way to talc or
talc-containing materials that formerly were asserted against (or that could have been asserted
against) the former Johnson & Johnson Consumer Inc. ("Old JJCI") on any theory of liability
(whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or
voidable transfer or conveyance, alter ego or otherwise).  For the avoidance of doubt, Enjoined
Talc Claims include, without limitation, all talc personal injury claims and other talc-related
claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate
Restructuring.  The Enjoined Talc Claims do not include talc-related claims for which the
exclusive remedy is provided under workers' compensation statutes and similar laws.

[3]    The Plaintiff in this adversary proceeding (the "Adversary Proceeding") is Debtor LTL
Management LLC.  The Defendants in the Adversary Proceeding are those parties listed on
Appendix A to the Complaint, as amended [Adv. Pro. Dkt. 60], as well as John and Jane Does 1-
1000.  The Defendants listed on Appendix A are all named plaintiffs in talc-related lawsuits
against the Debtor (or for which the Debtor is responsible or alleged responsible) as of the Petition
Date who sought to hold, or may seek to hold, the Protected Parties liable for the Enjoined Talc
Claims.  The Protected Parties are listed in Appendix B to the Complaint.  Defendants John and
Jane Does 1-1000 are prospective plaintiffs who may at any time while the above-captioned
chapter 11 case is pending seek to hold the Protected Parties liable for the Enjoined Talc Claims.

[4]    See Adv. Dkts. 44, 45, 49, 50, 52, 58, 104, 128, 141, 142, 143, and 146.

(Page 3)
Debtor: LTL Management LLC
Case No. 21-3032-MBK
Caption:  Order (I) Declaring that Automatic Stay Applies to Certain Actions Against
Non-Debtors and (II) Preliminarily Enjoining Certain Actions

the Court or the Bankruptcy Court for the Western District of North Carolina;[5] the Court having

entered the *Bridge Order Extending Termination Date of Order Granting the Debtor's Request

for Preliminary Injunctive Relief* [Adv. Dkt. 157] and having issued the *Memorandum Opinion*

[Adv. Dkt. 184] (the "PI Opinion"); for the reasons set forth in the PI Opinion, which is

incorporated herein by reference, **IT IS HEREBY ORDERED THAT:**

      1.     The Motion is GRANTED and the Adversary Proceeding is resolved in

favor of the Debtor.  All objections to the relief granted herein are OVERRULED.

      2.     The Defendants are prohibited and enjoined, pursuant to sections 105 and

362 of the Bankruptcy Code, from commencing or continuing to prosecute any Enjoined Talc

Claim against any of the Protected Parties, on any theory of liability, whether direct, derivative,

joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or

conveyance, alter ego or otherwise, for the period this Order is effective pursuant to

paragraph 15, below.  This injunction includes, without limitation:  (a) the pursuit of discovery

from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement

of any discovery order against the Protected Parties; (c) further motions practice related to the

foregoing; and (d) any collection activity on account of an Enjoined Talc Claim against any

Protected Party or its officers, directors, employees or agents or its respective assets.

      3.     In addition, and without limiting the foregoing, the Court finds and

declares that the commencement or continued prosecution of any Enjoined Talc Claim by any

Defendant against any of the Protected Parties while the Chapter 11 Case remains pending,

---

[5]    See Adv. Dkt. 176.

(Page 4)
Debtor: LTL Management LLC
Case No. 21-3032-MBK
Caption:  Order (I) Declaring that Automatic Stay Applies to Certain Actions Against
Non-Debtors and (II) Preliminarily Enjoining Certain Actions

including the actions listed in the last sentence of paragraph 2, above, would violate the

automatic stay imposed by sections 362(a)(l) and 362(a)(3) of the Bankruptcy Code and

therefore is prohibited.

4.    This Order is entered without prejudice to the Debtor's right to request

that the Court extend this Order to include other entities or persons not previously identified in

Appendix A or Appendix B to the Complaint.  In the event that the Debtor seeks to supplement

either Appendix A or Appendix B, the Debtor shall file with the Court and serve a notice,

together with a proposed order, setting forth any such modifications to Appendix A or

Appendix B.  The burden of proof for any modification of Appendix A or Appendix B is not

affected by this Order.  Parties shall have 14 days from the date of service of the notice to object

to the modification(s) to Appendix A or Appendix B, and the Debtor shall have 7 days from the

service of such objection to file and serve a response.  Absent a timely objection, the Debtor's

proposed modifications to Appendix A or Appendix B shall be approved by order of the Court

without the necessity of a hearing.  For the avoidance of doubt, the inclusion of a talc-related

claim on Appendix A is not an admission that such Defendant holds a currently pending claim

against either the Debtor or the Protected Parties.

5.    Notwithstanding anything to the contrary in this Order, Imerys Talc

America, Inc. and its affiliates (collectively, the "Imerys Entities") or Cyprus Mines Corporation

and its affiliates (collectively, the "Cyprus Entities") are not Defendants in this proceeding.  The

relief granted herein shall not apply to the Imerys Entities or the Cyprus Entities, and this Order

and the PI Opinion shall not bind the Imerys Entities or the Cyprus Entities.  The right of the

(Page 5)
Debtor: LTL Management LLC
Case No. 21-3032-MBK
Caption:  Order (I) Declaring that Automatic Stay Applies to Certain Actions Against
Non-Debtors and (II) Preliminarily Enjoining Certain Actions

Debtor to seek to enjoin the Imerys Entities or the Cyprus Entities, and the right of the Imerys

Entities or Cyprus Entities to oppose such relief, are hereby preserved in all respects.

      6.     Notwithstanding anything to the contrary in this Order, governmental units

(as defined under section 101 of the Bankruptcy Code) are not Defendants in this proceeding.

The relief granted herein, including any relief granted under this Order under section 105 of the

Bankruptcy Code, shall not apply to restrict or enlarge the rights of the Debtor or any

governmental unit under applicable bankruptcy law and all such rights are hereby preserved.

      7.     Any party subject to this Order may seek relief from any of the provisions

of this Order for cause shown.  This Order is without prejudice to the Debtor's or others' rights

to seek relief pursuant to section 362 of the Bankruptcy Code.

      8.     Notwithstanding anything to the contrary in this Order, any party asserting

Enjoined Talc Claims, without leave of the Court, may take reasonable steps to perpetuate

the testimony of any person subject to this Order who is not expected to survive the duration of

this Order or who otherwise is expected to be unable to provide testimony if such testimony is

not perpetuated during the duration of this Order.  Notice shall be provided to the Debtor by

notifying counsel for the Debtor of the perpetuation of such testimony.  The Debtor shall have

the right to object to the notice on any grounds it would have if it were a party to the underlying

proceeding and not subject to the terms of this Order, and the Debtor may raise any such

objection with the Court, except that the Debtor, Old JJCI and J&J waive objecting to the use of

such testimony based on lack of notice or lack of opportunity to cross-examine.  The use of such

testimony in any appropriate jurisdiction shall be subject to the applicable procedural and

evidentiary rules of such jurisdiction.  All parties reserve and do not waive any and all objections

(Page 6)
Debtor: LTL Management LLC
Case No. 21-3032-MBK
Caption:  Order (I) Declaring that Automatic Stay Applies to Certain Actions Against
Non-Debtors and (II) Preliminarily Enjoining Certain Actions

with respect to such testimony.  Defendants or other individuals asserting Enjoined Talc Claims

may not seek to perpetuate the testimony of representatives, including directors, officers,

employees and agents of the Debtor or the Protected Parties without the consent of the Debtor or

an order of the Court.  Notwithstanding the forgoing, parties in lawsuits pending in the MDL

who wish to perpetuate the testimony of any person subject to this Order who is not expected to

survive the duration of this Order or who otherwise is expected to be unable to provide testimony

if it is not perpetuated during the duration of this Order shall comply with the process outlined in

the In Extremis Deposition Protocol entered on January 23, 2017 in the MDL.

   9.  Pursuant to Bankruptcy Rule 7065, the Debtor is relieved from posting

any security in connection with this Order pursuant to Civil Rule 65(c).

   10.  This Order shall be immediately effective and enforceable upon its entry.

   11.  In accordance with section 108(c) of the Bankruptcy Code, this Order

shall toll, as of November 10, 2021, any applicable non-bankruptcy law, any order entered in a

non-bankruptcy proceeding, or any agreement that fixes a period under which an enjoined

Defendant is required to commence or continue a civil action in a court other than this Court on

any Enjoined Talc Claim asserted against the Debtor or any of the Protected Parties until the later

of:  (a) the end of such period, including any suspension of such period occurring on or after the

commencement of the case; or (b) 30 days after the termination or expiration of the preliminary

injunction issued by this Order.

   12.  The automatic stay shall continue to be lifted solely to permit the

applicable Defendants to proceed with and complete the following appeals, in each of which

(Page 7)
Debtor: LTL Management LLC
Case No. 21-3032-MBK
Caption:  Order (I) Declaring that Automatic Stay Applies to Certain Actions Against
Non-Debtors and (II) Preliminarily Enjoining Certain Actions

surety bonds have been issued in connection with the appeal: (a) <u>Leavitt</u>: (b) <u>Olson</u>; (c) <u>Schmitz</u>;

(d) <u>Barden</u> (as to Barden, Etheridge, McNeill and Ronning); (e) <u>Soskin</u>; and (f) <u>Prudencio</u>.

13.    The personal injury claims (including pain and suffering damages) of the

plaintiff in the <u>Vanklive</u> lawsuit shall be preserved even if the plaintiff subsequently dies (with

no impairment of such plaintiff's personal injury damages, including pain and suffering

damages).  The Debtor, New JJCI, and J&J specifically consent and agree to this provision.

14.    The Debtor shall cause a copy of this Order to be served via e-mail,

facsimile, hand delivery or overnight carrier on counsel for the known Defendants within three

business days of its entry on the Court's docket.

15.    This Order shall be promptly filed in the Clerk of Court's office and

entered into the record, and, except as the Court may otherwise determine, it shall remain

effective for the period through and including 30 days after the effective date of a confirmed plan

of reorganization in the Chapter 11 Case that is no longer subject to appeal or discretionary

review.

16.    The Court will revisit continuation of the automatic stay and preliminary

injunction ordered herein in 120 days from entry of the PI Opinion, on June 29, 2022, and similar

periods thereafter.

17.    The Court shall have exclusive jurisdiction over this Order and any and all

matters arising from or relating to the implementation, interpretation or enforcement of this

Order.

# Exhibit D

FOR PUBLICATION

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

<br><br><br>

LTL MANAGEMENT, LLC,

       Debtor.

<hr>

LTL MANAGEMENT, LLC,

       Plaintiff,

  v.

THOSE PARTIES LISTED ON APPPENDIX A TO
COMPLAINT and JOHN AND JANE DOES 1-1000,

       Defendants.

</td><td>

Case No. 21-30589 (MBK)

Adv. Pro. No. 21-03032 (MBK)

Chapter 11

Hearing Date:  February 18, 2022

</td></tr>
</table>

*All Counsel of Record*

## MEMORANDUM OPINION

This matter comes before the Court by way Debtor's bankruptcy case (Case No. 21-30589)

and subsequent adversary proceeding (Adv. Pro. No. 21-03032) and motion  ("Motion") (ECF No.

2 in Adv. Pro. No. 21-03032)[1] filed by Plaintiff LTL Management, LLC ("LTL" or "Debtor")

seeking an Order (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-

Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining

---

[1] Unless otherwise specified, all ECF Nos. will refer to docket entries in the Adversary Proceeding, Adv. Pro. No. 21-03032.

1

Order Pending a Final Hearing.  The Motion was initially filed in the Western District of North

Carolina.  Debtor filed a Supplemental Brief (ECF No. 128) to incorporate applicable Third Circuit

law.  The matter was fully briefed and scheduled for a Final Hearing.  The Court has fully

considered the submissions of the parties and the arguments set forth on the record at a hearing

held on February 18, 2022.  For the reasons set forth below, the Court grants Debtor's Motion and

resolves the adversary proceeding in favor of Debtor.  The Court issues the following findings of

fact and conclusions of law as required by FED. R. BANKR. P. 7052.[2]  Contemporaneously with

filing this Memorandum Opinion, the Court is filing a separate Opinion Denying the Motions to

Dismiss with respect to the pending motions to dismiss this chapter 11 proceeding.  These matters

have been tried collectively at evidentiary hearings held on February 14-18, 2022.  The Court also

adopts and incorporates herein the factual findings and conclusions of law set forth in the separate

Memorandum Opinion dated February 25, 2022.

## I.    Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended

September 18, 2012, referring all Bankruptcy cases to the Bankruptcy Court.  As explained in

detail below, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and

(G). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such.
Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## II.     Background

On October 14, 2021, LTL filed a voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Western District of North Carolina (the "North Carolina bankruptcy court"). *Petition*, ECF No. 1 in Case No. 21-30589.  LTL is an indirect subsidiary of Johnson & Johnson ("J&J") and traces its roots back to Johnson & Johnson Baby Products, Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J. *Declaration of John K. Kim in Support of First Day Pleadings* ("*Kim Decl.*") ¶¶ 9-10, ECF No. 5 in Case No. 21-30589.  J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products. *Id.* at ¶¶ 10-14.  In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder. *Id.*  In 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby Products.  *Id.*  In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division. *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions ("Kim Supp. Decl.")* ¶ 5, ECF No. 3.  Over the next few decades, nearly all assets[3] of the Baby Products division were transferred in a series of transactions and mergers, ultimately resting with one of J&J's corporate subsidiaries, Johnson & Johnson Consumer Inc. ("Old JJCI") in 2015. *Kim Decl.* ¶ 10-14, ECF No. 5 in Case No. 21-30589. Following these intercompany transactions, Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing baby powder caused ovarian cancer and mesothelioma. *Id.* at ¶¶ 15, 32.

---

[3] The only exception being those assets allocated to its diaper programs.

Similarly, through a series of transfers and indemnification agreements, Old JJCI assumed responsibility for all claims alleging that another J&J product, "Shower to Shower" caused cancer or other diseases. *Debtor's Supplemental Memorandum in Support of Preliminary Injunction Motion* ("*Debtor's Supp. Mem.*") 12-14, ECF No. 128. Old JJCI also agreed to indemnify various retailers ("Retailers") who sold Old JJCI's talc-containing products for claims related to the sale of such products. *Kim Supp. Decl.* ¶¶ 8-12, ECF No. 3.

On October 12, 2021, Old JJCI engaged in a series of transactions (the "2021 Corporate Restructuring") through which it ceased to exist and two new companies, LTL and Johnson & Johnson Consumer Inc. ("New JJCI"), were formed. *Kim Decl.* ¶ 16, 22-23, ECF No. 5 in Case No. 21-30589. The alleged purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Id.* at ¶ 21. As a result of the restructuring, LTL assumed responsibility for all of Old JJCI's talc-related liabilities. *Id.* at ¶¶ 16, 24. Through the restructuring, LTL also received Old JJCI's rights under a funding agreement (the "Funding Agreement"). *Id.* at ¶ 24. Under the Funding Agreement, J&J and New JJCI are obligated to pay, *inter alia*, "any and all costs and expenses" LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case" to the extent necessary. *Funding Agreement* 6, *Annex 2 to Declaration of John K. Kim in Support of First Day Pleadings*, ECF No. 5 in Case No. 21-30589.

Shortly after filing for bankruptcy on October 14, 2021 in the Western District of North Carolina, Debtor initiated the instant adversary proceeding, seeking declaratory and injunctive relief. Specifically, the Complaint requests an order declaring that the automatic stay applies to

certain actions against nondebtors (the "Protected Parties") or, in the alternative, asks the Court to

enjoin such actions and grant a temporary restraining order pending a final hearing. *Complaint*,

ECF No. 1.  Debtor simultaneously filed the instant Motion requesting a preliminary injunction

enjoining the prosecution of actions outside of the chapter 11 case on account of the same talc

claims that exist against the Debtor in the chapter 11 case. *Motion*, ECF No. 2.  The North Carolina

bankruptcy court held a two-day evidentiary hearing on November 4 and 5, 2021.  On November

10, 2021, Judge Whitley issued oral findings of fact and conclusions of law and granted the motion

on a preliminary basis. *North Carolina Bankruptcy Court's Order Granting Motion for

Preliminary Injunction*, ECF No. 102.  As the result of Judge Whitley's Order, the defendants were

"prohibited and enjoined, pursuant to sections 105 and 362 of the Bankruptcy Code, from

commencing or continuing to prosecute any [talc-related claims] against any of the Protected

Parties" for a period of 60 days. *Id.* at 7-8.  Judge Whitley made clear that his Order was without

prejudice and was "not intended to bind a subsequent Presiding Court." *Id.* at 7.  He then

transferred the bankruptcy case to the Bankruptcy Court for the District of New Jersey, and, on

November 17, 2021, this Court assumed exclusive jurisdiction of the adversary proceeding and

the underlying bankruptcy case.[4]

---

[4] This matter was initially scheduled to be heard on January 11, 2022, three days ahead of the January 14 expiration date of the Preliminary Injunction imposed by the North Carolina Order.  However, after the case was transferred to this Court, the Original TCC filed a Motion for Withdrawal of Reference (ECF No. 110) with the district court. Because the district court had not ruled on that motion—and in light of an identity of issues and evidence with the pending Motions to Dismiss in the main bankruptcy case—this Court adjourned the hearing date for this Motion to February 18, 2022, the final scheduled date for argument on the Motion to Dismiss.  Accordingly, On January 15, 2022, this Court entered a Bridge Order (ECF No. 157) extending the Preliminary Injunction entered by the North Carolina Bankruptcy Court to February 28, 2022.  In the interim, the District Court denied the Motion for Withdrawal of the Reference (ECF No. 32 in Case No. 21-cv-20252).

Following the transfer of the case to the District of New Jersey, Debtor supplemented its initial brief and amended and restated its arguments in support of the relief sought to reflect Third Circuit precedent. At its core, Debtor's argument remains the same and is two-fold. First, Debtor cites to 11 U.S.C. § 362 and contends that the automatic stay prohibits prosecution of talc claims against the Protected Parties. Second, Debtor asserts that the Court should exercise its authority under 11 U.S.C. § 105(a) to enjoin the continuation or commencement of the talc claims against the Protected Parties.

Several interested parties oppose the Motion, including: the Official Committee of Talc Claimants[5] (ECF No. 142), certain plaintiff-insurers (the "Objecting Insurers") (ECF No. 141), and attorneys for Alystock, Witkin, Kreis & Overholtz, PLLC ("AWKO") (ECF No. 143). The Debtor submitted an omnibus reply (ECF No. 146).[6]

In opposition to the Motion, the Original TCC contends that an extension of the stay under § 362(a) is not warranted. Moreover, the TCC asserts that this Court lacks subject matter jurisdiction to enjoin actions between nondebtors under § 105(a). AWKO likewise opposes the Motion and raises similar arguments. AWKO asserts that J&J must file its own bankruptcy

---

[5] At the time it filed its Opposition (ECF No. 142) on December 22, 2021, there existed only one Official Committee of Talc Claimants (the "Original TCC"). Soon thereafter, however, the United States Trustee reconstituted the Original TCC and appointed two separate committees: the Official Committee of Talc Claimants I (the "Ovarian Cancer Claimants Committee" or "TCC I") and the Official Committee of Talc Claimants II (the "Mesothelioma Claimants Committee" or "TCC II"). The U.S. Trustee's actions were challenged by way of motions filed in the underlying bankruptcy proceeding, which the Court granted in an Opinion dated January 20, 2022 (ECF No. 1212 in Case No. 21-30589). An Order memorializing the Court's ruling was entered on January 26, 2022 (ECF No. 1273). However, given the procedural posture of, and the pending motions in, both the underlying bankruptcy case and the instant adversary proceeding, the Court stayed the effect of its ruling, ordering that both TCC I and TCC II (collectively, the "Committees") "shall remain in full force and effect through March 8, 2022." *Order Granting Motions Challenging United States Trustees' Notice of Appointment* 2, ECF No. 1273 in Case No. 21-30589.

[6] On February 1, 2022, TCC II filed a Sur-Reply (ECF No. 166); however, that pleading was struck for the reasons set forth on the record during the hearing on February 10, 2022.

petition to enjoy the benefits and protections of the Bankruptcy Code's automatic stay and argues

that equitable relief under § 105(a) is not warranted.  Finally, the Objecting Insurers object to the

Motion only to the extent it seeks to enjoin pending litigation in the Superior Court of New Jersey

(the "New Jersey Coverage Action").

### III.   Discussion

#### A.  The Automatic Stay

Section 362(a) of the Bankruptcy Code provides, in relevant part, that

a petition filed under section 301, 302, or 303 of this title . . . operates as a stay applicable
to all entities, of—

> (1)  the commencement or continuation, including the issuance or employment of
> process, of a judicial, administrative, or other action or proceeding against the
> debtor that was or could have been commenced before the commencement of the
> case under this title, or to recover a claim against the debtor that arose before the
> commencement of the case under this title;
>
> . . .
>
> (3) any act to obtain possession of property of the estate or of property from the
> estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a).

The Third Circuit has explained that the purpose of the automatic stay is "two-fold." *In re

Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019).  First, it serves to "protect the debtor, by

stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a

respite from creditors and a chance to attempt a repayment or reorganization plan or simply be

relieved of the financial pressures that drove him or her into bankruptcy[.]" *Id.* (quotations,

citations, and alterations omitted).  Second it "protect[s] creditors by preventing particular

creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors." *Id.*

Although the scope of the automatic stay is broad, its protections typically apply only to debtors, not nondebtor defendants. *ACandS, Inc. v. Travelers Cas. & Sur. Co.,* 435 F.3d 252, 259 (3d Cir. 2006) (noting that "the scope of the automatic stay is broad and covers all proceedings against a debtor"); *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509 (3d Cir. 1997) (holding that "the clear language of section 362(a) stays actions only against a 'debtor.'"); *see also In re SN Liquidation, Inc.*, 388 B.R. 579 (Bankr. D. Del. 2008).  Nevertheless, by way of the Motion, Debtor seeks a declaration that the automatic stay enjoins actions against the Protected Parties, who are nondebtor entities.

### 1.    Authority for Extension of Stay to Nondebtors

Prior to engaging in analysis, this Court clarifies the framework within which motions seeking this type of relief are evaluated.  As with the instant Motion, most motions seeking to prevent litigation against nondebtor third parties are premised on both the automatic stay under §362(a) and a court's equitable powers under § 105(a).  However,

> [I]t is unclear whether the Third Circuit views staying an action to aid a debtor's reorganization the result of extending the § 362(a) stay or the result of issuing a separate injunction pursuant to, for example, a district court's inherent power to stay a pending action or a bankruptcy court's power under § 105(a).

*Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *1 n.7 (E.D. Pa. Apr. 15, 2009).  Courts in this circuit have recognized that "caselaw concerning the use of authority conferred by section 105(a) to implement the substantive powers created by section 362(a) is not entirely consistent." *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 103 n.8 (E.D. Pa. 2010)

8

(citing *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009) (noting that courts have often conflated the analysis of sections 362(a) and 105(a), and confused the issue). Indeed, many courts have used some iteration of the phrases "extension of the stay" and "injunctive relief" interchangeably when discussing whether to permit actions against nondebtor third parties to proceed. Additionally, many courts have cited only to § 105(a). *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 568 (3d Cir. 2004) (reviewing a § 105(a) injunction); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986) (granting an injunction under § 105(a), without discussion of § 362(a)).

In this Court's view, ample authority exists to conclude that § 362(a), § 105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties. For example, in *In re A.H. Robins Co., Inc.*—a case which the Third Circuit has cited with approval—the Fourth Circuit meticulously set forth the courts' powers, discussing each different source of authority in a separate section of the decision. *See In re A.H. Robins Co (A.H. Robins Co. v. Piccinin)*, 788 F.2d 994, 1001-1003 (4th Cir. 1986) (cited with approval in *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997)). The *Robins* court stated that a bankruptcy court may preclude lawsuits directly under: (1) § 362(a); or (2) by way of an injunction under §105(a); or (3) pursuant to its inherent power. 788 F.2d at 1001-003. The following year, in a subsequent case also related to the A.H. Robins bankruptcy, the Fourth Circuit clarified that it held in *Robins* "that the district court had four independent grounds on which it could stay the plaintiffs' suit against [the nondebtor third party]." *In re A.H. Robins Co. Inc. (A.H. Robins Co. v Aetna)*, 828 F.2d 1023, 1024 (4th Cir. 1987) (referring to § 362(a)(1), § 362(a)(3), § 105(a), and a court's

inherent powers under 28 U.S.C. § 1334 as independent bases for extension of the automatic stay to nondebtor third parties).

Further, the Third Circuit in *McCartney v. Integra Nat. Bank N.* recognized "a number of cases where courts have applied the automatic stay protection to nondebtor third parties." 106 F.3d 506, 510 (3d Cir. 1997). In doing so, the Third Circuit cited to *Robins* and explicitly acknowledged that the *Robins* court had relied on "both the automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants." *Id.* (citing *Robins*, 788 F.2d. 994). In its analysis, the *McCartney* court held that the plaintiff "was stayed from pursuing a deficiency judgment action against the nondebtor third party" because— due to the unusual circumstances of the case—doing so would "defeat the purpose of § 362." *Id.* at 511. Thus, the Third Circuit in *McCartney* upheld extension of the stay to a nondebtor solely on the basis of § 362, and without mention of § 105(a) in its analysis. To this Court, the decision in *McCartney* appears to be an endorsement of § 362 as an independent basis for extending the stay.

Nevertheless, several courts still view this as an open-ended question. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 423 B.R. at 103 n.8; *In re Philadelphia Newspapers, LLC*, 407 B.R. at 611; *Stanford v. Foamex L.P.*, 2009 WL 1033607, at *1 n.7. In their view, however, the issue is "academic as the practical effect (i.e., the staying of an action) is the same regardless of the means employed." *Foamex*, 2009 WL 1033607, at *1 n.7; *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 103 n.8 (declining to "delve into this analytical quagmire . . . [regarding] . . . whether the order issued by the Bankruptcy Court constituted the extension of the

stay under section 362(a) or an injunction under section 105(a)" because it was "of no moment for purposes of this appeal"). This Court disagrees. Although a discussion of the ultimate *effect* may be purely "academic" because the end result is the same, the proper *procedure* for getting there under each basis employs different methodologies and, thus, cannot be brushed aside as semantics. Significantly, if a court were to determine that § 362(a)(3), alone, serves as a proper basis to extend the stay to a nondebtor, then the inquiry could end there. However, to the extent a court wishes to rely on § 105(a) to enjoin actions against nondebtors, the court must first decide that it has subject matter jurisdiction. *See In re W.R. Grace & Co.,* 591 F.3d 164, 170–71 (3d Cir. 2009) (quoting *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 225 (3d Cir.2004)) (holding that, because § 105(a) does not provide an independent source of federal subject matter jurisdiction, a court must establish that it has subject matter jurisdiction prior to issuing an injunction under § 105(a)).

Ultimately, until the Third Circuit provides clearer guidance, this issue remains unsettled. Indeed, in several cases out of the Eastern District of Pennsylvania, district courts have used and re-used a three-step inquiry to determine whether the bankruptcy court's extension of a stay to a nondebtor was appropriate: "(1) whether the Bankruptcy Court had jurisdiction to issue the injunction; (2) whether the Bankruptcy Court properly extended the automatic stay under section 362(a) to the non-debtors; and (3) whether the Bankruptcy Court properly exercised its discretion in issuing the injunction." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 102 (citing *Philadelphia Newspapers II,* 407 B.R. at 611). Therefore, although this Court maintains that application of the stay to nondebtor third parties can be premised on several distinct grounds, this

11

Court will follow the framework established in the *In re Philadelphia Newspapers* line of cases. Accordingly, the Court first addresses its jurisdiction.

### B. Subject Matter Jurisdiction

"Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), as amended (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004) (citations omitted)). "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)). A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings. 28 U.S.C. §157(b)(1); *In re Roggio*, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020).

A proceeding "arise[s] under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d at 217. (3d Cir. 2006). A proceeding "arise[s] in" a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Id.* at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) and explaining that a proceeding arises in a bankruptcy case if it has "no existence outside of the bankruptcy"). Finally, "a claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar*

12

*Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted); *see also In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009).

The Original TCC maintains that this Court lacks subject matter jurisdiction over this issue. First, the Original TCC contends that Debtor's request for injunctive relief is not a core proceeding because it does not "arise under" or "arise in" the bankruptcy case. The Original TCC does not develop this argument and asserts, broadly, that injunctive relief is not unique to bankruptcy cases and that "Debtor's mere invocation of § 105 (or § 362, for that matter) is insufficient to establish that the injunction it seeks" is a core proceeding. *Objection of Original TCC* 80, ECF No. 142. The Original TCC then adds that, "[e]ven if these statutory provisions fall under the Court's 'core' jurisdiction in a general sense, the Court is without any jurisdiction to stay actions between non-debtors unless those actions could have some conceivable impact on the estate." *Id.* at 80-81. As Debtor points out, the Original TCC is incorrect. To the extent a proceeding is a "core" proceeding, the Court has jurisdiction and the inquiry ends there. Courts need not consider the impact on the estate unless they are exercising "related-to" jurisdiction. The case law cited by the Original TCC in its supporting footnote supports this position. *See, e.g.*, *Stoe v. Flaherty*, 436 F.3d 209 (finding that the court lacked jurisdiction because the matter was *not* a core proceeding).

Although "the Third Circuit has not addressed this precise issue, other courts have concluded that motions to extend an automatic stay and injunction to non-debtor third parties pursuant to sections 362 and 105 qualify as 'core' proceedings." *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, No. 21-cv-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (collecting cases). Further, Debtor in this case invokes § 362 to obtain the relief it seeks.

13

Because the instant proceeding invokes a substantive right under the Bankruptcy Code and is a proceeding that, by its nature, could arise only in the context of a bankruptcy case, the Court determines that it is a core proceeding over which this Court can exercise jurisdiction.  In denying the Original TCC's motion to withdraw the reference, the district court reached the same conclusion. *Id.* ("Here, the Adversary Proceeding is a 'core' proceeding.").

In any event, the Court determines that it also has "related to" jurisdiction.  The Original TCC contends that talc-related claims against the nondebtor Protected Parties have "no conceivable effect on the Debtor's bankruptcy estate . . . ." *Objection of Original TCC* 81, ECF No. 142.  As discussed in greater detail *infra*, this Court disagrees.  "What will or will not be sufficiently related to a bankruptcy to warrant the exercise of subject matter jurisdiction is a matter that must be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n.9 (3d Cir. 2009).  Here, the Court concludes that Debtor is liable for the talc claims as the result of pre-petition corporate transactions, including the 2021 Corporate Restructuring, and various contractual indemnification obligations.  Additionally, although the extent of shared insurance coverage is disputed, it remains uncontested that Debtor shares insurance policies— which are estate property under 11 U.S.C. § 541(a)—with the Protected Parties.  Therefore, continued litigation of talc claims against the Protected Parties has a "conceivable effect" on the bankruptcy estate because it effectively seeks to collect and liquidate claims against Debtor and could deplete available insurance coverage.  The weight of the case law supports this conclusion. *See, e.g.*, *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 657 (E.D. Pa. 2011) (finding that debtor's potential indemnification obligations and the impact on debtor's reorganization efforts,

taken together, provide an adequate basis for the Court to find that the state court proceedings are sufficiently "related to" the underlying bankruptcy); *In re Philadelphia Newspapers, LLC*, 423 B.R. at 103 (finding "related to" jurisdiction where debtor might be obligated to indemnify third party in the event of a judgment); *Philadelphia Newspaper, LLC*, 407 B.R. at 614–15 (finding "related to" jurisdiction due to the impact of the litigation on the debtor's reorganization efforts as well as the debtor's practice of indemnifying its employees).[7]

### C.  § 362(a)(1)

In support of its position, Debtor first cites to subsection (1) of § 362(a).  Specifically, Debtor contends that the talc claims are—at their core—an attempt to liquidate and recover claims against Debtor.  Debtor explains that Old JJCI no longer exists and Debtor, alone, is responsible for the talc claims.  Debtor also contends that Old JJCI's and J&J's talc-related liabilities were transferred to Debtor as the result of the corporate transactions previously discussed.  Thus, Debtor asserts that talc-related claims against Old JJCI and J&J constitute "action[s] or proceeding[s] against the debtor" to collect pre-petition debts and are expressly precluded under § 362(a)(1). *Debtor's Supp. Mem.* 41, ECF No. 128 (citing *In re Heating Oil Partners*, No. 08-1976, 2009 WL 5110838, at *6-7 (D. Conn. Dec. 17, 2009)).

---

[7] In a footnote, the Original TCC relies on the Third Circuit's decision in *Federal-Mogul* for the proposition that "related to" bankruptcy jurisdiction "exists only where 'the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit.' " *Objection of Original TCC* 81, n.38, ECF No. 142. (quoting *In re Fed.-Mogul Glob., Inc.*, 300 F.3d 368, 382 (3d Cir. 2002)).  As Debtor points out, however, the court in *Federal-Mogul* did not reach the merits of whether the district court had "related to" jurisdiction. *In re Fed.-Mogul Glob., Inc.*, 300 F.3d at 384.  Instead, the appellate court reviewed the district court's denial of defendant's transfer motion in the context of deciding whether to grant a writ of mandamus. *Id.*  Thus, the Original TCC's reliance on *Federal-Mogul* does not alter this Court's conclusion with respect to subject matter jurisdiction.

Additionally, Debtor points out that it is responsible for claims asserted against the Retailers and certain other indemnified parties, including New JJCI and J&J (the "Indemnified Parties"). Accordingly, Debtor argues that although talc claims are asserted against these other entities, Debtor is the true defendant. Indeed, Third Circuit precedent recognizes that the automatic stay under § 362(a)(1) can be extended to third parties where "unusual circumstances" exist. *See McCartney v. Integra Nat. Bank N.*, 106 F.3d at 510. Such unusual circumstances may be found "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *Id.* (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)); *see also In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that unusual circumstances exist warranting extension of the stay to nondebtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization"); *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004).

The Original TCC and AWOK (collectively, the "Objecting Parties") vehemently object to Debtor's request to extend the automatic stay to the Protected Parties. Their primary argument in opposition is bottomed on the Objecting Parties' distaste for the 2021 Corporate Restructuring and the use of the Texas divisional merger statute to create a special purpose vehicle in the hours before the bankruptcy filing to accomplish J&J's goals. *See Objection of Original TCC* 49-52, ECF No. 142, *Objection of AWOK* ¶12, ECF No. 143. Both Objecting Parties ask this Court to

look beyond the plain statutory language and see the larger picture. *See Objection of Original TCC* 51-53, ECF No. 142; *Objection of AWOK* 7, ECF No. 143 (asking the Court to "take into account all the relevant circumstances"). In short, they contend it would be inequitable—and produce an "absurd result"—if courts were to permit nondebtors to "avail themselves of the automatic stay simply by unilaterally allocating to the debtor indemnity and other obligations on the eve of the bankruptcy filing." *Objection of Original TCC* 53, ECF No. 142.

This Court recognizes that it is obligated "to construe statutes sensibly and avoid constructions which yield absurd or unjust results." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014) (quoting *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L.Ed.2d 290 (1989)). However, as discussed at length in the Opinion Denying the Motions to Dismiss, this Court finds no impropriety in the divisional merger used here to create a special-purpose vehicle to address the talc claims and, thus, perceives no "absurd or unjust result" produced if the automatic stay is extended to the Protected Parties to enable Debtor to achieve its ultimate objective. As Debtor points out, and as expressly found by Judge Whitley after the initial hearing, if the stay is *not* extended to the Protected Parties, it is difficult to envision how a successful reorganization can be achieved in this case. *See Transcript of Hearing* 142:15-17, ECF No. 392 in Case No. 21-30589 (Nov. 10, 2021) ("We're not going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same claims that they would be asserting there.").

The Court acknowledges and appreciates the Objecting Parties' concerns regarding Old JJCI's pre-petition corporate restructuring and Debtor's subsequent bankruptcy filing.

Nevertheless, as detailed in the Opinion Denying the Motions to Dismiss, this Court determines that those valid concerns do not change the fact that Debtor was created pursuant to—and in compliance with—a long-standing Texas statute. Additionally, those concerns do not establish bad faith, nor do they undermine the legitimate purpose of this bankruptcy. In so ruling, this Court considered the totality of circumstances, including, but not limited to, litigation posture outside the bankruptcy court, the subjective intent of Debtor and management, the degree of financial distress facing Debtor, the pressures from non-moving creditors, pre-petition litigation conduct, the nature of the creditor body and the extent of assets, the structure and formation of Debtor, and Debtor's reorganizational purpose and exit strategy. In sum, the Court is not persuaded by the Objecting Parties' allegations of gamesmanship or inequity. Those arguments provide neither grounds for dismissal, nor a sufficient basis to decline to extend the stay to the Protected Parties. The case law on which the Original TCC relies is distinguishable.[8] Therefore—working from the baseline that the bankruptcy was filed in good faith—this Court focuses its attention on Third Circuit precedent as applied to the facts of this case in resolving the instant Motion.

---

[8] Citing *In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005) and *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), the Original TCC contends that "the Third Circuit has rejected similar attempts to 'game' the Bankruptcy Code." *Objection of Original TCC* 53, ECF No. 142. However, in *In re Owens Corning*, the court denied substantive consolidation where it was used as a means of giving debtor(s) an advantage over one group in plan negotiations, and the court in *In re Integrated* found a lack of good faith where the bankruptcy was filed with the sole purposes of prejudicing one creditor. As discussed at length in this Court's Opinion Denying the Motions to Dismiss, the bankruptcy in this case does not provide Debtor with an improper tactical advantage and does not result in prejudice to nondebtor creditors. Thus, *In re Owens Corning* and *In re Integrated* do not change this Court's analysis. The Original TCC also cites multiple cases for the proposition that "feigned" or "collusive" filings should be rejected. *Objection of Original TCC* 54, ECF No. 142 (citing *Poe v. Ullman*, 367 U.S. 497, 505, 81 S. Ct. 1752, 1757, 6 L. Ed. 2d 989 (1961); *United States v. Johnson*, 319 U.S. 302, 303, 63 S. Ct. 1075, 1076, 87 L. Ed. 1413 (1943); *Muskrat v. United States*, 219 U.S. 346, 31 S. Ct. 250, 55 L. Ed. 246 (1911). Again, this Court has resolved the issue of good faith and finds the instant bankruptcy is neither "feigned" nor "collusive" and serves a legitimate bankruptcy purpose. Accordingly, the cases cited by the Original TCC are unpersuasive and do not serve as a basis for denying extension of the automatic stay.

18

### 1. Identify of Interests

Here, the Court finds that the nondebtor Protected Parties and Debtor enjoy such an identity

of interests that a lawsuit asserting talc-related claims against the Protected Parties is essentially a

suit against Debtor.  Following the two-day evidentiary hearing in the North Carolina Bankruptcy

Court, Judge Whitley reached the same conclusion. *See Transcript of Hearing* 141:8-12, ECF No.

392 in Case No. 21-30589 (Nov. 10, 2021) ("I believe there is, in effect, an identity of interest

within the meaning of the *Robins* case and that, notwithstanding the potential that some of the

claims may be direct, almost all of them, if not all of them, relate to the debtor's operations.").  As

an initial matter, the talc claims against the Protected Parties involve the same products, same time

periods, same alleged injuries, and same evidence as claims against Debtor.  *See id.* 138:14-19

("They're being sued on, effectively, the same products, the same time periods, etc.).  The

Objecting Parties do not—and cannot—dispute that Old JJCI no longer exists and that Debtor

assumed its liabilities. *See* TEX. BUS. ORGS. CODE ANN. § 10.008(a)(2), (3) (directing that "all

liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the

. . . new organizations in the manner provided by the plan of merger").  Likewise, the Objecting

Parties do not—and cannot—deny the corporate transactions and indemnity agreements that left

Debtor ultimately responsible for talc-related liabilities.  Judge Whitley similarly concluded that

Old JJCI assumed liability associated with the J&J Baby Products Division. *Transcript of Hearing*

138:13-17, ECF No. 392 in Case No. 21-30589 (Nov. 10, 2021) ("I believe under the

circumstances that the language used effectively means that what we had was an assumption of all

of the liabilities of the debtor and that is broad enough to cover future product liability claims.").

The Original TCC states in its opposition that "the claim of shared identities of interests is based solely on the allocation of agreements to the debtor on the eve of the bankruptcy filing for the very purpose of extending the stay." *Objection of Original TCC* 56, ECF No. 14. The Court is willing to accept that summarization and views it as a valid basis for extending the stay to the Protected Parties—not as a reason to decline extension of the stay as advanced by the Original TCC.

### 2. Impact on Bankruptcy Estate and Reorganization

The Original TCC additionally argues that "the existence of an indemnification from the debtor to a non-debtor . . . is an insufficient ground for extension of the automatic stay." *Objection of Original TCC* 57, ECF No. 14. Rather, the Original TCC insists that a debtor must also demonstrate that "the indemnification obligation threatens the debtor's assets or reorganization." *Id.* Relevant case law and the underlying purpose of the automatic stay support the Original TCC's interpretation. The court in *Robins* provided an illustration, noting that a situation in which extension of the stay would be warranted "would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case [because] . . . [t]o refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute." *A.H. Robins Co. v. Piccinin*, 788 F.2d at 999; *see also McCartney*, 106 F.3d at 510. Thus, a critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate and prospect of reorganization.

The Original TCC asserts that Debtor cannot prove that its indemnification obligations expose it to adverse consequences because "Debtor is a shell and has no actual estate to be impacted." *Objection of Original TCC* 58, ECF No. 142. Again, the Original TCC's argument

is rooted in its contention that this bankruptcy is a "charade." *Id.* at 57. The Court has already addressed and dispelled this argument in the accompanying Opinion Denying the Motions to Dismiss and will not belabor the point here. The bottom line is that Debtor is valid corporate entity, created properly and in accordance with Texas statute, with a bankruptcy estate comprised of assets and liabilities—including talc-related liabilities and indemnity obligations assumed from Old JJCI. Although the Original TCC attempts to characterize the Funding Agreement as a circular exchange of liability and payments that leaves Debtor's estate ultimately unaffected, this argument ignores the fact that, pursuant to the terms of the Funding Agreement, Debtor must first use its own assets to fund the trust—resorting only to financial contributions from J&J and New JJCI as a backstop. Thus, in this Court's view, the talc claims have an undeniable impact on Debtor's estate. Moreover, the Original TCC's unsupported allegations that Debtor and J&J "will not honor its reimbursement obligations under the Funding Agreement" or intend to "maroon [their] liability" represent mere speculation and wholly ignore this Court's role in supervising the bankruptcy case, the creation and funding of a trust, and trust distributions. *Objection of Original TCC* 58, ECF No. 142. Given Debtor's and J&J's actions in this case— which, to date, have been candid and transparent—there is simply no indication that the Funding Agreement is a "scheme to hinder, delay, and defraud talc powder creditors" as the Original TCC alleges. *Id.* And, to the extent Debtor's actions drift in that direction, this Court is prepared to take swift action and will honor its commitment of ensuring that claimants receive fair and timely compensation under a comprehensive and transparent distribution scheme.

Given the facts of this case, the Court concludes that continued litigation against the

Protected Parties would liquidate pending tort claims, as well as indemnification claims, against

Debtor outside of chapter 11 and potentially deplete available insurance coverage—frustrating

the purpose of the automatic stay. *See, e.g.*, *In re Dow Corning Corp.*, 86 F.3d 482, 494 (6th Cir.

1996), *as amended on denial of reh'g and reh'g en banc* (June 3, 1996) ("The potential for Dow

Corning's being held liable to the nondebtors in claims for contribution and indemnification, or

vice versa, suffices to establish a conceivable impact on the estate in bankruptcy.").  Moreover,

continued litigation against the Protected Parties would divert funds and resources toward

defense costs and potentially disrupt the flow of funds and resources to Debtor's trust pursuant

to the Funding Agreement. *See, e.g. In re MCSi, Inc.*, 371 B.R. 270, 271–72 (S.D. Ohio 2004)

(quoting *Gray v. Hirsch,* 230 B.R. 239, 243 (S.D.N.Y.1999) and collecting cases in which courts

"stayed actions against non-debtor co-defendants 'where they have found that the bankrupt estate

would be adversely affected because the creditor's action would prevent the non-debtor from

contributing funds to the reorganization, or would consume time and energy of the non-debtor

that would otherwise be devoted to a reorganization effort' ").  Furthermore, continued litigation

against the Protected Parties would undoubtedly impair mediation efforts and negotiations within

this bankruptcy and would complicate estimation hearings, with multiple uncoordinated hearings

nationwide.

### 3.  Joint Tortfeasor

The Original TCC also asserts that J&J is a joint tortfeasor with direct liability and, thus,

the automatic stay should not preclude prosecution of those independent and direct claims

against J&J as a nondebtor third party.  The Original TCC cites a host of cases and asserts that

it is "settled law that 'joint tortfeasors' are not entitled to the benefit of the automatic stay upon

a co-defendant's bankruptcy filing." *Objection of Original TCC* 60, ECF No. 142. This assertion

and the selective portions of underlying case law are misleading. Indeed, as previously

discussed, the automatic stay typically applies only to the debtor and, like any other nondebtor

third party, does not extend to "joint tortfeasors." Also discussed, there exists an exception to

this general rule in that the stay can be extended when the circumstances so warrant. Thus, even

assuming direct liability exists, the analysis for whether an extension of the automatic stay is

warranted based on "unusual circumstances" remains unaffected. The authority upon which the

Original TCC relies does not convince this Court otherwise. Specifically, the Original TCC cites

to *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 128 (4th Cir. 1983) and *Gold v.

Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983), and quotes the *Robins* court.

However, in both *Johns-Manville* and *Williford*, the joint tortfeasors sought to stay proceedings

under the theory that the debtor co-defendants were "indispensable parties." Neither of those

cases involved the situation presented here, wherein Debtor argues that suits against the

Protected Parties (the "joint tortfeasors") will have an adverse impact on the bankruptcy estate.

Additionally, the Original TCC quotes from the *Robins* decision and asserts that the *Robins* court

"opin[ed]" that the automatic stay would "clearly not extend to such non debtor." *Robins*, 788

F.2d at 999. However, the language quoted is truly dicta in which the *Robins* court discusses the

analysis of a bankruptcy court in the District of Connecticut, *see In re Metal Ctr., Inc.*, 31 B.R.

458 (Bankr. D. Conn. 1983). Further, in the very next sentence, the *Robins* court acknowledges

the exception to the general rule in its continued discussion of the *In re Metal* opinion, explaining

that if "a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code. . . . Clearly, the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate." *Robins*, 788 F.2d at 999 (quoting *In re Metal Ctr., Inc.*, 31 B.R. at 462).

For the foregoing reasons, the Original TCC's "joint tortfeasor" argument does not preclude extension of the automatic stay to the Protected Parties.

### 4. Challenge to the 1979 Agreement

The Original TCC disputes Debtor's talc liability by challenging the 1979 transaction in which Old JJCI agreed to indemnify J&J (the "1979 Agreement"). Specifically, the Original TCC claims there is no legal or factual support in the record. The Court disagrees. The 1979 Agreement provides, in relevant part:

> WHEREAS, J&J has a number of operating divisions conducting various lines of business; and WHEREAS, one of these operating divisions is named the JOHNSON & JOHNSON BABY PRODUCTS COMPANY Division (sometimes hereinafter called the "BABY Division"); and
>
> WHEREAS, the Subsidiary corporation, is wholly-owned by J&J and J&J is desirous of **transferring to this Subsidiary all assets and liabilities** which are now allocated to the BABY Division on the books or records of Johnson & Johnson; …
>
> *1979 Agreement* (emphasis added), *Movants' Ex.* 600.02.

Section 1 of the 1979 Agreement clearly provides that J&J Baby Products assumed all

liabilities of every kind and description associated with the Baby Products division and

indemnified J&J for such liabilities:

> J&J . . . does grant, bargain, sell, assign, alien, remise, release, convey, transfer, set
> over and confirm, unto the Subsidiary, its successors and assigns, forever, all the
> businesses, franchises, properties and assets . . . which are now allocated on its
> books or records of J&J to its Baby Division . . . .
>
> . . .
>
> . . . Subsidiary agrees to assume . . . all the indebtedness, liabilities and obligations
> of every kind and description which are allocated on the books or records of J&J as
> pertaining to its BABY Division and the Subsidiary hereby covenants and agrees
> with J&J that the Subsidiary will forever . . . indemnify and save harmless J&J
> against all the indebtedness, liabilities and obligations aforesaid hereby assumed. .
> . .
>
> . . .
>
> [T]he covenants and agreements herein contained shall inure to the benefit of and
> shall bind the respective parties hereto and their respective successors and assigns.

*Id.* §§ 1, 4.    In interpreting the language of the 1979 Agreement and the relevant circumstances,

the Court concludes that J&J Baby Products assumed all liabilities, including contingent and

future product liability claims.    The Original TCC makes much of the fact that the 1979

Agreement uses the phrase "on the books or records."    In the Original TCC's view, the use of

this phrase has a specific meaning in the context of corporate law and, thus, limited the scope of

liability assumed to only those liabilities existing and reported on J&J's books and records at the

time of the transaction.    The Original TCC cites to *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit*

*Ins. Corp.*, 109 F. Supp. 3d 179 (D.D.C. 2015) in support of this position.    In *Deutsche*, the court

analyzed a contractual provision that provided for the sale of liabilities and used the phrase

"which are reflected on the Books and Records" to define those liabilities. *Deutsche*, 109 F. Supp

25

at 198.  When a dispute arose as to the amount of the liabilities assumed in the contract, the

*Deutsche* court concluded that "the liabilities assumed by [the buyer] do not extend beyond the

amounts listed [in the seller's] financial accounting records." *Id.*  However, the contractual clause

at issue in *Duetsche* is distinguishable from the clause at issue in this case in several respects.

First, the contract in *Duetsche* memorialized a sale between two unrelated entities as opposed to

the inter-company transfer in the present case.  Second, the contract in *Deutsche* provided that

the liabilities were assumed "expressly . . . at Book Value." *Id.*  The reference to "Book Value"—

which is absent from the contract at issue in the instant case—suggests a finite value to the

liability being transferred.  In contrast, the agreement at issue here does not include such

definitive language.  Instead, it includes the word "forever" and explains that the contract will

bind the parties as well as their successors and assigns. *1979 Agreement*, § 1.  Accordingly, it

appears the 1979 Agreement contemplates continuing and future obligations resulting from the

transfer of the business.  In this respect the Court is persuaded by the decision in *Bouton v. Litton

Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), a case relied on by Debtor.  Like the parties in *Bouton*,

the parties in this case expressed a clear intention of carrying that business forward after the

transfer. *Bouton*, 423 F.2d at 651.

　　　　Additionally, the court in *Deutsche* used extrinsic evidence to determine the meaning of

the contract. *Deutsche*, 109 F. Supp at 204-207.  The New Jersey Supreme Court "permit[s] a

broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the

parties." *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 270, 901 A.2d 341, 347 (2006)

("Extrinsic evidence may be used to uncover the true meaning of contractual terms.") (citing *Atl.*

*N. Airlines v. Schwimmer*, 12 N.J. 293, 304, 96 A.2d 652, 657 (1953)); *see also Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 243–44 (3d Cir. 2005) (stating that "under New Jersey law, courts should interpret a contract considering the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction") (internal quotations and citations omitted); *Pier 541 LLC v. Crab House, Inc.*, No. 19-00437, 2021 WL 4438128, at *3 (D.N.J. Sept. 28, 2021).  While the *Deutsche* court ultimately concluded that the contract limited the amount of liability assumed, the factual distinctions between the circumstances in *Deutsche* and the case at hand compel this Court to reach an opposite conclusion.  The meeting minutes for the J&J Board of Directors Meeting held on December 12, 1978 provide insight into the purpose of the 1979 Agreement.  Specifically, the minutes reflect that, in furtherance of J&J's "long standing policy of decentralization of corporate business," the 1979 Agreement was intended to transfer all assets to subsidiaries who would, in turn, assume liabilities. *c* Thus, the construction of the 1979 Agreement advanced by the Original TCC, which limits the liability assumed to such reported in the books and records at the time of the transaction, is inconsistent with the stated purpose of the transaction as reflected in the Board Minutes.

During oral argument on this Motion, counsel for TCC II asserted that the language of the 1979 Agreement was "particular" and "specific," suggesting that the Court should not look beyond the plain meaning of the Agreement's terms for purposes of interpretation.  However, evidence of circumstances is admissible in aid of interpretation of an integrated agreement, even though the contract on its face is free from ambiguity. *See Conway*, 187 N.J. 259 (citing

*Schwimmer*, 12 N.J. 293).  In point of fact, this Court finds the 1979 Agreement to be ambiguous as to the status and treatment of future liability.  Indeed, the 1979 Agreement is silent in this respect.  "Under New Jersey law, ambiguities in an indemnification agreement are generally construed against the indemnitee," which is the party receiving indemnity. *Caldwell Trucking PRP*, 421 F.3d at 244 (3d Cir. 2005) (citing *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 161 n.3 (3d Cir. 1996).  Thus, in this case, any ambiguity in the 1979 Agreement should be construed in favor of Old JJCI as the indemnitor.  The Court need not engage further in this analysis as the record demonstrates that both Old JJCI and the Protected Parties share a common understanding as to which party was responsible for talc-related liabilities following the 1979 Agreement.

In addition, when faced with the absence of a critical contractual term—here, future liability—"courts 'will imply a reasonable missing term or, if necessary, will receive evidence to provide a basis for such an implication.' " *Twp. of White v. Castle Ridge Dev. Corp.*, 419 N.J. Super. 68, 76–77, 16 A.3d 399, 404 (App. Div. 2011) (quoting *Satellite Entm't Ctr., Inc. v. Keaton,* 347 N.J. Super. 268, 276, 789 A.2d 662 (App. Div. 2002)).  "In particular, courts will look to, among other things, all the relevant circumstances surrounding the transaction, as well as evidence of the parties' course of dealing, usage and course of performance." *Elliott & Frantz, Inc. v. Ingersoll–Rand Co.,* 457 *F.*3d 312, 328 (3d Cir. 2006) (applying New Jersey law); *see also* 49 N.J. PRACTICE PROCEDURE § 7:25 (2010 ed.) (citing RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1979)).  Accordingly, the Court considers the parties' course of performance since the time of the 1979 Agreement to glean the intent of the parties.

28

Debtor represents, and the Original TCC does not dispute, that "all talc-related costs not otherwise covered by insurance have been charged to Old JJCI since the assumption of liabilities under the 1979 Agreement." *Debtor's Omnibus Reply* 19, ECF No 146.  Although the Original TCC attempts to frame this course of action as "purely a function of accounting policy, not legal responsibility," *Objection of Original TCC* 38, ECF No. 142, deposition and trial testimony from Adam Lisman—who is the assistant controller for Johnson & Johnson and the Apex Company—confirms that the accounting was based on an underlying obligation.  Specifically, Mr. Lisman confirmed that since the 1979 transaction, Old JJCI is legally responsible for, and has actually paid, all talc-related expenses. *Trial Tr.* 123:21-22, Feb. 16, 2022, ECF No. 1518 ("My understanding is that JJCI borne [sic] all financial responsibility [for the talc litigation]."); *Lisman Dep. Tr.* 117:1-3, Oct. 30, 2021, *Ex. H to Toroborg Decl.*, ECF No. 1444-9 ("[T]hese are talc product liability costs that JJCI was ultimately responsible for, which is why it is showing up as an expense on their account."); *id* at 194:21, 195:10 ("Q: And does that mean that accounting follows the legal obligation associated with the expense? . . . A: Yes.") (objections omitted). Accordingly, the parties' course of performance since the time of the 1979 Agreement reinforces this Court's conclusion that Old JJCI was legally responsible for talc-related liabilities as a result of the 1979 Agreement.

The 1979 Agreement also provides J&J Baby Products with an irrevocable power of attorney to substitute itself "for J&J and in its [J&J's] name and stead . . . on behalf of and for the benefit of the Subsidiary" to, among other things, "defend and compromise any and all actions, suits or proceedings in respect of any said Properties"—defined as the Baby Products

division's "businesses, franchises, properties and asset." *1979 Agreement* §2, *Movants' Ex.* 600.02.  Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred.  And, as the result of a series of transactions culminating in the 2021 Corporate Restructuring, Debtor assumed that liability and substituted in as the real party in interest.  This, in turn, weighs in favor of extending the stay.

### 5.  Retailers

The Original TCC next contends that an extension of the stay to the Retailers is inappropriate because no identity of interests exists between Debtor and the Retailers.  In support of this position, the Original TCC revives its argument that the Retailers are joint tortfeasors who may owe direct liability to talc claimants.  The Original TCC asserts that "the fact that Old JJCI, after the fact, may have entered into Tender Agreements [or indemnification agreements] with the retailers does not eliminate such liability." *Objection of Original TCC* 70, ECF No. 142. Nonetheless, as discussed, the existence of joint tortfeasor status or direct liability does not end the inquiry as to whether the automatic stay should be extended to a nondebtor co-defendant. Here, Debtor certifies that it owes contractual, common law, and statutory indemnification obligations to the Retailers and the Indemnified Parties. *Kim Decl.* ¶ 53, ECF No. 5 in Case No. 21-30589.  These obligations—viewed in conjunction with the fact that the claims against the Retailers involve the same products, the same time period, the same alleged defect, and the same alleged harm as the claims against Debtor—are sufficient to establish the "unusual circumstances" warranting extension of the stay.  In fact, the Court cannot identify a scenario

where a retailer would have liability without some action or inaction by Debtor's predecessor also forming the basis of a cause of action. There is nothing in the record to demonstrate that any single lawsuit—out of the tens of thousands pending—consist of claims against Retailers in which J&J or Old JJCI have not been named as a defendant for the manufacture/sale of the product.

### 6. Absolute Indemnification

The Original TCC asserts that Debtor's indemnification obligation must be "absolute" to warrant extension of the automatic stay. *See, e.g. Robins* (giving example of "unusual circumstance" as where a debtor has "absolute" indemnity obligation to nondebtor); *Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *2 n.9 (E.D. Pa. Apr. 15, 2009) ("Even assuming that Foamex is the real party in interest, Foamex's indemnification obligations do not appear absolute, as required by courts extending the stay due to the existence of indemnification agreements; *id.* (collecting cases, including *Hess Corp. v. Performance Texaco, Inc.*, No. 3:08-CV-1426, 2008 WL 4960203 at *2 (M.D. Pa. Nov. 19, 2008) (reasoning that indemnification agreements constitute unusual circumstances only in "actions against non-debtors who are entitled to *absolute indemnity* by the debtor for a judgment against them") (emphasis added)) (citing *In re Mid-Atl. Handling Sys., LLC*, 304 B.R. 111, 128 (Bankr. D.N.J. 2003)). In opposition, Debtor cites to *In re Dow Corning Corp.*, for the proposition that "[t]here is no requirement that there be 'automatic' liability in respect of indemnification obligations." *Debtor's Omnibus Reply* 31, ECF No. 146 (citing *In re Dow Corning, Corp.*, 86 F.3d 482 (6th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (June 3, 1996)). Notably, in *In re*

*Dow Corning*, the Sixth Circuit observed that "[i]t has become clear following *Pacor* that 'automatic' liability is not necessarily a prerequisite for a finding of "related to" jurisdiction." *In re Dow Corning, Corp.*, 86 F.3d at 491 (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 987 (3d Cir. 1984)). Thus, the discussion of "automatic" liability in that case—and in *Pacor*—was in the context of a jurisdictional analysis; not in the context here, in which this Court is considering whether an "unusual circumstance" exists warranting extension of the automatic stay to a nondebtor third party. Nevertheless, this Court remains unpersuaded that "absolute" indemnity is a prerequisite for extension of the automatic stay.

The Fourth Circuit clarified in the follow-up case related to the A.H. Robins bankruptcy that it previously "found that a stay was authorized under 11 U.S.C. § 362(a)(3) because Aetna *might* seek indemnification from Robins for any damages it had to pay, thus implicating the debtor's property." *In re A.H. Robins Co. Inc. (A.H. Robins Co. v. Aetna)*, 828 F.2d 1023, 1025 (4th Cir. 1987) (emphasis added). The Fourth Circuit's use of the word "might" suggests that conditional indemnification is sufficient to trigger extension of automatic stay. Other courts which have addressed this issue likewise indicate that the mere possibility of indemnification obligations warrants extension of the automatic stay. *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 568–69 (3d Cir. 2004) (refusing to modify injunction precluding state court action against nondebtor third parties because the "prospect of indemnification" warranted a stay); *In re Philadelphia Newspapers, LLC*, 423 B.R. 98 (E.D. Pa. 2010) (holding that unusual circumstances existed to justify extension of automatic stay where debtor owed potential indemnification obligation); *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa.

2009) (holding that "the 'unusual circumstances' to warrant the extension of the section 362(a) stay [were] present . . . [in part] because the Debtors owe potential contractual and common law duties to indemnify the Non–Debtors").

Notwithstanding, Debtor asserted during trial that its indemnification obligation is, in fact, automatic. Counsel for Debtor argued that the only prerequisite to the indemnification obligation is that Debtor manufactured the product, which its predecessor indisputably did. Thus, Debtor concludes that indemnification obligations inarguably exist in this case and are automatically triggered by lawsuits involving talc products. The Objecting Parties did not demonstrate—in their briefing or during trial—that Debtor's indemnification obligations are conditional or that there exists a basis for Debtor to avoid indemnification liability. Accordingly, even assuming absolute indemnification is a prerequisite, or that Debtor's indemnification obligations are conditional, nothing in the record provides this Court with a plausible basis for concluding that the limitations on Debtor's obligations would come into play. The Court therefore determines that Debtor's indemnification obligations are automatic and, as a corollary, rejects the Original TCC's objection premised on absolute indemnification. *See, e.g.*, *Gulfmark Offshore, Inc. v. Bender Shipbuilding & Repair Co.*, No. CIV. A. 09-0249, 2009 WL 2413664, at *2 (S.D. Ala. Aug. 3, 2009) (rejecting party's objection premised on absence of absolute indemnification because objecting party "points to no facts or circumstances tending to suggest that those conditions [to indemnification liability] would or might be relevant here").

### 7. Tender Agreements

The Original TCC further submits that Debtor has not "proven the existence, let alone, terms, of all of these claimed Tender Agreements. Scant few are in the record." *Objection of Original TCC* 70, ECF No. 142. In response, Debtor counters that "this [argument] ignores that the Debtor has provided a summary of all the Tender Agreements, produced exemplars of many such agreements and also has common-law indemnification obligations to the Retailers." *Debtor's Omnibus Reply* 24, ECF No. 146. Moreover, this Court would be willing at a later date to review continuance of the stay if a record exists establishing the lack of a Tender Agreement or other contractual obligation.

### 8. Res Judicata, Collateral Estoppel, and Evidentiary Prejudice

The Debtor additionally relies on the principles of res judicata, collateral estoppel, and record taint in support of its Motion. Specifically, Debtor contends that permitting continued litigation against the Protected Parties "creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor." *Debtor's Supp. Mem.* 44, ECF No. 128. The Court agrees.

In *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 206 L. Ed. 2d 893 (2020), the Supreme Court explained the doctrines of res judicata and collateral estoppel. "[I]ssue preclusion (sometimes called collateral estoppel) . . . precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment." *Id.* at 1594 (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L.Ed.2d 308 (1980)) (other citations

omitted).  Claim preclusion (or res judicata), on the other hand, "prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated." *Id; see also Beasley v. Howard*, 14 F.4th 226, 231–32 (3d Cir. 2021).

### a. Collateral Estoppel

The Court will first address the doctrine of collateral estoppel.  In order for collateral estoppel to apply, the following four elements must be satisfied: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247–48 (3d Cir. 2010) (quoting *Szehinskyj v. Att'y Gen.*, 432 F.3d 253, 255 (3d Cir. 2005)). Collateral estoppel will also apply to a person who is not a formal party, to the extent such person also had "the opportunity to present proofs and argument" in the previous litigation. *Taylor*, 553 U.S. at 895 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 39, cmt. a (AM. L. INST. 1980)).

In the instant case, the Original TCC contends that Debtor's apprehension regarding potential use of collateral estoppel in future litigation is "misplaced." *Objection of Original TCC* 72, ECF No. 142.  The Original TCC argues that collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue in the earlier case. *Id.* (citing *Allen v. McCurry*, 449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980)).  Debtor will not be a party to continued litigation against the nondebtor defendants, thus, in the Original TCC's view, Debtor cannot be collaterally estopped from later

litigating any issue decided in those actions. The Third Circuit explicitly cautioned against this type of logic in *In re W.R. Grace & Co.*, 115 F. App'x 565 (3d Cir. 2004). In that case, a debtor sought extension of the automatic stay to a co-defendant and relied, in part, on the theory of collateral estoppel. The plaintiff in *In re W.R. Grace* set forth the same theory that the Original TCC advances here: If the debtor is not a party to the litigation against the nondebtor, the debtor will not be collaterally estopped from later litigating those same issues in an action against it. The Third Circuit cautioned that this theory should not be tested at the debtor's peril because "[i]t is more supposition than certainty at this juncture." *Id.* at 569. In a footnote, the Third Circuit explained that it believed the issue to be "at least unclear," and cited several cases where courts had determined that a debtor may be adversely affected by liability determinations or witness testimony in suits against nondebtors. *Id.* at 569 n.4 (citing *United Nat'l Ins. Co. v. Equip. Ins. Managers,* No. 95–CV–0116, 1997 WL 241152, at *11–13 (3d Cir. May 6, 1997); *In re American Film Technologies, Inc.,* 175 B.R. 847, 850 (Bankr. D. Del. 1994); *In re Johns–Manville Corp.,* 40 B.R. 219, 225 (S.D.N.Y. 1984) (discussing the potential effect that witness testimony could have on the debtor)). Further, the Third Circuit observed that "the courts have never adopted the absence of collateral estoppel as the test for preventing actions from proceeding against third parties when the debtor is protected by the automatic stay. Rather, courts employ a broader view of the potential impact on the debtor." *In re W.R. Grace & Co.*, 115 F. App'x at 570 (quoting *In re A.H. Robins Co.*, 828 F.2d at 1025) (explaining that a proper test for extension of the stay "is generally whether the litigation 'could interfere with the reorganization of the debtor' ")).

This Court sees no reason to deviate from the prudent course navigated by the Third Circuit in *In re W.R. Grace*. The possibility that collateral estoppel may not adversely impact Debtor in subsequent litigation does not outweigh the many reasons why extension of the stay is appropriate. The cases cited by the Original TCC are distinguishable and do not suggest otherwise. First, the Second Circuit in *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003) denied extension of the to a nondebtor where the basis for doing so was premised "solely" on the apprehension of later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision. Here, Debtor's basis for extending the stay is not bottomed "solely" on collateral estoppel concerns. This Court additionally notes that, in *Queenie*, the Second Circuit observed that the stay can apply to nondebtors if a claim against the nondebtor will have an immediate adverse economic consequence for the debtor's estate and did, in fact, extend the stay to a different entity because it was wholly-owned by the debtor, and adjudication of a claim against that nondebtor entity would have an immediate adverse economic impact on the debtor. *Id.* at 287-88 (citing *A.H. Robins Co. v. Piccinin,* 788 F.2d at 999 (4th Cir. 1986)) (other citations omitted). Thus, the holding *Queenie* does not support the Original TCC's position regarding collateral estoppel and, instead, further buttresses this Court's decision to extend the stay in light of the adverse economic impact of the continued litigation on Debtor.

Next, *Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v. Serv. Painting, Inc.*, No. CV 18-3480, 2019 WL 2143370 (E.D. Pa. May 16, 2019)—another case relied on by the Original TCC—is distinguishable. In that case, the court explained that "collateral estoppel concerns arise when the debtor owes an indemnification obligation to

the non-debtor," and the court declined to extend the stay because the nondebtor had neither

argued nor offered evidence that the debtor owed him an indemnification obligation. *Id.* at *9.

Here, Debtor's indemnification obligations are clearly established. Likewise, *In re MCSi, Inc.*,

371 B.R. 270 (S.D. Ohio 2004) offers the Original TCC no help. In that case, third parties sought

to lift the stay as to certain nondebtor co-defendants who had previously been covered by the

stay by way court order. The nondebtor co-defendants objected. In its analysis, the *MCSi* court

acknowledged that proceedings against nondebtor co-defendants can be properly stayed if

certain "unusual circumstances" exist. *Id.* at 271 (citing *Parry v. Mohawk Motors of Michigan,*

*Inc.,* 236 F.3d 299, 314 (6th Cir.2000), *cert. denied,* 533 U.S. 951, 121 S. Ct. 2594, 150 L.Ed.2d

752 (2001); *A.H. Robins Company, Inc.*, 788 F.2d 994). However, the *MCSi* court rejected each

and every basis for extending the stay and found no such "unusual circumstances" present. Thus,

when addressing the nondebtors' concern regarding collateral estoppel, the court observed that—

although it was a valid concern—"this concern has never been the sole justification for extending

the stay as to such co-defendants." *Id.* at 275. Further, a critical factor in the *MCSi* court's

analysis was that the debtor did not oppose lifting the stay as to those nondebtor co-defendants

and "its silence is deafening." *In re MCSi, Inc.*, 371 B.R. at 275. In the present case, Debtor is

not silent and instead is explicitly requesting extension of the stay, and, again, collateral estoppel

is not its sole basis for doing so.

### b.   Res Judicata

Res judicata—or claim preclusion—precludes relitigation of claims that could have been

asserted and decided in a prior action. It bars not only claims that were brought in a previous

action, but also claims that could have been brought.  *Beasley v. Howard*, 14 F.4th 226, 231 (3d

Cir. 2021); *Post v. Hartford Ins. Co.,* 501 F.3d 154, 169 (3d Cir. 2007).  The Supreme Court has

explained that "[i]f a later suit advances the same claim as an earlier suit between the same parties

[or their privies], the earlier suit's judgment 'prevents litigation of all grounds for, **or defenses**

**to**, recovery that were previously available to the parties, regardless of whether they were

asserted or determined in the prior proceeding.'" *Lucky Brand Dungarees, Inc.*, 140 S. Ct. at

1594-95 (quoting *Brown v. Felsen*, 442 U.S. 127, 131, 99 S. Ct. 2205, 60 L.Ed.2d 767 (1979))

(emphasis added).  A party seeking to invoke the res judicata doctrine must demonstrate that

there has been "(1) a final judgment on the merits in a prior suit involving (2) the same parties

or their privies and (3) a subsequent suit based on the same cause of action." *Duhaney v. Att'y*

*Gen. of the U.S.*, 621 F.3d 340, 347 (3d Cir. 2010) (citing *In re Mullarkey*, 536 F.3d 215, 225

(3d Cir. 2008)); *see also Kenny v. Schrading*, No. 20-cv-15786 (MASDEA), 2021 WL 5495898,

at *2 (D.N.J. Nov. 23, 2021).

Although Debtor cites to both collateral estoppel *and* res judicata in its submissions, the

substantive argument it presents is focused entirely on collateral estoppel.  The cases on which

Debtor relies in support of its position likewise focus on the potential prejudicial effect of

collateral estoppel, as opposed to res judicata.[9]  Indeed, the parties' briefs devote very little

---

[9] *See, e.g.*, *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 512 (3d Cir. 1997) (no mention of res judicata); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1000 (4th Cir. 1986) (using term "res judicata" only once while quoting another case and providing no analysis of the doctrine); *In re Mallinckrodt Plc*, No. AP 20-50850-JTD, 2021 WL 523625, at *8 (D. Del. Feb. 11, 2021) (no mention of res judicata); *In re Bestwall LLC*, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-105-RJC, 2022 WL 68763 (W.D.N.C. Jan. 6, 2022) (mentioning the term "res judicata" but citing to case law that analyzed risk of prejudice based on collateral estoppel only); *In re W.R. Grace & Co.*, 386 B.R. 17, 24 (Bankr. D. Del. 2008) (no mention of res judicata); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850 (Bankr. D. Del. 1994) (discussing only doctrine of collateral estoppel); *In re Sudbury, Inc.*, 140 B.R. 461, 464 (Bankr. N.D. Ohio

attention to this doctrine, mentioning the term only a few times without development.  It appears

to this Court that parties in situations similar to Debtor—and courts addressing issues similar to

those facing this Court—reference both doctrines in the interest of completeness, but do not

adequately acknowledge their different applications or develop their arguments.  Nevertheless,

this Court acknowledges that res judicata "is an affirmative defense, and 'the party asserting [the

doctrine] bear[s] the burden of showing that it applies.' " *Edwards v. U.S. Dep't of H.U.D.*, 799

F. App'x 113, 114 (3d Cir. 2020) (quoting *United States v. Athlone Indus., Inc.*, 746 F.2d 977,

983 (3d Cir. 1984)).  It is, therefore, unnecessary for this Court to explore in detail the potential

preclusive effect of final judgment against the Protected Parties. *See, e.g. In re Harang*, No. 21-

8003, 2021 WL 6128992, at *5 (B.A.P. 6th Cir. Dec. 28, 2021) (noting that the preclusive effect

of a ruling is an "open question for another court in a collateral proceeding").  Rather, it suffices

to acknowledge that there *exists a risk* that the doctrine of res judicata could adversely impact

Debtor in future litigation.  This risk weighs in favor of extending the stay under § 362(a)(1).

*See In re W.R. Grace & Co.*, 115 F. App'x 565 (holding that risk of future preclusive

consequences was enough to weigh in favor of extending the stay).

### c.  Record Taint

Finally, Debtor asserts that continued litigation could create an evidentiary record that

would negatively impact subsequent litigation—a concept otherwise known as "record taint."  In

---

1992) (finding that extension of stay was warranted where debtor had legitimate indemnity and collateral estoppel concerns and not discussing res judicata); *In re Johns-Manville Corp.*, 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984), and *appeal allowed, decision vacated in part*, 41 B.R. 926 (S.D.N.Y. 1984) (using the term "res judicata" only once without analysis and instead finding basis to extend stay where debtor "could be collaterally estopped in subsequent suits from relitigating issues determined against its officers and directors").

deciding whether to extend the stay, the Third Circuit has considered the risk of record taint as part of its "broad[] view of the potential impact on the debtor." *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 569 n.4 (3d Cir. 2004) (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) and acknowledging a risk that the evidentiary record created in a case against a nondebtor could later be used in a case against the debtor); *In re Mallinckrodt PLC*, Adv. Pro. No. 20-50850-JTD, 2021 WL 5275781, at *2 (D. Del. Nov. 10, 2021) (denying leave to file interlocutory appeal of order extending preliminary injunction because bankruptcy court appropriately performed "unusual circumstances" test and held that continued proceedings created "significant risk" of, among other thing, record taint); *In re W.R. Grace & Co.*, 386 B.R. 17, 35 (Bankr. D. Del. 2008) ("Under this 'broader view of the potential impact on the debtor,' this court takes into account the risks of collateral estoppel and record taint.").  The Original TCC acknowledges that the possibility of record taint has been cited as a basis for extension of the automatic stay. *See Objection of Original TCC* 73 n.34, ECF No. 142).  Nevertheless, the Original TCC asserts that the factors supporting such a finding are not present in the instant case. The Court disagrees.  Because the talc-related claims against the Debtor and the Protected Parties implicate the same product, the same time period, the same alleged defect and the same alleged harm, it is possible that the evidentiary record developed in continued litigation against the Protected Parties could prejudice Debtor—especially considering that Debtor would be absent from the continued litigation.   As stated previously, the risk that litigation against the Protected Parties could result in adverse consequences for Debtor—such as record taint—weighs in favor of extending the automatic stay.

### D.  § 362(a)(3)

Debtor also looks to § 362(a)(3) as a basis for staying proceedings against the Protected Parties.  Subsection (a)(3) of the statute directs a stay of any action against an entity from obtaining possession of or exercising control over the property of the bankruptcy estate. 11 U.S.C. § 362(a)(3).  "It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (collecting cases); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 148–49 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).

Here, Debtor states that "J&J and the Debtor are both covered for talc-related claims under various shared insurance policies" and that "[t]he Retailers are named as insureds in many such policies." *Debtor's Supp. Mem.* 45, ECF No. 128.  Thus, Debtor asserts that prosecution of claims against J&J or the Retailers would deplete insurance proceeds available to Debtor, thereby diminishing the bankruptcy estate.  The Original TCC concedes that insurance policies are estate property.  Nevertheless, the Original TCC maintains that § 362(a)(3) does not apply because "[e]ither no coverage exists or, if it does, it has been exhausted." *Objection of Original TCC* 76, ECF No. 142.  With respect to the existence of coverage, the Original TCC points out that the insurance carriers are currently disputing coverage.  In the Original TCC's view, it remains uncertain whether Debtor is entitled to coverage which, in turn, casts doubt on whether actions against co-insureds would actually deplete the policies and affect the bankruptcy estate.  The

Original TCC further argues that J&J and its affiliates have already exceeded the limits of coverage as the result of past litigation and exhausted any coverage to which Debtor may have been entitled. Thus, the Original TCC contends that continued litigation against the co-insureds would not affect estate property because there can be no further depletion of exhausted policies.

Ultimately, it is unquestionable that shared policies exist. Admittedly, certain coverage is disputed, and no definitive determination has been made as to exhaustion. However, these uncertainties do not change the fact that that the policies are estate property. *See In re W.R. Grace & Co.*, 475 B.R. at 81 (collecting cases). Moreover, as Debtor points out, and contrary to the Original TCC's assertions, the insurance policies have not yet been exhausted because "only payments made by the policyholder's insurers erode or exhaust the limits of the policies." *Omnibus Reply* 37, ECF No. 146. Although Old JJCI and J&J have incurred significant losses from the underlying talc claims, no agreement has been reached—nor has a court ruling been issued—regarding the allocation of those talc losses across the policy periods in question. Thus, nearly the entire policy coverage of $2 billion is potentially still available to Debtor and J&J.

Furthermore, that there are tens of thousands of talc-related actions pending with potential indemnity and that these claims far exceed the $2 billion policy limit are facts well-established in the record.[10] *See A.H. Robins Co.*, 788 F.2d at 1008 (4th Cir. 1986) ("That there are thousands of Dalkon Shield actions and claims pending is a fact established in the record and

---

[10] As detailed in Dr. Bell's expert report, at the time of filing, Debtor faced nearly 40,000 pending tort claims, with thousands of additional claims expected annually for decades to come. *Expert Report of Gregory K. Bell, Ph.D.* ("*Bell Report*") at 10. Additionally, as of the petition date, Debtor anticipated billions of dollars in talc-related liability and defense costs. *Id.* Indeed, in the first nine months of 2021, more than 12,300 new lawsuits were filed. *Id.*

the limited fund available under Robins' insurance policy is recognized in the record."). To the extent suits are permitted to proceed against additional insureds, those parties will incur costs that will undoubtedly deplete the insurance potentially available to Debtor for the talc claims.

This Court acknowledges that that—prior to finding "related to" jurisdiction over a nondebtor for purposes of extending the stay under § 105(a)—the Third Circuit has instructed that a court must make factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 232 (3d Cir. 2004), *as amended* (Feb. 23, 2005). As an initial matter, this Court presently is analyzing whether extension of the automatic stay is appropriate under § 362(a)(3) and, thus, is not yet invoking its equitable powers under § 105(a). However, regardless of the basis for extension of the stay, the message from *In re Combustion* is that a court must make adequate factual findings before staying proceedings against nondebtor co-insureds on the theory that asbestos-related personal injury claims against the nondebtors will automatically deplete the insurance proceeds available to the debtor and, thus, reduce the assets available to the bankruptcy estate. *See id.*, 391 F.3d at 232–33 ("Courts finding 'related to' jurisdiction over claims against non-debtors based in part on shared insurance policies have relied not only on extensive record findings regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor."); *see also In re Imerys Talc Am., Inc.*, No. 19-MC-103 (MN), 2019 WL 3253366, at *5 (D. Del. July 19, 2019) ("Here, Johnson & Johnson also fails to offer a sufficient record that the terms and operation of the policies establish subject matter jurisdiction."); *Kleiner v. Rite Aid Corp.*, 604 B.R. 1, 8 (E.D. Pa. 2019) ("We, like our Court of Appeals in *In re*

*Combustion Engineering, Inc.*, lack a sufficiently developed record of the relevant policies. And we decline to rest subject matter jurisdiction solely upon counsel's or a corporate representative's say-so."). Admittedly, the record in the instant case is not as sufficiently developed with respect to the insurance policies as in some of the other cases that have extended the stay on this basis. However, the existence of shared insurance coverage and tens of thousands of lawsuits that could exhaust that coverage is established. *See Bell Report* at 10. As an illustration of this point, while the trial in this matter was ongoing, a group of insurers filed a motion (ECF No. 1491) seeking relief from the automatic stay to proceed with litigation on the very issue of coverage in New Jersey state court. Moreover, this Court is mindful that the insurance policies are not Debtor's sole basis for extension of the stay to the Protected Parties in the instant case. Finally, the court heeds the advice given by the Third Circuit in *In re W.R. Grace & Co.*, discussed *supra.* 115 F. App'x 565 (3d Cir. 2004). In that case, the Third Circuit cautioned that a party's theory that a debtor would not be later adversely affected by collateral estoppel should not be tested at the debtor's peril. *Id.* at 569. Likewise, the Original TCC's theory that Debtor's insurance will not be affected—because Debtor is not entitled to it or because it has already been exhausted—will not be tested at Debtor's peril. Just as the risk of future preclusive consequences to the debtor in *W.R. Grace* was enough to weigh in favor of extending the stay, the chance that Debtor in this case could later prevail with respect to its insurance coverage demands weighs in favor of extending the stay.

### E.  § 105(a) Injunction

Pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C.

§ 105(a).  "The issuance of an injunction under section 105(a) is governed by the standards

generally applicable to the issuance of injunctive relief in non-bankruptcy contexts." *In re*

*Philadelphia Newspapers, LLC*, 423 B.R. at 105.  To qualify for injunctive relief, a litigant must

demonstrate a likelihood of success on the merits, that it will suffer irreparable harm if the

injunction is denied, that the granting of preliminary relief will not result in even greater harm

to the non-moving party and that the public interest favors such relief. *Kos Pharmaceuticals Inc.*

*v. Andrex Corp.*, 369 F.3d 700 (3d Cir. 2004); *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J.

2009) (citing *In re Phila. Newspapers, LLC*, 407 B.R. 606, 617 (E.D. Pa. 2009); *Tenafly Eruv*

*Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)).  However, "[a] preliminary

injunction is an 'extraordinary remedy, which should be granted only in limited circumstances.'

" *Kos Pharm., Inc.,* 369 F.3d at 708 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*,

882 F.2d 797, 800 (3d Cir. 1989)).   In determining whether a preliminary injunction is

appropriate, the Court considers the following factors:

> (1) whether the movant has shown a reasonable probability of success on the merits;
> (2) whether the movant will be irreparably injured by denial of the relief; (3)
> whether granting preliminary relief will result in even greater harm to the
> nonmoving party; and (4) whether granting the preliminary relief will be in the
> public interest.

*McTernan v. City of York, Pa.,* 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell,*

414 F.3d 474, 478 n.4 (3d Cir. 2005)).  "In considering a request for an injunction, these four

factors are not weighed simultaneously against one another. Rather, the Court determines

whether the first two threshold prongs are established, and if so, only then does it proceed to

consider the third and fourth factors." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 106 n.11

(citing *Tenafly*, 309 F.3d at 157).

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's

ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D.

Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986)

(explaining reasonable likelihood of success in terms of a successful reorganization)).   Here—

although the success of Debtor's reorganization is speculative at this early stage—there is

nothing in the record to suggest that Debtor does *not* have a reasonable likelihood of

reorganization.   To the contrary, Debtor has explained its strategy for reorganization and has

already executed a Funding Agreement which will aid in the reorganization process.[11]

Moreover, to demonstrate a reasonable likelihood of success, a movant need only show the

prospect or possibility that he or she will succeed, and need not prove same with certainty. *See*

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d

377 (3d Cir. 2013) (Jordan, J., dissenting) *rev'd and remanded sub nom. Burwell v. Hobby Lobby*

*Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (collecting cases).   Debtor

has met its burden here.   The Original TCC's arguments in opposition are equally speculative

---

[11] The Original TCC asserts that Debtor has not demonstrated that § 524(g) is available to it because the statute requires that, as of the Petition Date, the "debtor" must "be named as a defendant in [a] personal injury" lawsuit. *Objection of Original TCC* 85, ECF No. 142 (quoting 11 U.S.C. § 524(g)(2)((B)(i)(I).  Counsel for AWKO echoed this argument in closing statements on February 18, 2022.  In the Objecting Parties' view, the term "debtor" in the statutory provision refers to LTL, who the Objecting Parties assert was *not* named in any lawsuit.  Thus, the Objecting parties conclude that LTL cannot utilize § 524(g) and § 105(a) cannot be utilized to afford LTL a substantive right to which they are not entitled under the Code.  However, the Original TCC's position ignores the fact that LTL assumed the liabilities of Old JJCI—who *was* the named defendant in personal injury lawsuits—and that Old JJCI ceased to exist.  Thus, Debtor/LTL, as successor, is substituted under FED. R. CIV. P. 25(c).  In any event, a successful plan in this case also can be bottomed on a trust established under § 105(a), apart from § 524(g).

and, in large part, are again rooted in its general objection to the bankruptcy for lack of good faith—an argument which this Court has rejected. *See Objection of Original TCC* 87, ECF No. 142.

As to the second factor, the Court determines that Debtor is likely to suffer irreparable injury without relief. As previously explained, continued litigation will have an adverse impact on the bankruptcy estate, will hinder reorganization efforts, and will serve as a constant drain on resources and time. In reaching this conclusion, the Court considers Debtor's liability as a result of the 2021 Corporate Restructuring, Debtor's contractual indemnification obligations, and the potential disruption that continued litigation against New JJCI and J&J could cause to funding of Debtor's trust. *See In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011) (affirming bankruptcy court's finding that debtor would suffer harm without preliminary injunction because, without "unfettered assistance," the debtor's "ability to reorganize is clearly diminished and [its] estate risks substantial harm if it is deprived of [nondebtor's] assistance in reorganizing"). For reasons previously discussed, the Original TCC's arguments in opposition are not persuasive.

The Court must next consider whether granting preliminary relief will result in even greater harm to the nonmoving party—here, the talc claimants. For reasons expressed in the Opinion Denying the Motions to Dismiss, the Court concludes that the talc claimants will not be prejudiced through the issuance of a preliminary injunction, and will—in fact—benefit from the extension of the automatic stay to the Protected Parties and the handling of their claims through the bankruptcy process. This method of dealing with claims also protects the interests of future

claimants, prevents a race for proceeds, and promotes equality in distribution.  In the state and district courts, talc claimants struggle with the sluggish pace of litigation and face a legitimate possibility that they will not succeed in proving their claims.  Should a judgment be awarded, claimants must then endure the appellate process, where—at worst—their judgment is overturned, and—at best—recovery is delayed.  Extension of the automatic stay to the Protected Parties, on the other hand, ensures that all claims are reconciled through a bankruptcy trust, which would place reduced evidentiary and causation burdens on claimants.  Resolution of claims and payments to claimants can be achieved at a far more expeditious pace in bankruptcy than through uncertain litigation in the tort system.  A trust would establish a far simpler and streamlined process than currently available in the tort system.  Indeed, the Multi-District Litigation ("MDL") has been ongoing since 2016, with only a handful of bellwether trials on the horizon.  This Court is mindful that—as Professor Maria Glover acknowledges in her *amici curiae* brief—there is no perfect solution to the problems with mass tort litigation: "But no mechanism for handling the thorny challenges of mass torts is perfect, including bankruptcy. Indeed, it is the nature of mass torts to present different combinations of challenges, and those challenges follow mass torts wherever they go." *Glover* Brief at 25.  However, this Court cannot ignore the reality that MDL is not meeting the needs of the claimants.  The number of settlements reached in the talc-related lawsuits is dwarfed by the projected 10,000 new cases to be filed each year going forward. *See Expert Report of Charles H. Mullin, Ph.D.* at 5.  And although MDLs may be a useful device to facilitate settlements, the MDL in the instant case is far from a global resolution and is ill-equipped to provide for future claimants.  In short, a preliminary injunction

will not result in greater harm to the talc claimants.  Instead, it will "remedy[] some of the

intractable pathologies of asbestos litigation." *In re Federal-Mogul Glob., Inc.*, 684 F.3d at 362.

In this same vein, the Court finds that granting the preliminary injunction would be in

the public interest.  The Original TCC argues that this bankruptcy serves no interests other than

J&J's own.   The Court disagrees.  As detailed in this Court's Opinion Denying the Motions to

Dismiss, this Court holds no doubts that claim resolution through the bankruptcy process is in

the public interest.  First, as previously explained, a settlement trust benefits existing claimants—

whose time is valuable and may be limited due to their illnesses—by streamlining the claim

recovery process.  Additionally, a bankruptcy trust protects the needs of future talc claimants—

a class of individuals who have not yet developed symptoms or initiated litigation.   These

individuals will have very real injuries; however, their interests are largely unrepresented in the

tort system.  As noted by the court in *In re Bestwall LLC*, "a section 524(g) trust will provide all

claimants—including future claimants who have yet to institute litigation—with an efficient

means through which to equitably resolve their claims." 606 B.R. 243, 257 (Bankr. W.D.N.C.

2019).  Through adopted procedures, these trusts establish fixed criteria and common parameters

for payments to claimants, ensuring a level playing field for all present and future claimants

while taking into consideration the significance of preserving all due process rights. *See In re*

*W.R. Grace & Co.*, 729 F.3d 311, 324 (3d Cir. 2013) ("Therefore, as long as a court correctly

determines that § 524(g)'s requirements are satisfied, present and future claims can be channeled

to a § 524(g) trust without violating due process.").  Indeed, both present and future "claimant's

interests are protected by the bankruptcy court's power to use future earnings to compensate

similarly situated tort claimants equitably." *In re Federal-Mogul Glob., Inc.*, 684 F.3d at 359.

The Original TCC asserts that "there is no logical stopping point to the Debtor's strategy." *Objection of Original TCC* 92, ECF No. 142. It posits that "any rich company facing liabilities could completely stymie them simply by allocating them to a new entity and putting the entity into bankruptcy." *Id.* at 92-93. This argument was repeated at trial and Counsel for TCC I cautioned that extending the stay would "open the floodgate" for other companies to spin their liabilities off into a new company and then send that new company into bankruptcy. This position ignores statutory requirements, existing case law, and the courts' role in overseeing bankruptcies. First, a company—like Debtor—must invoke, and comply with, a statutory authority when engaging in corporate restructuring. Here, Debtor utilized the Texas Business Organizations Code to effect its divisional merger. While other companies can also utilize this statute, or another like it, those other companies must likewise follow procedures and requirements set forth in those statutes. Accordingly, a "rich company's" ability to effectuate the type of divisive merger present in this case is not unchecked or unregulated. Similarly, a company's ability to file for bankruptcy and—more significantly—a company's ability to extend the automatic stay to an affiliate nondebtor company are subject to limitation. *See, e.g.*, *McCartney*, 106 F.3d 506 (noting that automatic stay can be extended to nonbankrupt codefendants where "unusual circumstances" exist); *Robins*, 788 F.2d 994 (same); *In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249, at *5 (D. Del. Sept. 27, 2019) (collecting cases stating same). Finally, to the extent a "rich company" seeks to enter the bankruptcy system in bad faith or without a valid reorganization purpose, the courts serve as

gatekeepers for this type of abusive practice.

Ultimately, this Court determines that all factors weigh in favor of Debtor's position. The Court determines that a preliminary injunction pursuant to § 105(a) that extends the stay to the Protected Parties is appropriate given the circumstances of this case.

### F.  Public Policy

At the heart of the Objecting Parties' argument is the allegation that Debtor and J&J have unclean hands.  The Original TCC alleges both entities have engaged in bad faith and wrongful conduct that has caused further insult and injury to already-suffering talc claimants.  The Court makes no determinations as to Debtor's, Old JJCI's, or J&J's conduct in other proceedings. However, as to the case before it, this Court finds no ill-intent or reprehensible behavior.  The allegations of bad faith are insufficient to preclude Debtor from utilizing the bankruptcy system to achieve the goals it seeks—goals which this Court believes will ensure justice for existing and future talc claimants.

The Original TCC urges this Court not to use this case to "set new precedent." *Objection of Original TCC* 51, ECF No. 142.  However, as discussed in this Court's Opinion Denying the Motion to Dismiss, corporate transactions similar to the 2021 Corporate Restructuring were effectuated pre-bankruptcy filing in several other mass tort bankruptcies—even apart from the other similarly structured filings currently pending in the Western District of North Carolina.[12]

---

[12] *See, e.g.*, *In re Garlock Sealing Tech., LLC*, 10-31607 (Bankr. W.D.N.C. 2017); *In re Mid Valley, Inc.*, No. 03-25592 (Bankr. W.D.Pa. 2003); *In re Babcock & Wilcox Co.* No. 00-10992-10995 (Bankr. E.D. La, 2002).

The existence of those cases suggests that a ruling in favor of Debtor will not set entirely new precedent.

Moreover, the Court determines that the Original TCC's concerns regarding the consequences of a ruling in Debtor's favor are unfounded. The Original TCC characterizes a ruling in Debtor's favor as providing "a blueprint to transform the Bankruptcy Code into a tool for unbridled corporate greed and manipulation." *Objection of Original TCC* 3, ECF No. 142. As discussed in this Court's Opinion Denying the Motions to Dismiss, the Court does not share the Original TCC's outlook. Congress implemented § 524(g) and granted the bankruptcy court broad equitable powers under § 105(a) to serve a purpose under a specific set of circumstances. When companies can utilize that statute for their benefit and the benefit of existing and future claimants, they should be permitted to do so. Admittedly, the bankruptcy system—like the mass tort system, or any tool in the proverbial "toolbox"—is susceptible to abuse. However, this Court does not believe that mere potential for abuse requires removal of a tool from the toolbox. Instead, the potential for abuse demands stronger scrutiny. Thus, courts must conduct a fact-specific inquiry in each case and determine—among other things—whether an appropriate set of circumstances are present, whether an entity is in compliance with statutory regulations, whether a valid reorganization purpose exists, and whether innocent third parties will be unduly prejudiced. After considering those factors in the context of this case, the Court determines that extension of the automatic stay to the Protected Parties is warranted. Given that this determination is limited to the unique facts of the case presently before the Court, this ruling will not open the floodgates to an unchecked, unregulated, or inherently abusive method of addressing liability.

## IV.    Conclusion

For the reasons set forth above, the Court concludes that "unusual circumstances" are present warranting an extension of the automatic stay to the Protected Parties under § 362(a)(1) and (3).  To the extent § 362(a) does not serve as an independent basis for extension of the stay to nondebtor parties, the Court determines that a preliminary injunction under § 105(a) extending the automatic stay is appropriate.  The Court, thus, grants Debtor's Motion and resolves the instant adversary proceeding in Debtor's favor.  However, the Court concludes that taking measures in smaller steps will ensure that the parties progress in good faith towards mediation and plan formation.  The Court will revisit continuation of the automatic stay and preliminary injunction in 120 days, on June 29, 2022, and similar periods thereafter.

The Court understands that all sides are pointing fingers and suggesting that their adversaries will take advantage of these shorter periods of review and will endeavor to "run out the clock."  Let's be clear, the only clock of import sits on the Court's desk in Chambers and shows 1,869 days until retirement.  The Court is confident that it can outlast either side's efforts to slow-walk the proceedings and will not countenance such conduct.

The Court will enter a form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: February 25, 2022

54